CASE NO. 8:25-CV-2103-TDC (LEAD CASE)

# APPENDIX D — Rule 9019 Motion and Absence of Executed Settlement Agreement



FILED _____ ENTERED
_____ LOGGED _____ RECEIVED

JAN 1 2 2026

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY Night Drop Box DEPUTY

CASE NO. 8:25-CV-2103-TDC (LEAD CASE)

# APPENDIX D — Rule 9019 Motion and Absence of Executed Settlement Agreement



FILED        ENTERED
LOGGED       RECEIVED

JAN 1 2 2026

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY Night Drop Box DEPUTY

**APPENDIX D-1** Trustee's Motion for Approval of Proposed Compromise and Settlement (12/30/2024)
*(No executed settlement attached — Arguments II & V)*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | | |
|---|---|---|
| In re: | ) | |
| GREGORY B. MYERS, | ) | Case No. 15-26033-MCR |
| | ) | (Chapter 7) |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| BRIAN KING, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. No.:  24-00007 |
| | ) | |
| ROGER SCHLOSSBERG, TRUSTEE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### TRUSTEE'S MOTION FOR APPROVAL OF PROPOSED COMPROMISE
### AND SETTLEMENT WITH KING PLAINTIFFS

TO THE HONORABLE MARIA ELLENA CHAVEZ-RUARK, UNITED STATES
BANKRUPTCY JUDGE:

Defendant, Roger Schlossberg, Chapter 7 Trustee of the Bankruptcy Estate of Gregory B.

Myers (the "Trustee"), by his undersigned counsel, pursuant to Fed. R. Bank. P. 9019, and in

support of the instant *Motion for Approval of Proposed Compromise and Settlement with King*

*Plaintiffs* hereby respectfully represents as follows:

1.      As is set forth in the *Notice of Proposed Compromise and Settlement with King*

*Plaintiffs* filed contemporaneously herewith (the "*Notice*"), the Trustee proposes to enter into a

compromise and settlement of a pending dispute with the parties named therein. The background

of said dispute and the specific terms and conditions of said proposed compromise and settlement

are more particularly set forth in said *Notice*. A copy of said *Notice* is attached hereto and

incorporated by reference herein as ***Exhibit 1***.

2.      Pursuant to the provisions of Bankruptcy Rules 9019 and 2002, the *Notice* has been forwarded to all parties-in-interest herein as appears by reference to the *Certificate of Service* also filed contemporaneously herewith.

3.      If said proposed compromise and settlement is approved by this Court, the parties respectfully submit that this Court should entertain and enter an *Order* in substantially that form attached to the *Notice*.

4.      The parties believe that the above-described proposed compromise and settlement is in the best interests of all parties-in-interest herein and should be approved by the Court.

WHEREFORE, the Trustee respectfully requests that the proposed compromise and settlement be APPROVED.

Respectfully submitted,

SCHLOSSBERG | MASTRO

By:    /s/ Frank J. Mastro
        Frank J. Mastro #24679
        Roger Schlossberg
        P.O. Box 2067
        Hagerstown, MD 21742
        (301) 739-8610
        fmastro@schlosslaw.com
        *Attorneys for Defendant,*
        *Roger Schlossberg, Trustee*

2

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the **30th** day of **December 2024**, a copy of the *Trustee's*

*Motion for Approval of Proposed Compromise and Settlement with King Plaintiffs* and proposed

Order was served electronically via CM/ECF upon:

Maurice B. VerStandig, Esq.
The VerStandig Law Firm, LLC
1452 W. Horizon Ridge Pkwy., Suite 665
Henderson, NV 89012
mac@mbvesq.com
*Attorneys for Plaintiffs*

　　　　　　　　　　　　　　　　　*/s/ Frank J. Mastro*
　　　　　　　　　　　　　　　　　Frank J. Mastro

**APPENDIX D-2** Trustee's Notice of Proposed Compromise and Settlement
*(Notice deficiency; later ore tenus modification — Argument II)*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | |
|---|---|
| In re:<br>GREGORY B. MYERS,<br><br>Debtor. | )<br>)  Case No. 15-26033-MCR<br>)         (Chapter 7)<br>)<br>) |
| BRIAN KING, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ROGER SCHLOSSBERG, TRUSTEE,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)  Adv. No.:  24-00007<br>)<br>)<br>)<br>) |

## NOTICE OF TRUSTEE'S PROPOSED COMPROMISE
## AND SETTLEMENT WITH KING PLAINTIFFS

TO ALL PARTIES IN INTEREST:

PLEASE TAKE NOTE that Roger Schlossberg, Chapter 7 Trustee of the Bankruptcy Estate of Gregory B. Myers (the "Trustee"), and the Defendant in the above-captioned adversary proceeding, contemporaneously has filed his *Motion for Approval of Proposed Compromise and Settlement with King Plaintiffs* (the "*Settlement Motion*") seeking authority to compromise and settle the following described matter upon those terms and conditions hereinafter noted.

### Background

Gregory B. Myers ("the Debtor" or "Mr. Myers") filed a voluntary Chapter 11 bankruptcy petition on November 18, 2015 ("the Petition Date"). The Debtor remained in possession of the estate's assets and managed its financial affairs until February 22, 2017, when the case was

converted to a proceeding under Chapter 7 of the Bankruptcy Code . The Trustee thereafter was duly appointed as the Chapter 7 trustee herein.

In 2017, the Trustee was named as a nominal defendant in the matter of *Brian King, et al. v. Serv Trust, et al.*, Case No. 439677-V (the "King Case") then commenced in the Circuit Court for Montgomery County, Maryland ("the State Court");which case subsequently was consolidated with the related matter of *6789 Goldsboro LLC v. Serv Trust, et al.*, Case No. 451611-V (the "Goldsboro Case"; collectively, the King Case and the Goldsboro Case are hereafter referred to as "the State Court Cases"). Each of the State Court Cases concerns claims against Serv Trust, with the Goldsboro Case also concerning a claim against the Debtor.

In the King Case, which was designated the "lead" case in the State Court Cases, Brian King, Cristina King, and the Cristina and Brian King Children's Trust (the "King Plaintiffs") sought declaratory judgments that Serv Trust, a Maryland statutory trust, is the alter ego of the Debtor and, further, that Serv Trust's interest in 6789 Goldsboro LLC ("Goldsboro") has been redeemed by Goldsboro in accordance with the entity's governing documents.

In the Goldsboro Case, Goldsboro sued Serv Trust and the Debtor for the alleged breach of a promissory note and guaranty, respectively, and sought an award of monetary damages in excess of $1 million, including accrued interest.[1] The Goldsboro Case originally was brought as

---

[1] The factual milieu out of which the Goldsboro Case arose included the request of the Debtor, in his then-capacity as a co-trustee of Serv Trust, that Goldsboro make pre-petition loans totaling $635,000 to Serv Trust, which then forwarded the funds to the Debtor and his wife. On May 18, 2015, in connection with the foregoing loans, Serv Trust executed a Promissory Note in favor of Goldsboro while the Debtor executed a Guaranty Agreement in which he guaranteed Serv Trust's repayment of the loans made by Goldsboro. The Debtor, however, did not list Goldsboro as an unsecured creditor when he filed his bankruptcy petition six months later; which omission was one of the grounds upon which this Court denied a discharge to the Debtor under 11 U.S.C. § 727(a)(4)(A). *See In re Myers*, 2018 WL 4701387, *8 (Bankr. D. Md. Sept. 28, 2018) ("It is not believable that [the Debtor] simply forgot to include his largest unsecured creditor in the first several versions of his schedules when he had executed a personal guarantee in favor of that creditor six months prior to filing for bankruptcy and was requesting advances from the creditor up to and after filing his petition.").

an adversary proceeding in this Court, *see 6789 Goldsboro LLC v. Myers, et al.*, Adv. No. 18-407,
but this Court entered an *Order of Abstention* on January 30, 2019 which ultimately led to the
matter being refiled in State Court.

A trial in the consolidated State Court Cases was scheduled to commence on Tuesday,
January 3, 2023. However, at approximately 4:30 p.m. on Friday, December 30, 2022 – just
minutes before the close of business on the last business day before trial – the Debtor filed a notice
of removal purporting to remove the action to the U.S. Bankruptcy Court for the Middle District
of Florida, where the Debtor's later-filed and separate Chapter 13 case was pending at the time.[2]
The King Plaintiffs immediately filed an emergency motion to remand, noting the various
infirmities and inherent bad faith associated with Debtor's attempted removal at the eleventh-hour.
On the morning of January 3, 2023, the Florida bankruptcy court remanded the case back to the
Circuit Court for Montgomery County in time to allow for the trial of the State Court Cases to
proceed as scheduled.

Following the conclusion of the trial on January 3, 2023 – at which evidence was presented
showing that, *inter alia*, the Debtor and his wife received the extraordinary sum of $1,217,675.00
out of the $1,371,271.58 distributed by Serv Trust between March 10, 2011 and January 6, 2018
– or more than 88% thereof – the State Court adjudicated Serv Trust to be the alter ego of the
Debtor as of and subsequent to the Petition Date. In a subsequent written order entered on January
12, 2023 ("the *Alter Ego Order*"), the State Court memorialized its ruling, holding, *inter alia*, that

---

[2] The Debtor's Florida bankruptcy case ultimately was dismissed on January 20, 2023. On that day, the
U.S. Bankruptcy Court for the Middle District of Florida *sua sponte* entered an order which denied
confirmation of the Debtor's proposed Chapter 13 plan, dismissed his Chapter 13 case with prejudice, and
imposed a two-year bar on refiling, following the court's determination that Myers filed his Chapter 13
case in bad faith (as a tactic to delay and frustrate his creditors rather than as a means to repay them). *See
In re Myers*, 2023 WL 350183 (Bankr. M.D. Fla. Jan. 20, 2023).

"Serv Trust is, and as of November 18, 2015 was, the alter ego of Gregory B. Myers" and that "Serv Trust is a disregarded entity, being the alter ego of Mr. Myers."

In its ruling, the State Court stayed all further proceedings in the State Court Cases as its determination that Serv Trust is the alter ego of the Debtor necessarily rendered the automatic stay of 11 U.S.C. § 362(a) effective as to all remaining causes of action therein. The State Court reasoned that, in light of its alter ego ruling, all claims against Serv Trust must be construed as claims against the Debtor's bankruptcy estate ("the Estate"). *Id.* As a result, the King Plaintiffs' remaining claim against Serv Trust, which seeks a declaration regarding the alleged redemption of Serv Trust's interest in Goldsboro (the "Redemption Claim"), was stayed by operation of 11 U.S.C. § 362(a) (as were Goldsboro's separate claim against Serv Trust in the Goldsboro Case along with its previously stayed claim therein against the Debtor).

Further, as a matter of law, immediately upon entry of the *Alter Ego Order*, Serv Trust and all of its assets became property of the Estate, pursuant to 11 U.S.C. § 541(a), subject to administration by the Trustee as the sole legal representative of the Estate pursuant to 11 U.S.C. § 323. As the *Alter Ego Order* has not been stayed and remains in full force and effect, the Trustee is now the sole person empowered to defend or otherwise act to deal with the remaining claims against Serv Trust in the State Court Cases, which by operation of law are now claims against the Estate.

On February 7, 2023, the Trustee filed in this Court a *Motion for Approval of Proposed Compromise and Settlement with Brian King, Cristina King, and the Cristina and Brian King Children's Trust* (the "*Settlement Procedures Motion*"), [Dkt. #1005], which sought approval of a procedural resolution that would enable the litigation of the Redemption Claim in this Court. The proposed settlement consisted of the following elements:

(1)     The King Plaintiffs and the Trustee would jointly file a stipulation in the State Court Cases pursuant to which the King Plaintiffs would dismiss without prejudice the Redemption Claim against Serv Trust;

(2)     In consideration of the foregoing dismissal, the Trustee would agree to toll the statute(s) of limitation applicable to the Redemption Claim *nunc pro tunc* to September 14, 2017, the date the King Case was filed in the State Court; and

(3)     The King Plaintiffs and the Trustee would endeavor in good faith to negotiate a resolution to the Redemption Claim and, if negotiations were not successful, the King Plaintiffs would refile the Redemption Claim as an adversary proceeding in this Court within thirty (30) days after the entry of an order approving the settlement.

On February 28, 2023, the Debtor filed a motion to dismiss or strike the Trustee's *Settlement Procedure Motion* ("the *Motion to Strike*"). [Dkt. #1010]. On March 14, 2023, the Trustee filed an opposition to the Debtor's *Motion to Strike*. [Dkt. #1013]. On December 11, 2023, this Court entered a detailed memorandum opinion and *Order* granting the Trustee's *Settlement Procedures Motion* and denying the Debtor's *Motion to Strike*. [Dkt. #1029].

Subsequent settlement negotiations between the parties failed to yield a settlement and, on January 11, 2024, the King Plaintiffs re-filed the Redemption Claim as an adversary proceeding in this Court ('the Adversary Case'). [Adv. Dkt. #1]. The Trustee filed an answer to the adversary complaint on April 15, 2024, [Adv. Dkt. #13], and the Court subsequently issued a *Scheduling Order* on April 26, 2024. [Adv. Dkt. #15].[3]

As the Adversary Case progressed, the King Plaintiffs and the Trustee resumed settlement negotiations. This latest round of negotiations ultimately proved to be fruitful as the parties now have agreed to the following compromise and settlement, subject to notice to creditors and approval by the Court, on the terms and conditions described below.

---

[3] On May 7, 2024, the King Plaintiffs and the Trustee filed a stipulation in the State Court Cases dismissing the Redemption Claim without prejudice.

## Proposed Compromise and Settlement

The Trustee and the King Plaintiffs have agreed as follows:

(1) The King Plaintiffs will pay to the Trustee, for the benefit of the Estate, the sum of $150,000.00 (the "Settlement Payment") upon Court approval of the settlement, in order to redeem the entirety of Serv Trust's interest in Goldsboro and settle the Redemption Claim in the Adversary Case;

(2) Upon successful negotiation of the Settlement Payment by the Trustee, the parties will file a Stipulation of Dismissal in the Adversary Case dismissing all claims therein with prejudice; and

(3) The King Plaintiffs also will reimburse the Trustee for all reasonable legal fees and expenses that the Trustee incurs in connection with the litigation of any appeals taken by any party in the event that the *Settlement Motion* is granted by this Court (the "Appellate Legal Fees").

## Trustee's Analysis and Recommendation

For the reasons set forth below, the Trustee, in the sound exercise of his judgment, believes that the above-proposed compromise and settlement is in the best interest of the Estate and all interested parties herein and should be approved.

### A.   Applicable Legal Standards.

Bankruptcy Rule 9019(a) empowers a bankruptcy court to approve a compromise or settlement brought before it on motion by the trustee. Fed. R. Civ. P. 9019(a). In order to approve a settlement, a court must consider the following factors: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors. *In re Essex Constr., LLC*, 575 B.R. 648, 652-53 (Bankr. D. Md. 2017); *see also In re Bowman*, 181 B.R. 836, 843 (Bankr. D. Md. 1995).

It is not necessary for a bankruptcy court to conduct a "mini trial" or conclusively determine claims subject to a compromise. *See In re New Concept Housing, Inc.*, 951 F.2d 932, 939 (8th Cir. 1991); *In re Ashford Hotels, Ltd.*, 226 B.R. 797, 802 (S.D.N.Y. 1998). Nor is it necessary for the court to find that the proposed settlement constitutes the best result obtainable. *See In re Final Analysis, Inc.* 417 B.R. 332, 341-42 (Bankr. D. Md. 2009). Rather, the court need only canvass the issues to determine that the proposed settlement does not fall below the lowest point of reasonableness. *Id.* In doing so, the court does not substitute its judgment for that of the trustee. *See In re Bates*, 211 B.R. 338, 343 (Bankr. D. Minn. 1997). Ultimately, a bankruptcy court's decision to approve or reject settlement may be reviewed only for an abuse of discretion. *In re ASI Reactivation, Inc.*, 934 F.2d 1315, 1323-24 (4th Cir. 1991).

**B.    Analysis of the King Plaintiffs' Redemption Claim in the Adversary Case.**

The Trustee has thoroughly reviewed the available evidence related to the Redemption Claim asserted by the King Plaintiffs in the Adversary Case and evaluated the potential merits of the King Plaintiffs' request for a declaration that Serv Trust's interest in Goldsboro previously was fully redeemed by the King Plaintiffs. The Trustee also has evaluated the potential defenses available to him, including those defenses and arguments that previously were asserted by Serv Trust during the litigation of the State Court Cases.

It is the Trustee's informed opinion that he has a dim likelihood of prevailing on the merits should the Redemption Claim be tried in the Adversary Case. Thus, if the King Plaintiffs are successful in the Adversary Case, Serv Trust's interest in Goldsboro will be declared to have been redeemed, rendering this asset worthless to the Estate. The proposed compromise and settlement, by contrast, allows the Trustee to obtain a significant recovery for the Estate while limiting the Estate's exposure to the further expenditure of attorney's fees and litigation costs. A detailed explication of the Trustee's analysis is provided below.

1.      **Relevant Background Regarding the Redemption Claim.**

In or about late 2012, the Debtor discovered a parcel of real property located at 6789 Goldsboro Road in Bethesda, Maryland (the "Property") that he thought would be suitable for development.[4] On the recommendation of an acquaintance, the Debtor approached Mr. King about financing the acquisition of the Property. At that time, the Debtor was heavily indebted to a myriad of creditors and facing the clear prospect of bankruptcy. He thus sought to conceal his involvement with, and investment in, the Property by acting through Serv Trust, his alter ego.

The Debtor, acting through Serv Trust, and the King Plaintiffs then formed the Goldsboro entity. Goldsboro's Operating Agreement provides for the King Plaintiffs, as Class A members of the LLC, to put up almost all of the money needed to acquire the Property and fund its development while affording Serv Trust (*i.e.*, the Debtor), the sole Class B member of the LLC, a period of three (3) years in which to make the project profitable or risk having its "sweat equity" redeemed by the King Plaintiffs. Goldsboro ultimately purchased the Property on July 18, 2013 for the price of $1.35 million.

Goldsboro's Operating Agreement provides that if all governmental approvals needed to subdivide the Property into at least nineteen (19) townhouse dwellings are not obtained by July 18, 2016, and the Class A members of Goldsboro do not elect to sell the Property, the Class A members may have the Property appraised in accordance with the terms of the Operating

---

[4] 6789 Goldsboro Road is a 5.23-acre parcel in Bethesda near MacArthur Boulevard and Glen Echo Park. The parcel is perhaps best known for its white, ranch-style mansion that was built in 1935 and was the former residence of Hollywood starlet, Ilona Massey, and her husband, Air Force Maj. Gen. Douglas Dawson, a prominent aide to President Harry S. Truman. *See 19 Townhouses May Replace Bethesda Home of Hungarian Star*, WTOP News (Sept. 19, 2014) (available at https://wtop.com/news/2014/09/19-townhouses-may-replace-bethesda-home-of-hungarian-star/).

Agreement.[5] If the appraised value of the Property is found to be less than the monies invested by

the Class A members, the Class A members may cause Goldsboro to redeem the Class B member's

interests in consideration of the company's prior distributions or other payments to the Class B

member.

Unfortunately for Goldsboro, the necessary government approvals to permit the

development of 19 townhomes on the Property were not obtained by July 18, 2016, or at any time

thereafter. The Debtor, meanwhile, had become more cash-strapped as the project progressed,

leading him to request that Mr. King contribute additional funds to Goldsboro which could then

be loaned to Serv Trust and, in turn, to the Debtor, personally, in order to help him defray his

ongoing personal expenses. Mr. King agreed and authorized Goldsboro to loan several hundred

thousand dollars to the Debtor/Serv Trust. *See* footnote 1, *supra*.

In September of 2016, the King Plaintiffs offered to purchase Serv Trust's Class B shares

for the sum of $2 million less repayment of the outstanding loan obligations Serv Trust owed to

Goldsboro (for the loans received by Serv Trust for the Debtor's personal benefit). The King

Plaintiffs' offer was memorialized in a Memorandum of Understanding ("MOU"), which required:

(i) that the offer be accepted by September 12, 2016; and, (ii) if accepted, that closing occur by not

later than October 7, 2016. Serv Trust, however, did not accept the MOU by September 12, 2016

and closing did not occur by October 7, 2016.

Several months later, in January 2017, after government officials had denied Serv Trust's

bid to develop 19 townhouses on the Property, the Debtor emailed a copy of an executed MOU to

---

[5] The Operating Agreement provides that an appraisal of the Property occurs, *inter alia*, when the Class A members notify the Class B member of a demand for appraisal of the Property. Each class of members then has fifteen (15) days to appoint an MAI appraiser. If the two selected appraisers cannot agree on the value of the Property, then they shall appoint a third appraiser to undertake an additional appraisal to determine the value of the Property.

Mr. King and claimed that Serv Trust had timely accepted the buy-out offer. Mr. King rejected the

belated tender of an executed MOU and, soon afterward, terminated the Debtor's role as manager

of Goldsboro.

The King Plaintiffs then undertook to have the Property appraised. The appraisal obtained

by the King Plaintiffs valued the Property as being worth between $1,000,000 and $1,325,000,

which was far less than the approximately $3 million that the King Plaintiffs had invested in the

project to that point in time.

On or about August 23, 2017, the King Plaintiffs formally notified Serv Trust of their

election to have the Property appraised for purposes of determining the redemption value of Serv

Trust's interest in Goldsboro and appointed an appraiser pursuant to the terms of the Operating

Agreement. Serv Trust, however, did not respond as required under the Operating Agreement by

appointing its own appraiser in response to the election made by the King Plaintiffs.

In the absence of a counter-appraisal by Serv Trust, and given that the appraisal obtained

by the King Plaintiffs shows that the value of the Property is well-below the amount invested by

the King Plaintiffs, the King Plaintiffs contend that this Court should declare that Serv Trust's

interest in Goldsboro has been redeemed in consideration of prior distributions/payments to Serv

Trust, pursuant to the Operating Agreement.

**2.      Analysis of the Trustee's Potential Defenses to the Redemption Claim.**

The Trustee has concluded that the potential defenses to the Redemption Claim are not

likely to be found to be meritorious.

**a.      Whether the King Plaintiffs Properly Invoked and Followed the
Appraisal Procedures in the Operating Agreement.**

Serv Trust argued in the State Court Cases that the King Plaintiffs did not properly follow

the appraisal procedures set forth in the Operating Agreement because: (a) their appraisal was

dated six (6) days prior to the date they formally notified Serv Trust of their election to have the Property appraised; and (b) Serv Trust never appointed an appraiser. With respect to Serv Trust's first contention, the Trustee observes that there is nothing in the Operating Agreement which mandates that an appraisal must be performed *after* notice of an election is given. Rather, the Operating Agreement states that the appraisers selected by each party are to meet to determine whether they agree on the value of the Property. If they agree, the appraisers are to draft a joint report stating the value of the Property. If they disagree, the appraisers are to draft separate reports. The appraisers, however, are not precluded by the Operating Agreement from basing their opinion, or their separate report, on an appraisal conducted prior to the notice of election.

As to the second contention of Serv Trust advanced in the State Court Cases to the effect that it could prevent a redemption simply by refusing to appoint an appraiser, or by declining to cooperate in the appraisal process, the Trustee notes that the same violates the common law rule obligating parties to a contract to act in good faith with respect to their dealings thereunder. Pellucidly, the actions of Serv Trust in urging that that it effectively could render the appraisal provisions of the Operating Agreement nugatory simply by ignoring them constitutes the very essence of bad faith. The Operating Agreement afforded Serv Trust the right to appoint its own appraiser to value the Property in the event the appraisal process was invoked by the King Plaintiffs. By failing to appoint its own appraiser, Serv Trust arguably waived its right to participate in the appraisal process set forth in the Operating Agreement. *See, e.g., BarGale Indus., Inc. v. Robert Realty Co.*, 275 Md. 638, 643, 343 A.2d 529, 533 (1975) ("waiver is the intentional relinquishment of a known right... It is elementary that either party to a contract may waive any

of the provisions made for his benefit").[6] Without a competing appraisal to challenge the appraisal performed by the King Plaintiffs' appraiser, there effectively was no disagreement among the parties as to the value of the Property (and, thus, no need for a third appraiser to become involved in the process). Thus, any argument that the King Plaintiffs did not adhere to the appraisal procedures set forth in the Operating Agreement is unlikely to succeed.[7]

      **b.**      **Whether Serv Trust Accepted the King Plaintiffs' Buy-Out Offer in the MOU.**

Next, any argument that Serv Trust accepted the buy-out offer memorialized in the MOU also is not likely to succeed. The MOU, by its express terms, required that the offer be accepted by September 12, 2016 and, if accepted, that closing occur by not later than October 7, 2016. Although the Debtor claimed in the State Court Cases that he timely signed the MOU on September 12, 2016 and thereafter mailed it to Mr. King, the Debtor's behavior after September 12, 2016 belies those representations. The Debtor made no effort to draft closing documents (nor did Mr. King, for that matter). There are no email communications from the Debtor acknowledging, or otherwise indicating, that the MOU was accepted (and no original, signed document was ever received by Mr. King). Rather, the email communications between the parties subsequent to Sept. 12, 2016 are focused on meetings with attorneys and advisors in connection with a possible resubmission to local authorities of Goldsboro's proposal to subdivide the Property (which would be of no concern to the Debtor if he, in fact, had timely accepted a buy-out). In any event, closing

---

[6] Unsurprisingly, the King Plaintiffs seek a declaration in the Adversary Case, that "Serv Trust waived its right to appoint an alternative appraiser under the Operating Agreement by not doing so on or before September 11, 2017."

[7] The Trustee suspects that Serv Trust chose not to appoint its own appraiser because it knew that any competent appraiser would not value the Property anywhere near $3 million invested by the King Plaintiffs, where there was no ability to subdivide the parcel in the manner sought by Goldsboro (in light of the denial of such subdivision approval by governmental authorities).

never occurred by the October 7, 2016 deadline expressed in the MOU (and there are no communications agreeing to extend the deadline).

The Trustee also notes that in order for this defense to prevail, the Trustee would have to call the Debtor as a witness at trial and the finder of fact would have to credit the Debtor's testimony against the foregoing evidence to the contrary. For the reasons discussed in greater detail below, the Debtor has no credibility as a witness and it is, therefore, extremely likely – if not certain – that this defense will fail.

      c.      **Whether the King Plaintiffs Needed to Obtain Serv Trust's Consent in Order to the Redeem Serv Trust's Interest in Goldsboro.**

Lastly, Serv Trust argued in the State Court Cases that Goldsboro could not redeem Serv Trust's interest without Serv Trust's consent.[8] This argument deserves short shrift as the Operating Agreement expressly provides, in relevant part, that "the *Class A Members shall have the unilateral right and authority (without the consent of the Class B Member)* to cause the Company to redeem the Class B Member's Membership Rights solely in consideration for the Company's previous distributions or other previous payments to the Class B Member" in the event that the appraised value of the Property is less than the Class A Members' cumulative investment.

      3.      **The Debtor's Lack of Credibility as a Witness.**

In any potential trial of the Adversary Case, the Debtor almost certainly would have to be called as a witness and, therefore, the credibility of any testimony he would give would be critically important to the Trustee's case. In light of this most critical element of any prospective trial in this cause, the Trustee has assessed the credibility of the Debtor in connection with his evaluation of the merits of the proposed compromise and settlement.

---

[8] Serv Trust suggested that the King Plaintiffs were required to call a meeting of Goldsboro's members at which the members would need to vote on whether to approve the redemption of Serv Trust's interest in Goldsboro.

The Trustee, individually and through counsel, has had the opportunity to observe the Debtor's demeanor on numerous occasions, both in court and outside of court. The Trustee has seen the Debtor address the Court and provide testimony in various contested matters and adversary proceedings over the course of this Chapter 7 case (and in the myriad of Chapter 13 cases filed by the Debtor and his spouse, Barbara Ann Kelly). The Trustee and his counsel also have had the opportunity to question the Debtor outside of court in depositions, in Rule 2004 examinations, and in § 341 examinations. The Trustee and his counsel also have reviewed transcripts of testimony the Debtor has given in other forums in other matters.

It is the Trustee's firm opinion that the Debtor is not a credible witness. The Debtor frequently is evasive when responding to questions and seldom gives a candid answer.[9] Indeed, the Debtor's penchant for giving conflicting testimony is well-documented. *See, e.g., United States Trustee's Pre-Trial Statement*, Adv. No. 17-193, Dkt. #56, at p. 3 ("At the Meeting of Creditors, [the Debtor] testified that the monies he and Kelly received from Serv Trust were distributions for the benefit of their children, who are beneficiaries of Serv Trust. At his 2004 examination, the Debtor testified that the monies he and Kelly received from Serv Trust were loans, not distributions."); *Mem. Op.*, Adv. No. 17-193, Dkt. #94, at p. 21 ("Similarly, the line item for the Bethesda Property in the amount $3,860.96 included on his First Amended Schedule J conflicted with his 341 Meeting testimony that he was not making any post-petition payments on that property either.").

---

[9] This Court made similar observations when it converted the Debtor's case to Chapter 7. *See* Tr. of February 15, 2017 Hearing (Dkt. #711) at p. 301 ("It's troublesome to me that there were major omissions and major errors, and they were not brought to the foreground by the Debtor until caught... I do feel [it's] troublesome, especially because there was some obfuscation, that is refusal to answer certain questions, that might have revealed this. And that is troublesome.").

Further, this Court's previous determination "that Myers knowingly and fraudulently made false oaths in his bankruptcy case sufficient to deny him a discharge under § 727(a)(4)(A)," *see In re Myers*, 2018 WL 4701387, *8 (Bankr. D. Md. Sept. 28, 2018)," weighs heavily against the Debtor's credibility. *See also id.* at * 11 ("The numerous falsities indicate a cavalier attitude toward his schedules and a reckless disregard for the truth sufficient to deny him a discharge under § 727(a)(4)(A). His lack of candor and credibility left his creditors, the United States Trustee, and the Chapter 7 Trustee constantly playing catch up to get an understanding of his finances.").

Moreover, numerous courts, including this one, have concluded that the Debtor is a bad faith litigant which, in turn, further calls into question his trustworthiness and veracity. *See, e.g., In re Kelly*, 656 B.R. 541, 603 (Bankr. D. Md. 2023) ("Ms. Kelly filed this case as part of her and Mr. Myers' ongoing scheme to frustrate, hinder, and delay creditors and to cause creditors as much pain as possible along the way. This case is just the latest leg in a long journey designed to exploit and subvert the bankruptcy process."); *Kelly v. McNamee, Hosea, Jernigan, Kim, Greenan & Lynch, P.A.*, 2022 WL 861395, *3-4 (D. Md. Mar. 23, 2022) ("First, the Court finds that Appellants Barbara Ann Kelly and Gregory B. Myers are acting in bad faith… It is plainly clear to this Court that Appellants' appeal tactics have delayed the adjudication of these matters and have prejudiced Appellees by having to incur costs and fees in responding to these appeals."); *Myers v. McNamee, Hosea, Jernigan, Kim, Greenan & Lynch, P.A.*, 2020 WL 758151, *3, 5 (D. Md. Feb. 14, 2020) ("Myers has undoubtedly used (and abused) the judicial process to prolong proceedings in the bankruptcy matter and thus delay liquidation and distribution of Myers' assets… In this Court's view, Myers once again attempts, seemingly in bad faith, to manufacture further delay in the resolution of his claims.").

Accordingly, the Trustee believes that the Debtor is completely untrustworthy and offers no utility as a witness. As a result, the Trustee would not be materially aided by eliciting testimony

USDC - BALTIMORE MD
26 JAN 12 PM 11:56

**APPENDIX E-1** Transcript of Evidentiary Hearing – Day 1 (6/30/2025)
*(No testimony re execution of settlement; jurisdictional admissions — Arguments I & II)*

1                   UNITED STATES BANKRUPTCY COURT
                    FOR THE DISTRICT OF MARYLAND
2                        Greenbelt Division

3    In Re:                          Case No. 15-26033

4    GREGORY B. MYERS,               Chapter 7

5              Debtor.               Greenbelt, Maryland
                                     Monday, June 30, 2025
6    : : : : : : : : : : : : : :

7    BRIAN KING, ET AL.,             Adv. Proc. 24-00007

8              Plaintiffs.

9    v.

10   ROGER SCHLOSSBERG,

11             Defendant.

12   : : : : : : : : : : : : : : :  : : : : : : : : : : : : : : : :

13

14                   TRANSCRIPT OF HEARING ON

15                     RE: 24-00007
     17 APPLICATION TO COMPROMISE CONTROVERSY FILED BY DEFENDANT
16                       ROGER SCHLOSSBERG
          19 OBJECTION FILED BY DEBTOR GREGORY B. MYERS
17   20 MOTION FOR MISCELLANEOUS RELIEF FILED BY DEFENDANT ROGER
                           SCHLOSSBERG
18      22 SUPPORT DOCUMENT FILED BY DEBTOR GREGORY B. MYERS
          23 RESPONSE FILED BY DEBTOR GREGORY B. MYERS
19        24 RESPONSE FILED BY DEFENDANT ROGER SCHLOSSBERG

20                     RE: 15-26033
     1051 OBJECTION TO CLAIM FILED BY DEBTOR GREGORY B MYERS
21   1052 OBJECTION TO CLAIM FILED BY DEBTOR GREGORY B MYERS
     1053 OBJECTION TO CLAIM FILED BY DEBTOR GREGORY B MYERS
22    1060 OPPOSITION FILED BY INTERESTED PARTY BRIAN KING,
                 INTERESTED PARTY CRISTINA KING
23
         BEFORE THE HONORABLE MARIA ELLENA CHAVEZ-RUARK,
24                UNITED STATES BANKRUPTCY JUDGE

25



2

```
 1    APPEARANCES:

 2    For Roger Schlossberg,          Frank J. Mastro, Esq.
      Chapter 7 Trustee:              Roger Schlossberg, Esq.
 3                                    SCHLOSSBERG & MASTRO
                                      18421 Henson Boulevard
 4                                    Suite 201
                                      Hagerstown, MD 21742
 5
      For Brian King:                 Maurice B. VerStandig, Esq.
 6                                    THE VERSTANDIG LAW FIRM, LLC
                                      9812 Falls Road
 7                                    Suite 114-160
                                      Potomac, MD 20854
 8
      Also Present:                   Gregory B. Myers
 9                                    Pro Se Debtor

10

11

12

13

14

15

16

17

18
      Audio Operator:                 Jennifer Whitfield
19                                    (301)344-3965

20
      Transcript prepared by:         ESCRIBERS
21                                    7227 North 16th Street
                                      Suite #207
22                                    Phoenix, Arizona 85020
                                      (800)257-0885
23

24    Proceedings recorded by electronic sound recording; transcript
      produced by transcription service.
25
```

```
 1                    GREENBELT, MARYLAND - JUNE 30, 2025

 2             THE CLERK:  All rise.  Silence, please, and come to

 3     order.  The United States Bankruptcy Court for the District of

 4     Maryland is now in session, the Honorable Maria Ellena Chavez-

 5     Rurak presiding.

 6             Please be seated.  Calling the case of Gregory B.

 7     Myers, case number 15-26033.  The matters for consideration

 8     for the Court today are docket entry 1051, objection to claim

 9     number 22, filed by the debtor, docket entry 1052, objection

10     to claim number 23, filed by the debtor, docket entry 1053,

11     objection to claim number 21, filed by the debtor, and docket

12     entry 1060, opposition to objections, filed on behalf of the

13     King parties.

14             And we're also calling adversary number 24-00007,

15     King, et al. v. Schlossberg.  The matters before the Court are

16     docket entry 17, application to compromise controversy, filed

17     on behalf of the defendant, docket entry 19, preliminary

18     objection to trustee's application to compromise controversy

19     filed by the debtor, docket entry 22, supplement to

20     preliminary objection, filed by the debtor, docket entry 20,

21     motion to strike debtor's objection, filed on behalf of the

22     defendant, docket entry 23, response to motion to strike,

23     filed by the debtor, and docket entry 24, response to

24     opposition filed on behalf of the defendant.

25             Starting with counsel for the plaintiffs, please
```

4

1    state your name and clients for the record.

2            MR. MASTRO:  Good morning, Your Honor.  Frank Mastro

3    on behalf of the Chapter 7 trustee, Roger Schlossberg.

4            THE COURT:  Good morning.

5            MR. SCHLOSSBERG:  Good morning, Your Honor.  Roger

6    Schlossberg, trustee, counsel to the trustee.

7            THE COURT:  Good morning.

8            MR. VERSTANDIG:  Good morning, Your Honor.  Maurice

9    VerStandig on behalf of Brian King, Cristina King, and Brian

10   and Cristina King in their capacity as trustees of the

11   Cristina and Brian King Children's Trust.

12           THE COURT:  Good morning to you.

13           MR. MYERS:  Good morning, Your Honor.  Gregory Myers.

14           THE COURT:  Good morning, Mr. Myers.

15           MR. MYERS:  Morning.

16           THE COURT:  All right.  Well, we have a number of

17   matters on the docket for today.  We have, in the main

18   bankruptcy case, Mr. Myers' objections to the three claims

19   filed by we'll just refer to them as the King parties.  And

20   then in the adversary proceeding, we have the application to

21   compromise controversy filed by the trustee and a motion to

22   strike the debtor's objection to the trustee's motion.

23           The Court understands that there was also a motion to

24   intervene filed by Mr. Myers and a motion to dismiss the

25   adversary proceeding filed by Mr. Myers.  Apparently, they

1    were filed after business hours on Friday evening and were

2    just docketed literally just moments ago.  So I don't know if

3    the plaintiff and -- the plaintiffs and the defendant have had

4    an opportunity to look at that.  The Court is not going to

5    consider the motion to intervene or the motion to dismiss

6    today because they were just filed.

7            With regard to the motion to strike, and the Court

8    has given Mr. Myers an opportunity to be heard on other

9    matters, but the Court is going to deny the motion to strike

10   filed by the trustee.

11           So Willemain v. Kivett, 764 F.2d 1019, decided by the

12   Fourth Circuit in 1985 --

13           Please, everyone, have a seat.  I'm sorry.  You don't

14   have to continue standing.

15           The court set forth the well-known rule that when a

16   Chapter 7 case has an insolvent debtor, that the debtor -- or

17   has an insolvent bankruptcy estate, that the debtor does not

18   have a right to be heard.  Here, Mr. Myers has been denied a

19   discharge or his discharge was revoked.  And therefore, to the

20   extent any claims are not discharged in the bankruptcy

21   proceeding, he has a pecuniary interest.  So the Court is

22   going to give him an opportunity to be heard.

23           Let me cite to a couple of cases.  Grausz v.

24   Englander, 321 F.3d 467, out of the Fourth Circuit, 2003.

25   McGuirl v. White, 86 F.3d 1232, out of the D.C. Circuit, 1996.



1    And In re: Byrd, decided by Judge Catliota of this court, 2011

2    WL 589907, decided on February 10th, 2011, which was affirmed

3    in the decision Byrd v. Johnson, 467 B.R. 832, out of the

4    District of Maryland, 2012, and also affirmed in In re: Byrd,

5    484 Fed.Appx. 845, out of the Fourth Circuit, 2012.

6           And so those cases say that Willemain v. Kivett does

7    not apply where a debtor is denied a discharge because

8    bankruptcy actions could have an effect on the amount of the

9    discharge claims that the debtor remains obligated to pay once

10    the automatic stay is terminated.

11           So for all of those reasons, the Court is going to

12    deny the motion to strike and allow Mr. Myers an opportunity

13    to be heard.

14           All right.  So that leaves us with the application to

15    compromise controversy and the three claim objections.  I

16    propose that we put witnesses on the stand one time, instead

17    of having them on the stand and then off.  So the Court

18    proposes that we hear the application and the claim objections

19    together.

20           Let me start by asking the plaintiffs and the

21    defendant if they have anything to say before the Court

22    continues.

23           MR. VERSTANDIG:  Your Honor, no objection to doing so

24    in that manner.  I would note, if the application to

25    compromise is granted, my clients will withdraw the three



1    claims upon entry of an order granting the application

2    becoming a final order beyond any appellate deadline.

3            THE COURT: All right. Thank you, Mr. VerStandig.

4            Mr. Mastro, is there anything you'd like to say

5    before the Court continues?

6            MR. MASTRO: We have no objection to proceeding in

7    the fashion that Your Honor has outlined.

8            THE COURT: All right. Mr. Myers, you're standing.

9    What would you like to say?

10           MR. MYERS: Yes, Your Honor. Preliminary matter.

11   There was a complaint demand for trial by jury filed this

12   morning against you in your official capacity, Ramona D.

13   Elliott, Roger Schlossberg, Frank Mastro, Schlossberg &

14   Associates, P.A., and Maurice VerStandig. And there was also

15   a motion to disqualify you that was filed in my bankruptcy

16   case -- well, in this adversary and my bankruptcy case,

17   predicated upon this complaint demand for jury trial being

18   filed.

19           You have a per se conflict of interest. It's not

20   even bias and prejudice. It goes far beyond that. And for

21   those reasons, I don't believe you can hear this matter. I

22   believe you need to recuse yourself, and another judge needs

23   to take this matter up. And that's a matter that I believe

24   needs to be heard before anything else can be heard in this

25   case.

1          Additionally, if I understood the -- well, I'll leave

2     that first.  And then if I understood, did you suggest the

3     order is they do their --

4          THE COURT:  We're doing it all together, Mr. Myers.

5          MR. MYERS:  But something was after something,

6     according to what Mr. VerStandig said?

7          THE COURT:  Mr. VerStandig said that his clients will

8     withdraw their claims if the settlement is approved.

9          MR. MYERS:  Okay.  Will their claims go first, the

10    claim objections to their claims?

11         THE COURT:  The Court's going to hear them together.

12         MR. MYERS:  Well, they won't have any standing in the

13    adversary if they don't have a claim.

14         THE COURT:  That's not true, Mr. Myers.  Thank you.

15         MR. MYERS:  Okay.  Well --

16         THE COURT:  With regard to your -- as I've told you

17    numerous times, if you file something moments before a hearing

18    is scheduled to begin, the Court does not have time to

19    consider it.  This hearing has been scheduled for almost two

20    months, and so we're going to go forward with the hearing.

21    And the Court will deal with your motions in the ordinary

22    course.

23         I'm giving you an opportunity to be heard.  So with

24    regard to your motion to intervene, the Court will address

25    that, if and when the time comes.  I'm giving you an

1    opportunity to be heard as a party-in-interest.

2            With regard to your other motions, they were filed --

3    some were filed on Friday evening.  Apparently, some were

4    filed moments before this hearing began.  I haven't seen what

5    you filed this morning, and so I'm not going to consider it.

6    If you wanted -- if you wanted the Court to consider a motion

7    before this hearing, you should have filed it earlier.  So --

8            MR. MYERS:  Respectfully, respectfully, Your Honor,

9    there's no time limit.  Subject matter jurisdiction can be

10   raised at any time.  You have an obligation to consider and

11   resolve your subject matter jurisdiction.

12           You have a clear conflict of interest.  It cannot

13   wait.  It must be resolved.  You must rule on it.  That is the

14   case law.  I know it.  You know it.  And so if you don't, then

15   everything here will be void.  So you need to consider this

16   and rule on it because you do have a clear conflict of

17   interest.

18           THE COURT:  Mr. Myers, I --

19           MR. MYERS:  Thank you.

20           THE COURT:  -- don't need you to tell me what I need

21   to do.  You can sit down.  I'm going to go forward with the

22   hearing.  Thank you.

23           MR. MYERS:  Okay.  Well, then I'll place --

24           THE COURT:  All right.  So --

25           MR. MYERS:  -- my objection on the record for --



1          THE COURT:  It's on the record, Mr. Myers.  Have a

2     seat.

3          MR. MYERS:  No, you can't cut me off.

4          THE COURT:  Have a seat.

5          MR. MYERS:  I can put my comments on the record.  I

6     object because of a lack of subject matter jurisdiction.

7          THE COURT:  I heard you ten minutes ago.  Thank you.

8          MR. MYERS:  Okay.

9          THE COURT:  All right.  So Mr. Mastro, we're going to

10    hear from I'm going to have you put on your case first

11    since --

12         MR. MYERS:  Judge Rurak, there's other jurisdictional

13    matters.

14         THE COURT:  Mr. Myers.

15         MR. MYERS:  Jurisdiction has to be considered first.

16    There is other jurisdictional matters.

17         THE COURT:  I'm not going to hear --

18         MR. MYERS:  Unrelated to this.

19         THE COURT:  I'm not going to hear -- you can raise

20    them as objections in connection with the case.  I'm not going

21    to have you try and derail the proceedings at this late hour.

22    You've had time to file motions.  You've raised subject matter

23    jurisdiction in almost every proceeding, and I've rejected it.

24         If you want to raise an objection, you can raise it

25    in connection with the proceeding.  But we're going to get

 1    started with our witnesses.  Please have a seat.  Thank you.

 2            Mr. Mastro, call your first witness.  We're not going

 3    to have opening statements.

 4            MR. MASTRO:  Okay.  I call Roger Schlossberg,

 5    trustee.

 6            MR. MYERS:  I object to not having opening

 7    statements.

 8            THE COURT:  Objection's noted.  Thank you.

 9            Mr. Schlossberg, please come up and have a seat.

10    Now, I'm going to ask what you have in your hands there.  Are

11    these your exhibits?

12            MR. SCHLOSSBERG:  One of these books is our exhibits,

13    and the others are materials that I think I might need to make

14    reference to, and I'll be happy to identify them at any time

15    I'm looking at them.

16            THE COURT:  Okay.

17            MR. SCHLOSSBERG:  And that's a blank page.

18            THE COURT:  Okay.  All right.

19            MR. MYERS:  Objection, Your Honor.  In the past,

20    witnesses aren't allowed to bring materials up to the stand.

21            THE COURT:  But do you have authority for that?

22            MR. MYERS:  Every hearing in this case, Judge Lipp

23    and yourself do not allow witnesses to bring materials to the

24    stand.

25            THE COURT:  You can take materials to the stand, but

1    you'll have to make them available to the other side if you're

2    going to do that.

3          MR. MYERS:  I don't have them.  And I don't know what

4    he's got.  And he shouldn't be allowed to have up there any

5    materials --

6          THE COURT:  Mr. Schlossberg.

7          MR. SCHLOSSBERG:  Your Honor, I'm not familiar with

8    that rule.  I apologize.  Perhaps I'm an inexperienced

9    litigant, and I'm an inexperienced witness.  But I'm neither.

10          And I've been in this courtroom before.  I have

11    brought materials up with me.  If I am making reference to

12    something that's not an exhibit, I make a point of telling the

13    Court what I'm looking at.

14          THE COURT:  And that's fine.  Just, we should be

15    prepared to mark whatever you look at as an exhibit.

16          MR. MYERS:  Let counsel mark it and hand it to --

17          THE COURT:  Mr. Myers, I don't need any help from

18    you.  Thank you.

19          MR. MYERS:  Well, I'm sorry, Your Honor.

20          THE COURT:  Please stop talking.

21          MR. MYERS:  Your Honor, you have.  You have not

22    allowed me to bring materials.

23          THE COURT:  If you are not going to observe the

24    decorum of this court and the rules and the procedures of this

25    court, then you will not participate in these proceedings, Mr.

1    Myers.  We've been through this before.

2          MR. MYERS:  Yeah.  You're violating my due process

3    rights.  You have ruled previously --

4          THE COURT:  How am I doing that now?

5          MR. MYERS:  You have ruled previously, you, in this

6    court in one of my cases, many of my cases, and so has Judge

7    Lipp.  You are not allowed to bring materials up to the

8    witness stand with you.

9          THE COURT:  There is no rule that says that.  If Mr.

10   Schlossberg wants to bring materials to the stand with him, he

11   can do that.  And the materials will stay on the stand so that

12   any other witnesses can look at them as well.  We'll mark them

13   as exhibits.

14         So Mr. Schlossberg, it's your choice.  We can mark

15   whatever as an exhibit, or we can put it back on the table.

16   It's your call.

17         MR. SCHLOSSBERG:  Your Honor, I wouldn't know what to

18   mark at this point because I don't know that I'll need to look

19   at something.  So I will have them here.  And if I get to that

20   point, I'll pull them out of the notebook.  And I will offer

21   them to the Court.

22         MR. MYERS:  I'm sorry.  Excuse me, Your Honor.

23         THE COURT:  That's fine.  Thank you.  All right.

24         MR. MYERS:  He's not representing himself.  He's up

25   there as a Chapter 7 trustee.  I'd like clarification on that.

1          THE COURT:  Mr. Myers, if you keep speaking out of

2     turn -- I want you to be able to participate in these

3     proceedings, but you keep interrupting everyone.  That is not

4     the way it works.  Stop it.  I will give you a chance to be

5     heard.  And when it's your turn, I will hear from you.  I'm

6     speaking to Mr. Schlossberg right now.

7          Mr. Schlossberg, thank you.  If you do pull anything

8     out, we'll mark it as an exhibit, and we'll make it available

9     to all of the parties in the room.

10         MR. SCHLOSSBERG:  Understood, Your Honor.

11         THE COURT:  Thank you.  If you would turn and face

12    Ms. Whitfield, she will place you under oath.  Thank you.

13         THE CLERK:  Please raise your right hand.

14    (Witness sworn)

15         THE CLERK:  Please be seated and state your name and

16    business address for the record.

17         THE WITNESS:  Roger Schlossberg.  Office is at 18421

18    Henson Boulevard, Suite 201, Hagerstown, Maryland 21742.

19         THE COURT:  All right.  Mr. Mastro, you may proceed.

20         MR. MASTRO:  Thank you, Your Honor.

21    DIRECT EXAMINATION

22    BY MR. MASTRO:

23    Q.   Good morning, Mr. Schlossberg.

24    A.   Good morning, Mr. Mastro.

25    Q.   You are the Chapter 7 trustee in this case; is that



1    correct?

2    A.    I have that privilege.

3    Q.    And how long have you been the Chapter 7 trustee in this

4    case?

5    A.    February of 2017, I believe I was appointed, Your Honor.

6    Q.    And how long have you been a Chapter 7 trustee in this

7    district?

8    A.    I have been a Chapter 7 trustee since July of 1982.  I'm

9    in my forty-second year.

10    Q.    And --

11    A.    Finishing it, actually.

12    Q.    And in your forty-two years of being a Chapter 7 trustee,

13    have you had occasion before to put forth before the Court a

14    Rule 9019 motion for approval of a settlement?

15    A.    I have.

16    Q.    And what I want to focus on today, Mr. Schlossberg, is

17    what informed your judgment to cause you to seek approval of

18    the settlement that's currently before the Court.

19          MR. MASTRO:  And I'll assume the Court's familiar

20    with the papers, since we haven't gone through an opening

21    so -- but Your Honor, if there's anything that you need

22    clarification, please say so, and I'm happy to jump in and add

23    that.

24          THE COURT:  The Court has read all of the

25    pleadings --



1              MR. MASTRO:  Great.

2              THE COURT:  -- that were noticed for today.  Thank

3    you.

4    Q.    Mr. Schlossberg.

5    A.    Yes, sir.

6    Q.    We have an adversary proceeding, in which the trustee has

7    been named as a defendant, and the King parties have been

8    named as the -- they're the plaintiff, correct?

9    A.    That is correct.

10   Q.    And are you familiar with the claim that has been

11   asserted by the King plaintiffs in this adversary proceeding?

12   A.    I am.

13   Q.    Okay.  And just briefly, can you describe the nature of

14   their claim?  I believe it's a declaratory judgment claim.

15   A.    Okay.

16             MR. MYERS:  No.  Objection.

17             THE COURT:  On what basis?

18             MR. MYERS:  He's testifying.

19             THE COURT:  Overruled.  You can describe the nature

20   of the complaint, Mr. Schlossberg.

21             THE WITNESS:  Thank you, Your Honor.

22   A.    The -- the complaint is a two-count complaint.  It

23   includes -- oh, excuse me.  No, this complaint is not.  This

24   complaint seeks the redemption, a declaration by the Court,

25   that Mr. VerStandig's client, 6789 Goldsboro and the Kings --

1    and the King parties, as you described them earlier.  If we're

2    going to define them that way, I'll do that continuously, Your

3    Honor.  And the King parties have the right to redeem the

4    class B stock.  Oh, it was class B membership interests, I

5    should say.  The class B equity held by Serv Trust, a Maryland

6    statutory trust, which -- of which Mr. Myers is the principal.

7         The theory is that under the terms of the operating

8    agreement for 6789 -- I'm just going to call it that.  The

9    operating agreement for 6789 provided -- maybe I should take a

10   moment to talk about what that provided.  These folks entered

11   into a deal in 2013.  The King parties and Serv Trust, acting

12   through Mr. Myers, entered into a deal in 2013 with regard to

13   the acquisition of the property at 6789 Goldsboro Road in

14   Montgomery County.

15        This tract of land was thought to be valuable and capable

16   of subdivision into nineteen luxury townhouse lots.  And these

17   lots required subdivision approval from Montgomery County and

18   from the MN -- Montgomery -- excuse me, Maryland-National

19   Capital Park and Planning Commission.  Montgomery County

20   component.  MC at the end.  They -- they set it up.  In order

21   to be able to make this subdivision.

22        The agreement, and I'm referring to the first amended and

23   restated operating agreement of 6789 Goldsboro LLC.

24   Q.   And Mr. Schlossberg, can I jump in here?  And I want to

25   show you Exhibit 1.  And I put that up on the screen because I

1    think that may be helpful.  And ask you to identify it and

2    then continue with your understanding of --

3    A.    That is the document to which I'm making reference.

4           MR. MYERS:  Objection, Your Honor.  The problem with

5    him having stuff up there is he just started to identify a

6    document that hasn't been placed in the record as evidence.

7    This is a evidentiary hearing.  And then there's things popped

8    up the screen.

9           THE COURT:  Mr. Myers, stand up when you're

10   addressing the Court.

11          MR. MYERS:  Oh, I'm sorry, Your Honor.

12          THE COURT:  Thank you.

13          MR. MYERS:  Objection.  He's just referenced a

14   document that is not in the record.  Has not been placed --

15   has not been marked as an evidentiary exhibit.  I don't know

16   what he's looking at.  And now, there's a screen here that's

17   not an exhibit.

18          This is improper.  I'm entitled.  If he wants to mark

19   an exhibit, hand it to Mr. Schlossberg, and hand me a copy so

20   I can see what it is so the exhibits are identified so the

21   record is clear.  Thank you.

22          THE COURT:  Your objection's overruled.  We use

23   electronic copies of exhibits in this courtroom.  And the

24   exhibit that is being identified and described and in the

25   process of being -- it's already been marked as Exhibit Number

1    1, and it's in the process of being identified.  So your

2    objection, I don't understand it, but the screen is showing

3    you the exhibit.

4            MR. MASTRO:  Thank you.

5            THE COURT:  Mr. Mastro, you may continue.

6            MR. MASTRO:  Thank you, Your Honor.

7    BY MR. MASTRO:

8    Q.   Mr. Schlossberg, do you recognize what I've put on the

9    screen that's been marked as pre-marked as Trustee Exhibit 1?

10   A.   I do.

11   Q.   And --

12   A.   And I have the same copy in front of me in my notebook,

13   Your Honor.

14   Q.   And what are we looking at here?

15   A.   We are looking at the operating agreement of 6789, which

16   was formed in July of 2013.  The execution date on this

17   document -- how do I get to the end of that?

18   Q.   I can scroll down.

19   A.   No, it's right in the first paragraph, on page --

20   probably page 2.  There we go.  July 18th, 2013, they entered

21   into this agreement.  This agreement provided for a three-year

22   period, during which Mr. Myers, as the manager of this LLC,

23   was to act on behalf of the parties -- excuse me, on behalf of

24   6789 and the equity partners therein to --

25           MR. MYERS:  Objection.  The document speaks for



1    itself.

2         THE COURT:  Objection overruled.  Mr. Schlossberg can

3    testify as to what his understanding of this agreement is.

4    A.   For the purposes of getting the property approved for

5    subdivision into hopefully nineteen town -- nineteen townhouse

6    lots.  The agreement went on to provide that Mr. Myers put

7    precious little into it in terms of cash, whereas the class A

8    members put $1,785,000 in as the initial capital investment.

9    That initial capital investment was utilized to purchase the

10   property from its then-owner for $1,350,000, plus roughly

11   $35,000 of settlement expenses.  And the remainder of the

12   money was to be used as required in the administration of the

13   purposes of the entity, and I just described what the purposes

14   were.  The agreement went on to --

15        MR. MYERS:  Your Honor, objection.  This isn't just,

16   like, a running thing.  He needs to ask a question.  He needs

17   to answer it.  And I have a -- I need to have a chance to

18   object.  He can't just stand up there and testify for an hour

19   about what he thinks about different subjects.

20        THE COURT:  Objection overruled.  You may continue.

21        THE WITNESS:  Thank you.

22   A.   The agreement goes on to provide that the class A members

23   are obliged to bring additional capital to the table, as

24   required for the purposes of the entity.  They've committed

25   themselves to three -- committed themselves to $300,000 of



1    additional capital, with no restriction on their ability to

2    exceed that number, if they so choose.

3        The agreement goes on to make clear that the three-year

4    period that I've just described as the period within which

5    they expected or hoped or prayed to get the subdivision

6    approval, that the expiration of that three-year period, the

7    class A members have the right to seek to redeem their -- the

8    class B -- I referred to it as stock, again.  I apologize.

9    It's membership interest, of course.  Have the right to redeem

10   the class B membership interest under an appraisal and

11   redemption scheme that's set out in 7.7, I think it is.  No,

12   no, the -- the -- how do I move this page here?

13   BY MR. MASTRO:

14   Q.   Yeah, I'll move it.

15   A.   Fingers?  Yeah, apparently so.

16            THE CLERK:  Mr. Schlossberg, you don't have the

17   option to move it at this time.

18            MR. MYERS:  Oh, I can't move it?

19            THE CLERK:  No, Mr. Fasano (ph.) has to move that.

20            MR. MYERS:  Oh, that's not like the district court,

21   where I did this.  Okay.  All right.  I'm sorry.

22   BY MR. MASTRO:

23   Q.   All right.  I moved, Mr. Schlossberg, to section 7 of

24   the --

25   A.   Okay.



1    Q.    -- operating agreement --

2    A.    Go to the next page.

3    Q.    All right.

4    A.    Go to the next page, please.

5    Q.    Okay.  Did you review this portion of the operating

6    agreement?

7    A.    Yes.

8    Q.    Okay.  And what section would you like me to scroll down

9    to?

10    A.    I believe it's 7.7.  There we go.  Redemption.

11    Q.    Okay.

12    A.    The scheme is established through various sections, but

13    I'm just going to focus on this.  So let me set you up for it.

14    The -- at -- at -- after the three-year period, the class A

15    members had the right to demand an appraisal of the property.

16         The mechanism for doing that is it's a variation of the

17    three-step that we've all seen lawyers in this sort of thing,

18    where one party asks for an appraisal.  The other party

19    then -- and designates who their appraiser would be.  The

20    other party has a similar right to choose an appraiser.  The

21    appraisers get together.  If they can't agree, they agree on a

22    third appraiser.  And you establish the appraised value of the

23    property in that fashion.

24         That number, that appraised value number, is then

25    utilized in connection with the redemption provision in



1    section 7.7.  Under 7.7, if the class A members at any time

2    after the three years wish, and if the property has not

3    reached a state of entitlement, as it's used in this document,

4    that is the zoning and subdivision has been approved -- I

5    should say subdivision.  I don't think it was a zoning issue

6    per se.  But they had entitlement to develop it for nineteen

7    townhouse lots.

8        If they don't have that by the end of the three-year

9    period, and they have the right, then, to exercise the

10   appraisal option in connection with a proposed redemption.

11           THE COURT:  All right.  Hold on just one moment.  Mr.

12   Myers is standing.

13           Yes, Mr. Myers.

14           MR. MYERS:  Objection, Your Honor.  Relevance.  Why

15   is he even talking about this Serv Trust property is not

16   property of this estate.  He's never filed an adversary

17   against Serv Trust.  The Maryland case is ongoing and is on

18   appeal currently.  And there's no final judgment.  What is the

19   basis of his testimony?  I'd like to know what the basis of

20   this whole exercise in discussing Serv Trust, the King

21   parties, and 6789 Goldsboro Road is because he has no -- he

22   has no involvement in it.

23           THE COURT:  Well, you will have an opportunity to

24   cross-examine him.  And you can ask those questions at that

25   time.  Your objection --

1           MR. MYERS:  I can't get a proffer is what the basis

2     of this is?

3           THE COURT:  No.  You can cross-examine him.  Your

4     objection's overruled.

5           I interrupted you, Mr. Schlossberg.  Were you

6     finished answering the question?

7           THE WITNESS:  I don't think I was, Your Honor.

8     BY MR. MASTRO:

9     Q.   Mr. Schlossberg, if I could just direct you here to

10    the -- I think where you left off was you were getting into

11    once the appraised value is established, what's the next step

12    in the appraisal process and the redemption of class B member

13    under 7.7?

14    A.   Under the provisions of the agreement, and specifically

15    section 7.7, the class A members have the right to seek to

16    redeem the class B interest, the membership interest, if

17    they -- if it is determined that the appraised value is less

18    than the sum of the following items.

19         And we are looking here, Your Honor, at the fourth line

20    in 7.7, Your Honor.  Two.  Three four.  Oh, excuse me.  Fifth

21    line.  Sentence.  That line in the second word commences with,

22    "If the appraised value is less than or equal to the sum of",

23    and then there are four items that have to be summed up.

24    There is the unpaid cumulative initial capital return, the

25    unrecovered initial capital, the unpaid cumulative additional

1    capital return, and the unrecovered additional capital.

2         Now, Your Honor, the order in which they're put makes it

3    a little unusual, so I'm going to try and explain what that is

4    all about.  The second phrase, the unrecovered initial

5    capital, that refers to the $1,785,000 that had to be put up

6    by the class A members.

7         MR. MYERS:  Objection, Your Honor.  The document is

8    very complicated, drafted by Pillsbury, and he's out of the

9    blue making up definitions that are not in the operating

10   agreement.

11        THE WITNESS:  That's not so Your Honor.

12        MR. MYERS:  And he doesn't even have the final

13   operating agreement.

14        THE COURT:  Your objection's overruled.  Mr. Myers,

15   you'll have an opportunity to cross-examine him.

16        Please continue.

17   A.   The unrecovered initial capital.  The initial capital is

18   the $1,785,000.  The capital return referred to in the first

19   phrase, unpaid cumulative initial capital return, refers to a

20   provision earlier in this agreement, which says that the class

21   A members are entitled to that phrase, initial capital return,

22   which is calculated at ten percent per annum on the initial

23   capital.  That is a number which continues to run for the

24   entire period from 2013, when it was first put in, until

25   there's been a return of that capital.  Excuse me.  There's

1    been a recovery of that capital.    At ten percent per year on

2    $1,785,000, that's $178,500 per year.

3        Unrecovered initial capital is the initial capital that

4    has not been paid back to these folks, that they have not

5    recovered, which they could recover from operations if there

6    was operational cash to take it from or on a sale or other

7    development, just the way property works.  Now, again, it's

8    the sum of four things.  So first, it's the sum of the 1

9    million-785 plus interest at ten percent per annum running on

10   that rate up until the present time.  Then you have the third

11   item, unpaid cumulative additional capital return.  And then

12   the fourth, sort of out of order, the unrecovered additional

13   capital.

14       The unrecovered additional capital, or let's just say the

15   additional capital.  Additional capital is monies that had to

16   be put in to fund the operations of the entity as it tried to

17   reach its goals, which initially was committed to be expended

18   in the sum of $300,000 by the class A members.

19           MR. MYERS:  Objection, Your Honor.  There's no

20   question here.  I don't know what he is answering.  What is

21   the question that he's answering?

22           THE COURT:  Objection overruled.

23           Mr. Schlossberg, you may continue.

24           THE WITNESS:  Thank you, Your Honor.

25           MR. MYERS:  On what question?  What is the question,

1    please?

2              THE WITNESS:  Yeah.  I'm sorry.  I keep getting

3    interrupted here, as I'm trying to --

4              MR. MYERS:  Yes, I'd like to know what the question

5    is that he has --

6              THE WITNESS:  It's obvious he's trying to disrupt me.

7              MR. MYERS:  -- been answering for thirty minutes.

8              THE COURT:  His understanding of the document.  That

9    was the original question.

10             MR. MYERS:  So it's Roger Schlossberg, Chapter 7

11   trustee's understanding of this document.  And he can just sit

12   here for forty-five minutes and conjecture about what it

13   means?

14             THE COURT:  Yes, he can.  Objection's overruled.

15             Mr. Schlossberg, please continue.

16             THE WITNESS:  Thank you, Your Honor.

17   A.   The additional capital was originally committed at

18   $300,000, with no limitation on the ability of the class A

19   members to put additional funds in.

20        Over a period of time, a very substantial additional sum

21   was put in in excess of another million dollars, including

22   some $600,000 plus that was put in by those, the class A

23   members, put into Goldsboro as additional capital so that it,

24   Goldsboro, could then lend that money to Serv Trust, and Serv

25   Trust then lent that money to Mr. Myers.  That $1 million is

1    additional capital on top of the million-3.  I don't know how

2    much additional was put in after May 2nd, 2018.  Sorry.  I was

3    trying to remember the -- I have a note on that, but now I can

4    remember it.

5        Since May 2nd, 2018, obviously there have been continuing

6    expenses involved in the operation of this entity.  There was

7    taxes that had to be paid on an annual basis, which as of the

8    date of the Lipman appraisal, were $17,000 a year.  I'm sure

9    they've gone up some, but if they haven't, let's just use the

10   17,000 --

11       MR. MYERS:  Objection, Your Honor.  This has nothing

12   to do with the agreement.  Now, he's testifying about taxes

13   and the operation of 6789 Goldsboro LLC.

14       THE COURT:  Objection overruled.

15       You may continue.

16   A.   Those taxes would have to be paid on an annual basis from

17   2018 to this year.  That's another 140, $150,000.

18       There are other expenses involved in the operation, which

19   included utility charges, upkeep, landscaping, et cetera.  I

20   don't know what all those numbers are.  I just know that

21   somebody had to pay it, and the -- only the class A members

22   were obliged to advance the money for that purpose.  Perhaps

23   Mr. Myers paid some of it, and if he did, I'm sure he'll tell

24   us about that at some point.  And he'll correct me on that

25   apprehension that I have.

1           The important thing is here, Your Honor, on all that

2    additional capital, it also has a return that was assured to

3    the class A members.  Just as there was an assured return of

4    ten percent on the initial capital, there is also an assured

5    return of ten percent on the additional capital.  As of May

6    2nd, 2018, there was over $1 million of additional capital

7    which had been expended.  From that date forward --

8           MR. MYERS:  Objection, Your Honor.  There has been no

9    basis set for him to make that statement.  He has no knowledge

10   of that, unless somebody can show a predicate for that

11   testimony.

12          THE COURT:  Your objection's overruled.  You can

13   question him on cross-examination as to the basis for that

14   knowledge.

15          You may proceed.

16   A.   I do not know, Your Honor, because it would require an

17   extensive calculation.  How much of that $1 million was

18   expended on the first day in 2013, on July 13th -- July 18th,

19   2013, or if it was expended on May 1st -- excuse me.  That was

20   '13, of 2013, or if it was expended at the end of that period.

21   So I'm not going to try and calculate how much of that should

22   have accrued each year until 2018.

23          But as of 2018, there was over $1 million, slightly over

24   $1 million, in expenditures funded by additional capital.  At

25   the ten percent additional capital return assured under the

1   terms of this agreement, that's another $100,000 a year, which

2   would have been added in to the form -- the redemption

3   formula.  It's seven years since then, Your Honor.  That's

4   another $700,000, not including the calculation of the return

5   on additional capital for the first five years from 2013 to

6   2018 and not including any additional capital put in after

7   2018.

8   BY MR. MASTRO:

9   Q.    And Mr. Schlossberg, if I may, you pointed out before.

10  You have you get an appraised value and then you have the sum

11  of these four values that you're talking about.  What happens

12  next in the appraisal process?

13  A.    The class A members get their appraisal, Your Honor.

14  They obtained an appraisal, which is an exhibit here.

15  Q.    Look, just, before we get to that, Mr. Schlossberg --

16  A.    Yeah.

17  Q.    -- just, under the agreement, what happens when you

18  compare the two sets of numbers?

19  A.    Thank you.  I misunderstood.

20  Q.    Then we can get to that.

21  A.    Okay.  If the appraised value is in excess of the -- if

22  the appraised value is in excess of the sum, which is --

23  excuse me, in excess of the sum of those four items that I

24  just described that the class A members are entitled to get as

25  a return, either recovery of -- of initial or additional

1    capital or accrual of return on investment, as it is phrased

2    in here as initial capital return or additional capital

3    return.  If the appraised value exceeds those numbers, there

4    is no automatic right of redemption given to the class A

5    members.

6        If, on the other hand, the expenses -- excuse me, the sum

7    of the four items, if the sum of the four items exceeds the

8    appraised value as a matter of law, as by operation of the

9    document, the class A members are entitled to redeem the --

10    redeem the class B membership interest in consideration of

11    past consideration, that is, these items which they haven't

12    been paid.

13        MR. MYERS:  Objection.  Is he testifying as Chapter 7

14    trustee, or is he now, as a matter of law, "testifying" as

15    some kind of expert?  Because he's up there as a Chapter 7

16    trustee.  He's not up there as a legal expert in operating

17    agreements.

18        THE COURT:  He is testifying as the Chapter 7 trustee

19    appointed in this case.

20        You may continue.  Objection's overruled.

21        MR. MASTRO:  Thank you, Your Honor.

22    Q.   Mr. Schlossberg, we have on the screen Exhibit 1.  Again,

23    just for the record, is this something that you reviewed and

24    relied on in reaching your conclusion as to the settlement

25    agreement and your support for it?



1    A.    Yes.

2    Q.    And is what we have on the screen a true and accurate

3    copy of what you, in fact, reviewed?

4    A.    Yes, it is.

5              MR. MASTRO:  Your Honor, I would like to move

6    Trustee's Exhibit 1 into evidence.

7              MR. MYERS:  May I see it, please?  Do you have an

8    extra copy?

9              MR. MASTRO:  It's on the screen, and I emailed you an

10   extra -- I emailed you these exhibits.

11             MR. MYERS:  But do you have an extra copy I can look

12   at?

13             MR. MASTRO:  No, I don't.

14             THE COURT:  Mr. Myers, did --

15             Ms. Whitfield.

16             THE CLERK:  Yes.

17             THE COURT:  Was he included on the email with the

18   protocols?

19             THE CLERK:  Yes.

20             THE COURT:  Mr. Myers, it is the procedure of this

21   Court to use electronic exhibits.  It's on the court's

22   website.  Those protocols were emailed to you.  And so you're

23   expected to look at the exhibits that have been docketed on

24   the docket.

25             The trustee has eleven exhibits, and the King parties



1    have three exhibits.  You, I note for the record, did not pre-
2    file your exhibits as required, but we'll get to that if and
3    when we need to.  But these exhibits were pre-filed with the
4    Court and sent to you.  So if you do not have copies --
5            MR. MYERS:  So Mr. --
6            THE COURT:  So you did not bring copies with you?
7            MR. MYERS:  I don't have copies, Your Honor.  Mr.
8    Mastro holding what he says is Exhibit 1.  And Mr. Schlossberg
9    is not reading off the screen.  He's reading off of something.
10   Piece of paper on the desk.
11           THE COURT:  Well, he brought his own --
12           MR. MASTRO:  Just for the record --
13           THE COURT:  He brought his own copy of the exhibits
14   so that he could look at them on paper form, which is what
15   anybody is entitled to do, including you.
16           MR. MYERS:  Okay.  But don't you typically mark the
17   exhibits and let him look at it first?
18           THE COURT:  It's marked.
19           MR. MASTRO:  Well, don't you mark it and hand it to
20   him and let him read from the exhibit that's marked that's
21   going to go into evidence?
22           THE COURT:  It's marked.  We use electronic exhibits
23   in this courtroom.
24           MR. MYERS:  Okay.
25           THE COURT:  It's marked.  If you would like the Court

1     to take a recess and print off a copy of the agreement, which

2     has your signature on it, I'm happy to do that.  Do we need to

3     do that, Mr. Myers?  Would you like a paper copy?

4              MR. MYERS:  As long as I can look at it when I cross-

5     examine him, if that's possible, then we don't need to take a

6     break.  But if not, yeah, I'd like to have a copy.

7              THE COURT:  Court will take a five-minute recess.

8     The Court will print copies for Mr. Myers because he did not

9     bring his own copies, as instructed.

10             MR. VERSTANDIG:  Thank you, Your Honor.

11             THE COURT:  We will take five minutes.

12             THE CLERK:  All rise.

13             THE COURT:  Mr. Schlossberg, you are still on the

14    stand.  I would like you to stay in the witness box.  You are

15    not able to discuss your testimony with anyone.

16             THE WITNESS:  I just want to get my bottle of water,

17    if I can.

18             MR. MASTRO:  I can bring it to him.

19             THE COURT:  Thank you.

20             MR. MASTRO:  Thank you.

21             THE CLERK:  All rise.  Court is now in recess.

22         (Whereupon a recess was taken)

23             THE CLERK:  All rise.  United States Bankruptcy Court

24    for the District of Maryland now resumes its regular session,

25    the Honorable Maria Ellena Chavez-Rurak presiding.



1           Please be seated.

2           THE CLERK:  All right.  So Mr. Mastro --

3           MR. MYERS:  Thank you, Your Honor.

4           THE COURT:  You're welcome.

5           So Mr. Mastro had moved for the admission of Exhibit

6    1.

7           Mr. Myers, do you have any objection?

8           MR. MYERS:  Objection.  Relevance.

9           THE COURT:  Your objection's overruled.  The Court

10   will admit Exhibit Number 1.

11        (Agreement was hereby received into evidence as Trustees'

12   Exhibit 1, as of this date.)

13          MR. MYERS:  Well, what is the relevance of this

14   exhibit?

15          THE CLERK:  Mr. Mastro, ask your next question.

16          MR. MASTRO:  Thank you, Your Honor.

17   RESUMED DIRECT EXAMINATION

18   BY MR. MASTRO:

19   Q.   Mr. Schlossberg, did there ever come a point where the

20   King parties demanded an appraisal pursuant to the appraisal

21   procedures in the operating agreement that you just described?

22   A.   Yes, sir.

23   Q.   Okay.  And I want to show you what we've pre-marked as

24   Trustee's Exhibit 2.  Do you recognize this document that's on

25   the screen?



A. I do.
Q. Okay. And what are we looking at here?
A. We are looking at a letter from Mr. VerStandig on behalf of the King parties making a demand on Serv Trust as the class B party to -- to designate -- to designate an appraiser. Again, I can't move down the page as quickly so --
MR. MYERS: Objection. The letter speaks for itself.
THE COURT: Your objection's overruled.
Q. Okay. And Mr. Schlossberg, the letter is dated August 23rd, 2017. Does that fall more or less than three years after the operating agreement was entered into?
A. That's -- that's just over four years afterwards.
MR. MYERS: Clarification, Your Honor. You overruled my objection that the letter speaks for itself. Are you suggesting that it doesn't speak for itself, or you're noting my objection, for the record?
THE COURT: Your objection is noted, and it's overruled.
Mr. Mastro, please continue.
MR. MASTRO: Thank you, Your Honor.
Q. So Mr. Schlossberg, I believe your testimony is that you understand this letter to be a demand for an appraisal?
A. It is. It is a demand for appraisal. Yes, sir.
Q. Okay. And is this something that you reviewed and relied upon in forming your opinion regarding the settlement at



1    issue?

2    A.    Yes.

3    Q.    And is this a true and accurate copy of the demand letter

4    sent by Mr. VerStandig?

5    A.    It's true and accurate copy of the one that I --

6    Q.    The one that you reviewed?

7    A.    -- that I reviewed.  Yes.

8            MR. MASTRO:  Correct.  Your Honor --

9            MR. MYERS:  Objection.  I don't know what that even

10    means.

11            THE COURT:  Objection's overruled.  You can cross-

12    examine the witness.

13            MR. MASTRO:  Your Honor, I'd like to move Exhibit 2

14    into evidence at this time.

15            THE COURT:  Any objection, Mr. Myers?

16            MR. MYERS:  Yes, I object.

17            THE COURT:  And the basis is?

18            MR. MYERS:  The basis is this is just a copy that was

19    filed in the Court record.  I have no idea if it's a true and

20    accurate copy.

21            THE COURT:  Your objection's overruled, and Exhibit 2

22    is admitted.

23        (Demand letter from King parties was hereby received into

24    evidence as Trustees' Exhibit 2, as of this date.)

25    Q.    And Mr. Schlossberg, after this letter was sent, what is



1     your understanding as to whether or not an appraisal was ever

2     performed?

3     A.    My understanding is that there was an appraisal performed

4     by the class A member -- at the request of the class A members

5     by Lipman Frizzell prior to the date of that letter.

6     Q.    And Mr. Schlossberg, let me show you what's been pre-

7     marked as Exhibit 3.  Do you recognize this exhibit?

8     A.    I do.

9     Q.    And is this the appraisal report from Lipman Frizzell

10    that you were just referring to?

11    A.    That is the one that I reviewed, and that is my

12    understanding.

13    Q.    And this is the appraisal report that you reviewed in

14    connection with your evaluation of the settlement, the

15    proposed settlement?

16    A.    That is correct, Your Honor.

17    Q.    Okay.  And what did the appraisal say as to the value of

18    the property?

19    A.    The appraisal opined that as of July 3rd, 2017, the

20    property had a value in a range between $1 million and

21    $1,325,000.

22    Q.    And is that value more or less than those four numbers we

23    saw before that represented the contributions and returns of

24    the class A member in Goldsboro?

25    A.    Even without the consideration of the items as to which I



1    indicated a lack of knowledge, or in one case, computation,

2    this valuation is by an order of magnitude less than the total

3    that is the sum of those four items, Your Honor.

4            MR. MASTRO:  And Your Honor, at this time, I'd like

5    to move Exhibit 3 into evidence.

6            THE COURT:  Well, isn't the appraisal hearsay, Mr.

7    Mastro?

8            MR. MASTRO:  Well, this is what Mr. Schlossberg

9    relied upon in forming his opinion.  So it's not necessarily

10   offered for the truth, Your Honor.  That it's just simply what

11   he relied on and what the evidence would show in the adversary

12   case.

13           MR. MYERS:  Objection.  Hearsay.  It won't show

14   anything, Your Honor.

15           THE COURT:  Mr. Myers, please stand when you address

16   the Court.

17           Mr. VerStandig, I see you standing.

18           MR. VERSTANDIG:  Objection.

19           THE COURT:  What would you like to say regarding

20   this?

21           MR. VERSTANDIG:  Your Honor, under 9019, the question

22   is the reasonable exercise of the trustee's business judgment,

23   not a mini trial of the underlying case.  So the question for

24   the Court is whether it's a true and accurate copy of what the

25   trustee relied upon, not whether it's a true and accurate copy

1    of what an appraiser said, nor even of the underlying

2    veracity.  It's not being introduced for the underlying

3    truthfulness thereof.  It's being introduced to the

4    truthfulness of the trustee's diligent review and reliance

5    thereupon.

6              THE COURT:  Mr. Myers, you're standing.  What would

7    you like to say?

8              MR. MYERS:  Objection.  Hearsay.  Just as the Court

9    said.  This is a bogus appraisal, and it's worthless.

10             THE COURT:  All right.  Well, the Court is not going

11   to admit the appraisal based on hearsay grounds.  Of course,

12   Mr. Schlossberg is welcome to testify about what he reviewed

13   and what he considered, and he has already done that so -- but

14   the Court does not need to admit Exhibit Number 3 to

15   understand his testimony.  So the Court will not admit it as

16   hearsay.

17   Q.   And Mr. Schlossberg, in your review of the position

18   asserted by the King parties in this adversary case, did you

19   come to any conclusions on your own as to the relative merits

20   of their position?

21   A.   As to the question of whether the four cited items in

22   section 7.7, if the some of those items vastly exceeded the

23   valuation performed by the -- the Lippman Frizell firm, and as

24   such, I reached the conclusion in my valuation of what a trial

25   would result in if this -- if the adversary went to trial.  It

1   is my opinion that the conclusion of the fact finder would be

2   that the total return to which the class A members are

3   entitled under section 7.7 and the -- and the balance of the

4   agreement, what they're entitled to is much higher than the

5   valuation of the tract of property.  And as such, they had the

6   right to redeem without payment of any sums, other than that

7   consideration they had already provided.

8   Q.   Now, Mr. Schlossberg, did you also consider any potential

9   defenses to the Kings' claim in the adversary case, including

10   any defenses that were raised by Serv Trust when the case was

11   in state court?

12   A.   Of course, I did, Your Honor.  My job as a Chapter 7

13   trustee in evaluating a compromise and settlement offer is to

14   determine what's going to happen if I don't settle this case,

15   if I take it to trial.  If it goes to trial, I've told you

16   already my initial conclusion, that they could reach the

17   number that would allow them, that is, the class A members,

18   that would allow the class A members to a declaration that the

19   property had been redeemed and properly so.

20       On the other hand, Mr. Myers raised objections in the

21   state court proceedings.  Several objections.  Number 1, he

22   raised the objection that the -- that he had, in fact -- let

23   me take this in order.  I'm sorry.  I want to get my thoughts

24   in order, Your Honor.

25   Q.   Mr. Schlossberg, maybe if I could just direct you here.

1    A.   Go ahead.

2    Q.   You had mentioned earlier in your testimony that the

3    Lippman appraisal was dated six days prior to the date of the

4    letter, what we what we saw marked as Exhibit 3, that is dated

5    three days prior to what's been admitted as Exhibit 2.  Did

6    you have any --

7    A.   I'm sorry, Mr. Mastro.  I -- I had this problem in this

8    courtroom a couple weeks ago.  I really can't hear.

9    Q.   I'm sorry.  Let me get closer to the microphone.

10   A.   Thank you.

11   Q.   You mentioned in your testimony that the date of Exhibit

12   2 is August 23, 2017 --

13   A.   Yes.

14   Q.   -- and that the Exhibit 3, the appraisal, actually

15   predates August 23.

16   A.   Yes.

17   Q.   Did that create a potential defense, in your mind, in

18   your evaluation?

19   A.   It -- it did not raise a -- a defense in my mind, but it

20   did raise a defense, apparently, in Mr. Myers' mind.  Mr.

21   Myers urged in state court that the appraisal could not be

22   considered to be a proper appraisal for purposes of the

23   redemption analysis required because it was dated prior to the

24   date that a demand was made for appraisal.

25            MR. MYERS:  Objection, Your Honor.



1    Q.    And --

2            MR. MYERS:  Objection.

3            THE COURT:  Basis.

4            MR. MYERS:  I was not a party to the proceeding in

5    state court.  I didn't make an objection to the appraisal.

6    He's making things up.

7            THE COURT:  Well, you'll have an opportunity --

8            MR. MYERS:  The transcript is clear that I'm not a

9    party to that proceeding.

10           THE COURT:  Your objection's overruled.  You'll have

11   an opportunity to testify and to cross-examine the witness.

12           Mr. Mastro.

13           MR. MYERS:  Well, I'd appreciate if he says, when I

14   made an objection, be specific as to what proceeding that I

15   made such an objection.

16           THE COURT:  All right.  Your objection's overruled.

17           Mr. Mastro.

18           MR. MASTRO:  Thank you, Your Honor.

19   Q.    Mr. Schlossberg, you were saying you were considering the

20   objections raised by Serv Trust in the state court.  Is there

21   anything in your review of the operating agreement that --

22           MR. MYERS:  Objection.

23           THE COURT:  Basis.

24           MR. MYERS:  Mr. Mastro -- Mr. Schlossberg testified

25   that the objection was by me.  Now, Mr. Mastro is eliding over

1    that fact and saying the objection was by Serv Trust.  I am

2    not Serv Trust.  So please be specific.  Rephrase the

3    question.  Do something.

4              THE COURT:  All right.  Thank you.

5              Mr. Mastro, rephrase your question, please.

6    Q.   Mr. Schlossberg, in considering the objection that was

7    raised in the state court regarding the date of the appraisal,

8    did you review it the -- in your review of the operating

9    agreement, did you discover any provision addressing when the

10   appraisal needed to be dated?

11   A.   Well, in considering the objection that was raised in the

12   state court on behalf of the class B member -- and I may have

13   confused the issue.  I didn't mean to confuse Mr. Myers.  I

14   thought he would be up to speed on it, but I apologize.

15        In considering that, Your Honor, I did review the

16   operating agreement to see if the operating agreement had an

17   express requirement that the appraisal be dated after the date

18   of demand for appraisal.  And in fact, not unsurprisingly, it

19   is not.  There is no such clause in the agreement that I could

20   find.  Perhaps I'll learn of some on cross-examination.

21   Q.   Now, you testified you understood there was an appraisal

22   that was done by the King -- you testified that you understood

23   there was an appraisal done by the King parties?

24   A.   Yes.

25   Q.   Do you have any knowledge as to whether there was an

1    appraisal done by Serv Trust?

2    A.   It is my understanding from review of the state court

3    proceedings that there was none ever done by the Serv Trust

4    parties by the class B -- class B member.

5    Q.   And in your --

6             MR. MYERS:  Objection.  Basis.

7             THE COURT:  You'll have an opportunity to cross-

8    examine him.  Your objection's overruled.

9             Please continue.

10   Q.   And Mr. Schlossberg, did the fact that this Serv Trust

11   did not have its own appraisal, is that a potential defense

12   that you evaluated?

13   A.   It -- it -- it is a defense that I evaluated because it

14   was raised by the class B member in state court as a reason,

15   as a defense, somehow, to the position of the King parties in

16   that litigation.  But in evaluating it, I don't think it's any

17   defense at all.  I mean, the reality is, Your Honor, when you

18   have an appraisal provision --

19            MR. MYERS:  Objection.  He answered the question.

20   Next question, please.

21            THE COURT:  Objection overruled.  Please continue.

22   A.   When you have an appraisal provision similar to the one

23   that's here, it's common practice.  I can't ever remember not

24   doing this.  You go get your appraisal first and find out

25   whether or not you're barking up the wrong tree.  You've got

1    to know what you've got before you go into the process.

2              MR. MYERS:  Objection.

3              THE COURT:  Basis.

4              MR. MYERS:  Common practice is irrelevant.

5              THE COURT:  Objection overruled.

6              MR. MYERS:  And by the way, Your Honor, Mr. Mastro

7    seemed to suggest that Serv Trust didn't get an appraisal, and

8    that's not been established and is a question.  Thank you.

9              THE COURT:  Well, you'll have an opportunity to put

10   on evidence, Mr. Myers.

11             MR. MYERS:  I just want to correct the record.

12             Mr. Mastro.

13             MR. MASTRO:  Thank you, Your Honor.

14   BY MR. MASTRO:

15   Q.   Mr. Schlossberg, were there any other defenses that you

16   considered that perhaps were raised by Serv Trust or other

17   defenses?

18   A.   Yes, Your Honor.  There -- there was a -- there was

19   apparently a laudable attempt by -- by all parties, the class

20   A members and the class B members, to resolve the -- the

21   matter of the redemption by some kind of negotiation.  And

22   this, Your Honor, occurred in after the expiration of the

23   three-year period in July of 2016.  There apparently was some

24   back and forth, and the parties entered into a memorandum of

25   understanding.  Excuse me.  The parties considered a



1    memorandum of understanding, which was executed by the class A

2    members and then delivered to Mr. Myers on behalf of the class

3    B membership interest for execution.

4    Q.    Okay.  And Mr. Schlossberg, let me show you what I've

5    marked -- what we've pre-marked as Exhibit 4.  And is this the

6    memorandum of understanding you were just referring to that

7    you reviewed?

8    A.    This is.

9    Q.    And you reviewed this in connection with your evaluation

10   of the proposed settlement?

11   A.    I did.

12   Q.    Okay.  And you state that it was -- well, what's your

13   understanding of the terms of the memorandum of understanding

14   and when it needed to be accepted?

15   A.    This document, Your Honor, is it's a very simple

16   document.  It's a simple transaction --

17          MR. MYERS:  Objection.  The document speaks for

18   itself.

19          THE COURT:  Objection's overruled.  Please continue.

20   A.    This is a simple document, Your Honor.  And it's a

21   simple, relatively simple, transaction.  The class A members

22   are going to buy-out the class B member by a purchase of the

23   class B membership for $2 million.  This document, it's hard

24   to say what date it was prepared because there's no date on

25   the document, but it is not difficult to figure out the range

1   of dates within which it could have happened.

2       It had to have happened after July 13th of 2016, the end

3   of the three-year period, and it had to have occurred before

4   September the 12th of 2016 because this document has at

5   paragraph 6 provisions for mandatory execution and closing

6   dates.  The document had to be executed by September 12th of

7   2016, or the document shall be null and void.  And I'm quoting

8   from paragraph 6.  And then the closing on the purchase would

9   have had to have been made by less than a month later, October

10  7th, 2016.

11      So I know that the document was prepared or you can

12  impute that the document was -- was -- was drafted between the

13  13th of July and the 12th of September.  The copy that the

14  Court sees is a copy that's signed by the King parties.  It is

15  not a copy that's signed by Mr. Myers.

16      In the state court litigation, the class B member urged

17  that he, in fact, had executed that agreement and had caused

18  it to be delivered by United States mail, having been posted

19  on September 12th, 2016, within the terms of paragraph 6.

20  Q.   Mr. --

21          MR. MYERS:  Objection, Your Honor.  The state record

22  has a fully signed copy of this.  Judge Albright reviewed it,

23  and Judge Albright ruled it was an enforceable agreement.  Mr.

24  Schlossberg knows it, and they've intentionally put in here a

25  document that's half signed, which is their typical MO.



1           This is outrageous.  The document's been fully

2    signed.  There was a hearing in front of Judge Albright.

3    Judge Albright ruled.  Told Mr. VerStandig to his face, this

4    is an enforceable agreement.  Thank you.

5           THE COURT:  Your objection is noted, and it's

6    overruled.  You are welcome to introduce another copy of the

7    agreement as part of your case.

8           Mr. Mastro --

9           MR. MYERS:  He doesn't have standing anyway so --

10          THE COURT:  -- you may continue.

11          MR. MYERS:  -- we'll get to that.

12   Q.   And Mr. Schlossberg, let me show you what I've marked as

13   Exhibit 5.  It's an email chain that begins at the bottom,

14   January 10, 2017, and concludes January 16th, 2017.  Do you

15   recognize this?

16   A.   Yes, I've seen this before, and I relied on this in my

17   exercise of my judgment.

18   Q.   Okay.  And --

19          MR. MYERS:  Objection.  Hearsay.

20   Q.   And --

21          THE COURT:  Your objection's overruled.  He is the

22   Chapter 7 trustee for you, Mr. Myers, and you were a party to

23   this communication.

24          MR. MYERS:  This still doesn't make it not hearsay.

25          THE COURT:  All right.  He stands in your shoes.  He

1    is a Chapter 7 trustee.  So he has the same right to the

2    document that you would have outside of bankruptcy.

3        MR. MYERS:  Excuse me, Your Honor.  He would not have

4    the same right.  My estate was established on November 18,

5    2015.  This document's dated January 16, 2017.  He has no --

6    he doesn't stand in my shoes at all past November 18, 2015.

7    Period.

8        THE COURT:  All right.  Well, he can offer it as a

9    document that he reviewed and relied on in making his decision

10   to enter into this settlement agreement, but it will not be

11   offered for the truth of the matter asserted, Mr. Mastro.

12       MR. MYERS:  Thank you.

13   BY MR. MASTRO:

14   Q.   Okay.  Mr. Schlossberg, you said you had reviewed this

15   exhibit.  I believe it's Number 5.  And what, if any,

16   conclusions did you draw from your review of this exhibit?

17   A.   on its face, Mr. King rejects the assertion that Mr.

18   Myers made that it had been sent to him by mail on September--

19   they put it into issue.  Puts the question at issue, I think.

20       MR. MASTRO:  Okay.  And Your Honor, at this time, I

21   want to move into evidence Exhibits 4 and 5.

22       MR. MYERS:  Objection, Your Honor.  Exhibit 4 is

23   incomplete, and it's hearsay.

24       THE COURT:  The objection is overruled, and it is

25   admitted.



1              (Memorandum of understanding was hereby received into

2      evidence as Trustees' Exhibit 4, as of this date.)

3              THE COURT:  And Mr. Myers, you are welcome to

4      introduce a copy of the memorandum of understanding in your

5      case.

6              Exhibit 5 is also, for the reasons I stated, admitted

7      not to prove the truth of the matter asserted but simply as a

8      document that the trustee reviewed and considered in making

9      his decision to enter into this settlement.

10             MR. MYERS:  Objection.  Same objection for Exhibit 5.

11     It's hearsay.

12             THE COURT:  Okay.  It is not hearsay.

13             MR. MYERS:  Why isn't it hearsay?

14             THE COURT:  It's an agreement.

15             MR. MYERS:  It's not an agreement.  It's an unsigned,

16     partial whatever.  It's not the agreement.

17             THE COURT:  All right.  Well, to eliminate yet

18     another issue for the appeal that is likely to follow whatever

19     the Court's decision may be, the Court will admit Exhibit 4

20     not for the truth of the matter asserted but as a document

21     that was considered by Mr. Schlossberg in reaching his

22     decision.

23             For the same reason, the Court should admit Exhibit

24     3, but I'm not going to because the Court doesn't need to.  We

25     have the testimony of Mr. Schlossberg.



1            So Exhibit 4 and 5 are admitted not for the truth of

2    the matter asserted.

3        (Email chain was hereby received into evidence as

4    Trustees' Exhibit 5, as of this date.)

5    BY MR. MASTRO:

6    Q.    And Mr. Schlossberg, did you consider anything else in

7    evaluating this potential defense that the memorandum of

8    understanding was executed by Serv Trust?  Or by Mr. Myers

9    here?  I guess it's two members here that -- but something

10   that Serve Trust asserted below.

11   A.    I'm sorry.  Can you clarify the question, please?  I

12   didn't understand it.

13           THE COURT:  Reask the question.

14   Q.    Yeah, I should do that.  That wasn't a very artful ask.

15   Mr. Schlossberg --

16           THE WITNESS:  What exhibits are admitted at this

17   moment, Your Honor?  I'm sorry.  I'm just getting confused.

18           THE COURT:  At this point, Exhibits 1, 2, 4, and 5

19   have been admitted.

20           THE WITNESS:  All right.  1, 2, 4, and 5.  Okay.

21           THE COURT:  Yes

22           THE WITNESS:  Thank you.

23           THE COURT:  You're welcome.

24   A.    Go ahead, Mr. Mastro.

25   Q.    Mr. Schlossberg, did you do any further investigation or



1    further review of any documents or materials in connection

2    with the issue that was raised regarding the memorandum of

3    understanding?

4    A.    Yes.

5    Q.    Okay.  And what, if anything, did you look at or review?

6    A.    Your Honor, it was brought to my attention that

7    notwithstanding that the class B member takes -- was taking

8    the position that he had accepted the terms of the memorandum

9    of understanding in a timely way.  It was my understanding

10   that there was no closing on that by the date required for

11   closing.  Further, it was my understanding that there was

12   continued action taken by the class B member towards the

13   development of the property, notwithstanding the fact that he

14   had exercised his right to be bought out for $2 million.

15          MR. MYERS:  Objection.

16          THE WITNESS:  I'm talking.

17          MR. MYERS:  Objection.  You say exercise his right.

18   What are you talking -- the agreement is with Serv Trust.

19          THE WITNESS:  Well, the memorandum --

20          MR. MYERS:  Serv Trust is not a his.

21          THE COURT:  You will have the opportunity to put on

22   evidence and to cross-examine this witness, Mr. Myers.

23          Please continue, Mr. Schlossberg.

24   A.    And that that was inconsistent with the assertion that

25   there was a binding deal made under the memorandum of



1    understanding that would have yielded the class B member a net

2    payment of about $1,250,000. I think $1,254,000. Because the

3    $2 million was to be netted out under the terms of the

4    memorandum of understanding so that the loans that had been

5    made to -- by Goldsboro to Serv Trust for the purpose of then

6    lending it to Mr. Myers had to be paid back. And there was a

7    balance of $635,000 due on the principal, and there was

8    approximately another 100, 105, 110 apparently due in

9    interest, leaving a net that Mr. -- that the class B member

10   could have walked away with for about a million and a quarter.

11   Q.    Okay. And Mr. Schlossberg, you mentioned some possible

12   inconsistencies. I want to show you Exhibit -- let me go to

13   Exhibit 6, I believe. Let's start with that one. Showing you

14   what's marked as Trustee's Exhibit 6. Again, it's an email

15   chain, in which both Mr. Myers and Mr. King are parties to.

16   It's in October of 2016. Do you recognize this?

17   A.    I do.

18   Q.    And is this one of the documents that you considered in

19   connection with your evaluation of the MOU defense, I'll call

20   it?

21   A.    Yes, it is.

22   Q.    Okay. And let me show you Trustee's Exhibit 7. This is

23   another email chain with --

24   A.    And that document's significant also because that's the

25   day before closing was supposed to happen.



1          MR. MYERS:  Objection.  Hearsay.

2    Q.   You're referring to Exhibit 6?

3    A.   Yes.

4    Q.   Okay.

5          THE COURT:  Your objection's overruled.  Continue.

6    Q.   And Exhibit 7, as I was saying, this is an email chain in

7    late November of 2016.  Again, Mr. King and Mr. Myers are on

8    this chain.  Is this Exhibit 7 a document that you reviewed

9    and considered in connection with your evaluation of the MOU

10   defense?

11   A.   It absolutely is, yes.

12   Q.   Okay.  And lastly, I want to show you Trustee's Exhibit

13   8, which is a single email from Mr. Myers to Mr. King and

14   others dated December 15th, 2016.  Is this an email that you

15   considered as well?

16   A.   I'm -- I'm sorry.  I got caught up in -- in 7.  So many

17   pages.  It's a very lengthy series of emails.

18   Q.   Sorry.  Exhibit 8.

19   A.   Okay.  8.  Got it.

20   Q.   Is this an email that you considered?

21   A.   Yes, it is.

22   Q.   And are Exhibits 6, 7, and 8 true and accurate copies of

23   emails that you reviewed?

24   A.   They are true and accurate copies of the emails which I

25   reviewed.



1         MR. MASTRO:  And Your Honor, I'd like to move in

2    Trustee's Exhibit 6, 7, and 8 at this time.

3         MR. MYERS:  Objection.  Hearsay.

4         THE COURT:  The objection's overruled.  The Court

5    will admit Exhibits 6, 7, and 8, not to prove the truth of the

6    matter asserted, but simply as documents and information

7    considered by the trustee.

8         (Email chain was hereby received into evidence as

9    Trustees' Exhibit 6, as of this date.)

10        (Email chain was hereby received into evidence as

11   Trustees' Exhibit 7, as of this date.)

12        (Email chain was hereby received into evidence as

13   Trustees' Exhibit 8, as of this date.)

14        THE COURT:  Mr. VerStandig, you're standing.

15        MR. VERSTANDIG:  Your Honor, solely for

16   supplementation of the record.  Had our position been elicited

17   on the hearsay objection, we would have additionally noted

18   them to each be statements by a party opponent.  Simply noting

19   for the record, understanding there may be a record.  Thank

20   you.

21        THE WITNESS:  Your Honor, I'm sorry.  I didn't hear

22   Mr. VerStandig.

23        THE COURT:  Mr. VerStandig made the point that they

24   should also be admitted as an admission of a party opponent.

25        THE WITNESS:  Okay.

1          THE COURT:  And the Court will admit them as an

2    admission of a party opponent.

3          MR. MYERS:  Objection, Your Honor.

4          MR. VERSTANDIG:  Thank you, Your Honor.

5          MR. MYERS:  Who's the party opponent?

6          THE COURT:  Are you not opposed to the trustee today,

7    Mr. Myers?

8          MR. MYERS:  I'm not a party to this case.

9          THE COURT:  You're --

10         MR. MYERS:  I'm a party-in-interest, but I'm not a

11   party opponent.  And they shouldn't be admitted on that basis.

12         THE COURT:  Your objection's noted.  Thank you.  It's

13   overruled.  The Court admitted it not to prove the truth of

14   the matter asserted as well.

15         So Mr. Mastro, please continue.

16         MR. MYERS:  And that statement you just made is for

17   Exhibits --

18         THE COURT:  5, 6, 7, and 8.

19         MR. MASTRO:  Thank you, Your Honor.

20   BY MR. MASTRO:

21   Q.   Mr. Schlossberg, in connection with the MOU defense and

22   any other defenses that you considered, had you considered how

23   these defenses might play out at a trial and what you'd need

24   to do to prove these defenses?

25   A.   Were I to embrace the positions that Serv Trust had taken



1    at trial in the state court, I -- I, of course, would have had

2    to prove up all -- offer some evidence to support those

3    defenses that they were raising.  With respect to multiple of

4    those defenses, there is clearly a difference of opinion as to

5    what's the truth of -- of what was -- what happened and what

6    was intended.  So there was going to have to be witness

7    testimony in this court on the adversary proceeding if I were

8    to embrace those same theories of defense.  That's going to

9    have to be competent evidence with regard to the truth of the

10   matter asserted by each of the documents we just discussed and

11   the theories that they underpin.

12   Q.   And who would your witness be?

13   A.   I would only have one witness that I could possibly

14   consider, Your Honor.  I'd have to have Greg Myers be my

15   witness as to all of these matters.

16           MR. MYERS:  Objection.

17           THE COURT:  Well, stand when you address the Court,

18   please.

19           MR. MYERS:  Objection.

20           THE COURT:  What's the basis?

21           MR. MYERS:  What's the basis of him saying he only

22   has one witness, me?  I'm not a trustee of Serv Trust.

23           THE COURT:  Your objection's overruled.  You'll have

24   an opportunity to cross-examine him.

25           Mr. Mastro, continue.



1    Q.   And you were saying, Mr. Schlossberg, that you would have

2    Mr. Myers as --

3    A.   Was interrupted, so let -- if I may continue?

4    Q.    -- as your witness?  Go ahead.

5    A.   Mr. Myers is the -- was the manager of 6789 Goldsboro.

6    He was critically involved in everything that happened while

7    he was the manager of 6789.  Mr. Myers was negotiating the

8    memorandum of understanding.  Mr. Myers was going to be a

9    very --

10           MR. MYERS:  Objection.  There's no basis for that.

11           THE WITNESS:  Your Honor, It's very hard to testify

12   when you're constantly interrupted by somebody who's waiting

13   until he finishes.

14           MR. MYERS:  Well, fine.  There's no objection for him

15   to testify --

16           THE COURT:  Mr. Myers.

17           MR. MYERS:  -- as to what I was doing.  He wasn't

18   there.

19           THE COURT:  Your objection is overruled.  He is a

20   Chapter 7 trustee who did an investigation.  You can cross-

21   examine him later.

22           Please continue.

23   A.   Despite the fact that I don't like being interrupted,

24   he's correct about what he just said.  I wasn't there.  He

25   was.  He just made the point for me.  He has to be a witness



1    if any of these things are going to be tried to a trier of

2    fact.  That raises a big problem because Mr. Myers is patently

3    a witness of questionable credibility.

4              MR. MYERS:  Objection.

5              THE COURT:  Basis.

6              MR. MYERS:  Objection.  Untrue.

7              THE COURT:  Overruled.  You may continue.

8    A.    That's something else Mr. Myers and I would disagree

9    about, I guess, but I -- I cannot imagine advancing to the

10   Court Mr. Myers under oath.  I -- my experience with Mr. Myers

11   in this case has been such that he is a terrible witness.  He

12   insists that he is the only person who knows anything about

13   anything.  And he does not present a credible nor a very

14   attractive witness for a trier of fact to embrace.  I

15   considered that I would be entirely hamstrung by having the

16   witness to these events, the critical person with actual

17   knowledge, getting on the stand and not being believed.

18             THE COURT:  Mr. Mastro, your next question.

19   BY MR. MASTRO:

20   Q.    And Mr. Schlossberg, I want to show you what I've marked

21   as Trustee Exhibit 11.

22   A.    Speak up, please.

23   Q.    I want to show you what's been marked as Trustee Exhibit

24   11.  This is a June 11, 2025 order of the bankruptcy court in

25   the District of Columbia.

1              MR. MYERS: Excuse me, Your Honor. Did we skip 9 and

2    10?

3              THE COURT: We haven't gotten to them yet, Mr. Myers.

4              MR. MYERS: Oh, I just --

5              THE COURT: We're on Exhibit 11.

6    Q.   And Mr. Schlossberg, do you recognize this exhibit?

7    A.   I do. This is Judge Gunn's recent decision Mr. Myers

8    last Chapter 13 case.

9    Q.   Okay. And did you review it in connection --

10   A.   Yes, I did.

11   Q.   -- with your testimony today and your recommendation to

12   the Court?

13   A.   It certainly forms a portion of my -- my conclusions.

14   Not that something fresh came to me from the reading of it,

15   but it's a judicial determination regarding Mr. Myers and his

16   propensity for abuse of the bankruptcy process.

17             MR. MYERS: Objection.

18   A.   A sprawling tapestry of bad-faith abuse.

19             MR. MYERS: It's not a judicial anything. It's

20   subject to a motion for reconsideration. There's no final

21   order.

22             THE COURT: Your objection's overruled, Mr. Myers.

23   You can't object simply because you disagree with something.

24   You're going to have an opportunity to put on your case. If

25   you disagree, you can bring it in then. But please, please

1   stop interrupting.

2           MR. MYERS:  So he can misstate the facts?

3           THE COURT:  You have an opportunity to cross-examine

4   him.

5           MR. MYERS:  Okay.

6           THE COURT:  You don't get to interrupt him every time

7   he speaks.

8           I'm sorry.  Please continue.

9   Q.   And Mr. Schlossberg, is Exhibit 11 an item that you

10  reviewed and relied upon in forming your opinion relating to

11  Mr. Myers' (indiscernible)?

12  A.   Before I came into the courtroom today, I relied on this.

13  I did not rely on this particular exhibit at the time that I

14  filed the 9019 because Judge Gunn just entered this opinion,

15  what, nineteen days ago.

16          MR. MASTRO:  Your Honor, I'd like to move Trustee's

17  Exhibit 11 into evidence.

18          MR. MYERS:  Objection.  It's not a final order.

19          THE COURT:  Objection's overruled.  It is admitted.

20      (Judge Gunn's order was hereby received into evidence as

21  Trustees' Exhibit 11, as of this date.)

22  Q.   And so Mr. Schlossberg, did you form a conclusion as to

23  your likelihood of success in the adversary case?

24  A.   I did.

25  Q.   And what was that opinion?



1    A.    Your Honor, I don't think I have much of a chance --

2    chance of a snowball in hell, as they would say, of

3    prosecuting this case with a witness, the only witness that I

4    could possibly put on the stand, and I would not ask anyone to

5    accept that witness.  I think that the defenses are -- weak

6    is -- weak is too weak a term for the -- the defenses that

7    were asserted below in the state court.  They are I do not

8    think going to prevail.

9          And as a result of that, I accepted the solicitation of

10   interest of the King parties and tried to do that without

11   looking too excited because I knew I needed to get this case

12   settled and extract something for the estate out of this

13   litigation because this litigation was going to be futile,

14   expensive, and incredibly time consuming in this case, which

15   has already going on, for my purposes, for eight years plus.

16   Q.    And Mr. Schlossberg, let's pivot now to the settlement

17   proposal that's before the Court and the proposed terms.  One

18   of the -- let me just read the proposed terms.  Then I want to

19   ask you about your --

20   A.    Sure.

21   Q.    -- consideration of these terms.  First, the King

22   plaintiffs, and I'm reading from document 17-1.  This is our

23   notice that was filed back on December 30th of 2024.  Page 6.

24          THE WITNESS:  May I get that from Your Honor?  I have

25   a copy of that?



1            THE COURT:  Yes, you may.

2    Q.   It's page 6, Mr. Schlossberg.  Just let me know when

3    you're there.

4    A.   Just a sec.

5            MR. VERSTANDIG:  Is this up on the screen, Mr.

6    Mastro?

7            MR. MASTRO:  Yes.

8            THE COURT:  It's in the motion.

9            MR. MASTRO:  Yeah, that's Exhibit 11 that's on the

10   screen.

11   A.   Yes, sir.

12   Q.   Okay.

13           THE COURT:  I'm sorry.  It's not in the motion.  It's

14   in the notice of motion, docket number 17.

15           MR. MASTRO:  Correct.  Okay.

16           THE WITNESS:  17-1.

17           MR. MASTRO:  17-1.  Page 6.  I'm reading from the

18   top, Your Honor.

19   Q.   "The trustee and the King plaintiffs have agreed as

20   follows: number 1, the King plaintiffs will pay to the trustee

21   for the benefit of the estate the sum of $150,000, the

22   settlement payment, upon court approval of the settlement, in

23   order to redeem the entirety of Serv Trust's interest in

24   Goldsboro and settle the redemption claim in the adversary

25   case."



1  A.    Yes, sir.

2  Q.    "Number 2, upon successful negotiation of the settlement

3  payment by the trustee, the parties will file a stipulation of

4  dismissal in the adversary case, dismissing all claims therein

5  with prejudice.  And 3, the King plaintiffs also will

6  reimburse the trustee for all reasonable legal fees and

7  expenses that the trustee incurs in connection with the

8  litigation of any appeals taken by any party in the event that

9  the settlement motion is granted by this Court."

10      Are those are the terms of the settlement, as you

11  understand it, Mr. Schlossberg?

12  A.    They are.  One element was added that I think makes it

13  even more attractive, and that is the agreement of the King

14  parties that they will withdraw their proofs of claim, which

15  mirror the relief that sought in -- in the -- in the -- in the

16  complaint.

17  Q.    Okay.  And Mr. Schlossberg, let's focus first on the

18  first element of the settlement.  The estate is receiving

19  $150,000 from the King parties to redeem Serv Trust's interest

20  in 6789 Goldsboro LLC.  What is your take on that?

21  A.    Well, Your Honor, you have to read that with item 3.

22  They have to be read together, 1 and 3, because in -- in one

23  settlement made in this case long ago, the settlement monies

24  that were paid to me on behalf of the estate were somewhat

25  chewed up by appellate litigation that resulted from it.  As

1   of that date, I no longer entertain settlement proposals

2   without a provision similar to this so that the monies that I

3   get, paragraph 1, are the monies that I net at the end of the

4   day.  And in order to have that get-net result, I needed to

5   have that.

6       As I've already explained, I don't think I could try this

7   case.  I'm fairly good in the courtroom.  Mr. Merrit -- Mastro

8   is better, but he knows what he's doing.  At the end of the

9   day, though, I don't think all of our talents brought to bear

10  could prevail in the adversary proceeding.

11      So it's a very simple win-loss.  I can't win on the one.

12  And I take home $150,000 here on the other.  So for that

13  reason, I -- I think this is the sensible monetary decision to

14  make in the case.

15  Q.   Let me ask you this, Mr. Schlossberg.  If,

16  hypothetically, you were to prevail in the adversary case,

17  this asset, the Serv Trust interest in the LLC, which is the

18  only asset of the estate, correct?

19  A.   Your Honor, that -- that -- that's -- that's the other

20  side of it.  If -- if the case goes to trial and we pull a

21  rabbit out of our hat and we win, what do we do?  We've denied

22  Mr. VerStandig's client the ability to have the class B

23  interest.  I still got the class B interest.  What a wonderful

24  thing to have.

25      Now, who am I going to sell it to?  Who is going to want



1    to buy into this position?  This is a property which was

2    apparently a little overoptimistically expected to yield

3    nineteen townhouse lots in a very valuable section of -- of

4    Montgomery County.  According to the appraisal, which I read

5    in this case, it is suitable for six to eight townhouse lots

6    max.

7        According to my calculations, which admittedly are

8    missing some numbers along the way for the -- for the class A

9    interests, which have to be paid first before you start

10   cutting up the equity that the people would be buying into, if

11   I sell someone -- excuse me.  If I sell someone the class B

12   membership interest, they get to be a class B member under the

13   operating agreement.

14       Under the operating agreement, the class B interest does

15   not get to enjoy any of the proceeds, any of the income

16   generated, by 6 -- 6789 until after the class A members have

17   gotten back their initial capital, all of it, their initial

18   capital return, all of it, the additional capital investment,

19   and the additional capital return, as well as some other

20   smaller niggling numbers.  I think each of the class A members

21   were entitled to $7,500 at the end of the first year.  I'm not

22   sure what that was all about.  It's -- it's a -- it's a

23   rounding error at this point.

24       As I calculate it -- calculated it -- calculate it today,

25   we're talking about something in excess of 6 or $7 million and

1    maybe more than that that would have to be paid before anybody
2    could ever get any kind of value or return for the class B
3    membership interest.  So who's going to -- who's going to jump
4    at the opportunity to throw money at that opportunity?  I
5    don't think there's any buyers out there.
6        I'm going to have to go back to him.  I'm going to have
7    to go back to Mr. VerStandig and -- and negotiate with him
8    again to buy it.  To offer me a better number.  Maybe they'll
9    come back and offer me the memorandum -- the MOU number that
10   they had offered in mid-2016.  Not likely, but maybe they
11   would.  That's where I'd have to go.
12   Q.  Okay.  Mr. Schlossberg, is there any risk to the estate
13   that the King parties could do a new appraisal and invoke the
14   appraisal procedures once again?
15   A.  Your Honor, if they lose, all it says is the appraisal
16   process was flawed.  I should say, let's say that the section
17   7.7 process.  I don't want to call it appraisal or redemption
18   because it's a melange of both.  The process was flawed.
19   Okay.  Fine.  What's going to stop Mr. VerStandig from sending
20   me another letter, saying I got a new appraisal.  You have
21   fifteen days to designate your appraiser.
22       No, I don't want to be there because I'm pretty sure I
23   know where it's going to be now, again.  I -- I don't think
24   that would be a very wise business decision to make in the
25   exercise of my business judgment, which, of course, is the

1    standard here.

2    Q.    And did you do any investigation as to what the

3    property's value is worth now?

4    A.    I -- I don't have the kind of money that would be

5    necessary to go engage appraisers that I could justify the

6    expense to the estate, Your Honor.  I've done a little bit of

7    online valuation review, but I don't call those online

8    appraisals.  We just call those online valuations.

9    Q.    And --

10    A.    And those valuations seem to be looking at the property

11    as value for the old mansion that's still on the property.

12    And they -- they are -- they are like $2 million.  The range

13    of that range.  I -- I wasn't much impressed with the value of

14    that.

15        It might be less.  It might be more.  I -- I don't know.

16    I know this.  The million-350 that they paid for it in 2013,

17    Your Honor, is slightly higher than what the Lipman Frizzell

18    appraisal showed the property to be worth five years -- or

19    excuse me, four years later.

20    Q.    And Mr. Schlossberg, I want to direct your attention to

21    Exhibit 9, which I've put on the screen.  You mentioned you

22    looked at some online valuations.  This is a Redfin

23    valuation --

24    A.    Sorry.

25    Q.    -- that has the estimate range between 1.92 and 2.28 --



1    are you --

2    A.    I'm sorry.  I'm getting rid of the other book because

3    we're not talking about anything out of that.

4    Q.    Is Exhibit 9 one of the valuations you looked at

5    (indiscernible)?

6    A.    This is -- yeah, this is the Redfin, Your Honor.  And

7    this was printed a week ago.  Well, two weeks ago.  Thirteen

8    days ago.  And at that time, Redfin said it was worth, as I

9    said, in the neighborhood of $2 million.  They said

10   $2,016,270.  Again, for what that's worth.  It's a -- it's an

11   online valuation.  It's not an appraisal.

12           MR. MASTRO:  And Your Honor, I'd like to move Exhibit

13   9 into evidence at this time.

14           MR. MYERS:  Objection.  Hearsay.  This is garbage.

15   This has nothing to do with the development of that property.

16           THE COURT:  The objection's overruled.  This is

17   publicly available information, and it is information that he

18   relied on in reaching his decision.

19           So Mr. Mastro, at this point, Exhibits 1, 2, 4

20   through 9 and 11 have been admitted.  Exhibit 3, the Court did

21   not admit.  And Exhibit 10 has not been discussed.

22       (Redfin valuation was hereby received into evidence as

23   Trustees' Exhibit 9, as of this date.)

24           MR. MASTRO:  Right.  Court's indulgence for a second.

25           THE COURT:  Okay.



1    Q.    Okay.  Mr. Schlossberg, let me just show you, then,

2    Exhibit 10, since we haven't addressed that yet.  Okay.  And

3    do you see Exhibit 10 on your screen, or do you have it in

4    your binder there?

5    A.    I have it in my binder right in front of me, and I see it

6    on the screen as well.

7    Q.    Okay.

8    A.    It's the same document.

9    Q.    And could you identify Exhibit 10 for the Court, please?

10    A.    Your Honor, this is the decision that was made in the

11    state court proceedings, as we've been referring to them, back

12    in January of 2023, whereby Judge Lease entered a judgment on

13    the alter ego declaratory judgment claim, wherein the court

14    found that Serv Trust, a statutory trust under the laws of

15    Maryland, was and is as of November 18th, 2015 the alter ego

16    of Mr. Myers.  And with that, the court then took note of the

17    fact that in light of his bankruptcy proceedings and my role

18    as his trustee, that the other claims in the case, the one

19    that we're now talking about settling, were stayed by

20    operation of Section 362 of the Bankruptcy Code.

21    Q.    All right.  And is this in Exhibit 10, is this an item

22    that you reviewed and considered in connection with your

23    evaluation of the proposed settlement?

24    A.    It is.

25              MR. MASTRO:  All right.  And Your Honor, I move



1    Exhibit 10 into evidence.

2            THE COURT:  Mr. Myers.

3            MR. MYERS:  No objection.

4            THE COURT:  Exhibit 10 is admitted.

5        (Judge Lease's decision was hereby received into evidence

6    as Trustees' Exhibit 10, as of this date.)

7    Q.    And Mr. Schlossberg, we've looked at the settlement

8    terms.  What is your recommendation, your opinion, regarding

9    this settlement and the interests of the estate?

10   A.    I -- Your Honor, I feel very strongly.  I think I've

11   expressed that probably by my vigor.  But I think that the

12   proposed 9019 settlement in this case is in the best interests

13   of the bankruptcy estate and that it -- it is perhaps the last

14   meaningful opportunity to get some value out of the redemption

15   claim.

16           MR. MASTRO:  Mr. Schlossberg, I have no further

17   questions.

18           THE WITNESS:  Okay.

19           MR. MASTRO:  Thank you for your time.

20           THE COURT:  All right.  Thank you.

21           Mr. VerStandig, would you like to ask this witness

22   any questions?

23           MR. VERSTANDIG:  Yes, Your Honor.

24   CROSS-EXAMINATION

25   BY MR. VERSTANDIG:



1    Q.    Mr. Schlossberg, I want to go back to what you referred

2    to as the MOU defense, which is the memorandum of

3    understanding that may or may not have been executed and the

4    dispute thereof.  Do you recollect that?

5    A.    Yes, sir.

6    Q.    What is the date range you shared where the memorandum of

7    understanding could theoretically have been executed?

8    A.    That would be the three-year anniversary of the operating

9    agreement, which was the effective date under that operating

10   agreement of July 18th, 2013.  The anniversary, July 18th,

11   2016.

12   Q.    So not before July 18th, 2016, correct?

13   A.    That is correct.

14   Q.    Okay.  And we heard a moment ago with Exhibit 10 that

15   Serv Trust was found to be Mr. Myers alter ego, effective as

16   of November 18th, 2015, correct?

17   A.    Yes.

18   Q.    Has Mr. Myers been a debtor in bankruptcy in this Court

19   since November 18th, 2015?

20   A.    Yes.  This case has been pending -- I've -- I've -- I've

21   forgotten the petition date, but I'm assuming you've given it

22   to me accurately.

23   Q.    Are you familiar with the docket in this case?

24   A.    Yes, I'm familiar with that.  Looked -- I've looked at it

25   lots.



1    Q.    At any point in time, did Mr. Myers as a debtor-in-

2    possession or you as his Chapter 7 trustee seek leave of court

3    to enter into the memorandum of understanding?

4    A.    Well, now that -- now that you mention it, no.  I --

5    I'm -- I am certain that there is no such entry.

6    Q.    Thank you.  Are you also familiar with the claims

7    register in this case?

8    A.    Yes.

9    Q.    I'm showing you what's been marked as King Parties'

10   Exhibit 1.  Do you recognize this document?

11   A.    You're going to have to spin it up for me.

12   Q.    It's on your screen.

13   A.    Yeah, but I can't move it.

14   Q.    Oh.  Sure.

15   A.    That's a flaw in this system.

16   Q.    Yeah.  I will scroll --

17   A.    Scroll it slowly enough so that I can read.  Okay.  I

18   just saw what -- I know what this one is.  So this is the

19   proof of claim filed by you on behalf of the King parties with

20   respect to the relief that has been sought in the complaint

21   that is now pending in the adversary proceeding, which is 24-

22   007.

23   Q.    Thank you.  Is this a true and accurate copy of proof of

24   claim 21?

25   A.    I can't tell you that, sir.  I -- I -- I'm -- I'm not the

75

1    guy who looked at this recently.

2    Q.    Okay.

3    A.    This has been some time since I've looked at this.  I

4    trust you, as an officer of the court, that you're not trying

5    to cook the books by putting a document on here with docket

6    legends on it and that it's going to be -- turn out to not be

7    a true and accurate copy.  But I will assume that, and that's

8    the basis for my assumption, Your Honor.

9             MR. VERSTANDIG:  Your Honor, I move King Parties

10   Exhibit 1 into evidence, mirroring entry 21 in the claims

11   register.

12            THE COURT:  Any objection, Mr. Myers, to the

13   admission of Mr. King's proof of claim?

14            MR. MYERS:  Other than all the writing at the very

15   top is all -- I don't even understand what it's all typed

16   over.  So it's not a true and accurate copy.

17            THE COURT:  The objection's overruled.  The Court

18   will admit King Parties' Exhibit 1.  It appears to be -- and

19   the Court did look at the proofs of claim that were filed.  It

20   appears to be a copy of claim number 21 filed on the claims

21   register.

22       (Proof of claim 21 was hereby received into evidence as

23   King Parties' Exhibit 1, as of this date.)

24            MR. VERSTANDIG:  Your Honor, I move Exhibits 2 and 3

25   as well, being copies of claims 22 and 23 in the claims



1    register, respectively.

2            THE COURT:  Mr. Myers, any objection?

3            MR. MYERS:  No objection to the form, but not as to

4    the truth of the matter.

5            THE COURT:  All right.  Well, the Court will admit

6    King Parties' Exhibits 2 and 3.  They appear to be duplicates

7    of claim number 22 and claim number 23 on the claims register.

8        (Proof of claim 22 was hereby received into evidence as

9    King Parties' Exhibit 2, as of this date.)

10       (Proof of claim 23 was hereby received into evidence as

11   King Parties' Exhibit 3, as of this date.)

12           MR. VERSTANDIG:  Thank you, Your Honor.  Nothing

13   further.

14           Your Honor, if the Court would permit, I would ask

15   for a brief recess at the Court's convenience, but it is not a

16   matter of urgency.

17           THE COURT:  We will be taking a recess very shortly

18   for the lunch break and to give Mr. Myers an opportunity to

19   get his thoughts together for the cross-examination.

20           So is there any reason why now would not be a good

21   time for a lunch break?  That clock is about half an hour

22   slow.  It's 12:27.

23           MR. MASTRO:  That's fine with me, Your Honor.

24           THE COURT:  All right.

25           MR. VERSTANDIG:  That's fine with me, Your Honor.

1             THE COURT:  Mr. Myers.

2             MR. MYERS:  It's fine.

3             THE COURT:  Mr. Schlossberg.

4             THE WITNESS:  Fine with me, Your Honor.

5             THE COURT:  Okay.  All right.  Well, we are going to

6    take a luncheon recess.  As I said, it's 12:27.  How much time

7    would the parties like for a lunch break?

8             Mr. Mastro, how much time?

9             MR. MASTRO:  I think an hour would be sufficient,

10   Your Honor.

11            THE COURT:  Okay.  Would forty-five minutes be

12   sufficient?

13            THE WITNESS:  I don't know what fast food's like

14   around here, Your Honor.

15            THE COURT:  Okay.  All right.  So you are going to go

16   out and -- okay.

17            THE WITNESS:  Yes.

18            THE COURT:  All right.  We will reconvene at 1:30.

19            Mr. Myers, does that work for you?

20            MR. MYERS:  That's fine.

21            THE COURT:  Mr. VerStandig?

22            MR. VERSTANDIG:  Yes, Your Honor.

23            THE COURT:  All right.  We will take a recess, and we

24   will reconvene at 1:30.

25            Mr. Schlossberg, I know I don't have to tell you



1    this, but you are still under oath.  You are still a witness

2    on the stand.  And therefore, you may not discuss your

3    testimony with anyone, including your counsel.

4            THE WITNESS:  Understood, Your Honor.

5            THE COURT:  All right.  Thank you.

6            THE CLERK:  All rise.

7            MR. MYERS:  Your Honor, is the room going to be open

8    so I can work, or what do I do?  Take all this with me or --

9            THE COURT:  Mr. Myers, there is a conference room

10    right between this set of double doors and the next set of

11    double doors.  There's a conference room on each side, and

12    you're welcome to use either one of those.

13            MR. MYERS:  Okay.  Thank you.

14            THE COURT:  And we're going to lock the courtroom,

15    and we will unlock it just a few minutes before 1:30.  So

16    you're welcome to leave anything you'd like in the courtroom.

17            MR. MYERS:  Thank you.

18            THE CLERK:  All rise.  Court is now in recess.

19       (Whereupon a recess was taken)

20            THE CLERK:  All rise.  Silence, please, and come to

21    order.  The United States Bankruptcy Court for the District of

22    Maryland now resumes its regular session, the Honorable Maria

23    Ellena Chavez-Rurak presiding.

24            Please be seated.  Recalling the case of Gregory B.

25    Myers, case number 15-26033, and the adversary case of King,

1    et al., v. Schlossberg, adversary number 24-00007.

2            THE COURT: All right. Mr. Myers, are you ready?

3            MR. MYERS: Sort of. Do my best.

4            THE COURT: All right. So before you start asking

5    questions, I just want to review what's been admitted.

6            We have Trustee's Exhibits 1 and 2 have been

7    admitted. Exhibit 3 was not admitted. Exhibit 4 was

8    admitted. Exhibits 5 through 8 are admitted as admissions of

9    a party opponent. Mr. Myers is a party-in-interest here in

10   this proceeding opposing this settlement, and they are

11   statements by him. So they are admitted. 9 was admitted, 10

12   was admitted, and 11 was admitted.

13           King Exhibits 1, 2, and 3 were all admitted.

14           And Mr. Schlossberg, while Mr. Myers is getting

15   organized, I will remind you to let him finish his question

16   before you start answering. We are recording, so let's try

17   not to talk over each other so that we can make a transcript

18   for the record.

19           THE WITNESS: Certainly, Your Honor.

20           THE COURT: All right. Thank you.

21   CROSS-EXAMINATION

22   BY MR. MYERS:

23   Q.   Afternoon, Mr. Schlossberg.

24   A.   Good afternoon.

25   Q.   Do you recall on what date I filed my bankruptcy case?



80

1    A.    Sir, you got to look at me because I can't -- I do not

2    hear that well, sir.  It's the same thing I told Mr. Mastro.

3    Don't come over here, please.

4    Q.    I'm allowed.

5              THE COURT:  No, you are not allowed to come up here.

6    A.    No, you're not.

7              THE COURT:  Go back to the podium.

8              MR. MYERS:  So what am I supposed to do?  Look at him

9    when I'm looking at my notes?

10             THE COURT:  Yes.  Everyone else manages to do it.

11   I'm sure you can find a way to do it as well.

12             MR. MYERS:  Well, it's hard to look at hwhen I'm

13   doing this like this.

14             THE COURT:  Just keep your voice up, and that will

15   help.

16   Q.    Do you recall on what date I filed my bankruptcy petition

17   in this court?

18   A.    No, I do not.  I told, when I answered that question that

19   I think Mr. VerStandig raised, I said, I'm not sure of the

20   date that the case was actually filed in 2015.

21   Q.    Okay.  I will represent to you that I filed my bankruptcy

22   case originally as a Chapter 11 reorganization, case number

23   15-26033, on November 18, 2015.  That ring a bell?

24   A.    Actually, no, it does not.

25             THE WITNESS:  May I ask the Court to just confirm



1    that for me from the docket?

2              THE COURT:  Yes, just give me one moment here.  All

3    right.  So according to the Court's docket, Mr. Myers filed

4    this case on November 18th, 2015.

5              THE WITNESS:  18th.  Okay.  Thank you, Your Honor.

6              THE COURT:  Yes.

7    Q.    18?

8    A.    18.

9    Q.    Okay.  Now, we have that date.  November 18, 2015's the

10   petition date.  So pursuant to 11 U.S.C. 541, if I didn't own

11   something on November 18, 2015, then it wouldn't be property

12   of my bankruptcy estate; is that correct?

13   A.    I don't think it's proper for me to be giving legal

14   opinions.

15   Q.    I'm not asking you for your legal opinion.  I'm asking

16   you for your opinion as a Chapter 7 trustee.

17   A.    Everything that you own under the pervasive definition in

18   11 U.S.C. Section 541 that you own as of the date of the

19   filing, and that is a very broad everything, is property of

20   your bankruptcy estate.  And certain things that pop up

21   afterwards can also become property of your bankruptcy estate.

22   Q.    And what are the things that you referenced that can pop

23   up afterwards that would become property in my bankruptcy

24   estate?

25   A.    Inherited property.



1    Q.    Okay.  And that's for 180 days, correct?

2    A.    Well, the date of death is, is the operative.  If the

3    date of death is within 180 days afterwards.

4    Q.    Okay.

5    A.    There's also some others.  I don't have a copy of 541 in

6    front of me.  I believe --

7    Q.    Okay.

8    A.    -- if someone wants to give me a Code, I'd be happy to--

9    Q.    Okay.

10   A.    -- go on with a --

11   Q.    Right.

12   A.    -- more complete answer.

13   Q.    So on November 18, 2015, I had no ownership interest in

14   Serv Trust?

15   A.    Is that supposed to be a question?

16          MR. MASTRO:  Objection.  Calls for legal conclusion.

17          MR. MYERS:  It's a fact question.

18          THE COURT:  Well, ask a question, Mr. Myers.  You're

19   not testifying.  You're asking him questions.

20   Q.    Okay.  When were you appointed Chapter 7 trustee in case

21   15-26033, my bankruptcy case?

22   A.    In February of 2017.

23   Q.    Yeah, I believe it was February 22, 2017.

24   A.    I'd ask the Court to confirm that, if that's okay.

25   Q.    Okay.



1          THE COURT:  That's the date the case was converted,

2    February 22nd, 2017.

3    A.    That's the date I was appointed.

4    Q.    Okay.  And as Chapter 7 trustee, how long did you have to

5    file an adversary proceeding against third parties?  In other

6    words, what was the bar date for you to file an adversary

7    proceeding against third parties to bring property into my

8    bankruptcy estate?

9    A.    Well, if you -- if you think this is controlled by

10    Section 546, it would be two years from the date of the

11    conversion, assuming -- assuming the conversion was within --

12    I'm going to need a Code in front of me.  I'm sorry.  I can't

13    do this by -- by guesswork because you're trying to get me to

14    say something, and I'm going to make sure it's accurate.

15          THE WITNESS:  If I have to answer those questions,

16    Your Honor, I'll need a Bankruptcy Code.

17    Q.    Forty-two years you've been a bankruptcy trustee, right?

18    A.    You've been a debtor in bankruptcy for eight or ten

19    years, sir.

20    Q.    I didn't ask what I've been.  I'm asking the questions.

21    So you don't know how long you have from the date you're

22    appointed as Chapter 7 trustee in a converted Chapter 11 to

23    bring an adversary, say, for example, a section 5 adversary

24    against Serv Trust?

25          MR. MASTRO:  Objection, Your Honor.  I don't see the



1    relevance of this, number 1, and it's beyond the scope of

2    direct.

3            MR. MYERS:  No, it's not.

4            THE COURT:  Mr. Myers, I'm not sure -- you're not

5    here to quiz him on provisions of the Code.  If you have a

6    question, ask him the question.  If you're trying to get him

7    to testify about how long he had to sue Serv Trust --

8            MR. MYERS:  Here's where I'm going with it, Your

9    Honor.

10           THE COURT:  -- or to sue a third-party, then ask that

11   question.  I think we're just going to be spinning wheels here

12   for a while if we're just going to quiz him.

13   Q.   Have you ever filed an adversary proceeding against Serv

14   Trust?

15   A.   No, sir.

16   Q.   So when you became Chapter 7 trustee on February 22,

17   2017, there would be a bar date.  You seem to not recall what

18   that is.  But you have never, ever filed a adversary

19   proceeding against Serv Trust to attempt to bring their

20   property into my bankruptcy estate; is that correct?

21   A.   I just answered that question.  I said, I've never filed

22   any action against Serv Trust.

23   Q.   Okay.  So you've never brought any of Serv Trust's

24   property into my bankruptcy?

25   A.   Judge Lease did that.



85

1    Q.    No, I didn't ask.  I said you.

2    A.    I answered your question.

3    Q.    Okay.  No.  Okay.  Have you ever abandoned any property

4    or claims in my bankruptcy case?

5    A.    I honestly don't recall if I filed any abandonments in

6    this cause of -- this case, Your Honor.  I don't do them

7    often, but we do do them.  We did one in the last couple of

8    weeks.  But I -- I don't recall.

9          THE COURT:  Next question.

10   Q.    You ever abandon any claims against Serv Trust?

11   A.    I have no recollection of an abandonment in this case as

12   to Serv Trust or anyone else, but I'm not certain of that

13   without reviewing the docket or my files in my office.  This

14   is a pretty old case.

15   Q.    Well, I'll represent to you that I'm aware of the docket

16   in this case, and you've never filed an adversary against Serv

17   Trust.

18         THE COURT:  Mr. Myers, you are not testifying.

19   You're here to ask questions.  Is there a question?

20         MR. MYERS:  Yeah, there is.  There is lots of

21   questions.

22         THE COURT:  Ask them, and stop testifying.

23   Q.    Have you ever abandoned any property or any claims that I

24   would possess -- that I'd possess prior to filing bankruptcy

25   that once you became trustee were property of my estate?  Did



1    you ever abandon any of those claims?

2         MR. MASTRO:  Objection, Your Honor.  Again, I don't

3    really see the relevance of this, and it's well beyond the

4    scope of the direct examination.

5         THE COURT:  What does this have to do with the

6    proposed settlement with the King parties?

7         MR. MYERS:  The Chapter 7 trustee and his counsel

8    have completely elided over the fact that Serv Trust is not

9    property of my bankruptcy estate.  He has no ability

10   whatsoever to settle any claims in connection with nonestate

11   property.

12        THE COURT:  All right.  Well, you can make that

13   argument in your closing, and you can introduce any evidence

14   that you would like.  Your cross-examination of him has to

15   fall within the scope of the questions that have already been

16   asked to him so -- and he testified about his decision to

17   enter into the settlement.  He testified about --

18        MR. MYERS:  Exactly.

19        THE COURT:  -- the factors that he considered.  So

20   let's focus on the scope of, number 1, what is before the

21   Court, which is whether he exercised good business judgment in

22   reaching the settlement, and number 2, within the scope of his

23   testimony that he has already provided.

24   BY MR. MYERS:

25   Q.   Mr. Schlossberg, as Chapter 7 trustee, can you settle --



1    can you enter into a 9019 settlement agreement with the King

2    parties concerning nonestate property?

3            MR. MASTRO:  Objection, Your Honor.  I mean, we're

4    talking about estate property here.  This doesn't seem

5    relevant.

6            MR. MYERS:  It's not estate property.  That's my

7    question.

8            THE COURT:  Mr. Myers, let me talk.

9            I'm going to overrule the objection and give Mr.

10   Myers a little bit of leeway here to ask where I think he --

11   what I think he's trying to ask here.

12   A.   Please -- please ask the question again.

13   Q.   Sure.  Is it your opinion, as Chapter 7 trustee, that you

14   can enter into a Rule 9019 settlement agreement with another

15   party, for example, the King parties, to settle claims in

16   connection with nonestate property?

17   A.   You have asked -- you have posed a hypothetical question,

18   and I state that it's hypothetical, Your Honor, because the

19   Court has already decided this is entireties property, and of

20   course it is entireties property.  So it's a hypothetical.  If

21   you want me to answer hypotheticals, I will, Your Honor, but

22   it looks like a slippery slope of a lengthy afternoon.

23   Q.   Court has not decided this is a estate property.

24   A.   Oh, the Court has.

25           THE COURT:  Mr. Myers, please let me talk.  Okay.

1              MR. MYERS:  Okay.

2              THE COURT:  And then I'll give you a chance, if I
3    need more information from you.

4              Mr. Schlossberg, answer the question the best you
5    can.  I understand that it assumes things, facts that are not
6    in evidence.  But give a brief answer to this question,
7    please.

8    A.    Assuming, and it's hard to do that because the example
9    you gave of nonstate property, you expressly posited that the
10   property of Serv Trust would not be included among estate
11   property.  Let's take that particular example out of the way.
12   I cannot enter into an agreement binding nonestate property.
13   But I expressly note that the property of Serv Trust and that
14   Serv Trust itself is estate property.

15   Q.    How did Serv Trust property become a state property in my
16   bankruptcy estate?

17   A.    By order of Judge Lease in a case tried in the Circuit
18   Court for Montgomery County, where you were present.

19   Q.    Well, actually, I wasn't present, Mr. Schlossberg.  Was I
20   present?  Do you know if I was present at that trial?

21   A.    Be the first thing I know about that you weren't present
22   at.  I apologize if I'm wrong on that.  I was otherwise
23   engaged that day.  I wasn't at the trial.

24   Q.    Did you attend any hearings in the Montgomery County
25   litigation?



1    A.    No.

2    Q.    Were you aware of the fact, Mr. Schlossberg, that on

3    December 30th, 2022, I removed the Montgomery County

4    litigation, which, just for the record, I will refer to the

5    Montgomery County litigation as the King, et al., v. Serv

6    Trust, et al. case, 436977V, and the Goldsboro v. Serv Trust,

7    et al. case, 451611V.  Are you aware that I removed that

8    action to the United States District Court for the Middle

9    District of Florida on December 30th, 2022?

10   A.    Yes, I am.

11   Q.    Okay.  And are you aware that at 9:17 a.m. on January

12   3rd, before any hearing started in Montgomery County Circuit

13   Court, I filed a notice of appeal in the United States

14   Bankruptcy Court for the Middle District of Florida, appealing

15   to the Middle District -- to the United States District Court

16   for the Middle District of Florida from the order granting

17   emergency motion from remand, entered in adversary 2:22 AP

18   0048-FMD, which is the King removed case.  That's the caption

19   down in the bankruptcy court.  Were you aware that I filed

20   that notice of appeal before the hearing in Montgomery County

21   Circuit Court started?

22   A.    Yes, sir.

23   Q.    Okay.  And --

24   A.    Which restores the status quo.  That means there was

25   another --



1    Q.    I didn't ask another question yet.

2    A.    -- at 9:30 a.m.

3    Q.    I didn't ask another question yet.  And are you aware

4    that the United States Bankruptcy Court for the District of

5    Florida has never mailed a certified copy of the order back to

6    Montgomery County Circuit Court?

7    A.    No, I am not.

8    Q.    Okay.  And have you had an opportunity since February of

9    this year to review a decision from the Fourth Circuit Court

10   of -- a published decision out of the Fourth Circuit Court of

11   Appeals, identified as City of Martinsville, Virginia v.

12   Express Scripts, Inc.  Have you ever reviewed that decision?

13   A.    I can't say that I recall having reviewed that decision,

14   Your Honor.

15   Q.    Okay.  It's rather prescient.  I, of course, will take

16   this up in my closing argument, but are you aware that if an

17   appeal is filed before the bankruptcy court in Florida

18   physically mails a copy of the remand order to Montgomery

19   County Circuit Court, there is an automatic stay under

20   Coinbase?

21           MR. MASTRO:  Objection, Your Honor.  I don't see the

22   relevance in it.  Assumes all kinds of facts not in evidence.

23           THE COURT:  We have a sophisticated witness here.

24   I'm going to overrule it, and let him answer.

25   A.    What's the question again?



1    Q.   Are you aware that under -- are you aware that when a

2    case is removed, in this case, from the Montgomery County

3    Circuit Court, to the United States District Court for the

4    District of Florida and then initiates an adversary theory

5    preceding.  The bankruptcy court issued an order on January

6    3rd, 2023.  I'm not sure exactly what time, but it was early

7    in the morning.  Granting emergency motion for remand but

8    never physically sent a copy of that order, certified copy of

9    that order, as required by 28 U.S.C. 1447(c), to the

10   Montgomery County Circuit Court to restore jurisdiction to the

11   Montgomery County Circuit Court?  Never.  Ever.  It's not in

12   the record.

13          MR. MASTRO:  Objection, Your Honor.  I mean, there's

14   so much legal conclusions bound in there.  If he wants to ask

15   the witness is he aware that an order of remand was sent with

16   or without --

17          MR. MYERS:  Okay.

18          MR. MASTRO:  -- a certification or something, I guess

19   that's proper.  But he's throwing in all these other

20   qualifications and legal conclusions.  I'm having a hard time

21   following it.  I don't know if Mr. Schlossberg can follow it.

22          THE COURT:  Well, I'm going to give Mr. Schlossberg

23   an opportunity to try and respond.  The objection's overruled.

24   A.   Your Honor, that question would require me to accept as

25   accurate a number of representations that just passed from Mr.

1    Myers.  I don't have any confidence in Mr. Myers to accurately

2    testify as to these matters, nor do I necessarily think that

3    he actually understands what it is he's talking about.  It may

4    be true, but I have no idea.  And I'm not about to rely on the

5    representations of Mr. Myers.  Period.

6              THE COURT:  Thank you.

7    Q.   Thank you.  Let me ask you a question, Mr. Schlossberg.

8    Are you aware if there is an order remanding the case from the

9    United States Bankruptcy Court for the Middle District of

10   Florida, certified copy of an order that was physically mailed

11   to the Montgomery County Circuit Court and entered in the

12   circuit court litigation that we're talking about?

13   A.   No, I have no idea, sir.

14   Q.   You have no idea?

15   A.   I have no -- no idea.  None whatsoever.

16   Q.   Okay.  Have you ever heard of the Griggs principle?  Have

17   you ever heard of Griggs principle?

18   A.   Grapes?

19   Q.   Griggs.

20   A.   No, sir.  Don't know what it is.

21   Q.   Okay.  Now, do you recall, Mr. Schlossberg, that in my

22   converted Chapter 11 as a Chapter 7 that the petition date

23   remains the same as November 18, 2015, do you recall a

24   memorandum opinion and order entering judgment issued by Judge

25   Lipp on September 28th, 2018 in adversary proceeding 17-00193

1    that would be docket 94, docket 93, the opinion and the order,

2    and that was in connection with the UST's objection to my

3    discharge?

4    A.    If you want to show me a copy of it, I'll be happy to

5    tell you if I remember it.  There's been lots of orders and

6    lots of decisions in this case, many of which, of course, were

7    issued by Judge Lipp.

8    Q.    Well, you've cited that order many times in your papers.

9    A.    I'm -- you're not going to trap -- try and trap me into

10   saying something because I'm embarrassed that I can't remember

11   something.

12   Q.    Okay.

13   A.    Mr. Myers, that's -- that intimidation stuff doesn't work

14   with me.

15           MR. MYERS:  Can I approach the witness and ask him to

16   read the findings of fact from that order?

17           THE COURT:  Do you have a copy for the Court and for

18   the other parties in the courtroom?

19           MR. MYERS:  No, it's verbatim out of Judge Lipp's

20   order.

21           THE COURT:  Is that a yes or a no?

22           MR. MYERS:  I don't have copies.  It's Judge Lipp's

23   order and --

24           THE COURT:  Show it to Mr. Schlossberg's counsel

25   first.



1          MR. MYERS:  Those are verbatim.  No, not that.  Just

2    that.  Just that paragraph.

3          MR. MASTRO:  No, I object, Your Honor.  This is not

4    Judge Lipp's order here.  This is just his outline.  It's not

5    Judge Lipp's order.

6          MR. VERSTANDIG:  Portions of it also appear to be

7    ellipsised.

8          THE COURT:  If it's not a copy of the -- I'm sorry.

9          MR. VERSTANDIG:  Portions of it appear to be

10   ellipsised as well.

11         THE COURT:  If it's not a copy of the order, then you

12   may not introduce it into evidence.

13   BY MR. MYERS:

14   Q.  Mr. Schlossberg, do you recall -- because you have

15   testified previously concerning this order, do you recall that

16   in Judge Lipp's -- I'm just going to call -- the memorandum

17   opinion and order entering judgment, I'm going to call it the

18   judgment.  Under findings of fact, Judge Lipp said the

19   following.  This is "verbatim".

20        "The following facts are relevant to the issues at hand

21   and are either uncontroverted or are supported by evidence in

22   this case."  Now, this is September 28th, 2018.  "Serv Trust

23   is a trust that was created by Myers' mother for the benefit

24   of Myers' five children.  Serv Trust was funded with an

25   initial deposit of $1,000 from Myers' mother.  Myers and



1    Daniel Ring are the cotrustees of Serv Trust."

2        Do you recall reading that in that opinion?

3        MR. MASTRO:  Objection, Your Honor.  I don't know

4    what he's reading from and if that's the exact verbatim quote.

5    And I also don't know what the relevance of it is to this.

6        THE COURT:  I don't know either, but I'm going to

7    give him a little bit of leeway to ask his questions.  And if

8    Mr. Schlossberg has that passage committed to his memory, then

9    he can testify about it.

10        Mr. Schlossberg.

11    A.    Mr. Schlossberg does not have that committed to memory.

12    Your Honor.  I don't recall the particular hearing.  I know we

13    had a lot of hearings in this courtroom over a long period of

14    time.

15        THE COURT:  Next question.

16    BY MR. MYERS:

17    Q.    Do you recall in Judge Lipp's order, "It is undisputed

18    that Serv Trust was established to pay educational and other

19    expenses related to Myers' children.  It is also undisputed

20    that Myers is a cotrustee of Serv Trust, with the authority to

21    direct Serv Trust to make payments on behalf of its

22    beneficiaries, the Myers children.  Myers was adamant at trial

23    that every payment that he or Kelly received from Serv Trust

24    was for the benefit of his children.  If, as irrefutably He

25    testified to by Myers," irrefutably testified to by Myers,

1    "Every payment from Serv Trust to Myers and/or Kelly was for

2    the benefit of their children, then it appears Serv Trust was

3    serving its intended purpose, i.e., providing for Myers'

4    children."

5         And then, she says, "Such payments would not be loans to

6    Myers and/or Kelly.  They would be distributions to the trust

7    beneficiaries."

8         Do you recall that, Mr. Schlossberg?

9         MR. MASTRO:  Same objection, Your Honor.  I'd also

10   point out, for the record, that the trustee was not a party to

11   the 727 adversary.  That was brought by the United States

12   Trustee.  So myself and Mr. Schlossberg were not a party to

13   this.

14        THE COURT:  Understood, and Mr. Schlossberg can

15   testify for himself as to that.

16        Mr. Schlossberg, the objection's overruled.

17   A.   Same answer as I just gave a moment ago, Your Honor.  I

18   can't remember it as such.

19        THE COURT:  Understood.  Thank you.

20   Q.   Did you ever appeal Judge Lipp's memorandum opinion and

21   order entering judgment on September 28th, 2018 in adversary

22   17-00193, docket 94 and docket 93, Mr. Schlossberg?

23   A.   If that's -- if that's the same proceeding, and -- and

24   I -- I'm careful saying if because I don't have a lot of

25   confidence that you're not going to take something out of



1    context.  But if that's the same proceeding, I just heard my

2    counsel say I wasn't a party to that proceeding.  I don't see

3    how I could have taken an appeal from the decision.

4    Q.    Well, maybe I could be educated.  If you're a Chapter 7

5    trustee and there's an adversary filed by the United States

6    Trustee to deny my discharge, you'd have a right to file an

7    appeal, wouldn't you?

8            MR. MASTRO:  Objection, Your Honor.

9    Q.    You don't know?  Okay.

10           THE COURT:  The objection's overruled.  Answer best

11   you can.

12   A.    Never did the research on the subject, Mr. Myers, but I

13   don't think I have any rights in that litigation, including

14   especially taking an appeal from something I wasn't a party

15   to.

16   Q.    You testified earlier at length about the first amended

17   and restated operating agreement of 6789 Goldsboro LLC.

18   That's Trustee's Exhibit 1.  Do you recall that?

19   A.    Yes, I remember testifying.

20   Q.    Okay.  Do you know the history of 6789 Goldsboro LLC

21   preceding that first amended and restated operating agreement?

22   A.    No.  I was commenting on this -- this contract of record

23   in this case.

24   Q.    Okay.  Have you ever reviewed a copy of the Serv Trust

25   agreement that was formed July 10, 2010 by my mother as the



1    trustee -- I mean, the settlor?

2    A.    I may have over the years, but I don't recall.

3    Q.    But you didn't review that agreement in connection with

4    this?

5    A.    No.

6    Q.    Okay.  And would it surprise you, if you read that

7    agreement, it said Serv Trust is a common law trust, a

8    Maryland common law trust, a Maryland common law spendthrift

9    trust?

10   A.    It would astonish me because Judge Lease is a pretty

11   careful guy.  And he made a decision on the merits in your

12   case in Montgomery County.  And he found, I believe I saw

13   this, that it was a statutory trust.  I'm not sure what the

14   difference would be, but he found that it would be a -- it was

15   a statutory trust and that it was your alter ego.

16   Q.    You weren't present, were you, at the December 16th, 2022

17   pre-trial conference in the Montgomery County litigation with

18   Judge Lease, were you?

19   A.    I was not.

20   Q.    Okay.  So you're not aware that Judge Lease, on December

21   16, 2022, said that because of the automatic stay in my

22   Florida case, which Judge Delano issued an order specifically

23   saying there could be no claims against me personally, and at

24   that point in time, I was no longer a trustee of Serv Trust,

25   that Judge Lease on the record said Myers is not a party to



1    this litigation?

2              MR. MASTRO:  Objection.  Hearsay, Your Honor.

3              MR. MYERS:  It's in the record.

4              THE COURT:  Mr. Myers, you're asking him if he knows

5    about things, and it's almost like you're testifying from the

6    podium.  If you want to say all those things, you're going to

7    have an opportunity in your case.  But ask him about

8    specifically his decision making in entering into this

9    settlement.  That's the issue for the Court.

10             The issue for the Court is not whether this Court was

11   right or that Court was wrong.  The issue for this Court is

12   whether he exercised good business judgment in determining

13   that this settlement is something he should enter into.

14   That's the sole question for me today.  So and that was the

15   focus of his testimony in his direct.

16             Your cross-examination is limited to the scope of

17   what was asked in direct.  I'm trying to give you some leeway.

18   You've gone outside the bounds of what was asked in direct,

19   and I'm trying to give you some leeway to give you an

20   opportunity to show how that's relevant to the issue before

21   the Court.  But I'm not seeing it.

22             So with that in mind --

23             MR. MYERS:  His business judgment --

24             THE COURT:  With that in mind, ask him your next

25   question.  Okay.

```
1              MR. MYERS:  Yeah.

2    BY MR. MYERS:

3    Q.   In your business judgment, Mr. Schlossberg, if I wasn't a

4    party to the trial on January 3, then how could I possibly be

5    determined to be the alter ego of Serv Trust?

6              MR. MASTRO:  Objection, Your Honor.  I don't see what

7    the relevance of this is.

8              MR. MYERS:  It's his business judgment.  I mean --

9              THE COURT:  But he's not the one -- a court

10   decided --

11             MR. MYERS:  It didn't.

12             THE COURT:  -- that you are the alter ego of Serv

13   Trust.  Mr. Schlossberg didn't decide that.

14             MR. MYERS:  Okay.  Let me go to the next question,

15   and maybe we can get to that.  Your Honor, where I'm going

16   with this is that he's elided over the entire fact that this

17   matter still rests in the Montgomery County Circuit Court.

18             THE COURT:  Well, ask him that question.

19   Q.   Okay. Mr. Schlossberg, are you aware that on -- are you

20   aware that Judge Simpson entered an order remanding the

21   litigation that we're talking about back to Montgomery County

22   Circuit Court?

23   A.   I don't know that I recall whose order it was that

24   remanded this case back, but I do recall that there was an

25   order remanding this case back to the circuit court for
```



1    Montgomery County after Judge Lease entered his final order

2    and sent the case back here for further action because of the

3    stay, which barred him from going forward --

4    Q.    That's not --

5    A.    -- the second issue.

6          THE COURT:  Next question.

7    Q.    Mr. Schlossberg, I wasn't referring to Judge Delano's

8    order.  I was referring to Judge Simpson's order in this court

9    in 2019.

10   A.    Okay.  Well, then I was not thinking of the same period

11   of time and transactions.  I apologize.  In the future, I'll

12   ask that you put the dates on the orders that you're trying to

13   characterize.

14        I do not recall whatever order it is you're talking about

15   that sent this case back to -- Judge Simpson sent it back to

16   Montgomery County?  I would like to see the document you're

17   talking about.

18        THE WITNESS:  I apologize, Your Honor.  I think that

19   I was confused.

20        THE COURT:  No apology needed.

21        MR. MYERS:  Your Honor, may I request?  I don't have

22   access to it.  It's Judge Simpson's remand order when Mr.

23   VerStandig removed the Montgomery County litigation to this

24   Court, and she remanded it very shortly thereafter.  Is it

25   possible I could ask you to look at that order so we can



1     refresh?

2            THE COURT:  All right.  This is what I'm going to do.

3     Mr. Myers, I would like you to give Ms. Fernandez -- Ms.

4     Fernandez, raise your hand -- whatever you need a copy of for

5     this cross-examination.  I want you to let her know.  And if

6     it's in the docket, we will make copies for everybody in the

7     courtroom and -- but I'm not going to keep getting off the

8     stand -- getting off the bench so that we can keep printing

9     exhibits for you.

10           So if there's anything other than this order that you

11    would like, please let Ms. Fernandez know, and we will make

12    copies for everybody in the courtroom.  Okay.

13           MR. MYERS:  Yes.

14           THE COURT:  All right.

15           MR. MYERS:  Thank you, Your Honor.

16           THE CLERK:  All rise.  Court is now in recess.

17        (Whereupon a recess was taken)

18           THE CLERK:  All rise.  Silence, please, and come to

19    order.  The United States Bankruptcy Court for the District of

20    Maryland now resumes its regular session, the Honorable Maria

21    Ellena Chavez-Rurak presiding.

22           Please be seated.

23           THE COURT:  All right.  Mr. Myers, your next

24    question.  And actually, before you ask that question, Mr.

25    Myers, can you tell me how much time you think you need for



1    your cross-examination?  I'm just trying to manage our time

2    for today.

3              MR. MYERS:  Well, it's hard for me because of the way

4    I am, because of the way Mr. Schlossberg is, and the

5    interaction.  So what time?

6              THE COURT:  It's 3 o'clock now.

7              MR. MYERS:  At least three --

8              THE COURT:  He's been on the stand for almost an hour

9    and a half.

10             MR. MYERS:  Yeah, probably two more hours.

11             THE COURT:  All right.  Well, I'll give you until 5

12   o'clock.  Okay.  I want to make sure you have an opportunity

13   to ask him what you want to ask him.  But I'm just trying to

14   manage our time because we come back tomorrow, but I have

15   other things scheduled in the afternoon,  so all right.

16             MR. MYERS:  Well, I'll probably bring Mr. Schlossberg

17   back in my case, so on direct.

18             THE COURT:  Okay.

19             MR. MYERS:  Your Honor, your nice clerk gave me

20   exhibits.  Are we going to mark these copies that I'm got?

21             THE COURT:  Are you marking them?

22             MR. MYERS:  Yeah, I'd like to put them in the record.

23             THE COURT:  Okay.  Well, you should have done that

24   already.

25             MR. MYERS:  So what exhibit do you want me to start

```
 1   with?

 2              THE COURT:  Well, you're debtor.  So Debtor's Exhibit

 3   1 would be a good place to start.

 4              MR. MYERS:  So do I ask him questions?  Do I show it

 5   to them?

 6              THE COURT:  Well, so let's -- I have four exhibits.

 7   So tell me what is Number 1.  What's Number --

 8              MR. MYERS:  This is Judge Lipp's order entering

 9   judgment, case 17-00193.93, dated 9/28/18.

10              THE WITNESS:  That's too much information.

11              THE COURT:  All right.  So that's Number 1.

12              THE WITNESS:  Which one was that?  I just hear

13   mumbling.

14              THE COURT:  It is the thicker one, docket number 93.

15              THE WITNESS:  The big one?  Big one?

16              THE COURT:  The big one.  Judge Lipp's decision from

17   September 28th, 2018.

18              THE WITNESS:  And this is Debtor's 1?

19              THE COURT:  That's Debtor's 1.  And what's going to

20   be Debtor's Number 2?

21              MR. MYERS:  I don't know until I finish this one.

22   I'm just going to grab them as I go.

23              THE COURT:  Okay.

24              MR. MYERS:  Thank you.

25              THE COURT:  All right.  Your next question.
```



1    RESUMED CROSS-EXAMINATION

2    BY MR. MYERS:

3    Q.   Okay.  So Debtor's Number 1, Mr. Schlossberg, do you have

4    that there?

5    A.   Yes.

6    Q.   Okay.  And on memorandum and opinion, which starts on

7    page 3, that's doc 94 in case 17-00193.

8    A.   Page 3.  Okay.

9    Q.   Okay.  And then that's the beginning of the memorandum

10   opinion.  And then the next page, page 2, findings of fact.

11   This is Judge Lipp making findings of fact.

12   A.    Wait a minute.  Page 3.  The page after that's not 2.

13   That's 4.

14   Q.   So the fourth page in on the exhibit should be 2 at the

15   bottom.

16          THE COURT:  He means page 2 of the memorandum

17   opinion.

18          THE WITNESS:  Thank you, Your Honor.

19          THE COURT:  You're welcome.

20   Q.   2 of 38.

21   A.   You got two documents combined there.  Okay.  Got it.

22   Q.   That's the way it was given to me so -- these are Judge

23   Lipp's findings of fact.  "The following facts are relevant to

24   the issues at hand are neither uncontroverted or supported by

25   the evidence in this case."  That's the first sentence.  Do



1    you see that?

2    A.    Yes.

3    Q.    And then do you see the footnote at the bottom, footnote

4    2, which is at the end of that sentence?

5    A.    I see it.

6    Q.    It says, "To the extent any of the following findings of

7    fact constitute conclusions of law, they are adopted as such,

8    and to the extent any conclusions of law constitute findings

9    of fact, they are so adopted."  Do you see that footnote?

10   A.    Yes.

11   Q.    So let me ask you a question in your business judgment is

12   Chapter 7 trustee.  If Judge Lipp made a finding of fact that

13   Serv Trust was a trust that was created by Myers' mother for

14   the benefit of Myers' five children, that Serv Trust was

15   funded with an initial deposit of 1,000 from Myers' mother,

16   Myers and Daniel Ring are the cotrustees of Serv Trust, that

17   would be a finding of fact and would be res judicata at

18   anything different in this case, correct?

19          MR. MASTRO:  Objection.  It calls for a legal

20   opinion, Your Honor.

21          MR. MYERS:  I'm asking for his business judgment.

22          THE COURT:  I'm going to overrule the objection and

23   let him answer the question.  Of course, this decision was

24   rendered on September 28th, 2018.

25          So Mr. Schlossberg, I'll let you answer the question.



1    A.    As the Court notes, this was entered on September 28th,

2    2018.  Subsequent to that date, Judge Lease conducted a trial

3    on the subject of the trust and fully adjudicated the issue of

4    the existence of the trust and that the trust was the alter

5    ego of Mr. Myers.  That's the important fact for the trustee

6    in even bringing this 9019 motion because it is that which

7    placed me in control of the asset by the decision of that

8    Court.

9         You can't take things out of context, respectfully.  And

10    if you find anything that is arguably favorable to your

11    construct of facts, Mr. Myers, you ignore everything else in

12    the world, including any other court decisions which must be

13    construed together with it.  That is the -- that is the signal

14    pitfall in your reasoning process, and it carries through to

15    each and every question you have put in front of me, which is

16    nothing more than an invitation to me to reject the decisions

17    of the courts --

18    Q.    Okay.

19    A.    -- that are in place here.

20    Q.    Thank you, Mr. Schlossberg.  Yeah.

21    A.    I'm sorry.  I'm still answering.

22    Q.    You're not answering the question I asked.

23    A.    Let me finish.

24         THE COURT:  Yes.  Mr. Myers, let him --

25    Q.    Not asking -- yeah.



1          THE COURT:  Mr. Myers, he's entitled to complete his

2    answer.  You asked him the question.  I'm not going to cut him

3    off.

4          MR. MYERS:  Okay.

5          THE COURT:  Please continue.

6    A.    Each and every one of the various contentions that you've

7    spent the last hour and a half on have been futile efforts to

8    get me to reject the prevailing law in this case.  You may try

9    the rest of the afternoon and all day tomorrow.  You're going

10   to get the same results.

11         THE WITNESS:  Thank you, Your Honor.

12         THE COURT:  Thank you, Mr. Schlossberg.

13         Mr. Myers, next question.

14         MR. MYERS:  Are you finished, Mr. Schlossberg?

15         THE WITNESS:  Your Honor, I've --

16         THE COURT:  Mr. Myers, next question.  We don't need

17   the snippiness from anyone.

18         MR. MYERS:  Well, the last time I questioned him --

19         THE COURT:  Next question.

20         MR. MYERS:  -- he started talking again.

21   Q.    So you just said, Mr. Schlossberg, that Judge Lease fully

22   adjudicated the case.

23   A.    No, I said he fully adjudicated the question.

24   Q.    What question?

25   A.    The question of the alter ego.  He expressly declined to

1    take on the redemption case because he said he was barred by

2    the stay because I, as the successor to Serv Trust, am

3    protected by the stay.

4    Q.   What stay?

5    A.   The bankruptcy stay.  Section 362(a) of the Bankruptcy

6    Code.

7    Q.   There was no stay.

8    A.   There is a stay, sir.  That's just silliness.  You know

9    better than that.

10   Q.   I don't need you to talk like that to me.

11            THE COURT:  Mr. Myers, next question.

12            MR. MYERS:  Well, please ask him to --

13            THE COURT:  Next question.

14            MR. MYERS:  -- control his remarks.

15   Q.   Okay.  We're in the -- we're going to mark this, or it's

16   already been marked, Trustee's Exhibit 10.  Do you want to

17   pull that out, Mr. Schlossberg?

18   A.   I have in front of me.

19   Q.   So you're saying that Judge Lease fully adjudicated the

20   question?  So this is order entering partial judgment.  How

21   did he fully adjudicate anything in that case with a nonfinal

22   order?

23            MR. MASTRO:  Objection, Your Honor.  I think this

24   (indiscernible) --

25            THE COURT:  Objection is overruled.  Thank you.



1    A.    Judge Lease fully adjudicated the issue of the alter ego

2    claim.    Judge Lease had in front of him a two-count complaint.

3    It had the alter ego, and it also sought the remand.    The

4    remand --

5    Q.    Do you mean the redemption?

6    A.    Please let me finish.

7    Q.    The remand.

8    A.    The remand could not go forward because to do so would be

9    to be taking acts that belong to this court because I am

10    protected by the bankruptcy stay.    And I am vested, was vested

11    by him on that date and have been ever since with the rights,

12    whatever they are, of Serv Trust.

13    Q.    So when you say remand, did you mean redemption?

14    A.    Sir, I don't know when you're talking about.    I use the

15    word remand.

16    Q.    Well, I'd like to know.    I don't understand what the

17    answer means.

18    A.    So --

19            THE COURT:    Next question.

20            MR. MYERS:    Well, he just used remand for the second

21    count.    There is no remand for the second count, Your Honor.

22            THE COURT:    Ask him a question, Mr. Myers.

23    Q.    What did you mean by remand just now?

24    A.    The Court.    I'm sorry.    I see that the -- the word that

25    was used by Judge Lease was that it was removed.    No, actually



```
 1   it wasn't.  What he said was I am stayed by the bankruptcy by
 2   Section 362, and this case will remain stayed until either the
 3   case is removed, for the second time, back to the bankruptcy
 4   court or someone lifts the stay or the stay otherwise is
 5   lifted by operation of law.  I apologize for saying it had
 6   been remanded.  I was leaping to the result.
 7   Q.   And is there not a third item there in that paragraph
 8   you're reading?
 9   A.   I just said that at the end, sir.
10   Q.   So where in this order entering partial judgment of the
11   stay does it say that it's Serv Trust property is property of
12   the bankruptcy estate?
13   A.   Can't hear you, sir.  You're talking into your chest.
14   Q.   Where does it say in this order entering partial judgment
15   and stay, Mr. Schlossberg, that Serv Trust property is
16   property of my bankruptcy estate?
17   A.   At the top of the page 2, the first complete paragraph
18   says "Found and adjudged pursuant to the alter ego declaratory
19   claim, and for those reasons stated on the record at the close
20   of the trial, Serv Trust is, and as of November 18, 2015, was
21   the alter ego of Gregory B. Myers pursuant to Maryland law."
22   Q.   So is it your contention that after Judge Lipp makes a
23   ruling that's final and unappealable and is res judicata to
24   anything that Judge Lease does that he can just ignore her
25   ruling?
```



 1   A.   I wouldn't be so bold as to say Judge Lease ignored any

 2   other court's ruling.  I would say that he applied that ruling

 3   in light of the facts in front of him, and he made the

 4   decision.  And if you got a problem with it, take an appeal,

 5   as you've done.  And if you have a real problem, maybe you

 6   should have moved to stay everything and keep it in -- in that

 7   court.  But you didn't do that.  So we're here now.  I'm

 8   vested with Serv Trust's rights.  And I'm taking --

 9   Q.   You can stop.  I didn't ask a question.

10        THE COURT:  Mr. Myers, don't --

11   Q.   I don't need you to continue on.

12        THE COURT:  Stop.  Mr. Myers, don't interrupt him.

13        MR. MYERS:  I didn't --

14        THE COURT:  Don't interrupt him.  I didn't let him

15   interrupt you.  I didn't let Mr. Mastro interrupt you.  I'm

16   not going to let you interrupt anyone either.

17        MR. MYERS:  Don't I get to ask the questions, and

18   then he answers my question and not go off on some tangent

19   about what he thinks the law is?

20        THE COURT:  He's answering the question.

21        MR. MYERS:  No, he's not.

22        THE COURT:  He is.  And you're not going to interrupt

23   him anymore.

24        Mr. Schlossberg, please continue.

25        THE WITNESS:  I'm sorry, Your Honor.  He just got



1   what he wanted.  Broke my chain of thought.  And I don't want

2   to sound like I'm not sensible about something, so I'm going

3   to stop right here.

4            THE COURT:  Okay.

5            THE WITNESS:  I'll wait for the next question.

6   Q.   Mr. Schlossberg, you just said that I should have filed a

7   notice of appeal.  I did file a notice of appeal, as you know,

8   in the Maryland Court of Appeals back in January of 2023, and

9   they determined that there is no final order in that case.  So

10  it has not been adjudicated, as you so state, unless you can

11  tell me something I don't know, which you like to do.

12  A.   I'm not going to parse words with you, Mr. Myers.  You

13  don't like some results, so you decide to, as you say -- you

14  overuse the word elide, by the way.  This is not what this

15  case is about.

16           MR. MYERS:  I'm sorry, Your Honor.  This --

17           THE COURT:  Stop interrupting.

18           This is not what this case is about.

19  A.   This case is about taking action based on what I'm

20  charged with by law and what Your Honor charges me with when

21  you allow me to continue in the case.  My actions are actions

22  to preserve property of the estate, a phrase you -- you take

23  exception to.  Take exception all you like, but that's the

24  fact of it.

25           If I'm wrong, you'll have an appellate court sometime



1    tell you that.  In the meantime, unless you get a stay of the

2    prior decision from which you are appealing, you're stuck with

3    the effect of it until such time.  I don't know why you can't

4    understand this after all the appeals you've been in in this

5    case alone.

6            THE COURT:  All right.  Thank you.

7            Mr. Myers, your next question, please.  And Mr.

8    Myers, are you moving Debtor's Exhibit 1 into evidence?

9            MR. MYERS:  Yes, please.

10           THE COURT:  Any objection?

11           MR. MASTRO:  Your Honor, it's a limited objection as

12   to 1 that's going to come into play later.  Since there was no

13   witness and exhibit list, we necessarily object to Mr. Myers

14   introducing anything into evidence.  However, Debtor's Exhibit

15   1 is on the docket in this case.  The Court is welcome to take

16   judicial notice of the docket in this case and related

17   adversary proceedings.  So preserving our objection as it may

18   pertain to later items, we do not object to Debtor's Exhibit

19   1.

20           THE COURT:  All right.  Debtor's Exhibit 1 is

21   admitted.

22       (Judge Lipp's decision was hereby received into evidence

23   as Debtors' Exhibit 1, as of this date.)

24   Q.   So Mr. Schlossberg, you just chided me about appellate

25   matters.  And on April 18th, 2023, in the Appellate Court of



1    Maryland, as you well know, I had filed a motion for stay

2    pending appeal.  On April 28th, 2023, the King parties, Mr.

3    VerStandig, counsel, filed a response to my motion, which

4    Goldsboro and the Chapter 7 trustee adopted and incorporated

5    in their respective responses filed in the Appellate Court of

6    Maryland.  And this is what it said in Mr. VerStandig's

7    motion, the King parties.

8        "The order from which Mr. Myers instantly seeks a stay

9    is, by its own express terms, nonfinal.  Indeed, the document

10   is titled order entering partial judgment and stay."  And the

11   order most certainly does not dispose of the totality of the

12   triable issues below.  Here's the next sentence.  "The order

13   from which appellants appealed did not adjudicate or complete

14   the adjudication of any claim in this matter."  It, therefore,

15   was not a final order.  Those are your words, sir.

16           THE COURT:  Mr. Myers, why does it matter?  Why does

17   it matter whether the judgment was final or not final?  You're

18   not here -- the Court is not determining any of the issues

19   that were before the state court.  The Court is only

20   determining whether Mr. Schlossberg exercised good business

21   judgment in reaching a settlement with the King parties.

22           MR. MYERS:  I'm befuddled, Your Honor.  If there's no

23   final -- this case was remanded to Montgomery County Circuit

24   Court from this Court.  This Court lost jurisdiction.  The

25   case -- I will answer --



1           THE COURT:  I'm not determining -- I'm not

2    determining the alter ego issue.  That issue was remanded to

3    this -- that issue was -- the court abstained, and it was sent

4    back to the state court.  That issue was decided.  Why does

5    this Court no longer have jurisdiction over anything related

6    to Serv Trust?  That's not the case.

7           MR. MYERS:  Yes, it is, Your Honor.

8           THE COURT:  That one issue, the Court abstained with

9    regard to that one issue.  It was sent to the state court.

10   The state court, whether the state court -- what happened in

11   the state court after the state court issued this order

12   doesn't matter.

13          MR. MYERS:  Sure it does.  Once you remand a case,

14   once this Court remands that matter to Montgomery County

15   Circuit Court, this Court loses all jurisdiction over the

16   claims and issues in that matter.  And Rooker-Feldman prevents

17   you from exercising any kind of jurisdiction over the matters

18   in the state court.  And the state court has not completed any

19   determination of the claims in that case, which is exactly

20   what Mr. VerStandig just said.

21          He can't say, oh, Judge Lease entered a nonfinal

22   order deciding this one issue, and therefore, I can run back

23   to the bankruptcy court and say it's mine.  No.  Until there's

24   a final judgment on all claims against all parties, Judge

25   Lease can revise, can vacate, can do anything he wants with

1    that order, and that's in his court.  And Rooker-Feldman says

2    you can't interfere with that because now, you're sitting in

3    an appeal of a state court.

4            THE COURT:  Mr. Myers, what I am deciding today does

5    not depend on what Judge Lease did in state court.  The

6    question for this Court is whether the disputes between the

7    King parties and the trustee should be settled.  What you're

8    talking about is one issue that the Court abstained from, and

9    that was a determination of whether you are the alter ego of

10   Serv Trust.  I'm not determining that.  That's not what's

11   being settled here.

12           What's being settled here is all disputes between the

13   King parties and the trustee.  And this Court has exclusive

14   jurisdiction over the allowance and disallowance of claims.

15   So this Court determines what claims are allowed.  What claims

16   are disallowed.  And so this Court has jurisdiction over the

17   settlement of things that are not related to the alter ego

18   issue.  That's all in the state court.  That's not what's

19   being decided here.

20           MR. MYERS:  How can you -- how can you adjudicate a

21   9019 settlement motion when Serv Trust property is not

22   property of the estate?

23           THE COURT:  Serv Trust property is property of the

24   estate, and that determination was made by Judge Lease in his

25   order.  I understand it says partial judgment.  Whether it's a

1    final judgment or not does not impact whether the trustee can

2    and should enter into a settlement with these parties.  There

3    are numerous issues involved.

4           MR. MYERS:  Judge, the bottom line, the middle line,

5    the top line, and any line is until the Montgomery County

6    Circuit Court completes that case, Serv Trust property is not

7    property of my bankruptcy estate.

8           THE COURT:  Okay.  Well, let's complete the witness

9    examination.  You're welcome to make that argument in your

10   closing, and I look forward to your case citations to support

11   that.  So why don't you ask your next question?  We have a

12   witness on the stand.

13   BY MR. MYERS:

14   Q.   Mr. Schlossberg, I'm going to mark this as --

15   A.   Which one have you got there?

16   Q.   Okay.  Well, I'm going to mark the last one we just

17   talked about, which was Myers' preliminary objection to the

18   motion for approval of compromise.  I'm going to do that

19   Debtor's 2.

20          THE COURT:  Wait.  What are you marking?  I have an

21   email, I have a stipulation of dismissal, and I have an order

22   remanding case.

23          MR. MYERS:  This is.  Filed in this case, doc 19,

24   Gregory B. Myer's preliminary objection to the trustee's

25   motion for approval of proposed compromise and settlement with

1    the King plaintiffs.

2            THE COURT:  All right.  Do you have copies for

3    everyone?

4            MR. MYERS:  No.

5            THE COURT:  Mr. Mastro and Mr. VerStandig, do you

6    have --

7            MR. MYERS:  We've already --

8            THE COURT:  -- copies of Mr. Myers' objection to the

9    settlement?

10            MR. VERSTANDIG:  Your Honor, I do not have a copy.

11    I've reviewed it.  I would point out the parties' briefs are

12    not evidence for myriad reasons.

13            THE COURT:  Understood.

14            MR. MASTRO:  I might have a copy of it, Your Honor.

15            THE COURT:  All right.  Well, that's for you.  Mr.

16    Myers can give his copy to the witness.  And that will become

17    part of the body of exhibits on the witness stand.

18            MR. MYERS:  Are you going to give that to him so I

19    can read?

20            MR. MASTRO:  Can read over his shoulder.  That's

21    fine.

22            THE COURT:  You can hand it to the witness.

23            MR. MYERS:  I need to read from it to ask him a

24    question.

25            THE COURT:  Well, then you should have brought an



1    extra copy.  Either it's being marked as Debtor's Exhibit 2,

2    in which case you hand it to Mr. Schlossberg, or it's not

3    being admitted, in which case you can keep it in your hand --

4    or it's not being offered.  So if you're offering it as an

5    exhibit, you need to hand it to Mr. Schlossberg so he can look

6    at it.

7              MR. MYERS:  Mr. Mastro didn't do that.

8              MR. MASTRO:  Your Honor.

9              THE COURT:  Because Mr. Myers, you did not pre-file

10   your exhibits.  I'm giving you a lot of leeway by even

11   allowing you to introduce exhibits because the protocols you

12   received by email said that if you did not pre-file them at

13   least three business days before this hearing, you would not

14   be able to introduce any exhibits.

15             MR. MYERS:  Okay.  I'll give a --

16             THE COURT:  So I'm trying to give you a little bit of

17   leeway here.

18             MR. MYERS:  All right.  Thank you.  Can I give it to

19   him?

20             THE COURT:  You may hand it to Mr. Schlossberg.

21             MR. MYERS:  Debtor's Number 2.

22        (Myers' objection to settlement was hereby marked for

23   identification as Debtors' Exhibit 2, as of this date.)

24             THE WITNESS:  Thank you.

25   BY MR. MYERS:



1    Q.    Can you read in the record starting at the top of that

2    page, Mr. Schlossberg?

3    A.    Page 2?

4    Q.    Yeah.

5            THE COURT:  You don't need to read it into the

6    record.  If you want to ask him a question about it, you can

7    ask him a question about it.

8            MR. MYERS:  Well, it states what Judge Lease said.

9            THE COURT:  Okay.  Well, then ask him --

10           THE WITNESS:  I'm sorry.  I didn't hear what he said.

11           THE COURT:  I said, you don't have to read it into

12    the record.  He's marked it as an exhibit.

13           THE WITNESS:  Okay.

14           THE COURT:  So it's docket number 19.

15           MR. MYERS:  Debtor's Number 2?  Oh, docket number 19.

16           THE COURT:  Okay.  So it's sixty-three pages long,

17    Mr. Schlossberg.

18           THE WITNESS:  No, this is a ten-page document.  This

19    is docket number 19 in --

20           MR. MYERS:  This adversary.

21           THE WITNESS:  -- this adversary proceeding.

22           THE COURT:  All right.  So it's the ten-page

23    objection without any of the exhibits, then?

24           THE WITNESS:  No exhibits.

25           MR. MYERS:  Yes.



1          THE COURT:  I'm asking Mr. Schlossberg because he's

2   the one who has it in his hand.

3          So it's a ten-page document?

4          THE WITNESS:  Yes, ma'am.

5          THE COURT:  Okay.  All right.  Next question.

6          MR. MYERS:  Well, I need -- I can't ask the question

7   if I can't look at the document.  So I'll take it back.

8          THE COURT:  Well, it's been offered as an exhibit.

9   You don't take it back now.

10          MR. MYERS:  Well, I can't ask a question about it,

11   Your Honor, if I can't see it.

12          THE COURT:  Well, then you should have brought

13   another copy.  All right.  So that's Debtor's Number 2.  The

14   Court will take judicial notice of the filing of the document.

15   But the statements made therein do not have evidentiary effect

16   because it's a pleading.

17          MR. MYERS:  Well, you can take judicial notice,

18   correct, of what happened in the Montgomery County Circuit

19   Court?

20          THE COURT:  Are you going to -- what are you offering

21   me?  Are you offering me orders from the court or a transcript

22   of the proceedings?

23          MR. MYERS:  Transcripts are already in the record of

24   this case.

25          THE COURT:  And where are they?



1              MR. MYERS:  In one of the filings, I attached the

2    December 16th, 2022 hearing transcript from Judge Lease in the

3    Montgomery County Circuit Court matter.

4              THE COURT:  All right.  Well, let me see if it's

5    attached to this pleading.  Give me one moment.

6              MR. MYERS:  It's possible it was attached to doc 22,

7    which was a supplement.  Actually, it was a doc attached to

8    doc 22, which is a supplement.  And it was attached as exhibit

9    H.

10             THE COURT:  All right.  So this is a seventeen-page

11   transcript, correct?

12             MR. MYERS:  It sounds right.  I don't know.  But

13   December 16, 2016.

14             THE COURT:  16 pages.

15             MR. MYERS:  Okay.

16             THE COURT:  All right.  So the Court will take --

17             MR. VERSTANDIG:  Your Honor, may I inquire, not

18   having it in front of me, who the transcript is by, meaning is

19   it from a court reporter, or is it from --

20             THE COURT:  It was prepared by Deposition Services,

21   Inc.

22             MR. VERSTANDIG:  Thank you, Your Honor.

23             THE COURT:  All right.  It's a sixteen-page

24   transcript.  It's at -- we'll call this Debtor's Number 3.  It

25   is at docket number 22-1.  It's exhibit H, and it's sixteen

1    pages.  And it appears to be a transcript from December 16th,

2    2022.

3        (Transcript of hearing 12/16/2022 was hereby marked for

4    identification as Debtors' Exhibit 3, as of this date.)

5        THE COURT:  All right.  So the Court will admit this

6    into evidence.  It appears to be a complete copy.

7    (Transcript of hearing 12/16/2022 was hereby received into

8    evidence as Debtors' Exhibit 3, as of this date.)

9        THE COURT:  So your next question, Mr. Myers.

10        MR. MYERS:  Yeah.  I'm going to read this paragraph

11    from that transcript and then ask Mr. Schlossberg a question.

12        Judge Lease said on December 16, 2022, "There would

13    not be a ruling that would impose liability on you", meaning

14    me, Mr. Myers.  "However, these plaintiffs would have to, if

15    they wanted to proceed against you, would be required to try

16    that matter again separately, and there would not be any

17    rescue or collateral estoppel issues because you were not a

18    party to that case at that time.  Because you were stayed, you

19    were not considered a party."

20    BY MR. MYERS:

21    Q.    How could there be any ruling against me, Mr.

22    Schlossberg?

23        MR. MASTRO:  Objection, Your Honor.

24    A.    Is there something I'm supposed to be reading because I

25    have nothing in front of me.  And I keep -- I am hearing most



1     of the words that you say, but I have no confidence that

2     I'm -- I'm hearing something that -- that I can rely on.  So

3     if I may see it, I'll be happy to comment on it, or to tell

4     you that I don't think it has much relevance to anything

5     anyhow.  But so be it.

6             THE COURT:  Let me see if I can have somebody print

7     it.

8             MR. MYERS:  It's okay, Your Honor.  I'll take care of

9     it in argument.  It's a transcript.  It's Judge Lease

10    statement that I wasn't a party and --

11            THE COURT:  Okay.  Next question.

12    Q.   Is it your contention, Mr. Schlossberg, if I was not a

13    live party in that case on January 3 because, according to

14    Judge Lease, the upcoming trial does not involve you?  Is it

15    possible that there could ever be an alter ego ruling when I'm

16    not even present?

17            MR. MASTRO:  Objection, Your Honor.  I don't see what

18    this has to do with what we're here today about.  I mean --

19            THE COURT:  The objection's overruled.  I'll let him

20    answer.

21            Mr. Schlossberg.

22    A.   Your Honor, I'm being asked to comment on the effect of a

23    ruling that I'm bound honored to accept as the rule of law in

24    the case.  I am acting on that.  I have brought to the Court a

25    means of taking an asset, which otherwise essentially has zero

1    realizable value for this estate.  And through an act of

2    alchemy, I've turned it into $150,000 --

3         MR. MYERS:  Your Honor, I didn't ask this question.

4    A.    -- worth of gold.

5         THE COURT:  Stop interrupting.

6         MR. MYERS:  Well, he's --

7         THE COURT:  Stop interrupting.  Mr. Schlossberg.

8    A.    I have turned that asset into gold.  It's only $150,000.

9    It's not a great big nugget, but it's gold.  That's what I'm

10   here for today.  If he doesn't like the other rulings in the

11   case, go get relief where you can get relief.  You can't get

12   it for me.  My job is to liquidate the assets that are placed

13   in my hands.

14   Q.    And they weren't placed --

15   A.    I have done so.

16   Q.    -- in your hands, Mr. Schlossberg.

17   A.    You're arguing with me.  You're not supposed to argue

18   when you ask questions.

19   Q.    And you're not supposed to just run on and testify about

20   legal matters.

21        MR. MASTRO:  Your Honor (indiscernible) --

22   A.    I'd ask that somebody be controlled.

23        THE COURT:  Stop.  Stop.  Everybody, stop.  Stop.

24        Mr. Myers, stop interrupting him.  Stop interrupting

25   him.  Please do not put me in a position where I have to have

```
 1   you silenced in these proceedings.  I want to hear from you.
 2   I want you to have an opportunity to be heard.  I want you to
 3   have an opportunity to question whatever witnesses are here.
 4         But you have to observe the decorum of the Court.
 5   You cannot argue with the witness.  When you're at that podium
 6   and there's a witness on the stand, you are asking questions.
 7   You are not testifying.  You are not stating what you think is
 8   right or wrong about what he says.  And you are not offering
 9   facts.  You are simply asking questions.  Please do not
10   interrupt any more.
11         Mr. Schlossberg, please finish your --
12         MR. MYERS:  Your Honor, may I respond?  Am I not --
13         THE COURT:  No, you may not.
14         MR. MYERS:  To you?
15         THE COURT:  No, you may not.
16         MR. MYERS:  Well, in my --
17         THE COURT:  There's a witness on the stand.
18         MR. MYERS:  And in my --
19         THE COURT:  He's in the middle of an answer.  Stop
20   interrupting.
21         MR. MYERS:  You're interrupting my examination.
22         THE COURT:  No, you're interrupting me.  You're
23   interrupting him.  You're interrupting everyone.  Stop it.
24         Mr. Schlossberg, please continue.
25         THE WITNESS:  Your Honor, I'm sorry.  I've completely
```



1    lost -- I don't even know what question we had going.

2              THE COURT:  Okay.  All right.  Next question, Mr.

3    Myers.

4              MR. MYERS:  It's a stipulation of dismissal.  Mr.

5    Schlossberg has a copy.

6              THE COURT:  All right.  We'll call that --

7              MR. MYERS:  3.

8              THE COURT:  -- Debtor Number 4.

9              MR. MYERS:  4?  Well, number 2 was your opposition to

10   the settlement.  Number 3 was the transcript.  So this is

11   Debtor Number 4.

12       (Stipulation of dismissal was hereby marked for

13   identification as Debtors' Exhibit 4, as of this date.)

14   BY MR. MYERS:

15   Q.   Do you have Debtor Number 4 in front of you, Mr.

16   Schlossberg?

17   A.   Yes.

18   Q.   Stipulation of dismissal?

19   A.   Yes.

20   Q.   Can you tell me what that is?

21   A.   Stipulation of dismissal.  What do you --

22   Q.   Can you describe what you did there?

23   A.   This is the dismissal of the state court iteration of the

24   redemption dispute, which was wholly appropriate when this

25   Court took over the proceedings in 24-007.



1   Q.   How did this Court take over the proceedings from the

2   Montgomery County Circuit Court case if the Montgomery County

3   Circuit Court case was not removed to this Court, which you

4   stated in your settlement motion couldn't be done?

5   A.   You asked me the question.  I gave you the answer.

6   Again, you don't like the answer.  When you don't like the

7   answer, you try to --

8   Q.   Please answer my question, Mr. Schlossberg.

9           THE COURT:  Do not interrupt him.

10  A.   I'm answering your question.

11          THE COURT:  Do not interrupt.

12          Go ahead.

13  A.   I answered the question just now, Your Honor.

14          THE COURT:  All right.  Thank you.  Next --

15  A.   I believe I answered it fully.

16  Q.   Well, I don't know what your answer was.  What was your

17  answer to my question?

18  A.   Well, I'll defer to the Court.  The Court can determine

19  whether I --

20  Q.   No, I'm asking you.

21  A.   No, because if you do that, that's asked and answered.

22  It's a proper objection.

23          MR. MYERS:  I'm sorry.

24          THE WITNESS:  I'm sorry, Your Honor.  I don't do --

25          MR. MYERS:  Can his attorney do that, or --



1              THE WITNESS:  I don't mean to be --

2              MR. MYERS:  -- is he going to just be his own

3      attorney?

4              MR. MASTRO:  Objection, Your Honor.  Asked and

5      answered.

6              THE COURT:  He can raise the objection.

7              MR. MYERS:  He's here as a Chapter 7 trustee, not

8      counsel for Chapter 7 trustee.

9              THE COURT:  He's also counsel in the case.  Read the

10     order.

11             MR. MYERS:  Okay.  Well, he can't be both on the

12     stand.

13             THE COURT:  He's not testifying as an attorney.  He's

14     testifying as a Chapter 7 trustee.  And you have asked the

15     same question over and over and over again.  I was going to

16     let you do it because you have an hour and seventeen minutes

17     left.  And if you want to ask the same question for an hour

18     and seventeen minutes, I was going to let you do it.  But if

19     you'd like to move on to something else, that probably would

20     be advisable so you can cover more ground.

21             MR. MYERS:  Your Honor, I just object to this entire

22     proceeding.  This case was removed to Montgomery County

23     Circuit Court and has never come back to this court.

24             THE COURT:  You can make that argument.  There's a

25     witness on the stand.  Ask him a question.



```
 1              MR. MYERS:  Right.  And I ask him, and he wouldn't
 2     answer.
 3              THE COURT:  Ask him the next question.
 4     Q.   How did the Montgomery County Circuit Court litigation
 5     come back to this court?
 6     A.   I'll defer to the record of the proceedings.  It came
 7     back by proper orders of the court.
 8     Q.   What order?
 9     A.   Your Honor, I don't have the docket in front of me.  I'm
10     not going to be second guessing the way counsel put together
11     the docket and which item happened first and what went down.
12     This case is properly in this court.  I don't think you have
13     any doubt about it.  I doubt that you'd be conducting this
14     hearing if you had that doubt, Your Honor.
15              This is what we're here for.  We're not here on any of
16     these issues.  This is an irrelevant inquiry because the only
17     inquiry that matters that is a factual one, which justifies
18     inquiring of a witness under oath, is my judgment and how I
19     got to it.  It doesn't matter.  Nothing else matters here for
20     that.  Those are all interesting questions, and you certainly
21     have the right to argue them.  They're issues of law.  Raise
22     them up.
23              MR. MYERS:  Can I sit down, Your Honor?
24     A.   Raise them as issues of law.
25              MR. MYERS:  Because he just keeps going on.
```



```
 1              THE COURT:  Stop interrupting, Mr. Myers.

 2              MR. MYERS:  I am not interrupting, Your Honor.  He is

 3   just going on and on.

 4              THE COURT:  You asked him a question.  I'm letting

 5   him answer it.  Stop interrupting.

 6              MR. MYERS:  This is a sham proceeding.

 7              THE COURT:  Well, you're welcome to leave, Mr. Myers.

 8              MR. MYERS:  It's a sham proceeding.  There's --

 9              THE COURT:  You're welcome to leave if you don't like

10   it.

11              MR. MYERS:  That litigation is in Montgomery County

12   Circuit Court.  You have no subject matter jurisdiction.

13   Rooker-Feldman prevents it.  The case was removed to Florida

14   and was never remanded.  And it was dismissed in Florida.

15              THE COURT:  And you can make those arguments in your

16   closing arguments.  There is a witness on the stand.  Either

17   ask him a question, or I'm dismissing the witness and you're

18   done with him.

19   BY MR. MYERS:

20   Q.   Were you aware if I ever had an interest in Serv Trust?

21   A.   Asked and answered.

22   Q.   Just answer the question, please.

23              THE COURT:  No, Mr. Myers, you don't instruct the

24   witness to answer.  I do.  That's my job.  Okay.  So stop --

25              MR. MYERS:  Well, his attorney's job is to say ask
```



1    and answer --

2             THE COURT:  Stop.  Stop.

3             MR. MYERS:  -- if he wants to do an objection.

4             THE COURT:  Stop.  Stop.  Stop.  I'm trying to give

5    you some leeway, and you're making it painful.  So stop

6    arguing with me.

7             Mr. Schlossberg, would you please answer the

8    question?

9    A.   Yes, ma'am.

10            THE COURT:  One more time.

11   A.   Yes, ma'am.

12            THE COURT:  Last time.

13   A.   Thank you for acknowledging I've tried to answer this

14   question before.  I will answer it again.

15   Mr. Myers' interest in Serv Trust was determined by the

16   Circuit Court for Montgomery County to be affected by his

17   alter ego status individually with Serv Trust.  When that

18   Court determined that Serv Trust's interests were bound up in

19   Mr. Myers such that the alter ego doctrine took effect, they

20   passed to me, as his bankruptcy trustee under Section 541

21   because it was part of the pervasive description of property

22   contained in -- contained in that statute.  To the extent that

23   Mr. Myers had interests, they passed to me.  And since then,

24   I've been acting on those.  I hope that's a complete answer.

25            THE COURT:  Thank you.



www.escribers.net  |  800-257-0885

1          Mr. Myers.

2     Q.   Has the court ever entered a judgment with me present at

3     trial?

4     A.   You've told me you weren't present on the day of trial.

5     I'll take you at your word.  Judgment was entered --

6     Q.   Are you aware that Mr. VerStandig filed papers in that

7     Court that says I am an indispensable party to that case, and

8     without it, it can't go forward?

9          THE COURT:  You're talking about in the state court

10    case, not this case, correct?

11         MR. MYERS:  Correct, Your Honor.  I guess, let's

12    just -- here's where I'm going.  He's trying --

13         THE COURT:  No.  Wait.  Wait.  Stop.  There's a

14    witness on the stand.  I'm just trying to make sure the

15    questions --

16         MR. MYERS:  I'm trying to save us all some trouble.

17         THE COURT:  The questions.  You don't get to argue

18    with people while a witness is on the stand.  You get to ask

19    questions.

20         MR. MYERS:  Okay.

21         THE COURT:  I'm trying to clarify what you're talking

22    about.  Are you talking about being an indispensable party in

23    this adversary proceeding or in the state court proceeding?

24         MR. MYERS:  Either one, I guess, I would be a

25    required indispensable party, and I'm not named as a party.



1          THE COURT:  Mr. Schlossberg, if you have an opinion

2     on that, please answer.

3     A.    To the extent that Mr. Myers is an indispensable party,

4     those characteristics which make him an -- an indispensable

5     party necessarily passed to me with the entry of the alter ego

6     decision by Judge Lease.  So to the extent that he was

7     indispensable prior to the court determining the alter ego and

8     rendering the alter ego decision, I believe that makes me that

9     party.

10          THE COURT:  All right.  Thank you.

11          Mr. Myers, your next question.

12     BY MR. MYERS:

13     Q.    So Mr. Schlossberg, property of my estate is determined

14     on November 18, 2015, not one day after.  Do you think a state

15     court can enter an order eight years later nunc pro tunc and

16     put property back in my estate?

17     A.    I believe you've made a false statement of -- of law,

18     that is, that the decision is made on that date, and nothing

19     ever after that can ever affect it in any way, including

20     decisions of the courts determining exactly what your rights

21     were under state law as of that date.

22     Q.    But there has been no determination of what my rights

23     were on November 18, 2015 because Judge Lease said, I'm not a

24     party.

25     A.    You're -- you're -- you're testifying and arguing with me

1    both.  I -- I mean, I don't know what I'm supposed to do with

2    you.  You didn't ask me a question.  You say, you said, but,

3    but.  Well, it's not a but-but situation.  You don't get to

4    argue with me.  You get to argue with the judge.  You get to

5    argue with other counsel.  But not with me.  I'm just a

6    witness.

7    Q.    Were you aware that Mr. VerStandig was my attorney

8    beginning in 2010?

9    A.    I knew that Mr. VerStandig had that privilege at some

10   point prior to all this litigation in another matter.

11   Q.    And do you realize he was my attorney at the beginning of

12   my bankruptcy case?

13   A.    To be honest with you, I've never given much thought to

14   Mr. VerStandig's role with you or without you.

15   Q.    Did you ask Mr. VerStandig to litigate this case for you?

16   A.    Mr. VerStandig is not litigating anything for me.

17   Q.    The Montgomery County Circuit Court case?

18   A.    He's not litigating anything for me.  He's never

19   litigated anything for me.

20   Q.    Well, not according to Mr. VerStandig.

21   A.    Well, you'll have to call -- call Mr. VerStandig to the

22   stand, although I think you may have some problems getting him

23   as -- to testify as a witness here.  But you'd have to get Mr.

24   VerStandig to explain any statement he made to that effect.

25   And as I said earlier, based on my judgment as to your

1    credibility, I doubt that Mr. VerStandig said that.

2    Q.    Well, I have the transcript, so I'll show it to you.

3    A.    Is it one that you typed up yourself?  You have a habit

4    of doing that.

5          THE COURT:  Next question.

6          MR. MYERS:  I don't need to hear that, Your Honor.

7          THE WITNESS:  It's true.

8          THE COURT:  Move on.  You're arguing with the

9    witness.  It's inappropriate.

10   Q.    So did Mr. VerStandig ever ask you or Mr. Mastro, to your

11   knowledge, to pursue the declaratory judgment action in

12   Montgomery County Circuit Court?

13         MR. MASTRO:  Objection to the extent he's calling for

14   the disclosure of attorney-client privilege.

15         THE WITNESS:  Oh, that's good.

16   Q.    Mr. VerStandig's not your attorney.

17         THE COURT:  No.  I'll allow the witness to answer the

18   question.  He knows he's not going to disclose attorney-client

19   privilege communications, if there are any, that are relevant.

20   A.    I have no knowledge of Mr. VerStandig ever having been

21   employed on my behalf or my firm's behalf or Mr. Mastro, as my

22   partner, having been done.  And anyone who makes an allegation

23   to the contrary is going to have to explain that to me because

24   I don't know it.

25   Q.    Well, I didn't ask you if he was employed.  I said, did

1    you ever ask Mr. VerStandig to pursue this matter, whether

2    he's employed or not?  I don't know what you mean by employed,

3    but to pursue this matter for you because you were time barred

4    in this case?

5    A.    Now, I see where you think you're going.  The answer is

6    no.  Your Honor, I never requested Mr. VerStandig at any time

7    to do anything for me in any fashion.

8    Q.    So if Mr. VerStandig told Judge Lease that you did, what

9    do you think of that?

10   A.    I think you're posing hypotheticals again, and

11   considering your reputation for credibility, I doubt that it

12   actually happened.

13   Q.    Do the King parties have -- since you never abandoned any

14   claims or causes of action in this case, are you aware if the

15   King parties were ever sought and an order was entered

16   providing them with derivative jurisdiction to litigate claims

17   that are exclusively the province of the Chapter 7 trustee?

18   A.    I know of absolutely no derivative action requests made

19   in this litigation.  I doubt sincerely that there are any such

20   actions ever filed, and I doubt that they very seriously that

21   they exist.  But you go ahead.

22   Q.    When you say in this litigation, are you referring to the

23   Montgomery County litigation or this case?

24   A.    I'm referring to any matters involving Gregory Myers.

25   Q.    That's not my question, Mr. Schlossberg.



1   A.   Well, it's my answer.

2   Q.   Well, that's not my question.  So please answer my

3   question.  Are you aware --

4   A.   Well, you want me to answer your question.

5   Q.   Are you aware --

6   A.   If you articulate a question that can be answered

7   intelligibly, I will answer it.

8   Q.   Fine.

9   A.   Why don't you try and frame it again?

10  Q.   Thank you.  Are you aware if the King parties, any of

11  them, ever came into this court to obtain an order providing

12  them with derivative jurisdiction to litigate claims that are

13  exclusively the property of the Chapter 7 trustee?

14  A.   Asked and answered, Your Honor.  I clearly answered that

15  question not three minutes ago.

16       THE COURT:  All right.  Answer it one more time,

17  please.

18  A.   No, there are none.

19  Q.   So would it surprise you if Mr. Mastro told Judge Lease

20  that they were provided with derivative jurisdiction?

21  A.   That they asked for derivative jurisdiction and were

22  granted it by some court?

23  Q.   No, that the bankruptcy court understood they had

24  derivative jurisdiction?

25  A.   I wasn't there.  I haven't heard it.  I don't believe it



1    actually was said.  I'd like to see it in context.

2    Q.    Okay.

3    A.    You have an awful habit of taking things out of context.

4    Q.    Sure.  But would that surprise you?

5    A.    Not a bit.  Not a bit, coming from you.

6    Q.    No, would it surprise you that, Mr. Mastro, when the

7    issue of jurisdiction came up in the hearing before Judge

8    Dwyer and she recognized that alter ego claims are the

9    exclusive jurisdiction of the bankruptcy trustee.  And she

10   said, well, what are you doing here?  And Mr. Mastro said,

11   well, the bankruptcy court, and he kind of worked his way

12   around it, is aware of this.

13   A.    The bankruptcy court is aware that we're in the circuit

14   court for Montgomery County.  That Mr. Mastro was there on

15   behalf of the Chapter 7 trustee.  That's scarcely derivative

16   jurisdiction.  Is this an intentional -- do you, like, make

17   these things up?

18         MR. MYERS:  Your Honor.  Mr. Mastro, I am not

19   suggesting --

20   Q.    I mean, Mr. Schlossberg, I am not suggesting stating the

21   obvious.  Mr. Mastro represented to the Court that the King

22   parties had derivative jurisdiction, as did Mr. VerStandig.

23         THE COURT:  Well, he said he wasn't there.  You're

24   asking him to opine on things that he has said he doesn't have

25   any knowledge of.



1    Q.    Okay.  So as the Chapter 7 trustee, Mr. Schlossberg, when

2    your counsel files papers in cases, are you aware of what

3    they're doing?  Are you aware of what they're saying in court

4    cases?

5    A.    If I'm not in the courtroom, I don't know what he said.

6    If he files a pleading, I know what's in the pleadings.

7    Q.    Okay.

8    A.    You want to show me the pleading that says that we hereby

9    grant -- excuse me hereby grant jurisdiction to assert these

10   claims?  And Mac (ph.) can do it for us.

11   Q.    Well, there is --

12   A.    You must have something like that.

13   Q.    There is no order granting the King parties derivative

14   jurisdiction.

15   A.    Well, it sounds like you --

16   Q.    When the --

17   A.    Sounds like that -- that's not what you were saying a

18   couple minutes ago.

19   Q.    No, I said he misrepresented that it happened.  So

20   anyway, do you recall when Goldsboro filed the adversary in

21   this case before the King parties filed their adversary in

22   Montgomery County Circuit Court?

23   A.    You have to give me a year.  When was that filed?

24   Q.    2018 or so, Goldsboro came in here and said, we want to

25   litigate that Serv Trust is Myers' alter ego and Judge Lipp



1    said, not a chance.  And she abstained and accused you all of

2    forum shopping.  And in that case, do you recall that they

3    requested that would you give them derivative jurisdiction?

4    Do you recall what your answer was?

5    A.    Don't recall the whole thing.  And I know that Judge Lipp

6    never said on the stand -- sat on her -- on the bench and

7    said, not a chance.  That's not her style.

8    Q.    Yeah.  I'm paraphrasing.

9    A.    No, you're not paraphrasing.  You're characterizing.

10   Q.    I'm paraphrasing.

11   A.    It's like a leading.  You mess up on these things.

12   Q.    Thank you, Mr. Schlossberg.  So let's go back to Mr.

13   VerStandig.  So here you are, with your Chapter 7 trustee

14   forty-two years of business judgment, and you find out that

15   Mr. VerStandig has been my attorney since 2010.  He has

16   represented Serv Trust.  He has represented 6789 Goldsboro

17   LLC.  He has represented me.  And now, all of a sudden, he

18   decides, wow, I'm going to represent just the King parties and

19   kick everybody else to the curb.  Does that not raise a red

20   flag in your business judgment?

21         MR. VERSTANDIG:  Objection.  Assumes facts not in

22   evidence, specifically that I ever represented Serv Trust or

23   6789 Goldsboro LLC.

24         MR. MYERS:  We'll put that in evidence tomorrow.

25   I'll call Mr. VerStandig.



```
 1              THE WITNESS:  Is he on your witness list for
 2    tomorrow?  I missed that.
 3              MR. MYERS:  Well, he just spoke, so now he is.
 4    Q.   Are you aware of that, Mr. Schlossberg?
 5    A.   Aware of what?
 6    Q.   That he represented all those parties --
 7    A.   I don't think -- I --
 8    Q.   -- and has a conflict of interest, and now he's
 9    representing the King parties in this bogus 9019 settlement.
10              THE COURT:  Hold on.
11    A.   You know, I'd love to know your --
12              MR. MASTRO:  Objection, Your Honor.
13              THE COURT:  Hold on.  Objection.  Yes.
14              MR. MASTRO:  I mean, it's hearsay.  He's just saying
15    what Mr. VerStandig said in open court.  Is he aware of that?
16    We don't have a transcript.  I don't know what's going on
17    here.  I mean, we're getting so far afield, Your Honor.  I'd
18    throw in a relevance objection as well.
19              THE COURT:  Thank you.
20              MR. VERSTANDIG:  And assumes facts not in evidence,
21    namely, that I ever represented Serv Trust or 6789 Goldsboro
22    LLC.
23              THE COURT:  All right.  So Mr. Schlossberg, I'm going
24    to ask the question a different way.  To your knowledge, has
25    Mr. VerStandig represented the King parties, Serv Trust, and
```

1    6789 Goldsboro at different times?

2            THE WITNESS:  At different times, I believe -- I know

3    that he has represented the King parties since this dispute

4    about redemption started.  Maybe a little bit -- maybe before

5    that.  I don't know.  I know that Mr. VerStandig represented

6    Mr. Myers.  Mr. Myers seems to be saying continues to

7    represent him.  I -- is -- maybe that representation's still

8    going on, but I can't believe that Mr. Myers couldn't find his

9    way to the Attorney Grievance Commission if that were the

10   case.

11           And maybe you have.  Have you brought a proceeding?

12           MR. MYERS:  You don't ask the questions.

13           THE WITNESS:  Oh, I'm sorry.  You're right.

14           THE COURT:  So okay.  So to your knowledge, Mr.

15   VerStandig represents the King parties and has represented

16   them for some time and at some point in the past represented

17   Mr. Myers?

18           THE WITNESS:  That is my understanding.  Yes, Your

19   Honor.

20           THE COURT:  Okay.

21           THE WITNESS:  And -- and -- and -- and Mr.

22   VerStandig, I don't know.  I think he just said he never

23   represented Goldsboro and Serv Trust.  Whatever he said.  But

24   you know, I don't know those things, Your Honor.  So I do the

25   best that I can, judging the credibility of the -- the -- the

1   people who are asking the questions and the reasonable

2   implications of answers that are given by others.

3           THE COURT:  All right.  Thank you.

4   BY MR. MYERS:

5   Q.  So Mr. Schlossberg, you said I wouldn't be a good

6   witness, but can you rely on an attorney if he has a conflict

7   of interest in this proceeding?

8   A.  There's no evidence of a conflict.

9   Q.  Okay.  There will be tomorrow.

10  A.  And I don't -- excuse me.  He is not my attorney.

11  Q.  Well, according to him, he is.

12  A.  Your Honor, I'd love to know the proof on this.

13  Q.  I have it right here.  Here's the transcript.  It's going

14  into evidence, and I'll mark it.

15  A.  Did you type that one?

16  Q.  Yeah, I did.  I typed it with a crayon.  I don't need

17  your comments, Mr. Schlossberg.

18          THE COURT:  Well, Mr. Myers, we don't need yours.

19          MR. MYERS:  Okay.

20          THE COURT:  All right.  Next question.

21  Q.  So Mr. Schlossberg ,did you know that Mr. VerStandig was

22  employed at Offit Kurman up until, I don't know, about 2017?

23  A.  Yes, I did know that he worked at Offit Kurman.

24  Q.  Okay.  And do you know that Offit Kurman represents the

25  King parties, 6789 Goldsboro, and Serv Trust at one point or



1  another, same time, while Mr. VerStandig was there?  In fact,

2  he -- well, you'll see it in the evidence when it's presented.

3  A.   He represented you when he was working at Offit.

4  Q.   No, he represented 6789 Goldsboro LLC and Serv Trust.

5           MR. VERSTANDIG:  Same objection.  Assumes facts not

6  in evidence.

7           THE COURT:  Understood.  Mr. Myers, next --

8           MR. MYERS:  I'm going to bring the evidence tomorrow.

9  They're his emails.  They're his time sheets.

10          THE COURT:  Okay.  Stop.  Stop.  Stop talking.  There

11  is a witness on the stand.  I don't need your dialog.

12          Mr. Schlossberg, if you're able to answer the

13  question, can you answer the question?

14  A.   Give me the question again.

15  Q.   If Mr. VerStandig was representing 6789 Goldsboro LLC,

16  Serv Trust, me, Dan Ring as another trustee of Serv Trust, and

17  Brian King, Cristina King, and the Cristina and Brian King

18  Children's Trust, whether he was at Offit Kurman or after he

19  left, would that give you pause in your experienced business

20  judgment that there's a problem here?

21  A.   Your Honor, if there's a problem there, it's not my

22  problem.  I'm the bankruptcy trustee.  I'm trying to liquidate

23  an asset that I have.  And I'm happy to -- I'll sell it to any

24  one of them or any combination of them if they bring me the

25  money and the Court approves the -- the proposed purchase,

1    sale and purchase.  But I -- I don't get to vet the -- the

2    purchasers when I'm selling something at an auction.  I stand

3    on the steps.  I got my hands up.  I'm trying to build a crowd

4    and get the prices to go up.

5    Q.    Thank you, Mr. Schlossberg.

6    A.    Green is green.  I'm answering your question.  Green is

7    green, and I try to do what I can do.

8    Q.    Okay.

9    A.    I don't care much of anything about the -- this conflict

10   issue that you're raising.  Doesn't affect me.

11   Q.    Well, apparently you -- Mr. Schlossberg, didn't you care

12   earlier on direct exam by Mr. Mastro that I couldn't be a good

13   witness because I couldn't be trusted?  I couldn't tell the

14   truth?

15   A.    Demonstrably so.

16   Q.    Okay.  But you're okay with an attorney on the other side

17   of this settlement agreement who's got a conflict of interest,

18   a clear conflict of interest?

19   A.    Well, the part --

20         MR. VERSTANDIG:  Again, just for clarity of record,

21   because there is a propensity to sometimes take things out of

22   context --

23         THE COURT:  I understand.

24         MR. VERSTANDIG:  Objection.

25         THE COURT:  Your objection is noted.



1          MR. VERSTANDIG:  That's not in evidence.

2          THE COURT:  Your objection is noted.  And I'll let

3   Mr. Schlossberg answer.

4          THE WITNESS:  Thank you, Your Honor.

5   A.   If there is a conflict between Mr. VerStandig and 6789

6   and Serv Trust and the King family but they're all comfortable

7   with the fact that they're generally on the same side of one

8   another and not raising an issue about it, it's not my

9   business.  Not your business.  Not anybody's business but the

10  parties who allegedly are the subjects of that conflict.  And

11  they can certainly waive that.

12  Q.   Are you aware that Serv Trust has ever waived their

13  privilege?

14  A.   I am not aware of any of this, and I don't believe in any

15  of it.

16  Q.   Are you aware that I have ever waived my privilege?

17  A.   I didn't include you in the laundry list just there of

18  the people with conflicts.  I --

19  Q.   Why not?

20  A.   Because we heard earlier, I believe, that this was a

21  representation 2010 or something like that in some other

22  matter.  If I understood it correctly --

23  Q.   No, you didn't.  This was a representation that in 2013,

24  Mr. VerStandig organized the meeting for 6789, Serv Trust, and

25  the King parties.  He was there present, and you'll see it in



1   the evidence.  So let's move on.

2   A.   Okay.

3        MR. MYERS:  So I'm going to mark this as -- what are

4   we up to, Your Honor?

5        THE COURT:  Debtor Number 5.  What are you marking,

6   Mr. Myers?

7        MR. MYERS:  This is a motion to disqualify Mr.

8   VerStandig in my Florida bankruptcy case, which was written by

9   an attorney.  Not me.  Not in crayon.  And I'll be happy to

10  hand it to Mr. Schlossberg.

11       THE COURT:  Do you have copies for everyone?

12       MR. MYERS:  Actually, this was a subsequent one.

13  There was a previous one written by my attorney down there.

14       THE COURT:  So no --

15       MR. MYERS:  I don't have copies for everybody, but I

16  can put it in on my case when I get Mr. VerStandig on the

17  stand.

18       THE WITNESS:  Can we make sure we get copies for

19  tomorrow so that we can look at them tonight, like --

20       MR. MYERS:  Well --

21       THE COURT:  -- he's had the chance to look at ours?

22       MR. MYERS:  -- I didn't look at yours.

23       THE COURT:  Mr. Myers, that was your choice not to

24  look at theirs.  But all of this had to be filed three

25  business days ago.  So you're now almost a week late.



```
 1              If there are any documents that you intend to
 2    introduce into evidence tomorrow, then you need to let me know
 3    before 5 o'clock today.  So you have -- or at 5 o'clock.
 4              You have Mr. Schlossberg on the stand for another
 5    forty-eight minutes.
 6              MR. MYERS:  Your Honor, are you saying I cannot
 7    complete my examination of Mr. Schlossberg if it goes over?
 8              THE COURT:  I asked you how much time you needed.
 9    You said two hours.
10              MR. MYERS:  I said approximately.
11              THE COURT:  Okay.  So --
12              MR. MYERS:  And you limited me to 5 o'clock.  Are you
13    limiting my examination of Mr. Schlossberg?
14              THE COURT:  I am not going to let you have an
15    unlimited amount of time to question this witness because you
16    have chosen to argue with him over every little thing since
17    he's been on the stand.  That's your choice.  You said you
18    needed approximately two hours.  I'm going to give you
19    approximately two hours to complete your cross-examination.
20    You are now an hour and thirteen minutes into that.
21              MR. MYERS:  Yes, and every time --
22              THE COURT:  So use your --
23              MR. MYERS:  -- I ask a question --
24              THE COURT:  So use your time wisely.
25              MR. MYERS:  Every time I ask a question, Mr.
```

 1    Schlossberg decides to filibuster.

 2           THE COURT:  Next question.

 3           MR. MYERS:  This is Debtor's Number 5.  It's been

 4    passed out.  It's an email chain dated October 11, 2019.

 5           MR. VERSTANDIG:  Your Honor, I'm going to object

 6    before this is read in court or otherwise referenced.

 7           THE COURT:  I'm sorry.  Say that again, Mr.

 8    VerStandig.

 9           MR. VERSTANDIG:  I'm objecting before this is read on

10    the record.  The Email chain in question is a hybrid of

11    communications that are protected by the attorney-client

12    privilege and the accountant-client privilege.  This was

13    surreptitiously obtained by, I don't remember, Mr. Myers'

14    counsel or Serv Trust's counsel through issuance of a subpoena

15    without proper notice during state court proceedings.

16           At no point in time have the King parties, who are

17    the holders of the subject privilege, waived or abrogated the

18    privilege.  The communications in here are exclusively between

19    clients, their attorneys, and their accountants.  Maryland

20    recognizes both the attorney-client privilege and the

21    accountant-client privilege.

22           Mr. Myers is aware that this is privileged.  This has

23    been raised several times in proceedings over time.  Yet, he

24    persists in trying to introduce it into the record, despite

25    knowing that no one who holds the privilege has ever waived

1    it.  And as my client's counsel, I will be clear, they are not

2    waiving their privilege.

3         MR. MYERS:  Your Honor, there's no privilege.  The

4    subpoena was issued to the CPA firm, and the CPA firm answered

5    the request for documents.  And they were submitted.  That's

6    as simple as it is.

7         THE COURT:  Well, there is an accountant-client

8    privilege --

9         MR. MYERS:  The account is a --

10        THE COURT:  -- and unless you have -- and if this is

11   an inadvertent disclosure, then it is still privileged.  Do

12   you have anything to substantiate any argument that the

13   privilege was waived?

14        MR. MYERS:  Privilege of who?

15        THE COURT:  The privilege belongs to the clients.  It

16   belongs to the King parties.  Do you have anything --

17        MR. MYERS:  The King parties?  The CPAs are CPAs for

18   Serv Trust and 6789 Goldsboro LLC.

19        THE COURT:  Well, then, do you have anything to show

20   that Serv Trust and 6789 Goldsboro have waived the privilege?

21        MR. MYERS:  I was a manager when this happened of

22   Serv Trust -- I mean, of 6789 Goldsboro LLC.

23        MR. VERSTANDIG:  Your Honor, I --

24        MR. MYERS:  They produced the tax returns.

25        MR. VERSTANDIG:  Hold on.  I don't --



```
1              MR. MYERS:  There's no privilege.

2              MR. VERSTANDIG:  -- believe Mr. Myers was the

3    manager.  These are post-litigation emails.  It starts with an

4    email from my client to myself on the last page, dated October

5    10th, 2019.

6              THE COURT:  Well, the state court determined --

7              MR. MYERS:  It didn't.

8              THE COURT:  -- that as -- excuse me.  The state court

9    determined that as of November 18th, 2015, you were the alter

10   ego of Serv Trust.  And so your rights as of November 18th,

11   2015 are being exercised by Mr. Schlossberg.

12             MR. MYERS:  I disagree.  There is no final order from

13   the state court, and you can't --

14             THE COURT:  I don't need a final order.

15             MR. MYERS:  -- do anything with a nonfinal order.

16   You know that.  I know that.

17             THE COURT:  Don't tell me what you think I know.

18             MR. MYERS:  Maryland law knows that.

19             THE COURT:  Don't tell me what you think I know.

20             MR. MYERS:  Well --

21             THE COURT:  Because what you think and what I think

22   are so diametrically opposed that there's no overlap.  So

23   don't presume to know what I know.  You don't.

24             MR. MYERS:  I don't presume to know, but I disagree

25   with what you're saying.
```

```
 1              THE COURT:  Well, and you're welcome to say that you
 2    disagree when you get to your closing argument.
 3              So the Court is not admitting Debtor's Exhibit Number
 4    5.
 5              Would you like to move Debtor's Exhibit Number 4 --
 6              MR. MYERS:  So how is Mr. VerStandig --
 7              THE COURT:  -- the stipulation of dismissal, into
 8    evidence?
 9              MR. MYERS:  How would Mr. VerStandig have --
10              THE COURT:  Is that a yes?
11              MR. MYERS:  I'm asking a question.
12              THE COURT:  Debtor's Exhibit Number 4.
13              MR. MYERS:  We're still on the other exhibit.
14              THE COURT:  Stop talking over me.  Debtor's Exhibit
15    Number 4 is the --
16              MR. MYERS:  Well, you're not letting me respond.
17              THE COURT:  Debtor's Exhibit Number 4 --
18              MR. MYERS:  So you're violating my due process right.
19              THE COURT:  So Debtor's Exhibit Number 1, Number 3,
20    and Number 4 have been admitted.  5 is not admitted.  And
21    Debtor's Exhibit Number 2, the Court has taken judicial
22    notice.
23          (Stipulation of dismissal was hereby received into
24    evidence as Debtors' Exhibit 4, as of this date.)
25              THE COURT:  Next question, Mr. Myers.
```

1    BY MR. MYERS:

2    Q.   Yeah.  So were you aware that Mr. VerStandig, as counsel

3    for 6789 Goldsboro LLC, filed a complaint in Garrett County.

4    A.   I don't know what the possible relevance is, but I -- I

5    don't -- I don't have any recollection of that.  It may be

6    that it was --

7    Q.   It was a claim on a note.

8    A.   I -- I -- I don't have any recollection of it.  If I knew

9    it, I don't remember it now.

10   Q.   Okay.  So he was 6789 Goldsboro LLC's attorney in the

11   Garrett County action and --

12   A.   I'm sorry.  When was that?

13   Q.   Somewhere around 2018 maybe.

14   A.   Again --

15   Q.   And then that action --

16   A.   -- if I ever knew it, I don't recall it now.  But go

17   ahead.

18   Q.   Okay.  Do you have any knowledge of why he might file

19   something in Garrett County?

20   A.   I haven't --

21   Q.   Isn't that where you are?

22   A.   No, it is not where I am.

23   Q.   Um-hum.

24   A.   You don't know much about the geography of Maryland.  I'm

25   pretty far from there.



1    Q.   Yeah.  Thank you, Mr. Schlossberg, for that insult.  So

2    if Mr. VerStandig is representing 6789 Goldsboro LLC and the

3    King parties, and Brian King is the manager of 6789 Goldsboro

4    LLC, and he represented Serv Trust and me and Dan Ring, don't

5    you think there's a conflict there?

6             MR. VERSTANDIG:  Objection.

7             THE COURT:  We've covered this ground.  Move on to

8    another subject, Mr. Myers.

9             MR. VERSTANDIG:  Your Honor, just for clarity of the

10   transcript so the context matters, there is no evidence that I

11   ever represented Serv Trust.  There is no evidence that I ever

12   represented Mr. Ring.  For what it's worth, I believe Mr.

13   Myers is right.  I think I did represent Goldsboro in filing

14   an action, but I -- there is no evidence before the Court that

15   I've represented Serv Trust or Mr. Ring.

16            THE COURT:  Thank you, Mr. VerStandig.  Your

17   objection is noted.

18            MR. MYERS:  Yeah.  So that's --

19            THE COURT:  And the objection is sustained for all

20   the reasons Mr. VerStandig said and also because it's been

21   asked and answered at least six or seven times at this point.

22   Q.   Were you aware that Mr. King filed tax returns with the

23   IRS that said Serv Trust was in bankruptcy?

24   A.   I don't think that I do.

25   Q.   Would that change your business judgment on this



1    transaction if Mr. King, as the manager, filed tax returns at

2    the IRS that said Serv Trust is in bankruptcy?

3    A.    Well, it wouldn't change my view of my role, my job, and

4    the fact that I'm getting $150,000 for something that probably

5    would liquidate on the market for 0.

6    Q.    Okay.  Let's talk about that.  What do you mean when you

7    say I would get?

8    A.    Sorry.  I take my cases personally.  I'm -- I'm a little

9    parochial about my job.  If I am trusted with handling the

10   assets of an estate, I try, Your Honor, to say the estate,

11   this.  The estate, that.  But sometimes, especially when

12   perhaps there is a degree of irritation in the circumstances,

13   I will let you know just how personally I take my role in this

14   job, and I will refer to the estate and myself as being one

15   and the same.  The trustee and the estate have the same

16   interests, but I don't -- I'm not wild about the fact that

17   from time to time, I might identify myself, as opposed to the

18   estate.

19   Q.    So if there were tax returns filed by Mr. King as manager

20   of Serv Trust and it showed Serv Trust had zero percent

21   before --

22   A.    And it showed Serv Trust what?

23   Q.    Zero percent interest.

24   A.    Is there a question behind that?

25   Q.    Yeah.  Would that cause you to be concerned about a



1    settlement when Mr. King has already said in 2018 that Serv

2    Trust had zero percent?  False.

3    Q.   I'm sorry.  Are you answering your own question?  Because

4    I don't think I'd agree with that answer.  If Mr. King was

5    signing a tax return for Goldsboro and stated with respect to

6    the K-1s that would have to go with it, Your Honor, that

7    the -- to be wholly consistent with his articulated position

8    because he has said that on -- excuse me just a minute, Your

9    Honor.

10        By the fall of 2017, it was -- it was Mr. King's position

11   and that of the King parties that they had successfully

12   redeemed the class B stock.  So if they had redeemed the class

13   B stock, in 2018, looking back at it, maybe when he's filed

14   the 2017 return or maybe Mr. Myers is referring to the '18

15   returns, it wouldn't be too surprising that someone who

16   thought that they had successfully redeemed the stock -- the

17   membership interest, the B membership -- class B membership

18   interest, would state, perhaps in -- in trying to explain why

19   the People who had K-1s before don't have K-1s anymore and why

20   they don't no longer have an interest.

21        I've never seen these alleged returns, so it's a little

22   hard for me to speculate further than that, but I think that

23   would be wholly consistent with his position.  Now, if he's

24   wrong, Mr. Myers, if he's wrong and he -- and he didn't have a

25   right to redeem it, then that return that he filed for



1    Goldsboro would be a bad return.

2    Q.   Well, can you elaborate on bad?

3    A.   I just did.

4    Q.   No, what do you mean by bad return?  Like, fraudulent

5    return or --

6    A.   No, it would be --

7    Q.   -- illegal return or --

8    A.   It would be an incorrect return.  If you're right, it

9    would be an incorrect return.  But I can see also where

10   there's an argument to be made either way on that.  And I

11   guess we'll figure out how that goes at some point down the

12   road.

13       But you started the thing off would it changed my

14   business judgment in making a deal with them.  Might make them

15   a little more unsavory if I had known that.  But it doesn't

16   change the fact that they're bringing money to the table for

17   the creditors of my estate that I can't get any other way.

18   Q.   Well, just so we're clear, Mr. Schlossberg, I don't think

19   it's property of your estate.

20   A.   Well, I -- I -- I'll concede you said that, sir.  I

21   concede.

22       THE COURT:  Next question.  We don't need dialog

23   while a witnesses on the stand.

24   Q.   So Mr. Schlossberg, you -- going back, I couldn't recall.

25   Did you say you've reviewed the Serv Trust trust agreement?



1    Did you say earlier, either on cross or direct, that you've

2    ever reviewed the Serv Trust trust agreement?

3    A.    No, I said I've never seen it.

4    Q.    Okay.

5    A.    I don't think I've ever seen it.

6    Q.    So if there is no final decision in the Montgomery County

7    Circuit Court case, and I've never been -- there's never been

8    a trial where I've been a party.  And I wasn't a settler of

9    Serv Trust, which you well know because you would have done

10   something before the King parties tried to do it.  I wasn't a

11   settler.  I wasn't a beneficiary.  And I've never put any of

12   my own property into Serv Trust.  How, then, is it possible

13   that it could be my alter ego?

14   A.    I'm not going to revisit the judge's decision.

15   Q.    Okay.

16   A.    The judge made that decision.  Judge Lease --

17   Q.    Made a nonfinal order --

18   A.    -- of the Circuit Court for -- let me answer my question.

19   Your question.

20   Q.    Okay.

21   A.    Judge Lease of the Circuit Court for Montgomery County

22   made his decision in this case and determined that you were

23   the alter ego.  I'm not going behind this decision.

24   Q.    Yeah.  That's not a final decision.  It's not a judgment.

25   A.    You're arguing.



1    Q.    Well, that case is on appeal in the Maryland Court of

2    Appeals.

3    A.    You're arguing.

4    Q.    So it divests this Court of jurisdiction.  And this case

5    is on appeal in the district court, so that divests this Court

6    of jurisdiction.  And then there's probably two or three other

7    appeals that are out there, where you've brought up the issue

8    of this Goldsboro thing.  So pretty sure that this Court

9    doesn't have any jurisdiction to be considering this.  At any

10   rate, you --

11          THE COURT:  What's your question?

12   Q.    You reference one document, the first amended and

13   restated operating agreement.  Are you aware that there was a

14   second amended and restated operating agreement?

15   A.    Asked and answered, Your Honor.

16          THE COURT:  Answer it again, Mr. Schlossberg.

17   A.    The only agreement that I'm aware of is the one that is

18   in evidence here today.

19   Q.    Okay.  So is that, in your business judgment, a problem

20   that you don't even know what agreements exist for 6789

21   Goldsboro LLC?

22          THE COURT:  That's argumentative.  You don't need to

23   answer that.

24          Next question.

25   Q.    So you don't know all of the agreements for 6789



1    Goldsboro LLC?  You haven't reviewed the second amended

2    operating agreement?

3    A.    Your question --

4             THE COURT:  That question is argumentative.  You

5    don't need to answer it.

6             THE WITNESS:  Thank you, Your Honor.

7             THE COURT:  The second question, I would like you to

8    answer.  Have you reviewed any other agreements?

9    A.    No, that's the only one I've ever seen for their

10   operating agreement.

11            THE COURT:  All right.  Thank you.

12   Q.    So how can you form a business judgment based on one

13   agreement out of numerous agreements?

14   A.    Let's see how I can put this.

15            THE COURT:  That's --

16            THE WITNESS:  No, Your Honor, I can do this, if you

17   allow me.

18            THE COURT:  Okay.

19   A.    I did not attend any meetings of the 6789 Goldsboro LLC.

20   I've never seen any of its membership resolutions.  I haven't

21   seen the subscription agreements.  I haven't seen the receipts

22   for the capital contributions.  But what I am aware of is they

23   have $150,000 that they want to give to me for my bankruptcy

24   estate so that I can swell the coffers of the bankruptcy

25   estate.



1    Q.    So if --

2    A.    In the -- not finished.

3    Q.    Yeah, well, I didn't ask that question.

4    A.    I'm not finished.

5            THE COURT: Stop.

6    Q.    I didn't ask you this question.

7            THE COURT: Stop. Stop. Do not interrupt him again.

8            MR. MYERS: He's going off.

9            THE COURT: I don't know how many times I have to say

10   it, Mr. Myers. Stop it. You will observe --

11           MR. MYERS: Aren't I allowed to ask questions?

12           THE COURT: -- the decorum of this court -- do not

13   interrupt me either.

14           MR. MYERS: Yeah, this is -- okay.

15           THE COURT: You will observe the decorum of this

16   court. Stop interrupting people.

17           Mr. Schlossberg, finish your answer, please.

18           THE WITNESS: He did it again, Your Honor. I don't

19   remember where I was going.

20           THE COURT: Okay. So --

21           MR. MYERS: No, we're good.

22   Q.    Okay. So let me ask you this hypothetical. If the

23   Maryland Court of Appeals or Judge Lease determines and he

24   vacates the nonfinal order, which he certainly has

25   jurisdiction to do, then you would be settling and accepting



1    money from the King parties for property that this estate

2    doesn't own, which would constitute fraud and a violation of

3    your fiduciary duties as a Chapter 7 trustee.

4          MR. MASTRO:  Your Honor, objection.

5    Q.   Is that correct?

6          THE COURT:  I'm going to object.  You don't need to

7    answer that question.

8          MR. MYERS:  Oh, yeah.  Okay.

9          THE COURT:  Next question.  You have thirty minutes.

10   Q.   This all boils down, Mr. Schlossberg, to a question,

11   which is why your counsel never brought it up, is whether Serv

12   Trust's property is property of the estate.  You know it's

13   not, so you elide it over it.

14   A.   Asked and answered whatever question's come in, Your

15   Honor.

16          THE COURT:  That's stricken from the record.

17          Next question.

18   Q.   Okay.  So let's talk about value.  Did you ever read

19   Brian King's deposition testimony in the Montgomery County

20   Circuit Court case?

21   A.   No, sir.

22   Q.   Okay.  Would it surprise you if Brian King testified

23   after Mr. VerStandig filed the amended declaratory judgment

24   action that it was his opinion that the lots were worth

25   $450,000 each --



1    A.    It would --

2    Q.    -- the nineteen lots?

3    A.    It would neither surprise me or -- or not surprise me.

4    I -- it --

5    Q.    You don't care?

6    A.    Really don't care.

7    Q.    Okay.  Would you care, based on your disparaging remarks

8    about the value of the property, and oh, aren't you so lucky

9    you get 150,000?  Would you care that in August of 2016,

10   before Brian King sent the memorandum of understanding, which

11   was fully executed, that the Wormald Group made a written

12   offer through CBRE for $8-1/2 million?

13          MR. VERSTANDIG:  Your Honor, objection.

14          MR. MASTRO:  Objection.

15          MR. VERSTANDIG:  Assumes facts not in evidence.

16   Assumes hearsay that's it's not in evidence.  Attempts to

17   proffer hearsay.  Relevance.  And I'm probably missing one or

18   two things that Mr. Mastro will pick up on.

19          MR. MASTRO:  What he said.

20          THE COURT:  The objection is sustained.  Next

21   question.

22   Q.    Would it surprise you that a builder would offer $8-1/2

23   million in 2016 for nineteen preliminary plan lots in that

24   location?

25   A.    It would surprise me in this fashion, sir.  If there was

1    someone out there with an interest in this property, at those

2    kind of numbers, it would surprise me that you waived the

3    right to present a competing appraisal to slap down the

4    attempted redemption under section 7.7. So yes, it would

5    surprise me.

6    Q.    I didn't waive anything because Mr. --

7    A.    Arguing with the witness.

8    Q.    I'm not arguing with you. On September 12, I believe, if

9    my memory strikes me correct, you had looked at the memorandum

10   of understanding. It was completely signed by all parties.

11   I'm going to see if I can find a copy of that.

12        So this memorandum of understanding that Brian King sent

13   to Serv Trust was executed by Serv Trust on September 12.

14   I'll bring the copy that was submitted into the Montgomery

15   County filing that Judge Albright said is enforceable

16   agreement. I'll also bring the portion of the transcript

17   where she said Brian -- she said Brian --

18        THE COURT: What's your question, Mr. Myers? We

19   don't need to hear what your --

20        MR. MYERS: Can I do what he does?

21        THE COURT: No. No.

22        MR. MYERS: No? Okay.

23        THE COURT: Because you're asking questions.

24        MR. MYERS: Okay.

25        THE COURT: That's why. So --



1          MR. MYERS:  So on September 12th --

2          THE COURT:  -- stop giving narrative on what you're

3   going to do and --

4          MR. MYERS:  Uh-huh.

5          THE COURT:  -- what you're not going to do.  Ask a

6   question.

7   Q.   Okay.  Why did you submit an incomplete copy of the

8   memorandum of understanding as an exhibit in this record?

9   A.   Because Your Honor, if there had been a timely executed

10  memorandum of understanding, it called for a closing by

11  October 6th, I think it was, or October 7th of -- October 7th

12  of 2016.

13       And after that date -- oh, and there was supposed to be a

14  $75,000 deposit have been paid to Mr. Myers between the time

15  that the agreement got signed and that date of closing.  It's

16  my understanding that there was never a $75,000 payment

17  made because it is the position of Mr. King, as I understand

18  it and as makes sense to me, that he didn't receive back a

19  signed copy.

20       That's further confirmed by the fact that Mr. Myers

21  wasn't yelling and screaming that he wanted his $75,000

22  deposit and when October 7th passed without a closing and he

23  didn't have the rest of his $2 million he was supposed to get.

24  He would have been making trouble.

25       But instead, what we see is that Mr. Myers demonstrably



1   is working forward together with these folks at Goldsboro,

2   trying to get -- look like some stream permit. I'm not going

3   to pretend I understand that. I know there's a stream through

4   the property, and that was something that affected its -- it's

5   value. Not -- not favorably. I think they were trying to

6   move it.

7       But Mr. -- Mr. Myers wouldn't have been working with them

8   hand in glove in meetings. Very polite emails among them.

9   Mr. Myers would have been raising all sorts of cane, Your

10  Honor.

11      So the fact that there is a dispute about when Mr. Myers

12  signed this thing and whether it was, in fact, done in a

13  timely fashion and whether the absence of Mr. Myers taking

14  action back against the Goldsboro guys for his two million

15  bucks, there's an absence of that makes me believe -- makes me

16  believe Mr. King's position on this.

17      I suppose I could have put either one in. I could have

18  put both of them in and said, there's a dispute over this.

19  But I don't believe Mr. Myers position on it. It doesn't make

20  sense. And I'm not sure why -- I'm not sure why I chose that

21  one over the other one. I don't think it makes much matter of

22  a difference.

23  Q.  Mr. Schlossberg, do you think it matters that Judge

24  Albright reviewed the fully signed one at a hearing and

25  determined that this is an enforceable agreement?



1    A.    I don't know anything about anything from Judge Albright.

2    Q.    Okay.  Well, you will.  We'll put that in the record.

3    And you seem concerned that I would continue to work on this

4    project,  Paragraph 7 of this agreement.  Manager's actions,

5    that's me.

6    A.    Um-hum.

7    Q.    Prior to closing, the manager shall continue to act in

8    the best interests of Goldsboro.  So if I just dropped off and

9    didn't do anything, then potentially Serv Trust would be in

10   breach of this agreement?

11   A.    Where is you making noise about your $75,000?  Where is

12   you making noise --

13   Q.    I didn't ask you that question.

14   A.    -- about the closing an your $2 million??

15   Q.    Doesn't matter.  And let me ask you another question, Mr.

16   Schlossberg.  It says execution and closing dates.  Paragraph

17   6.  It says, "This agreement must be executed by September

18   12th, 2016, or this agreement shall be null and void."  So if

19   the agreement was executed by September 12, 2016, then the

20   agreement is not null and void, which is what Judge Albright

21   found.  And there is affidavits in the record from me.  Mr.

22   Ring signed it.  He's a CPA.  He's a well respected CPA.  So I

23   went down to Annapolis.  We signed it.  I mailed it.  So now

24   you're going to call him a liar?

25              MR. VERSTANDIG:  Objection.



1          MR. MYERS:  Yeah.

2          MR. VERSTANDIG:  Assumes facts not in evidence, not

3    the least of which being Mr. Myers is repetitively construing

4    a ruling on a motion to dismiss that, as matter of law, must

5    assume facts in favor of the nonmoving party as some sort of

6    series of binding judicial findings of fact.

7          I would also note there is no evidence that Mr. Ring

8    is a respected CPA, but that seems less material.

9          THE COURT:  I'm going to sustain the objection and

10   direct Mr. Schlossberg not to answer.

11         Next question.

12   Q.  So if, in fact, this agreement is a valid agreement, then

13   in that event they've breached the agreement, and everything

14   that comes after that, which is what Mr. VerStandig tried to

15   pull a fast one --

16   A.  Excuse -- I just make sure I heard you right because you

17   said -- did you say assuming that this agreement is -- is

18   not -- is -- is an invalid agreement or --

19   Q.  No.

20   A.  Okay.  You said valid?

21   Q.  I'm sorry.

22   A.  Okay.  Please continue.

23   Q.  Assuming the Court determines that this agreement is a

24   valid and enforceable contract entered into on September 12,

25   2016, which is what Judge Albright indicated, then all of Mr.



1    VerStandig's end run after in 2017 with his, oh, we want to do

2    an appraisal and try and redeem Serv Trust's interest after

3    they've already entered into a contract to purchase Serv

4    Trust's interest, that would be a problem, wouldn't it?

5    A.    Well, not with what I've just heard in Mr. VerStandig's

6    objection sustained by the Court, which was that that was the

7    judge explaining what the standard is on a motion to dismiss.

8    And of course, that's a -- a proper statement of law that the

9    Court has to assume all the allegations of the motion or the

10    complaint, I'm not sure which thing we're dealing with there,

11    in the light most favorable to the other party.  Well, I

12    assume you were the other party at that point, and they were

13    getting -- you were getting the benefit of those assumptions

14    for the purposes of a preliminary ruling that said not going

15    to dismiss it.

16    Q.    Well, that would be very similar to Judge Lease's

17    preliminary ruling, wouldn't it, Mr. Schlossberg?

18    A.    I don't even know what you're talking about.

19    Q.    Sure you do.

20    A.    But I'm probably not alone.

21    Q.    Sure you do.  Okay.  And please, I would ask that you not

22    refer to me.  Serv Trust had counsel there.  I wasn't the one

23    talking.  I wasn't the one filing the pleadings.

24         THE COURT:  What?  You don't get to tell him how to

25    answer questions.  You get to ask him --



1          MR. MYERS:  No --

2          THE COURT:  You get to ask him questions, so ask your
3    next question.

4          MR. MYERS:  Okay.  I am requesting that he --

5          THE COURT:  No.  No.  No.

6          MR. MYERS:  -- not refer to me as Serv Trust.

7          THE COURT:  No.  No.  Next question.

8          MR. MYERS:  No.  Nothing I do is worth anything.

9    Q.  So we talked a little bit earlier about Judge Lipp's

10   ruling in 2018, where, now you have it in front of you, the

11   Debtor's Exhibit 1, where she says, Serv Trust is a trust that

12   was created by Myers' mother for the benefit of Myers' five

13   children.  Serv Trust was funded with an initial deposit of

14   1,000 from Myers' mother.  Myers and Daniel Ring are the

15   cotrustees of Serv Trust.  Myers testified that Serv Trust has

16   a fifty percent interest in Maryland limited liability company

17   named 6789 Goldsboro LLC.  These are her findings of fact in

18   2018.  But you think that Judge Lease isn't bound by these

19   findings of fact that are final and unappealable.

20         And then Judge Lippe continues.  Goldsboro continued to

21   make post-petition -- these are her findings of fact.  Judge

22   Lipp.  Goldsboro continued to make post-petition advances to

23   Serv Trust, which funds were then made available to Myers

24   and/or Kelly to pay for their children's education and

25   household expenses.  That was her finding.



1          She then went on to say, it is undisputed that Serv Trust

2     was established to pay educational and other expenses related

3     to Myers' children.  She said it is also undisputed that Myers

4     is a cotrustee of Serv Trust, with the authority to direct

5     Serv Trust to make payments on behalf of its beneficiaries,

6     the Myers children.  And then, she says, if, as irrefutably

7     attested to by Myers.

8          Okay.  So you think it's okay that in a nonfinal order in

9     a proceeding in circuit court that isn't over yet that I've

10    never even been on trial.  No party.  I'm not a party.  And by

11    the way, that trial was not only never remanded by the Middle

12    District of Florida, but Judge Delano entered an order saying

13    no claims against me could go forward.

14              MR. MASTRO:  Objection, Judge.  He's arguing.

15              THE COURT:  What's your question, Mr. Myers?  What's

16    the question?

17    Q.   That question is that that doesn't give you any pause?

18    A.   Asked and answered.  That entire preface was done forty-

19    five minutes ago, almost word for word, Your Honor, and the

20    same question at the end.

21              THE COURT:  The objection is sustained.

22              MR. MYERS:  This is -- excuse me, Your Honor.  What

23    are we up to?

24              THE COURT:  Debtor Number 6.

25              MR. MYERS:  So we've admitted 1?



1          THE COURT: 1 was admitted. The Court took judicial
2     notice of Number 2. The Court admitted Number 3. Admitted
3     Number Four. Did not admit Number 5.
4          MR. MYERS: And I'm sorry. Number 3 was which?
5          MR. VERSTANDIG: Transcript.
6          THE COURT: Number 3 is the transcript from the
7     December 16th, 2022 hearing.
8          MR. MYERS: And you took take judicial notice of 2?
9          THE COURT: And that was your objection to the
10    proposed settlement.
11         MR. MYERS: Oh, okay. So this will be 6, correct?
12    Debtor's 6?
13         THE COURT: Yes. This is still Debtor Number 6.
14         MR. MYERS: Okay. And Debtor's Number 6 is -- and
15    I'm not sure if you all -- it's the trustee's opposition to
16    debtor's motion to dismiss filed in the Montgomery County
17    case.
18         MR. VERSTANDIG: No, Your Honor. I did not have a
19    crystal ball. I did not know what exhibits that were not on a
20    list would be introduced today. If (indiscernible) --
21         THE COURT: Mr. Myers -- I get it.
22         MR. VERSTANDIG: -- from state court, it's not
23    evidentiary.
24         THE COURT: I gave you an opportunity. I told you,
25    if you wanted to admit any documents into evidence, you had to

1    give them to the Court during either the last recess or the

2    recess before that, and we would make copies for you, even

3    though you did not comply with the Court's procedures and did

4    not pre-file the exhibits. And I told you I was not going to

5    be getting on and off the bench to make copies of exhibits for

6    you.

7        So if you want to offer that, you can bring copies

8    with you tomorrow, and maybe I will change my mind between now

9    and tomorrow.

10       MR. MYERS: Okay. Thank you.

11   BY MR. MYERS:

12   Q. So Mr. Schlossberg, what would you think if Mr. Mastro on

13   December 30, 2022, three days before this alleged trial, told

14   the Montgomery County Circuit Court in a pleading, here, the

15   claim asserted by the King parties in the declaratory judgment

16   complaint has nothing whatsoever to do with the trustee's

17   performance of his duties in Myers' Maryland bankruptcy case.

18       MR. MASTRO: Objection, Your Honor. He's taking this

19   out of context. This was written --

20       MR. MYERS: It's not --

21       MR. MASTRO: -- in connection with an argument

22   that -- it has to do with the Barton doctrine. And so that's

23   where that came up because he wanted to dismiss the trustee, I

24   believe, as a party to the case because we were named as a

25   nominal defendant. And so that's what that's -- that's what

1    that's about.

2              MR. MYERS:  Yeah, I'm not arguing Barton doctrine.

3              MR. MASTRO:  He didn't --

4              MR. MYERS:  Just a statement.

5              MR. MASTRO:  In fairness to the witness --

6              THE COURT:  Stop interrupting.

7              MR. MASTRO:  In fairness to the witness, he's taking

8    that out of context and just making it appear that I'm,

9    stating this proposition for something that it was not

10   intended to.  So I would object to that extent, Your Honor.

11             THE COURT:  So what is the question, Mr. Myers?

12             MR. MYERS:  This is a statement by Mr. Mastro,

13   Chapter 7 trustee's counsel.  I don't care about the Barton

14   doctrine.  It simply says here the claim asserted by the King

15   parties in the declaratory judgment complaint has nothing

16   whatsoever to do with the trustee's performance of his duties

17   in Myers' Maryland bankruptcy case.

18             THE COURT:  And what's your question?

19   BY MR. MYERS:

20   Q.   Is that true, Mr. Schlossberg?

21             THE COURT:  If you're able to answer based on that

22   snippet of information he's read from, and that's something

23   you don't have in front of you.

24   A.   Well, Your Honor, that's -- I'm -- I'm -- I'm afraid to

25   answer something because I know I'm going to see this later on

1    in a -- in a noncontextual fashion.

2         Mr. Myers, I do not know exactly what was said in court.

3    I would need to see that. And frankly, I'd have to think

4    about what was up because I understand what Mr. Mastro was

5    saying to the Court. I was not -- in that proceeding, at that

6    point, I'm not really sure where the Barton doctrine would

7    have even been a subject matter.

8         We were not bringing the cause of action. I was a

9    defendant in that case. And I was not raising any Barton

10   doctrine issues. I had participated in the proceedings

11   because I was trying to get that case moved along. I was a

12   necessary party and didn't have any interest other than that,

13   unless it became successful, as it did. And then Serv Trust

14   became part of my bankruptcy estate.

15        MR. MASTRO: Your Honor, and it's coming back to me

16   now. I think the argument was that Mr. VerStandig didn't

17   invoke the Barton doctrine prior to naming the trustee as a

18   defendant, and that's why Mr. Myers sought to dismiss the

19   trustee. And I think I was pointing out that the Barton

20   doctrine wasn't applicable to this circumstance so --

21        THE COURT: And I have no idea why any of this has to

22   do with whether the trustee has exercised good business

23   judgment.

24        MR. MASTRO: You and me both, Your Honor.

25        THE COURT: Next question, Mr. Myers. You have seven

1    minutes.

2           MR. MYERS: I'll place an objection on the record

3    that you cut me short. So and Mr. --

4           THE COURT: Your objection's noted.

5           MR. MYERS: And Mr. Schlossberg's filibuster.

6    BY MR. MYERS:

7    Q.   So Mr. Mastro also told the court further, "Although the

8    trustee has been joined herein as a nominal 'defendant'",

9    "defendant", "the bankruptcy estate's interest in this

10   litigation is more properly aligned with the King parties than

11   it is with Myers or Serv Trust. The court, therefore, may

12   properly reclassify and realign the trustee as a nominal

13   plaintiff in this matter. Maryland Rule 2-213."

14          THE COURT: Mr. Myers, I'm going to cut you off. If

15   you're going to read from a document, I'm not going to require

16   the witness to answer your question because you haven't marked

17   the document as an exhibit. You haven't provided a copy to

18   him so that he could review the whole document. Instead,

19   you're taking snippets out of pleadings and reading them to

20   the trustee without him having the context of the pleading.

21   So I'm not going to require him to answer any questions that

22   you ask in that manner.

23   Q.   If you dismissed -- if Count II was dismissed, the

24   redemption claim, what are you doing here?

25   A.   Mr. Myers, again, you have an uncanny ability to take



1    things out of context and ignore the rest of the context.

2    Can't do that.

3    Q.   Help me out.

4    A.   The case was dismissed, as I explained before, and I know

5    you were listening.  As I explained before, the case was

6    dismissed because by that point, we were in the bankruptcy

7    court.  We had brought the parallel claim.  He had brought the

8    parallel claim, and we consented to being sued in this court

9    in this adversary proceeding.  And at that time, the -- the

10   agreed fashion of disposing of the -- of the dispute was that

11   we would come back to this court.  An adversary proceeding

12   would proceed here.  The parties were encouraged to negotiate

13   and to try and reach an accord, like the one we have before

14   the Court today.  And if not, then we were going to go ahead

15   and try the case.

16        And our negotiations failed.  And we scheduled this case

17   for trial.  But we kept talking, and we reached a point where

18   we reached an accord.

19        At that point, though, Mr. Myers, there was a case moving

20   on its way to trial in this Court.  There was no reason for

21   the proceedings in Montgomery County to duplicate this

22   proceeding, even just as a matter of record.  And that is why

23   that doesn't give me trouble in any way.  It doesn't affect my

24   judgment in any way.  It doesn't implicate any thinking about

25   why this is a good deal here today, which is why we're here,

1    Your Honor.

2         On the one hand, nothing.  On the other hand, $150,000.

3    I don't know, Your Honor, but the scales seemed to go like

4    that.

5    Q.    Well, you would agree that it'd be great if you could get

6    $150,000 for property that's not nonestate property any day of

7    the week, right?  So you just said that the case was --

8         THE COURT:  Hold.  Wait.  Wait a minute.  Are you

9    asking him a question?

10        MR. MYERS:  Yeah.  I'm asking this question.

11   Q.    You just --

12        THE COURT:  Then that's stricken then.

13        MR. MYERS:  What?

14        THE COURT:  Then that comment is stricken --

15        MR. MYERS:  Yeah.

16        THE COURT:  -- from the record.

17   Q.    So you just testified that the case in Montgomery County

18   was dismissed.  It wasn't dismissed.  Is that your testimony?

19   That's part of the problem.

20   A.    Mr. Myers, your exhibit, Debtor's Number 4, is a

21   stipulation of dismissal that the redemption claim was

22   dismissed in the Montgomery County Circuit Court, and I just

23   explained it was dismissed so that we did not have parallel

24   proceedings of record.  The case is here.  This Court has

25   jurisdiction over it.  This Court, if there -- the settlement

1   doesn't get approved, we have to try the case.  This Court

2   will try the case.

3   Q.   Okay.  Well, there are parallel proceedings because the

4   case still exists in Montgomery County.

5   A.   So says you.

6   Q.   Are you disputing that the case --

7   A.   I'm not giving legal opinions.

8   Q.   I'm asking you your opinion.  Are you disputing that the

9   litigation in Montgomery County is still not open?

10  A.   Those proceedings have been dismissed, Your Honor.

11  There's a stipulation of dismissal.

12  Q.   The whole case?

13  A.   I just told you.  There's a stipulation of dismissal.

14  Q.   Of one count.

15  A.   So be it.

16  Q.   Great.  You can't do that voluntarily.

17          THE COURT:  What's your question, Mr. Myers?  Stop

18  arguing with the witness.

19  A.   Mr. Myers is suggesting I didn't have the ability to --

20  Q.   No, you didn't.

21  A.   -- sign that stipulation.

22  Q.   You didn't.  It's fraudulent.

23  A.   Fraudulent?  That's a big word.

24          THE COURT:  What's your question, Mr. Myers?

25  Q.   How did you have authority on May 7, 2024, with no final



1    judgment in that case, to execute --

2    A.    You -- you don't seem to understand.  Once the --

3    Q.    I'm asking my question.

4    A.    Once the --

5    Q.    Let me finish my question before you interrupt me.

6    A.    You're right.  I did interrupt you.

7          THE COURT:  Finish your question.

8    Q.    What authority did you have as a nominal defendant in a

9    case that's still open, with no final judgment, to sign a

10   stipulation of dismissal with Mr. -- well, you didn't sign it,

11   but VerStandig Law Firm and Schlossberg Mastro.  But it says

12   the Chapter 7 trustee, who is by operation of law.  What

13   operation of law are you talking about?

14   A.    Asked and answered, Your Honor.

15   Q.    Well, I'm asking you.  What operation of law?  You put it

16   in here.

17   A.    Asked and answered, Your Honor.  We've been over this.

18         THE COURT:  The objection's sustained.  Move onto the

19   next question.

20         MR. MYERS:  Okay.

21         THE WITNESS:  Your Honor, I take note that it's 5

22   o'clock.  May I inquire --

23         THE COURT:  Mr. Myers, how much more time do you need

24   to wrap this up?

25         MR. MYERS:  I don't know.  We can continue tomorrow.

1          THE COURT:  No, we're not continuing tomorrow.  I'm
2     asking you how much time you need to (indiscernible).

3          MR. MYERS:  I don't know, Your Honor.

4          THE COURT:  Well, hours ago, you told me you needed
5     two hours.

6          MR. MYERS:  No, I said approximately.

7          THE COURT:  You approximately two hours.  So you
8     need --

9          MR. MYERS:  Well, he's --

10         THE COURT:  So you need another five minutes?  Ten
11    minutes?

12         MR. MYERS:  Probably another thirty minutes.

13         THE COURT:  All right.  I'll give you twenty.

14         MR. MYERS:  Okay.

15         THE COURT:  And then I'm cutting -- and then that's
16    the end of your cross-examination of this witness.

17         MR. MYERS:  Right.

18         THE WITNESS:  Your Honor, may I ask one further
19    question?

20         THE COURT:  Yes.

21         THE WITNESS:  Tomorrow's proceedings --

22         THE COURT:  We'll talk about tomorrow after you're
23    off the --

24         THE WITNESS:  We need -- we need exhibits in the next
25    couple hours, not at 10 o'clock tonight.



1          THE COURT:  Understood.  We'll talk about that after
2     you're off the stand.
3               Mr. Schlossberg.
4          THE WITNESS:  Thank you, Your Honor.
5     BY MR. MYERS:
6     Q.    Mr. Schlossberg, before the hearing today, you saw a
7     complaint and demand for trial by jury filed by me against
8     Judge Ruark, Ramona D. Elliott, Roger Schlossberg, Frank
9     Mastro, Schlossberg & Associates, P.A., and Maurice
10    VerStandig; is that correct?
11    A.    I saw the first page.
12    Q.    Did you review anything else in here?
13    A.    Nothing.
14    Q.    Okay.  So --
15    A.    I did hear, though, that you're asking for $40 million.
16    Is that correct?  I -- I don't --
17    Q.    So you're aware --
18    A.    That's what I heard.
19    Q.    You're aware there's a complaint demand for jury trial
20    where you're a defendant, Judge Rurak's a defendant, Frank
21    Mastro's a defendant, Maurice VerStandig's a defendant, and
22    Schlossberg & associates is a defendant?
23          THE COURT:  What's the question?
24          MR. MYERS:  I'm just confirming what he said.
25          THE COURT:  No, ask him a question.



1           MR. MASTRO:  Move to strike, Your Honor.

2    Q.   Are you --

3           THE COURT:  Objection's denied.

4    Q.   Are you aware that a notice of appeal was filed in this

5    case a few days ago to the --

6           THE COURT:  Okay.  Then I am going to grant the

7    motion to strike.  You did not ask a question.  You just --

8           MR. MYERS:  I'm asking it.

9           THE COURT:  -- just had a soliloquy.  Now, you're

10   asking about a notice of appeal.  You just talked about a

11   complaint that was filed and did not ask a question, even

12   though I asked you to.  So let's move on to the notice of

13   appeal.  It's been stricken from the record

14          MR. MYERS:  No, Your Honor.  He answered the

15   question.

16          THE COURT:  Yes, Mr. Myers.  It's been stricken from

17   the record.

18          MR. MYERS:  Then I'll ask it again.

19          THE COURT:  You can tell me no all you want.

20          MR. MYERS:  I know.

21          THE COURT:  It's been stricken.

22          MR. MYERS:  Right.  You'd strike everything from me.

23          THE COURT:  Next question.  You were asking about a

24   notice of appeal.

25          MR. MYERS:  What did you strike from the record, so I



1   know.

2           THE COURT:  Your soliloquy about the complaint that
3   was filed.

4   Q.   Okay.  So you've already answered, correct, Mr.
5   Schlossberg, you saw this complaint this morning before this
6   hearing started?

7   A.   Told you --

8           THE COURT:  He testified that he looked at the first
9   page and that he heard that you're asking for $40 million.
10  Next question.

11          MR. MYERS:  Thank you.  And that's in the record,
12  correct?  That answer is in the record?

13          THE COURT:  What --

14          MR. MYERS:  What you just said?

15          THE COURT:  Yes.  Yes, that's the record.

16          MR. MYERS:  Thank you.  Okay.  I'm going to mark this
17  as Defendant's 7.  7?

18          THE COURT:  Well, 6 did not get marked because you
19  were reading from it and not offering copies so --

20          MR. MYERS:  Okay.  So 6?

21          THE COURT:  So this is 6.

22          MR. MYERS:  They have copies of this, Your Honor.

23          THE COURT:  Okay.  Show a copy to Mr. Mastro and Mr.
24  VerStandig.

25          MR. MYERS:  I think they already have it.



1           MR. VERSTANDIG:  No.

2           MR. MASTRO:  No.  No.  We don't have it.

3           MR. VERSTANDIG:  Your Honor, I'm confident I've seen

4    this before in my life, but again, I think this was not on an

5    exhibit list.

6           MR. MYERS:  The clerk handed them out.

7           MR. VERSTANDIG:  No.

8           THE COURT:  Is this the order remanding case?

9           MR. MYERS:  No.

10          MR. MASTRO:  No.

11          THE COURT:  What?  Then what--

12          MR. MASTRO:  This looks like some pleading

13   (indiscernible) --

14          MR. VERSTANDIG:  This is --

15          MR. MYERS:  This the order --

16          MR. VERSTANDIG:  -- the Judge Delano --

17          MR. MYERS:  It's in the case already in the record.

18   It's the order sustaining -- this is out of my Florida

19   bankruptcy case.  This is the order sustaining debtor's

20   objection to proof of claim 3 filed by Brian King and Cristina

21   King.

22          THE COURT:  You didn't pre-file it.  You don't have

23   copies for everyone.

24          MR. MYERS:  I believe she made copies.

25          THE COURT:  I have copies of everything that she made



1   a copy of. And I'm telling you, that is not one of the

2   documents that you gave. The only document I have left that

3   you have not marked as an exhibit is an order remanding case

4   issued by this Court on December 5th, 2019. It's a three-page

5   order.

6           MR. MYERS: Okay. Let me take that one up, then.

7           THE WITNESS: I don't have such a document, Your

8   Honor.

9           THE COURT: I don't know what he's --

10          The order remanding case, do we have copies of that?

11          MR. VERSTANDIG: Yes.

12          THE COURT: It's one of the documents that was given

13  to me. Was it not given to the witness?

14          MR. VERSTANDIG: I can pass my copy to Mr.

15  Schlossberg.

16          THE COURT: It's a two-page order from Judge Simpson

17  on December 5th, 2019.

18          THE WITNESS: That's not here. I have four

19  documents, Judge.

20          THE COURT: I'm going to have Ms. Fernandez come up

21  and take a look.

22          THE WITNESS: Can you guys give me one of yours?

23          MR. VERSTANDIG: Yep. Your Honor, may I approach?

24          THE COURT: You may. So is this Debtor Number 6, Mr.

25  Myers, the order remanding case?



1          MR. MYERS:  As soon as I find it.

2          THE WITNESS:  All right.  I -- I've got it here.  And

3     what number is this, Your Honor, now?  6?

4          THE COURT:  It would be 6.

5          (Judge Simpson's order was hereby marked for

6     identification as Debtors' Exhibit 6, as of this date.)

7          THE WITNESS:  Got it.

8     BY MR. MYERS:

9     Q.   Do you have that in front of you, Mr. Schlossberg,

10    Debtor's 6, order remanding case?

11         (Pause)

12    Q.   I was waiting for you to say you've --

13    A.   I -- I told the Judge I've got it.

14    Q.   -- had a chance to look at it.

15         THE COURT:  He's reading it.

16         MR. MYERS:  Okay.

17    A.   I'm done.  I'm ready.

18         THE COURT:  Okay.

19    A.   Let's go.

20         THE COURT:  And so what is your question, Mr. Myers?

21    Q.   So this is an order remanding the case.  So Mr.

22    VerStandig had removed the Montgomery County case to this

23    Court, establishing adversary 19-00427.  And then on December

24    5, 2019, this Court entered an order remanding the adversary

25    proceeding to Montgomery County, Maryland, pursuant to 28



1    U.S.C. 1452(b).  So how does the case get back here?  Because

2    in your -- I'll add a piece of information for you.  In your

3    notice of stipulation of settlement or whatever you called it,

4    you specifically said in there, there's no way to bring that

5    case back here.  It's too late.

6            MR. VERSTANDIG:  Your Honor, objection.  Assumes

7    facts not in evidence.  I think Mr. Myers is suggesting that

8    the Montgomery County Circuit Court case, which was removed to

9    this Court the first time Mr. Myers sued me and then remanded

10   when he dismissed the claim against me for allegedly violating

11   the automatic stay, is the case that is in front of you today,

12   whereas the record has been clear that that case has a

13   judgment on one count and a dismissal on the other.  And the

14   adversary proceeding in front of you today is a fresh, clean,

15   new, whatever the terminology may be, that was filed on

16   whatever date in 2024, I believe.

17           THE COURT:  I don't even understand the question.

18   Q.   The question is, is that when a case is remanded to the

19   state court, under 28 U.S.C. 1452(b), this court loses all

20   jurisdiction over the matters and claims in that case, and

21   Rooker-Feldman prevents this Court from considering anything

22   to do with that case.  So you're essentially, in this case,

23   sitting in review of a case that's ongoing in Montgomery

24   County Circuit Court.  Mr. VerStandig incorrectly stated that

25   the one count was a --

1          MR. MASTRO:  Your Honor, this is argumentative.

2          THE COURT:  What's your question?

3          MR. MYERS:  I'm responding to what Mr. VerStandig

4    said.  He misstated that he may -- he's trying convince the

5    Court that the Montgomery County circuit case is over.  It's

6    not.

7          THE COURT:  No, the Montgomery County case was

8    seeking -- it was a declaratory judgment action to determine

9    whether you are and were the alter ego of Serv Trust.

10          MR. MYERS:  And that claim was stayed by Judge

11    Delano.

12          THE COURT:  There was a determination made on that.

13          MR. MYERS:  Void.  Was stayed.

14          THE COURT:  Well, okay.  You can make that argument.

15    What is your question about this adversary proceeding, which

16    has one count for a declaratory judgment regarding the

17    redemption of interest?

18          MR. MYERS:  So you can't have the same case in two

19    different courts.

20          THE COURT:  What's your question --

21          MR. MYERS:  Never mind.

22          THE COURT:  -- for this witness?

23          MR. MYERS:  Okay.

24          THE COURT:  What are you asking?

25          MR. MYERS:  I'll move on.  I mean, obviously, we

1    have --

2              THE COURT:  We've been talking about this for four

3    hours.

4              MR. MYERS:  Right.  And it's my position that once

5    this case --

6              THE COURT:  And you can make your position in closing

7    argument.  Ask this witness a question.

8              MR. MYERS:  Well, we might not get that far.

9              THE COURT:  You have eight minutes left.  Seven

10   minutes now.

11   BY MR. MYERS:

12   Q.   Are you familiar that there was an order entered, Mr.

13   Schlossberg, on -- are you looking at your phone?

14   A.   No, I'm not looking at my phone.

15   Q.   Are you familiar that there was an order entered on June

16   29, 2021, in my bankruptcy case in Florida, case number 2:21-

17   bk-00123 sustaining my objection to a proof of claim filed by

18   Brian King and Cristina King by Mr. VerStandig and the

19   objection was sustained and the claim of Brian and Cristina

20   King is disallowed in its entirety?  Do you dispute that that

21   would not have res judicata effect on this little charade

22   you're doing here?

23   A.   Well, I think that's insulting to everybody who's here

24   trying to do this case and to the Court.

25   Q.   Legal.



1  A.    Excuse me.

2  Q.    I said, what you're trying to do is legal.

3         THE COURT:  So Mr. Schlossberg, are you familiar with

4  the claims --

5         THE WITNESS:  Your Honor --

6         THE COURT:  -- that were filed --

7         THE WITNESS:  Your Honor --

8         THE COURT:  -- in the Florida proceeding, and if

9  so --

10        THE WITNESS:  I -- I'm not familiar with it.  I heard

11 some discussion about it today.  But I've -- I've never looked

12 at it.

13        THE COURT:  Okay.

14        THE WITNESS:  To my knowledge.  Maybe some --

15 maybe -- maybe it was put in front of me someday to say, you

16 know, this is interesting, but I -- I don't know anything

17 about it.

18        THE COURT:  All right.

19        THE WITNESS:  I couldn't give you a -- a sensible

20 answer.

21        THE COURT:  Thank you.  Mr. Myers.

22        MR. MYERS:  Yeah.  I want to get to his -- I'll mark

23 this is defendant's answer to the complaint in this case.  Can

24 I mark it as an exhibit, or do I have to have copies of that

25 too?

1          THE COURT:  Same as the other exhibits that you don't

2     have copies of.

3          MR. MYERS:  Well --

4          THE COURT:  Why don't you ask him a question about

5     the answer?

6     BY MR. MYERS:

7     Q.   Okay.  This is your -- Mr. Schlossberg, I'll represent to

8     you, this is your defendant's answer to the complaint in this

9     case, adversary 24-00007.  This is filed on April 15, 2024,

10    doc 13, in this adversary.  And in this answer, it says on

11    page 5 of 7 -- this is paragraph 37 of your response, general

12    allegations bankruptcy.

13         "The trustee admits that the parties engaged in

14    settlement negotiation in the weeks prior to the filing of the

15    complaint and that no agreement between the parties was

16    reached as a result of such pre-filing settlement

17    negotiations.  The trustee is advised that plaintiffs filed

18    the instant complaint in order to protect and preserve their

19    litigation rights and not to stymie or otherwise interfere

20    with the continuation of settlement negotiations between the

21    parties."

22         So do you have any opinion at all on the King parties'

23    standing in this case if their proofs of claim are -- if my

24    objections to their proof of claims are overruled, why they're

25    even here?  What standing they would have to come into this

1    Court?

2    A.    Mr. Myers, you're asking me if, if this Court should

3    sustain your objections to the proofs of claim filed by the

4    Kings, what's left in this case to decide?  Is that what

5    you're -- you're asking me?

6    Q.    Well, let me rephrase it.  The King parties, they're all

7    identical, their proofs of claim.  This is a Chapter 7 case,

8    and they say they're owed $0.  And the basis for their relief

9    is equitable relief in this adversary.  I've done a little

10   reading, and that's not a valid basis for a proof of claim in

11   a Chapter 7 case.  So they have to have some monetary request.

12         Now, we just palavered a little bit about the fact that

13   their objection, their proof of claim filed in my Florida

14   case, which is good across the world, was my objection was

15   sustained.  And their claim, any claim they could bring,

16   related claim, is gone forever.

17         MR. VERSTANDIG:  Objection.

18   Q.    So how is it that they're filing a claim in this case,

19   and you're not concerned that their claim has already been

20   overruled?

21         MR. VERSTANDIG:  Objection.  Assumes facts in

22   evidence, specifically that there would be a prejudicial

23   impact to the denial of a claim in a Florida case that was

24   subsequently dismissed without a plan being confirmed and with

25   the bar order being entered against the debtor.  Assumes

 1    various theories of law.  Calls for an expert opinion.  Calls

 2    for speculation.  Lack of foundation.

 3           THE COURT:  The objection's sustained.  Next

 4    question.

 5           MR. MYERS:  An objection to a proof of claim that's

 6    been sustained in a Chapter 13 case is a final order,

 7    regardless of whether the case is --

 8           THE COURT:  What's your question, Mr. Myers?  Stop

 9    arguing.

10           MR. MYERS:  Yeah, well, this is just so much garbage.

11           MR. VERSTANDIG:  I'm sorry.  What did you just say?

12           THE WITNESS:  I'm sorry.  I didn't hear that.

13           MR. MYERS:  I don't know.

14           THE COURT:  Mr. Myers, if you're going to say

15    something, don't mumble.  Have the guts to stand behind what

16    you're saying.

17           MR. MYERS:  Oh, I have guts, Your Honor.

18           THE WITNESS:  What did you say?

19           THE COURT:  Well, if you want to --

20           MR. MYERS:  I've been here.  I've been in this court

21    for eight years putting up with this.  I have guts.

22           THE COURT:  Actually, you've been in this court for

23    ten years.  Ten years.  And --

24           MR. MYERS:  Yeah, and I've been -- and I've been --

25           THE COURT:  And you have not yet learned the decorum

 1    of the court.

 2            MR. MYERS:  I've been defrauded and ripped off.

 3            THE COURT:  You have not learned the court's

 4    procedures.  You haven't learned the --

 5            MR. MYERS:  Well, oh, oh, I know the court's

 6    procedures.

 7            THE COURT:  -- Federal Rules of Bankruptcy

 8    Procedures.  So if you're going to --

 9            MR. MYERS:  So --

10            THE COURT:  -- say something, don't mumble.  Have the

11    guts to say it out loud so that I can hear it, and I can deal

12    with it.

13            MR. MYERS:  Yeah, well, okay.  I think this whole

14    thing is a sham.  I think that they're trying to steal Serv

15    Trust property.  There's no final order in the Maryland case.

16            THE COURT:  Okay.  Well, you can make those arguments

17    in your closing.

18            MR. MYERS:  But here I'm going to ask my last

19    question.

20            THE COURT:  There's a witness on the stand.

21            MR. MYERS:  Yeah, I'm going to ask him a question.

22            THE COURT:  Okay.  Ask him.

23    BY MR. MYERS:

24    Q.   So as affirmative defenses signed by your attorney, the

25    complaint, in whole or in part, fails to state a claim upon

1    which relief can be granted, wherefore the trustee prays for

2    relief as follows.  Dismiss plaintiff's complaint.  Did you

3    ever amend this?

4    A.    May I see the document just a minute because I want to

5    make sure that this isn't being taken as poorly out of

6    context --

7            THE COURT:  Here, I will actually -- you stay where

8    you are, Mr. Myers.  I will tell you that, under affirmative

9    defenses, it says in paragraph number 1, the complaint, in

10   whole or in part, fails to state a claim upon which relief can

11   be granted, and this answer was filed on April the 15th, 2024.

12           THE WITNESS:  Are there any following prayers, Your

13   Honor?

14           THE COURT:  It says the trustee reserves the right to

15   amend this answer to assert any and all affirmative defenses,

16   which may become known to it through discovery, wherefore, the

17   trustee prays for relief as follows.  Dismiss plaintiff's

18   complaint and award such other and further relief as the court

19   may deem just and proper.

20   A.    Your Honor were this case going to trial, I would either

21   be relying on my omnibus request for relief, or I'd be

22   prosecuting the defense of it should be dismissed.  We'd be

23   having a hearing, I'm sure, on our motion to dismiss.  But

24   instead, we got to this glorious point, where we could get rid

25   of this dispute, and we could liquidate this asset for the



1    benefit of the estate.  And that is why we're here today.  I

2    don't have a clue what the relevance of that particular

3    question was, but I've answered it.

4    BY MR. MYERS:

5    Q.    Well, let me ask a follow-up question.  You're here

6    trying to do a settlement for a claim for their adversary that

7    it's your position they don't even have a claim.  Fails to --

8    A.    Oh --

9    Q.    -- state a claim upon which relief can be granted.  How

10   are you entering into a settlement?  Why would you enter into

11   a settlement, which is so far below the reasonable business

12   judgment, when you think their claim -- when you think they

13   failed to state a claim?

14   A.    You can't possibly be that naive about the operations of

15   business in this court and how the pleadings work.

16   Q.    I'm fully aware of how things work in this court.

17            MR. MYERS:  I don't have any further questions today,

18   Your Honor.

19            THE COURT:  All right.  So Mr. Mastro, let me ask.

20   Do you intend to do a redirect?

21            MR. MASTRO:  No, Your Honor.

22            THE COURT:  Mr. VerStandig.

23            MR. MYERS:  No, Your Honor.

24            THE COURT:  All right.  Mr. Schlossberg, thank you

25   for your testimony.  The Court does not have any questions for

1    you.  I would like you to leave on the witness stand only the

2    documents that have been entered into evidence, which, again

3    are Trustee's Exhibits 1, 2, and 4 through 11 --

4              THE WITNESS:  Your Honor.  I'm sorry, Your Honor.

5    This, I brought this binder.  Yeah.  You're welcome to it.

6              THE COURT:  No.  Nope.  Nope.  You're right.  That's

7    your binder.  You take that.  The exhibits, the Trustee's

8    exhibits and the King parties' exhibits are on the docket, and

9    we have the electronic copies.

10             What I need you to leave on the witness stand are

11   Debtor's Exhibits 1.  I don't know that you ever had exhibit

12   2.  That was Mr. Myers' objection to settlement.

13             THE WITNESS:  I have 2.

14             THE COURT:  You have 2?  Okay.  So 1, 2, 3, 4 --

15             THE WITNESS:  Do not have 3.

16             THE COURT:  -- 5, and 6.

17             THE WITNESS:  I have 4 and 6.

18             THE COURT:  5 was not admitted, but still leave it.

19             THE WITNESS:  Do you want that left on the bench?

20   Left on the --

21             THE COURT:  1 through 6 should be on the bench.  And

22   to be clear --

23             THE WITNESS:  Well, I don't have -- I don' have 6.

24             THE COURT:  -- 1 through 4 were admitted, and 6, the

25   order remanding, Judge Simpson's order remanding, the Court is

1    going to admit that.  That's an order of this Court.

2           (Judge Simpson's order was hereby received into evidence

3    as Debtors' Exhibit 6, as of this date.)

4           THE WITNESS:  So Your Honor, I --

5           THE COURT:  So Debtor's 1 through 6 should be on the

6    witness stand, and 5 was not admitted.

7           What?

8           THE WITNESS:  I do not have 3.

9           THE COURT:  You don't have the transcript?

10           THE WITNESS:  No.

11           THE COURT:  It looks like this.  Transcript, you do

12    not have?

13           THE WITNESS:  No transcript, Your Honor.

14           THE COURT:  Okay.  I am going to have my copy put on

15    the witness stand so that any additional witnesses will have

16    the benefit of these exhibits.

17           Okay.  Okay.  So we do have it --

18           THE WITNESS:  Okay.

19           THE COURT:  -- and we will put it on the witness

20    stand.

21           THE WITNESS:  Oh, so you had mine?  Okay.

22           THE COURT:  All right.  Thank you, Mr. Schlossberg.

23           MR. SCHLOSSBERG:  Thank you, Your Honor.  Can we talk

24    about exhibits?

25           THE COURT:  Yes.  So let me ask you, Mr. Mastro, at



1    this point in time, do you anticipate calling other witnesses?

2          MR. MASTRO:  No.  The trustee has no further

3    witnesses, and we'll rest our case in chief.

4          THE COURT:  All right.  And Mr. VerStandig, do you

5    have any witnesses that you intend to introduce tomorrow?

6          MR. VERSTANDIG:  No, we do not.

7          THE COURT:  All right.  Mr. Myers, how many witnesses

8    do you have for tomorrow?

9          MR. MYERS:  Three.

10          MR. MASTRO:  Objection, Your Honor.

11          THE COURT:  And who are these witnesses?

12          MR. MYERS:  Roger Schlossberg, Frank Mastro, and

13    Maurice VerStandig.

14          MR. MASTRO:  Your Honor, we object.

15          MR. MYERS:  They're here in the Court.

16          THE COURT:  All right.  Well, I'm not going to allow

17    you to put an attorney on the stand who is acting in their

18    capacity as attorney unless you have a darn good reason so --

19          MR. MYERS:  I do.  Impeachment of their testimony in

20    the Montgomery County case.

21          THE COURT:  Who testified that Mr. Mastro testified

22    in the Montgomery County case?

23          MR. MYERS:  Well, he made representations to the

24    Court --

25          THE COURT:  All right.  Well, you can --



1          MR. MYERS:  -- which now, Mr. Schlossberg said are

2   not true.

3          THE COURT:  You can address that -- you can address

4   that in your argument.  And then --

5          MR. MYERS:  What is the basis that I can't call Mr.

6   Mastro?  He's here in court.

7          THE COURT:  Because he's an attorney, and you're not

8   going to call him as a witness, which would have the impact of

9   disqualifying him as counsel, which I think is part of your

10  goal here to derail these proceedings.  So I'm not going to

11  allow it.

12         If you don't agree with something Mr. Mastro said,

13  you're going to have an opportunity to address it with the

14  Court.  If you don't agree with something Mr. VerStandig said,

15  you're going to have an opportunity to address it with the

16  Court.

17         So you are not going to call Mr. Mastro or Mr.

18  VerStandig.  Are you going to testify, Mr. Myers?

19         MR. MYERS:  When are you going to rule on the motion

20  to disqualify -- disqualification of you?

21         THE COURT:  Not before we resume first thing tomorrow

22  morning.

23         MR. MYERS:  Okay.  Well, then I would ask for an

24  emergency stay so I can go to the district court and --

25         THE COURT:  Denied.



```
1              MR. MYERS:  Denied?

2              THE COURT:  So are you testifying --

3              MR. MYERS:  Okay.  Are you going to enter an order,

4      please?

5              THE COURT:  Are you testifying?

6              MR. MYERS:  I don't know.

7              THE COURT:  All right.

8              MR. MYERS:  Think I will.

9              THE COURT:  So I'll put you down as a possible

10     witness.  And then you said you may be recalling Mr.

11     Schlossberg, which I may or may not allow.  So you're going to

12     have --

13             MR. MYERS:  I will be on my direct.

14             MR. MASTRO:  We would object to that.

15             THE COURT:  Hold on.  Hold on.

16             MR. MYERS:  Of course he would object.

17             THE COURT:  Hold on.  You're going to have to be

18     prepared to address the Court tomorrow morning and convince me

19     why I should allow you to recall him, when he has been on the

20     stand all day.  I'm not going to allow you to call him as part

21     of your case simply to prolong his testimony after you told me

22     you needed a certain amount of time, and I've given you much

23     more than what --

24             MR. MYERS:  On cross-examination.  This is my case,

25     Your Honor.  I'm entitled to call my witnesses.
```

```
 1              THE COURT:  Well, if I --

 2              MR. MYERS:  And that's in violation of my due process

 3    right.

 4              THE COURT:  Okay.  If I do allow you to call him,

 5    it's going to be very limited in scope and --

 6              MR. MYERS:  So you're limiting my case.

 7              MR. VERSTANDIG:  Your Honor.

 8              THE COURT:  I'm limiting your case to the subject

 9    matter --

10              MR. MYERS:  He had three hours.

11              THE COURT:  -- that's before this Court.

12              MR. MYERS:  Okay.  I've told you time and time again

13    that the issue for this Court is whether he has exercised good

14    business judgment in reaching this settlement.  You had an

15    opportunity --

16              MR. MYERS:  And I disagree that that's the issue.

17              THE COURT:  Well, you can disagree all you want, Mr.

18    Myers.

19              MR. MYERS:  I will.

20              THE COURT:  And you're going to disagree that today

21    is Monday as well.

22              MR. MYERS:  No.

23              THE COURT:  You're entitled to do that.

24              MR. MYERS:  That's insulting.

25              THE COURT:  You can disagree.
```



1          MR. MYERS:  That's insulting.

2          THE COURT:  But I've told you the standard for this

3    Court -- I have an application to compromise a controversy

4    before me.  The standard, the question, the sole question for

5    me, is whether the Chapter 7 trustee has exercised good

6    business judgment in deciding to enter into this settlement.

7    That's the sole issue for me to decide.  Not what your --

8          MR. MYERS:  You have to decide jurisdiction.

9          THE COURT:  -- not what your rights may have been in

10   other litigation.  Not what another court has decided.  You

11   spent all this time and all this stuff, even though I've told

12   you numerous times what the question is for this Court.  If

13   you want to spend your time on other things, then you're

14   welcome to spend your time on other things.  But I'm not going

15   to allow you to put him back on the stand to ask him about

16   things that are not relevant to the issue before this Court.

17         MR. MYERS:  Jurisdiction.

18         THE COURT:  So I'm going to give you until tomorrow

19   morning --

20         MR. MYERS:  Jurisdiction is relevant.

21         THE COURT:  Stop interrupting me.

22         MR. MYERS:  Well, you're wrong.  Jurisdiction is

23   relevant.

24         THE COURT:  Stop interrupting me.

25         MR. MYERS:  No, I'm done.



```
 1                THE COURT:  You are done.  You are welcome --

 2                MR. MYERS:  Are you going to issue the order?

 3                THE COURT:  -- to leave at any time, Mr. Myers.

 4                MR. MYERS:  Are you going to issue the order:?

 5                THE COURT:  Stop interrupting me.  I'm talking.

 6                MR. MYERS:  This is a sham proceeding.

 7                THE COURT:  I told you.  I told you, you cannot file

 8   pleadings minutes before a hearing begins and expect the Court

 9   to act on them before the hearing begins.  And you and I both

10   know that you filed these pleadings simply to derail these

11   proceedings.  I'm not going to allow it.

12                This has been pending too long.  It is time to wrap

13   up --

14                MR. MYERS:  I am allowed.

15                THE COURT:  -- these issues.  It is time to wrap up

16   these issues.  I'm going forward with the hearing tomorrow

17   morning.

18                Let's talk about timing.  So --

19                MR. MYERS:  Not if you have a conflict of interest.

20                THE COURT:  Mr. Myers.

21                MR. MYERS:  And you know it.

22                THE COURT:  Mr. Myers, again, don't tell me what I

23   know --

24                MR. MYERS:  Okay.

25                THE COURT:  -- because you don't have a clue what I
```



1  know --

2         MR. MYERS:  Oh.

3         THE COURT:  -- which is obvious from the way you have

4  prosecuted this case.  I have encouraged you time and time

5  again to get experienced bankruptcy counsel to represent you.

6  You've refused to do it.  Instead, you want to come in here

7  and prosecute the case on your own.  You're welcome to do

8  that.

9         MR. MYERS:  I don't want to.

10        THE COURT:  You're welcome to do that.

11        MR. MYERS:  I don't want to.  But he stole a million-

12  110 of my money.

13        THE COURT:  Stop interrupting me.  Stop interrupting

14  me.

15        MR. MYERS:  I'm done.

16        THE COURT:  You are welcome -- no, you've said you're

17  done four times, and you're still going back and forth,

18  interrupting me.

19        MR. MYERS:  Because this is a sham.

20        THE COURT:  You are welcome to prosecute your case as

21  a pro se litigant.  You are still bound by the statutes and

22  the rules that govern this Court.  You did not pre-file your

23  exhibit and witness list, even though I know that that

24  protocol was sent to you, even though I know it is on the

25  court's website that you're required to do that.  You didn't

1    do it.  But I still gave you a chance to be heard.  I still

2    gave you an opportunity to introduce documents.

3             Now, let's talk about tomorrow.

4             MR. MYERS:  I don't believe you --

5             THE COURT:  If you want to --

6             MR. MYERS:  -- have addressed jurisdiction yet.

7             THE COURT:  If you want to introduce documents

8    tomorrow into evidence, you must file them on the docket

9    tonight with an exhibit list.  Even then, I don't know if I'm

10   going to allow you to introduce all of the documents that you

11   offer.  I'm going to give you until -- it's 5:32 now.  I'm

12   going to give you until 9 p.m.  Whatever documents you want to

13   introduce into evidence, file on the docket with an exhibit

14   list.  You must follow the protocol that was sent to you last

15   week.  It may have even been sent to you before that.

16            But you must file an exhibit list.  You must identify

17   the exhibits.  You must attach the exhibits.  You would be

18   starting with Debtor's Number 7 because we have 1 through 6

19   already marked.

20            So I will excuse you from having to file a witness

21   list.  You have identified Mr. Mastro, Mr. VerStandig, Mr.

22   Schlossberg, and then yourself as potential witnesses.  And

23   whoever you call as a witness tomorrow, I will deal with it

24   tomorrow.  But I can tell you that I am not going to allow you

25   to put Mr. Mastro or Mr. VerStandig on the stand, and I very,

1    very well may not allow you to put Mr. Schlossberg back on the

2    stand either.  So --

3              MR. MYERS:  Okay.  When are you going to issue the

4    order denying my motion to stay?  Tonight, please?

5              THE COURT:  So you know what?  I don't believe you

6    have the ability to file on the docket, and the clerk's office

7    is closed.  So what I'm going to tell you is that you must

8    email your documents to Mr. Mastro and Mr. VerStandig with a

9    copy to -- with a copy to the Court by email by 9 p.m.  Again,

10   you need an exhibit list.  You need the numbered exhibits

11   attached.  And you will start with Number 7.

12             MR. MYERS:  Your Honor, I don't believe you have

13   jurisdiction --

14             THE COURT:  So that will be --

15             MR. MYERS:  -- so I don't know.

16             THE COURT:  -- by 9 p.m. tonight.  And Mr. Myers, as

17   I told you at the beginning of the hearing, if you want to

18   raise jurisdictional arguments, you are welcome to do that in

19   your closing argument.  We're going to complete the

20   presentation of evidence, and I will hear --

21             MR. MYERS:  Well --

22             THE COURT:  -- whatever arguments you have after

23   that.

24             MR. MYERS:  Yeah.  Okay.

25             THE COURT:  All right.  So --



1          MR. MYERS:  So --

2          THE COURT:  -- what time should we start tomorrow?

3    Is 9 a.m. good for everyone?

4          MR. MYERS:  may I have an answer to my question?  Are

5    you going to enter the order denying my motion to stay?

6          THE COURT:  Is 9 a.m. good for everyone?

7          MR. VERSTANDIG:  Your Honor, 9 a.m. is agreeable to

8    the King parties.

9          MR. MYERS:  10 o'clock was what the schedule said.

10         THE COURT:  Well, I wanted to give you additional

11   time to put on your case.  Okay.  We'll start at 10 o'clock.

12         All right.  So 10 o'clock.  I will see everyone at 10

13   o'clock in person tomorrow.

14         Mr. Myers, I'm not going to give you an unlimited

15   amount of time to put your case on.  I was trying to give you

16   a little more time.  You don't want it.  That's fine.  We'll

17   start at 10.

18         I am not ruling on the motions that you filed minutes

19   before this hearing began today.  I am not ruling on those

20   motions before tomorrow.  You have filed other motions against

21   me, against the trustee, against others, and none of them have

22   had --

23         MR. MYERS:  That's not a motion, Your Honor.

24         THE COURT:  -- none of them have had --

25         MR. MYERS:  That's a complaint and a demand for jury

1    trial.

2            THE COURT:  You filed a motion to disqualify.  You

3    didn't file a complaint in this court.

4            MR. MYERS:  Filed a complaint.

5            THE COURT:  Don't misstate the facts.

6            MR. MYERS:  I filed the complaint.  You're the one

7    who's misstating what I'm saying.  I filed the complaint in

8    the district court before this hearing ever began.

9            THE COURT:  You asked me if I was going to rule on

10   any motions.

11           MR. MYERS:  I asked you if you were going to enter

12   an --

13           THE COURT:  I'm not ruing on your motion to

14   disqualify --

15           MR. MYERS:  -- order on the --

16           THE COURT:  Let me finish.  I am not ruling on your

17   motion to disqualify, which was docketed minutes before this

18   hearing began.  And that was only because you said you filed

19   pleadings, and we had no knowledge of them.  You've known

20   about this hearing for two months.  You waited until five

21   minutes before the hearing began to file these things.

22           I'm not ruling on the motions you filed last night,

23   and I'm not ruling on any motions you filed this morning

24   because I haven't read them.  I haven't seen them because you

25   waited until the last minute, even though I've told you time

```
 1    and time again not to wait until the last minute to file.

 2              MR. MYERS:  Then you should continue the hearing and

 3    rule on the motion to disqualify.

 4              THE COURT:  So I am not continuing the hearing.  I am

 5    not continuing the hearing.

 6              MR. MYERS:  Okay.

 7              THE COURT:  We are going forward tomorrow.  I'm going

 8    to give you a limited amount of time to put on your case.  And

 9    then I'm going to rule.

10              MR. MYERS:  Well, are you going to enter an order

11    tonight denying my motion to stay?  You just denied it.

12              THE COURT:  I denied it.  It's on the record.  You

13    didn't file a motion, and so I'm not going --

14              MR. MYERS:  You denied it.  Are you going to enter an

15    order tomorrow then?

16              THE COURT:  I'm not going to enter a written order

17    when you have not filed a written motion.  You made an oral

18    motion.  I denied it.  Denied.  I'm not staying it.

19              MR. SCHLOSSBERG:  Your Honor.  Your Honor, a motion

20    to disqualify, it was docketed sometime during the day today.

21    It was docketed this morning --

22              THE COURT:  I haven't even read it yet.

23              MR. MASTRO:  We haven't seen it.  Haven't had a

24    chance to respond to it.  Nobody (indiscernible) --

25              MR. SCHLOSSBERG:  Filing after 10 o'clock this
```



1    morning.

2            THE COURT:  And parties-in-interests are going to

3    have an opportunity to --

4            MR. SCHLOSSBERG:  I just now (indiscernible).

5            MR. MYERS:  Well, we'll see what the district court

6    says.

7            THE COURT:  Let me finish.  Parties-in-interest will

8    have an opportunity to respond.  And so I am not ruling on

9    anything before the hearing begins at 10 a.m. tomorrow, and we

10   will wrap this hearing up by 1 or 1:30 tomorrow.

11           Anything further before we conclude?

12           Mr. Myers.

13           MR. MYERS:  I think this is a sham.  I think you

14   don't have jurisdiction.  I think you have a conflict of

15   interest.  And I'll be in the district court in the morning.

16           THE COURT:  You have fun with that.  Your objection's

17   noted.

18           Mr. Mastro.  Mr. Schlossberg.  Mr. VerStandig.

19   Anything further?

20           MR. VERSTANDIG:  No, Your Honor.  Nothing further.

21   Just looking forward on scheduling, I want to be open with the

22   Court.  I'm obligated in another court on Wednesday, so I look

23   forward to concluding tomorrow.

24           THE COURT:  The Court has a full docket on Wednesday.

25   We will not be continuing on Wednesday.



1              MR. VERSTANDIG:  Thank you.

2              MR. SCHLOSSBERG:  Thank you, Your Honor.

3              THE COURT:  All right.  Thank you.

4              MR. MASTRO:  Thank you.

5              THE CLERK:  All rise.  Court is now adjourned.

6         (Whereupon these proceedings were concluded)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          I N D E X

 2                                                           VOIR
        WITNESSES:          DIRECT  CROSS  REDIRECT  RECROSS  DIRE
 3      Trustee:
        Roger Schlossberg      14      72,79
 4

 5      EXHIBITS:   DESCRIPTION                    I.D.    EVID.
        Debtor:
 6      1           Judge Lipp's decision          114     114
        2           Myers' objection to settlement 120     120
 7      3           Transcript of hearing          124     124
        4           Stipulation of dismissal       128     154
 8      6           Judge Simpson's order          189     201

 9      Trustee:
        1           Operating agreement             35      35
10      2           Demand letter from King parties 37      37
        4           Memorandum of understanding     51      51
11      5           Email chain                     52      52
        6           Email chain                     56      56
12      7           Email chain                     56      56
        8           Email chain                     56      56
13      11          Judge Gunn's order              62      62
        9           Redfin valuation                70      70
14      10          Judge Lease's decision          72      72

15      King Parties:
        1           Proof of claim 21               75      75
16      2           Proof of claim 22               76      76
        3           Proof of claim 23               76      76
17

18      RULINGS:                                   PAGE    LINE
        Trustee's motion to strike is denied         5       7
19      Debtor's oral motion to stay is denied     203      25

20

21

22

23

24

25
```

1

2                          CERTIFICATION

3    I certify that the foregoing is a correct transcript from the

4    electronic sound recording of the proceedings in the above-

5    entitled matter.

6

7                                              January 6, 2026

8    _____    _____

9    RIVER WOLFE                          DATE

10   TTA-Certified Digital Legal Transcriber CDLT-265

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25