CASE No. 8:25-CV-2103-TDC (LEAD CASE)

**APPENDIX E-3** Trustee's Exhibit and Witness List (Filed 6/25/2025)
*(No executed settlement listed or offered — Argument II)*

_____ FILED    _____ ENTERED
_____ LOGGED    SLG RECEIVED

JAN 1 2 2026

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY M ght prop Box    DEPUTY

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | |
|---|---|
| In re:<br>GREGORY B. MYERS,<br><br>    Debtor. | )<br>) Case No. 15-26033-MCR<br>)     (Chapter 7)<br>)<br>) |
| BRIAN KING, *et al*.,<br><br>    Plaintiffs,<br><br>v.<br><br>ROGER SCHLOSSBERG, TRUSTEE,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>) Adv. No.: 24-00007<br>)<br>)<br>)<br>)<br>) |

**TRUSTEE'S EXHIBIT AND WITNESS LISTS FOR HEARING ON
TRUSTEE'S MOTION FOR APPROVAL OF PROPOSED COMPROMISE
AND SETTLEMENT WITH KING PLAINTIFFS**

Roger Schlossberg, the Chapter 7 Trustee for the bankruptcy estate of Gregory B. Myers ("the Trustee"), by and through his undersigned counsel, hereby submits the following list of exhibits that he may seek to admit into evidence, and list of witnesses that he may call to testify, at the in-person hearing on the *Trustee's Motion for Approval of Proposed Compromise and Settlement with King Plaintiffs* ("the *Settlement Motion*"), [Dkt. #17], which is scheduled for June 30 and July 1, 2025.

**List of Potential Exhibits**

1. First Amended and Restated Operating Agreement of 6789 Goldsboro LLC

2. Letter from Maurice VerStandig, Esq. to Serv Trust dated Aug. 23, 2017

3. Appraisal of 6789 Goldsboro Road by M. Ronald Lipman, MAI

4. Memorandum of Understanding (partially executed)

5.     Email exchange between Brian King and Greg Myers in Jan. 2017

6.     Email chain involving Brian King and Greg Myers dated Oct. 6, 2016

7.     Email chain involving Brian King and Greg Myers dated Nov. 30, 3016

8.     Email from Greg Myers to Brian King dated Dec. 15, 2016

9.     Redfin online valuation of 6789 Goldsboro Road as of June 17, 2025

10.     *Order Entering Partial Judgment and Stay* entered in *King, et al. v. Serv Trust, et al.*, Case No. 436977-V (Circuit Court for Montgomery County, Jan. 12, 2023)

11.     *Memorandum Opinion and Order on Show Cause*, entered in *In re Gregory B. Myers*, Case No. 25-00069-ELG (June 11, 2025)

Copies of the foregoing exhibits are appended hereto. The Trustee reserves the right to supplement or amend his exhibit list prior to the hearing in accordance with the Court's protocol.

### List of Potential Witnesses

1.     Roger Schlossberg, Trustee

2.     Brian King

3.     Cristina King

4.     Corporate designee of the Cristina and Brian King Children's Trust

5.     Corporate designee of 6789 Goldsboro LLC

The Trustee reserves the right to supplement or amend his witness list prior to the hearing in accordance with the Court's protocol.

2

Respectfully submitted,

SCHLOSSBERG | MASTRO

  _/s/ Frank J. Mastro_
Frank J. Mastro #24679
Roger Schlossberg
P.O. Box 2067
Hagerstown, MD 21742-2067
(301) 739-8610
fmastro@schlosslaw.com
rschlossberg@schlosslaw.com
_Attorneys for Roger Schlossberg, Trustee_


### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this **25th** day of **June 2025**, in accordance with this Court's

_Protocol for In-Person Hearings_, I served a copy of the foregoing _Trustee's Exhibit and Witness_

_Lists for Hearing on Trustee's Motion for Approval of Proposed Compromise and Settlement with_

_King Plaintiffs_, together with all exhibits referenced therein, via email upon the following

interested parties:

Maurice B. VerStandig, Esq.
The VerStandig Law Firm, LLC
1452 W. Horizon Ridge Pkwy., #665
Henderson, NV 89012
mac@mvbesq.com
_Counsel for King Plaintiffs_

Gregory B. Myers
700 Gulf Shore Blvd. North
Naples, FL 34102
gregbmyers@verizon.net
_Debtor_

      _/s/ Frank J. Mastro_
      Frank J. Mastro

3

# FIRST AMENDED AND RESTATED OPERATING AGREEMENT

## OF

## 6789 GOLDSBORO LLC

---

THE INTERESTS DESCRIBED HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES ACT OF ANY STATE OR JURISDICTION. NO SALE, OFFER TO SELL, OR OTHER TRANSFER OF THESE INTERESTS MAY BE MADE BY A MEMBER UNLESS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT, OR UNLESS IN THE OPINION OF COUNSEL TO 6789 GOLDSBORO LLC THE PROPOSED DISPOSITION FALLS WITHIN A VALID EXEMPTION FROM THE REGISTRATION PROVISIONS OF THOSE ACTS.

- 1 -

Execution Copy
2779005.7 27336/122546  07/18/2013

Trustee Ex. 1

## 6789 GOLDSBORO LLC

## FIRST AMENDED AND RESTATED OPERATING AGREEMENT

THIS FIRST AMENDED AND RESTATED OPERATING AGREEMENT (this "Agreement") is made and entered into and shall be effective as the 18th day of July, 2013, by and among the undersigned (each a "Member" and collectively the "Members"), as all of the members of 6789 GOLDSBORO LLC (the "Company"), a Maryland limited liability company.

### Explanatory Statement

WHEREAS, the Company was formed by the filing of Articles of Organization with the SDAT on January 12, 2012; and

WHEREAS, the Members desire to set forth their agreements and understandings with respect to the Company, and to enter into this Agreement for the purpose of amending and restating the operating agreement of the Company in its entirety as follows.

NOW, THEREFORE, the Members, intending to be legally bound, agree as follows:

### Section I
### Defined Terms

The following capitalized terms shall have the meanings specified in this Section I. Other terms are defined in the text of this Agreement; and, throughout this Agreement, those terms shall have the meanings respectively ascribed to them.

"Act" means the Maryland Limited Liability Company Act, as amended from time to time.

"Adjusted Capital Account Deficit" means, with respect to any Interest Holder, the deficit balance, if any, in the Interest Holder's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(i)     the deficit shall be decreased by the amounts which the Interest Holder is obligated to restore (if any), or is deemed obligated to restore pursuant to Sections 1.704-2(g)(1) and (i)(5) of the Regulations (i.e., the Interest Holder's Share of Minimum Gain and Member Minimum Gain); and

(ii)    the deficit shall be increased by the items described in Section 1.704-1(b)(2)(ii)(d)(4), (5), and (6) of the Regulations.

"Agreement" means this Agreement, as amended from time to time.

"Capital Account" means, with respect to any Interest Holder, the capital account on the books of the Company determined and maintained in accordance with applicable Treasury Regulations to Section 704(b) and (c) of the Code. It is intended that the Capital Accounts of all

- 2 -

Interest Holders shall be maintained in compliance with the provisions of Section 1.704-1(b) of the Regulations, and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation.

"Capital Contribution" means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Section 1.704-1(b)(2)(iv)(d) of the Regulations) to the Company by a Member, net of liabilities assumed or to which the assets are subject. A Member's "Initial Capital Contribution" shall be the total amount contributed by a Member (net of liabilities) pursuant to Section 3.2, including the amounts specified in Exhibit A and the amounts contributed by the Class A Members pursuant to Section 3.2.2. A Member's "Additional Capital Contribution" shall be the total amount contributed by a Member (net of liabilities) pursuant to Section 3.3.2.

"Cash Flow" means all cash funds derived from operations of the Company (including proceeds from the sale of Company assets and interest received on reserves), without reduction for any noncash charges, but less cash funds used to pay Development Costs.

"Class A Member" means those Members listed on Exhibit A, as it may be amended from time to time, as having Class A Interests.

"Class B Member" means those Members listed on Exhibit A, as it may be amended from time to time, as having Class B Interests.

"Code" means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

"Cumulative Additional Capital Return" means a cumulative but non-compounded annual return equal to ten percent (10%) of the Unrecovered Additional Capital balance of the Members for each taxable year of the Company, distributable to the Members out of the Cash Flow of the Company. If for any taxable year the Cumulative Additional Capital Return is not paid in full, the portion of the Cumulative Additional Capital Return not paid for that year, together with any accumulated unpaid Cumulative Additional Capital Return for prior taxable years (collectively the "Unpaid Cumulative Additional Capital Return") shall be payable out of Cash Flow in subsequent years. If a Member's Unrecovered Additional Capital changes during the course of any taxable year, the Cumulative Additional Capital Return payable to the Member for that year shall be calculated based upon the weighted average of the Member's Unrecovered Additional Capital balances during the course of the year.

"Cumulative Initial Capital Return" means a cumulative but non-compounded annual return equal to ten percent (10%) of the Unrecovered Initial Capital balance of the Members for each taxable year of the Company, distributable to the Members out of the Cash Flow of the Company. If for any taxable year the Cumulative Initial Capital Return is not paid in full, the portion of the Cumulative Initial Capital Return not paid for that year, together with any accumulated unpaid Cumulative Initial Capital Return for prior taxable years (collectively the "Unpaid Cumulative Initial Capital Return") shall be payable out of Cash Flow in subsequent years. If a Member's Unrecovered Initial Capital changes during the course of any taxable year,

- 3 -

the Cumulative Initial Capital Return payable to the Member for that year shall be calculated based upon the weighted average of the Member's Unrecovered Initial Capital balances during the course of the year.

"Decision Date" means the date which is thirty-six (36) months after the date the Company closes on the acquisition of the Property.

"Depreciation" means, for each taxable year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such taxable year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such taxable year, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such taxable year bears to such beginning adjusted tax basis, provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such taxable year is zero (0), Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Class A Members.

"Development Costs" means all costs incurred by the Company in acquiring, maintaining (e.g., annual real estate taxes, hazard insurance, utilities, security, repairs, mowing, etc.), entitling, and developing the Property, including but not limited to, fees and expenses for attorneys (including attorneys' fees associated with the contract for the purchase of the Property and for preparing and reviewing the Members' term sheet and this Agreement), engineers, architect, environmental, geotechnical, traffic and other engineers and consultants.

"Entitlements" means all governmental approvals necessary to permit the subdivision (or equivalent) of the Property for no fewer than twenty-six (26) single family or townhouse dwellings.

"Fiscal Year" means each calendar year of existence of the Company.

"Gross Asset Value" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

   (i)    The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Members, provided that the initial Gross Asset Values of the assets contributed to the Company pursuant to Section 3.2 hereof shall be as set forth in such Section;

   (ii)    The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account), as determined by Members, as of the following times: (A) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (B) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for an interest in the Company; (C) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); and (D) in connection with the grant of an interest in the Company (other than a de minimis interest) as

- 4 -

Execution Copy
2779005.7 27336/122546 07/18/2013

consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a member capacity, or by a new Member acting in a partner capacity in anticipation of being a Member; provided that an adjustment described in clauses (A), (B), and (D) of this paragraph shall be made only if the Members reasonably determine that such adjustment is necessary to reflect the relative economic interests of the Members in the Company;

(iii)    The Gross Asset Value of any item of Company assets distributed to any Member shall be adjusted to equal the gross fair market value (taking Code Section 7701(g) into account) of such asset on the date of distribution as determined by the Members; and

(iv)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to (A) Regulations Section 1.704-1(b)(2)(iv)(m) and (B) subparagraph (vi) of the definition of "Profits" and "Losses" or Section 3.3(g) hereof, provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (iv) to the extent that an adjustment pursuant to subparagraph (ii) is required in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraph (i), (ii), or (iv), such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset, for purposes of computing Profits and Losses.

"Interest" means a Person's share of the Profits and Losses of, and the right to receive distributions from, the Company.

"Interest Holder" means any Person who holds an Interest, whether as a Member or as an unadmitted assignee of a Member.

"Involuntary Withdrawal" means, with respect to any Member, the occurrence of any of the following events:

(i)    the Member makes an assignment for the benefit of creditors;

(ii)    the Member files a voluntary petition of bankruptcy;

(iii)    the Member is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding;

(iv)    the Member files a petition or answer seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation;

- 5 -

        (v)    the Member seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Member or of all or any substantial part of the Member's properties;

        (vi)    the Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in Subsections (i) through (v);

        (vii)    any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver, or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated;

        (viii)   if the Member is an individual, the Member's death or adjudication by a court of competent jurisdiction as incompetent to manage the Member's person or property;

        (ix)    if the Member is acting as a Member by virtue of being a trustee of a trust, the termination of the trust;

        (x)    if the Member is a partnership or another limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company;

        (xi)    if the Member is a corporation, the dissolution of the corporation or the revocation of its charter; or

        (xii)   if the Member is an estate, the distribution by the fiduciary of the estate's entire interest in the limited liability company.

"Majority in Interest of Class A Members" means Class A Members whose Percentage Interests in the aggregate are greater than 51% of the Percentage Interests owned by the Class A Members (i.e., 26% of all Interests as of the date of this Agreement).

"Majority in Interest of All Members" means a Majority in Interest of Class A Members, plus the Class B Member.

"Manager" is the Person designated as such in Section VI.

"Member" means each Person signing this Agreement.

"Member Loan Nonrecourse Deductions" means any Company deductions that would be Nonrecourse Deductions if they were not attributable to a loan made or guaranteed by a Member within the meaning of Section 1.704-2(i) of the Regulations.

- 6 -

"Membership Rights" means all of the rights of a Member in the Company, including a Member's: (i) Interest; (ii) right to inspect the Company's books and records; (iii) right to participate in the management of and vote on matters coming before the Company; and (iv) unless this Agreement or the Articles of Organization provide to the contrary, right to act as an agent of the Company.

"Minimum Gain" has the meaning set forth for the term "partnership minimum gain" in Section 1.704-2(b)(2) of the Regulations. Minimum Gain shall be computed separately for each Interest Holder in a manner consistent with the Regulations under Code Section 704(b).

"Negative Capital Account" means a Capital Account with a balance of less than zero (0).

"Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Regulations. The amount of Nonrecourse Deductions for a taxable year of the Company equals the net increase, if any, in the amount of Minimum Gain during that taxable year, determined according to the provisions of Section 1.704-2(c) of the Regulations.

"Nonrecourse Liability" has the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

"Percentage" means, as to a Member, the percentage set forth after the Member's name on Exhibit A, as amended from time to time, and as to an Interest Holder who is not a Member, the Percentage of the Member whose Interest has been acquired by such Interest Holder.

"Person" means and includes any individual, corporation, partnership, association, limited liability company, trust, estate, or other entity.

"Positive Capital Account" means a Capital Account with a balance greater than zero (0).

"Profit" and "Loss" means, for each taxable year of the Company (or other period for which Profit or Loss must be computed), the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

(i)     all items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss;

(ii)     any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss;

(iii)     any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Section 1.704-1(b)(2)(iv)(i)) of the Regulations and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss;

(iv)     gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of,

- 7 -

notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes;

       (v)    in lieu of the depreciation, amortization, or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

       (vi)    notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Sections 4.2 hereof shall not be taken into account in computing Profit or Loss.

"Property" shall have the meaning given in Section 2.2.

"Regulation" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

"SDAT" means the State Department of Assessments and Taxation of Maryland.

"Target Amount" means the amount, for any Fiscal Year, which a Member would then be entitled to receive if, immediately following such Fiscal Year: (a) all of the assets of the Company (other than cash and claims of the Company for contributions) were sold for cash equal to their respective Gross Asset Values (or, in the case of assets subject to liabilities for which the creditor's right is limited to assets of the Company, the amounts of such liabilities, if greater than the aggregate Gross Asset Values of such assets); (b) all unconditional obligations to contribute to the Company were collected in full; and (c) the proceeds of such sale and collections, and all other cash of the Company, were applied to pay all debts of the Company with the balance distributed as provided in Section V of this Agreement.

"Transfer" means, when used as a noun, any voluntary sale, hypothecation, pledge, assignment, attachment, or other transfer, and, when used as a verb, means, voluntarily to sell, hypothecate, pledge, assign, or otherwise transfer.

"Unrecovered Additional Capital" means, at any time, the excess, if any, of (i) a Member's Additional Capital Contributions over (ii) the sum of all previous distributions made to such Member as a return of Additional Capital Contributions pursuant to this Agreement.

"Unrecovered Initial Capital" means, at any time, the excess, if any, of (i) a Member's Initial Capital Contributions over (ii) the sum of all previous distributions made to such Member as a return of Initial Capital Contributions pursuant to this Agreement.

"Voluntary Withdrawal" means a Member's dissociation with the Company by means other than by a Transfer or an Involuntary Withdrawal.

Execution Copy
2779005.7 27336/122546 07/18/2013

## Section II
## Formation and Name; Office; Purpose; Term

2.1     Name of the Company; Organization. The name of the Company shall be "6789 Goldsboro LLC." The Members hereby ratify the Articles of Organization as filed with SDAT, as amended by the Resolution attached hereto as Exhibit B and intended to be filed with SDAT on or about the date of this Agreement (as amended, the "Articles of Organization").

2.2     Purpose. The Company is organized solely to purchase, acquire, buy, own, trade in, hold, develop, lease, manage, entitle, subdivide, sell, and otherwise deal in and with the real property and improvements thereon known as 6789 Goldsboro Road, Bethesda, Maryland 20817 (the "Property") and to do any and all things necessary, convenient, or incidental to that purpose, and for no other purpose whatsoever.

2.3     Term. The term of the Company commenced on the date the Articles of Organization were filed with the SDAT and shall be perpetual, unless sooner terminated pursuant to Section VIII of this Agreement.

2.4     Principal Office and Resident Agent. The principal office of the Company in the State of Maryland shall be located at 3925 Beech Avenue, Baltimore, Maryland 21211 or at any other place within the State of Maryland upon which the Manager selects and a Majority in Interest of Class A Members approve. The name and address of the Company's resident agent in the State of Maryland is as set forth in the Articles of Organization.

2.5     Title to Company Property. All property owned by the Company shall be owned by the Company as an entity, and no Member, individually, shall have any ownership interest in such property. The Company must hold any of its assets in its own name.

## Section III
## Members; Capital; Capital Accounts

3.1     Members. The Members of the Company are set forth in Exhibit A attached hereto, as may be amended from time to time.

3.2     Initial Capital Contributions.

3.2.1.     Contemporaneously with the execution of this Agreement, each Member shall pay and contribute to the Company such Member's Initial Capital Contribution as specified on Exhibit A. The Members acknowledge that the Initial Capital Contributions made by the Class A Members as specified in Exhibit A, totaling $1,785,000, cover (i) the purchase price for the Property ($1,350,000), (ii) all closing costs associated with the purchase of the Property ($35,000), (iii) $300,000 to be applied to the Class B Payment (as defined in Section 3.10), and (iv) the first $100,000 of the total $300,000 that the Class A Members will contribute pursuant to Section 3.2.2. The Members also acknowledge that the Initial Capital Contribution made by the Class B Member, totaling $306,192, equals (i) the Gross Asset Value of the Regional Sales Contract for the purchase of the Property ($300,000), and (ii) certain Developments Costs previously incurred by the Company and paid for by the Class B Member (totaling $6,192).

- 9 -

3.2.2.    The Members recognize that the Company intends to fund the Development Costs with Capital Contributions made by the Class A Members. If the Manager at any time prior to the Decision Date determines that the Company requires additional Capital Contributions for the sole purpose of funding Development Costs, then the Manager shall give notice to the Class A Members of (i) the total amount of Capital Contribution required, (ii) the reason the Capital Contribution is required, (iii) each Class A Member's proportionate share of the total Capital Contribution (determined in accordance with this Section), and (iv) the date each Class A Member's Capital Contribution is due and payable, which date shall be no fewer than ten (10) business days after the notice has been given. Each Class A Member shall contribute its proportionate share of additional funds as an additional Initial Capital Contribution. The total additional Capital Contributions which the Manager may require the Class A Members to contribute during the term of this Agreement shall not exceed Three Hundred Thousand Dollars ($300,000) in the aggregate and all such amounts shall also be deemed Initial Capital Contributions under this Agreement (i.e., with respect to the Class A Members, all references to Initial Capital Contributions in this Agreement shall mean and include the Capital Contributions made by the Class A Members pursuant to both Section 3.2.1 and this Section 3.2.2). Pursuant to Section 3.2.1, the Class A Members are contributing the first $100,000 of the $300,000 on the date of this Agreement. A Class A Member's proportionate share of the total additional Capital Contribution required under this Section shall be equal to the product obtained by (1) multiplying the Class A Member's Percentage and the total additional Capital Contribution required, and (2) multiplying such amount by two (2). A Class A Member's proportionate share shall be payable in cash or by certified check. Notwithstanding anything to the contrary in this Agreement, the Class B Member shall not be obligated to make any Capital Contribution to the Company beyond that set forth in the last sentence of Section 3.2.1, which the Company acknowledges has already been made.

3.3    Additional Capital Contributions.

3.3.1.    Except as provided in Section 3.2.2, no Member shall be required to contribute any additional capital to the Company, lend any funds to the Company or guarantee any loans for the Company, and, except as set forth in the Act, no Member shall have any personal liability for any obligation of the Company.

3.3.2.    If additional capital is needed to fund Development Costs after the initial $300,000 is contributed by the Class A Members in accordance with Section 3.2.2, any Member may thereafter make such contributions ("Additional Capital Contributions") in cash to the Company.

3.4    No Interest on Capital Contributions. Interest Holders shall not be paid interest on their Capital Contributions, except as expressly provided otherwise in this Agreement. No Interest Holder shall be entitled to withdraw any part of his, her or its Capital Account or Capital Contribution or to receive any distributions from the Company except as expressly provided in this Agreement. Unless otherwise provided by law, no Interest Holder shall be personally liable for the return or repayment of all or any part of any other Member's Capital Account or Capital Contribution, it being expressly agreed that any such return of capital pursuant to this Agreement shall be made solely from the assets of the Company.

- 10 -

3.5     Return of Capital Contributions.  Except as otherwise provided in this Agreement, no Interest Holder shall have the right to receive the return of any Capital Contribution.

3.6     No Right to Partition.  No Interest Holder shall have the right to require partition of the Property or to compel any sale or appraisal of the Property or any sale of a deceased Interest Holder's Interest in the Company's assets, except as specifically provided in Section VII of this Agreement.

3.7     Form of Return of Capital.  If an Interest Holder is entitled to receive a return of a Capital Contribution, the Interest Holder shall not have the right to receive anything but cash in return of the Interest Holder's Capital Contribution.

3.8     Capital Accounts.  A separate Capital Account shall be maintained for each Interest Holder.

3.9     Loans to the Company.  The Members shall not be obligated to make loans to the Company.  Upon the agreement of a Majority in Interest of All Members, any Member may make loans to the Company upon commercially reasonable terms agreed upon by the Company and the Member.  The amount of any loan shall not be an increase in the Member's Capital Contribution, or entitle the Member to any increase in the Member's share of the Profits or Losses of the Company, but the loan shall be repaid to the Member out of the net Cash Flow, together with interest at the rate of a cumulative but non-compounded annual return equal to ten percent (10%).  Each payment made by the Company to a Member with respect to any loan shall be applied first to accrued interest and then to the outstanding balance of the principal thereof.  The Company shall be deemed to have waived the statute of limitations in any action which may be brought for the collection of any loan by a Member to the Company.

3.10    Payment to Class B Member.  Simultaneously with the closing on the Company's purchase of the Property, the Company shall make a distribution of capital to the Class B Member in the amount of $300,000 (the "Class B Payment"), such that the Class B Member's Unrecovered Initial Capital shall thereafter be $6,192.

### Section IV
### Allocations of Profit and Loss

4.1     Allocations of Profit or Loss.  After giving effect to the special allocations set forth in Sections 4.2, for any taxable year of the Company, Profit or Loss shall be allocated among the Members, pro rata, to the extent necessary to cause the Capital Account balance of each Member (determined after reflection therein of allocations for such period under this Section IV) to equal his Target Amount; provided, however, that Losses allocated to a Member shall not exceed the amount that can be so allocated without causing the Member to have an Adjusted Capital Account Deficit at the end of such taxable year.  Any Loss so disallowed shall be allocated to the other Members.

4.2     Regulatory Allocations.  The following special allocations shall be made in the following order:

- 11 -

4.2.1.    Company Minimum Gain Chargeback.  Except as set forth in Section 1.704-2(f)(2), (3), and (4) of the Regulations, if, during any taxable year, there is a net decrease in Company Minimum Gain, each Interest Holder, prior to any other allocation pursuant to this Section IV, shall be specially allocated items of gross income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Interest Holder's share of the net decrease of Company Minimum Gain, computed in accordance with Section 1.704-2(g)(2) of the Regulations.  It is the intent of the parties hereto that any allocation pursuant to this Section 4.2.1 shall constitute a "minimum gain chargeback" under Section 1.704-2(f) of the Regulations.

4.2.2.    Qualified Income Offset.  If an Interest Holder receives (1) an allocation of Loss or deduction (or item thereof), or (2) any distribution, which causes the Interest Holder to have an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Interest Holder, before any other allocation is made of Company items for that taxable year, in the amount and in proportions required to eliminate the excess as quickly as possible.  This Section 4.2.2 is intended to comply with, and shall be interpreted consistently with, the "qualified income offset" provisions of the Regulations promulgated under Code Section 704(b).

4.2.3.    Nonrecourse Deductions.  Nonrecourse Deductions for a taxable year or other period shall be specially allocated among the Interest Holders in proportion to their Percentages.

4.2.4.    Member Loan Nonrecourse Deductions.    Any Member Loan Nonrecourse Deduction for any taxable year or other period shall be specially allocated to the Interest Holder who bears the risk of loss with respect to the loan to which the Member Loan Nonrecourse Deduction is attributable in accordance with Section 1.704-2(b) of the Regulations.

4.2.5.    Code Section 754 Adjustment.  To the extent an adjustment to the tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Section 1.704-1(b)(2)(iv)(m) of the Regulations, to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases basis), and the gain or loss shall be specially allocated to the Interest Holders in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Regulations.

4.3    Tax Allocations.

4.3.1.  Subject to Section 4.3.2 through Section 4.3.4, all income, gains, losses and deductions of the Company shall be allocated, for federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses and deductions among the Members for computing their Capital Accounts, except that if any such allocation for tax purposes is not permitted by the Code or other applicable law, the Company's subsequent income, gains, losses and deductions shall be allocated among the

- 12 -

Members for tax purposes, to the extent permitted by the Code and other applicable law, so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

4.3.2.    Items of Company taxable income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) and the traditional method of Treasury Regulations Section 1.704-3(b), so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Gross Asset Value.

4.3.3.    If the Gross Asset Value of any Company asset is adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f) as provided in clause (c) of the definition of Gross Asset Value, subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) using the traditional method of Treasury Regulations Section 1.704-3(b).

4.3.4.    Allocations pursuant to this Section 4.3 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profit and Loss, distributions or other items pursuant to any provisions of this Agreement.

4.4    Curative Allocations.  In the event that the Tax Matters Member determines, after consultation with counsel experienced in income tax matters, that the allocation of any item of Company income, gain, loss or deduction is not specified in this Section IV (an "Unallocated Item"), or that the allocation of any item of the Company income, gain, loss or deduction hereunder is clearly inconsistent with the Members' economic interests in the Company (determined by reference to the general principles of Treasury Regulations Section 1.704-1(b) and the factors set forth in Treasury Regulations Section 1.704-1(b)(3)(ii)) (a "Misallocated Item"), then the Tax Matters Member may allocate such Unallocated Items, or reallocate such Misallocated Items, to reflect such economic interests; provided, that no such allocation will be made without the prior consent of each Member that would be adversely and disproportionately affected thereby; and provided, further, that no such allocation shall have any material effect on the amounts distributable to any Member, including the amounts to be distributed upon the complete liquidation of the Company.

## Section V
## Distributions

5.1    Distributions of Cash Flow.  Cash Flow shall be applied or distributed as follows and in the following order:

5.1.1.    to the payment of all unpaid expenses of the Company; then

5.1.2.    to the payment of debts and liabilities of the Company then due and outstanding (including all debts due to any Interest Holder); then

- 13 -

5.1.3.    to the Class A Members in an amount equal to their Unpaid Cumulative Initial Capital Return, pro-rata in accordance with the amount of their relative Unpaid Cumulative Initial Capital Returns, until paid in full; then

5.1.4.    to the Class A Members in an amount equal to their Unrecovered Initial Capital, pro-rata in accordance with the amount of their relative Unrecovered Initial Capital balances, until reduced to zero ($0.00); then

5.1.5.    to the Class A Members, in an amount equal to: (i) $7,500 if such distribution is made before the first anniversary of the date of this Agreement, (ii) $15,000 if such distribution is made on or after such first anniversary and before the second anniversary of the date of this Agreement, and (iii) $22,500 if such distribution is made on or after the second anniversary of the date of this Agreement, minus in each case amounts previously distributed to the Class A Members pursuant to this Section 5.1.5, such amount to be distributed to the Class A Members in proportion to their respective Percentage Interests; then

5.1.6.    to the Class B Member in an amount equal to its Unpaid Cumulative Initial Capital Return, until paid in full; then

5.1.7.    to the Class B Member in an amount equal to its Unrecovered Initial Capital balance, until reduced to zero ($0.00); then

5.1.8.    to the Members in an amount equal to their Unpaid Cumulative Additional Capital Return, pro-rata in accordance with the amount of their relative Unpaid Cumulative Additional Capital Returns, until paid in full; then

5.1.9.    to the Members in an amount equal to their Unrecovered Additional Capital, pro-rata in accordance with the amount of their relative Unrecovered Additional Capital balances, until reduced to zero ($0.00); then

5.1.10.    the balance, to the Members in proportion to their respective Percentage Interests.

5.2    Liquidation and Dissolution.

5.2.1.    If the Company is liquidated, the assets of the Company shall be distributed to the Interest Holders in accordance with Section 5.1.

5.2.2.    No Interest Holder shall be obligated to restore a Negative Capital Account.

5.3    Withholding. All amounts required to be withheld pursuant to Code Section 1446 or any other provision of federal, state, or local tax law shall be treated as amounts actually distributed to the affected Interest Holders for all purposes under this Agreement.

5.4    Tax Distributions. During each fiscal year, the Manager will use reasonable efforts to make cash distributions from the Company (each a "Tax Distribution") to each Member in an amount equal to the excess, if any, of (i) the product of (a) the highest federal,

- 14 -

state and local marginal income tax rate applicable to a person living in Maryland, multiplied by (b) the amount of net income allocated to such Member for such fiscal year (the "Tax Allocation"), over (ii) the aggregate net cash distributions made to such Member by the Company for such fiscal year or portion thereof (such excess of (i) over (ii) is hereinafter referred to as the "Tax Shortfall"). For the purposes of the preceding sentence, the Tax Allocation for a fiscal year or portion thereof shall be reduced by any net losses of the same character previously allocated to such Member, to the extent such losses were not previously taken into account under this Section. The Company may make Tax Distributions on an annual basis or on a quarterly basis, in the Manager's reasonable discretion. To the extent that there is insufficient cash to make Tax Distributions in the full amount of the Tax Shortfall, Tax Distributions shall be made to the Members on a pro rata basis in proportion to their respective Tax Shortfall amounts. No Member shall be required to make any Capital Contributions to fund Tax Distributions. Any Tax Distributions made pursuant to this Section 5.4 shall be treated as advance payments of amounts otherwise payable under Sections 5.1 and 5.3 and shall be considered to have been distributed under the provisions which correspond to the allocation of net income for such Member.

### Section VI
### Management; Rights, Powers, and Duties

6.1    Management.

   6.1.1.    Manager.    Except as otherwise provided herein, the day-to-day operations of the Company shall be managed by a Manager, who may, but need not, be a Member. Gregory B. Myers is hereby designated to serve as the initial Manager. The Manager shall use commercially reasonable good faith efforts to, without limitation, obtain the Entitlements, ensure that the Property is properly maintained, and otherwise act in the best interests of the Company. If for any reason Gregory B. Myers cannot serve or resigns as Manager, Brian N. King shall be the successor Manager. If at any time after the twenty-fourth (24th) month following the date the Company closes on the purchase of the Property, the Class A Members reasonably believe that the Manager has not diligently pursued the Entitlements or will not be able to obtain the Entitlements by the Decision Date, then upon the affirmative vote of a Majority in Interest of Class A Members, the Class A Members may remove the Manager then acting and elect a new Manager. The Manager shall provide regular updates (no fewer than once per month) to the Members concerning the status of the Entitlements.

   6.1.2.    General Powers.    Subject in all cases to the other provisions of this Agreement and the requirements of applicable law, the Manager shall have the general power and authority to manage and operate the day-to-day business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs, including, without limitation, for Company purposes, the power to:

   6.1.2.1.    enter into agreements and contracts and to give receipts, releases, and discharges, provided that no one agreement or contract with any one Person shall have a value in excess of $25,000 without the prior approval of a Majority in Interest of Class A Members (such approval not to be unreasonably delayed, conditioned or withheld);

- 15 -

6.1.2.2.   purchase liability and other insurance to protect the Company's Property and business;

6.1.2.3.   execute any and all other instruments and documents which may be necessary or in the opinion of the Manager desirable to carry out the intent and purpose of this Agreement, including, but not limited to, documents whose operation and effect extend beyond the term of the Agreement, provided that the Manager shall not cause the Company to incur any liability or expense to any one Person, including Development Costs, in excess of $25,000 without the prior approval of a Majority in Interest of Class A Members (such approval not to be unreasonably delayed, conditioned or withheld);

6.1.2.4.   make any and all expenditures which the Manager, in its reasonable discretion, deems necessary or appropriate in connection with the management of the affairs of the Company and the carrying out of its obligations and responsibilities under this Agreement, including, without limitation, all legal, accounting and other related expenses incurred in connection with the organization and operation of the Company and obtaining the Entitlements, provided that no one such expenditure shall exceed $25,000 without the prior approval of a Majority in Interest of Class A Members.

6.1.3.   Major Decisions Requiring Consent.  Notwithstanding anything to the contrary in this Agreement, in addition to such matters reserved to the Members herein and subject to the general restrictions governing the operation of the Company contained within Section 2.2 hereof, the Manager shall not undertake any of the following without the prior approval of all Members:

6.1.3.1.   any financing, sale (except as provided in Section 7.6 or Section 7.7), exchange or other disposition of the Property and/or all of the Company's assets;

6.1.3.2.   the Company's lending any money to any Member or other Person;

6.1.3.3.   admitting additional Members to the Company or selling additional membership Interests;

6.1.3.4.   filing on behalf of the Company any petition in bankruptcy or assignment for the benefit of creditors or the failure to defend against an involuntary petition for same;

6.1.3.5.   merging or consolidating the Company with any other entity;

6.1.3.6.   dissolving the Company; and

6.1.3.7.   requiring Capital Contributions from a Member, except as provided in and as limited by Section 3.2.

- 16 -

6.1.4.    Limitation on Authority of Members.

6.1.4.1.    No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member.

6.1.4.2.    This Section 6.1 supersedes any authority granted to the Members pursuant to Section 4A-401 of the Act. Any Member who takes any action or binds the Company in violation of this Section 6.1 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to the loss or expense.

6.2    Meetings of and Voting by Members.

6.2.1.    A meeting of the Members may be called at any time by the Manager or by any Member. Meetings of Members shall be held at the Company's principal place of business or at any other place in Baltimore, Maryland designated by the Person calling the meeting. Not less than ten (10) nor more than ninety (90) days before each meeting, the Person calling the meeting shall give written notice of the meeting to each Member entitled to vote at the meeting. The notice shall state the time, place, and purpose of the meeting. Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of Members' meetings, or is present at the meeting in person or by proxy. A Member may vote either in person or by written proxy signed by the Member or by his duly authorized attorney-in-fact.

6.2.2.    Except as otherwise provided in this Agreement, the affirmative vote of Members holding fifty-one percent (51%) or more of the Percentages then held by Members shall be required to approve any matter coming before the Members.

6.2.3.    In lieu of holding a meeting, the Members may vote or otherwise take action by a written instrument executed by and indicating the consent of Members required by this Agreement to approve a particular matter coming before the Members.

6.3    Personal Services.

6.3.1.    No Member shall be required to perform services for the Company solely by virtue of being a Member. Unless approved by the Manager and a Majority in Interest of All Members, no Member shall perform services for the Company or be entitled to compensation for services performed for the Company.

6.3.2.    Unless approved by a Majority in Interest of All Members, the Manager shall not be entitled to compensation for services performed for the Company. However, upon substantiation of the amount and purpose thereof, the Manager shall be entitled to reimbursement for expenses reasonably incurred in connection with the activities of the Company.

- 17 -

6.4    Duties of Parties.

6.4.1.    The Manager shall not be liable, responsible, or accountable in damages or otherwise to the Company or to any other Member for any action taken or any failure to act on behalf of the Company within the scope of the authority conferred on the Manager by this Agreement or by law, unless the action was taken or omission was made fraudulently or in bad faith or unless the action or omission constituted gross negligence.

6.4.2.    Except as otherwise expressly provided in Section 6.4.3 or Section 6.6, nothing in this Agreement shall be deemed to restrict in any way the rights of any Member or Manager to conduct any other business or activity whatsoever, and the Member and Manager shall not be accountable to the Company or to any Member with respect to that business or activity even if the business or activity competes with the Company's business. The organization of the Company shall be without prejudice to each Member's and Manager's respective rights to maintain, expand, or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of any other Member or Manager unrelated to the Company or the Property.

6.4.3.    Each Member understands and acknowledges that the conduct of the Company's business may involve business dealings and undertakings with Members and their affiliates. In any of those cases, those dealings and undertakings shall be at arm's length and on commercially reasonable terms.

6.5    Liability and Indemnification.

6.5.1.    Neither the Manager nor any officer of the Company shall be liable, responsible, or accountable, in damages or otherwise, to any Member or to the Company for any act performed in good faith by the Manager or such officer and within the scope of the authority conferred on the Manager or officer by this Agreement, except for fraud, gross negligence, willful or wonton misconduct or an intentional breach of this Agreement.

6.5.2.    The Company shall indemnify the Manager and any officer for any act performed by the Manager or officer in good faith believed to be within the scope of the authority conferred on the Manager or officer by this Agreement, except for fraud, gross negligence, or an intentional breach of this Agreement. The Company shall promptly notify the Members whenever the Manager or any officer has been indemnified by the Company for any act, matter, or thing whatsoever.

6.5.3.    No Member of the Company shall have any liability under this Agreement or under the Act except as provided herein or as required by the Act. Except as required by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member of the Company. The liability of each Member shall be limited solely to the amount of its Capital Contribution, except as provided in this Section 6.5. No Member of the Company shall be liable for any debts, obligations and liabilities,

- 18 -

whether arising in contract, tort or otherwise, of any other Member, the Manager or any officer of the Company.

6.6    Independent Activities. Each of the Members and Manager may engage in any other business activity. The Manager shall not be obligated to contribute its full time and efforts to the Company; however, the Manager shall diligently and faithfully devote such of its time to the business of the Company as may be necessary to properly conduct the affairs of the Company and obtain the Entitlements as promptly as reasonably possible. Except to the extent inconsistent with this Section, any of the Members or Manager may in the future engage in activities relating to the development and ownership of other real property, both for their own accounts and for others, and nothing contained herein shall be deemed to prevent such parties from continuing such activities, or initiating further such other limited or general partnerships, joint ventures, limited liability companies or other entities in which they are or may become a party, nor as requiring them to permit the Company or any of the Members or Manager to participate in any such operations in which they may be interested. Notwithstanding the foregoing to the contrary, neither the Manager nor any Member, or their affiliates, shall directly or indirectly purchase or develop any property in the immediate vicinity of the Property except through the Company.

## Section VII
## Transfer of Interests and Withdrawals of Members

7.1    Transfers.

7.1.1.    Except as specifically permitted by this Agreement or consented to by all of the Members, no Member may sell, assign, mortgage, pledge, grant a security interests in, or otherwise transfer or encumber all or any part of the Member's Membership Rights or Interest, whether voluntarily or involuntarily, by operation of law or otherwise.

7.1.2.    Each Member hereby acknowledges the reasonableness of the prohibition contained in this Section 7.1 in view of the purposes of the Company and the relationship of the Members. The Transfer of any Membership Rights or Interests in violation of the prohibition contained in this Section 7.1 shall be deemed invalid, null and void, and of no force or effect. Any Person to whom Membership Rights are attempted to be transferred in violation of this Section 7.1 shall not be entitled to vote on matters coming before the Members, participate in the management of the Company, act as an agent of the Company, receive distributions from the Company, or have any other rights in or with respect to the Membership Rights.

7.2    Voluntary Withdrawal. No Member shall have the right or power to Voluntarily Withdraw from the Company.

7.3    Involuntary Withdrawal. Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the Withdrawn Member shall thereupon become an Interest Holder but shall not become a Member, and shall have all the rights of an Interest Holder.

Execution Copy
2779005.7 27336/122546 07/18/2013

7.4    Optional Buy-out in Event of Involuntary Withdrawal.

7.4.1.    If a Member Involuntarily Withdraws, the withdrawn Member shall be deemed to offer for sale (the "Withdrawal Offer") to the Company all of the Membership Rights owned of record and beneficially by the withdrawn Member (the "Withdrawal Interest").

7.4.2.    The Withdrawal Offer shall be and remain irrevocable for a period (the "Withdrawal Offer Period") ending at 11:59 P.M., local time, at the Company's principal office on the sixtieth (60th) day following the date the Members elect to continue the Company. At any time during the Withdrawal Offer Period, the Company may accept the Withdrawal Offer by notifying the withdrawn Member (the "Withdrawal Notice") of its acceptance. The withdrawn Member shall not be deemed a Member or Manager for the purpose of the vote on whether the Company shall accept the Withdrawal Offer.

7.4.3.    If the Company accepts the Withdrawal Offer, the Withdrawal Notice shall fix a closing date (the "Withdrawal Closing Date") for the purchase which shall be not earlier than ten (10) or later than ninety (90) days after the expiration of the Withdrawal Period.

7.4.4.    If the Company accepts the Withdrawal Offer, the Company shall purchase the Withdrawal Interest for a price equal to the amount the withdrawn Member would receive if the Company were liquidated and an amount equal to the Appraised Value were available for distribution to the Members pursuant to Section V (the "Withdrawal Purchase Price"). The Withdrawal Purchase Price shall be paid in cash on the Withdrawal Closing Date.

7.4.5.    If the Company fails to accept the Withdrawal Offer, then the withdrawn Member or the withdrawn Member's successor, as the case may be, upon the expiration of the Withdrawal Offer Period, thereafter shall be treated as the unadmitted assignee of a Member.

7.5    Appraised Value.

7.5.1.    The term "Appraised Value" means the appraised value of the Property determined as follows. Within fifteen (15) days after demand by either one or the other, the Company and the Withdrawing Member, pursuant to Section 7.4, or the Class A Members and the Class B Member, pursuant to Section 7.7, shall each appoint a MAI appraiser to determine the value of the Property. If the two (2) appraisers agree upon the value of the Property, they shall jointly render a single written report stating that value. If the two (2) appraisers cannot agree upon the value of the Property, they shall each render a separate written report and they shall appoint a third (3rd) MAI appraiser, who shall appraise the Property and determine the Property's value, and shall render a written report of his opinion thereon. If the appraisers cannot agree upon the third (3rd) MAI appraiser, then each of such appraisers will recommend one (1) MAI appraiser and the selection shall be by coin toss. Each party shall pay the fees and costs of the appraiser appointed by that party, and the fees and other costs of the third (3rd) appraiser shall be shared equally by both parties.

7.5.2.    The value contained in the aforesaid joint written report or written report of the third appraiser, as the case may be, shall be the Appraised Value; provided, however, that if the value of the Property contained in the appraisal report of the third (3rd) appraiser is more than the higher of the first two (2) appraisals, the higher of the first two (2) appraisals shall

- 20 -

govern; and provided, further, that if the value of the Property contained in the appraisal report of the third appraiser is less than the lower of the first two (2) appraisals, the lower of the first two (2) appraisals shall govern.

7.6     Sale of Property.  In the event that (a) the Entitlement of the Property is not completed by the Decision Date, or (b) (i) the Company has incurred all $300,000 of the Initial Capital Contributions paid by the Class A Members in accordance with Section 3.2.2, and (ii) no Member elects to make Additional Capital Contributions to the Company sufficient to cover any remaining or arising deficit, then the Class A Members shall have the unilateral right and authority (without the consent of the Class B Member), at their option, to require the Company to sell the Property, in its then-current development state, to an unaffiliated third-party purchaser.

7.7     Redemption of Class B Member.  In the event that (a) the Entitlement of the Property is not completed by the Decision Date, and (b) the Class A Members do not elect to require the Company to sell the Property in accordance with Section 7.6, then the Class A Members may elect to determine the Appraised Value of the Property in accordance with Section 7.5.  If the Appraised Value is less than or equal to the sum of Unpaid Cumulative Initial Capital Return, Unrecovered Initial Capital, Unpaid Cumulative Additional Capital Return, and Unrecovered Additional Capital, of the Class A Members, from the date of the contribution through the date the Appraised Value has been determined pursuant to Section 7.5 (collectively, the "Class A Investment"), then the Class A Members shall have the unilateral right and authority (without the consent of the Class B Member) to cause the Company to redeem the Class B Member's Membership Rights solely in consideration for the Company's previous distributions or other previous payments to the Class B Member.  If the Appraised Value is greater than the Class A Investment, then in such event the Class B Member shall retain its Membership Rights; provided, however, the Class A Members shall continue to have the unilateral right and authority thereafter (without the consent of the Class B Member), at their option, to require the Company to sell the Property, in its then-current development state, to an unaffiliated third-party purchaser.

7.8     Prohibition of Pledges.  No Member shall at any time pledge, mortgage, hypothecate or otherwise encumber any of its Interest, or permit any of its Interest to be pledged, mortgaged, hypothecated, encumbered or otherwise subjected to any lien, without the prior written consent of a Majority in Interest of All Members.  No purported pledge, mortgage, hypothecation or encumbrance of, or lien on or security interest in, any Interest in violation of the provisions of this Agreement shall be valid or enforceable.

**Section VIII**
**Dissolution, Liquidation, and**
**Termination of the Company**

8.1     Events of Dissolution.  The Company shall be dissolved upon the happening of any of the following:

8.1.1.     The sale or disposition of all of the Property;

8.1.2.     The unanimous written agreement of all of the Members; or

- 21 -

8.1.3.    The entry of a decree of judicial dissolution.

8.2    <u>Procedure for Winding Up and Dissolution</u>. If the Company is dissolved, the Manager shall wind up its affairs. On winding up of the Company, the assets of the Company shall be distributed, first, to creditors of the Company, including Interest Holders who are creditors, in satisfaction of the liabilities of the Company, and then to the Interest Holders in accordance with <u>Section V</u>.

8.3    <u>Filing of Articles of Cancellation</u>. If the Company is dissolved, the Manager shall promptly file Articles of Cancellation with SDAT. If there is no Manager, then the Articles of Cancellation shall be filed by the remaining Members; if there are no remaining Members, the Articles of Cancellation shall be filed by the last Person to be a Member; if there is neither a Manager, remaining Members, nor a Person who last was a Member, the Articles of Cancellation shall be filed by the legal or personal representatives of the Person who last was a Member.

## Section IX
## Books, Records, Accounting, and Tax Elections

9.1    <u>Treasurer</u>. The Class A Members may appoint a Treasurer, who shall maintain the Company's books of account and shall perform such other duties as may be assigned by the Manager or the Members. The initial Treasurer shall be Brian N. King. In the event Brian N. King resigns or is removed as Treasurer, the Class A Members may appoint Cristina J. King as replacement Treasurer (without the prior approval of the Class B Member); provided, however, that if the Class A Members appoint a replacement Treasurer other than Cristina J. King, such appointment shall be subject to the prior approval of the Class B Member (such approval not to be unreasonably delayed, conditioned or withheld). The Treasurer shall use commercially reasonable good faith efforts to, without limitation, discharge its duties as set forth in this Agreement and act in the best interests of the Company.

9.2    <u>Bank Accounts</u>. All funds of the Company shall be deposited in a bank account or accounts maintained in the Company's name. The Treasurer shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

9.3    <u>Books and Records.</u>

9.3.1.    The Treasurer shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business. The records shall include, but not be limited to, complete and accurate information regarding the state of the business and financial condition of the Company, a copy of the Articles of Organization and this Agreement and all amendments to the Articles of Organization and this Agreement; a current list of the names and last known business, residence, or mailing addresses of all Members; and the Company's federal, state, or local tax returns. The Manager shall promptly provide to the Treasurer all documentation related to the Company's business as necessary for the Treasurer to maintain complete and accurate books and records. The Treasurer shall promptly provide to the Manager all information related to the Company's business as necessary for the Manager perform its obligations under this

- 22 -

Agreement and must diligently keep the Manager informed of and immediately upon receipt provide copies to Manager of any notices received by the Company at its principal office.

9.3.2.    The books and records shall be maintained in accordance with sound accounting practices and shall be available at the Company's principal office for examination by any Member or the Member's duly authorized representative at any and all reasonable times during normal business hours.

9.3.3.    Each Member shall reimburse the Company for all costs and expenses incurred by the Company in connection with the Member's inspection and copying of the Company's books and records.

9.4    Annual Accounting Period. The annual accounting period of the Company shall be its taxable year. The Company's taxable year shall be selected by the Treasurer, subject to the requirements and limitations of the Code.

9.5    Reports. Within seventy-five (75) days after the end of each taxable year of the Company or as soon thereafter as the reports become available, the Treasurer shall cause to be sent to each Person who was a Member at any time during the accounting year then ended: (i) an annual compilation report, prepared by the Company's independent accountants in accordance with standards issued by the American Institute of Certified Public Accountants; and (ii) a report summarizing the fees and other remuneration paid by the Company to any Member or the Manager in respect of the taxable year. In addition, within seventy-five (75) days after the end of each taxable year of the Company or as soon thereafter as tax information becomes available, the Treasurer shall cause to be sent to each Person who was an Interest Holder at any time during the taxable year then ended, that tax information concerning the Company which is necessary for preparing the Interest Holder's income tax returns for that year. At the request of any Member, and at the Member's expense, the Treasurer shall cause an audit of the Company's books and records to be prepared by independent accountants for the period requested by the Member.

9.6    Tax Matters Partner. Brian N. King shall be the Company's tax matters partner ("Tax Matters Partner"). The Tax Matters Partner shall have all powers and responsibilities provided in Code Section 6221, *et seq.* The Tax Matters Partner shall keep all Members informed of all notices from government taxing authorities related to the Company which may come to the attention of the Tax Matters Partner. The Company shall pay and be responsible for all reasonable third-party costs and expenses incurred by the Tax Matters Partner in performing those duties. A Member shall be responsible for any costs incurred by the Member with respect to any tax audit or tax-related administrative or judicial proceeding against any Member, even though it relates to the Company. The Tax Matters Partner may not compromise any dispute or extend the statute of limitations with the Internal Revenue Service without the approval of the Members.

9.7    Tax Elections. The Tax Matters Partner shall have the authority to make all Company elections permitted under the Code, including, without limitation, elections of methods of depreciation and elections under Code Section 754. The decision to make or not make an election shall be at the Tax Matters Partner's sole and absolute discretion; provided, however,

- 23 -

that no such election will be made without the prior consent of each Member that would be adversely and disproportionately affected thereby.

## Section X
## General Provisions

10.1    Assurances. Each Member shall execute all such certificates and other documents and shall do all such filing, recording, publishing, and other acts as the Manager deems appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

10.2    Notifications. Any notice, demand, consent, election, offer, approval, request, or other communication (collectively a "notice") required or permitted under this Agreement must be in writing and either delivered personally or sent by certified or registered mail, postage prepaid, return receipt requested. Any notice to be given hereunder by the Company shall be given by the Manager. A notice must be addressed to an Interest Holder at the Interest Holder's last known address on the records of the Company. A notice to the Company must be addressed to the Company's principal office. A notice delivered personally will be deemed given only when acknowledged in writing by the person to whom it is delivered. A notice sent by mail will be deemed given three (3) business days after it is mailed. A notice sent by overnight courier will be deemed given on the first (1) business day following the day it is deposited with the courier. Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.

10.3    Specific Performance. The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach, or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

10.4    Complete Agreement. This Agreement constitutes the complete and exclusive statement of the agreement among the Members. It supersedes all prior written and oral statements, including any prior representation, statement, condition, or warranty. Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of all of the Members.

10.5    Applicable Law. All questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Maryland.

- 24 -

10.6    Section Titles. The headings herein are inserted as a matter of convenience only, and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

10.7    Binding Provisions. This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and permitted assigns.

10.8    Jurisdiction and Venue. Any suit involving any dispute or matter arising under this Agreement may only be brought in the United States District Court for the District of Maryland or any Maryland State Court having jurisdiction over the subject matter of the dispute or matter. All Members hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

10.9    Terms. Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the identity of the Person may in the context require.

10.10    Separability of Provisions. Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

10.11    Counterparts. This Agreement may be executed simultaneously in two or more counterparts and electronically, including by transmission of PDF (Portable Document Form) or a comparable image, each of which shall be deemed an original for all purposes and all of which, when taken together, shall constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart. An electronically executed and/or delivered counterpart or copy of this Agreement shall be effective and admissible as an original for all purposes.

10.12    Estoppel Certificate. Each Member shall, within ten (10) days after written request by any Member or the Manager, deliver to the requesting Person a certificate stating, to the Member's knowledge, that: (a) this Agreement is in full force and effect; (b) this Agreement has not been modified except by any instrument or instruments identified in the certificate; and (c) there is no default hereunder by the requesting Person, or if there is a default, the nature and extent thereof.

[The remainder of this page is intentionally left blank.]

[Signatures contained on the following pages.]

- 25 -

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed, under seal, as of the date set forth hereinabove.

WITNESS OR ATTEST:

MEMBERS:

**SERV TRUST**, a Maryland statutory trust

By: _____, TRUSTEE (SEAL)
        Gregory B. Myers, Trustee

By: _____ (SEAL)
        Daniel J. Ring, Trustee

_____ (SEAL)
**Brian N. King**

_____ (SEAL)
**Cristina J. King**

**CRISTINA AND BRIAN KING
CHILDREN'S TRUST**

By: _____ (SEAL)
        Vevita Leon, Trustee

By: _____ (SEAL)
        Brian N. King, Trustee

By: _____ (SEAL)
        Timothy Lynch, Trustee

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed, under seal, as of the date set forth hereinabove.

WITNESS OR ATTEST:                    MEMBERS:

                                      **SERV TRUST**, a Maryland statutory trust

_____    By: _____ (SEAL)
                                      Gregory B. Myers, Trustee

*Sandra Capone*
Sandra CAPONE              By: _____ (SEAL)
                                      Daniel J. Ring, Trustee

_____    _____ (SEAL)
                           **Brian N. King**

_____    _____ (SEAL)
                           **Cristina J. King**

                           **CRISTINA AND BRIAN KING
                           CHILDREN'S TRUST**

_____    By: _____ (SEAL)
                                      Vevita Leon, Trustee

_____    By: _____ (SEAL)
                                      Brian N. King, Trustee

_____    By: _____ (SEAL)
                                      Timothy Lynch, Trustee

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed, under seal, as of the date set forth hereinabove.

WITNESS OR ATTEST:                    MEMBERS:

                                      **SERV TRUST**, a Maryland statutory trust

_____        By: _____ (SEAL)
                                         Gregory B. Myers, Trustee


_____        By: _____ (SEAL)
                                         Daniel J. Ring, Trustee


_____            _____ (SEAL)
                                   **Brian N. King**


_____            _____ (SEAL)
                                   **Cristina J. King**



                                   **CRISTINA AND BRIAN KING
                                   CHILDREN'S TRUST**

_____        By: _____ (SEAL)
                                         Vevita Leon, Trustee


_____        By: _____ (SEAL)
                                         Brian N. King, Trustee


_____        By: _____ (SEAL)
                                         Timothy Lynch, Trustee

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed, under seal, as of the date set forth hereinabove.

WITNESS OR ATTEST:                    MEMBERS:

**SERV TRUST**, a Maryland statutory trust

By: _____ (SEAL)
_____            Gregory B. Myers, Trustee

By: _____ (SEAL)
_____            Daniel J. Ring, Trustee

_____ (SEAL)
_____
**Brian N. King**

_____ (SEAL)
_____
**Cristina J. King**

**CRISTINA AND BRIAN KING
CHILDREN'S TRUST**

By: _____ (SEAL)
_____            Vevita Leon, Trustee

By: _____ (SEAL)
_____            Brian N. King, Trustee

By: _____ (SEAL)
_____            Timothy Lynch, Trustee

MANAGER:

_____, MANAGER (SEAL)
Gregory B. Myers

Execution Copy
2779005.7 27336/122546 07/18/2013

**6789 GOLDSBORO LLC**

## AMENDED AND RESTATED OPERATING AGREEMENT

### Exhibit A
### List of Members, Capital, and Percentages

| Name, Address, and Taxpayer I.D. Number | Membership Class | Initial Cash Capital Contribution (as of July 18, 2013) | Percentage Interests |
|---|---|---|---|
| Brian N. King<br>3925 Beech Avenue<br>Baltimore, MD 21211<br>SS#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 | Class A Member | $714,000 | 20% |
| Cristina J. King<br>3925 Beech Avenue<br>Baltimore, MD 21211<br>SS#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 | Class A Member | $714,000 | 20% |
| Cristina and Brian King Children's Trust<br>3925 Beech Avenue<br>Baltimore, MD 21211<br>EIN#20-6405435 | Class A Member | $357,000 | 10% |
| Serv Trust<br>4505 Wetherill Road<br>Bethesda, MD 20816<br>EIN#27-6725119 | Class B Member | $306,192 | 50% |

- 28 -

6789 GOLDSBORO LLC

## AMENDED AND RESTATED OPERATING AGREEMENT

### Exhibit B

### Resolution to Change Principal Office and Resident Agent

[See attached]

## RESOLUTION TO CHANGE PRINCIPAL OFFICE OR RESIDENT AGENT

The ~~directors/stockholders/general partner/~~authorized person of _____

6789 Goldsboro LLC

(Name of Entity)

organized under the laws of _____Maryland_____, passed the following resolution:

(State)

**[CHECK APPLICABLE BOX(ES)]**

☑ **The principal office is changed from:  (old address)**

3158 Braverton Street, Suite 206

Edgewater, MD  21037

**to:   (new address)**

3925 Beech Avenue

Baltimore, MD  21211

☑ **The name and address of the resident agent is changed from:**

Daniel J. Ring

3158 Braverton Street, Suite 206, Edgewater, MD  21037

**to:**

Danielle Stager Zoller

233 E. Redwood St., Baltimore, MD  21202

I certify under penalties of perjury the foregoing is true.

_____, MANAGER    /Gregory B. Myers, Manager

~~Secretary or Assistant Secretary~~
~~General Partner~~
Authorized Person

I hereby consent to my designation in this document as resident agent for this entity.

SIGNED_____

Resident Agent



VerStandig
LAW FIRM

Maurice B. VerStandig, Esq.
Sender's Direct Dial: (301)444-4600
Sender's E-mail: mac@mbvesq.com

August 23, 2017

<u>VIA CERTIFIED MAIL</u>
Serv Trust
4505 Wetherill Road
Bethesda, Maryland 20816

Re: 6789 Goldsboro LLC

To Whom it May Concern:

Please take note that the undersigned and this firm represent Brian King ("Mr. King"), Cristina King ("Ms. King"), and the Cristina and Brian King Children's Trust (the "King Trust") in their capacity as the collective Class A Members of 6789 Goldsboro LLC (collectively, the "Class A Members"). If Serv Trust is represented by counsel in connection with its dealings with 6789 Goldsboro LLC, please forward this letter to such attorney(s) and ask her/him to contact me as soon as may be practicable.

Pursuant to the allowances of Section 7.7 of the First Amended and Restated Operating Agreement of 6789 Goldsboro LLC (the "Operating Agreement"), the Class A Members are hereby electing to determine the Appraised Value (as that term is defined in the Operating Agreement) of the Property (as that term is defined in the Operating Agreement), so as to determine if 6789 Goldsboro LLC may redeem the membership of Serv Trust.

Pursuant to Section 7.5.1 of the Operating Agreement, the Class A Members hereby appoint M. Ronald Lipman, MAI as their designated appraiser.

Pursuant to Section 10.2 of the Operating Agreement, the Class A Members hereby designate The VerStandig Law Firm, LLC, 9812 Falls Road, #114-160, Potomac, Maryland 20854 as the address to which notices shall be given for the sole and limited purpose of designating an appraiser under Section 7.5.1 of the Operating Agreement.

Sincerely,

Maurice "Mac" VerStandig, Esq.
*For the Firm*

cc:    Brian King

**Trustee Ex. 2**



Proposed Goldsboro Place Subdivision
6789 Goldsboro Road
Bethesda, Maryland 20817

Report Date:
August 17, 2017

**LIPMAN**

**FRIZZELL &**

**MITCHELL**

Real Estate Consultants

6240 Old Dobbin Lane, Suite 140
Columbia, Maryland 21045
Phone:  410-423-2300
Fax:    410-423-2410
www.LFMvalue.com

**APPRAISAL REPORT**

Prepared for:

Gordon Feinblatt LLC
Ms. Danielle S. Zoller, Esquire
233 East Redwood Street
Baltimore, Maryland 21202

LFM #:17-237

**Trustee Ex. 3**



LIPMAN
FRIZZELL &
MITCHELL

August 17, 2017

Ms. Danielle S. Zoller, Esquire
Gordon Feinblatt LLC
233 East Redwood Street
Baltimore, Maryland 21202

RE:    Appraisal Report
       Proposed Goldsboro Place Subdivision
       6789 Goldsboro Road
       Bethesda, Maryland 20817

Dear Ms. Zoller:

In accordance with your request, we have prepared an appraisal of the above-referenced property. This appraisal report sets forth the pertinent data gathered, the techniques employed, and the reasoning leading to our value opinions.

The subject property consists of a 5.23 acre site located at 6789 Goldsboro Road in Bethesda, Maryland 20817 currently improved with a vacant residence and proposed to be improved with a residential townhouse subdivision. The subject is further identified as Tax Map GN41, Parcels P619 and P735. The current zoning is R-60 which allows townhouse development under the "Optional Method Cluster Development". The subject property is currently not subdivided and there are no approvals in place.

The property is located in the Bethesda section of Montgomery County, an upscale, primarily residential section of the Washington Metropolitan area. The site enjoys 475+/- front feet on the north side of Goldsboro Road, just east of its intersection with MacArthur Boulevard and west of its intersection with Tulip Hill Terrace.

The following is a summary of the subject's strengths and weaknesses:

Strengths

- Housing prices and the demand for housing in the subject property's market area are strong, as the subject neighborhood and market area are part of the prestigious River Road corridor.

- The surrounding neighborhood is largely built-out, with limited opportunity for developing new housing units.

Danielle S. Zoller, Esquire
Page 2



Weaknesses

- The site exhibits steep slopes and a stream which traverses the majority of its length, greatly impacting and limiting potential development. The only buildable portion of the property is along its Goldsboro Road frontage, east of where the on-site stream crosses Goldsboro Road.

- There are no approvals in place for subdivision into a townhouse subdivision, which is itself a conditional use.

## Highest and Best Use

Residential development of the site is both financially feasible and maximally productive and therefore, the subject's highest and best use. However, due to the topography of the site and the stream which traverses it, in addition to its lack of approvals for townhouse development which is a conditional use with unknown lot yield at this time, this potential use of the site is speculative as of the date of valuation.

## Bethesda Chevy Chase Master Plan /Density Implications

Review of the current Master Plan for the area provides critical insights into the ability of the subject property to be developed. Pertinent sections from page 67 of that Plan are as follows:

| P8 | P619 P735 | MacArthur Blvd and Goldsboro Rd | 5.23 acres | House (26du potential) | R-60 | Town-house (26 du potential) | R-60 | -Should not expect to receive full density -Development Should cluster in relatively flat area adjacent to Goldsboro Rd -Suitable for cluster to preserve steep slopes | -Reduce density due to extreme environmental constraints [slopes, possible wetlands] -Enhance and protect the environmental character of site |

It becomes quite clear that, while zoning allows a density of 26 dwelling units, ostensibly in a townhouse format, the site's physical constraints severely limit its potential buildout; further confirmation of the property's development limitations. Excerpts of a telephone conversation we had with Marco Fuster, lead reviewer of the subject's plan and on staff at MNCPPC-MC, relating specifically to the most recent development proposal submitted by the property owners are as follows:

1] The site poses extreme environmental constraints and impacts
2] There are overlapping regulations which impact the site
3] The site has numerous features which impact on potential development including a stream with possible wetlands, flood plain, steep slopes and severe topography issues, forest conservation areas, soil conditions, and a sewer line which runs along Goldsboro Road.

Based on the issues raised in the Master Plan and those again cited by the MNCPPC-MC representative, it is obvious that the subject developer's proposed density of 19 townhouses could never have been achieved and was therefore unrealistic from the get-go, so much so that a density of less than half of that originally proposed is more likely. It should be noted that realistic density potential directly affects the site's market value.

Danielle S. Zoller, Esquire
Page 3



Based on our physical inspection of the subject property and site conditions we have studied via topographical maps and other publicly available data, together with plans submitted by the developer which note the physical features we saw on-site, and consistent with the development criteria set forth in the Master Plan and addressed by Marco Fuster, we have attempted to lay out townhouse units on the flat area of the subject property along its Goldsboro Road frontage.

We have measured the site's frontage along Goldsboro Road, east of the stream crossing (frontage west of the crossing is too shallow for development) to be 264 ft. Assuming 26 ft. wide luxury garage townhouses (the narrowest acceptable in this market) and imposing the appropriate side yard setbacks, we conclude that six to eight townhouse units would maximize the site's potential.

Specifically, such density could be achieved in two sticks of three units each, one stick of three and one stick of four, or two sticks of four each. This then becomes the baseline for our valuation of the subject property in terms of its density potential.

## Value Conclusion:

Based upon a lot yield of six to eight townhouse lots, we apply a unit value of $165,000/lot derived later in this report in the sales comparison approach. This results in a market value range as follows: (6 lots x $165,000/lot = $1,000,000, rounded) or (8 lots x $165,000/lot = $1,325,000, rounded) resulting in a final value range of $1,000,000 to $1,325,000 [ONE MILLION DOLLARS to ONE MILLION THREE HUNDRED TWENTY FIVE THOUSAND DOLLARS].

We developed our analyses, opinions, and conclusions and prepared this report in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP) of the Appraisal Foundation; the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA); the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute; and the requirements of our client as we understand them.

Ms. Danielle S. Zoller, Esquire is the client in this assignment. The intended users are Gordon Feinblatt LLC and their client in this matter.

No borrower, property purchaser or property seller, and no party other than those parties specifically identified above shall rely on the appraisal for any purpose or be considered an intended user of the appraisal. However, we have abstracted the operating agreement for 6789 Goldsboro Road LLC (see addenda) and acknowledge that this report may be utilized in the context of a redemption of the Class B member's interest.

The acceptance of this appraisal assignment and the completion of the appraisal report submitted herewith are contingent on the following extraordinary assumptions and/or hypothetical conditions:

## Extraordinary Assumptions:

In this assignment we make the assumption that the subject property will yield up to eight townhouse lots, although it has not received site plan approval for any lots at the present time.

Danielle S. Zoller, Esquire
Page 4



## Hypothetical Conditions:

No hypothetical assumptions were employed in this assignment.

Based on the analysis contained in the following report and by way of summary, our value conclusions involving the subject property are as follows:

### VALUE CONCLUSION

| Value Premise | Interest Appraised | Effective Date | Indicated Value Range |
|---|---|---|---|
| As Is | Fee Simple | July 3, 2017 | $1,000,000 to $1,325,000 |

This letter of transmittal is not considered valid if separated from this report, and must be accompanied by all sections of this report as outlined in the Table of Contents, in order for the value opinions set forth above to be valid.

Respectfully submitted,
Lipman Frizzell & Mitchell LLC

M. Ronald Lipman, MAI
Principal
Maryland License #04-1072
License Expires December 31, 2018

Sheldon A. Stern, MAI
Senior Appraiser
Maryland License # 04-1976
License Expires January 14, 2019

6789 Goldsboro Road



# Table of Contents

Summary of Salient Facts ........................................................................................................ 1

Aerial & Street Map Views ...................................................................................................... 2

Introduction ............................................................................................................................ 3

Washington, D.C. Metropolitan Area Analysis ...................................................................... 7

Montgomery County, Maryland Analysis ............................................................................. 10

Neighborhood Analysis ........................................................................................................ 21

Market Analysis .................................................................................................................... 23

Property Description ............................................................................................................. 25

Zoning Overview ................................................................................................................... 29

Assessment and Tax Data .................................................................................................... 31

Subject Strengths & Weaknesses ........................................................................................ 33

Highest and Best Use ........................................................................................................... 34

Appraisal Methodology ........................................................................................................ 35

Sales Comparison Approach ................................................................................................ 36

Conclusion ............................................................................................................................ 50

General Assumptions and Limiting Conditions .................................................................... 51

Certification .......................................................................................................................... 55

Certification .......................................................................................................................... 56

Addenda ................................................................................................................................ 57

6789 Goldsboro Road



# Summary of Salient Facts

| | |
|---|---|
| Property Name:<br>Address: | Proposed Goldsboro Place Subdivision<br>6789 Goldsboro Road<br>Bethesda, Montgomery County, Maryland 20817 |
| Tax Parcel Number: | Tax Map GN41, Parcels P619 and P635 |
| Property Owner: | 6789 Goldsboro LLC |
| Property Rights Appraised: | Fee Simple |
| Zoning: | R-60, Residential – Moderate Density |
| Site Size: | 5.46 acres (237,650 square feet) |
| Property Description: | The subject property consists of a residential parcel containing irregular topography with steep slopes and a stream which traverses the site and is improved with a vacant residential dwelling built in 1935. |
| Extraordinary Assumptions: | In this assignment we make the assumption that the subject property will yield up to eight townhouse lots, although it has not received site plan approval for any lots at the present time. |
| Hypothetical Conditions: | No hypothetical assumptions were employed in this assignment. |
| Highest and Best Use: | Residential Cluster Development |
| Date of Inspection: | July 3, 2017 |
| Report Date: | August 17, 2017 |

### VALUE CONCLUSION

| Value Premise | Interest Appraised | Effective Date | Indicated Value Range |
|---|---|---|---|
| As Is | Fee Simple | July 3, 2017 | $1,000,000 to $1,325,000 |

6789 Goldsboro Road



## Aerial & Street Map Views



Note: Outlined above is the entire proposed Goldsboro Place townhouse subdivision.



6789 Goldsboro Road



# Introduction

### Client and Other Intended Users of the Appraisal
The client in this assignment is Gordon Feinblatt LLC and the intended users of this report are Gordon Feinblatt LLC and their client and no others.

### Intended Use of the Appraisal
The intended use of this report is to support an analysis by Gordon Feinblatt LLC of the subject property as it relates to its current development potential and the operating agreement for 6789 Goldsboro Road LLC .

### Real Estate Identification
The subject property is located at 6789 Goldsboro Road, Bethesda, Maryland 20817. The Montgomery County Assessor identifies the subject property as Tax Map GN341, Parcels P619 and P735.

TAX MAP



### Real Property Interest Appraised
We have appraised the fee simple interest in the subject property.

### Type and Definition of Value
The purpose of this appraisal is to develop an opinion of the market value of the subject property. "Market Value," as used in this appraisal, is defined as "the most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus." Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1] Buyer and seller are typically motivated.

6789 Goldsboro Road



2) Both parties are well informed or well advised, each acting in what they consider their own best interests;
3) A reasonable time is allowed for exposure in the open market;
4) Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
5) The price represents the normal consideration for the property sold unaffected by special or creative financing or sale concessions granted by anyone associated with the sale."

(Source: The Dictionary of Real Estate Appraisal, Sixth Edition, pg. 142)

The "as is" value is the value of the property in its present condition under market conditions prevalent on the date of the appraisal.

Please refer to the Glossary in the *Addenda* for further definitions of terms employed in this report.

### Date of Report
The date of this report is August 17, 2017, the date of the letter of transmittal.

### Valuation Scenarios and Effective Dates of Value
We developed opinions of value for the subject property under the following scenarios and corresponding effective dates of value:

| Valuation | Effective Date of Value |
|-----------|-------------------------|
| "As Is" | July 3, 2017 |

We completed an appraisal inspection of the subject property on July 3, 2017.

### Use of Real Estate as of the Effective Date of Value
The subject property existed as a single lot with a vacant single family dwelling completed in 1935 as of the effective date of value.

### Use of Real Estate as of the Date of this Report
Assumed to be the same as above.

6789 Goldsboro Road



## Ownership and Sales History

According to tax assessment records, title to the subject property is vested in 6789 Goldsboro LLC. This entity purchased the property in July 2013 from Virginia J. Dawson, Trustee for $1,350,000. Other than the above, we are not aware of any more sales, listings, or offers for the subject property within the past three years.

## Scope of Work

The scope of work includes all steps taken in the development of the appraisal. These include 1) the extent to which the subject property is identified, 2) the extent to which the subject property is inspected, 3) the type and extent of data researched, 4) the type and extent of analysis applied, and 5) the type of appraisal report prepared. These items are discussed as follows:

### Extent to Which the Property was Identified

#### Legal Characteristics
The subject was legally identified via an inspection of the property, State of Maryland and Montgomery County tax assessment records.

#### Economic Characteristics
Economic characteristics of the subject property were identified via an analysis of the local housing market, as well as a comparison to properties with similar locational and physical characteristics.

#### Physical Characteristics
The subject was physically identified via a general inspection of the property by the appraiser, as well as a visual review of aerial photography.

### Extent to Which the Property was Inspected
We inspected the subject on July 3, 2017.

### Type and Extent of the Data Researched
We researched and analyzed: 1) market area data, 2) property-specific, market-analysis data, 3) zoning and land-use data, and 4) current data on comparable sales in the competitive market area.

### Type and Extent of Analysis Applied
Surrounding land use trends, the condition of the property, demand for the subject, and relative legal limitations were observed and analyzed in concluding the subject's highest and best use. The subject was then valued based on the highest and best use conclusion, relying on the sales comparison approach.

### Appraisal Report Type
This is an Appraisal Report as defined by the Uniform Standards of Professional Appraisal Practice under Standards Rule 2-2a. Please see the Scope of Work above for a description of the level of research completed.

### Appraisal Conformity
We developed our analyses, opinions, and conclusions and prepared this report in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP) of the Appraisal Foundation; the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA); the

6789 Goldsboro Road



Interagency Appraisal and Evaluation Guidelines; the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute; and the requirements of our client as we understand them.

## Extraordinary Assumptions
In this assignment we make the assumption that the subject property will yield up to eight townhouse lots, although it has not received site plan approval for any lots at the present time.

## Hypothetical Conditions
No hypothetical assumptions were employed in this assignment.



6789 Goldsboro Road

# Washington, D.C. Metropolitan Area Analysis

The Washington-Arlington-Alexandria, DC-VA-MD-WV Metropolitan Statistical Area (MSA) includes: Calvert, Charles, Frederick, Montgomery and Prince George's Counties in Maryland; Arlington, Clarke, Culpeper, Fairfax, Fauquier, Loudoun, Prince William, Rappahannock, Spotsylvania, Stafford and Warren Counties, and the Cities of Alexandria, Fairfax, Falls Church, Fredericksburg, Manassas and Manassas Park, located in Northern Virginia; Jefferson County, in West Virginia; and the District of Columbia.



The Washington MSA's population grew by an average annual rate of 1.5% between 1990 (4,122,259) and 2000 (4,796,183), according to the U.S. Census Bureau. In 2016, the MSA had an estimated population of 6,131,977, an increase of 0.9% over 2015, at 6,078,469. The population for the MSA had an average annual change of 1.5% and a total change of 16.5% from 2006 to 2016. The Washington MSA's population is projected to increase to 6,446,853 in 2020 and 7,231,458 in 2030, according to reports from the Metropolitan Washington Council of Governments Cooperative Forecasts 9.0 for the District of Columbia and Jefferson County, West Virginia, the Weldon Cooper Center for Public Service for Virginia counties and cities, and the Maryland Department of Planning for Maryland counties.

6789 Goldsboro Road



In 2016, the Washington, D.C. MSA had an estimated average annual labor force of 3,313,056, with an average unemployment rate of 3.8%, compared to an average rate of 6.0% for the District of Columbia, 4.3% for Maryland, 4.0% for Virginia, 6.0% for West Virginia and the U.S. average unemployment rate of 4.9%.

In June 2017, the Washington, D.C. MSA had an estimated labor force of 3,424,661 with an unemployment rate of 3.9%, compared to a rate of 6.4% for the District of Columbia, 4.2% for Maryland, 3.9% for Virginia, 5.1% for West Virginia and the U.S. unemployment rate of 4.4%.

The early 1990s produced a depressed economic environment for the Metropolitan area with cutbacks in employment by the Federal Government, the area's largest employer. This was followed by corporate mergers and layoffs in the mid-1990s. By the late 1990s the economy had improved and private sector hiring was strong, with low unemployment and resurgence in demand for commercial development. During 2002, the economy in the Metropolitan area was stagnant with low mortgage interest rates responsible for a strong housing market. By 2005, a strong seller's market developed for both residential and commercial real estate that began to slow down by year end, as interest rates rose. Sales activity in the housing market declined in 2006 through 2009, while commercial activity remained relatively stable.

According to reports from the U.S. Census Bureau, the estimated median household income for the Washington, D.C. MSA increased from $71,013 in 2005 to $85,844 in 2015, an average annual increase of 1.9% and a total change of 20.9%. The MSA's 2015 median income was 0.9% higher than the 2014 median income of $85,059. Median income for the MSA was 17.4% higher than the District of Columbia's median household income of $73,115, 13.3% higher than Maryland's income of $75,784, 29.6% higher than Virginia's income of $66,263 and 104.5% higher than West Virginia's median household income of $41,969.

The residential market in the Washington Metropolitan area was extremely active during the first half of this decade, although home sales began to slow in 2006 and pricing began to decline since that time. The extreme expansion experienced between 2000 and 2005 ended and the market is in the process of finding equilibrium.

According to reports from the Metropolitan Regional Information Systems, Inc. (MRIS), in 2016, the MSA had an average home sale price of $400,431, an increase of 2.0% over 2015, at $392,474 (previous data has been changed with the addition of Culpeper and Rappahannock counties to the MSA). During the same period, the number of units sold in the MSA went from 80,115 in 2015 to 86,071 in 2016, an increase of 7.4%.

In June 2017 the average home sale price in the MSA was $425,115, an increase of 3.4% over June 2016, at $411,111. During the same period, the number of units sold in the MSA went from 9,561 in June 2016 to 10,035 in June 2017, an increase of 5.0%. The average year-to-date (YTD) 2017 home sale price in the MSA was $408,901, an increase of 3.0% over YTD 2016, at $396,854. The total number of units sold in the MSA (YTD) went from 40,247 in 2016 to 43,121 in 2017, an increase of 7.1%.

6789 Goldsboro Road



In late 2007, financial markets began to deteriorate from a period of rapid growth in real estate prices and economic activity during the 2000s. What followed was a deep and unprecedented global economic recession, which has come to be known as The Great Recession. Real estate markets in particular were profoundly affected by this recession in comparison to past recessions.

The duration and far reaching impact of The Great Recession has been unprecedented as have been measures in monetary and fiscal policy undertaken by the U.S. Government to combat the ongoing problems. The Federal Reserve has lowered the Federal Funds Target Rate to a range of 0 to 0.25%, the lowest rate since December of 2008 and over $5 trillion has been added to the nation's debt since January of 2008. Standard & Poor's Ratings Services revised its outlook on the U.S. long-term credit rating from AAA to AA+ to reflect future concerns regarding the ability of the U.S. Government to fulfill its obligations as a result of its increased debt loads, without major policy changes.

During the last three years, the Washington, D.C. MSA has shown signs of stabilization. The MSA experienced increases in the average home sale price from 2010 through 2016, after decreases in 2008 and 2009. The average unemployment rate decreased in 2011 through 2016, after increasing unemployment in 2009 and 2010. These recent signs of stabilization indicate a recovery from the late 2000s and early 2010s.

Going forward, the Washington, D.C. MSA's economic base will continue to be a positive influence as it recovers. Economic growth may not again reach the pace set in the mid-2000s, however, the MSA's favorable demographic trends and location will assist in stabilizing and, ultimately, growing its economy.

6789 Goldsboro Road

# Montgomery County, Maryland Analysis

## Location

Bordering Washington, D.C. to the immediate northwest, Montgomery County represents one of Maryland's most populated and affluent jurisdictions. It comprises a land area of 495± square miles and is bordered by Frederick County to the northwest, Howard County to the northeast, Prince George's County to the southeast and the District of Columbia and Virginia to the south and west, respectively. Montgomery County has 19 municipalities including: Barnesville, Brookville, Town of Chevy Chase, Chevy Chase View, Chevy Chase Village, Village of Chevy Chase (Section 3), Village of Chevy Chase (Section 5), Gaithersburg, Garrett Park, Glen Echo, Kensington, Laytonsville, Martin's Additions, North Chevy Chase, Poolesville, Rockville, Somerset, Takoma Park and Washington Grove. The centrally located City of Rockville serves as the County seat and is 15 miles from Washington, D.C., 37 miles from Baltimore, MD, 132 miles from Philadelphia, PA and 223 miles from New York, NY.



6789 Goldsboro Road



## Population

The U.S. Census Bureau estimated Montgomery County's 2000 population at 873,874, which had an average annual growth rate of 2.1% from 1980, at 579,053. In 2016, the County had an estimated population of 1,043,863, an increase of 0.7% over 2015, at 1,036,233. The County experienced an overall total increase in population of 12.7% and an average annual increase of 1.2%, from 2006 to 2016. Montgomery County is projected to have a population of 1,067,000 in 2020 and 1,153,900 in 2030, according to reports from the Maryland Department of Planning. The County's anticipated modest rate of growth in this decade is expected to occur primarily outside the Capital Beltway (I-495). A summary of population history and forecast is shown in the following chart.

### HISTORICAL AND PROJECTED POPULATION – SUBURBAN WASHINGTON REGION

| | 2006 | 2016 | Average Annual Growth Rates 2006-2016 | 2020 | 2016-2020 | 2030 | 2020-2030 |
|---|---|---|---|---|---|---|---|
| MARYLAND | 5,627,367 | 6,016,447 | 0.7% | 6,224,510 | 0.9% | 6,612,190 | 0.6% |
| Suburban Washington Region | 2,002,800 | 2,199,503 | 0.9% | 2,247,150 | 0.5% | 2,402,500 | 0.7% |
| Frederick County | 224,211 | 247,591 | 1.0% | 265,650 | 1.8% | 304,050 | 1.4% |
| Montgomery County | 926,492 | 1,043,863 | 1.2% | 1,067,000 | 0.5% | 1,153,900 | 0.8% |
| Prince George's County | 852,097 | 908,049 | 0.6% | 914,500 | 0.2% | 944,550 | 0.3% |

*Sources: 2006 & 2016 - U.S. Census Bureau, Release Date: March 2017; 2000 & 2030 - Projections: Maryland Department of Planning.*

## Employment

The County's talented workforce and strategic location have influenced its development as one of the nation's largest centers of research and development activity and private and governmental employment. The County's anticipated future employment growth is expected in the private sector, particularly in the areas of service, high technology and related industries. A survey of the County's total employment, broken down by sector of work, is shown in the following chart.

### SUMMARY OF EMPLOYMENT

| SOURCE | Annual 2014 | Annual 2015 | % Change 2014–15 | Annual 2016 | % Change 2015–16 |
|---|---|---|---|---|---|
| Government | 89,580 | 89,344 | -0.3% | 89,763 | 0.5% |
| Natural Resources & Mining | 304 | 308 | 1.3% | 310 | 0.6% |
| Construction | 23,662 | 23,585 | -0.3% | 23,332 | -1.1% |
| Manufacturing | 11,304 | 11,666 | 3.2% | 11,946 | 2.4% |
| Trade, Transportation & Utilities | 57,824 | 57,695 | -0.2% | 56,846 | -1.5% |
| Information | 12,608 | 12,354 | -2.0% | 11,780 | -4.6% |
| Financial Activities | 30,040 | 30,607 | 1.9% | 29,790 | -2.7% |
| Professional & Business Services | 98,782 | 99,022 | 0.2% | 102,397 | 3.4% |
| Education & Health Services | 67,618 | 69,925 | 3.4% | 71,561 | 2.3% |
| Leisure & Hospitality | 41,005 | 41,827 | 2.0% | 43,203 | 3.3% |
| Other Services & Unclassified | 22,616 | 22,552 | -0.3% | 22,521 | -0.1% |
| Total | 455,343 | 458,885 | 0.8% | 463,449 | 1.0% |

*Source: Maryland Department of Labor, Licensing & Regulation*

6789 Goldsboro Road



In June 2017, the estimated civilian labor force for Montgomery County was 567,794, with an unemployment rate of 3.5% (not seasonally adjusted), compared to a rate of 3.9% for the Washington, D.C. MSA, 4.2% for the State of Maryland and the U.S. unemployment rate of 4.4% (seasonally adjusted). Government employment accounts for 19% of the Montgomery County work force with the remaining 81% in the private sector. The top ten employers in Montgomery County are listed in the following chart.

## TOP TEN EMPLOYERS

| Employer | Product/Service | Employees |
|---|---|---|
| National Institutes of Health* | HQ/Medical research/Federal government | 17,580 |
| U.S. Food and Drug Administration* | HQ/Food & drug R&D & standards/Federal government | 13,855 |
| Naval Support Activity Bethesda* | Medical services/Federal government | 12,000 |
| Marriott International | HQ/Hotels, motels/Accommodation & food services | 5,800 |
| Adventist Healthcare | HQ/Medical services/Health care | 4,290 |
| Montgomery College | Higher Educations/Educational services | 3,190 |
| National Oceanic & Atmospheric Admin.* | HQ/Weather analysis & reporting/Federal government | 2,920 |
| National Institute of Standards & Technology* | HQ/testing and standards; R&D | 2,835 |
| Kaiser Foundation Health Plan | Medical services/Health care | 2640 |
| U.S. Nuclear Reg. Comm.* | HQ/utilities regulation | 2340 |

*Note: Excludes post offices, state and local governments; national retail and national food service; includes higher education. Sources: Economic development agencies statewide and Maryland Department of Business and Economic Development, 2016.*

*Employee counts for federal and military facilities exclude contractors to the extent possible; embedded contractors may be included.*

## Income

According to the U.S. Census Bureau, estimated median household income for Montgomery County increased from $81,874 in 2005, to $98,314 in 2015, an average annual increase of 1.8% and a total increase of 20.1%. The County's 2015 estimated income was 29.7% higher than Maryland's median income of $75,784. Median household income growth in the County from 2005 to 2015 is shown in the following chart.

## MEDIAN HOUSEHOLD INCOME

| Year | Income | Annual % Change | Total % Change |
|---|---|---|---|
| 2005 | $81,874 | - | - |
| 2006 | $87,019 | 6.3% | 6.3% |
| 2007 | $91,440 | 5.1% | 11.7% |
| 2008 | $93,895 | 2.7% | 14.7% |
| 2009 | $93,774 | -0.1% | 14.5% |
| 2010 | $88,559 | -5.6% | 8.2% |
| 2011 | $92,288 | 4.2% | 12.7% |
| 2012 | $94,365 | 2.3% | 15.3% |
| 2013 | $97,873 | 3.7% | 19.5% |
| 2014 | $97,279 | -0.6% | 18.8% |
| 2015 | $98,314 | 1.1% | 20.1% |
| Average Annual % Change | | 1.8% | |

*Sources: U.S. Census Bureau*

6789 Goldsboro Road



## Assessable Tax Base

The assessable tax base is affected by physical growth, the economy and market prices. In FY 2016 (as of the November 30, 2016 base estimate date), the County had an estimated assessable tax base of $178.612 billion, an increase of 4.3% over 2015, at $171.300 billion. The County experienced an average annual increase of 2.4% and a cumulative change of 26.5% from 2006 to 2016, as set forth in the following chart.

### ASSESSABLE TAX BASE

| Year* | Tax Base (In $Billions) | Annual % Change | Cumulative % Change |
|---|---|---|---|
| 2006 | $141.182 | - | - |
| 2007 | $163.916 | 16.1% | 16.1% |
| 2008 | $182.492 | 11.3% | 29.3% |
| 2009 | $182.804 | 0.2% | 29.5% |
| 2010 | $174.841 | -4.4% | 23.8% |
| 2011 | $163.570 | -6.4% | 15.9% |
| 2012 | $158.918 | -2.8% | 12.6% |
| 2013 | $160.520 | 1.0% | 13.7% |
| 2014 | $164.438 | 2.4% | 16.5% |
| 2015 | $171.300 | 4.2% | 21.3% |
| 2016 | $178.612 | 4.3% | 26.5% |
| Average Annual % Change | | 2.4% | |

*Source: State Department of Assessments and Taxation.*
*\* For Tax Years beginning July 1st.*

## Retail Sales

According to reports from the Comptroller of Maryland, Bureau of Revenue Estimates (BRE), Montgomery County had sales totaling $9.135 billion in 2016 an increase of 0.7% over 2015, at $9.072 billion. The County experienced an average annual increase of 0.2% and a cumulative growth rate of 1.8% from 2006 to 2016, as shown in the following chart.

### RETAIL SALES

| Year* | Retail Sales (In $Billions) | Annual % Change | Cumulative % Change |
|---|---|---|---|
| 2006 | $8.976 | - | - |
| 2007 | $9.052 | 0.8% | 0.8% |
| 2008 | $8.985 | -0.7% | 0.1% |
| 2009 | $8.537 | -5.0% | -4.9% |
| 2010 | $8.065 | -5.5% | -10.2% |
| 2011 | $8.337 | 3.4% | -7.1% |
| 2012 | $8.716 | 4.5% | -2.9% |
| 2013 | $8.631 | -1.0% | -3.8% |
| 2014 | $8.697 | 0.8% | -3.1% |
| 2015 | $9.072 | 4.3% | 1.1% |
| 2016 | $9.135 | 0.7% | 1.8% |
| Average Annual % Change | | 0.2% | |

*Source: Comptroller of Maryland - Bureau of Revenue Estimates (BRE) Consolidated Revenue Reports; Sales and Use Tax Summaries.*
*\* Fiscal Years through June 30th.*

6789 Goldsboro Road



## Housing

The housing stock of Montgomery County mostly consists of single family housing for the upper income purchaser. Metropolitan Regional Information Systems, Inc. (MRIS), in their report on housing statistics, stated that the average sale price of an existing home in Montgomery County in 2016 was $505,285, an increase of 0.8% over 2015, at $501,305. The number of units sold in the County went from 12,191 in 2015 to 12,896 in 2016, an increase of 5.8%. Historical changes in average sale price and number of units sold from 2006 to 2016 are shown in the following chart.

### AVERAGE HOME SALE PRICES AND UNITS SOLD

| Year | Units Sold | % Change | Avg. Price | % Change |
|------|-----------|----------|-----------|----------|
| 2006 | 13,494 | -- | $529,046 | -- |
| 2007 | 10,355 | -23.3% | $550,188 | 4.0% |
| 2008 | 8,519 | -17.7% | $503,965 | -8.4% |
| 2009 | 10,375 | 21.8% | $434,246 | -13.8% |
| 2010 | 10,408 | 0.3% | $441,618 | 1.7% |
| 2011 | 9,500 | -8.7% | $451,963 | 2.3% |
| 2012 | 10,155 | 6.9% | $465,510 | 3.0% |
| 2013 | 11,461 | 12.9% | $500,338 | 7.5% |
| 2014 | 10,976 | -4.2% | $503,956 | 0.7% |
| 2015 | 12,191 | 11.1% | $501,305 | -0.5% |
| 2016 | 12,896 | 5.8% | $505,285 | 0.8% |

*Source: Metropolitan Regional Information Systems, Inc. (MRIS)*

In June 2017 the average home sale price in the County was $545,893, a decrease of 0.1% from June 2016, at $546,394. During the same period, the number of units sold in the County went from 1,532 in June 2016 to 1,519 in June 2017, a decrease of 0.8%. The average year-to-date (YTD) 2017 home sale price in the County was $524,221, an increase of 4.6% over YTD 2016, at $501,290. The total number of units sold in the County (YTD) went from 6,127 in 2016 to 6,300 in 2017, an increase of 2.8%. A comparison of 2017 to 2016, for average home sale prices and number of units sold in Montgomery County on a monthly and YTD basis, is shown in the following chart.

### AVERAGE HOME SALE PRICES & NO. OF UNITS SOLD - MONTHLY/YTD COMPARISON

| Month | 2016 Units Sold | 2017 Units Sold | 2016-2017 % Change | 2016 Average Price | 2017 Average Price | 2016-2017 % Change |
|-------|------|------|---------|-----------|-----------|---------|
| January | 646 | 704 | 9.0% | $451,298 | $482,017 | 6.8% |
| February | 658 | 701 | 6.5% | $494,907 | $517,511 | 4.6% |
| March | 841 | 1,013 | 20.5% | $473,902 | $510,481 | 7.7% |
| April | 1,103 | 1,117 | 1.3% | $527,180 | $546,156 | 3.6% |
| May | 1,347 | 1,246 | -7.5% | $514,061 | $543,266 | 5.7% |
| June | 1,532 | 1,519 | -0.8% | $546,394 | $545,893 | -0.1% |
| YTD | 6,127 | 6,300 | 2.8% | $501,290 | $524,221 | 4.6% |

*Source: Metropolitan Regional Information Systems, Inc. (MRIS)*

6789 Goldsboro Road



According to reports from the U.S. Census Bureau, in 2016, Montgomery County issued new residential building permits for 2,170 dwelling units (including multi-family), an increase of 4.3% over 2015, at 2,080. Of those permits issued in 2016, 1,414 were for single-family units, an increase of 3.4% over 2015, at 1,367 single-family units. During the same period, the County issued multi-family permits for 756 units, an increase of 6.0% over 2015,' at 713 multi-family units.

The dollar value of all new permits issued in Montgomery County, in 2016, was $425.0 million, a decrease of 4.7% from 2015, at $445.8 million. The number of units and the construction costs for building permits issued in the County from 2006 to 2016 are shown in the following chart.

## RESIDENTIAL BUILDING PERMITS

| | Number of Units | | | | Construction Costs ($millions) | | | |
|------|------------------|------------------|--------|----------|-------------------|------------------|----------|----------|
| Year | Single-Family | Multi-Family | Total | % Change | Single-Family | Multi-Family | Total | % Change |
| 2006 | 1,237 | 1,794 | 3,031 | -- | $343.4 | $230.8 | $574.2 | -- |
| 2007 | 1,408 | 2,051 | 3,459 | 14.1% | $387.6 | $276.5 | $664.0 | 15.6% |
| 2008 | 997 | 479 | 1,476 | -57.3% | $259.8 | $76.2 | $336.1 | -49.4% |
| 2009 | 862 | 0 | 862 | -41.6% | $244.5 | $0.0 | $244.5 | -27.2% |
| 2010 | 909 | 990 | 1,899 | 120.3% | $225.1 | $118.3 | $343.3 | 40.4% |
| 2011 | 1,031 | 1,481 | 2,512 | 32.3% | $236.5 | $197.9 | $434.5 | 26.5% |
| 2012 | 1,174 | 2,807 | 3,981 | 58.5% | $238.3 | $265.6 | $503.8 | 16.0% |
| 2013 | 1,652 | 1,862 | 3,514 | -11.7% | $326.7 | $197.3 | $523.9 | 4.0% |
| 2014 | 1,440 | 2,399 | 3,839 | 9.2% | $297.3 | $327.8 | $625.1 | 19.3% |
| 2015 | 1,367 | 713 | 2,080 | -45.8% | $298.7 | $147.1 | $445.8 | -28.7% |
| 2016 | 1,414 | 756 | 2,170 | 4.3% | $322.5 | $102.5 | $425.0 | -4.7% |

*Source: U.S. Census Bureau*

## Commercial/Industrial Markets

In second quarter 2017, CoStar reported Montgomery County's existing office space at 72.8 million square feet, with a vacancy rate of 13.8%. Industrial/flex space totaled 25.9 million square feet, with a vacancy rate of 9.3%. Retail space in the County totaled 41.9 million square feet, with a vacancy rate of 3.5%. The County had a total combined existing RBA of 140.7 million square feet, with an overall vacancy rate of 9.9%. Montgomery County's RBA for office, industrial/flex, retail, and combined space and vacancy rates for fourth quarters 2010 through 2016 and second quarter 2017, are shown in the following chart.

## COMMERCIAL RBA AND VACANCY RATES

| | Office | | Industrial/Flex | | Retail | | Combined | |
|-----------|------------|---------|------------------|---------|-------------|---------|-------------|---------|
| Year/Qtr. | Sq. Ft. | Vacancy | Sq. Ft. | Vacancy | Sq. Ft. | Vacancy | Sq. Ft. | Vacancy |
| 2017 2Q | 72,832,744 | 13.8% | 25,934,240 | 9.3% | 41,907,009 | 3.5% | 140,673,993 | 9.9% |
| 2016 4Q | 72,813,634 | 13.8% | 25,934,240 | 8.7% | 41,830,784 | 3.3% | 140,578,658 | 9.7% |
| 2015 4Q | 72,495,725 | 14.1% | 25,734,160 | 10.0% | 40,943,966 | 3.7% | 139,173,851 | 10.3% |
| 2014 4Q | 72,345,503 | 13.7% | 25,727,160 | 10.7% | 40,855,521 | 3.9% | 138,928,184 | 10.3% |
| 2013 4Q | 71,176,577 | 12.6% | 25,713,560 | 11.1% | 40,317,439 | 4.2% | 137,207,576 | 9.8% |
| 2012 4Q | 70,803,616 | 12.1% | 25,713,560 | 11.7% | 39,759,794 | 4.2% | 136,276,970 | 9.7% |
| 2011 4Q | 69,844,809 | 12.1% | 25,713,560 | 12.8% | 39,613,395 | 4.2% | 135,171,764 | 9.9% |
| 2010 4Q | 69,806,861 | 12.6% | 25,713,560 | 13.0% | 39,333,142 | 4.4% | 134,853,563 | 10.3% |

*Source: CoStar*

6789 Goldsboro Road



Traditionally, Montgomery County is considered one of the metropolitan area's strongest and most desirable office markets. As a result of negative market forces, new project delivery and construction activity was very modest in the early 1990's with build-to-suit developments being the only new construction. As the aggregate economy strengthened in the late 1990's, Montgomery County experienced a positive building environment. In the current economy, new commercial construction has leveled off with almost no speculative activity. The Federal government is expanding its facilities by lease arrangements with developers on private land and government owned land as they establish new requirements based on recent events.

Montgomery County is currently home to 250 biotech companies. New technology parks are planned along the I-270 and Rt. 29 corridors, adding to the County's global reputation as a technology center. According to the Maryland Department of Business & Economic Development, the County's business parks include:

- White Oak Science Gateway (formerly the East County Science Center) – 115-acre site to include a business incubator, a pilot manufacturing facility, lab facility, build-to-suit office space and a higher education facility adjacent to the new U.S. FDA headquarters campus.

- Montgomery College Germantown Campus Technology Park – Up to one million square feet of planned development which includes an academic and training facility that is tied in with the college's biotech program. It also includes a business incubator and build-to-suit facilities.

- LifeSci Village (formerly East County Science Center) – 300-acre mixed-use development focusing on advanced technologies; adjacent to the U.S. FDA headquarters campus.

- Great Seneca Science Corridor – This area (17.5 million sq.ft.) is being developed for scientific research and development.

- Johns Hopkins University Belward Research Campus – 108 acres are to be developed for research and education in addition to the 36 acres currently under use.

6789 Goldsboro Road



Business incubators in Montgomery County include: Germantown Innovation Center, Germantown; Bethesda Green Business Incubator, Bethesda; Association for Entrepreneurial Science (AES), Rockville; Rockville Innovation Center, Rockville; William E. Hanna, Jr. Innovation Center at Shady Grove, Rockville; Silver Spring Innovation Center, Silver Spring; and the Wheaton Business Innovation Center, Wheaton, Maryland. A Market Profile for Montgomery County's industrial and office properties is shown in the following chart.

### MARKET PROFILE DATA

| Land - cost per acre | Low | High | Average |
|---|---|---|---|
| Industrial | $146,200 | $2,500,000 | $972,430 |
| Office | $154,800 | $2,892,400 | $1,147,700 |
| **Rental Rates - per square foot** | | | |
| Warehouse / Industrial | $10.00 | $29.00 | $11.88 |
| Flex / R&D / Technology | $17.00 | $28.50 | $22.84 |
| Class A Office | $13.50 | $51.00 | $32.09 |

*Source: Montgomery County Department of Economic Development, 2016*

## Transportation

Despite consistently heavy traffic patterns and vehicular congestion within its major highway corridors, transportation throughout the County and its surrounding metropolitan area is considered adequate. Montgomery County is served by the Capital Beltway (I-495) which travels in an east/west direction through Prince George's County and Virginia, and in a generally circular orientation around the District of Columbia. It is linked to the north by U.S. Route 29, and Interstates 270 and 95 which provide access between the Capital Beltway and Baltimore and Howard Counties, as well as Rockville/Shady Grove, Bethesda, Gaithersburg, and Frederick County. There are 150 buses, including Metrobus, operating along 39 routes in the County, plus extensive service via the County's Ride-On bus system. Taking advantage of this highway system, are 123 local and long-distance trucking companies.

An 18.8-mile Inter County Connector (I-200) toll road has been completed from I-270/I-370 to I-95 (Contracts A-C), which greatly eases east/west travel linking Prince George's and Montgomery Counties, according to reports from the Maryland Department of Transportation. The limited access highway begins from the west at I-270/I-370 in Montgomery County, MD and ends at US 1 in Prince George's County, MD.

6789 Goldsboro Road



The ICC is a limited access toll facility that has been constructed in the following sequence:

A. I-270/I-370 to MD 97 – 7.2 miles of six-lane highway (opened February 2011).

B. MD 97 to US 29 – 6.9 miles of six-lane highway (opened November 2011).

C. US 29 to I-95 - 3.8 miles of six-lane ICC highway, 1.3 miles of US 29 road improvements and 1.9 miles of I-95 auxiliary lane and C-D roadway improvements (opened November 2011).

D/E. Contract D/E Modified is the fourth design build contract of the ICC. It consists of collector-distributor lanes along I-95 from the ICC to just north of MD 198 and includes the extension of the ICC from the eastern terminus of Contract C to a partial interchange at Virginia Manor Road and a new signalized intersection at U.S. 1, near the Muirkirk MARC commuter rail station (opened to traffic as of November 2014).

The County also has extensive rail service in the form of twelve Metrorail stations that serve three of the system's busiest stops. Commuters have access to the MARC commuter rail and long-distance passenger service is provided by AMTRAK. CSX Transportation provides freight rail service to the area.

Montgomery County is also served by the Helen Delich Bentley Port of Baltimore (renamed for former Congresswoman, Helen Delich Bentley on June 2, 2006, in celebration of the 300th anniversary of the Port), which is located at Dundalk, Curtis Bay, Locust Point and Canton Yards. The Port is a significant economic engine for the region and considered to be a leading U.S. automobile and break-bulk port with six public terminals, including a state-of-the-art Intermodal Container Transfer Facility, adjacent to Seagirt Marine Terminal, which serves import and export accounts, accommodating loading and discharge at the seaport. Another ICTG is located at Dundalk Marine Terminal, a general cargo facility with direct rail access. The Port is one of America's top container terminals due to its strategic Mid-Atlantic location, inland setting and 50' channel, and is ranked as one of the nation's top "Ro-Ro" (roll-on, roll-off) ports. The Port is generally ice-free year round and can be approached from the south via the Chesapeake Bay or from the north via the Delaware Bay and Chesapeake-Delaware Canal.

Montgomery County's commercial passenger and air cargo services are available through the Baltimore/Washington International Thurgood Marshall Airport, Washington Dulles International Airport and Ronald Reagan Washington National Airport. The County is also served by the Montgomery County Airpark which provides regional, commuter and corporate air service and is owned by the Montgomery County Revenue Authority.

6789 Goldsboro Road



## The Great Recession

In late 2007 financial markets began to deteriorate from a period of rapid growth in real estate prices and economic activity during the 2000s. What followed was a deep and unprecedented global economic recession which has come to be known as The Great Recession. Real estate markets in particular were profoundly affected by this recession in comparison to past recessions.

One of the most destructive legacies of The Great Recession has been the nationwide erosion in home prices following dramatic increases in the mid-2000s which were fueled by easy credit and speculation. In Montgomery County the average home sale price increased from $253,507 in 2000 to $550,188 in 2007, or 117%. In 2016, the average sale price was $505,285, down 8.2% from the high. Residential building permit values decreased from a peak of $717.4 million in 2005 to $425.0 million in 2016, a decrease of 40.8%.

On a positive note, retail sales in Montgomery County grew from $8.976 billion in 2006 to $9.135 billion in 2016, a cumulative increase of 1.8%.

The effects of The Great Recession can also be found in unemployment, which, in Montgomery County, averaged 3.5% annually between 2006 and 2009, with a high of 5.3% in 2009, and a low of 2.6% in 2007. In 2010 unemployment jumped to 5.6% in 2010. The average unemployment rate decreased to 5.3% in 2011, 5.2% in 2012, 5.0% in 2013 4.4% in 2014, 3.9% in 2015 and 3.3% in 2016.

Median household income in the County increased by 6.3% in 2006 then slowed to an increase of 1.1% in 2015. Montgomery County's assessable tax base decreased from 2010 to 2012, after steady increases from 2004 to 2009 and then increased in 2013 through 2016. Vacancy rates have also increased for office RBA but decreased for industrial/flex and retail commercial property types since 2010.

The duration and far reaching impact of The Great Recession has been unprecedented as have been measures in monetary and fiscal policy undertaken by the U.S. Government to combat the ongoing problems. The Federal Reserve has lowered the Federal Funds Target Rate to a range of 0 to 0.25%, the lowest rate since December of 2008 and over $5 trillion has been added to the nation's debt since January of 2008. Standard & Poor's Ratings Services revised its outlook on the U.S. long-term credit rating from AAA to AA+ to reflect future concerns regarding the ability of the U.S. Government to fulfill its obligations as a result of its increased debt loads, without major policy changes.

## Conclusions

Montgomery County represents one of the Washington MSA's most populated and affluent submarkets. Due to its stable population base and proximity to a variety of quality educational facilities, its civilian labor force is generally considered talented and highly educated. This characteristic is evidenced by the extensive concentration of high tech industries within its boundaries and its historically low unemployment rates.

6789 Goldsboro Road



During the last four years, Montgomery County has shown signs of stabilization. Home prices increased in 2010 through 2014, after two years of decreases in 2008, 2009 and 2015 and then increased again in 2016. Retail sales decreased every year from 2008 through 2010, increased in 2011 and 2012, decreased in 2013, and then increased in 2014 through 2016. The average unemployment rate decreased in 2011 through 2016, after two years of increasing unemployment in 2009 and 2010. These recent signs of stabilization indicate a recovery from the late 2000s and early 2010s.

Going forward, Montgomery County, as well as the Washington, D.C. Region, will continue to benefit from the presence of the Federal Government. The County's proximity to Washington and Baltimore and its economic base will be a positive influence as it recovers. Economic growth may not again reach the pace set in the mid-2000s, however, Montgomery County's favorable demographic trends and location will assist in stabilizing and, ultimately, growing its economy.

6789 Goldsboro Road



# Neighborhood Analysis

**NEIGHBORHOOD MAP**



The subject property is situated in Bethesda, Montgomery County, Maryland. Bethesda is just north of the District of Columbia, within the southern portion of Montgomery County. Its general boundaries are formed by the Capital Beltway to the north, Connecticut Avenue (Route 185) to the east, Bradley Boulevard (Route 191) to the south, and Bradley Lane to the west. Commercial development of varying age and form can be found along the neighborhood's major arteries and residential uses are oriented along minor roads. The area is largely built-out, being an inner suburb of Washington, D.C. The largest land users are the National Institutes of Health (NIH) and National Naval Medical Center located on the east and west sides of Wisconsin Avenue, just south of the Capital Beltway. The subject property's location is in the northwestern portion of the neighborhood near the Glen Echo area and the Potomac River.

The subject property is located in zip code 20817 within Montgomery County. Information from ESRI Business Analyst Online was obtained regarding this area known as Bethesda. ESRI estimated the number of households in 2017 at 38,385, an increase of 6.5% (1.3% on average per year) over the 2010 population of 36,050 and an increase of 4.4% (0.9% on average per year) over 2017 to 40,065 in 2022. ESRI projects the 2017 households at 13,812 and an increase in the number of households by 535, or 2.9% (0.8% on average per year), over the next five years, totaling 14,347 in 2022. The area's 2017 median household income of $180,412 is well above the State of Maryland ($76,754) and the United States ($56,124).

The area is well served by road and public transportation systems. Major north/south arteries include Old Georgetown Road (Route 187), River Road (Route 190), Connecticut Avenue (Route 185) and Wisconsin Avenue (Route 355), all of which carry traffic from Montgomery County into

6789 Goldsboro Road



Washington, D.C., with interchanges at the Capital Beltway (I-495). Major east/west arteries include East West Highway (Route 410) which carries traffic from New Carrollton and Hyattsville through the Bethesda area, and Bradley Boulevard (Route 191), which carries traffic from Connecticut Avenue into the Potomac area of southwestern Montgomery County. The Capital Beltway (I-495) runs along the northern boundary of the neighborhood and is the primary east/west artery in the area. I-495 has interchanges with Connecticut Avenue, Wisconsin Avenue/Rockville Pike, Old Georgetown Road, and Interstate 270. In addition, the neighborhood has access to mass transit along major routes, and access to the Metro system with the Bethesda station at Wisconsin Avenue and Old Georgetown Road.

Residents have access to all necessary amenities. Shopping is readily available throughout the area with most of the retail uses in Bethesda concentrated in the Woodmont Triangle area formed by Woodmont Avenue, Old Georgetown Road and Battery Lane. The Montgomery Mall is location on Democracy Boulevard, west of Old Georgetown Road adjacent to I-270. Retail uses are also found along Rockville Pike corridor, north of I-495. Shopping needs in the immediate neighborhood can be found along the River Road corridor, northwest of Little Falls Parkway. Employment opportunities exist within the commercial and office developments in the area and to the south within the limits of Washington, D.C. Residents have access to public and private recreational amenities and public and private schools.

The area is served by all necessary utilities. The Washington Suburban Sanitary Commission (WSSC) provides public water and sewer service. Electricity is provided by PEPCO, while Washington Gas provides natural gas service. Verizon Communications provides local phone service. All utilities are available in sufficient quantities to serve the neighborhood and support development.

In summary, Bethesda is a neighborhood with households of above-average economic means. Growth is limited due to the neighborhood's built-out nature. New residential development is primarily achieved by builders or households purchasing older units, which are razed for redevelopment. The subject is situated along Goldsboro Road, west of River Road, a major north/south artery in Bethesda. The subject is well located in the neighborhood with good access to commuter routes, public transportation, and employment centers.

6789 Goldsboro Road



# Market Analysis

The purpose of this section is to provide relevant information about the marketplace in which the subject's residential component will compete.

## Local Housing Market Statistics

The Maryland Association of Realtors (MAR) track residential sales statistics that provide a context for neighborhood-specific and property-specific data. It should be noted that, generally, these reports do not include new house offerings and sales. It does, however, provide insight into the market environment in which the subject neighborhood and surrounding areas exist. We researched housing trends within Maryland and Prince George's County.

### HOUSING MARKET PERFORMANCE

STATE OF MARYLAND                                           MONTGOMERY COUNTY

| Year | # of Sales | % Change | Average Sales Price | % Change | Year | # of Sales | % Change | Average Sales Price | % Change |
|------|-----------|----------|---------------------|----------|------|-----------|----------|---------------------|----------|
| 2001 | 80,169 | n/a | $184,953 | n/a | 2001 | 15,543 | n/a | $275,079 | n/a |
| 2002 | 84,976 | 6.0% | $210,015 | 13.6% | 2002 | 16,030 | 3.1% | $320,418 | 16.5% |
| 2003 | 89,371 | 5.2% | $241,025 | 14.8% | 2003 | 16,533 | 3.1% | $363,147 | 13.3% |
| 2004 | 98,242 | 9.9% | $286,554 | 18.9% | 2004 | 17,753 | 7.4% | $429,480 | 18.3% |
| 2005 | 98,858 | 0.6% | $341,006 | 19.0% | 2005 | 17,011 | -4.2% | $507,340 | 18.1% |
| 2006 | 82,787 | -16.3% | $357,674 | 4.9% | 2006 | 13,523 | -20.5% | $529,511 | 4.4% |
| 2007 | 63,585 | -23.2% | $362,197 | 1.3% | 2007 | 10,360 | -23.4% | $550,210 | 3.9% |
| 2008 | 46,910 | -26.2% | $341,066 | -5.8% | 2008 | 8,516 | -17.8% | $503,958 | -8.4% |
| 2009 | 53,025 | 13.0% | $300,573 | -11.9% | 2009 | 10,376 | 21.8% | $434,297 | -13.8% |
| 2010 | 54,605 | 3.0% | $291,202 | -3.1% | 2010 | 10,401 | 0.2% | $441,492 | 1.7% |
| 2011 | 53,971 | -1.2% | $277,897 | -4.6% | 2011 | 9,490 | -8.8% | $451,479 | 2.3% |
| 2012 | 56,530 | 4.7% | $282,179 | 1.5% | 2012 | 10,094 | 6.4% | $465,597 | 3.1% |
| 2013 | 63,556 | 12.4% | $308,950 | 9.5% | 2013 | 11,051 | 9.5% | $501,345 | 7.7% |
| 2014 | 62,791 | -1.2% | $307,154 | -0.6% | 2014 | 10,612 | -4.0% | $505,458 | 0.8% |
| 2015 | 73,044 | 16.3% | $305,055 | -0.7% | 2015 | 11,789 | 11.1% | $504,038 | -0.3% |
| 2016 | 79,956 | 9.5% | $309,502 | 1.5% | 2016 | 12,471 | 5.8% | $503,261 | -0.2% |
| Jan - Jul 2016 | 46,093 | n/a | $313,567 | n/a | Jan - Jul 2016 | 7,377 | n/a | $511,856 | n/a |
| Jan - Jul 2017 | 48,410 | 5.0% | $326,788 | 4.2% | Jan - Jul 2017 | 7,460 | 1.1% | $528,431 | 3.2% |

Source: MAR

The data indicates growth in sales volumes through 2005 with significant declines in 2006, 2007, and 2008. Pent up demand was released in 2009, during which time the number of sales increased by 13.0% in the State and 42.7% in the County. Since then, demand has been stable for most years in the State with significant growth in 2013, 2015, and 2016. In the County, growth was positive in 2010 and 2011, declined in 2012-2014 and increased significantly in 2015 and 2016. In terms of sales prices, the peak was reached in 2006/07, then declined through 2011. Prices in the State, overall, have been relatively stable for the past four years, while Montgomery County has experienced growth. Year-to-date statistics for 2017 indicated continued strong growth in demand and prices. We expect continued growth in the residential market over the near term.

6789 Goldsboro Road



Using MRIS, the regional multiple list database, we analyzed sales data for townhouses aged five years or less within Zip Code 20817, the subject's neighborhood. This data identifies two townhouse subdivisions. River Quarry Subdivision located along River Road just outside the Capital Beltway (I-495) near Seven Locks Road recorded nine MRIS townhouse sales between the years 2012 and 2015. These large units which ranged from 3,900 to 4,500sq.ft., indicated sales prices ranging from $950,000 to $1,150,00 over this time period.

More current in the subject property's zip code is the opening of Montgomery Row Subdivision being developed by EYA Builders. The development reached the market in mid-2016 and is planned with 168 townhouses. This subdivision is located along the Democracy Boulevard corridor on Fernwood Road, near the Montgomery Mall, the current Marriott International headquarters and the I-270 spur. These 22 foot wide townhouse contain from 1,700 to 2,650sq.ft. Current sales prices have ranged from $850,000 to $1,200,000. Reports indicate that 54 units have sold.

EYA Builders are also developing the Grosvenor Heights Subdivision on Grosvenor Lane just outside the Capital Beltway near the Grosvenor Metro. These townhouse units are 24 foot wide with 2,500 to 3,400 sq.ft. and are being offered from $1,100,00 to $1,350,000. The development will contain 142 units. The property is located at 5315 Merriam Street in the adjacent Bethesda zip code 20814.

Conclusion

The housing market in Montgomery County is strong, as evidenced by countywide statistics presented at the beginning of this section. The current average sales price for Montgomery County is $528,431 for the first seven months of 2017. New townhouse communities in the subject property zip code begin in the mid $800,000 to well over $1,000,000.

The subject property will consist of no more than 8 townhouse lots located along the north side of Goldsboro Road, which is a well-established, luxury single-family market. Considering the subject property's proposed small size and configuration as a townhouse project, we project an accelerated sellout period for the project. We estimate sales prices for the finished townhouse product to be in excess of $1,000,000 and the townhouse lots to be 26 foot wide. We assume the subject lots will capture their fair share of total demand for the market and as such, we project a sellout for the subject townhouses to be less than one year.

6789 Goldsboro Road



## Property Description

The subject is an irregularly shaped parcel located on the north side of Goldsboro Road, between MacArthur Boulevard and Massachusetts Avenue. The site contains 5.46 acres (237,650 sq.ft.) in two parcels found on Montgomery County Tax Map GN341, Parcels P619 and P735. It is improved with an older, vacant dwelling completed in 1935 and containing 4,236sq.ft.

The site exhibits irregular topography with severe slopes and contains a stream which bisects the property. It also exhibits numerous other features including steep slopes, flood plain area, forest conservation areas and potential soil conditions. The topography is relatively flat along its 475+/- frontage on Greensboro Road, rising steeply to the north. Impacting the site is a sewer line which runs along its southern boundary adjacent to Goldsboro Road.

Based upon the site conditions described above, a proposed site plan that was submitted in late 2015 and now before MNCPPC Planning Board found below proposing 19 townhouse lots is unrealistic. The Bethesda Chevy Chase Master Plan approved and adopted in 1990, outlines the challenges for the site and complex development requirements that must be met in order to receive planning board approval for any realistic site plan. The unapproved plan submitted is shown below.

### PROPOSED SITE PLAN



6789 Goldsboro Road



The topography map below identifies steep slopes which negatively impact the subject property. Currently improving the site is an older, vacant structure in poor condition indicated on the map, which will be demolished to make way for new townhouse construction. This improvements does not contribute value to the subject.

## TOPOGRAPHY MAP



6789 Goldsboro Road



According to Montgomery County Flood Hazard Map. No. 24031C0435D, effective September 296, 2006, the subject is located in Zone X, an area of minimal flooding on most of the site except certain areas which border Goldsboro Road.

FLOOD PLAIN MAP



The subject has access to all necessary public utilities. Electricity is provided by Potomac Electric Power, natural gas is provided by Washington Gas, while Verizon provides local telephone service. Washington Suburban Sanitary Commission serves the site with both domestic water and sanitary sewer. This appraisal has identified environmental and soil conditions that could negatively impact development.

We have determined that the site could conceivably be developed with anywhere from six to eight townhouse units in two sticks of three, one stick of three and one stick of four, or two sticks of four each. This then becomes the baseline for our valuation of the subject property in terms of its density potential.

6789 Goldsboro Road

## Subject Photographs

 

View of Subject Frontage Along Goldsboro Rd.    View of Entry to Property from Goldsboro Rd.

 

View of Subject Improvements    View of Stream Which Traverse Subject Property

 

View of Stream Which Traverse Subject Property    View Looking West Along Goldsboro Road With Subject Property on the Right

6789 Goldsboro Road



# Zoning Overview

### ZONING MAP



## Zoning Designation

The subject property is zoned R-60, Residential, One-Family, Detached, within Montgomery County. The purpose of this zone is:

1. To provide designated areas of the County for moderate density uses;

2. The predominant use is residential in a detached house;

3. A limited number of other building types may be allowed under the optional method of development.

## Development Regulations

Permitted uses under the standard method development standards include single-family detached residences, and townhouse development under the cluster development method.

The minimum lot size for detached residential lots is 6,000 sq.ft. Lot width at front building line is 60 ft. Lot width at front lot line is 25ft. The maximum density is 7.26 units per acre. Maximum lot coverage is 35%.

Minimum setback requirements are: (1) Front Yard – 25 feet, (2) Side Yard – 8 feet per side, and (4) Rear Yard – 20 feet.

6789 Goldsboro Road



## Cluster Development Method

Under the cluster development method, the minimum usable area is 5.0 acres. The Planning Board may allow development to proceed under optional development method Cluster Development on a smaller site than allowed in Usable Area if the subject property is recommended for cluster development in a master plan or if it finds that cluster development on a smaller site would be more suitable than standard method development for environmental reasons.

The minimum lot area is 1,500sq.ft., with the lot width at front building line to be determined at site plan stage of approvals. The lot width at front lot line is 14ft. for a townhouse.

## Legal, Conforming Status

The Goldsboro Road site in its current configuration as a single family lot does not have an approved site plan consistent with zoning regulations under the cluster development method which allows townhouse development. The appraiser estimates the site can be developed with up to eight townhouse lots under the optional Cluster Development Method.

6789 Goldsboro Road



# Assessment and Tax Data

### Assessment Methodology
The State of Maryland has enacted a real estate assessment procedure called the Triennial Assessment. Under this procedure, one-third of all properties are re-assessed each year. The increase, if any, in assessment is phased-in during a three-year period, one-third per year. Decreases take effect immediately. Assessments are based on 100% of market value.

### Assessed Values and Property Taxes
The subject property was assessed as of January 1, 2017 for a total of $1,418,900. The current assessment is slightly less than its prior cycle value of $1,429,400.

| Account No. | Year Assessed | Land | Improvements | Total |
|---|---|---|---|---|
| 07-00421275 | 2017 | $997,800 | $421,100 | $1,418,900 |
| 07-00421264 | 2017 | $29,400 | $0 | $29,400 |
| | | | Total Assessment | $1,448,300 |

The subject's phase-in values are as follows:

### PHASE-IN ASSESSMENTS

| | Tax Year | Assessment |
|---|---|---|
| Base Year | 2016/17 | $1,458,800 |
| Phase-in Yr. 1 | 2017/18 | $1,448,300 |
| Phase-in Yr. 2 | 2018/19 | $1,448,300 |
| Phase-in Yr. 3 | 2019/20 | $1,448,300 |

### Tax Rates
The appropriate tax rates for the subject property are as follows:

### TAX RATES

| Jurisdiction | Rate |
|---|---|
| Montgomery County | $1.0129 /$100 of Assessment |
| State of Maryland | $0.1120 /$100 of Assessment |
| Total | $1.1249 /$100 of Assessment |

### Property Taxes
The real estate tax burden for the subject is calculated as follows:

### TAX CALCULATION

| | 2017/18 | 2018/19 | 2019/20 |
|---|---|---|---|
| Assessed Value | $1,448,300 | $1,448,300 | $1,448,300 |
| Times: Tax Rate/$100 | $1.1249 | $1.1249 | $1.1249 |
| Estimated Tax | $16,292 | $16,292 | $16,292 |

6789 Goldsboro Road



## Metropolitan Charges

As the subject property is provided metropolitan services, a charge of $686 has been levied against it by Montgomery County for the 2017/18 levy year. It is estimated that these charges will remain relatively constant over a reasonable holding period.

## Summary of Taxes

|  | 2017/18 | 2018/19 | 2019/20 |
|---|---|---|---|
| Real Estate Taxes | $16,292 | $16,292 | $16,292 |
| Metropolitan Charges | $686 | $686 | $686 |
| Total Taxes Due | $16,978 | $16,978 | $16,978 |

## Conclusions

According to the Montgomery Tax Assessor's Office the subject's property taxes are current as of the date of value. The property's assessed value is above our indicated value conclusion.

6789 Goldsboro Road



# Subject Strengths & Weaknesses

At this point, we pause to summarize the subject's strengths and weaknesses.

### Strengths

- The subject property is located in a largely built-out area in Bethesda consisting of single family homes with residents having above average income levels.

- Due to the size of the subject property, the site represents a small infill development with potential yield no more than eight townhouse lots.

### Weaknesses

- The property faces development challenges dues steep slopes, forest conservation areas, a stream which crosses the site, environmental concerns including a potential flood plain area and irregular topography.

These strengths and weaknesses were considered in our analysis and valuation of the subject property.

6789 Goldsboro Road



# Highest and Best Use

The Highest and Best Use of a property is the reasonably probable and legal use of vacant land or an improved property that is: physically possible, appropriately supported, financially feasible, and that results in the highest value. These four conditions are discussed as follows:

### Physically Possible:
The subject property includes a single undivided lot with physical and environmental challenges which limit its development potential.

### Legally Permissible:
There is no approved site developed plan. Townhouse development must receive site plan approval under the Optional Method Development Standard utilizing cluster development, in order for the subject property to be a legal, conforming use.

### Financially Feasible:
The subject property is situated in Bethesda along the River Road corridor in Montgomery County. As previously indicated, demand is strong for housing in this portion of the county. Development of townhouse lots along the flat portion of the site situated along Goldsboro Road is most likely. This approach will hold development costs down and help create a financially feasible development.

### Maximally Productive:
Townhouse construction is maximally productive.

### Conclusion
Our analysis of the project indicates that highest and best use of the subject's site is townhouse construction. The most likely buyer of the subject property's townhouse lots is a local builder or developer. The most likely users are owner-occupied households upon completion of vertical improvements.

6789 Goldsboro Road



# Appraisal Methodology

## Three Approaches to Value

There are three traditional approaches typically available to develop indications of real property value: the cost, sales comparison, and income capitalization approaches.

### Cost Approach

The cost approach is based upon the principle of substitution, which states that a prudent purchaser would not pay more for a property than the amount required to purchase a similar site and construct similar improvements without undue delay, producing a property of equal desirability and utility. This approach is particularly applicable when the improvements being appraised are relatively new or proposed, or when the improvements are so specialized that there is little or no sales data from comparable properties.

### Sales Comparison Approach

The sales comparison approach involves the direct comparison of sales and listings of similar properties, adjusting for differences between the subject property and the comparable properties. This method can be useful for valuing general purpose properties or vacant land. For improved properties, it is particularly applicable when there is an active sales market for the property type being appraised – either by owner-users or investors.

### Income Capitalization Approach

The income capitalization approach is based on the principle of anticipation, or the assumption that value is created by the expectation of benefits to be derived in the future, such as expected future income flows including the reversion, or future re-sale of the property appraised. Its premise is that a prudent investor will pay no more for the property than he or she would for another investment of similar risk and cash flow characteristics. The income capitalization approach is widely used and relied upon in appraising income-producing properties, especially those for which there is an active investment sales market.

## Subject Valuation

The subject includes a 5.46 acre site with potential for subdivision with up to eight townhouse lots. As such, the only applicable valuation method is the Sales Comparison Approach. We fully developed the Sales Comparison Approach to reflect bulk townhouse lot purchases in the market.

6789 Goldsboro Road



# Sales Comparison Approach

### Introduction
The Sales Comparison Approach is developed to derive a market value for the subject property under its highest and best use as townhouse lots. However, there are currently no site plan approvals in place for any development at the subject property.

### Methodology
Land is most often valued using the Sales Comparison Approach. This approach is based on the premise that a buyer would pay no more for a specific property than the cost of obtaining a property with the same utility. In the sales comparison approach, the opinion of market value is based on closed sales, listings and pending sales of properties similar to the subject property, using the most relevant units of comparison. The comparative analysis focuses on the difference between the comparable sales and the subject property using all appropriate elements of comparison.

A systematic procedure for applying the sales comparison approach includes the following steps: (1) researching and verifying transactional data, (2) selecting relevant units of comparison, (3) analyzing and adjusting the comparable sales for differences in various elements of comparison, and (4) reconciling the adjusted sales into a value indication for the subject site.

### Unit of Comparison
The unit of comparison depends on land use economics and how buyers and sellers use the property. The unit of comparison for the residential lots in this analysis is the price paid per townhouse lot.

### Elements of Comparison
Elements of comparison are the characteristics or attributes of properties and transactions that cause the prices of real estate to vary. The main elements of comparison that are considered in sales comparison analysis are as follows: (1) real property rights conveyed, (2) financing terms, (3) conditions of sale, (4) expenditures made immediately after purchase, (5) market conditions, (6) location and (7) physical characteristics.

### Comparable Sales Data
A search of data sources and public records, a field survey, and interviews with knowledgeable real estate professionals in the area was conducted to obtain and verify sales of comparable townhouse lots. We used the sales summarized on the following pages in our analysis, as these sales are judged to be the most useful in developing an opinion of the market value of the subject property.

6789 Goldsboro Road



Summarized in the chart below are comparable land sales of sites which were developed with townhouses. We analyzed the comparable land sales to derive a market value for the subject property's site which has the potential to be subdivided into up to eight townhouse lots.

## COMPARABLE SALES SUMMARY – TOWNHOUSES

| Sale No. | Subject | 1 | 2 | 3 | 5 |
|---|---|---|---|---|---|
| Address | 6789 Goldsboro Road | 1902 Chapman Ave. | 3605 Chevy Chase Lake Dr. | 1166 Findley Road | 10435 Fernwood Road |
| City, State | Bethesda, MD | Rockville, MD | Chevy Chase, MD | Kensington, MD | Bethesda, MD |
| Date of Sale | | Nov-16 | Feb-16 | Sep-15 | Jun-15 |
| Sale Price | | $10,365,000 | $16,640,000 | $3,665,000 | $22,000,000 |
| No. of Lots | 8 | 61 | 62 | 26 | 168 |
| No. of MPDU Units | 0 | 9 | 10 | 4 | 21 |
| Lots Net of MPDU's | 8 | 52 | 52 | 22 | 147 |
| Lot Size (Sq.Ft.) | 1,690 | 720 | 1,073 | 1,205 | 1,050 |
| Lot Width (Ft.) | 26 | 18 | 24 | 23 | 22 |
| Price/Lot (Net of MPDU's) | | $199,327 | $320,000 | $166,591 | $149,660 |
| House Price | | Asking Price: Not Available | Asking Price: $1,500,000 | Asking Price: $570,000 | Asking Price: $775,000 |
| Lot-to-House Price Ratio | | n/a | 21.3% | 29.2% | 19.3% |

6789 Goldsboro Road



## COMPARABLE SALES MAP



6789 Goldsboro Road



## Land Comparable Sale No. 1



1902 Chapman Avenue Subdivision

### Property Identification

| | |
|---|---|
| Property/Sale ID | 111723/17211 |
| Property Type | Subdivision-Residential |
| Address | 1902 Chapman Avenue |
| City, State Zip | Rockville, Maryland 20852 |
| County | Montgomery |
| MSA | Washington, DC-MD-VA-WV |
| Tax ID | Tax Map GQ63, Subdivision 201, Block 5, Lot 16, Plat 25184 |
| Latitude/Longitude | 39.060199/-77.120010 |

### Transaction Data

| | |
|---|---|
| Sale Status | Closed |
| Sale Date | 11-17-2016 |
| Sale Price | $10,365,000 |
| Gross Land Acres | 2.407 |
| $/Gross Land Acre | $4,306,011 |
| Gross Land SF | 104,853 |
| $/Gross Land SF | $98.85 |
| No. of Lots | 61 |
| $/Lot | $169,918 |
| Grantor | 1900 Chapman Project Owner LLC |
| Grantee | Winchester Homes, Inc. |
| Property Rights | Fee Simple |
| Deed Book/Page | 53231/00406 |
| Financing Descrip. | None Recorded |

6789 Goldsboro Road



## Property Description

| | | | |
|---|---|---|---|
| Gross Acres | 2.407 | Proposed Use | For Sale Townhouses |
| Gross SF | 104,853 | Utilities | All Available |
| No. of Lots | 61 | Zoning Code | MXTD |

## Verification

| | |
|---|---|
| Confirmed With | Co-Star, Assessment Records |

## Remarks

The site is located on east side of Chapman Avenue between Twinbrook Parkway, Thompson Avenue and CSX Railroad/WMATA right-of-way. It is also a short distance east of Rockville Pike and the nearby Twinbrook Metro stop. The site will contain 61 townhouse units. The townhouses will be 16 to 18 foot wide and 40 ft. deep with front loaded, two car garages. All site plan approvals were in place. The property was about 60% thru the process to ultimately obtain a building permit. There will be 9 MPDU units or about 15% of the total units. The adjacent parcel from which the subject was subdivided will contain 319 apartments on Lot 15.



1902 Chapman-Aerial

6789 Goldsboro Road



Land Comparable Sale No. 2



The Brownstones at Chevy Chase Lake Subdivision

## Property Identification

| | |
|---|---|
| Property/Sale ID | 111724/17212 |
| Property Type | Subdivision-Residential |
| Address | 3605 Chevy Chase Lake Drive |
| City, State Zip | Chevy Chase, Maryland 20815 |
| County | Montgomery |
| MSA | Washington, DC-MD-VA-WV |
| Tax ID | Tax Map HN43, Parcel E, Chevy Chase Lake Station, Plat 25182 |
| Latitude/Longitude | 38.995572/-77.073019 |

## Transaction Data

| | |
|---|---|
| Sale Status | Closed |
| Sale Date | 02-05-2016 |
| Sale Price | $16,640,000 |
| Gross Land Acres | 3.270 |
| $/Gross Land Acre | $5,088,685 |
| Gross Land SF | 142,441 |
| $/Gross Land SF | $116.82 |
| No. of Units | 62 |
| $/Unit | $268,387 |
| No. of Lots | 62 |
| $/Lot | $268,387 |
| Grantor | Chevy Chase Lake Development Corporation |
| Grantee | CC Homes Associates LLC |
| Property Rights | Fee Simple |
| Deed Book/Page | 51624/0347 |
| Financing Terms | Partially seller financed |

6789 Goldsboro Road



## Property Description

| | | | |
|---|---|---|---|
| Gross Acres | 3.270 | Density (Units/Ac) | 18.96 |
| Gross SF | 142,441 | Proposed Use | For Sale Townhouses |
| No. of Units | 62 | Utilities | All Available |
| No. of Lots | 62 | Zoning Code | CRT-1.5 |

## Verification

Confirmed With       SDAT/CoStar

## Remarks

The grantor was the Housing Opportunities Commission of Montgomery County (HOC) which took back substantial financing in the transaction. The development to be built by EYA will contain 62 townhouses selling for $1,500,000 to $1,800,000 with 2,900 to 3,100 sq.ft. that will be 22-24 ft. wide with two car garages and elevators. There will be with 10 MPDU units selling in the low $200,000's. The property backs up to the Capital Crescent Trail and the proposed Purple Line.



Brownstones at Chevy Chase Lake Aerial

6789 Goldsboro Road



## Land Comparable Sale No. 3



Kensington Overlook Subdivision

### Property Identification

| | |
|---|---|
| Property/Sale ID | 110121/16262 |
| Property Type | Subdivision-Residential |
| Address | 1166 Findley Road |
| City, State Zip | Kensington, Maryland 20895 |
| County | Montgomery |
| MSA | Washington, DC-MD-VA-WV |
| Tax ID | Tax Map HQ61 , Block G, Lots 1-26 and A-K, Plat 24829 |
| Latitude/Longitude | 39.036107/-77.060955 |

### Transaction Data

| | |
|---|---|
| Sale Status | Closed |
| Sale Date | 09-03-2015 |
| Sale Price | $3,665,000 |
| Gross Land Acres | 3.020 |
| $/Gross Land Acre | $1,213,576 |
| Gross Land SF | 131,551 |
| $/Gross Land SF | $27.86 |
| No. of Units | 26 |
| $/Unit | $140,962 |
| No. of Lots | 26 |
| $/Lot | $140,962 |
| Grantor | Wheaton Land Investment, LLC |
| Grantee | K. Hovanian Homes of Maryland, LLC |
| Property Rights | Fee Simple |
| Deed Book/Page | 51096/17 |
| Financing Descrip. | None recorded |
| Financing Terms | None |



6789 Goldsboro Road

## Property Description

| | | | |
|---|---|---|---|
| Gross Acres | 3.020 | Density (Units/Ac) | 8.61 |
| Gross SF | 131,551 | Proposed Use | 25 TH & 1 SFD |
| No. of Units | 26 | Zoning Code | RT-8 |
| No. of Lots | 26 | | |

## Verification

| | |
|---|---|
| Confirmed With | Seller, DAIC, Deed |

## Remarks

DAIC indicates the location of Kensington Heights as being at the SW corner of University Boulevard West and Valley View Avenue

The property description in the deed is lengthy. Refer to the deed for more information. The seller indicated that these were engineered and recorded lots at the time of sale. They were not finished lots. The seller confirmed that this is the sale of 25 single family attached lots and 1 single family home lot. At the time of sale the lots were recorded and the development approved/entitled. The site was lightly wooded and level to gently rolling. Site development work commenced within a month of the sale. All utilities were available along University Boulevard and Valley View. The TH units are being marketed in early 2016 for a base price of $570,000 containing 1,900 to 2,000sq.ft., with lots widths ranging from 21 to 24 foot. There are 4 MPDU units selling in the $170,000's. Property was subsequently marketed as Kensington Overlook.



Kensington Overlook Aerial

6789 Goldsboro Road



## Land Comparable Sale No. 4



Montgomery Row at Rock Spring Subdivision

## Property Identification

| Property/Sale ID | 108169/15134 |
|---|---|
| Property Type | Residential (Single-Family) |
| Address | 10435 Fernwood Road |
| City, State Zip | Bethesda, Maryland 20817 |
| County | Montgomery |
| MSA | Washington, DC-MD-VA-WV |
| Tax ID | Map GP43, Lot P5 in Rock Spring Park, Plat 24078 |
| Latitude/Longitude | 39.026141/-77.138760 |

## Transaction Data

| Sale Status | Closed |
|---|---|
| Sale Date | 06-15-2015 |
| Sale Price | $22,000,000 |
| Gross Land Acres | 9.070 |
| $/Gross Land Acre | $2,425,579 |
| Gross Land SF | 395,089 |
| $/Gross Land SF | $55.68 |
| No. of Lots | 168 |
| $/Lot | $130,952 |
| Grantor | Rock Spring III, IV & V LLC (Founders) |
| Grantee | RS Homes Associates (EYA) |
| Property Rights | Fee Simple |
| Deed Book/Page | 50481/301 |
| Days on Market | Unknown |
| Financing Descrip. | Cash to grantor |
| Financing Terms | Conventional |

6789 Goldsboro Road



### Property Description

| | | | |
|---|---|---|---|
| Gross Acres | 9.070 | Proposed Use | Residential |
| Gross SF | 395,089 | Utilities | Available |
| No. of Lots | 168 | Zoning Code | I-3 |

### Verification

Confirmed With    Kevin McGloon, Cushman

### Remarks

This vacant parcel is is situated in the Rock Spring office park and was approved for 440,000 sq.ft. of office space. The sellers (Founders) were asking $50/FAR, but were unable to obtain an office user for the site. Founders shifted its buyer pool and went residential. EYA is the buyer who will improve the site with 168 townhouses (21 MPDU & 147 market rate) with prices ranging from $770,000 to $1,050,000 and containing 1,800 to 2,700sq.ft. of improvements and 20 to 22 foot wide. The MPDU units are selling for the low $200,000's. The site has roughly eight developable acres, but was able to obtain a density based on 17 acres based on the area of the larger Rock Spring Park project. The property was under contract for 3.5 years while approvals were obtained. Approximately 1.5 acres along Fernwood Road will be dedicated to Montgomery County for the North Bethesda Transitway. The site is bound by Rockledge Drive on the west, Fernwood Road on the south, and Rock Spring Drive on the east. As of mid-2017 it was reported the community was 50% sold out.



Montgomery Row at Rock Spring-Aerial

6789 Goldsboro Road



## Analysis of Comparable Land Sales – Townhouse Lots

In developing an estimate of land value, we investigated transactions of bulk townhouse lots located within somewhat comparable locations in Montgomery County. From our investigations, we obtained information on numerous sales, the most pertinent of which are summarized on the previous pages. We compared these sales to each other and to the subject and made adjustments for significant differences including location, conditions of sale, physical characteristics including lot size and width and any other significant differences. The characteristics of the comparable land sales in relation to the subject property are discussed in the following paragraphs. Our analysis of the comparable sales is summarized below.

## Transaction Adjustments

Transaction adjustments include 1] real property rights conveyed, 2] financing terms, 3] conditions of sale, 4] expenditures made immediately after purchase, and 5] market conditions.

### Property Rights

All of the comparable sales reflect fee simple property rights as does the subject property.

### Financing

Comparable Sale No. 2 was adjusted upward for financing provided to support the transaction by the grantor the Housing Opportunities Commission of Montgomery County [HOC] which affected the transaction.

### Conditions of Sale/Motivation

None of the comparable sales were affected by the conditions of sale or motivation of the grantor.

### Anticipated Expenditures

All of the comparable sales have approved site plans unlike the subject property's raw condition with no approvals in place. This necessitated each property undergoing the approval process which defined the number of approved lots and added significant value to each comparable sale.

### Market Conditions/Time

Comparable Sale No. 4 was adjusted upward for market conditions to reflect its long contract period and the subsequent improvements in the residential markets.

## Property Adjustments

Property adjustments are based on locational, lot size and lot width adjustments and are applied after the application of transactional adjustments.

### Location/Amenities

Comparable Sale Nos. 1, 3 and 4 were adjusted upward for their inferior locations in comparison to the subject property's Goldsboro Road location along the River road corridor. Comparable No. 2 was adjusted downward for a superior Chevy Chase location.

### Lot Size

Based upon the surrounding neighborhood characteristics and that of the site, the appraiser assumes the subject's lot sizes to be above average in size and at a minimum to measure 26 foot wide by 65 foot deep, resulting in a lot containing 1,690sq.ft. Upward adjustments were therefore made to all of the comparable sales for their inferior lot size.

6789 Goldsboro Road



<u>Lot Width</u>
The subject's lot widths at 26ft. are also assumed to have the greatest width based upon its location and the high end townhouse product envisioned for the site. We adjusted Comparable Sales Nos. 1, 2, 3 and 4 upward for their inferior lot width.

## Summary of Adjustments & Conclusion: Townhouse Lots
Based on the preceding comparative analysis, adjustments made to the comparable sales are summarized on the summary chart found on the following page. The analysis of comparable sales suggests a raw lot price (without site plan approval) ranging between $154,930 and $165,391 for the subject's proposed townhouse lots.

We conclude an average raw townhouse lot value without any site plan approvals at $165,000/lot for the subject's proposed townhouse lots ranging from 6 to 8 lots. This results in a market value ranging from $1,000,000 to $1,325,000.

Found on the following page is an adjustment grid which reflects that all of the comparable townhouse lot sales have site plan approvals in place, in comparison to the subject property's totally raw condition with no site plan approvals.

6789 Goldsboro Road



## SUMMARY OF ADJUSTMENTS

| Sale No. | Subject | 1 | 2 | 3 | 4 |
|---|---|---|---|---|---|
| Address | 6789 Goldsboro Road | 1902 Chapman Ave. | 3605 Chevy Chase Lake Dr. | 1166 Findley Rd. | 10435 Fernwood Rd. |
| Subdivision | | Chapman Ave. | Brownstones at Chevy Chase Lake | Kensington Overlook | Montgomery Row at Rock Spring |
| City | Bethesda | Rockville | Chevy Chase | Kensington | Bethesda |
| Date of Sale | Aug-17 | Nov-16 | Feb-16 | Sep-15 | Jun-15 |
| Sale Price/Lot | | $199,327 | $320,000 | $166,591 | $149,660 |
| No. of Lots | 8 | 52 | 52 | 22 | 147 |
| Typical Width (Ft.) | 26 | 18 | 24 | 23 | 22 |
| Typical Size (Sq.Ft.) | 1,690 | 720 | 1,073 | 1,205 | 1,050 |
| **Transactional Adjustments** | | | | | |
| Property Rights | | 0% | 0% | 0% | 0% |
| Financing | | 0% | -15% | 0% | 0% |
| Conditions of Sale/Motivation | | 0% | 0% | 0% | 0% |
| Anticipated Expenditures | | -40% | -40% | -40% | -40% |
| Market Conditions/Time | | 0% | 0% | 0% | 20% |
| Adjusted Sales Price | | $119,596 | $144,000 | $99,955 | $119,728 |
| **Property Adjustments** | | | | | |
| Location/Amenities | | 10% | -5% | 40% | 15% |
| Lot Size | | 20% | 15% | 10% | 15% |
| Lot Width | | 15% | 5% | 5% | 10% |
| Composite Adjustment | | -13% | -48% | -7% | 12% |
| Total Adjusted Price/Lot | | $173,414 | $165,600 | $154,930 | $167,619 |

| | |
|---|---|
| Minimum Adjusted Price | $154,930 |
| Maximum Adjusted Price | $173,414 |
| Average Adjusted Price | $165,391 |

6789 Goldsboro Road



# Conclusion

## Summary of Value Indications

The Sales Comparison Approach was developed to derive market value, as is, of the subject property. We have developed the value conclusion in a range to reflect the subject property's raw condition and the fact that the site plan approval process faces challenges based upon the site's severe topography and other critical factors. The summary chart below summarizes our final value conclusion for the property, developed within a range.

### VALUE CONCLUSION

| Value Premise | Interest Appraised | Effective Date | Indicated Value Range |
|---|---|---|---|
| As Is | Fee Simple | July 3, 2017 | $1,000,000 to $1,325,000 |

## Exposure Time and Marketing Periods

As part of the appraisal process, it is necessary to estimate the exposure time for the subject property. The Appraisal Institute defines exposure time as "the estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale on the effective date of the appraisal; a retrospective estimate based upon an analysis of past events assuming a competitive and open market".

The definition assumes that the property was actively exposed and aggressively marketed to potential purchasers through marketing channels commonly used by sellers of similar type properties. The definition also assumes that the property was offered at a price reflecting the most probable mark-up over market value and that a sale was consummated under the terms and conditions of the definition of market value required by the regulation.

In estimating the subject's exposure time, we considered current economic and real estate market conditions and information from brokers and other market participants. We focused on market conditions existing prior to and as of the effective date of this appraisal. After a significant decline in the residential market, conditions in the subject's market have stabilized and demand for residential properties has increased.

The subject must be realistically priced in order to be marketable. Our analysis of the property is based on current market conditions and the outlook of today's buyers. It is our opinion that the subject property would be attractive to land developers and could be sold within a period of 12 months, if reasonably priced. If the property is not priced reflective of today's market, it likely will not sell.

Based on this analysis, it is concluded that the subject's exposure time would be 12 months. This opinion assumes that the property is priced consistent with your appraisers' opinion of market value and marketed through normal channels. A change in market conditions is not foreseen for at least 24 months for this type of development property. Therefore, the marketing time for the subject property is also 12 months.

6789 Goldsboro Road



# General Assumptions and Limiting Conditions

This appraisal is subject to the following limiting conditions:

1] The legal description – if furnished to us – is assumed to be correct.

2] No responsibility is assumed for legal matters, questions of survey or title, soil or subsoil conditions, engineering, availability or capacity of utilities, or other similar technical matters. The appraisal does not constitute a survey of the property appraised. All existing liens and encumbrances have been disregarded and the property is appraised as though free and clear, under responsible ownership and competent management unless otherwise noted.

3] Unless otherwise noted, the appraisal will value the property as though free of contamination. Lipman Frizzell & Mitchell LLC will conduct no hazardous materials or contamination inspection of any kind. It is recommended that the client hire an expert if the presence of hazardous materials or contamination poses any concern.

4] The stamps and/or consideration placed on deeds used to indicate sales are in correct relationship to the actual dollar amount of the transaction.

5] Unless otherwise noted, it is assumed there are no encroachments, zoning violations or restrictions existing in the subject property.

6] The appraiser is not required to give testimony or attendance in court by reason of this appraisal, unless previous arrangements have been made.

7] Unless expressly specified in the engagement letter, the fee for this appraisal does not include the attendance or giving of testimony by Appraiser at any court, regulatory, or other proceedings, or any conferences or other work in preparation for such proceeding. If any partner or employee of Lipman Frizzell & Mitchell LLC is asked or required to appear and/or testify at any deposition, trial, or other proceeding about the preparation, conclusions or any other aspect of this assignment, client shall compensate Appraiser for the time spent by the partner or employee in appearing and/or testifying and in preparing to testify according to the Appraiser's then current hourly rate plus reimbursement of expenses.

8] The values for land and/or improvements, as contained in this report, are constituent parts of the total value reported and neither is [or are] to be used in making a summation appraisal of a combination of values created by another appraiser. Either is invalidated if so used.

9] The dates of value to which the opinions expressed in this report apply are set forth in this report. We assume no responsibility for economic or physical factors occurring at some point at a later date, which may affect the opinions stated herein. The forecasts, projections, or operating estimates contained herein are based on current market conditions and anticipated short-term supply and demand factors and are subject to change with future conditions.

10] The sketches, maps, plats and exhibits in this report are included to assist the reader in visualizing the property. The appraiser has made no survey of the property and assumed no responsibility in connection with such matters.

6789 Goldsboro Road



11] The information, estimates and opinions, which were obtained from sources outside of this office, are considered reliable. However, no liability for them can be assumed by the appraiser.

12] Possession of this report, or a copy thereof, does not carry with it the right of publication. Neither all, nor any part of the content of the report, or copy thereof (including conclusions as to property value, the identity of the appraisers, professional designations, reference to any professional appraisal organization or the firm with which the appraisers are connected), shall be disseminated to the public through advertising, public relations, news, sales, or other media without prior written consent and approval.

13] No claim is intended to be expressed for matters of expertise that would require specialized investigation or knowledge beyond that ordinarily employed by real estate appraisers. We claim no expertise in areas such as, but not limited to, legal, survey, structural, environmental, pest control, mechanical, etc.

14] This appraisal was prepared for the sole and exclusive use of the client for the function outlined herein. Any party who is not the client or intended user identified in the appraisal or engagement letter is not entitled to rely upon the contents of the appraisal without express written consent of Lipman Frizzell & Mitchell LLC and Client. The Client shall not include partners, affiliates, or relatives of the party addressed herein. The appraiser assumes no obligation, liability or accountability to any third party.

15] Distribution of this report is at the sole discretion of the client, but third-parties not listed as an intended user on the face of the appraisal or the engagement letter may not rely upon the contents of the appraisal. In no event shall client give a third-party a partial copy of the appraisal report. We will make no distribution of the report without the specific direction of the client.

16] This appraisal shall be used only for the function outlined herein, unless expressly authorized by Lipman Frizzell & Mitchell LLC.

17] This appraisal shall be considered in its entirety. No part thereof shall be used separately or out of context.

18] Unless otherwise noted in the body of this report, this appraisal assumes that the subject property does not fall within the areas where mandatory flood insurance is effective. Unless otherwise noted, we have not completed nor have we contracted to have completed an investigation to identify and/or quantify the presence of non-tidal wetland conditions on the subject property. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

19] The flood maps are not site specific. We are not qualified to confirm the location of the subject property in relation to flood hazard areas based on the FEMA Flood Insurance Rate Maps or other surveying techniques. It is recommended that the client obtain a confirmation of the subject's flood zone classification from a licensed surveyor.

20] If the appraisal is for mortgage loan purposes 1) we assume satisfactory completion of improvements if construction is not complete, 2) no consideration has been given for rent loss during rent-up unless noted in the body of this report, and 3) occupancy at levels consistent with our "Income and Expense Projection" are anticipated.

6789 Goldsboro Road



21) It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures which would render it more or less valuable. No responsibility is assumed for such conditions or for engineering which may be required to discover them.

22) Our inspection included an observation of the land and improvements thereon only. It was not possible to observe conditions beneath the soil or hidden structural components within the improvements. We inspected the buildings involved, and reported damage (if any) by termites, dry rot, wet rot, or other infestations as a matter of information, and no guarantee of the amount or degree of damage (if any) is implied. Condition of heating, cooling, ventilation, electrical and plumbing equipment is considered to be commensurate with the condition of the balance of the improvements unless otherwise stated. Should the client have concerns in these areas, it is the client's responsibility to order the appropriate inspections. The appraiser does not have the skill or expertise to make such inspections and assumes no responsibility for these items.

23) This appraisal does not guarantee compliance with building code and life safety code requirements of the local jurisdiction. It is assumed that all required licenses, consents, certificates of occupancy or other legislative or administrative authority from any local, state or national governmental or private entity or organization have been or can be obtained or renewed for any use on which the value conclusion contained in this report is based unless specifically stated to the contrary.

24) When possible, we have relied upon building measurements provided by the client, owner, or associated agents of these parties. In the absence of a detailed rent roll, reliable public records, or "as-built" plans provided to us, we have relied upon our own measurements of the subject improvements. We follow typical appraisal industry methods; however, we recognize that some factors may limit our ability to obtain accurate measurements including, but not limited to, property access on the day of inspection, basements, fenced/gated areas, grade elevations, greenery/shrubbery, uneven surfaces, multiple story structures, obtuse or acute wall angles, immobile obstructions, etc. Professional building area measurements of the quality, level of detail, or accuracy of professional measurement services are beyond the scope of this appraisal assignment.

25) We have attempted to reconcile sources of data discovered or provided during the appraisal process, including assessment department data. Ultimately, the measurements that are deemed by us to be the most accurate and/or reliable are used within this report. While the measurements and any accompanying sketches are considered to be reasonably accurate and reliable, we cannot guarantee their accuracy. Should the client desire a greater level of measuring detail, they are urged to retain the measurement services of a qualified professional (space planner, architect or building engineer). We reserve the right to use an alternative source of building size and amend the analysis, narrative and concluded values (at additional cost) should this alternative measurement source reflect or reveal substantial differences with the measurements used within the report.

26) In the absence of being provided with a detailed land survey, we have used assessment department data to ascertain the physical dimensions and acreage of the property. Should a survey prove this information to be inaccurate, we reserve the right to amend this appraisal (at additional cost) if substantial differences are discovered.

27) If only preliminary plans and specifications were available for use in the preparation of this appraisal, then this appraisal is subject to a review of the final plans and specifications when available (at additional cost) and we reserve the right to amend this appraisal if substantial differences are discovered.

6789 Goldsboro Road



28] Unless otherwise stated in this report, the value conclusion is predicated on the assumption that the property is free of contamination, environmental impairment or hazardous materials. Unless otherwise stated, the existence of hazardous material was not observed by the appraiser and the appraiser has no knowledge of the existence of such materials on or in the property. The appraiser, however, is not qualified to detect such substances. The presence of substances such as asbestos, urea-formaldehyde foam insulation, or other potentially hazardous materials may affect the value of the property. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required for discovery. The client is urged to retain an expert in this field, if desired.

29] The Americans with Disabilities Act ("ADA") became effective January 26, 1992. We have not made a specific compliance survey of the property to determine if it is in conformity with the various requirements of the ADA. It is possible that a compliance survey of the property, together with an analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act. If so, this could have a negative effect on the value of the property. Since we have no direct evidence relating to this issue, we did not consider possible noncompliance with the requirements of ADA in developing an opinion of value.

30] This appraisal applies to the land and building improvements only. The value of trade fixtures, furnishings, and other equipment, or subsurface rights (minerals, gas, and oil) were not considered in this appraisal unless specifically stated to the contrary.

31] No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated, unless specifically stated to the contrary.

32] Any estimate of insurable value, if included within the scope of work and presented herein, is based upon figures developed consistent with industry practices. However, actual local and regional construction costs may vary significantly from our estimate and individual insurance policies and underwriters have varied specifications, exclusions, and non-insurable items. As such, we strongly recommend that the Client obtain estimates from professionals experienced in establishing insurance coverage. This analysis should not be relied upon to determine insurance coverage and we make no warranties regarding the accuracy of this estimate.

33] The data gathered in the course of this assignment (except data furnished by the Client) shall remain the property of the Appraiser. The appraiser will not violate the confidential nature of the appraiser-client relationship by improperly disclosing any confidential information furnished to the appraiser. Notwithstanding the foregoing, the Appraiser is authorized by the client to disclose all or any portion of the appraisal and related appraisal data to appropriate representatives of the Appraisal Institute if such disclosure is required to enable the appraiser to comply with the Bylaws and Regulations of such Institute now or hereafter in effect.

34] Acceptance and/or use of this appraisal report constitutes acceptance of the foregoing general assumptions and limiting conditions.

6789 Goldsboro Road



# Certification

I certify that, to the best of my knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4. I have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of the appraisal within the three-year period immediately preceding acceptance of this assignment.

5. I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6. My engagement in this assignment was not contingent upon developing or reporting predetermined results.

7. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8. My analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

9. M. Ronald Lipman, MAI made a personal inspection of the property that is the subject of this report.

10. No one provided significant real property appraisal assistance to the person signing this certification.

11. The reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

12. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

13. As of the date of this report, I, M. Ronald Lipman, MAI have completed the continuing education program for Designated Members of the Appraisal Institute.

M. Ronald Lipman, MAI
Principal
Maryland License #04-1072
License Expires December 31, 2018

6789 Goldsboro Road



## Certification

I certify that, to the best of my knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4. I have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of the appraisal within the three-year period immediately preceding acceptance of this assignment.

5. I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6. My engagement in this assignment was not contingent upon developing or reporting predetermined results.

7. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8. My analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

9. Sheldon A. Stern, MAI made a personal inspection of the property that is the subject of this report.

10. No one provided significant real property appraisal assistance to the person signing this certification.

11. The reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

12. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

13. As of the date of this report, I, Sheldon A. Stern, MAI have completed the continuing education program for Designated Members of the Appraisal Institute.

*Sheldon A. Stern*

Sheldon A. Stern, MAI
Senior Appraiser
Maryland License #04-1976
License Expires January 14, 2019

6789 Goldsboro Road



## Addenda

Glossary
Abstract of Operating Agreement
Qualifications
     M. Ronald Lipman, MAI – Principal
     Sheldon A. stern, MAI- Senior Appraiser
Client List

6789 Goldsboro Road



## Glossary
Definitions are taken from the Dictionary of Real Estate Appraisal, 5th Edition (Dictionary), the Uniform Standards of Professional Appraisal Practice (USPAP) and Building Owners and Managers Association International (BOMA).

### Absolute Net Lease
A lease in which the tenant pays all expenses including structural maintenance, building reserves, and management; often a long-term lease to a credit tenant. (Dictionary)

### Additional Rent
Any amounts due under a lease that is in addition to base rent. Most common form is operating expense increases. (Dictionary)

### Amortization
The process of retiring a debt or recovering a capital investment, typically though scheduled, systematic repayment of the principal; a program of periodic contributions to a sinking fund or debt retirement fund. (Dictionary)

### As Is Market Value
The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date. (Dictionary)

### Base (Shell) Building
The existing shell condition of a building prior to the installation of tenant improvements. This condition varies from building to building, landlord to landlord, and generally involves the level of finish above the ceiling grid. (Dictionary)

### Base Rent
The minimum rent stipulated in a lease. (Dictionary)

### Base Year
The year on which escalation clauses in a lease are based. (Dictionary)

### Building Common Area
The areas of the building that provide services to building tenants but which are not included in the rentable area of any specific tenant. These areas may include, but shall not be limited to, main and auxiliary lobbies, atrium spaces at the level of the finished floor, concierge areas or security desks, conference rooms, lounges or vending areas food service facilities, health or fitness centers, daycare facilities, locker or shower facilities, mail rooms, fire control rooms, fully enclosed courtyards outside the exterior walls, and building core and service areas such as fully enclosed mechanical or equipment rooms. Specifically excluded from building common areas are; floor common areas, parking spaces, portions of loading docks outside the building line, and major vertical penetrations. (BOMA)

### Building Rentable Area
The sum of all floor rentable areas. Floor rentable area is the result of subtracting from the gross measured area of a floor the major vertical penetrations on that same floor. It is generally fixed for the life of the building and is rarely affected by changes in corridor size or configuration. (BOMA)

### Certificate of Occupancy (COO)
A statement issued by a local government verifying that a newly constructed building is in compliance with all codes and may be occupied.

### Common Area (Public) Factor
In a lease, the common area (public) factor is the multiplier to a tenant's useable space that accounts for the tenant's proportionate share of the common area (restrooms, elevator lobby, mechanical rooms, etc.). The public factor is usually expressed as a percentage and ranges from a low of 5 percent for a full tenant to as high as 15 percent or more for a multi-tenant floor. Subtracting one (1) from the quotient of the rentable area divided by the useable area yields the load (public) factor. At times confused with the "loss factor" which is the total rentable area of the full floor less the useable area divided by the rentable area. (BOMA)

### Common Area Maintenance (CAM)
The expense of operating and maintaining common areas; may or may not include management charges and usually does not include capital expenditures on tenant improvements or other improvements to the property.

6789 Goldsboro Road

CAM can be a line-item expense for a group of items that can include maintenance of the parking lot and landscaped areas and sometimes the exterior walls of the buildings. CAM can refer to all operating expenses.

CAM can refer to the reimbursement by the tenant to the landlord for all expenses reimbursable under the lease. Sometimes reimbursements have what is called an administrative load. An example would be a 15 percent addition to total operating expenses, which are then prorated among tenants. The administrative load, also called an administrative and marketing fee, can be a substitute for or an addition to a management fee. (Dictionary)

Condominium
A form of ownership in which each owner possesses the exclusive right to use and occupy an allotted unit plus an undivided interest in common areas.

A multiunit structure, or a unit within such a structure, with a condominium form of ownership. (Dictionary)

Conservation Easement
An interest in real property restricting future land use to preservation, conservation, wildlife habitat, or some combination of those uses. A conservation easement may permit farming, timber harvesting, or other uses of a rural nature to continue, subject to the easement. In some locations, a conservation easement may be referred to as a conservation restriction. (Dictionary)

Contributory Value
The change in the value of a property as a whole, whether positive or negative, resulting from the addition or deletion of a property component. Also called deprival value in some countries. (Dictionary)

Debt Coverage Ratio (DCR)
The ratio of net operating income to annual debt service (DCR = NOI/Im), which measures the relative ability to a property to meet its debt service out of net operating income. Also called Debt Service Coverage Ratio (DSCR). A larger DCR indicates a greater ability for a property to

withstand a downturn in revenue, providing an improved safety margin for a lender. (Dictionary)

Deed Restriction
A provision written into a deed that limits the use of land. Deed restrictions usually remain in effect when title passes to subsequent owners. (Dictionary)

Depreciation
In appraising, the loss in a property value from any cause; the difference between the cost of an improvement on the effective date of the appraisal and the market value of the improvement on the same date. 2] In accounting, an allowance made against the loss in value of an asset for a defined purpose and computed using a specified method. (Dictionary)

Disposition Value
The most probable price that a specified interest in real property is likely to bring under the following conditions:

1] Consummation of a sale within a exposure time specified by the client; 2] The property is subjected to market conditions prevailing as of the date of valuation; 3] Both the buyer and seller are acting prudently and knowledgeably; 4] The seller is under compulsion to sell; 5] The buyer is typically motivated; 6] Both parties are acting in what they consider to be their best interests; 7] An adequate marketing effort will be made during the exposure time specified by the client; 8]Payment will be made in cash in U.S. dollars or in terms of financial arrangements comparable thereto; and 9] The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. (Dictionary)

Easement
The right to use another's land for a stated purpose. (Dictionary)

EIFS
Exterior Insulation Finishing System. This is a type of exterior wall cladding system. Sometimes referred to as dry-vit.

6789 Goldsboro Road



### Effective Date
The date at which the analyses, opinions, and advice in an appraisal, review, or consulting service apply. 2] In a lease document, the date upon which the lease goes into effect. [Dictionary]

### Effective Gross Income (EGI)
The anticipated income from all operations of the real property after an allowance is made for vacancy and collection losses and an addition is made for any other income. [Dictionary]

### Effective Rent
The rental rate net of financial concessions such as periods of no rent during the lease term and above- or below-market tenant improvements (TIs). [Dictionary]

### EPDM
Ethylene Diene Monomer Rubber. A type of synthetic rubber typically used for roof coverings. [Dictionary]

### Escalation Clause
A clause in an agreement that provides for the adjustment of a price or rent based on some event or index. e.g., a provision to increase rent if operating expenses increase; also called an expense recovery clause or stop clause. [Dictionary]

### Estoppel Certificate
A statement of material factors or conditions of which another person can rely because it cannot be denied at a later date. In real estate, a buyer of rental property typically requests estoppel certificates from existing tenants. Sometimes referred to as an estoppel letter. [Dictionary]

### Excess Land
Land that is not needed to serve or support the existing improvement. The highest and best use of the excess land may or may not be the same as the highest and best use of the improved parcel. Excess land may have the potential to be sold separately and is valued separately. [Dictionary]

### Expense Stop
A clause in a lease that limits the landlord's expense obligation, which results in the lessee paying any operating expenses above a stated level or amount. [Dictionary]

### Exposure Time
1] The time a property remains on the market. 2] The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective estimate based on an analysis of past events assuming a competitive and open market. [Dictionary]

### Extraordinary Assumption
An assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions. Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property such as market conditions or trends; or about the integrity of data used in an analysis. [Dictionary]

### Fee Simple Estate
Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat. [Dictionary]

### Floor Common Area
Areas on a floor such as washrooms, janitorial closets, electrical rooms, telephone rooms, mechanical rooms, elevator lobbies, and public corridors which are available primarily for the use of tenants on that floor. [BOMA]

### Full Service (Gross) Lease
A lease in which the landlord receives stipulated rent and is obligated to pay all of the property's operating and fixed expenses; also called a full service lease. [Dictionary]

### Going Concern Value
The market value of all the tangible and intangible assets of an established and operating business with an indefinite life, as if sold in aggregate; more accurately termed the market value of the going concern.

The value of an operating business enterprise. Goodwill may be separately measured but is an integral component of going-concern value when it exists and is recognizable. [Dictionary]

6789 Goldsboro Road



#### Gross Building Area
The total constructed area of a building. It is generally not used for leasing purposes (BOMA)

#### Gross Measured Area
The total area of a building enclosed by the dominant portion (the portion of the inside finished surface of the permanent outer building wall which is 50 percent or more of the vertical floor-to-ceiling dimension, at the given point being measured as one moves horizontally along the wall), excluding parking areas and loading docks (or portions of the same) outside the building line. It is generally not used for leasing purposes and is calculated on a floor by floor basis. (BOMA)

#### Gross Up Method
A method of calculating variable operating expense in income-producing properties when less than 100 percent occupancy is assumed. The gross up method approximates the actual expense of providing services to the rentable area of a building given a specified rate of occupancy. (Dictionary)

#### Gross Retail Sellout
The sum of the appraised values of the individual units in a subdivision, as if all of the units were completed and available for retail sale, as of the date of the appraisal. The sum of the retail sales includes an allowance for lot premiums, if applicable, but excludes all allowances for carrying costs. (Dictionary)

#### Ground Lease
A lease that grants the right to use and occupy land. Improvements made by the ground lessee typically revert to the ground lessor at the end of the lease term. (Dictionary)

#### Ground Rent
The rent paid for the right to use and occupy land according to the terms of a ground lease; the portion of the total rent allocated to the underlying land. (Dictionary)

#### HVAC
Heating, ventilation, air conditioning. A general term encompassing any system designed to heat and cool a building in its entirety.

#### Highest and Best Use
The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are 1) legal permissibility, 2) physical possibility, 3) financial feasibility, and 4) maximally profitability. Alternatively, the probable use of land or improved –specific with respect to the user and timing of the use–that is adequately supported and results in the highest present value. (Dictionary)

#### Hypothetical Condition
That which is contrary to what exists but is supposed for the purpose of analysis. Hypothetical conditions assume conditions contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis. (Dictionary)

#### Industrial Gross Lease
A lease of industrial property in which the landlord and tenant share expenses. The landlord receives stipulated rent and is obligated to pay certain operating expenses, often structural maintenance, insurance and real estate taxes as specified in the lease. There are significant regional and local differences in the use of this term. (Dictionary)

#### Insurable Value
A type of value for insurance purposes. (Dictionary)
(Typically this includes replacement cost less basement excavation, foundation, underground piping and architect's fees).

#### Investment Value
The value of a property interest to a particular investor or class of investors based on the investor's specific requirements. Investment value may be different from market value because it depends on a set of investment criteria that are not necessarily typical of the market. (Dictionary)

#### Just Compensation
In condemnation, the amount of loss for which a property owner is compensated when his or her property is taken. Just compensation should put the owner in as good a position as he or she would be if the property had not been taken. (Dictionary)

6789 Goldsboro Road



Leased Fee Interest
A freehold [ownership interest] where the possessory interest has been granted to another party by creation of a contractual landlord-tenant relationship [i.e., a lease]. [Dictionary]

Leasehold Interest
The tenant's possessory interest created by a lease. [Dictionary]

Lessee (Tenant)
One who has the right to occupancy and use of the property of another for a period of time according to a lease agreement. [Dictionary]

Lessor (Landlord)
One who conveys the rights of occupancy and use to others under a lease agreement. [Dictionary]

Liquidation Value
The most probable price that a specified interest in real property should bring under the following conditions:

1) Consummation of a sale within a short period.
2) The property is subjected to market conditions prevailing as of the date of valuation.
3) Both the buyer and seller are acting prudently and knowledgeably.
4) The seller is under extreme compulsion to sell.
5) The buyer is typically motivated.
6) Both parties are acting in what they consider to be their best interests.
7) A normal marketing effort is not possible due to the brief exposure time.
8) Payment will be made in cash in U.S. dollars or in terms of financial arrangements comparable thereto.

The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. [Dictionary]

Loan to Value Ratio (LTV)
The amount of money borrowed in relation to the total market value of a property. Expressed as a percentage of the loan amount divided by the property value. [Dictionary]

Major Vertical Penetrations
Stairs, elevator shafts, flues, pipe shafts, vertical ducts, and the like, and their enclosing walls.

Atria, lightwells and similar penetrations above the finished floor are included in this definition. Not included, however, are vertical penetrations built for the private use of a tenant occupying office areas on more than one floor. Structural columns, openings for vertical electric cable or telephone distribution, and openings for plumbing lines are not considered to be major vertical penetrations. [BOMA]

Market Rent
The most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement including permitted uses, use restrictions, expense obligations; term, concessions, renewal and purchase options and tenant improvements (TIs). [Dictionary]

Market Value
The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:
a. Buyer and seller are typically motivated;
b. Both parties are well informed or well advised, and acting in what they consider their own best interests;
c. A reasonable time is allowed for exposure in the open market;
d. Payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto; and
e. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

Market Value As If Complete
Market value as if complete means the market value of the property with all proposed construction, conversion or rehabilitation hypothetically completed or under other specified hypothetical conditions as of the date of the appraisal. With regard to properties wherein anticipated market conditions indicate that stabilized occupancy is not likely as of the date of

6789 Goldsboro Road



completion, this estimate of value shall reflect the market value of the property as if complete and prepared for occupancy by tenants.

<u>Market Value As If Stabilized</u>
Market value as if stabilized means the market value of the property at a current point in time when all improvements have been physically constructed and the property has been leased to its optimum level of long term occupancy.

<u>Marketing Time</u>
An opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of the appraisal. Marketing time differs from exposure time, which is always presumed to precede the effective date of an appraisal. (Advisory Opinion 7 of the Standards Board of the Appraisal Foundation and Statement on Appraisal Standards No. 6, "Reasonable Exposure Time in Real Property and Personal Property Market Value Opinions" address the determination of reasonable exposure and marketing time). (Dictionary)

<u>Master Lease</u>
A lease in which the fee owner leases a part or the entire property to a single entity (the master lease) in return for a stipulated rent. The master lessee then leases the property to multiple tenants. (Dictionary)

<u>Modified Gross Lease</u>
A lease in which the landlord receives stipulated rent and is obligated to pay some, but not all, of the property's operating and fixed expenses. Since assignment of expenses varies among modified gross leases, expense responsibility must always be specified. In some markets, a modified gross lease may be called a double net lease, net net lease, partial net lease, or semi-gross lease. (Dictionary)

<u>Operating Expense Ratio</u>
The ratio of total operating expenses to effective gross income (TOE/EGI); the complement of the net income ratio, i.e., OER = 1 – NIR (Dictionary)

<u>Option</u>
A legal contract, typically purchased for a stated consideration, that permits but does not require the holder of the option (known as the optionee) to

buy, sell, or lease real property for a stipulated period of time in accordance with specified terms; a unilateral right to exercise a privilege. (Dictionary)

<u>Partial Interest</u>
Divided or undivided rights in real estate that represent less than the whole (a fractional interest). (Dictionary)

<u>Pass Through</u>
A tenant's portion of operating expenses that may be composed of common area maintenance (CAM), real estate taxes, property insurance, and any other expenses determined in the lease agreement to be paid by the tenant. (Dictionary)

<u>Potential Gross Income (PGI)</u>
The total income attributable to real property at full occupancy before vacancy and operating expenses are deducted. (Dictionary)

<u>Prospective Future Value Upon Completion</u>
Market value "upon completion" is a prospective future value estimate of a property at a point in time when all of its improvements are fully completed. It assumes all proposed construction, conversion, or rehabilitation is hypothetically complete as of a future date when such effort is projected to occur. The projected completion date and the value estimate must reflect the market value of the property in its projected condition, i.e., completely vacant or partially occupied. The cash flow must reflect lease-up costs, required tenant improvements and leasing commissions on all areas not leased and occupied.

<u>Prospective Future Value Upon Stabilization</u>
Market value "upon stabilization" is a prospective future value estimate of a property at a point in time when stabilized occupancy has been achieved. The projected stabilization date and the value estimate must reflect the absorption period required to achieve stabilization. In addition, the cash flows must reflect lease-up costs, required tenant improvements and leasing commissions on all unleased areas.

<u>Replacement Cost</u>
The estimated cost to construct, at current prices as of the effective appraisal date, a substitute for the building being appraised, using modern materials and current standards, design, and layout. (Dictionary)

6789 Goldsboro Road



#### Reproduction Cost
The estimated cost to construct, at current prices as of the effective date of the appraisal, an exact duplicate or replica of the building being appraised, using the same materials, construction standards, design, layout, and quality of workmanship and embodying all of the deficiencies, super-adequacies, and obsolescence of the subject building. (Dictionary)

#### Retrospective Value Opinion
A value opinion effective as of a specified historical date. The term does not define a type of value. Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgments, estate tax, and condemnation. Inclusion of the type of value with this term is appropriate, e.g., "retrospective market value opinion." (Dictionary)

#### Sandwich Leasehold Estate
The interest held by the original lessee when the property is subleased to another party; a type of leasehold estate. (Dictionary)

#### Sublease
An agreement in which the lessee (i.e., the tenant) leases part or all of the property to another party and thereby becomes a lessor. (Dictionary)

#### Subordination
A contractual arrangement in which a party with a claim to certain assets agrees to make his or her claim junior, or subordinate, to the claims of another party. (Dictionary)

#### Substantial Completion
Generally used in reference to the construction of tenant improvements (TIs). The tenant's premises are typically deemed to be substantially completed when all of the TIs for the premises have been

completed in accordance with the plans and specifications previously approved by the tenant. Sometimes used to define the commencement date of a lease.

#### Surplus Land
Land that is not currently needed to support the existing improvement but cannot be separated from the property and sold off. Surplus land does not have an independent highest and best use and may or may not contribute value to the improved parcel. (Dictionary)

#### Triple Net (Net Net Net) Lease
A lease in which the tenant assumes all expenses (fixed and variable) of operating a property except that the landlord is responsible for structural maintenance, building reserves, and management. Also called NNN, triple net lease, or fully net lease. (Dictionary)

(The market definition of a triple net lease varies; in some cases tenants pay for items such as roof repairs, parking lot repairs, and other similar items.)

#### Usable Area
The measured area of an office area, store area or building common area on a floor. The total of all the usable areas or a floor shall equal floor usable area of that same floor. The amount of floor usable area can vary over the life of a building as corridors expand and contract and as floors are remodeled. (BOMA)

#### Value-in-Use
The value of a property assuming a specific use, which may or may not be the property's highest and best use on the effective date of the appraisal. Value in use may or may not be equal to market value but is different conceptually. (Dictionary)

6789 Goldsboro Road



# Abstract of 6789 Goldsboro Road LLC – First Amended & Restated Operating Agreement

| | |
|---|---|
| Date: | July 18, 2013 |
| Definitions: | Cumulative Initial Capital Return: means a cumulative but non-compounded return equal to 10% on the Unrecovered Initial Capital Balance. |
| | Cumulative Additional Capital Return: means a cumulative but non-compounded return equal to 10% on the Unrecovered Additional Capital Balance. |
| | Decision Date: 36 months after the date the Company closes on the acquisition (that date is July 19, 2016). |
| | Entitlements: means all governmental approvals necessary to permit the subdivision of the property for no fewer than 26 single family or townhouse dwellings. |
| | Majority in Interests of Class A Members is greater than 51%. |
| | Majority and Interest of All Members: means majority in interests of Class A Members, plus the Class B Member. |
| | Manager: Gregory B. Myers for day-to-day operations of the Company. |
| Term: | Perpetual |
| Initial Capital Contributions: | Class A Members: $1,785,000 |
| | Class B Members: $306,192 (reflects the Gross Asset Value of the sale contract [$300,000] and certain development costs previously incurred [$6,192]) |
| Additional Capital Contributions: | Class A Members are subject to Capital Calls not to exceed $300,000. |
| Partition: | No Interest Holder shall have the right to require partition of the Property. |
| Allocation of Profits & Loss: | Pro rata |
| Distributions of Cash Flow: | After the payment of all unpaid expenses, debts and liabilities, distributions shall be made first to the Class A Members in an amount equal to their Unpaid Cumulative Capital Return (pro rata), then to Class A Members in the amount equal to their Unrecovered Initial Capital (pro rata); next to the Class A Members in an amount equal to $7,500/year for the first three years for a total of $22,500. Then to the Class B Member in an amount equal to its |

6789 Goldsboro Road



Unpaid Cumulative Initial Capital Return, then to the Class B Member in an amount equal to its Unrecovered Initial Balance, next to the Members in an amount equal to the Unpaid Cumulative Additional Capital Return. Next to the Members in an amount equal to their own unrecovered additional capital (pro rata), thence, the balance to the Members in proportion to their Respective Percentage Interest.

Management:

The Manager, Gregory B. Myers, has the general power and authority to manage and operate the day-to-day business and affairs of the Company, however, contracts in excess of $25,000 require prior approval of the Majority and Interest of Class A Members. Major decisions require approval of all Members including financing and sale.

Transferability:

No Member may sell, assign, mortgage, pledge, grant, security interests in or otherwise transfer or encumber all or any part of the Member's Membership Rights or Interests.

Withdrawal:

No Member shall have the right to or power to voluntarily withdraw from the Company.

Redemption of Class B Member:

In the event that a) the entitlement of the property is not completed by the Decision Date and b) the Class A Members do not elect to require the Company to sell the property in accordance with Section 7.6, then the Class A Members may elect to determine the appraised value of the property in accordance with Section 7.5. If the appraised value of the property is less than or equal to the sum of Unpaid Cumulative Initial Capital Return, Unrecovered Initial Capital, Unpaid Cumulative Initial Additional Capital Return and Unrecovered Additional Capital, then the Class A Members shall have the unilateral right and authority (without consent of the Class B Member) to cause the Company to redeem the Class B Membership Rights solely in consideration for the Company's previous distributions or other previous payments to the Class B Member. If the appraised value is greater than the Class A Investment, then in such event the Class B Member shall retain its Membership Rights; provided, however, the Class A Members shall continue to have the unilateral right and authority thereafter (without the consent of the Class B Member) at their option to require the Company to sell the Property, in its then current development state to an unaffiliated third party purchaser.

6789 Goldsboro Road



Qualifications of M. Ronald Lipman, MAI
Principal
Lipman Frizzell & Mitchell LLC

## State Certifications

State of Maryland
Commonwealth of Virginia
District of Columbia

## Education

Masters Degree in Business
Administration (Real Estate
Major) – American University,

Bachelor of Arts Degree
(Business Administration
Major) Duke University

## Contact Details

410-423-2328 (p)
410-423-2410 (f)

Lipman Frizzell & Mitchell LLC
6240 Old Dobbin Lane
Suite 140
Columbia, MD 21045

www.LFMvalue.com
rlipman@LFMvalue.com

## Membership/Affiliations

Member (MAI): Appraisal Institute (Chapter Pres.-'78 & '79)
Licensed Broker - Maryland Real Estate Commission
Board of Trustees - Mid Atlantic Realty Trust (NYSE), Chairman
Investment Committee (1993-2003)

## Teaching/Instructor Assignments

SREA 101 and 201 Courses, 1971-1980, Loyola & Notre Dame Colleges
Annual School of Maryland Assessing Officers, 1969-1973, 1978-1980
Condemnation Course IV for Appraisal Institute, Baltimore 1979/80
Capitalization Theory & Techniques, for Appraisal Institute, Balt/, 1981
Income Property Valuation for Maryland Tax Court, 1984
Md. Chapter, Appraisal Institute - R41-c Seminar, 1985
Internal Rate of Return Seminar for Md. Commercial Assessors, 1986
Acquisition of Real Estate - John Hopkins Univ. Continuing Studies, 1987
The Appraisal of Real Estate, Masters Prog. - JHU MBA program, 1992

No articles have been published in the last ten years

## Qualified as Expert Witness Before the Courts of:

Baltimore City; Baltimore, Anne Arundel, Montgomery, Howard, Prince
Georges, Carroll, Frederick & Cecil Counties; Fairfax County, VA; District
of Columbia Superior Court; U.S. District Court of Maryland; Federal
Bankruptcy Court; Los Angeles County Superior Court; Federal Tax
Court; Maryland Tax Court; American Arbitration Association, NY; Court
of Common Pleas, Erie, PA

Numerous appraisals have been completed for all types of income and
owner/user properties including office buildings, apartment complexes,
shopping centers and industrial properties in addition to raw land and
finished sites for development of these uses and special purpose
properties such as mobile home parks, marinas and assisted living
facilities.

6789 Goldsboro Road

## QUALIFICATIONS OF SHELDON A. STERN, MAI
Senior Appraiser
Lipman Frizzell & Mitchell LLC

---

### State Certifications

State of Maryland

---

### Education

Masters Degree in Real Estate
and Urban Development -
American University

Master of Business
Administration -
University of Baltimore

Bachelors Degree in Business
Administration/Accounting -
University of Maryland College
Park
Johns Hopkins University -
School of Continuing Studies

---

### Contact Details

410-423-2366 (p)
410-423-2410 (f)

Lipman Frizzell & Mitchell LLC
6240 Old Dobbin Lane
Suite 140
Columbia, MD 21045

sstern@LFMvalue.com
www.LFMvalue.com

### Membership/Affiliations
Member:        Appraisal Institute - MAI Designation
Licensed Broker:   Maryland Real Estate Commission
Certified Property Manager (CPM):   Institute of Real Estate Mgmt.

### Appraisal Institute & Related Courses
Basic Valuation Procedures
Real Estate Appraisal Principles
Capitalization Theory and Techniques, I, II, III
Cade Studies in Real Estate Valuation
Valuation Analysis and Report Writing
Standards of Professional Practice

### Seminars
Current Trends in Real Estate Acquisition, Commercial Real Estate
Leasing, Market Research in Real Estate, Site Evaluation and Land
Development

### Experience
Senior Associate
Lipman Frizzell & Mitchell LLC (2016-Present)
Valbridge Property Advisors | Lipman Frizzell LLC (2013-2016)
Lipman Frizzell & Mitchell LLC (1987-2013)

Property Manager/Real Estate Analyst
Dreyfuss Brothers, Inc. (1978-1986)
I. Stern - Real Estate (1975-1979)

Board of Directors
CHAI, Comprehensive Housing Assistance, Inc.
(1990-2003, 2007-Present)

Expert Witness
Federal Bankruptcy Court, Property Tax Assessment Appeals Board
(PTAAB), Participant: MICPEL Trial Advocacy Program

Speaker
MD Assoc. of Assessment Officers 1998 Conference - Apartment/Low
Income Housing Valuation

Appraisal/valuation and consulting assignments include: apartment buildings; retail buildings and shopping
centers; office buildings; industrial buildings; residential subdivisions; and vacant industrial, commercial and
residential land. Assignments also include tax credit valuations, Fannie Mae and Freddie Mac reports, and HUD
MAP valuations and comparability studies. Assignments have been concentrated in the Baltimore/Washington
Metropolitan areas including northern Virginia.

6789 Goldsboro Road



## Representative Clients of Lipman Frizzell & Mitchell LLC

### Developers/Investors/Advisors:
A&R Development Corporation
ATAPCO
Bavar Properties Group
Bozzuto Group
Casey Management, Inc.
Cignal Corporation
Clark Enterprises, Inc.
Continental Realty
Cordish Companies
Corporate Office Properties Trust
Enterprise Homes Inc.
Federal Realty Investment Trust
Forest City Enterprises
FRP Development Corporation
General Growth Properties
Greenebaum & Rose
H & S Properties
Harrison Group
Heritage Properties
Himmelrich Associates, Inc.
Home Properties
James Keelty & Co.
James F. Knott Realty Group
The JBG Companies
J.P. Morgan Investment
Jones Lang LaSalle
Kimco Realty
KLNB Retail
Lerner Enterprises
Lubert-Adler Management Inc.
MacKenzie Commercial
Manekin Corporation
Merritt Properties
Muni Cap, Inc.
NVR, Inc.
Riparius Development Corp.
Ryland Homes
Shelter Development
Southern Management Corp.
St. John Properties
Time Group
Toll Brothers, Inc.
Trammel Crow
Vornado Realty Trust
Whiting Turner

### Accounting Firms:
Grant Thornton
Ernst & Young
Ellin & Tucker Chartered
Hertzbach & Company
PWC

### Corporate:
7-Eleven, Inc.
Allied Chemical
Amtrak
Apple Computer
AT&T
Black & Decker
Blue Cross/Blue Shield
Chaney Enterprises
Chrysler Realty Corp.
Costco Wholesale Corp.
CSX
Exxon Mobil
Ford Motor Company
GEICO
General Electric
General Motors
Google
Home Depot
Hyatt Hotels
IBM
Intel
JCPenney
Kaiser Permanente
Lockheed Martin Corp.
Lord & Taylor
Macy's
Marriott Corporation
McDonalds Corporation
Noxell
Peebles Stores
PEPCO
Percontee, Inc.
Safeway Inc.
Sears Roebuck & Co.
Solo Cup
Target Corporation
Toyota
T. Rowe Price
Verizon Wireless
Wal-Mart
Washington Gas
Wawa, Inc.

### Lenders/Mortgage Brokers:
Aetna Insurance
Allstate Investments LLC
Artisan's Bank
AXA Equitable
Bank of America
Bank of New England
BB&T
CalPERS
Canada Life Assurance Co.
Capital Funding Group, Inc.

Cecil Bank
Chesapeake Bank
Citibank Bank
Columbia Bank
Community Bank of the Chesapeake
Eagle Bank
FCNB Bank
FNMA
GE Capital
GMAC
Goldman Sachs
Harford Bank
HSBC
JP Morgan Chase
Key Bank
M & T Bank
Money Store
Morgan Stanley Capital I Inc.
Nationwide Insurance Co.
New York Life
NorthMarq Capital Inc.
Northwest Savings Bank
Old Line Bank
PNC Bank
Revere Bank
Prudential Ins. Co. of America
Sandy Spring Bancorp
State Farm Insurance Co.
Travelers
Sun Life of Canada
SunTrust
TIAA/CREF
Transamerica
United Bank
Walker & Dunlop
Wells Fargo Bank
Wilmington Trust

### Law Firms:
Abramoff, Neuberger, LLP
Arent Fox LLP
Ballard Spahr LLP
Blank, Rome LLP
DLA Piper (US)
Eccleston & Wolfe
Fedder & Garten
Friedman & Friedman, LLP
Gallagher, Evelius & Jones LLP
Gibbs & Haller
Goodwin Procter LLP
Gordon Feinblatt LLC
Hogan Lovells
Jacobs & Dembert, P.A.
Lerch Early & Brewer
Linowes & Blocher LLP

6789 Goldsboro Road

London & Mead
McGuire Woods LLP
Miles & Stockbridge P. C.
Miller, Miller & Canby
Niles, Barton & Wilmer LLP
Paley Rothman
Pasternak & Fidis, P.C.
Rosenberg Martin & Greenberg
Saul Ewing LLP
Semmes, Bowen & Semmes
Shapiro, Sher Guinot & Sandler
Shulman Rogers
Squire Patton Boggs, L.L.P.
Steptoe & Johnson LLP
Tydings & Rosenberg LLP
Venable LLP
Whiteford, Taylor & Preston LLP
Wilkes Artis Chartered
Zuckerman Spaeder LLP

Institutional:
American University
Archdiocese of Baltimore
Bon Secours Health System
Catholic Charities
Coppin State University
Franklin Square Hospital
Greater Baltimore Medical Center
Good Samaritan Hospital
Harry & Jeanette Weinberg Foundation
Johns Hopkins Hospital
Mass. Institute of Tech. [MIT]
Morgan State University
Northwest Hospital Center
St. Agnes Hospital
St. Joseph Medical Center

St. Paul School
Sinai Hospital/LifeBridge Health
Sisters of Notre Dame
Towson University
University of Maryland
University of MD Medical System

Governmental/Other:
Baltimore City
Baltimore County
Baltimore Development Corp.
Blaustein Family Interests
BOMA
Carroll County
Cecil County
District of Columbia
D.C. Housing Finance Agency
Estate of Jack Kent Cooke
Federal Communication Commission
Federal Deposit Insurance Corp.
Federal Home Loan Bank Board
Frederick County
Harford County
Anne Arundel County
Howard County
Internal Revenue Service
MD Dept. of Natural Resources
MD Economic Development Corp.
Maryland Historical Trust
Maryland Insurance Deposit Fund
MNCPPC
Maryland Stadium Authority
Mass Transit Administration
Montgomery County
Prince George's County

MD State Highway Administration
U.S. Army Corps of Engineers
U.S. Dept. of Housing & Urban Development
U.S. Dept. of Justice
U.S. Dept. of the Navy
U.S. General Services Admin.
U.S. Naval Academy Athletic Assoc.
U.S. Postal Service
Washington, D.C. Office of Tax & Revenue
Washington Suburban Sanitary Commission

Recreational:
Argyle Country Club
Baltimore Country Club
Bethesda Country Club
Burning Tree Golf Club
Caves Valley Golf Club
Columbia Association
Country Club of Maryland
Country Club at Woodmore
Elkridge Club
Four Streams Golf Club
Green Spring Valley Hunt Club
Hillendale Country Club
Hunters Oak Golf Course
Lakewood Country Club
Maryland Club
Norbeck Country Club
Suburban Country Club
Woodmont Country Club

## MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding (this "Agreement") sets forth the terms of an agreement by which the Class A Members of 6789 Goldsboro LLC ("Goldsboro") will purchase all of the interests of the Class B Member in Goldsboro. The Class A Members are Brian King, Cristina King, and the Cristina and Brian King Children's Trust (collectively referred to as the "Buyers"). The Class B Member is Serv Trust (the "Seller") and its Trustees are Gregory B. Myers and Daniel Ring. Gregory B. Myers is also the Manager of Goldsboro. Goldsboro was formed more than thirty six months prior to the execution of this Agreement. The purpose of the formation of Goldsboro was to develop a parcel of land located in Bethesda, Maryland (the "Property"), to get it entitled and sell it to a third party for a profit. The parties hereto agree that the Property has not been fully entitled as of the date of this Agreement. The Agreement of the Buyers and Seller are as follows:

1.  <u>Purchase of Class B Membership Rights and Interest</u>. The Buyers shall purchase all of the Class B Membership Rights and Interest on the terms set forth herein. The Class B Member and its Trustees agree to the sale of the Class B Membership Rights and Interest. The parties will enter into a Membership Interest Purchase and Sale Agreement which incorporates the terms and provisions of this Agreement (the "Purchase Agreement").

2.  <u>Representations</u>. The Class B Member and its Trustees represent and warrant that the Class B Membership Rights and Interest have not been assigned or encumbered in any way and the Trustees have the full power and authority to agree to the terms of this Agreement, to agree to the change of the Manager of Goldsboro, and to enter into the Purchase Agreement. The Class B Member and its Trustees further represent that the sale of the Class B Membership Rights and Interest will not require the consent or approval of any third party or governmental authority. The Purchase Agreement shall contain additional customary representations and warranties from Seller and Buyers.

3.  <u>Mutual Releases</u>. At Closing, the Buyers, Seller and Seller's Trustees shall agree to full and mutual releases of any and all claims or complaints that they have or may have (known or unknown) against each other arising out of their ownership of Goldsboro, the loans made by Goldsboro to the Class B Member, and the development of the Property.

4.  <u>Purchase Price</u>. The purchase price that the Seller agrees to take and that the Buyers agree to pay for the Class B Membership Rights and Interest ("Purchase Price") shall be $2,000,000.00. At Closing, a portion of the Seller's proceeds of the Purchase Price shall be paid directly to Goldsboro, as repayment of the principal and interest then due on all loans made by Goldsboro to the Seller. The principal amount outstanding is currently $635,000, and the interest due thereon shall be determined as of the date of Closing. The balance of the Purchase Price shall be retained by the Seller (approximately $1,254,372.00).

5.  <u>Payment of Purchase Price</u>. The Purchase Price will be paid as follows:

King000330

Trustee Ex. 4

    a. A deposit of $75,000.00 will be paid to an escrow agent (Buyer's attorney), in cash, upon the signing of this Agreement, and then paid to Seller at Closing. The deposit shall be refundable if Seller fails to close.

    b. The balance of the Purchase Price shall be paid by Buyers at Closing. Closing shall occur upon the execution and delivery of the Purchase Agreement and an Assignment and Assumption of Membership Interests (the "Required Agreements").

6. <u>Execution and Closing Dates</u>. This Agreement must be executed by September 12, 2016 or this Agreement shall be null and void. The Closing must occur by October 7, 2016.

7. <u>Manager's Actions</u>. Prior to Closing, the Manager shall continue to act in the best interests of Goldsboro.

8. <u>No Encumbrances or Interference</u>. The Seller and its Trustees shall not take any action to encumber the Class B Interest or the Property or cloud title to the Class B Interest or the Property. The Seller and its Trustees shall not take any action whatsoever to devalue the Property or interfere with the development or sale of the Property before or after Closing.

9. <u>Confidentiality</u>. The parties to this Agreement shall not make any announcement or in any manner disclose to any person the existence, or any of the contents, of this Agreement, or of any other agreement entered into between the parties prior to Closing, without the express consent of the other parties hereto, unless such disclosure is required by law or by an order of court or administrative agency of competent jurisdiction.

If this Agreement is acceptable, please countersign one copy of this Agreement where indicated, and return the countersigned copy. This Agreement may be executed and delivered in several counterparts and electronically. This Agreement is intended to be a legally binding document.

_____
Brian King, Buyer

_____
Cristina King, Buyer

[signatures continued on next page]

2

King000331

[signatures continued – Memorandum of Understanding]

Cristina and Brian King Children's Trust, Buyer

By: _____, Trustee
        Vevita Leon

By: _____, Trustee
        Brian King

By: _____, Trustee
        Timothy Lynch


Serv Trust, Seller

By: _____
        Gregory B. Myers, Trustee

By: _____
        Daniel J. Ring, Trustee


_____

Gregory B. Myers, Manager

3

King000332

| | |
|---|---|
| **From:** | Greg Myers |
| **To:** | "Brian King" |
| **Cc:** | Greg Myers |
| **Subject:** | RE: 6789 Goldsboro LLC - Memorandum Of Understanding |
| **Date:** | Monday, January 16, 2017 4:56:37 PM |

Brian,

The executed Memorandum of Understanding was mailed to you on September 12, 2016, via U.S. Mail addressed to you at 3925 Beech Avenue, Baltimore, Maryland 21211.

Greg

**From:** Brian King [mailto:brian@realestatedimensions.com]
**Sent:** Tuesday, January 10, 2017 10:16 AM
**To:** 'Greg Myers' <gregbmyers@verizon.net>
**Subject:** RE: 6789 Goldsboro LLC - Memorandum Of Understanding

Greg,

The Memorandum of Understanding was not executed and delivered by September 12, 2016 pursuant to section 6 so it is null and void.

Brian

**From:** Greg Myers [mailto:gregbmyers@verizon.net]
**Sent:** Tuesday, January 10, 2017 12:30 AM
**To:** brian@realestatedimensions.com
**Cc:** Greg Myers <gregbmyers@verizon.net>
**Subject:** 6789 Goldsboro LLC - Memorandum Of Understanding

Brian,

Attached is a PDF copy of the executed MEMORANDUM OF UNDERSTANDING.

Greg

King001842

**Trustee Ex. 5**

| | |
|---|---|
| From: | Greg Myers |
| To: | "Timothy Dugan"; "Brian King"; "Jeffrey Knight"; scrum@mhgpa.com; sroser@mhgpa.com |
| Cc: | "Erica H. Hilburger"; Greg Myers |
| Subject: | RE: Goldsboro Place = Message from Robert Kronenberg |
| Date: | Thursday, October 6, 2016 2:00:48 PM |

I'm good with October 19 or 25 (because those are the dates Jeff Knight can do).

**From:** Timothy Dugan [mailto:TDugan@shulmanrogers.com]
**Sent:** Thursday, October 06, 2016 4:01 PM
**To:** Gregory Myers (gregbmyers@verizon.net) <gregbmyers@verizon.net>; Brian King <brian@realestatedimensions.com>; Jeffrey Knight (jeffrey.knight@pillsburylaw.com) <jeffrey.knight@pillsburylaw.com>; scrum@mhgpa.com; sroser@mhgpa.com
**Cc:** Erica H. Hilburger <EHilburger@shulmanrogers.com>
**Subject:** Goldsboro Place = Message from Robert Kronenberg

Dear Greg, Brian, Jeff, Steve and Scott:

Robert Kronenberg contacted me today via email regarding our project and the 8/31/16 meeting, our submittal of additional information (the cross section and the perspective), and the subsequent 9/28/16 telephone call:

Tim,

Here are some dates and times available for our team.

| | |
|---|---|
| Monday October 17 | 1:30-2:30 |
| Wed. October 19 | 11-12 |
| Tuesday October 25 | 9-10, 1-2 |
| Wed. October 26 | 3-4 |

This meeting is a follow up to our discussion and at your request before we issue formal resubmittal comments. We have reviewed the resubmittal package and do not believe the majority of the DRC comments have been resolved, with the same concerns still outstanding. We are happy to go over those comments and your resubmittal but we still cannot support your application. I'm here until 9:30 if you want to discuss further. Elza and Marco are also on the chain and can discuss as well.

First, please advise Erica Hilburger and me regarding your availability for the meeting dates and times.
mailto:ehilburger@shulmanrogers.com; mailto:tdugan@shulmanrogers.com

Second, Erica Hilburger and I will schedule a conference call with Greg Myers and Jeff Knight (and others as directed) to go over the strategy and any next steps before the meeting.

King002038

**Trustee Ex. 6**

Thank you.

Tim

122532.00003

**TIMOTHY DUGAN**
ATTORNEY AT LAW

tdugan@shulmanrogers.com  |  **T** 301.230.5228  |  **F** 301.230.2891

SHULMAN, ROGERS, GANDAL, PORDY & ECKER, P.A.
12505 PARK POTOMAC AVENUE, 6TH FLOOR, POTOMAC, MD 20854
1600 Tysons Boulevard, Suite 200, McLean, VA 22102

**ShulmanRogers.com**  |  BIO  |  VCARD

**SHULMAN** | GANDAL
**ROGERS** | PORDY
         | ECKER

The information contained in this electronic message and any attached documents is
privileged, confidential, and protected from disclosure. It may be an attorney-client
communication and, as such, is privileged and confidential. If you are not the intended
recipient, note that any review, disclosure, copying, distribution, or use of the contents of this
electronic message or any attached documents is prohibited. If you have received this
communication in error, please destroy it and notify us immediately by telephone (1-301-230-
5200) or by electronic mail (LawFirm@srgpe.com). Thank you.

King002039

| | |
|---|---|
| **From:** | Greg Myers |
| **To:** | "Timothy Dugan"; "Jeffrey Knight"; scrum@mhgpa.com; sroser@mhgpa.com; "Michael J. Klebasko"; "Scott Petrey"; "Brian King"; "Erica H. Hilburger"; "Christopher M. Demarco" |
| **Subject:** | RE: Goldsboro Place = Scheduling a case status and strategy conference call for Thursday, December 1, 2016 |
| **Date:** | Wednesday, November 30, 2016 10:35:04 AM |

Any time tomorrow.

**From:** Timothy Dugan [mailto:TDugan@shulmanrogers.com]
**Sent:** Wednesday, November 30, 2016 1:13 PM
**To:** Gregory Myers (gregbmyers@verizon.net) <gregbmyers@verizon.net>; Jeffrey Knight
(jeffrey.knight@pillsburylaw.com) <jeffrey.knight@pillsburylaw.com>; scrum@mhgpa.com;
sroser@mhgpa.com; Michael J. Klebasko (mklebasko@wetlandstudies.com)
<mklebasko@wetlandstudies.com>; Scott Petrey (spetrey@wetlandstudies.com)
<spetrey@wetlandstudies.com>; Brian King <brian@realestatedimensions.com>; Erica H. Hilburger
<EHilburger@shulmanrogers.com>; Christopher M. Demarco (info@realestatedimensions.com)
<info@realestatedimensions.com>
**Subject:** Goldsboro Place = Scheduling a case status and strategy conference call for Thursday,
December 1, 2016
**Importance:** High

To the Team:

Conference call in number:
202-499-2029
Password: 5498043#


Please advise Erica Hilburger and me when you are available for a 30-60 minute conference call on
Thursday, December 1, 2016

Thank you.

Tim

**TIMOTHY DUGAN**
ATTORNEY AT LAW

tdugan@shulmanrogers.com  |  **T** 301.230.5228  |  **F** 301.230.2891

SHULMAN, ROGERS, GANDAL, PORDY & ECKER, P.A.
12505 PARK POTOMAC AVENUE, 6TH FLOOR, POTOMAC, MD 20854
1600 Tysons Boulevard, Suite 200, McLean, VA 22102

**ShulmanRogers.com**  |  BIO  |  VCARD

King002040

**Trustee Ex. 7**

**SHULMAN ROGERS** | GANDAL PORDY ECKER

---

**From:** Steve Crum [mailto:scrum@mhgpa.com]
**Sent:** Wednesday, November 30, 2016 1:54 PM
**To:** Timothy Dugan; Gregory Myers (gregbmyers@verizon.net); Jeffrey Knight
(jeffrey.knight@pillsburylaw.com); Scott Roser; Michael J. Klebasko (mklebasko@wetlandstudies.com);
Scott Petrey (spetrey@wetlandstudies.com); Brian King; Erica H. Hilburger; Christopher M. Demarco
(info@realestatedimensions.com)
**Subject:** RE: Goldsboro Place = Scheduling a case status and strategy conference call for Thursday,
December 1, 2016

Tim & Erica-

I'm available tomorrow after 3:00 p.m.

Regards-

**Stephen E. Crum, P.E.**
**Macris, Hendricks & Glascock, P.A.**
Engineers, Planners, Landscape Architects & Surveyors
9220 Wightman Road, Suite 120
Montgomery Village, MD 20886-1279
Email: scrum@mhgpa.com
Direct: 240.912.0819
Phone: 301.670.0840 x1019
Fax: 301.948.0693
Cell: 301.717.5983
Web: www.mhgpa.com

---

**From:** Timothy Dugan [mailto:TDugan@shulmanrogers.com]
**Sent:** Wednesday, November 30, 2016 1:13 PM
**To:** Gregory Myers (gregbmyers@verizon.net); Jeffrey Knight (jeffrey.knight@pillsburylaw.com); Steve
Crum; Scott Roser; Michael J. Klebasko (mklebasko@wetlandstudies.com); Scott Petrey
(spetrey@wetlandstudies.com); Brian King; Erica H. Hilburger; Christopher M. Demarco
(info@realestatedimensions.com)
**Subject:** Goldsboro Place = Scheduling a case status and strategy conference call for Thursday,
December 1, 2016
**Importance:** High

To the Team:

Conference call in number:
202-499-2029
Password: 5498043#

Please advise Erica Hilburger and me when you are available for a 30-60 minute conference call on



**SHULMAN ROGERS** | GANSAL PORDY ECKER

The information contained in this electronic message and any attached documents is privileged, confidential, and protected from disclosure. It may be an attorney-client communication and, as such, is privileged and confidential. If you are not the intended recipient, note that any review, disclosure, copying, distribution, or use of the contents of this electronic message or any attached documents is prohibited. If you have received this communication in error, please destroy it and notify us immediately by telephone (1-301-230-5200) or by electronic mail (LawFirm@srgpe.com). Thank you.

King002041

| | |
|---|---|
| **From:** | Greg Myers |
| **To:** | "Timothy Dugan"; "Steve Crum"; "Jeffrey Knight"; "Scott Roser"; "Michael J. Klebasko"; "Scott Petrey"; "Brian King"; "Erica H. Hilburger"; "Christopher M. Demarco" |
| **Cc:** | Greg Myers |
| **Subject:** | RE: Goldsboro Place = Your availability for FRIDAY DECEMBER 2, 2016 FOR A TEAM CONFERENCE CALL and For the MNCPPC MEETING on 12/13, 12/14/16, and 12/15/16 |
| **Date:** | Wednesday, November 30, 2016 3:16:53 PM |

I will make myself available anytime Friday, but prefer we schedule the call Friday morning sometime so that we can get to work on the modifications asap.

**From:** Timothy Dugan [mailto:TDugan@shulmanrogers.com]
**Sent:** Wednesday, November 30, 2016 2:03 PM
**To:** 'Steve Crum' <scrum@mhgpa.com>; Gregory Myers (gregbmyers@verizon.net) <gregbmyers@verizon.net>; Jeffrey Knight (jeffrey.knight@pillsburylaw.com) <jeffrey.knight@pillsburylaw.com>; Scott Roser <sroser@mhgpa.com>; Michael J. Klebasko (mklebasko@wetlandstudies.com) <mklebasko@wetlandstudies.com>; Scott Petrey (spetrey@wetlandstudies.com) <spetrey@wetlandstudies.com>; Brian King <brian@realestatedimensions.com>; Erica H. Hilburger <EHilburger@shulmanrogers.com>; Christopher M. Demarco (info@realestatedimensions.com) <info@realestatedimensions.com>
**Subject:** Goldsboro Place = Your availability for FRIDAY DECEMBER 2, 2016 FOR A TEAM CONFERENCE CALL and For the MNCPPC MEETING on 12/13, 12/14/16, and 12/15/16

**Thursday is not proving to be a good day to get everyone together for a call. Please send to Erica Hilburger and me your availability for Friday, December 2, 2016.**

ALSO

I contacted MNCPPC about meeting on

Tuesday, December 13th
Wednesday, December 14th
or
Thursday, December 15th

Please advise us of your availability for those dates as well. Thank you.

## TIMOTHY DUGAN
ATTORNEY AT LAW

tdugan@shulmanrogers.com | **T** 301.230.5228 | **F** 301.230.2891

SHULMAN, ROGERS, GANDAL, PORDY & ECKER, P.A.
12505 PARK POTOMAC AVENUE, 6TH FLOOR, POTOMAC, MD 20854
1600 Tysons Boulevard, Suite 200, McLean, VA 22102

**ShulmanRogers.com** | BIO | VCARD

King002042

**SHULMAN** | GANDAL
**ROGERS** | PORDY
          | ECKER

---

**From:** Steve Crum [mailto:scrum@mhgpa.com]
**Sent:** Wednesday, November 30, 2016 1:54 PM
**To:** Timothy Dugan; Gregory Myers (gregbmyers@verizon.net); Jeffrey Knight
(jeffrey.knight@pillsburylaw.com); Scott Roser; Michael J. Klebasko (mklebasko@wetlandstudies.com);
Scott Petrey (spetrey@wetlandstudies.com); Brian King; Erica H. Hilburger; Christopher M. Demarco
(info@realestatedimensions.com)
**Subject:** RE: Goldsboro Place = Scheduling a case status and strategy conference call for Thursday,
December 1, 2016

Tim & Erica-

I'm available tomorrow after 3:00 p.m.

Regards-

**Stephen E. Crum, P.E.**
**Macris, Hendricks & Glascock, P.A.**
Engineers, Planners, Landscape Architects & Surveyors
9220 Wightman Road, Suite 120
Montgomery Village, MD 20886-1279
Email: scrum@mhgpa.com
Direct: 240.912.0819
Phone: 301.670.0840 x1019
Fax: 301.948.0693
Cell: 301.717.5983
Web: www.mhgpa.com

---

**From:** Timothy Dugan [mailto:TDugan@shulmanrogers.com]
**Sent:** Wednesday, November 30, 2016 1:13 PM
**To:** Gregory Myers (gregbmyers@verizon.net); Jeffrey Knight (jeffrey.knight@pillsburylaw.com); Steve
Crum; Scott Roser; Michael J. Klebasko (mklebasko@wetlandstudies.com); Scott Petrey
(spetrey@wetlandstudies.com); Brian King; Erica H. Hilburger; Christopher M. Demarco
(info@realestatedimensions.com)
**Subject:** Goldsboro Place = Scheduling a case status and strategy conference call for Thursday,
December 1, 2016
**Importance:** High

To the Team:

Conference call in number:
202-499-2029
Password: 5498043#

Please advise Erica Hilburger and me when you are available for a 30-60 minute conference call on

King002043

Thursday, December 1, 2016

Thank you.

Tim

**TIMOTHY DUGAN**
ATTORNEY AT LAW

tdugan@shulmanrogers.com | T 301.230.5228 | F 301.230.2891

SHULMAN, ROGERS, GANDAL, PORDY & ECKER, P.A.
12505 PARK POTOMAC AVENUE, 6TH FLOOR, POTOMAC, MD 20854
1600 Tysons Boulevard, Suite 200, McLean, VA 22102

**ShulmanRogers.com** | BIO | VCARD

**SHULMAN** | GANDAL
**ROGERS** | PORDY
            | ECKER

The information contained in this electronic message and any attached documents is
privileged, confidential, and protected from disclosure. It may be an attorney-client
communication and, as such, is privileged and confidential. If you are not the intended
recipient, note that any review, disclosure, copying, distribution, or use of the contents of this
electronic message or any attached documents is prohibited. If you have received this
communication in error, please destroy it and notify us immediately by telephone (1-301-230-
5200) or by electronic mail (LawFirm@srgpe.com). Thank you.

King002044

| From: | Greg Myers |
|---|---|
| To: | brian@realestatedimensions.com; chris@realestatedimensions.com |
| Cc: | Greg Myers |
| Subject: | Pillsbury Invoices |
| Date: | Thursday, December 15, 2016 8:52:36 AM |
| Attachments: | 160830_6789 Invoice.pdf |
| | 160830_Serv Trust Invoice_note.pdf |
| | 161208_6789 Invoice.pdf |

Brian,

Per our call this morning, attached are copies of the corrected August 30, 2016 invoices (one for 6789 and one for Serv Trust note). Also attached is the Pillsbury summary invoice dated December 8, 2016 which I received today. Per our call, Chris will pay the below invoices immediately (and Chris will pay Invoice No. 8093388, dated 11/17/16 for $7,019.50 next month).

6789 Goldsboro LLC:

| 8056811 | 05/24/16 | $17,136.50 |
|---|---|---|
| 8063141 | 06/28/16 | $21,097.45 |
| 8082963 | 08/30/16 | $18,605.50 |
| 8087587 | 10/21/16 | $13,708.00 |

Serv Trust note:

| 8083001 | 08/30/16 | $8,608.00 |
|---|---|---|

Please confirm these payments will go out tomorrow, 12/16/16, so that I can let Pillsbury know (as I mentioned, I don't want to get sideways on revising the stream permits).

Thanks,
Greg

King001601

Trustee Ex. 8

R  City, Address, School, Agent, ZIP        Buy ▾   Rent ▾   Sell ▾   Mortgage ▾   Real Estate Agents ▾   Feed        Join / Sign in

← Search    **Overview**    Sale & tax history    Property details    Neighborhood    Climate    ♡ Favorite    ✎ Edit Facts    ↪ Share



Trustee Ex. 9

LAST SOLD ON JUL 18, 2013 FOR $1,350,000

**6789 Goldsboro Rd**, Bethesda, MD 20817

| **$2,016,270** | **3** | **2** | **4,236** |
|---|---|---|---|
| Redfin Estimate | Beds | Baths | Sq Ft |

### Is this your home?

Track this home's value and nearby sales activity

> **I own 6789 Goldsboro Rd**

### About this home

5+ acres unique opportunity to own this fabulous estate lot in close-in bethesda

| Single-family | 1935 | 5.23 acres |
|---|---|---|
| Property Type | Year Built | Lot Size |

| $476 |
|---|
| Est. Price/Sq.Ft. |

Listed by Kristin Gerlach • Gerlach real estate, inc. • 301-656-8686 (broker)
Bought with Kristin Gerlach • Gerlach real estate, inc. • 301-656-8686 (broker)

Redfin checked: a minute ago (Jun 17, 2025 at 12:14pm) • Source: BRIGHT MLS #1004571588

### Thinking of selling?

Estimated sale price

**$1.92M – $2.28M**

Reach more buyers when you sell with Redfin. Plus, you'll save $20,163 in fees. ⊙

> Schedule a selling consultation

Get an in-depth report about your home value and the Bethesda market.

> **Request a free analysis**

## Redfin Estimate

# $2,016,270

▲ $666K since sold in July 2013   ▲ $34K since April

🕒 Recently sold homes    📈 Estimate history    🏢 Homes for sale





| $1,400,000 | $1,515,000 | $1,213,000 |
|---|---|---|
| 3 beds  2.5 baths  3,404 sq | 4 beds  3 baths  2,870 sq ft | 3 beds  3 baths  2,464 sq ft |
| 7105 Laverock Ln, Bethesda,... | 7211 Macarthur Blvd,... | 6615 Rannoch Rd, Bethesda,... |

See comparables on map ⌄

Claim this home to receive a free report every month with insights on the changing estimate.

> I own 6789 Goldsboro Rd

## Homeowner tools



**List your home for rent on Redfin for free**

Rental estimate

**$6,677 /mo**

Based on similar rentals

[ Get started for free ]

## Sale history for 6789 Goldsboro Rd

**Today**

| Jul 19, 2013 | Sold (Public Records) | $1,350,000 |
| Date | This was part of a multi-property sale. | Price |
| | Public Records | |

**Jul, 2013**

| Jul 18, 2013 | Sold (MLS) | $1,350,000 |
| Date | BRIGHT MLS #1004571508 | Price |
| Feb 15, 2013 | Listing Removed | — |
| Date | BRIGHT MLS #1004571508 | Price |
| Aug 30, 2011 | Listed | $1,495,000 |
| Date | BRIGHT MLS #1004571508 | Price |

  

Listing provided courtesy of Bright MLS

‹                                                    ›

See all property history ⌄

** Price available after **signing in.**

## Tax history for 6789 Goldsboro Rd

| Year | Property Tax | Land | + | Additions | = | Assessed Value ⓘ |
|------|-------------|------|---|-----------|---|-----------------|
| 2024 | $19,429 (+5.8%) | | | | | |
| 2023 | $18,372 (+10.7%) | | | | | |
| 2022 | $16,593 (+0.6%) | | | | | |
| 2021 | $16,491 (+0.3%) | $997,800 | | $425,000 | | $1,422,800 |
| 2020 | $16,437 | | | | | |

Show more tax history ⌄

## Property details

## IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

BRIAN KING, *et al.*                                    :

    Plaintiffs,                                     :

    v.                                              :          Case No. 436977-V

SERV TRUST, *a Maryland Statutory Trust, et al.*  :

    Defendants.                                     :

**Entered: Clerk, Circuit Court for Montgomery County, MD January 12, 2023**

---

6789 GOLDSBORO ROAD LLC,                                :

    Plaintiff,                                      :

    v.                                              :          Case No. 451611-V
                                                                   (Consolidated)
SERV TRUST, *et al.*                                    :

    Defendants                                      :

### ORDER ENTERING PARTIAL JUDGMENT AND STAY

Upon consideration of the evidence adduced at a trial of this matter on January 3, 2023 (the "Trial"), the arguments of counsel for various represented parties at said trial, the record herein, and governing law, it is, by the Circuit Court for Montgomery County, Maryland, hereby:

ORDERED, pursuant to Maryland Rule 2-519, and for those reasons stated on the record at the Trial, that judgment be entered in favor of Brian King, Cristina King, and the Cristina and Brian King Children's Trust (collectively, the "King Parties"), and against Serv Trust, on all claims set forth in the Second Amended Counterclaim filed by Serv Trust herein; and it is further

ORDERED, for those reasons stated on the record at the close of Trial, that judgment be entered in favor of the King Parties on Count II of the First Amended Complaint for Declaratory Judgment (the "Alter Ego Declaratory Claim"); and it is further

FOUND AND ADJUDGED, for those reasons stated on the record at the close of Trial,

1

Trustee Ex. 10

that Serv Trust is regarded herein as a statutory trust under the doctrine of judicial admission; and it is further

FOUND AND ADJUDGED, pursuant to the Alter Ego Declaratory Claim, and for those reasons stated on the record at the close of Trial, that Serv Trust is, and as of November 18, 2015 was, the alter ego of Gregory B. Myers ("Mr. Myers"), pursuant to Maryland law; and it is further

FOUND AND ADJUDGED, pursuant to the Alter Ego Declaratory Claim, and for those reasons stated on the record at the close of Trial, that Serv Trust is a disregarded entity, being the alter ego of Mr. Myers; and it is further

FOUND AND ADJUDGED, pursuant to the Alter Ego Declaratory Claim, and for those reasons stated on the record at the close of Trial, that inasmuch as Serv Trust is the alter ego of Mr. Myers, all further proceedings in this case are stayed pursuant to the provisions of Section 362 of Title 11 of the United States Code, with all such proceedings constituting proceedings within the scope of those set forth in Section 157(b) of Title 28 of the United States Code; and it is further

ORDERED, that all remaining matters in this case are accordingly stayed pending the first to occur of (i) the above-captioned proceeding being removed to the United States Bankruptcy Court for the District of Maryland; (ii) a court of competent jurisdiction affording relief from the stay set forth in Section 362 of Title 11 of the United States Code; or (iii) the occurrence of other events constituting a termination of the stay provided for in Section 362 of Title 11 of the United States Code.

1-9-2023
Dated

Hon. David W. Lease, JUDGE
Circuit Court for Montgomery County

Entered: Clerk, Circuit Court for
Montgomery County, MD
January 12, 2023

2

The order below is hereby signed.

Signed: June 11 2025



*Elizabeth L. Gunn*
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLUMBIA

**In re:**                                    **Case No. 25-00069-ELG**

    **Gregory Brian Myers,**              **Chapter 13**
        **Debtor.**

## MEMORANDUM OPINION AND ORDER ON SHOW CAUSE

On March 20, 2025, the Court entered the *Order to Show Cause*[1] (the "Show Cause Order")

requiring the Debtor to appear at a hearing on April 16, 2025 (the "Hearing") and show cause why

(i) the automatic stay of 11 U.S.C. § 362(a)[2] should not be annulled retroactively to the petition

date for bad faith and granting prospective relief from the automatic stay as to the NBC Entities[3];

(ii) this case should not be dismissed as a bad faith filing, with a bar to refiling in any bankruptcy

court of no less than ten (10) years, such that the filing of any case prior to expiration of any bar

would not cause the automatic stay to become operative; and (iii) this Court should not find the

Debtor to be a vexatious litigant and/or enter an injunction prohibiting any person or entity

---

[1] ECF No. 24.

[2] Unless specified otherwise, all chapter, code, and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532.

[3] Collectively, Naples Property Holding Company, LLC; Naples Beach Club Land Trust Trustee, LLC, as Trustee; Naples Beach Club Phase II and III Land Trust Trustee, LLC, as Trustee; and NBC Club Owner, LLC.

**Trustee Ex. 11**

related to the Debtor from filing any further matters or removals in the United States Bankruptcy Court for the District of Columbia and/or the United States District Court for the District of Columbia absent certain enumerated circumstances. The Show Cause Order also stayed all proceedings in the adversary proceeding filed by the Debtor (the "Adversary Proceeding").[4] At the conclusion of the Hearing, the Court took the matter under advisement. This Memorandum Opinion and Order sets forth the Court's findings of fact and conclusions of law regarding the Show Cause Order.

## I.    Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409. Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate.[5]

## II.    Background

*a.    The Debtor's D.C. Chapter 13*

The Debtor initiated this case by filing a voluntary petition for relief on February 26, 2025 (the "Petition Date"), just 37 days after the expiration of the two-year (2) refiling bar against the Debtor issued by the United States Bankruptcy Court for the Middle District of Florida.[6] On March 24, 2025, without ever filing schedules or a statement of financial affairs (though after filing a motion to enforce the automatic stay[7] and an adversary proceeding[8]) and while the Show Cause Order remained pending, the Debtor moved to voluntarily dismiss his chapter 13 case.[9] On March

---

[4] *Myers v. Naples Property Holding Company, LLC*, Case No. 25-10005-ELG.
[5] *See* Fed. R. Bankr. P. 7052.
[6] Voluntary Petition for Individuals Filing for Bankruptcy, ECF No. 1; *see In re Myers*, Case No. 2:21-bk-00123-FMD, 2023 WL 350183 at *5 (Bankr. M.D. Fla. Jan. 20, 2023)
[7] Debtor's Emergency Motion to Enforce Automatic Stay, ECF No. 14.
[8] Complaint and Demand for Trial by Jury, ECF No. 22.
[9] Debtor's Motion Requesting This Case be Dismissed, ECF No. 29.

26, 2025, the Court granted dismissal of the case under § 1307(b), but retained jurisdiction over

the Show Cause Order as to the questions of whether (i) the case was filed in bad faith and whether

the dismissal would be with or without prejudice for the reasons set forth in the Show Cause Order;

(ii) the Debtor should be declared a vexatious litigant; and (iii) the Adversary Proceeding should

be dismissed with prejudice (the "Dismissal Order").[10] On April 11, 2025, despite the stay of the

Adversary Proceeding, the Debtor filed a *Notice of Dismissal Without Prejudice* attempting to

have the Adversary Proceeding dismissed before the Court could address the issue of prejudice.[11]

Responses to the Show Cause Order were due on or before April 2, 2025. Timely responses

were filed by the NBC Entities and the chapter 7 trustee (the "Chapter 7 Trustee") for the Debtor's

still open and pending 2015 case in the United States Bankruptcy Court for the District of Maryland

(the "Maryland Chapter 7").[12] The Debtor did not timely respond to the Show Cause Order (other

than seeking to dismiss his case), however, the filings by the NBC Entities and Chapter 7 Trustee

precipitated a filing of a Line by the Debtor apparently as a responsive pleading.[13] The Line does

not address the issues raised by this Court in the Show Cause Order, instead addressing grievances

with the Chapter 7 Trustee.

At the Hearing, the Court heard argument on the Show Cause Order from the Debtor, the

Office of the United States Trustee (the "UST")[14], the NBC Entities, counsel for the chapter 13

trustee in this dismissed case, and counsel for the Chapter 7 Trustee.

---

[10] Order Granting Dismissal and Retaining Jurisdiction, ECF No. 30. On April 2, 2025, the Debtor filed an appeal of the Dismissal Order (without paying the filing fee). *See* Notice of Appeal, ECF No. 32.

[11] Adversary Proceeding, ECF No. 6.

[12] Response to Order to Show Cause, ECF No. 35; Response to Order to Show Cause by Interested Party, Roger Schlossberg, Chapter 7 Trustee, ECF No. 36. *See In re Myers*, Case No. 15-26033-MCR.

[13] Line, ECF No. 39.

[14] On March 11, 2025, the UST filed a Motion to Dismiss Case and Impose Additional Bar on Re-filing (ECF No. 13) (the "UST Motion"), requesting that the Court issue an order with a four-year (4) bar to refiling. The UST Motion was noticed and set for hearing on April 24, 2025. The UST provided argument at the Hearing and referenced both the Show Cause Order and the UST Motion. Due to the fulsome argument at the Hearing, the hearing on the UST Motion

b.    *The Debtor's History of Abuse of the Bankruptcy Process and the Courts*

Since 2015, hundreds of pages of opinions from more than a dozen different courts (both federal and state) have been written regarding the legal machinations, "sprawling tapestry of bad faith abuse of the bankruptcy process,"[15] and "dilatory and abusive litigation tactics"[16] by the Debtor, his spouse, Barbara Ann Kelly ("Ms. Kelly"), and the entities they own, including the 700 Trust (as discussed below). The "long and sordid history of bankruptcy filings"[17] by the Debtor, Ms. Kelly, and/or their entities is well-documented in the opinions issued in bankruptcy cases, adversary proceedings, appeals, and removed matters involving the Debtor, Ms. Kelly, and/or their entities issued prior to the filing of this case, including, but certainly not limited to, the following selected opinions:

1) *In re Kelly*, Case No. 18-13244-WIL, 2018 WL 4354653 (Bankr. D. Md. Sep. 11, 2018).

2) *Myers v. United States Tr.*, No. 19-cv-00637-PX, 2020 WL 758157 (D. Md. Feb. 13, 2020) (noting that as of February 2020 "Myers ha[d] filed 15 bankruptcy appeals and five civil cases related to his 2015 bankruptcy action, the overwhelming majority of which have been dismissed either by the Court or by Myers voluntarily after he failed to designate the record, file a brief, or pay his filing fees").

3) *Myers v. McNamee, Hosea, Jernigan, Kim, Greenan, & Lynch, P.A.*, No. 18-cv-03460-PX, 2020 WL 758151 (D. Md. Feb. 14, 2020) (noting that the "case represents one matter in a litany of litigation stemming from Myers' bankruptcy petition filed over four years ago" in 2015), *reconsideration denied*, No. 18-cv-03460-PX, 2020 WL 1064810 (D. Md. Mar. 5, 2020).

4) *Kelly v. McNamee*, Lead Case: GJH-21-1186, Members Cases GJH-21-1184; GJH-21-1185, 2022 WL 861395 (D. Md. Mar. 23, 2022).

5) *In re Myers*, Case No. 2:21-bk-00123-FMD, 2023 WL 350183 (Bankr. M.D. Fla. Jan. 20, 2023) (imposing a two (2) year bar to refiling as to Mr. Myers).

---

was continued pending issuance of this Memorandum Opinion and Order. Due to the relief granted in this Memorandum Opinion and Order, the relief sought in the UST Motion is duplicative and deemed resolved.

[15] *In re 700 Tr.*, Case No. 24-10230-KKS, 2024 WL 5242058, at *1 (Bankr. N.D. Fla. Dec. 27, 2024).

[16] *In re Kelly*, 656 B.R. 541, 548 (Bankr. D. Md. 2023).

[17] *Kelly v. Naples Prop. Holding Co., LLC*, Civ. No. DLB-24-184, 2025 WL 974345, at *1 (D. Md. Mar. 31, 2025).

6) *In re 700 Tr.*, Case No. 24-10230-KKS, 2024 WL 5242058 (Bankr. N.D. Fla. Dec. 27, 2024).

7) *In re Myers*, Case No. 2:22-v-478-JES, 2023 WL 5720739 (M.D. Fla. Sep. 5, 2023), *appeal dismissed*, No. 23-13408, 2024 WL 1827262 (11th Cir. Apr. 26, 2024).

8) *In re Kelly*, 656 B.R. 541 (Bankr. D. Md. 2023) (imposing a four-year (4) bar to refiling as to Ms. Kelly, among other sanctions), *aff'd*, Civ. No. DLB-24-184, 2025 WL 974345 (D. Md. Mar. 31, 2025), *appeal filed*, Case No. 25-1474 (4th Cir. Apr. 30, 2025).

9) *In re Myers*, Case No. 2:21-bk-00123-FMD, 2022 WL 2827475 (Bankr. M.D. Fla. July 15, 2022), *aff'd*, Case No. 2:22-cv-498-JES, 2023 WL 5697379 (M.D. Fla. Sep. 5, 2023), *appeal dismissed*, No. 23-13409, 2025 WL 1113148 (11th Cir. Apr. 15, 2025).

10) *Myers v. Naples Golf and Beach Club, Inc.*, 1:24-cv-03127-ACR (D.D.C. Nov. 19, 2024), *appeal dismissed*, No. 24-7180 (D.C. Cir. Feb. 5, 2025) (finding Mr. Myers "brought this appeal, and the underlying district court action, in bad faith and for an improper purpose," and imposing sanctions against Mr. Myers in the amount of appellees' attorney's fees and costs), *imposing additional sanctions*, No. 24-7180 (D.C. Cir. June 2, 2025) (potentially enjoining Mr. Myers from filing any appeals or initiating any proceedings in that court until proof submitted that sanctions had been paid).

11) *In re 700 Tr.*, Case No. 2:25-bk-00051-FMD (Bankr. M.D. Fla. May 12, 2025) (dismissing bankruptcy case and imposing a four (4) year bar as to Ms. Kelly, Mr. Myers, and the 700 Trust to refiling in any jurisdiction).[18]

The Court gives full faith and credit to the rulings of each of these courts (and any others not specifically mentioned herein) and, rather than repeating the thorough and substantial histories already set forth therein, only seeks to supplement in this Memorandum Opinion those facts that have occurred related to this case. For the avoidance of doubt, the Court joins the United States Bankruptcy Court for the District of Maryland and the United States Bankruptcy Court for the

---

[18] After this matter was taken under advisement, the United States Bankruptcy Court for the Middle District of Florida issued a ruling in the 700 Trust case barring the 700 Trust, the Debtor, and Ms. Kelly from filing a future petition in any bankruptcy court for a period of four (4) years after the date upon which Judge Ruark's order became final and non-appealable. *See In re 700 Tr.*, 2:25-bk-00051-FMD, ECF No. 141.

Middle District of Florida in their stated intention to preclude the Debtor from further abusing the
bankruptcy process.[19]

### c.    Status of Other Cases Related to the Debtor as of the Petition Date

In considering the Show Cause Order, it is beneficial to understand the status of the Debtor,
Ms. Kelly, and the 700 Trust's various cases as of the Petition Date. In the days leading up to the
filing of this case, the Debtor, Ms. Kelly, and the 700 Trust suffered significant setbacks in their
pending cases. On November 8, 2024, 110 days before the Petition Date, the Debtor and Ms. Kelly
purportedly caused the creation of the 700 Trust and executed a quitclaim deed which sought to
convey the Debtor's and Ms. Kelly's former house in Naples, Florida to the 700 Trust, in part, in
order to circumvent the existing filing bars (two (2) years as to the Debtor and four (4) years as to
Ms. Kelly[20]). On December 27, 2024, the United States Bankruptcy Court for the Northern District
of Florida entered an opinion finding that the case was "a thinly disguised attempt to continue
several years' worth of bad faith litigation under cover of a 'business trust' formed, apparently, for
the sole and exclusive purpose of continuing Mr. Myers' and Ms. Kelly's bad faith legal actions"[21]
and put the Debtor and Ms. Kelly "on notice that the Court reserves jurisdiction to consider
whether they should be deemed 'vexatious litigants,' possibly subject to an additional sanction in
the form of a bar against future filings in this and other courts."[22] On January 10, 2025, the United

---

[19] *See Kelly*, 656 B.R. at 548 ("Ms. Kelly and Mr. Myers have exploited and subverted the bankruptcy process for over eight years. It is the intention of this Court that they be precluded from doing so any longer."); *see 700 Tr.*, 2024 WL 5242058 at *2 ("The Court takes no pleasure in imposing such extraordinary relief, but it is the duty of this Court to prevent further abuse of the bankruptcy process by Ms. Kelly. The Court determines that the relief granted is necessary and appropriate under the unique facts of this case to protect the integrity of the Court and the bankruptcy process.").

[20] Ms. Kelly's appeal of her bar order was pending in the United States District Court for the District of Maryland. As noted *supra*, the bar order was subsequently affirmed. Not deterred, Ms. Kelly has appealed the District Court order to the Fourth Circuit Court of Appeals. *See Kelly*, Case No. 25-1474, ECF No. 1. Ms. Kelly has already asked for an extension of the initial briefing deadline through and including June 26, 2025. *Id.*, ECF No. 5.

[21] *In re 700 Tr.*, 2024 WL 5242058 at *3.

[22] *Id.* at *7.

States Bankruptcy Court for the Northern District of Florida transferred the 700 Trust's chapter 11 bankruptcy case to the United States Bankruptcy Court for the Middle District of Florida to stop the "Debtor's, its Trustees', and its counsel's continued, well-demonstrated mockery of and disdain for the entire judicial system."[23] A hearing in the United States Bankruptcy Court for the Middle District of Florida on a motion to dismiss the 700 Trust case with prejudice was set for hearing on March 5, 2025.[24]

On January 7, 2025, the Eleventh Circuit Court of Appeals affirmed the district court denying reconsideration of its order to remand the Debtor's and Ms. Kelly's easement lawsuit against the NBC Entities to Florida state court.[25] In late January 2025 and early February 2025, the Eleventh Circuit also dismissed several appeals filed by the Debtor against the NBC Entities.[26] On February 5, 2025, the Court of Appeals for the District of Columbia Circuit issued a per curiam order dismissing the Debtor's appeal for lack of jurisdiction (related to the removal of an action from Florida state court as to the NBC Entities to the United States District Court for the District of Columbia) and ordering sanctions in the amount of reasonable attorneys' fees and costs against the Debtor.[27] Further, the United States District Court for the District of Columbia set a status conference in the case underlying the denied appeal for March 10, 2025.[28]

In the face of resuming litigation with the NBC Entities in either state court or the United States District Court, the continued decade-long administration of the Maryland Chapter 7, and the expiration of the two (2) year bar, the Debtor chose to again file a skeletal petition to obtain the benefit of the automatic stay—this time in the United States Bankruptcy Court for the District

---

[23] *In re 700 Tr.*, Case No. 24-10230-KKS, 2025 WL 77751, at *6 (Bankr. N.D. Fla. Jan. 10, 2025).

[24] *In re 700 Tr.*, Case No. 2:25-bk-0051-FMD, ECF No. 133.

[25] *In re Myers*, No. 23-11906, 2925 WL 39995 (11th Cir. Jan. 7, 2025).

[26] *See Myers v. City of Naples, Fla.*, No. 24-14007-AA, 2025 WL 752488 (11th Cir. Jan. 28, 2025); *see Myers v. City of Naples, Fla.*, No. 25-10179-A, 2025 WL 1155805 (11th Cir. Feb 11, 2025).

[27] *See Myers*, No. 24-7180, Doc. #2098926.

[28] See *Myers*, 1:24-cv-03127-ACR.

7

of Columbia, a court the Debtor may have presumed to be unfamiliar with his, Ms. Kelly's, and

their entities' byzantine and copious filing history. The Debtor was mistaken.[29]

      *d.     The Debtor's History of Use of Bankruptcy Filings as a Sword and Delay Tactic*

      Since 2018, the Debtor and/or Ms. Kelly have filed at least eight (8) individual chapter 13

petitions across four (4) different jurisdictions seeking to take advantage of the automatic stay for

litigation purposes.[30] Additionally, since 2015, the Debtor, Ms. Kelly, and the 700 Trust have filed

at least three (3) chapter 11 petitions across two jurisdictions for the same reason.[31] This chapter

13 case is no different from its predecessors. The Debtor and Ms. Kelly are not "honest but

unfortunate debtors," but instead seek only to utilize the bankruptcy system as a sword to delay

unfavorable litigation results and frustrate their creditors. This abuse of the bankruptcy system is

particularly acute here where the Debtor filed a skeletal petition, without any statements or

schedules, and yet utilized his bankruptcy case number to file at least four Suggestions of

Bankruptcy in an attempt to stall or otherwise delay proceedings, including proceedings before the

United States District Court for the District of Columbia and United States Court of Appeals for

the District of Columbia Circuit.[32]

---

[29] The Court recalls that the Debtor in this case previously filed a chapter 11 petition in this jurisdiction for his entity the 1712 Property Holding Trust on June 19, 2022. *See* 22-00104-ELG, ECF No. 1. On July 1, 2022, the Court dismissed the case for failure to pay the balance of the chapter 11 filing fee. *See id.* at ECF No. 15.

[30] The totality of the Debtor's and Ms. Kelly's chapter 13 bankruptcy history, as well as the outcomes of those cases, are briefly recited herein: *See In re Barbara Ann Kelly*, Case No. 18-13244-LSS (Bankr. D. Md.) (dismissed for exceeding chapter 13 jurisdictional debt limit); *In re Barbara Ann Kelly*, Case No. 18-07142-FMD (Bankr. M.D. Fla.) (Debtor voluntarily dismissed); *In re Gregory B. Myers*, Case No. 19-10392-BLS (Bankr. D. Del.) (dismissed for improper venue); *In re Gregory B. Myers*, Case No. 19-17428-LSS (Bankr. D. Md.) (Debtor voluntarily dismissed); *In re Barbara Ann Kelly*, Case No. 19-24525-LSS (Bankr. D. Md.) (Debtor voluntarily dismissed); *In re Gregory B. Myers*, Case No. 21-00123-FMD (Bankr. M.D. Fla.) (dismissed with prejudice as a bad faith filing and two (2) year refiling bar imposed); *In re Barbara Ann Kelly*, Case No. 23-12700-MCR (Bankr. D. Md.) (Debtor voluntarily dismissed and bankruptcy court imposed prospective relief including modifying the automatic stay, imposing a four (4) year equitable servitude, and prospectively lifting the automatic stay), *aff'd on appeal*, Civ. No. DLB-24-184 (Mar. 31, 2025); *In re Gregory B. Myers*, Case No. 25-00069-ELG (Bankr. D.D.C.).

[31] *See In re* Myers, Case No. 15-26033-MCR (Bankr. D. Md.) (converted to chapter 7 and still pending); In *re Barbara Ann Kelly*, Case No. 23-11566-LSS (Bankr. D. Md.) (dismissed *sua sponte* by the court); *In re 700 Tr.*, Case No. 25-00051-FMD (Bankr. M.D. Fla.) (dismissed, initially filed in Bankr. N.D. Fla. as Case No. 24-10230-KKS).

[32] *See* Suggestion of Bankruptcy, *In re 700 Tr.*, Case No. 25-00051-FMD (Bankr. M.D. Fla. Mar. 4, 2025), ECF No. 130; Suggestion of Bankruptcy, *In re Myers (King v. Schlossberg)*, Case No. 15-26033-MCR, Adv. No. 24-00007

No further clarity of the intent or purpose for the Debtor's bankruptcy case as anything other than a continuation of the Debtor's decade long crusade to evade creditors was offered at the Hearing. Despite the fact that the Debtor had not filed a responsive pleading, the Court provided the Debtor with all the time he wanted (ultimately, over two hours) to address the merits of the case and the Show Cause Order. However, instead of addressing the purpose of his bankruptcy case, the Debtor accused the Court of bias and disparaged the other parties in interest present. Further, at the Hearing, the Court repeatedly asked the Debtor why he had filed a chapter 13 petition in this jurisdiction. The Debtor refused to provide a straightforward answer and insisted on casting aspersions on the integrity of sister bankruptcy courts. Instead of providing any clarity as to the purpose for his bankruptcy filing or any basis upon which the Court might find a modicum of good faith, the Debtor instead chose to maintain, as he has in his previous bankruptcy cases, that he is being unfairly targeted and receiving unequal treatment from the American judiciary. Notably, the Debtor did not show remorse for his past bankruptcy filings or take any responsibility for his behavior in this or any past cases, instead continuing to try to paint himself as a "victim." The only victims here are the bankruptcy system itself in the thousands of hours of judicial resources expended upon the Debtor's filings and the innocent creditors who have sought for years, or in some cases over a decade, to exercise their rights.

### III.    Legal Analysis

In considering whether cause exists to sanction the Debtor, and if so, what sanctions are appropriate, the Court finds persuasive the District Court of Maryland's recent memorandum opinion[33] affirming the order dismissing Ms. Kelly's 2023 chapter 13 case and granting

---

(Bankr. D. Md. Mar. 6, 2025), ECF No. 25; Suggestion of Bankruptcy, *Myers v. Naples Golf and Beach Club, Inc.*, Case No. 24-03127-ACR (D.D.C. Mar. 7, 2025), ECF No. 23; Suggestion of Bankruptcy, *Myers*, No. 24-7180, Doc. #2105042.

[33] *Kelly*, 2025 WL 974345.

prospective relief (the "Opinion"). In the Opinion, the court found that absent sanctions "Kelly and Myers will continue to manipulate the bankruptcy system to prevent the foreclosure of [their] properties and harm their innocent creditors."[34] The Court wholeheartedly agrees and, for the reasons stated herein and as stated by sister courts, finds that sanctions are appropriate in this case as to the Debtor. The question is: If the previous two (2) year and four (4) year bars were insufficient to stop the Debtor, Ms. Kelly, and their entities from manipulating the bankruptcy system, then what *will* stop them? The Show Cause Order raised three proposed sanctions, each discussed herein.

    *a. Bar to Refiling*

    The Debtor cannot avoid an adverse ruling or bar to refiling simply by requesting voluntary dismissal of this case.[35] The Court retained jurisdiction on the question of a bar to refiling in the Dismissal Order and finds, as the United States Bankruptcy Court for the Middle District of Florida has found on two separate occasions, that a bar to refiling is appropriate. Sections 105(a) and 349(a) of the Bankruptcy Code authorize the Court to issue a lengthy bar, for cause. As the United States Bankruptcy Court for the District of Maryland found as to Ms. Kelly, "[i]f ever there were a case that screams out for the extraordinary relief allowed by Sections 105(a) and 349(a), this is it."[36] The Debtor has more than demonstrated that he can manipulate the litigation process to take several years (or a decade or more) to obtain a final order. Thus, it is necessary and appropriate that the bar to refiling be effective immediately, but the bar time period shall not begin until the date that this Memorandum Opinion and Order becomes final and nonappealable.

---

[34] *Id.* at *20.

[35] *Id.* at *11.

[36] *See Kelly*, 656 B.R. at 607.

The question is: what is the correct time period? The Show Cause Order required the Debtor to show cause as to why a ten (10) year bar to refiling should not be entered. Relying on *In re Balmer*,[37] the Chapter 7 Trustee urges the Court to impose a ten (10) year bar on the Debtor. In *Balmer*, after a period of eight (8) years of abuse of the bankruptcy system by the debtor, the bankruptcy court barred the debtor for eight (8) years—a period equal to the duration of the debtor's abuse of the bankruptcy system.[38] Based upon the totality of the circumstances, including but not limited to (i) the Debtor's abuse of the bankruptcy system spanning a decade beginning in 2015 with his first chapter 11 filing (which remains open to this date as a chapter 7 and is the basis for over a dozen written opinions in the main case and associated adversary proceedings); (ii) the apparent unpersuasive nature of the previous two (2) year bar as to the Debtor and the existing four (4) year bar as to Ms. Kelly; (iii) the consistent and persistent burden on the bankruptcy system by the Debtor; (iv) the Debtor's lack of recognition or perception of his ongoing and unfettered abuse of the bankruptcy system; and (v) the Debtor's apparent incapacity to understand or abide by an adverse ruling, the Court finds that a ten (10) year bar to refiling in any court is appropriate beginning on the date that this Memorandum Opinion and Order becomes final and nonappealable. For avoidance of any doubt, the bar is effective immediately, however, the ten-year (10) period will not begin to run until after any and all appeals of this Memorandum Opinion and Order have been exhausted.

   b. *Annulment of the Stay*

The Show Cause Order also required the Debtor to show cause why the automatic stay should not be annulled retroactively to the Petition Date for bad faith and why the Court should not grant prospective relief from the automatic stay as to the NBC Entities in any bankruptcy case

---

[37] No. 1:03-BK-19058 E, 2003 WL 22658196 (Bankr. E.D. Ark. Oct. 10, 2003).
[38] *Id.* at *4.

11

filed in any jurisdiction by the Debtor. However, because the Debtor voluntarily dismissed this chapter 13 case, the question of annulment of the stay is moot. Furthermore, given the ten (10) year bar to refiling, the Court finds that prospective relief from the stay is unnecessary and may be duplicative.

### c. Vexatious Litigant Pre-Filing Injunction

A vexatious litigant injunction is an "extreme sanction and should be imposed in only the most egregious cases."[39] Prior to imposing such a sanction, courts must look to (i) whether there have been numerous, similar actions filed by the party; (ii) whether the party's previous filings were adjudicated as frivolous filings and completely lacked substantive allegations; (iii) whether the party is seeking to harass a certain adversary; and (iv) whether the administration of justice has been impeded so that a vexatious litigant injunction is required.[40] Despite the Debtor's prolific and abusive filing history across multiple jurisdictions as described herein, the Court finds that due to the bar imposed herein and at this time and case posture (solely based upon the filings in this Court), the Debtor is not a vexatious litigant.[41]

### d. Dismissal of the Adversary Proceeding with Prejudice

Dismissal with prejudice is "an appropriate response to a debtor's egregious misconduct, contumacious actions, or abuse of the bankruptcy process."[42] Despite the stay of the Adversary Proceeding, the Debtor filed a *Notice of Dismissal Without Prejudice* attempting to dismiss the Adversary Proceeding to avoid an adverse ruling less than one month after the matter was filed.[43]

---

[39] *Duru v. Mitchell*, 289 F. Supp. 3d 112, 117 (D.D.C. 2018) (citing *In re Powell*, 851 F. 2d 427, 434 (D.C. Cir. 1988)).
[40] *Id.*

[41] It is also not clear that such prohibition would have the desired impact on the Debtor in any event. The United States Bankruptcy Court for the Middle District of Florida imposed a bar against filing any further matters absent either the prior authorization of the Court or such filing be signed by an attorney in good standing with the bar. Notwithstanding this requirement, the Debtor caused an attorney to file the 700 Trust case and recently sanctions were entered against the Debtor and the attorney. *See in re 700 Tr.*, Case No. 2:25-bk-00051-FMD, ECF No. 140.

[42] *In re Ebersole*, 452 B.R. 920, 922 (Bankr. W.D. Va. 2011).
[43] Adversary Proceeding, ECF No. 6.

This tactic echoes those used previously by the Debtor to evade adverse rulings and warranted repercussions and to preserve future avenues of legal abuse resulting in harm to innocent creditors and a waste of judicial resource. No such escape route is available to the Debtor in this case. The Adversary Proceeding is another example of the Debtor's contumacious actions and abuse of the bankruptcy process.[44] Thus, the Court shall dismiss the Adversary Proceeding, with prejudice.

## IV.    Conclusion

Therefore, for the reasons stated herein, the Court finds that cause exists to sanction the Debtor. Accordingly, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that:

1.    This case is **DISMISSED WITH PREJUDICE**.

2.    The Debtor, Gregory Brian Myers, is barred from filing any case under any chapter of the Bankruptcy Code for a period of ten (10) years in any jurisdiction, effective immediately, but with such ten-year (10) period beginning on the date that this Memorandum Opinion and Order becomes final and nonappealable.

3.    By separate order, the Adversary Proceeding (25-10005-ELG) shall be dismissed with prejudice.

[Signed and dated above.]

Copies to: recipients of electronic notification.

---

[44] Adversary Proceeding, ECF No. 1 (pleading a cause of action under § 362(k) and a tort claim originating from alleged stay violations and seeking damages in the millions of dollars).