8:25-cv-2103-TDC (Lead Case)
8:25-cv-2337-TDC
8:25-cv-2635-TDC

───────────

**United States District Court
for the District of Maryland
Greenbelt Division**

───────────

*Myers v. Schlossberg, et al. (In re Myers)*

────────────────

On Appeal from the United States Bankruptcy Court
for the District of Maryland

───────────

Appellees' Appendix

Maurice B. VerStandig, Esq.
Bar No. 18071
The VerStandig Law Firm, LLC
9812 Falls Road, #114-160
Potomac, Maryland 20854
Phone: (301) 444-4600
mac@mbvesq.com

Frank J. Mastro, Esq.
Bar No. 24679
Schlossberg Mastro
P.O. Box 2067
Hagerstown, Maryland 21742
Phone: (301) 739-8610
fmastro@schlosslaw.com

*Counsel for Appellees*

## **Table of Contents**

Motion for Approval of Proposed Compromise (February 7, 2023)...................... 1

Notice of Proposed Compromise (February 7, 2023)............................................. 5

Exhibit to Motion to Compromise (February 7, 2023).......................................... 11

Complaint for Declaratory Relief (January 10, 2024) ........................................... 34

Motion to Approve Compromise (December 30, 2024)........................................ 42

Notice of Proposed Compromise (December 30, 2024)........................................ 45

Preliminary Objection to Motion to Approve Compromise (January 21, 2025) ................................................................................................................ 63

Trustee's Trial Exhibit 1 (June 30-July 1, 2025) .................................................. 73

Trustee's Trial Exhibit 2 (June 30-July 2, 2025).................................................. 106

Trustee's Trial Exhibit 3 (June 30-July 1, 2025) ................................................. 107

Trustee's Trial Exhibit 10 (June 30-July 1, 2025) ............................................... 183

Trustee's Trial Exhibit 11 (June 30-July 1, 2025) ............................................... 185

Proceeding Memo (July 1, 2025) ......................................................................... 198

Supplemental Objection to Motion to Approve Compromise (July 3, 2025) ................................................................................................................ 200

Order Approving Compromise (July 3, 2025) ..................................................... 204

Notice of Appeal (July 17, 2025) ........................................................................ 207

Proof of Claim of Brian King (January 10, 2024) ............................................... 210

Proof of Claim of Cristina King (January 10, 2024) ........................................... 213

Proof of Claim of Cristina and Brian King Children's Trust (January 10, 2024) ................................................................................................................ 216

Trial Transcripts (June 30-July 1, 2025) ............................................................. 219

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | | |
|---|---|---|
| In re: | ) | |
| GREGORY B. MYERS, | ) | Case No. 15-26033-MCR |
| Debtor. | ) | (Chapter 7) |
| | ) | |

**MOTION FOR APPROVAL OF PROPOSED COMPROMISE AND SETTLEMENT
WITH BRIAN KING, CRISTINA KING, AND THE CRISTINA AND
BRIAN KING CHILDREN'S TRUST**

TO THE HONORABLE MARIA ELLENA CHAVEZ-RUARK, UNITED STATES
BANKRUPTCY JUDGE:

COMES NOW, Roger Schlossberg, the Chapter 7 Trustee herein (the "Trustee"), by his

undersigned counsel, and in support of the instant *Motion for Approval of Proposed Compromise*

*and Settlement with Brian King, Cristina King, and the Cristina and Brian King Children's Trust*

hereby respectfully represents as follows:

1.       As is set forth in the *Notice of Proposed Compromise and Settlement with Brian*

*King, Cristina King, and the Cristina and Brian King Children's Trust* filed contemporaneously

herewith (the "*Notice*"), the Trustee proposes to enter into a compromise and settlement of a

pending dispute with the parties named therein.  The background of said dispute and the specific

terms and conditions of said proposed compromise and settlement are more particularly set forth

in said *Notice*.  A copy of said *Notice* is attached hereto and incorporated by reference herein as

*Exhibit 1*.

2.       Pursuant to the provisions of Bankruptcy Rules 9019 and 2002, the *Notice* has been

forwarded to all parties-in-interest herein as appears by reference to the *Certificate of Service* also

filed contemporaneously herewith.

3.    If said proposed compromise and settlement is approved by this Court, the parties respectfully submit that this Court should entertain and enter an *Order* in substantially that form attached to the *Notice*.

4.    The parties believe that the above-described proposed compromise and settlement is in the best interests of all parties-in-interest herein and should be approved by the Court.

WHEREFORE, the Trustee respectfully requests that the proposed compromise and settlement be APPROVED.

Respectfully submitted,

SCHLOSSBERG | MASTRO

By:    */s/ Frank J. Mastro*
     Frank J. Mastro #24679
     Roger Schlossberg
     P.O. Box 2067
     Hagerstown, Maryland 21742
     (301) 739-8610
     fmastro@schlosslaw.com
     rschlossberg@schlosslaw.com
     *Attorneys for Trustee*

Appellees' Appendix 0002

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY, that on this **7th** day of **February 2023**, a copy of the foregoing *Motion for Approval of Proposed Compromise and Settlement with Brian King, Cristina King, and the Cristina and Brian King Children's Trust* was served upon all parties listed on the attached CMECF Mail List (via electronic mail to those parties listed on the Electronic Mail Notice List and via first-class mail postage prepaid to those parties listed on the Manual Notice List), and upon the following parties via first-class, postage prepaid mail:

Maurice B. Verstandig, Esq.
The Verstandig Law Firm, LLC
9812 Falls Road, #114-160
Potomac, MD 20854
mac@mvbesq.com
*Attorneys for Brian King, Cristina King, and
the Cristina and Brian King Children's Trust*

and via first class, postage prepaid mail upon:

Gregory B. Myers
700 Gulf Shore Blvd. N.
Naples, FL 34102
gregbmyers@verizon.net
*Debtor*

Benjamin Andres
Gordon & Simmons, LLC
1050 Key Parkway, Suite 101
Frederick, MD 21702

Bradford F. Englander
Whiteford Taylor & Preston, LLP
3190 Fairview Park
Suite 800
Falls Church, VA 22042

H. Jason Gold
Nelson Mullins Riley & Scarborough LLP
101 Constitution Ave NW
Suite 900
Washington, DC 20001

Appellees' Appendix 0003

Hunter Harman
Berkshire Hathaway Home Services
Beach Properties of FL
2063 Highway 395 South
Santa Rosa Beach, FL 32459

IPFS Corporation
30 Montgomery Street
Suite 1000
Jersey City, NJ 07302

Barbara Ann Kelly
4505 Wetherill Rd.
Bethesda, MD 20816

Michael K. Myers
7728 Lee Avenue
Alexandria, VA 22308

Serv Trust
3158 Bravertown Street
Suite 206
Edgewater, MD 21037

Tenants by the Entirety
Roger Charles Simmons
Gordon & Simmons, LLC
1050 Key Parkway, Suite 101
Frederick, MD 21702

Office of the U.S. Trustee
6305 Ivy Lane, Suite 600
Greenbelt, MD 20770


                                        _____ */s/ Frank J. Mastro*_____
                                        Frank J. Mastro

Appellees' Appendix 0004

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | |
|---|---|
| In re: | ) |
| GREGORY B. MYERS | ) Case No. 15-26033-MCR |
| | ) |
| Debtor. | ) (Chapter 7) |
| | ) |

## NOTICE OF PROPOSED COMPROMISE AND SETTLEMENT WITH BRIAN KING, CRISTINA KING, AND THE CRISTINA AND BRIAN KING CHILDREN'S TRUST

TO ALL PARTIES-IN-INTEREST:

PLEASE TAKE NOTE that Roger Schlossberg, Chapter 7 Trustee of the Bankruptcy Estate of Gregory B. Myers (the "Trustee"), contemporaneously has filed his *Motion for Approval of Proposed Compromise and Settlement with Brian King, Cristina King, and the Cristina and Brian King Children's Trust* (the "*Settlement Motion*") seeking authority to compromise and settle the following described matter upon those terms and conditions hereinafter noted.

### Background

Gregory B. Myers ("the Debtor" or "Myers") filed a voluntary Chapter 11 bankruptcy petition on November 18, 2015 ("the Petition Date"). The Debtor remained in possession of the estate's assets and managed its financial affairs until February 22, 2017, when the case was converted to a proceeding under Chapter 7 of the Bankruptcy Code . The Trustee thereafter was duly appointed as the Chapter 7 Trustee herein.

In 2017, the Trustee was named as a nominal defendant in the matter of *Brian King, et al. v. Serv Trust, et al.*, Case No. 439677-V (the "King Case"), in the Circuit Court for Montgomery County, Maryland ("the State Court"), a case which subsequently was consolidated with the related matter of *6789 Goldsboro LLC v. Serv Trust, et al.*, Case No. 451611-V (the "Goldsboro Case";

Appellees' Appendix 0005

collectively, the King Case and Goldsboro Case are hereafter referred to as "the State Court Cases"). Each of the State Court Cases concerns claims against Serv Trust, with the Goldsboro Case also concerning a claim against the Debtor.

In the King Case, which was designated the "lead" case in the State Court, Brian King, Cristina King, and the Cristina and Brian King Children's Trust (the "King Parties") sought declaratory judgments that Serv Trust, a Maryland statutory trust, is the alter ego of the Debtor and, further, that Serv Trust's interest in 6789 Goldsboro LLC ("Goldsboro") has been redeemed by operation of the entity's governing documents.

In the Goldsboro Case, Goldsboro sued both Serv Trust and the Debtor for the alleged breach of a promissory note and guaranty, respectively, and sought an award of monetary damages in excess of $1 million, including accrued interest.[1] The Goldsboro Case originally was brought as an adversary proceeding in this Court, *see 6789 Goldsboro LLC v. Myers, et al.*, Adv. No. 18-407, but this Court entered an *Order of Abstention* on January 30, 2019 which ultimately led to the matter being refiled in State Court.

A trial in the consolidated State Court Cases was scheduled to commence on Tuesday, January 3, 2023, the first business day of the New Year. However, at approximately 4:30 p.m. on Friday, December 30, 2022 – just minutes before the close of business on the last business day

---

[1] The Debtor, in his then-capacity as a co-trustee of Serv Trust, requested that Goldsboro make pre-petition loans totaling $635,000 to Serv Trust, which then forwarded the funds to the Debtor and his wife. On May 18, 2015, in connection with the foregoing loans, Serv Trust executed a Promissory Note in favor of Goldsboro while the Debtor executed a Guaranty Agreement in which he guaranteed Serv Trust's repayment of the loans made by Goldsboro. The Debtor, however, did not list Goldsboro as an unsecured creditor when he filed his bankruptcy petition six months later; which omission was one of the grounds upon which this Court denied a discharge to the Debtor under 11 U.S.C. § 727(a)(4)(A). *See In re Myers*, 2018 WL 4701387, *8 (Bankr. D. Md. Sept. 28, 2018) ("It is not believable that [the Debtor] simply forgot to include his largest unsecured creditor in the first several versions of his schedules when he had executed a personal guarantee in favor of that creditor six months prior to filing for bankruptcy and was requesting advances from the creditor up to and after filing his petition.").

Appellees' Appendix 0006

before trial – the Debtor filed a notice of removal purporting to remove the action to the U.S. Bankruptcy Court for the Middle District of Florida, where the Debtor's later-filed and separate Chapter 13 case was pending at the time.[2] The King Parties immediately filed an emergency motion to remand noting the various infirmities and inherent bad faith associated with Debtor's attempted removal at the eleventh-hour. On the morning of January 3, 2023, the Florida bankruptcy court remanded the case back to the Circuit Court for Montgomery County in time to allow for the trial of the State Court Cases to proceed as scheduled.

Following the conclusion of the trial on January 3, 2023 – at which evidence was presented showing that, *inter alia*, the Debtor and his wife received the extraordinary sum of $1,217,675.00 out of the $1,371,271.58 distributed by Serv Trust between March 10, 2011 and January 6, 2018 – or more than 88% thereof – the State Court adjudicated Serv Trust to be the alter ego of the Debtor as of and subsequent to the Petition Date. In a subsequent written order entered on January 12, 2023, the State Court memorialized its ruling, holding, *inter alia*, that "Serv Trust is, and as of November 18, 2015 was, the alter ego of Gregory B. Myers" and that "Serv Trust is a disregarded entity, being the alter ego of Mr. Myers." *See Order Entering Partial Judgment and Stay* (the "State Court Order"), attached hereto as ***Exhibit 1***.

In its ruling, the State Court stayed all further proceedings in the State Court Cases as its determination that Serv Trust is the alter ego of the Debtor necessarily rendered the automatic stay of 11 U.S.C. § 362(a) effective as to all remaining causes of action therein. The State Court reasoning that, in light of its alter ego ruling, all claims against Serv Trust must be construed as

---

[2] The Debtor's Florida bankruptcy case ultimately was dismissed on January 20, 2023. On that day, the U.S. Bankruptcy Court for the Middle District of Florida *sua sponte* entered an order which denied confirmation of the Debtor's proposed Chapter 13 plan, dismissed his Chapter 13 case with prejudice, and imposed a two-year ban against refiling, following the court's determination that Myers filed his Chapter 13 case in bad faith (as a tactic to delay and frustrate his creditors rather than as a means to repay them). *See In re Myers*, 2023 WL 350183 (Bankr. M.D. Fla. Jan. 20, 2023).

Appellees' Appendix 0007

claims against the Estate. *Id*. Thus, the King Parties' remaining claim against Serv Trust, which seeks a declaration regarding the alleged redemption of Serv Trust's interest in Goldsboro, is stayed by operation of 11 U.S.C. § 362(a) (as are Goldsboro's claims against Serv Trust in the Goldsboro Case along with its previously stayed claim therein against the Debtor).

Further, as a matter of law, immediately upon entry of the State Court Order, Serv Trust and all of its assets became property of the Debtor's bankruptcy estate herein ("the Estate"), pursuant to 11 U.S.C. § 541(a), subject to administration by the Trustee as the sole legal representative of the Estate pursuant to 11 U.S.C. § 323. The State Court Order has not been stayed and remains in full force and effect. *See* Md. Rule 2-632. Thus, the Trustee is now the sole person empowered to act with respect to the remaining claims against Serv Trust in the State Court Cases, which are now construed as claims against the Estate.

In consideration of the interests of this Court and all creditors of the Debtor in the important outcome of the remaining claim in the King Case, the Trustee would prefer to litigate the balance of the King Case in this Court and the King Parties have expressed that they are amenable to such an outcome. However, notwithstanding that the remaining claim against Serv Trust in the King Case became a claim against the Estate only as of January 12, 2023, the Trustee likely will not be able to effect a removal of the King Case to this Court.[3] Despite the apparent bar prohibiting removal of the existing King Case to this Court, the Trustee has engaged in negotiations with the King Parties in an attempt to craft a creative solution to the above-described procedural

---

[3] Although this Court would have jurisdiction under 28 U.S.C. § 1452, removal would be timely only if the time period for removal set forth in § 1446(b)(3) would apply. However, the Trustee believes it more likely that the time period set forth in Fed. R. Bankr. P. 9027(a)(3) would apply to make any attempted removal untimely. Although a small minority of jurisdictions have applied § 1446 rather than Rule 9027, *see* Thomas B. Bennett, *Removal, Remand, and Abstention Related to Bankruptcies: Yet Another Litigation Quagmire!*, 27 Cumb. L. Rev. 1027 (1997), this Court and many others have favored the application of Rule 9027. *See, e.g., Roberts v. Creighton*, 2009 WL 7083320 (D. Md. Feb. 27, 2009); Patricia C. Williams and Keller W. Allen, *Removal of State Court Cases to Bankruptcy Court*, 27 Gonz. L. Rev. 129 (1991).

Appellees' Appendix 0008

conundrum. As a result of those negotiations, said parties now have agreed to the following compromise and settlement, subject to notice to creditors and approval by the Court, on the terms and conditions described below.

<u>**Proposed Compromise and Settlement**</u>

The Trustee and the King Parties have agreed as follows:

(1)     The King Parties and the Trustee shall jointly file a stipulation in the King Case pursuant to which the King Parties will dismiss without prejudice their remaining claim against Serv Trust regarding the alleged redemption of Serv Trust's interest in Goldsboro ("the Redemption Claim").

(2)     In consideration of the foregoing dismissal, the Trustee agrees to toll the statute(s) of limitation applicable to the Redemption Claim *nunc pro tunc* to September 14, 2017, the date the King Case was filed in the State Court.

(3)     The King Parties and the Trustee further agree to endeavor in good faith to negotiate a resolution to the Redemption Claim and, if negotiations are not successful, the King Parties shall refile the Redemption Claim as an adversary proceeding in this Court within thirty (30) days after the entry of an order approving this settlement.

<u>**Trustee's Recommendation**</u>

The Trustee, in the sound exercise of his judgment, believes that the proposed compromise is in the best interest of the Estate and all interested parties herein. The proposed compromise affords the Trustee time to become familiar with the Redemption Claim and to potentially negotiate a resolution of the same (subject, of course, to notice to creditors and approval by this Court), which could yield significant income for the Estate. Even if a resolution is not reached, the Redemption Claim will be litigated in the Estate's preferred forum. The Trustee does not perceive

<div align="center">5</div>

that any harm to the Estate will result from the proposed compromise. Therefore, the Trustee strongly recommends approval of this proposed compromise and settlement.

## **Manner of Objection**

Parties in interest objecting to the proposed action by the Trustee are to file such Objections in writing with the United States Bankruptcy Court, 6500 Cherrywood Lane, Suite 300, Greenbelt, Maryland 20770, by not later than twenty-one (21) days after the date of this Notice; with a copy of said Objection to be provided to the undersigned by the same date.  Objections must specifically state the factual and legal grounds upon which such Objection is based.  Hearings may be held before the United States Bankruptcy Court upon any such Objections as are filed, or the Court may determine the matter without a hearing.  Further, the Court may conduct a hearing in its discretion regardless of whether any Objections are filed.  Any party in interest filing an Objection may be required to be present at such hearing as may be held.  If no Objection is filed within the period above-provided, the Court will proceed to consider the Debtor's proposed compromise and settlement as above-proposed without further notice to parties in interest. Parties in interest desiring further information should consult the Court file or communicate with the undersigned.

Date:  February 7, 2023

Respectfully submitted,

SCHLOSSBERG | MASTRO

By:___*/s/ Frank J. Mastro*_____
    Frank J. Mastro #24679
    Roger Schlossberg
    P.O. Box 2067
    Hagerstown, MD 21742
    (301) 739-8610
    fmastro@schloslaw.com
    rschlossberg@schloslaw.com
    *Attorneys for Trustee*

6

Appellees' Appendix 0010

## IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

BRIAN KING, *et al.*                               :

    Plaintiffs,                          :

    v.                                        :   Case No. 436977-V

SERV TRUST, *a Maryland Statutory Trust, et al.* :   **Entered: Clerk, Circuit Court for Montgomery County, MD January 12, 2023**

    Defendants.                          :

---

6789 GOLDSBORO ROAD LLC,                    :

    Plaintiff,                          :

v.                                           :   Case No. 451611-V
                                                 (Consolidated)
SERV TRUST, *et al.*                        :

    Defendants                          :

### ORDER ENTERING PARTIAL JUDGMENT AND STAY

Upon consideration of the evidence adduced at a trial of this matter on January 3, 2023 (the "Trial"), the arguments of counsel for various represented parties at said trial, the record herein, and governing law, it is, by the Circuit Court for Montgomery County, Maryland, hereby:

ORDERED, pursuant to Maryland Rule 2-519, and for those reasons stated on the record at the Trial, that judgment be entered in favor of Brian King, Cristina King, and the Cristina and Brian King Children's Trust (collectively, the "King Parties"), and against Serv Trust, on all claims set forth in the Second Amended Counterclaim filed by Serv Trust herein; and it is further

ORDERED, for those reasons stated on the record at the close of Trial, that judgment be entered in favor of the King Parties on Count II of the First Amended Complaint for Declaratory Judgment (the "Alter Ego Declaratory Claim"); and it is further

FOUND AND ADJUDGED, for those reasons stated on the record at the close of Trial,

1

that Serv Trust is regarded herein as a statutory trust under the doctrine of judicial admission; and it is further

FOUND AND ADJUDGED, pursuant to the Alter Ego Declaratory Claim, and for those reasons stated on the record at the close of Trial, that Serv Trust is, and as of November 18, 2015 was, the alter ego of Gregory B. Myers ("Mr. Myers"), pursuant to Maryland law; and it is further

FOUND AND ADJUDGED, pursuant to the Alter Ego Declaratory Claim, and for those reasons stated on the record at the close of Trial, that Serv Trust is a disregarded entity, being the alter ego of Mr. Myers; and it is further

FOUND AND ADJUDGED, pursuant to the Alter Ego Declaratory Claim, and for those reasons stated on the record at the close of Trial, that inasmuch as Serv Trust is the alter ego of Mr. Myers, all further proceedings in this case are stayed pursuant to the provisions of Section 362 of Title 11 of the United States Code, with all such proceedings constituting proceedings within the scope of those set forth in Section 157(b) of Title 28 of the United States Code; and it is further

ORDERED, that all remaining matters in this case are accordingly stayed pending the first to occur of (i) the above-captioned proceeding being removed to the United States Bankruptcy Court for the District of Maryland; (ii) a court of competent jurisdiction affording relief from the stay set forth in Section 362 of Title 11 of the United States Code; or (iii) the occurrence of other events constituting a termination of the stay provided for in Section 362 of Title 11 of the United States Code.

1-9-2023
Dated

Hon. David W. Lease, JUDGE
Circuit Court for Montgomery County

Entered: Clerk, Circuit Court for
Montgomery County, MD
January 12, 2023

2

Entered: December 10th, 2023
Signed: December 10th, 2023

**SO ORDERED**



*Maria Elena Chavez-Ruark*

MARIA ELENA CHAVEZ-RUARK
U.S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
## at Greenbelt

In re:

GREGORY B. MYERS,

      Debtor.

Case Number: 15-26033-MCR
(Chapter 7)

### ORDER GRANTING MOTION FOR APPROVAL OF PROPOSED
### COMPROMISE AND SETTLEMENT WITH BRIAN KING, CRISTINA
### KING, AND THE CRISTINA AND BRIAN KING CHILDREN'S TRUST

Before the Court is the Motion for Approval of Proposed Compromise and Settlement With

Brian King, Cristina King, and the Cristina and Brian King Children's Trust [Dkt. No. 1005] (the

"Settlement Procedure Motion") filed on February 7, 2023 by Roger Schlossberg, the Chapter 7

trustee (the "Trustee") appointed to administer the Chapter 7 bankruptcy estate of Gregory B.

Myers (the "Debtor").   The Settlement Procedure Motion seeks to establish a procedural

mechanism for resolving litigation pending in state court among Brian King, Cristina King, and

the Cristina and Brian King Children's Trust (collectively, the "King Parties"), Serv Trust, and the

Trustee (who was named as a nominal defendant).  In the event that the Trustee and the King

Parties reach a resolution of their dispute, then the Trustee will file a motion seeking approval of

the settlement and all parties in interest will be given notice and an opportunity to be heard.

On February 28, 2023, the Debtor filed a Motion to Dismiss or Strike the Settlement Motion or, in the Alternative, Opposition to the Settlement Motion [<u>Dkt. No. 1010</u>] (the "<u>Motion to Strike</u>").  On March 14, 2023, the Trustee filed an opposition to the Motion to Strike [<u>Dkt. No. 1013</u>], and on July 21, 2023, the Debtor filed a reply in support of the Motion to Strike [<u>Dkt. No. 1020</u>].  The Court has reviewed all of the pleadings and finds that a hearing would not aid the decisional process.

For the following reasons, the Settlement Procedure Motion is granted.

## I.    <u>UNDISPUTED FACTS</u>

The material facts are undisputed.  Some of the facts are set forth in the Memorandum Opinion issued by this Court on September 28, 2018 [Adv. No. 17-00193, <u>Dkt. No. 94</u>], which was entered in conjunction with an Order Entering Judgment [Adv. No. 17-00193, <u>Dkt. No. 95</u>] through which the Debtor was denied a discharge under Sections 727(a)(3), 727(a)(4)(A), 727(a)(4)(B), and 727(a)(5) of the United States Bankruptcy Code (the "<u>Bankruptcy Code</u>").[1]  The remainder of the facts are established by the record in this bankruptcy case, two related adversary proceedings, and two state court cases, as set forth in more detail below.[2]

---

[1] All statutory references shall be to the Bankruptcy Code unless otherwise stated.

[2] The Court may take judicial notice of docket entries, pleadings, and papers filed in other cases.  *In re Marriott Intl., Inc., Customer Data Sec. Breach Litig.*, <u>543 F. Supp. 3d 96, 133</u> (D. Md. 2021), *aff'd sub nom. In re Marriott Intl., Inc.*, <u>31 F.4th 898</u> (4th Cir. 2022); *Brown v. Ocwen Loan Servicing, LLC*, <u>2015 WL 5008763</u>, at *1 n.3 (D. Md. Aug. 20, 2015), *aff'd*, <u>639 Fed. App'x 200</u> (4th Cir. 2016).  The Court may also take judicial notice of "prior litigation between the same parties where the two cases represent related litigation."  *White v. Harris*, <u>23 F. Supp. 2d 611, 614</u> (D. Md. 1998) (citing *United States Fidelity & Guar. Co. v. Lawrenson*, <u>334 F.2d 464, 467</u> (4th Cir.), cert. denied, <u>379 U.S. 869</u> (1964)); *see also Cason v. Holder*, <u>815 F. Supp. 2d 918, 922</u> (D. Md. 2011), *aff'd*, <u>464 Fed. App'x 131</u> (4th Cir. 2012) (unpublished) ("This Court can take judicial notice of its own records in another case … where the two cases represent related litigation.") (citations omitted) and *In re Modanlo*, <u>342 B.R. 238, 241</u> (D. Md. 2006) ("Moreover, the Bankruptcy Court is considered 'a unit of the district court' under <u>28 U.S.C. § 151</u>, and we believe a district court should properly take judicial notice of its own records in another case.") (quoting *Anderson v. Fed. Deposit Ins. Corp.*, <u>918 F.2d 1139, 1141</u> (4th Cir. 1990)).

Appellees' Appendix 0014

On November 18, 2015, the Debtor filed a voluntary petition for relief under Chapter 11 in this Court.  The Debtor's initial Schedule D filed on December 16, 2015 [Dkt. No. 19] listed an entity named Serv Trust as having a claim in the amount of $151,500.00 secured by property known as Lot 6 Seaside 14 Subdivision, Santa Rosa Beach, FL 32459 ("Lot 6").  Serv Trust is a trust that was created by the Debtor's mother for the benefit of the Debtor's children.  The Debtor is or was a co-trustee of Serv Trust.

The Debtor testified at his continued meeting of creditors on February 1, 2016 that Serv Trust has a 50% interest in a Maryland limited liability company named 6789 Goldsboro LLC ("Goldsboro LLC"), the sole asset of which is a parcel of residential real property located in Montgomery County, Maryland (the "Goldsboro Property").  The Debtor did not disclose the other 50% owner of Goldsboro LLC at his continued 341 meeting of creditors but testified that the unnamed owner paid the entire purchase price for the Goldsboro Property and made capital contributions into Goldsboro LLC, which funds could be loaned to Serv Trust and used for the beneficiaries of Serv Trust.

On October 25, 2016, while the Debtor's bankruptcy case was proceeding under Chapter 11, the Court entered an order authorizing the Debtor to sell Lot 6 [Dkt. No. 175].  The net proceeds generated from the sale of Lot 6 totaled $1,238,598.91 (the "Lot 6 Sale Proceeds"), which proceeds were subject to various disputed secured claims and liens, including a purported lien in favor of Serv Trust in the amount of $951,803.96 (which is significantly higher than the secured claim set forth in the Debtor's initial Schedule D).

On November 19, 2016, Offit Kurman, P.A. commenced an adversary proceeding against Serv Trust [Adv. No. 16-00541] (the "Serv Trust Adversary Proceeding") seeking to determine the priority and extent of Serv Trust's asserted lien against the Lot 6 Sale Proceeds.

On January 27, 2017, Goldsboro LLC filed a Motion for Enlargement of Time to File Proof of Claim in the Debtor's bankruptcy case [Dkt. No. 279].  On January 31, 2017, the Debtor filed a Second Amended Schedule E/F [Dkt. No. 283], which listed, for the first time, Goldsboro LLC as having an unsecured, nonpriority claim against the Debtor in the amount of $476,395.83.   On February 3, 2017, Goldsboro LLC filed a proof of claim [Claim No. 17-1] in the Debtor's case asserting a general unsecured claim in the amount of $476,395.83 based on a "Guaranty."

On February 3, 2017, Serv Trust, through its former counsel, filed a line which, among other things consented to the relief requested in the Serv Trust Adversary Proceeding in this Court [Adv. No. 16-00541, Dkt. No. 43].  Three days later, the Court entered a judgment which avoided Serv Trust's asserted lien against the Lot 6 Sale Proceeds as if such lien never existed and disallowed any scheduled or filed claim of Serv Trust in the Debtor's bankruptcy case [Adv. No. 16-00541, Dkt. No. 43].

On February 22, 2017, after an evidentiary hearing, the Court entered an order granting the motion of the United States Trustee to convert the Debtor's case from Chapter 11 to Chapter 7 [Dkt. No. 316].  The Trustee was appointed immediately upon conversion.

On September 14, 2017, the King Parties filed a Complaint for Declaratory Judgment (the "King Declaratory Judgment Complaint") against Serv Trust in the Circuit Court for Montgomery County, Maryland (the "State Court") in the case styled *King, et al. v. Serv Trust, et al.*, Case No. 436977-V (the "King Declaratory Judgment Case").  The King Declaratory Judgment Complaint sought, among other things, (i) a judgment declaring that the King Parties could direct Goldsboro LLC to redeem the interest of Serv Trust in Goldsboro LLC in exchange for previous consideration paid based on an appraisal conducted of the Goldsboro Property pursuant to the Operating

Agreement governing Goldsboro LLC, and (ii) a judgment declaring that Serv Trust's interest in Goldsboro LLC has been redeemed.[3]

On January 24, 2018, Goldsboro LLC filed a Complaint (the "Goldsboro Breach of Contract Complaint") against Serv Trust in the Circuit Court for Garrett County, Maryland in the case styled *6789 Goldsboro LLC v. Serv Trust, et al.*, Case No. C-11-CV-18-000018.   The Goldsboro Breach of Contract Complaint asserted claims for breach of a promissory note and promissory estoppel.[4]   The Circuit Court for Garrett County, Maryland transferred the case to the State Court on July 24, 2018, and the State Court assigned Case No. 451611-V to the case and consolidated it with the King Declaratory Judgment Case (collectively, the "State Court Case").

On February 5, 2018, the Debtor and his wife, Barbara Ann Kelly, filed a joint motion to vacate the judgment entered in the Serv Trust Adversary Proceeding [Adv. No. 16-00541, Dkt. No. 46] (the "Motion to Vacate").   On February 14, 2018, the Debtor and Ms. Kelly filed a joint motion to reopen the Serv Trust Adversary Proceeding [Adv. No. 16-00541, Dkt. No. 51] (the "Motion to Reopen").   Offit Kurman, P.A. and the Trustee filed oppositions to the Motion to Vacate [Adv. No. 16-00541, Dkt. Nos. 56 and 61], and the Trustee filed an opposition to the Motion to Reopen [Adv. No. 16-00541, Dkt. No. 63].   The Court held a hearing to consider the Motion to Vacate, the Motion to Reopen, and related oppositions on July 30, 2018, at which it denied both motions.   On August 3, 2018, the Court entered orders consistent with its ruling [Adv. No. 16-00541, Dkt. Nos. 73 and 74].   The Debtor and Ms. Kelly appealed the orders to the United States District Court for the District of Maryland (the "District Court").   *See* Case No. 8:18-cv-

---

[3] A copy of the King Declaratory Judgment Complaint appears at Adv. No. 18-00407, Dkt. No. 4, Exhibit A.

[4] A copy of the Goldsboro Breach of Contract Complaint appears at Adv. No. 18-00407, Dkt. No. 4, Exhibit B.

02536-PX.  On November 12, 2020, the District Court entered an order dismissing the appeal based on the Debtor and Kelly's failure to comply with filing requirements [Case No. 8:18-cv-02536-PX, Dkt. No. 49].  The Debtor and Ms. Kelly appealed the District Court's dismissal of the appeal to the United States Court of Appeals for the Fourth Circuit where it remains pending.  *See* Case No. 20-02309.

On October 29, 2018, Goldsboro LLC filed a Complaint for Declaratory Judgment against the Debtor, Serv Trust, and the Trustee (the "Goldsboro Declaratory Judgment Complaint") thereby commencing an adversary proceeding in this Court against Serv Trust [Adv. No. 18-00407] (the "Goldsboro Adversary Proceeding").  The Goldsboro Declaratory Judgment Complaint alleged that the King Parties collectively are the other owner of Goldsboro LLC, exercised their right to redeem Serv Trust's interest in Goldsboro LLC, and filed a declaratory judgment action in the State Court in connection therewith (this being the King Declaratory Judgment Complaint filed in the State Court).  The Goldsboro Declaratory Judgment Complaint sought a judgment from this Court declaring that Serv Trust is the alter ego of the Debtor and that the assets and liabilities of Serv Trust are assets and liabilities of the Debtor subject to administration by the Trustee.  Goldsboro LLC also requested an order from this Court staying the State Court Case based on Goldsboro's LLC assertion that Serv Trust is the alter ego of the Debtor.

On January 30, 2019, the Court entered an order abstaining from exercising jurisdiction over the claims asserted in the Goldsboro Adversary Proceeding [Adv. No. 18-00407, Dkt. No. 28] (the "Abstention Order").  The Abstention Order determined that the State Court could determine whether Serv Trust is the alter ego of the Debtor in connection with the State Court Case, and if such a determination was made, then the parties to the State Court Case could come back to this Court to determine a course of action.  On the other hand, if the State Court determined

that Serv Trust is not the alter ego of the Debtor, then the State Court Case would have little impact on the Debtor's bankruptcy case and there would be no basis for the Court to exercise jurisdiction over the Goldsboro Adversary Proceeding.  The Abstention Order also stated that the State Court could determine whether the automatic stay of Section 362(a) applies to the State Court Case.

After entry of the Abstention Order, the King Parties filed an amended complaint in the King Declaratory Judgment Case to include a request for declaratory judgment that Serv Trust is the alter ego of the Debtor.

On November 13, 2019, Maurice VerStandig, a named defendant to a counter-complaint and third-party complaint filed by the Debtor in the State Court Case, filed a notice of removal of the State Court Case, thereby removing the matter to this Court [Adv. No. 19-00427, Dkt. No. 1].  On December 3, 2019, the Debtor filed a notice voluntarily dismissing the counter-complaint and third-party complaint in the removed adversary proceeding [Adv. No. 19-00427, Dkt. No. 4].  On December 5, 2019, the Court entered an order remanding the case back to the State Court based on the Debtor's dismissal of the counter-complaint and third-party complaint and the Court's prior Abstention Order [Adv. No. 19-00427, Dkt. No. 5].

On April 20, 2021, the Trustee filed a status report [Dkt. No. 930] in this case detailing how the Lot 6 proceeds were distributed and/or earmarked for future distribution, detailing other assets of the bankruptcy estate, and describing the proofs of claim filed in this case.  The status report indicates that the Debtor's bankruptcy estate is insolvent.  The Court notes that the Trustee has incurred significantly more legal fees since the filing of the status report.

The State Court Case proceeded to trial on January 3, 2023, at which the State Court determined that Serv Trust is the alter ego of the Debtor.  The State Court reduced its oral ruling from the January 3, 2023 trial to a written order entered on January 12, 2023 (the "Alter Ego

Order").[5]  The Alter Ego Order determined that "Serv Trust is, and as of November 18, 2015 was, the alter ego of [the Debtor], pursuant to Maryland law" and further determined that "Serv Trust is a disregarded entity, being the alter ego of [the Debtor]" and therefore, "all further proceedings in this case are stayed pursuant to the provisions of Section 362 of Title 11 of the United States Code" pending the removal of the State Court Case to this Court, the granting of relief from stay, or the occurrence of other events terminating the automatic stay.  Alter Ego Order at p. 2.

On January 23, 2023, shortly after entry of the Alter Ego Order, the Firm entered its appearance in the State Court Case on behalf of Serv Trust and filed a Motion for a New Trial or to Vacate, Alter, or Amend Judgment (the "Post-Trial Motion") on behalf of Serv Trust.[6]  The Post-Trial Motion states that the Firm was retained on January 20, 2023.  The Trustee filed a line in the State Court Case purporting to withdraw the Post-Trial Motion, to which the Firm filed a motion to strike on behalf of Serv Trust.  On February 27, 2023, the State Court held a hearing to consider the Post-Trial Motion, the Trustee's line, and Serv Trust's motion to strike the Trustee's line.

On April 17, 2023, the State Court issued an oral ruling at which it denied the Post-Trial Motion and granted Serv Trust's motion to strike the Trustee's line.[7]  In its oral ruling, the State Court explained that it has jurisdiction to consider the Post-Trial Motion because it has "authority under the Maryland Rules to control its judgments that are non-final."  Transcript at p. 6.  On

---

[5] A copy of the State Court's Alter Ego Order appears at Dkt. No. 1004 (Motion for Sanctions), Exhibit 1.

[6] Copies of the Firm's Notice of Appearance and Post-Trial Motion appear at Dkt. No. 1004 (Motion for Sanctions), Exhibits 2 and 3, respectively.

[7] A copy of the transcript of the State Court's oral ruling appears at Dkt. No. 1015 (Opposition to Motion for Sanctions), Exhibit B.

April 18, 2023, the State Court reduced its oral ruling to a written order denying the Post-Trial Motion and granting the motion to strike.[8]

The Debtor noted an appeal of the order denying the Post-Trial Motion and filed an emergency motion for a stay pending the outcome of the appeal. On May 5, 2023, the Appellate Court of Maryland entered an order denying the Debtor's motion for stay pending appeal.[9] The order gave the Debtor 20 days to show cause why the appeal should not be dismissed because it is an appeal of a nonfinal order. On May 25, 2023, the Debtor voluntarily dismissed his appeal of the order denying the Post-Trial Motion.

## II.     THE SETTLEMENT PROCEDURE MOTION AND RELATED FILINGS

The Trustee maintains that, based on the Alter Ego Order, all claims against Serv Trust must be construed as claims against the Debtor's bankruptcy estate. Similarly, the Trustee maintains that entry of the Alter Ego Order vested all of Serv Trust's assets in the Debtor's bankruptcy estate pursuant to Section 541(a), with those assets subject to administration by the Trustee as the legal representative of the bankruptcy estate under Section 323(a). As such, the Trustee filed the Settlement Procedure Motion seeking the opportunity to settle the remaining claims presented in the King Declaratory Judgment Complaint regarding the asserted redemption of Serv Trust's interest in Goldsboro LLC. The Trustee believes it is unlikely that the King Declaratory Judgment Case can be removed to this Court because any removal would be untimely under Bankruptcy Rule 9027(a)(3). Accordingly, in lieu of removal, the Trustee and the King Parties have agreed to the following terms:

---

[8] A copy of the State Court's order denying the Post-Trial Motion appears at Dkt. No. 1015 (Opposition to Motion for Sanctions), Exhibit C.

[9] A copy of the Appellate Court's order denying the Debtor's motion for stay pending appeal appears at Dkt. No. 1016 (Supplemental Opposition to Motion for Sanctions), Exhibit B.

(1)    The King Parties and the Trustee shall jointly file a stipulation in the King Declaratory Judgment Case pursuant to which the King Parties will dismiss without prejudice their remaining claim against Serv Trust regarding the alleged redemption of Serv Trust's interest in Goldsboro LLC (the "Redemption Claim");

(2)    In consideration of the foregoing dismissal, the Trustee agrees to toll the statute(s) of limitation applicable to the Redemption Claim *nunc pro tunc* to September 14, 2017, the date the King Declaratory Judgment Case was filed in the State Court; and

(3)    The King Parties and the Trustee further agree to endeavor in good faith to negotiate a resolution to the Redemption Claim, and if negotiations are not successful, the King Parties shall refile the Redemption Claim as an adversary proceeding in this Court within thirty (30) days after the entry of an order approving this settlement.

The Trustee avers that in the sound exercise of his judgment, the proposed settlement procedures are in the best interest of the bankruptcy estate and all interested parties herein. The Trustee states that the proposed procedures afford him time to become familiar with the Redemption Claim and to potentially negotiate a resolution of the same, which could yield significant income for the bankruptcy estate. In the event a resolution is not reached, the Trustee states that the Redemption Claim will be litigated in this Court, which is the bankruptcy estate's preferred forum.

The Debtor's Motion to Strike presents numerous arguments in opposition to the Settlement Procedure Motion and is being treated as an opposition to the Settlement Procedure Motion by the Court. Those arguments are:

➢    The relief sought in the Settlement Procedure Motion requires an adversary proceeding because it seeks to recover money or property and seeks equitable relief, and Serv Trust's beneficiaries are required to be joined as defendants;

➢    The Settlement Procedure Motion is not a core proceeding and the Debtor does not consent to entry of any final order by this Court;

➢    The Court is divested of jurisdiction to consider the Settlement Procedure Motion because of the ongoing appeal of the Serv Trust Adversary Proceeding, which remains pending in the United States Court of Appeals for the Fourth Circuit;

➢ The Trustee is using the Settlement Procedure Motion to "commit a crime (*i.e.*, theft of Serv Trust's property)" and that the Trustee will consummate a settlement before Serv Trust can obtain a stay of "the bogus 9019 Order;"

➢ The Settlement Procedure Motion is seeking an advisory opinion because there is no justiciable controversy or cause of action affecting the bankruptcy estate and therefore, nothing for the Trustee to settle;

➢ The King Parties are not "parties in interest" and, therefore, lack standing to participate in this case;

➢ The State Court lacked subject matter jurisdiction to enter the Alter Ego Order because the King Parties never obtained leave from this Court to sue the Trustee as required by *Barton v. Barbour*, 104 U.S. 126, 127 (1881);

➢ The Trustee is mischaracterizing the Alter Ego Order in that the State Court did not enter a proposed order submitted by the King Parties that explicitly stated that Serv Trust's assets now belong to the Debtor's bankruptcy estate subject to the Trustee's control;

➢ The Alter Ego Order is not a final judgment and, therefore, has no force or effect pursuant to Maryland Rule 2-602;

➢ The Trustee has no authority under the Bankruptcy Code or any applicable non-bankruptcy law to "tortiously interfere with Serv Trust's property and legal rights" because Serv Trust is not a debtor in bankruptcy, the Debtor is not a settlor or beneficiary of Serv Trust, and Serv Trust and did not file a proof of claim in the Debtor's bankruptcy case;

➢ The Order Sustaining the Debtor's Objection to Proof of Claim No. 3 Filed by Brian King and Cristina King in the Debtor's bankruptcy case filed in the United States Bankruptcy Court for the Middle District of Florida is "res judicata" as to any claim the King Parties might have against the Debtor;

➢ The State Court erroneously ruled that the automatic stay of Section 362(a) applies to the remaining causes of action in the State Court Case because the automatic stay was terminated in the Debtor's bankruptcy case in 2018 and only this Court has the authority to reimpose the automatic stay; and

➢ The Settlement Procedure Motion is not a proper exercise of the Trustee's business judgment and falls below the lowest point in the range of reasonableness because it is fraudulent.

In addition to these arguments, the Debtor requests that the Trustee be ordered to show cause why sanctions should not be imposed against him for filing the Settlement Procedure Motion based on the Debtor's assertion that the Settlement Procedure Motion is frivolous.

The Trustee filed an Opposition to the Motion to Strike in which he argues that the Debtor lacks standing to object to the Settlement Procedure Motion under *Willemain v. Kivitz*, 764 F.2d 1019 (4th Cir. 1985), because the bankruptcy estate is insolvent and the Debtor has no pecuniary interest in any settlement ultimately reached.  The Trustee reiterates that the Settlement Procedure Motion involves a procedural matter related to a pending (albeit stayed) state court declaratory judgment claim concerning the Redemption Claim.  The Trustee asserts that the Debtor's bankruptcy estate is insolvent (*see* Status Report at Dkt. No. 930) and continues to hemorrhage attorney's fees based on the Debtor's continuing bad-faith litigation tactics as described in several District Court cases involving the Debtor.  The Trustee maintains that there is no possibility that the Debtor's bankruptcy estate will be rendered solvent under any set of circumstances.  Therefore, the Debtor lacks standing to object to the Settlement Procedure Motion because he lacks a pecuniary interest in the outcome of any achieved settlement.

The Debtor filed a reply in support of the Motion to Strike the Settlement Procedure Motion, stating that the Court previously determined that the Debtor has standing in connection with matters involving Serv Trust in the orders denying the Motion to Vacate and the Motion to Reopen that were entered in the Serv Trust Adversary Proceeding on July 30, 2018.  The Debtor further argues that the King Parties lacked standing when they filed the King Declaratory Judgment Case because only the Trustee had standing to bring avoidance actions and he failed to do so within the time limitations set forth in Section 546(a).  Consequently, the Debtor argues that the Trustee lacks standing to pursue the Settlement Procedure Motion.  The Debtor also argues that this Court rejected a prior attempt to remove the King Declaratory Judgment Case to this Court when it remanded the matter back to the State Court soon after the matter was removed to this Court.  The

Debtor argues that the Court is now deprived of jurisdiction to consider the Settlement Procedure

Motion in light of the prior remand of the Removed Adversary Proceeding.

III.    **ANALYSIS**

At this juncture, the Trustee is not seeking the approval of specific terms of a compromise

with the King Parties.  Rather, in light of the exceptional posture of these proceedings due to the

entry of the Alter Ego Order, the Trustee is seeking authorization to negotiate with the King Parties

to attempt a resolution of the Redemption Claim.  *See In re Fairpoint Commun.., Inc.*, No. 09-

16335(BRL), 2009 WL 10816988 (Bankr. S.D.N.Y Dec. 4, 2009) (approving a motion to establish

settlement procedures and requiring further notice of the settlement of certain types of claims).  In

exchange, the King Parties and the Trustee will dismiss without prejudice the remaining claims in

the King Declaratory Judgment Complaint, the Trustee will toll the statute(s) of limitation

applicable to the Redemption Claim, and if negotiations are not successful, the King Parties will

refile the Redemption Claim as an adversary proceeding in this Court within thirty (30) days of

the date of entry of this Order.  Conversely, and although not expressly stated in the Settlement

Procedure Motion, the successful resolution of the Redemption Claim will be subject to approval

by this Court pursuant to the legal standard applicable to motions seeking the approval of a

compromise or settlement under Bankruptcy Rule 9019, as articulated by this Court in *In re Final

Analysis, Inc.*, 417 B.R. 332 (Bankr. D. Md. 2009), after notice and an opportunity to be heard is

provided to all parties interest.

Preliminarily, the Court will dispose of the Trustee's argument that the Debtor does not

have standing to oppose the Settlement Procedure Motion under the legal principle espoused in

*Willemain v. Kivitz*.  In that case, the Court held that an insolvent Chapter 7 debtor is not a party

in interest and thus lacks standing to challenge a trustee's motion to sell "because he ha[s] no

pecuniary interest in the distribution of his assets among his creditors." *Willemain v. Kivitz*, 764 F.2d at 1022. Prior to entry of the Alter Ego Order, the Debtor's bankruptcy estate was unquestionably insolvent as detailed in the Trustee's Status Report filed on April 20, 2021 [Dkt. No. 930]. Nevertheless, there is a possibility that Serv Trust's assets, which now belong to the Debtor's bankruptcy estate, may bring significant value to the estate and render it solvent. Although the Court recognizes that this is highly unlikely, out of an abundance of caution, the Court will allow the Debtor to be heard with regard to the Settlement Procedure Motion and will consider the merits of the Motion to Strike.

The Debtor has objected to the Settlement Procedure Motion on numerous grounds, none of which are persuasive. Procedurally, the Trustee may pursue settlement of the Redemption Claim through a motion pursuant to Bankruptcy Rule 9019(a), which provides that "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). Moreover, in the event the Trustee ultimately seeks the recovery of property from Serv Trust, which is now considered property of the Debtor's estate pursuant to the Alter Ego Order, Bankruptcy Rule 7001(1) provides that "a proceeding to recover money or property, *other than a proceeding to compel the debtor to deliver property to the trustee*" is an adversary proceeding. Fed. R. Bankr. P. 7001 (*emphasis added*). Thus, the recovery of property from Serv Trust would not be an adversary proceeding and would not require a complaint under Bankruptcy Rule 7003. Furthermore, the settlement of the Redemption Claim constitutes a "core proceeding" under several subparagraphs of Section 157(b)(2) of Title 28 of the United States Code, including (2)(A) (matters concerning the administration of the estate), (2)(C) (counterclaims by the estate against persons filing claims against the estate), (2)(E) (orders to turn over property of the estate), and (2)(O) (other proceedings affecting the liquidation of the assets of the estate).

28 U.S.C. § 157(b)(2).  As a core proceeding, the Debtor's consent to entry of a final judgment is not necessary.  Moreover, entry of this Order is not a final judgment for purposes of finality as it only approves settlement procedures.

The Debtor argues that the beneficiaries of Serv Trust are required to be joined as defendants in this matter.  The Debtor is incorrect.  The beneficiaries of Serv Trust are no longer beneficiaries of Serv Trust because, pursuant to the Alter Ego Order, "Serv Trust is a disregarded entity, being the alter ego of [the Debtor]."  Alter Ego Order, at p. 2.  Therefore, the named beneficiaries are not required to be joined as defendants in an adversary proceeding or named as respondents in any contested matter.  The time for the named beneficiaries to assert any rights to the assets of Serv Trust or to otherwise intervene in the State Court Case was prior to the State Court's determination that Serv Trust is the alter ego of the Debtor.  Moreover, Serv Trust need not be in bankruptcy and the fact that the Debtor was not a settlor or beneficiary is irrelevant because Serv Trust has been determined to be the Debtor's alter ego and the Serv Trust's assets are subject to administration by the Trustee as the legal representative of the bankruptcy estate under Section 323(a).

The Debtor's argument that the King Parties do not have standing to appear in this Court also fails.  The Trustee filed the Settlement Procedure Motion to resolve a potential claim between the bankruptcy estate and the King Parties.  Standing of the King Parties is irrelevant to the Settlement Procedure Motion – the Trustee, as the administrator of the Debtor's bankruptcy estate, certainly has standing to settle any claim against or held by the bankruptcy estate.  *See Dimeglio v. Haines*, No. CIV. Y-93-2656, 1999 WL 1489197, at *2 (D. Md. Dec. 28, 1999) ("The bankruptcy trustee succeeds to all causes of action held by the debtor at the time the bankruptcy petition is filed" and "[o]nce the petition is filed, only the trustee has authority to settle or release

such claims.").  Nevertheless, the King Parties became potential creditors of the Debtor upon entry

of the Alter Ego Order – long after the claims bar date.  Therefore, the King Parties have standing

to assert any claims against the Debtor in this Court, are irrefutably parties in interest to this

proceeding, and must be given an opportunity to assert their claims against the bankruptcy estate.

Contrary to the Debtor's assertion, the Settlement Procedure Motion is not seeking an

advisory opinion from the Court.  The Settlement Procedure Motion is the mechanism by which

the Trustee is seeking authority to resolve a stayed cause of action in the State Court as

contemplated by the Abstention Order.

The Debtor disputes the jurisdiction of the State Court to enter the Alter Ego Order because

the King Parties did not obtain leave from this Court to sue the Trustee in the King Declaratory

Judgment Case.  The Debtor's argument fails.  "In *Barton v. Barbour*, 104 U.S. 126, 26 L.Ed. 672

(1881), the Supreme Court held that 'before another court may obtain subject-matter jurisdiction

over a suit filed against a receiver for acts committed in his official capacity, the plaintiff must

obtain leave of the court that appointed the receiver.'"  *Conway v. Smith Dev., Inc.*, 64 F.4th 540,

542 (4th Cir. 2023) (quoting *McDaniel v. Blust*, 668 F.3d 153, 156 (4th Cir. 2012)).  This doctrine,

which is commonly called the "Barton Doctrine," has been extended to suits against bankruptcy

trustees and their attorneys.  *See Conway v. Smith Dev.*, 64 F.4th at 542.  Here, the Trustee was

named as a nominal defendant in the King Declaratory Judgment Case.  He is not being sued for

any act committed in his official capacity as Trustee of the Debtor's bankruptcy estate.

Accordingly, the Barton Doctrine is not applicable to this matter.

The Debtor also argues that the refusal of the State Court to enter the proposed order

submitted by the King Parties, which included language that Serv Trust's assets belong to the

Debtor's bankruptcy estate, instead of the Alter Ego Order is proof that the State Court did not

determine that Serv Trust's assets belong to the Debtor's bankruptcy estate. It is unclear why the State Court did not enter the proposed order submitted by the King Parties, but the effect of the Alter Ego Order is clear. The law dictates that the Alter Ego Order vested all of Serv Trust's assets in the Debtor's bankruptcy estate pursuant to Section 541(a), and those assets are subject to administration by the Trustee as the legal representative of the bankruptcy estate under Section 323(a). The Alter Ego Order need not explicitly state that Serv Trust's assets now belong to the Debtor's bankruptcy estate subject to the Trustee's control for it to be true.

The Debtor further contends that this Court does not have jurisdiction to consider the Settlement Procedure Motion because of the ongoing appeal of the Serv Trust Adversary Proceeding. The Court agrees with the Debtor that, ordinarily, the filing of a notice of appeal divests the bankruptcy court of jurisdiction with regard to the matter being appealed. *Videsh Sanchar Nigam Ltd. v. Startec Global Comm's Corp. (In re Startec Global Comm's Corp.)*, 303 B.R. 605, 607 (D. Md. 2004); *In re Bradshaw*, 284 B.R. 520, 523 (Bankr. D. Mass. 2002). Here, however, the pending appeal of the judgment avoiding Serv Trust's alleged lien in the Lot 6 proceeds which, the Court notes, was entered with Serv Trust's consent through its former counsel, is wholly unrelated to the King Declaratory Judgment Case and the potential settlement of the Redemption Claim.

The Debtor argues that the Trustee has misconstrued or mischaracterized the holding of the Alter Ego Order and that he is using the Settlement Procedure Motion as a means to "steal" Serv Trust's property. It is the Debtor, however, who is misconstruing the Alter Ego Order. As previously stated, the Alter Ego Order specifically determined that "Serv Trust is, and as of November 18, 2015 was, the alter ego of [the Debtor], pursuant to Maryland law" and further determined that "Serv Trust is a disregarded entity, being the alter ego of [the Debtor]." Alter Ego

Order at p. 2.  Thus, there are no assets belonging to Serv Trust for the Trustee to "steal" because Serv Trust was deemed the alter ego of the Debtor and all of its assets now belong to the Debtor's bankruptcy estate subject to administration by the Trustee.  Moreover, the Debtor is incorrect in his argument that the Alter Ego Order has no force or effect because it is not a final judgment under Maryland Rule 2-602.  The Alter Ego Order may not have disposed of the entire King Declaratory Judgment Case, but interlocutory orders are still orders of the court with full force and effect albeit subject to revision until entry of a final judgment adjudicating all of the claims by and against all of the parties.  *See* Maryland Rule 2-602(a)(3) (an order that does not adjudicate all claims in the action is subject to revision any time before entry of judgment adjudicating all claims of the parties).

The Debtor argues that an order sustaining the Debtor's objection to the King Parties' claim entered on June 29, 2021 in the Debtor's bankruptcy case in the United States Bankruptcy Court for the Middle District of Florida is *res judicata* as to any claim the King Parties might have against the Debtor.  Again, however, the Debtor misconstrues the impact of the Alter Ego Order, which was entered on January 12, 2023 – after entry of the order sustaining the Debtor's claim objection and, the Court notes, after the dismissal of the Florida bankruptcy case.[10]  Any claim the King Parties may have against the Debtor arose upon entry of the Alter Ego Order and would not be barred by an order entered 18 months earlier under significantly different facts.

The Debtor argues that the State Court had no authority to determine that the State Court Case was stayed upon entry of the Alter Ego Order because the automatic stay was terminated in

---

[10] The Debtor filed the Florida bankruptcy case (Case No. 2:21-bk-00123-FMD) on January 28, 2021.  The Florida Bankruptcy Court dismissed that case on January 20, 2023 and set forth its reasons for dismissal in a Memorandum Opinion Denying Confirmation and Dismissing Case [Case No. 2:21-bk-00123-FMD, Dkt. No. 368].

the Debtor's bankruptcy case in 2018 for all purposes and only this Court has the authority to

reimpose the automatic stay.  A state court has concurrent jurisdiction with bankruptcy courts to

determine the applicability of the automatic stay:

> The State court may not grant relief from the stay – that is a matter
> committed exclusively to the Bankruptcy Court – but it may, when
> presented with the issue, determine whether, factually or legally, a
> stay is in effect and whether a particular action it is about to take or
> has already taken is subject to such a stay.  Those determinations
> are, of course, reviewable on appeal.

*Klass v. Klass*, 377 Md. 13, 21 (2003).

Moreover, the Abstention Order entered in the Goldsboro Adversary Proceeding

specifically provided that the State Court could determine whether Serv Trust is the alter ego of

the Debtor in connection with the King Declaratory Judgment Case, and if such a determination

was made, then the parties could come back to the bankruptcy court to determine a course of action.

The Abstention Order further stated:  "If the State Court determines that the automatic stay is

applicable based on the relationship between the Debtor and Serv Trust, then the matter will be

stayed and the parties can come back to this Court to figure out how to proceed."  Abstention Order

at p. 4.  This is exactly what has happened – the State Court determined that Serv Trust is the alter

ego of the Debtor so the parties are now back before this Court seeking authority to resolve the

remaining Redemption Claim.

The Debtor did not explain his statement that the automatic stay arising in his case

terminated for all purposes in 2018.  The Court suspects he is referring to when he was denied a

discharge in this case.  Although the stay of any act against the Debtor, personally, was lifted upon

the denial of the Debtor's discharge, Section 362(c) of the Bankruptcy Code provides that "the

stay of an act against property of the estate under subsection (a) of this section continues until such

property is no longer property of the estate."  11 U.S.C. § 362(c)(1).

Lastly, the Debtor argues that the Settlement Procedure Motion is not a proper exercise of the Trustee's business judgment and falls below the lowest point in the range of reasonableness because it is fraudulent. This argument is premature (and, as set forth above, the Trustee is acting within the scope of his authority in filing the Settlement Procedure Motion and therefore is not committing fraud). As previously explained, the Settlement Procedure Motion is not seeking approval of specific settlement terms. It merely seeks approval of the procedural mechanism through which the Trustee and the King Parties are going to pursue resolution of the Redemption Claim. If a resolution is reached, the parties will be required to file a further motion seeking Court approval of any proposed compromise under Bankruptcy Rule 9019. At that time, the Court will consider the reasonableness of any proposed settlement and all parties in interest will be given an opportunity to object and be heard.

Having disposed of all of the Debtor's arguments in opposition to the Settlement Procedure Motion, there is no basis to entertain the Debtor's request that the Trustee show cause why sanctions should not be imposed for filing the Settlement Procedure Motion. The Debtor's request is categorically denied.

For these reasons, it is, by the United States Bankruptcy Court for the District of Maryland, hereby

ORDERED, that the Settlement Procedure Motion is granted; and it is further

ORDERED, that the proposed compromise and settlement procedure described in the Settlement Procedure Motion and related notice is approved; and it is further

ORDERED, that the Trustee and the King Parties may proceed to negotiate a resolution of the Redemption Claim and any proposed settlement is subject to notice to all parties in interest and approval by this Court in accordance with Bankruptcy Rule 9019; and it is further

ORDERED, that the Debtor's request for an order directing the Trustee to show cause why

sanctions should not be imposed against him for filing the Settlement Procedure Motion is denied;

and it is further

ORDERED, that the deadline for the King Parties to file a proof of claim against the

bankruptcy estate is 30 days from the date on which this Order is entered.

cc:    Debtor – Gregory B. Myers, 750 Gulf Shore Boulevard North, Naples, FL 34102
       Debtor – Gregory B. Myers, 4505 Wetherill Road, Bethesda, MD 20816
       Movant – Roger Schlossberg, Chapter 7 Trustee
       Movant's Counsel – Frank J. Mastro, counsel for Chapter 7 Trustee
       United States Trustee – Lynn A. Kohen
       Other – Barbara Ann Kelly, 750 Gulf Shore Boulevard North, Naples, FL 34102
       Other – Barbara Ann Kelly, 4505 Wetherill Road, Bethesda, MD 20816
       All creditors and other parties in interest

**END OF ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| GREGORY B. MYERS, | ) | Case No. 15-26033-MCR |
| | ) | |
| Debtor, | ) | |
| _____ | ) | |
| | ) | |
| BRIAN KING, CRISTINA KING, | ) | |
| AND THE CRISTINA AND BRIAN | ) | |
| KING CHILDREN'S TRUST, | ) | |
| | ) | Adversary Case No. _____ |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROGER SCHLOSSBERG, in His | ) | |
| Official Capacity as Chapter 7 Trustee | ) | |
| of the Bankruptcy Estate of Gregory B. | ) | |
| Myers, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | | |

## COMPLAINT FOR DECLARATORY RELIEF

Come now Brian King ("Mr. King"), Cristina King ("Mrs. King"), and Brian King in his capacity as trustee of the Cristina and Brian King Children's Trust (the "Trustee of the Children's Trust," with the trust itself being known as the "Children's Trust")) (Mr. King, Mrs. King, and the Trustee of the Children's Trust being collectively known as the "Plaintiffs" and each sometimes being known as a "Plaintiff"), by and through undersigned counsel, pursuant to Federal Rule of Bankruptcy Procedure 7003 and Federal Rule of Civil Procedure 3, and as and for their complaint for declaratory relief (the "Complaint") against Roger Schlossberg, in his official capacity as Chapter 7 Trustee of Mr. Myers' bankruptcy estate (the "Trustee" or "Defendant"), state as follows:

1

Appellees' Appendix 0034

**Introduction**

1.      This action concerns the affairs of 6789 Goldsboro LLC ("6789 Goldsboro"), an entity formed to develop an eponymous parcel of real estate in Bethesda, Maryland.

2.      Gregory B. Myers ("Mr. Myers" or the "Debtor") prevailed upon the Plaintiffs to invest their money into developing the project, with 6789 Goldsboro being funded by the Plaintiffs and having its senior equity interests owned by the Plaintiffs.

3.      In exchange for his efforts locating the project and working to develop the project, Mr. Myers was granted a subordinate, junior equity interest in the company; knowing he would soon be filing bankruptcy, and wishing to conceal that interest from his creditors, Mr. Myers took the interest in the name of Serv Trust, an entity that has now been declared – by the Circuit Court for Montgomery County, Maryland – to be Mr. Myers' alter ego.

4.      At core, the deal with the Plaintiffs and Mr. Myers was simple: Mr. Myers had three years to develop 6789 Goldsboro Road, Bethesda, Maryland 20817 (the "Property") into an asset worth more than the monies invested by the Plaintiffs. If Mr. Myers succeeded in doing so, the junior equity interest would realize value; if Mr. Myers failed to do so, the junior equity interest could be redeemed for previous consideration.

5.      By reason of Mr. Myers taking repeated loans from 6789 Goldsboro, and in light of certain development issues encountered, the Property ultimately was not worth as much as the Plaintiffs had invested; after Mr. Myers performed an attempted act of grift on the Plaintiffs, they accordingly invoked the mechanism to redeem the junior equity interest titularly held by Serv Trust as Mr. Myers' alter ego.

6.      The Plaintiffs now seek a judicial declaration that the junior equity interest has been redeemed; since Mr. Myers is a debtor in bankruptcy, and insofar as the interest was held in the

2

name of an entity that has been adjudicated his alter ego, the Trustee is the proper defendant hereto and, accordingly, is the party against whom suit is instantly brought.

## Parties

7.     Mr. King is a natural person who is a citizen of the State of Florida by virtue of his ongoing domicile therein.

8.     Mrs. King is a natural person who is a citizen of the State of Florida by virtue of her ongoing domicile therein.

9.     Mr. King also brings this suit in his capacity as the Trustee of the Children's Trust, which is a Maryland trust.

10.    The Trustee is the duly-appointed trustee of the Chapter 7 bankruptcy estate of Mr. Myers, an estate that includes the assets of Serv Trust, a Maryland statutory trust that has been adjudicated to be the alter ego of Mr. Myers.

## Jurisdiction and Venue

11.    This Honorable Court enjoys jurisdiction over the instant proceeding, pursuant to the allowances of Section 157(b)(2)(A, B, O) of Title 28 of the United States Code, as this case concerns the administration of the Debtor's estate, an equitable claim against the Debtor's estate, and the liquidation of a putative asset of the Debtor's estate.

12.    Venue is properly laid in this Honorable Court pursuant to the allowances of Section 1334 of Title 28 of the United States Code, as this matter relates to a proceeding under Title 11 of the United States Code.

## General Allegations: 6789 Goldsboro LLC – Property and Operating Agreement

13.    The Plaintiffs collectively comprise the full Class A members of a 6789 Goldsboro and have done so at all times relevant.

3

14.     Mr. Myers, through his alter ego, Serv Trust, was the sole Class B member of 6789 Goldsboro prior to the time at which the subject interest was redeemed.

15.     Pursuant to the First Amended and Restated Operating Agreement of July 18, 2013 (the "Operating Agreement," inclusive of the subsequent amendment thereto), for 6789 Goldsboro, the entity exists to "purchase, acquire, buy, own, trade in, hold, develop, lease, manage, entitle, subdivide, sell, and otherwise deal in and with" the Property. *See* Operating Agreement at § 2.2.

16.     6789 Goldsboro acquired the Property on July 18, 2013 and has owned the Property continuously and without interruption at all times since.

17.     Pursuant to Section 7.7 of the Operating Agreement, as subsequently amended, if the governmental approvals requisite to subdivide the Property into at least nineteen (19) townhouse dwellings are not obtained by July 18, 2016, and the Class A members of 6789 Goldsboro do not elect to sell the Property, the Class A members have the right to have the Property appraised in accordance with the terms of the Operating Agreement.

18.     Pursuant to Section 7.5 of the Operating Agreement, an appraisal of the Property occurs, *inter alia*, when the Class A members notify the Class B member of a demand for appraisal of the Property, and each class of members then has fifteen (15) days to appoint an MAI appraiser.

19.     Under the regime of Section 7.5 of the Operating Agreement, an appraisal is then made by examining the appraisals of the individuals appointed by each class of membership and, if need be, having a third appraiser – mutually selected – undertake an additional appraisal.

20.     Following an appraisal triggered by Section 7.7 of the Operating Agreement, if the appraised value of the Property is found to be less than the monies thus far invested by the Class A members, the Class A members may cause 6789 Goldsboro to redeem the Class B member's interests in exchange for previous consideration.

Appellees' Appendix 0037

**General Allegations: Appraisal**

21.     The governmental approvals requisite to subdivide the Property into at least nineteen (19) townhouse dwellings were not obtained by July 18, 2016 and, further, have not been obtained as of the date of filing of this Complaint.

22.     On August 23, 2017, the Class A members notified Serv Trust of their election to have the Property appraised for purposes of determining if the entity may redeem the interest of Serv Trust.

23.     Specifically, notice was sent by undersigned counsel, on behalf of the Class A members (the Plaintiffs herein), to Serv Trust, via certified mail, return receipt requested, at the address indicated in the Operating Agreement (the "Appraisal Election").

24.     The Appraisal Election was delivered on August 24, 2017.

25.     By electronic mailing dated September 13, 2017, Serv Trust acknowledged its receipt of the Appraisal Election but did not appoint an appraiser pursuant to the Operating Agreement.

26.     Pursuant to the Operating Agreement, the last day for Serv Trust to appoint an appraiser was September 11, 2017.

27.     The Plaintiffs did not receive the appointment of an appraiser from Serv Trust through any of the means specified in the Operating Agreement (nor through any other medium) in a timely (or even untimely) manner.

28.     The Plaintiffs have had the Property appraised by their designated appraiser, and are in receipt of a report indicating its market value – at the time of the subject appraisal – to be between One Million Dollars and No Cents ($1,000,000.00) and One Million Three Hundred Twenty Five Thousand Dollars and No Cents ($1,325,000.00) (the "Class A Appraisal").

Appellees' Appendix 0038

29.     The Class A members' investment in 6789 Goldsboro, as of the time of the Class A Appraisal, exceeds Three Million Five Hundred Thousand Dollars and No Cents ($3,500,000.00) (the "Class A Investment").

## General Allegations: Bankruptcy

30.     The relief sought herein was originally pursued in the Circuit Court for Montgomery County, Maryland (the "State Court").

31.     As part of the litigation in the State Court, the Plaintiffs also sought a declaration that Serv Trust is the alter ego of Mr. Myers.

32.     Notwithstanding myriad delays occasioned by Mr. Myers' gamesmanship (including an effort to remove the State Court suit to a bankruptcy court in Florida on the last business day before trial), the State Court claim to declare Serv Trust to be the alter ego of Mr. Myers was finally tried to the bench in January 2023.

33.     Following trial, the State Court ruled in favor of the Plaintiffs, adjudicating, *inter alia*, "Serv Trust is a disregarded entity, being the alter ego of Mr. Myers" and "Serv Trust is, and as of November 18, 2015 was, the alter ego of Gregory B. Myers."

34.     The Trustee was a nominal defendant in the State Court litigation and was represented at trial.

35.     With Serv Trust being declared the alter ego of Mr. Myers, and the claim concerning the redemption of Serv Trust's interests in 6789 Goldsboro accordingly being a claim against Mr. Myers' bankruptcy estate, the State Court ordered, *inter alia*, "all further proceedings in this case are stayed pursuant to the provisions of Section 362 of Title 11 of the United States Code, with all such proceedings constituting proceedings within the scope of those set forth in Section 157(b) of Title 28 of the United States Code."

6

36.     By agreement of the Plaintiffs and the Trustee, and consistent with an order of this Honorable Court approving the subject agreement, the litigation is thusly now brought in this Honorable Court, so the case may appropriately proceed.

37.     Pursuant to the aforementioned order of this Honorable Court, the parties hereto have entered into settlement negotiations over the past several weeks, albeit to no avail as of present; for the avoidance of doubt, the filing of this Complaint is not intended to stymie or otherwise interfere with those negotiations but, rather, is undertaken solely to protect and preserve the litigation rights of the Plaintiffs.

### Count One
### Declaratory Judgment: Redemption of Interests

38.     The Plaintiffs repeat and re-allege each and every foregoing paragraph of this Complaint, as though fully set forth herein.

39.     There does now exist an actual controversy between the parties hereto, concerning their respective rights under the Operating Agreement and the extent, *vel non*, of their legal relations.

40.     The Plaintiffs maintain that the interests of Serv Trust, in 6789 Goldsboro, have been redeemed pursuant to the allowances of the Operating Agreement.

41.     Specifically, Serv Trust failed to timely designate an alternative appraiser for purposes of appraising the Property, let alone procure an appraisal that values the Property at a sum in excess of the Class A Investment.

42.     Specifically, the Class A Appraisal reveals the Property to have a value well below that of the Class A Investment.

43.     Specifically, under the Operating Agreement, the Plaintiffs are entitled to have 6789 Goldsboro redeem the interest of Serv Trust, without any further consideration, where the

7

value of the Property in its present state is less than the sum of the Class A Investment.

44.     The Plaintiffs thusly maintain the interests of Serv Trust, in 6789 Goldsboro, have been fully redeemed, and the Trustee has no right, title, or interest in the affairs, equity, or assets of 6789 Goldsboro.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) declare Serv Trust to have waived its right to appoint an alternative appraiser under the Operating Agreement by not doing so on or before September 11, 2017; (ii) declare the interest of Serv Trust, in 6789 Goldsboro, to have been fully redeemed; and (iii) afford such other and further relief as may be just and proper.

Respectfully submitted,

THE VERSTANDIG LAW FIRM, LLC,


/s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
Bar No. 18071
1452 W. Horizon Ridge Pkwy., #665
Henderson, Nevada 89012
Phone: 301-444-4600
E-mail: mac@mbvesq.com
*Counsel for the Plaintiffs*

8

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | | |
|---|---|---|
| In re: | ) | |
| GREGORY B. MYERS, | ) | Case No. 15-26033-MCR |
| | ) | (Chapter 7) |
| Debtor. | ) | |
| | ) | |
| | ) | |
| BRIAN KING, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. No.:  24-00007 |
| | ) | |
| ROGER SCHLOSSBERG, TRUSTEE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**TRUSTEE'S MOTION FOR APPROVAL OF PROPOSED COMPROMISE
AND SETTLEMENT WITH KING PLAINTIFFS**

TO THE HONORABLE MARIA ELLENA CHAVEZ-RUARK, UNITED STATES
BANKRUPTCY JUDGE:

Defendant, Roger Schlossberg, Chapter 7 Trustee of the Bankruptcy Estate of Gregory B.

Myers (the "Trustee"), by his undersigned counsel, pursuant to Fed. R. Bank. P. 9019, and in

support of the instant *Motion for Approval of Proposed Compromise and Settlement with King

Plaintiffs* hereby respectfully represents as follows:

1.      As is set forth in the *Notice of Proposed Compromise and Settlement with King

Plaintiffs* filed contemporaneously herewith (the "*Notice*"), the Trustee proposes to enter into a

compromise and settlement of a pending dispute with the parties named therein.  The background

of said dispute and the specific terms and conditions of said proposed compromise and settlement

are more particularly set forth in said *Notice*.  A copy of said *Notice* is attached hereto and

incorporated by reference herein as ***Exhibit 1***.

2.      Pursuant to the provisions of Bankruptcy Rules 9019 and 2002, the *Notice* has been forwarded to all parties-in-interest herein as appears by reference to the *Certificate of Service* also filed contemporaneously herewith.

3.      If said proposed compromise and settlement is approved by this Court, the parties respectfully submit that this Court should entertain and enter an *Order* in substantially that form attached to the *Notice*.

4.      The parties believe that the above-described proposed compromise and settlement is in the best interests of all parties-in-interest herein and should be approved by the Court.

WHEREFORE, the Trustee respectfully requests that the proposed compromise and settlement be APPROVED.

Respectfully submitted,

SCHLOSSBERG | MASTRO

By:     */s/ Frank J. Mastro*
        Frank J. Mastro #24679
        Roger Schlossberg
        P.O. Box 2067
        Hagerstown, MD 21742
        (301) 739-8610
        fmastro@schlosslaw.com
        *Attorneys for Defendant,*
        *Roger Schlossberg, Trustee*

2

Appellees' Appendix 0043

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the **30th** day of **December 2024**, a copy of the *Trustee's*

*Motion for Approval of Proposed Compromise and Settlement with King Plaintiffs* and proposed

Order was served electronically via CM/ECF upon:

Maurice B. VerStandig, Esq.
The VerStandig Law Firm, LLC
1452 W. Horizon Ridge Pkwy., Suite 665
Henderson, NV 89012
mac@mbvesq.com
*Attorneys for Plaintiffs*

                                         */s/ Frank J. Mastro*
                                         Frank J. Mastro

Appellees' Appendix 0044

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | | |
|---|---|---|
| In re: | ) | |
| GREGORY B. MYERS, | ) | Case No. 15-26033-MCR |
| | ) | (Chapter 7) |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| BRIAN KING, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. No.: 24-00007 |
| | ) | |
| ROGER SCHLOSSBERG, TRUSTEE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## NOTICE OF TRUSTEE'S PROPOSED COMPROMISE
## AND SETTLEMENT WITH KING PLAINTIFFS

TO ALL PARTIES IN INTEREST:

PLEASE TAKE NOTE that Roger Schlossberg, Chapter 7 Trustee of the Bankruptcy Estate of Gregory B. Myers (the "Trustee"), and the Defendant in the above-captioned adversary proceeding, contemporaneously has filed his *Motion for Approval of Proposed Compromise and Settlement with King Plaintiffs* (the "*Settlement Motion*") seeking authority to compromise and settle the following described matter upon those terms and conditions hereinafter noted.

### Background

Gregory B. Myers ("the Debtor" or "Mr. Myers") filed a voluntary Chapter 11 bankruptcy petition on November 18, 2015 ("the Petition Date"). The Debtor remained in possession of the estate's assets and managed its financial affairs until February 22, 2017, when the case was

converted to a proceeding under Chapter 7 of the Bankruptcy Code . The Trustee thereafter was duly appointed as the Chapter 7 trustee herein.

In 2017, the Trustee was named as a nominal defendant in the matter of *Brian King, et al. v. Serv Trust, et al.*, Case No. 439677-V (the "King Case") then commenced in the Circuit Court for Montgomery County, Maryland ("the State Court");which case subsequently was consolidated with the related matter of *6789 Goldsboro LLC v. Serv Trust, et al.*, Case No. 451611-V (the "Goldsboro Case"; collectively, the King Case and the Goldsboro Case are hereafter referred to as "the State Court Cases"). Each of the State Court Cases concerns claims against Serv Trust, with the Goldsboro Case also concerning a claim against the Debtor.

In the King Case, which was designated the "lead" case in the State Court Cases, Brian King, Cristina King, and the Cristina and Brian King Children's Trust (the "King Plaintiffs") sought declaratory judgments that Serv Trust, a Maryland statutory trust, is the alter ego of the Debtor and, further, that Serv Trust's interest in 6789 Goldsboro LLC ("Goldsboro") has been redeemed by Goldsboro in accordance with the entity's governing documents.

In the Goldsboro Case, Goldsboro sued Serv Trust and the Debtor for the alleged breach of a promissory note and guaranty, respectively, and sought an award of monetary damages in excess of $1 million, including accrued interest.[1] The Goldsboro Case originally was brought as

---

[1] The factual milieu out of which the Goldsboro Case arose included the request of the Debtor, in his then-capacity as a co-trustee of Serv Trust, that Goldsboro make pre-petition loans totaling $635,000 to Serv Trust, which then forwarded the funds to the Debtor and his wife. On May 18, 2015, in connection with the foregoing loans, Serv Trust executed a Promissory Note in favor of Goldsboro while the Debtor executed a Guaranty Agreement in which he guaranteed Serv Trust's repayment of the loans made by Goldsboro. The Debtor, however, did not list Goldsboro as an unsecured creditor when he filed his bankruptcy petition six months later; which omission was one of the grounds upon which this Court denied a discharge to the Debtor under 11 U.S.C. § 727(a)(4)(A). *See In re Myers*, 2018 WL 4701387, *8 (Bankr. D. Md. Sept. 28, 2018) ("It is not believable that [the Debtor] simply forgot to include his largest unsecured creditor in the first several versions of his schedules when he had executed a personal guarantee in favor of that creditor six months prior to filing for bankruptcy and was requesting advances from the creditor up to and after filing his petition.").

Appellees' Appendix 0046

an adversary proceeding in this Court, *see 6789 Goldsboro LLC v. Myers, et al.*, Adv. No. 18-407, but this Court entered an *Order of Abstention* on January 30, 2019 which ultimately led to the matter being refiled in State Court.

A trial in the consolidated State Court Cases was scheduled to commence on Tuesday, January 3, 2023. However, at approximately 4:30 p.m. on Friday, December 30, 2022 – just minutes before the close of business on the last business day before trial – the Debtor filed a notice of removal purporting to remove the action to the U.S. Bankruptcy Court for the Middle District of Florida, where the Debtor's later-filed and separate Chapter 13 case was pending at the time.[2] The King Plaintiffs immediately filed an emergency motion to remand, noting the various infirmities and inherent bad faith associated with Debtor's attempted removal at the eleventh-hour. On the morning of January 3, 2023, the Florida bankruptcy court remanded the case back to the Circuit Court for Montgomery County in time to allow for the trial of the State Court Cases to proceed as scheduled.

Following the conclusion of the trial on January 3, 2023 – at which evidence was presented showing that, *inter alia*, the Debtor and his wife received the extraordinary sum of $1,217,675.00 out of the $1,371,271.58 distributed by Serv Trust between March 10, 2011 and January 6, 2018 – or more than 88% thereof – the State Court adjudicated Serv Trust to be the alter ego of the Debtor as of and subsequent to the Petition Date. In a subsequent written order entered on January 12, 2023 ("the *Alter Ego Order*"), the State Court memorialized its ruling, holding, *inter alia*, that

---

[2] The Debtor's Florida bankruptcy case ultimately was dismissed on January 20, 2023. On that day, the U.S. Bankruptcy Court for the Middle District of Florida *sua sponte* entered an order which denied confirmation of the Debtor's proposed Chapter 13 plan, dismissed his Chapter 13 case with prejudice, and imposed a two-year bar on refiling, following the court's determination that Myers filed his Chapter 13 case in bad faith (as a tactic to delay and frustrate his creditors rather than as a means to repay them). *See In re Myers*, 2023 WL 350183 (Bankr. M.D. Fla. Jan. 20, 2023).

3

"Serv Trust is, and as of November 18, 2015 was, the alter ego of Gregory B. Myers" and that "Serv Trust is a disregarded entity, being the alter ego of Mr. Myers."

In its ruling, the State Court stayed all further proceedings in the State Court Cases as its determination that Serv Trust is the alter ego of the Debtor necessarily rendered the automatic stay of 11 U.S.C. § 362(a) effective as to all remaining causes of action therein. The State Court reasoned that, in light of its alter ego ruling, all claims against Serv Trust must be construed as claims against the Debtor's bankruptcy estate ("the Estate"). *Id.* As a result, the King Plaintiffs' remaining claim against Serv Trust, which seeks a declaration regarding the alleged redemption of Serv Trust's interest in Goldsboro (the "Redemption Claim"), was stayed by operation of 11 U.S.C. § 362(a) (as were Goldsboro's separate claim against Serv Trust in the Goldsboro Case along with its previously stayed claim therein against the Debtor).

Further, as a matter of law, immediately upon entry of the *Alter Ego Order*, Serv Trust and all of its assets became property of the Estate, pursuant to 11 U.S.C. § 541(a), subject to administration by the Trustee as the sole legal representative of the Estate pursuant to 11 U.S.C. § 323. As the *Alter Ego Order* has not been stayed and remains in full force and effect, the Trustee is now the sole person empowered to defend or otherwise act to deal with the remaining claims against Serv Trust in the State Court Cases, which by operation of law are now claims against the Estate.

On February 7, 2023, the Trustee filed in this Court a *Motion for Approval of Proposed Compromise and Settlement with Brian King, Cristina King, and the Cristina and Brian King Children's Trust* (the "*Settlement Procedures Motion*"), [Dkt. #1005], which sought approval of a procedural resolution that would enable the litigation of the Redemption Claim in this Court. The proposed settlement consisted of the following elements:

4

(1)     The King Plaintiffs and the Trustee would jointly file a stipulation in the State Court Cases pursuant to which the King Plaintiffs would dismiss without prejudice the Redemption Claim against Serv Trust;

(2)     In consideration of the foregoing dismissal, the Trustee would agree to toll the statute(s) of limitation applicable to the Redemption Claim *nunc pro tunc* to September 14, 2017, the date the King Case was filed in the State Court; and

(3)     The King Plaintiffs and the Trustee would endeavor in good faith to negotiate a resolution to the Redemption Claim and, if negotiations were not successful, the King Plaintiffs would refile the Redemption Claim as an adversary proceeding in this Court within thirty (30) days after the entry of an order approving the settlement.

On February 28, 2023, the Debtor filed a motion to dismiss or strike the Trustee's *Settlement Procedure Motion* ("the *Motion to Strike*"). [Dkt. #1010]. On March 14, 2023, the Trustee filed an opposition to the Debtor's *Motion to Strike*. [Dkt. #1013]. On December 11, 2023, this Court entered a detailed memorandum opinion and *Order* granting the Trustee's *Settlement Procedures Motion* and denying the Debtor's *Motion to Strike*. [Dkt. #1029].

Subsequent settlement negotiations between the parties failed to yield a settlement and, on January 11, 2024, the King Plaintiffs re-filed the Redemption Claim as an adversary proceeding in this Court ('the Adversary Case'). [Adv. Dkt. #1]. The Trustee filed an answer to the adversary complaint on April 15, 2024, [Adv. Dkt. #13], and the Court subsequently issued a *Scheduling Order* on April 26, 2024. [Adv. Dkt. #15].[3]

As the Adversary Case progressed, the King Plaintiffs and the Trustee resumed settlement negotiations. This latest round of negotiations ultimately proved to be fruitful as the parties now have agreed to the following compromise and settlement, subject to notice to creditors and approval by the Court, on the terms and conditions described below.

---

[3] On May 7, 2024, the King Plaintiffs and the Trustee filed a stipulation in the State Court Cases dismissing the Redemption Claim without prejudice.

Appellees' Appendix 0049

## Proposed Compromise and Settlement

The Trustee and the King Plaintiffs have agreed as follows:

(1) The King Plaintiffs will pay to the Trustee, for the benefit of the Estate, the sum of $150,000.00 (the "Settlement Payment") upon Court approval of the settlement, in order to redeem the entirety of Serv Trust's interest in Goldsboro and settle the Redemption Claim in the Adversary Case;

(2) Upon successful negotiation of the Settlement Payment by the Trustee, the parties will file a Stipulation of Dismissal in the Adversary Case dismissing all claims therein with prejudice; and

(3) The King Plaintiffs also will reimburse the Trustee for all reasonable legal fees and expenses that the Trustee incurs in connection with the litigation of any appeals taken by any party in the event that the *Settlement Motion* is granted by this Court (the "Appellate Legal Fees").

## Trustee's Analysis and Recommendation

For the reasons set forth below, the Trustee, in the sound exercise of his judgment, believes that the above-proposed compromise and settlement is in the best interest of the Estate and all interested parties herein and should be approved.

## A.    Applicable Legal Standards.

Bankruptcy Rule 9019(a) empowers a bankruptcy court to approve a compromise or settlement brought before it on motion by the trustee. Fed. R. Civ. P. 9019(a). In order to approve a settlement, a court must consider the following factors: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors. *In re Essex Constr., LLC*, 575 B.R. 648, 652-53 (Bankr. D. Md. 2017); *see also In re Bowman*, 181 B.R. 836, 843 (Bankr. D. Md. 1995).

6

It is not necessary for a bankruptcy court to conduct a "mini trial" or conclusively determine claims subject to a compromise. *See In re New Concept Housing, Inc.*, 951 F.2d 932, 939 (8th Cir. 1991); *In re Ashford Hotels, Ltd.*, 226 B.R. 797, 802 (S.D.N.Y. 1998). Nor is it necessary for the court to find that the proposed settlement constitutes the best result obtainable. *See In re Final Analysis*, *Inc.* 417 B.R. 332, 341-42 (Bankr. D. Md. 2009). Rather, the court need only canvass the issues to determine that the proposed settlement does not fall below the lowest point of reasonableness. *Id*. In doing so, the court does not substitute its judgment for that of the trustee. *See In re Bates*, 211 B.R. 338, 343 (Bankr. D. Minn. 1997). Ultimately, a bankruptcy court's decision to approve or reject settlement may be reviewed only for an abuse of discretion. *In re ASI Reactivation, Inc*., 934 F.2d 1315, 1323-24 (4th Cir. 1991).

**B.      Analysis of the King Plaintiffs' Redemption Claim in the Adversary Case.**

The Trustee has thoroughly reviewed the available evidence related to the Redemption Claim asserted by the King Plaintiffs in the Adversary Case and evaluated the potential merits of the King Plaintiffs' request for a declaration that Serv Trust's interest in Goldsboro previously was fully redeemed by the King Plaintiffs. The Trustee also has evaluated the potential defenses available to him, including those defenses and arguments that previously were asserted by Serv Trust during the litigation of the State Court Cases.

It is the Trustee's informed opinion that he has a dim likelihood of prevailing on the merits should the Redemption Claim be tried in the Adversary Case. Thus, if the King Plaintiffs are successful in the Adversary Case, Serv Trust's interest in Goldsboro will be declared to have been redeemed, rendering this asset worthless to the Estate. The proposed compromise and settlement, by contrast, allows the Trustee to obtain a significant recovery for the Estate while limiting the Estate's exposure to the further expenditure of attorney's fees and litigation costs. A detailed explication of the Trustee's analysis is provided below.

7

Appellees' Appendix 0051

1.      **Relevant Background Regarding the Redemption Claim.**

In or about late 2012, the Debtor discovered a parcel of real property located at 6789 Goldsboro Road in Bethesda, Maryland (the "Property") that he thought would be suitable for development.[4] On the recommendation of an acquaintance, the Debtor approached Mr. King about financing the acquisition of the Property. At that time, the Debtor was heavily indebted to a myriad of creditors and facing the clear prospect of bankruptcy. He thus sought to conceal his involvement with, and investment in, the Property by acting through Serv Trust, his alter ego.

The Debtor, acting through Serv Trust, and the King Plaintiffs then formed the Goldsboro entity. Goldsboro's Operating Agreement provides for the King Plaintiffs, as Class A members of the LLC, to put up almost all of the money needed to acquire the Property and fund its development while affording Serv Trust (*i.e.*, the Debtor), the sole Class B member of the LLC, a period of three (3) years in which to make the project profitable or risk having its "sweat equity" redeemed by the King Plaintiffs. Goldsboro ultimately purchased the Property on July 18, 2013 for the price of $1.35 million.

Goldsboro's Operating Agreement provides that if all governmental approvals needed to subdivide the Property into at least nineteen (19) townhouse dwellings are not obtained by July 18, 2016, and the Class A members of Goldsboro do not elect to sell the Property, the Class A members may have the Property appraised in accordance with the terms of the Operating

---

[4] 6789 Goldsboro Road is a 5.23-acre parcel in Bethesda near MacArthur Boulevard and Glen Echo Park. The parcel is perhaps best known for its white, ranch-style mansion that was built in 1935 and was the former residence of Hollywood starlet, Ilona Massey, and her husband, Air Force Maj. Gen. Douglas Dawson, a prominent aide to President Harry S. Truman. *See 19 Townhouses May Replace Bethesda Home of Hungarian Star*, WTOP News (Sept. 19, 2014) (available at https://wtop.com/news/2014/09/19-townhouses-may-replace-bethesda-home-of-hungarian-star/).

Appellees' Appendix 0052

Agreement.[5]  If the appraised value of the Property is found to be less than the monies invested by the Class A members, the Class A members may cause Goldsboro to redeem the Class B member's interests in consideration of the company's prior distributions or other payments to the Class B member.

Unfortunately for Goldsboro, the necessary government approvals to permit the development of 19 townhomes on the Property were not obtained by July 18, 2016, or at any time thereafter. The Debtor, meanwhile, had become more cash-strapped as the project progressed, leading him to request that Mr. King contribute additional funds to Goldsboro which could then be loaned to Serv Trust and, in turn, to the Debtor, personally, in order to help him defray his ongoing personal expenses. Mr. King agreed and authorized Goldsboro to loan several hundred thousand dollars to the Debtor/Serv Trust. *See* footnote 1, *supra*.

In September of 2016, the King Plaintiffs offered to purchase Serv Trust's Class B shares for the sum of $2 million less repayment of the outstanding loan obligations Serv Trust owed to Goldsboro (for the loans received by Serv Trust for the Debtor's personal benefit). The King Plaintiffs' offer was memorialized in a Memorandum of Understanding ("MOU"), which required: (i) that the offer be accepted by September 12, 2016; and, (ii) if accepted, that closing occur by not later than October 7, 2016. Serv Trust, however, did not accept the MOU by September 12, 2016 and closing did not occur by October 7, 2016.

Several months later, in January 2017, after government officials had denied Serv Trust's bid to develop 19 townhouses on the Property, the Debtor emailed a copy of an executed MOU to

---

[5] The Operating Agreement provides that an appraisal of the Property occurs, *inter alia*, when the Class A members notify the Class B member of a demand for appraisal of the Property. Each class of members then has fifteen (15) days to appoint an MAI appraiser. If the two selected appraisers cannot agree on the value of the Property, then they shall appoint a third appraiser to undertake an additional appraisal to determine the value of the Property.

Appellees' Appendix 0053

Mr. King and claimed that Serv Trust had timely accepted the buy-out offer. Mr. King rejected the belated tender of an executed MOU and, soon afterward, terminated the Debtor's role as manager of Goldsboro.

The King Plaintiffs then undertook to have the Property appraised. The appraisal obtained by the King Plaintiffs valued the Property as being worth between $1,000,000 and $1,325,000, which was far less than the approximately $3 million that the King Plaintiffs had invested in the project to that point in time.

On or about August 23, 2017, the King Plaintiffs formally notified Serv Trust of their election to have the Property appraised for purposes of determining the redemption value of Serv Trust's interest in Goldsboro and appointed an appraiser pursuant to the terms of the Operating Agreement. Serv Trust, however, did not respond as required under the Operating Agreement by appointing its own appraiser in response to the election made by the King Plaintiffs.

In the absence of a counter-appraisal by Serv Trust, and given that the appraisal obtained by the King Plaintiffs shows that the value of the Property is well-below the amount invested by the King Plaintiffs, the King Plaintiffs contend that this Court should declare that Serv Trust's interest in Goldsboro has been redeemed in consideration of prior distributions/payments to Serv Trust, pursuant to the Operating Agreement.

      **2.**      **Analysis of the Trustee's Potential Defenses to the Redemption Claim.**

The Trustee has concluded that the potential defenses to the Redemption Claim are not likely to be found to be meritorious.

          **a.**      **Whether the King Plaintiffs Properly Invoked and Followed the Appraisal Procedures in the Operating Agreement.**

Serv Trust argued in the State Court Cases that the King Plaintiffs did not properly follow the appraisal procedures set forth in the Operating Agreement because: (a) their appraisal was

Appellees' Appendix 0054

dated six (6) days prior to the date they formally notified Serv Trust of their election to have the Property appraised; and (b) Serv Trust never appointed an appraiser. With respect to Serv Trust's first contention, the Trustee observes that there is nothing in the Operating Agreement which mandates that an appraisal must be performed *after* notice of an election is given. Rather, the Operating Agreement states that the appraisers selected by each party are to meet to determine whether they agree on the value of the Property. If they agree, the appraisers are to draft a joint report stating the value of the Property. If they disagree, the appraisers are to draft separate reports. The appraisers, however, are not precluded by the Operating Agreement from basing their opinion, or their separate report, on an appraisal conducted prior to the notice of election.

As to the second contention of Serv Trust advanced in the State Court Cases to the effect that it could prevent a redemption simply by refusing to appoint an appraiser, or by declining to cooperate in the appraisal process, the Trustee notes that the same violates the common law rule obligating parties to a contract to act in good faith with respect to their dealings thereunder. Pellucidly, the actions of Serv Trust in urging that that it effectively could render the appraisal provisions of the Operating Agreement nugatory simply by ignoring them constitutes the very essence of bad faith. The Operating Agreement afforded Serv Trust the right to appoint its own appraiser to value the Property in the event the appraisal process was invoked by the King Plaintiffs. By failing to appoint its own appraiser, Serv Trust arguably waived its right to participate in the appraisal process set forth in the Operating Agreement. *See, e.g., BarGale Indus., Inc. v. Robert Realty Co*., 275 Md. 638, 643, 343 A.2d 529, 533 (1975) ("waiver is the intentional relinquishment of a known right… It is elementary that either party to a contract may waive any

11

of the provisions made for his benefit").[6] Without a competing appraisal to challenge the appraisal performed by the King Plaintiffs' appraiser, there effectively was no disagreement among the parties as to the value of the Property (and, thus, no need for a third appraiser to become involved in the process). Thus, any argument that the King Plaintiffs did not adhere to the appraisal procedures set forth in the Operating Agreement is unlikely to succeed.[7]

### b. Whether Serv Trust Accepted the King Plaintiffs' Buy-Out Offer in the MOU.

Next, any argument that Serv Trust accepted the buy-out offer memorialized in the MOU also is not likely to succeed. The MOU, by its express terms, required that the offer be accepted by September 12, 2016 and, if accepted, that closing occur by not later than October 7, 2016. Although the Debtor claimed in the State Court Cases that he timely signed the MOU on September 12, 2016 and thereafter mailed it to Mr. King, the Debtor's behavior after September 12, 2016 belies those representations. The Debtor made no effort to draft closing documents (nor did Mr. King, for that matter). There are no email communications from the Debtor acknowledging, or otherwise indicating, that the MOU was accepted (and no original, signed document was ever received by Mr. King). Rather, the email communications between the parties subsequent to Sept. 12, 2016 are focused on meetings with attorneys and advisors in connection with a possible resubmission to local authorities of Goldsboro's proposal to subdivide the Property (which would be of no concern to the Debtor if he, in fact, had timely accepted a buy-out). In any event, closing

---

[6] Unsurprisingly, the King Plaintiffs seek a declaration in the Adversary Case, that "Serv Trust waived its right to appoint an alternative appraiser under the Operating Agreement by not doing so on or before September 11, 2017."

[7] The Trustee suspects that Serv Trust chose not to appoint its own appraiser because it knew that any competent appraiser would not value the Property anywhere near $3 million invested by the King Plaintiffs, where there was no ability to subdivide the parcel in the manner sought by Goldsboro (in light of the denial of such subdivision approval by governmental authorities).

Appellees' Appendix 0056

never occurred by the October 7, 2016 deadline expressed in the MOU (and there are no communications agreeing to extend the deadline).

The Trustee also notes that in order for this defense to prevail, the Trustee would have to call the Debtor as a witness at trial and the finder of fact would have to credit the Debtor's testimony against the foregoing evidence to the contrary. For the reasons discussed in greater detail below, the Debtor has no credibility as a witness and it is, therefore, extremely likely – if not certain –  that this defense will fail.

> **c.    Whether the King Plaintiffs Needed to Obtain Serv Trust's Consent in Order to the Redeem Serv Trust's Interest in Goldsboro.**

Lastly, Serv Trust argued in the State Court Cases that Goldsboro could not redeem Serv Trust's interest without Serv Trust's consent.[8] This argument deserves short shrift as the Operating Agreement expressly provides, in relevant part, that "the *Class A Members shall have the unilateral right and authority (without the consent of the Class B Member*) to cause the Company to redeem the Class B Member's Membership Rights solely in consideration for the Company's previous distributions or other previous payments to the Class B Member" in the event that the appraised value of the Property is less than the Class A Members' cumulative investment.

> **3.    The Debtor's Lack of Credibility as a Witness.**

In any potential trial of the Adversary Case, the Debtor almost certainly would have to be called as a witness and, therefore, the credibility of any testimony he would give would be critically important to the Trustee's case. In light of this most critical element of any prospective trial in this cause, the Trustee has assessed the credibility of the Debtor in connection with his evaluation of the merits of the proposed compromise and settlement.

---

[8] Serv Trust suggested that the King Plaintiffs were required to call a meeting of Goldsboro's members at which the members would need to vote on whether to approve the redemption of Serv Trust's interest in Goldsboro.

Appellees' Appendix 0057

The Trustee, individually and through counsel, has had the opportunity to observe the Debtor's demeanor on numerous occasions, both in court and outside of court. The Trustee has seen the Debtor address the Court and provide testimony in various contested matters and adversary proceedings over the course of this Chapter 7 case (and in the myriad of Chapter 13 cases filed by the Debtor and his spouse, Barbara Ann Kelly). The Trustee and his counsel also have had the opportunity to question the Debtor outside of court in depositions, in Rule 2004 examinations, and in § 341 examinations. The Trustee and his counsel also have reviewed transcripts of testimony the Debtor has given in other forums in other matters.

It is the Trustee's firm opinion that the Debtor is not a credible witness. The Debtor frequently is evasive when responding to questions and seldom gives a candid answer.[9]  Indeed, the Debtor's penchant for giving conflicting testimony is well-documented. *See, e.g.*, *United States Trustee's Pre-Trial Statement*, Adv. No. 17-193, Dkt. #56, at p. 3 ("At the Meeting of Creditors, [the Debtor] testified that the monies he and Kelly received from Serv Trust were distributions for the benefit of their children, who are beneficiaries of Serv Trust. At his 2004 examination, the Debtor testified that the monies he and Kelly received from Serv Trust were loans, not distributions."); *Mem. Op.*, Adv. No. 17-193, Dkt. #94, at p. 21 ("Similarly, the line item for the Bethesda Property in the amount $3,860.96 included on his First Amended Schedule J conflicted with his 341 Meeting testimony that he was not making any post-petition payments on that property either.").

---

[9] This Court made similar observations when it converted the Debtor's case to Chapter 7. *See* Tr. of February 15, 2017 Hearing (Dkt. #711) at p. 301 ("It's troublesome to me that there were major omissions and major errors, and they were not brought to the foreground by the Debtor until caught… I do feel [it's] troublesome, especially because there was some obfuscation, that is refusal to answer certain questions, that might have revealed this. And that is troublesome.").

Appellees' Appendix 0058

Further, this Court's previous determination "that Myers knowingly and fraudulently made false oaths in his bankruptcy case sufficient to deny him a discharge under § 727(a)(4)(A)," *see In re Myers*, 2018 WL 4701387, *8 (Bankr. D. Md. Sept. 28, 2018)," weighs heavily against the Debtor's credibility. *See also id.* at * 11 ("The numerous falsities indicate a cavalier attitude toward his schedules and a reckless disregard for the truth sufficient to deny him a discharge under § 727(a)(4)(A). His lack of candor and credibility left his creditors, the United States Trustee, and the Chapter 7 Trustee constantly playing catch up to get an understanding of his finances.").

Moreover, numerous courts, including this one, have concluded that the Debtor is a bad faith litigant which, in turn, further calls into question his trustworthiness and veracity. *See, e.g., In re Kelly*, 656 B.R. 541, 603 (Bankr. D. Md. 2023) ("Ms. Kelly filed this case as part of her and Mr. Myers' ongoing scheme to frustrate, hinder, and delay creditors and to cause creditors as much pain as possible along the way. This case is just the latest leg in a long journey designed to exploit and subvert the bankruptcy process."); *Kelly v. McNamee, Hosea, Jernigan, Kim, Greenan & Lynch, P.A.*, 2022 WL 861395, *3-4 (D. Md. Mar. 23, 2022) ("First, the Court finds that Appellants Barbara Ann Kelly and Gregory B. Myers are acting in bad faith… It is plainly clear to this Court that Appellants' appeal tactics have delayed the adjudication of these matters and have prejudiced Appellees by having to incur costs and fees in responding to these appeals."); *Myers v. McNamee, Hosea, Jernigan, Kim, Greenan & Lynch, P.A.*, 2020 WL 758151, *3, 5 (D. Md. Feb. 14, 2020) ("Myers has undoubtedly used (and abused) the judicial process to prolong proceedings in the bankruptcy matter and thus delay liquidation and distribution of Myers' assets… In this Court's view, Myers once again attempts, seemingly in bad faith, to manufacture further delay in the resolution of his claims.").

Accordingly, the Trustee believes that the Debtor is completely untrustworthy and offers no utility as a witness. As a result, the Trustee would not be materially aided by eliciting testimony

Appellees' Appendix 0059

from the Debtor and, in fact, the Trustee's prospects at trial likely will be harmed if the Debtor is called as a witness.

## C.      Other Considerations Informing the Trustee's Analysis and Recommendation.

Even if the Trustee were to try the Adversary Case (at considerable expense) and prevail at trial, there is no guarantee that the Trustee thereafter would be able to liquidate Serv Trust's interest in Goldsboro for more than what is being offered in this proposed settlement. As Goldsboro is a private company, there is no readily accessible market in which the Trustee can liquidate Serv Trust's interest. Further, Serv Trust's interest still would be subject to the King Plaintiffs' ability to invoke the appraisal process to force a redemption. In other words, even if, for example, the Trustee prevails on grounds that the King Plaintiffs did not properly follow the appraisal procedures in 2017, the Trustee cannot prevent the King Plaintiffs from triggering a new round of appraisals following a trial. Given that current online Zillow and Redfin valuations of the Property are roughly between $1.8 - $2.0 million, it is clear that Serv Trust's interest in Goldsboro will be at serious risk of redemption even if the Trustee is successful at trial. This risk of redemption will make it extremely difficult, if not impossible, for the Trustee to market Serv Trust's interest to potential buyers. Thus, the settlement proposed herein is very attractive to the Trustee.

Finally, the Trustee is mindful of the Debtor's propensity to litigate nearly every action that is proposed to be taken by the Trustee and to appeal (and/or to seek reconsideration of) nearly every ruling made by this Court (and by the District Court) that the Debtor perceives to be adverse to his interests.[10] As a result, the Estate has incurred an extraordinary amount of administrative

---

[10] This is not an overstatement. Since the commencement of the instant Chapter 7 case, the Debtor and his spouse, Barbara Ann Kelly, have filed twenty (20) appeals to the District Court. *See Myers v. United States Trustee*, No. 17-CV-01218; *Kelly v. United States Trustee*, No. 17-CV-01239; *Myers v. Schlossberg, et al.*, No. 17-CV-02537; *Myers v. McNamee, Hosea, Jernigan, Kim, Greenan & Lynch, P.A.*, No. 17-CV-02781; *Kelly v. Schlossberg*, No. 17-CV-03846; *Myers v. Schlossberg*, No. 17-CV-03847; *Myers, et al. v.*

Appellees' Appendix 0060

expenses defending against the Debtor's multitudinous (and often frivolous) appeals – none of which have proven successful. Accordingly, the Trustee must anticipate that the Debtor will oppose this proposed settlement and will file yet another appeal if the settlement is approved. To mitigate the expense to the Estate in these circumstances, the Trustee insisted that the King Plaintiffs bear responsibility for reimbursing the Trustee for all Appellate Legal Fees incurred in the event that the proposed settlement is approved by the Court. The King Plaintiffs have agreed to this provision as part of the proposed settlement and its value to the Estate cannot be understated. This provision insures that the Estate will reap the full benefit of the $150,000.00 Settlement Payment to be made by the King Plaintiffs, as the Estate will be insulated from the cost of litigating any appeals related to the settlement.

Accordingly, in consideration of the contemplated cost to litigate the Adversary Case through a contested trial and possible appeals, the concomitant risk of adverse rulings, and the omnipresent vagaries of litigation, the Trustee, in the exercise of his business judgment and for all of the reasons expressed above, believes that the proposed compromise and settlement with the

---

*Schlossberg, et al.*, No. 18-CV-00336; *Myers v. Fitzgerald*, No. 18-CV-01417; *Myers v. Fitzgerald*, No. 18-CV-01630; *Myers, et al. v. Offit Kurman, P.A., et al.*, No. 18-CV-02536; *Myers, et al. v. Schlossberg*, No. 18-CV-03783; *Myers v. McNamee, Hosea, Jernigan, Kim, Greenan & Lynch, P.A.*, No. 19-CV-00245; *Myers v. McNamee, Hosea, Jernigan, Kim, Greenan & Lynch, P.A.*, No. 19-CV-00636; *Myers v. United States Trustee*, No. 19-CV-00637; *Myers v. McNamee, Hosea, Jernigan, Kim, Greenan & Lynch, P.A., et al.*, No. 19-CV-03677; *Myers v. Schlossberg*, No. 21-CV-01184; *Myers v. McNamee, Hosea, Jernigan, Kim, Greenan & Lynch, P.A., et al.*, No. 21-CV-01185; *Myers v. McNamee, Hosea, Jernigan, Kim, Greenan & Lynch, P.A., et al.*, No. 21-CV-01186; *Myers v. Specialized Loan Servicing, LLC, et al.*, No. 22-CV-00778; *Myers v. King, et al.*, No. 23-CV-03511-DLB. In addition, Mr. Myers and/or Ms. Kelly have filed six (6) further appeals to the Court of Appeals for the Fourth Circuit. *See Myers, et al. v. Offit Kurman, P.A., et al.*, Appeal No. 18-2144; *Myers v. United States Trustee*, Appeal No. 20-1261; *Myers v. McNamee, Hosea, Jernigan, Kim, Greenan & Lynch, P.A., et al.*, Appeal No. 20-2007; *Myers, et al. v. Offit Kurman, P.A., et al.*, Appeal No. 20-2309; *Kelly, et al. v. McNamee, Hosea, Jernigan, Kim, Greenan & Lynch, P.A., et al.*, Appeal Nos. 22-1378 and 22-1379 (consolidated). The foregoing list does <u>not</u> include any of the appeals filed by Mr. Myers and/or Ms. Kelly in connection with the myriad of intervening Chapter 13 cases that they have commenced in Maryland, Florida, and Delaware.

Appellees' Appendix 0061

King Plaintiffs is in the best interests of all parties-in-interest herein and, therefore, strongly recommends that the proposed compromise and settlement be approved.

### **Manner of Objection**

Parties in interest objecting to the proposed action by the Trustee are to file such Objections in writing with the United States Bankruptcy Court, 6500 Cherrywood Lane, Suite 300, Greenbelt, Maryland 20770, by not later than twenty-one (21) days after the date of this Notice; with a copy of said Objection to be provided to the undersigned by the same date. Objections must specifically state the factual and legal grounds upon which such Objection is based. Hearings may be held before the United States Bankruptcy Court upon any such Objections as are filed, or the Court may determine the matter without a hearing. Further, the Court may conduct a hearing in its discretion regardless of whether any Objections are filed. Any party in interest filing an Objection may be required to be present at such hearing as may be held. If no Objection is filed within the period above-provided, the Court may proceed to consider the Debtor's proposed compromise and settlement as above-proposed without further notice to parties in interest. Parties in interest desiring further information should consult the Court file or communicate with the undersigned.

Date: December 30, 2024                                Respectfully submitted,

                                                       SCHLOSSBERG | MASTRO


                                                       By: ___/s/ Frank J. Mastro_____
                                                           Frank J. Mastro #24679
                                                           Roger Schlossberg
                                                           P.O. Box 2067
                                                           Hagerstown, MD 21742
                                                           (301) 739-8610
                                                           fmastro@schlosslaw.com
                                                           *Attorneys for Defendant,*
                                                           *Roger Schlossberg, Trustee*

18

Appellees' Appendix 0062

USBC-MD B FILED DB
21 JAN '25 PM 11:2?

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)**

In re:

GREGORY B. MYERS,

    Debtor.

_____/

Case No. 15-26033-MCR
(Chapter 7)

BRIAN KING, *et al.*,

    Plaintiffs,

v.

                                            Adv. No. 24-00007

ROGER SCHLOSSBERG, TRUSTEE,

    Defendant.

_____/

## GREGORY B. MYERS'S PRELIMINARY OBJECTION TO THE TRUSTEE'S MOTION FOR APPROVAL OF PROPOSED COMPROMISE AND SETTLEMENT WITH KING PLAINTIFFS

Gregory B. Myers ("Mr. Myers" or "Movant"), *pro se*, files his preliminary objection (the

"Objection") to the *Trustee's Motion For Approval Of Proposed Compromise And Settlement With*

*King Plaintiffs* (Doc. 17) (the "Motion"), and states:

### BACKGROUND

On December 16, 2022, the Montgomery County Circuit Court (Lease, J) held a hearing in

*King, et al. v. Serv Trust, et al.*, Case No. 436977-V (the "King Case") and *6789 Goldsboro LLC*

*v. Serv Trust, et al.*, Case No. 436977-V (the "Goldsboro Case") (the "King Case" and "Goldsboro

Case" having been consolidated for administrative purposes, and referred to herein collectively as

the "State Court Litigation"). The following statements were placed on the record during the

1

December 16, 2022, hearing in the State Court Litigation:

> THE COURT: *** So Mr. Myers is here in court. The matters against Mr. Myers have been stayed. *** Mr. Myers is a party to the case, but his matters have been stayed at this point in time.
> THE COURT: What's the status of this matter? I'll start with counsel for the King Parties.
> MR. VERSTANDIG: Your Honor, we are prepared to proceed to trial on January 3rd [2023]. Pre-trial statements were filed a couple of years ago prior to a bankruptcy stay and are inclusive of all the exhibits and all the witnesses we plan to rely upon during our trial in January [2023]. It will be a more abbreviated list of witnesses and exhibits because the claims against Mr. Myers are stayed. ***
> MR. MYERS: *** If King Parties prevail in either of their two counts, I have potential liability.
> THE COURT: They would have to prove those counts against you in a separate trial. The matter would not be -- there would not be any collateral estoppel or res judicata because you did not participate in this case as a party. You were stayed and out of the case.
> MR. MYERS: There would still be a ruling that would impose liability upon me.
> THE COURT: There would not be a ruling that would impose liability on you. There would be a ruling that would potentially impose liability on Serv Trust. However, these Plaintiffs would have to, if they wanted to proceed against you, would be required to try that matter again separately and there would not be any res judicata or collateral estoppel issues because you were not a party to th[is] case. You were stayed, so you are not considered a party.

(Alterations and emphasis supplied supplied). See also King Plaintiff's motion to stay proceedings,

a copy of which is attached hereto as **Exhibit A** and made a part hereof.

On January 3, 2023, the Montgomery County Circuit Court (Lease, J) made the following

statement on the record in the State Court Litigation:

> THE COURT: And under the Frow doctrine you can, either one of two things: you sort of abstain from going forward because you don't want to try it twice, or two, you can enter the judgment, but then it's a non-final judgment because anything that I do today in essence necessarily would be nonfinal because we don't have, we're not putting all of the claims against all the parties are not getting to an adjudication. **So we don't have a final judgment today under any circumstance**.

2

(Emphasis supplied).[1] A copy of the partial hearing transcript is attached hereto as **Exhibit B** and made a part hereof.

On January 3, 2023, Mr. Myers noticed an appeal to the Appellate Court of Maryland ("ACM") stemming from the conduct in the State Court Litigation. The ACM docketed the case as No. 1876, September Term 2022, ACM-REG-1876-2022 (the "ACM Appeal").

On January 12, 2023, the Montgomery County Circuit Court (Lease, J.)—in violation of the ACM's jurisdiction—entered an ORDER ENTERING PARTIAL JUDGMENT AND STAY in the State Court Litigation, ordering "that all remaining matters in this case are accordingly stayed… ."

On April 17, 2023, the Montgomery County Circuit Court (Lease, J) held a hearing in the State Court Litigation and ruled the "triggering mechanism" for bankruptcy jurisdiction would necessarily require entry of a **final order** in the State Court Litigation (i.e., *not* entry of a *non*-final order). A copy of the hearing transcript is attached hereto as **Exhibit C** and made a part hereof

On April 18, 2023, in the ACM Appeal, Mr. Myers filed a motion for stay pending appeal. On April 28, 2023, the King Parties filed a response to Mr. Myers's motion (the "King Parties ACM Response")—which Goldsboro and the Trustee adopted and incorporated in their respective responses filed in the ACM Appeal—arguing:

> "[T]he order from which Mr. Myers instantly seeks a stay is, by its own express terms, non-final. Indeed, the document is titled 'Order Entering Partial Judgment and Stay,' and the order most certainly does not dispose of the totality of the triable issues below."
>
> **"The order from which appellants appealed did not adjudicate or complete the adjudication of any claim in this matter**. It therefore was not a final order[.]"

---

[1] The King Parties have **never** answered the Second Amended Counterclaim filed by Serv Trust in Case 436977-V and are now in default.

3

"Here, the order below is, by its own titular designation, 'partial' in nature. There are no less than three causes of action that have not yet been tried judgment and, accordingly, upon which no judgment has been entered."

"[T]here remain unresolved causes of action in both cases that were consolidated below and, as such, there does not exist a final order in either case, even if they were to be considered separately."

(Alterations supplied). A copy of the King Parties ACM Response is attached hereto as **Exhibit**

**D**. The King Parties, Goldsboro, and the Trustee are judicially estopped from taking a different

position in this Court.

On May 7, 2024, the King Parties and the Trustee executed and filed a fraudulent

"STIPULATION OF DISMISSAL" (the Stipulation") in the State Court Litigation, which states:

COMES NOW, Plaintiffs, Brian King, Cristina King, and Brian King in his capacity as trustee of the Cristina and Brian King Children's Trust (collectively, the "King Parties"), and Defendant, Serv Trust, through Roger Schlossberg, the Chapter 7 Trustee of the Bankruptcy Estate of Gregory B. Myers, who is, by operation of law, now the sole legal representative of Serv Trust following this Court's judicial determination herein that Serv Trust is the alter ego of Gregory B. Myers, by and through their respective undersigned counsel, pursuant to Md. Rule 2-506(a), hereby stipulate and agree that Count I of Plaintiffs' First Amended Complaint (Declaratory Judgment: Redemption of Interests) in Case No.: 436977-V shall be, and is hereby, DISMISSED.

A copy of the fraudulent Stipulation is attached hereto as **Exhibit E**.

## ARGUMENT

Serv Trust's property is unaffected unless and until there is a final judgment in the State

Court Litigation, and it is **undisputed** that there is no final judgment in the State Court Litigation

that adjudicates all claims against all parties in the State Court Litigation. In fact, the King

Plaintiffs (VerStandig) represented to the Appellate Court of Maryland that "The order from which

appellants appealed did not adjudicate or complete the adjudication of *any claim* in this matter."

(Emphasis supplied). The Trustee adopted and incorporated that very argument as his own.

4

It is obvious the Settlement Motion—together with Adversary Proceeding No. 24-00007—is a sham; a fraud. See *In re Anderson*, 377 B.R. 865 (2007). holding "the Chapter 7 Trustee's settlement with the owners of the other undivided one-half interest in the property cannot be approved, for, as already discussed, that settlement contemplates the Chapter 7 Trustee conveying to those owners an interest in the property that the bankruptcy estate in all likelihood no longer owns. **The bankruptcy estate's receipt of consideration from the Defendants under such circumstances would be tantamount to fraud and, therefore, would be in violation of the Chapter 7 Trustee's fiduciary duty to administer the bankruptcy estate in a lawful manner**." (Emphasis supplied). See also email chain attached hereto as **Exhibit F**, evidencing a conspiracy by and among Brian King, Timothy Lynch, Maurice VerStandig and others to commit tax fraud in violation of 26 U.S. Code § 7206, as well and numerous other bad acts.[2] *See Etgen v. Washington County Bldg. Loan Ass'n.,* 184 Md. 412, 41 A.2d 290 (1945) ("where two or more persons conspire to carry out a fraud to cheat another, each of them is liable to the defrauded party irrespective of the degree of his activity in the fraudulent transaction or whether he shared in the profits of the scheme. In order to establish liability of a participant in a fraud, it is not necessary to show that he was a party to its contrivance at its inception. If it is shown that he knew of the fraudulent scheme and willfully aided in its execution, he is chargeable with the consequences. All persons who participate in such a transaction are jointly liable for the ensuing injury regardless of the degree of culpability. *Lomita Land W*ater Co. v. Robinson, 154 Cal. 36, 97 P. 10, 14."). Id. at 418. The Trustee's "fingerprints" are now on this scheme as well.[3]

---

[2] Notably, on December 18, 2018, **The Honorable Anne K. Albright** (now sitting on the Appellate Court of Maryland), found, *inter alia*, that Brian King as the Managing Member of 6789 Goldsboro LLC breached his fiduciary duty to Serv Trust "in order to benefit himself and the other class A members" (his family), and concluding "**that would amount to constructive fraud**.".

3 Given the criminal and fraudulent nature of the Settlement Motion, it is apparent that counsel's

5

On December 5, 2019, the Maryland bankruptcy court (Simpson, J) entered an Order remanding Adv. No. 19-00427 (i.e., the State Court Litigation) "to the Circuit Court for Montgomery County, Maryland pursuant to 28 U.S.C. ' 1452(b)." (Adv. No. 19-00427; Dkt. No. 5) the "Remand Order"). A copy of the Remand Order is attached hereto as **Exhibit G** and made a part hereof.

This Court (Chavez-Ruark, J) has previously acknowledged that the Montgomery County Circuit Court (Lease, J) has jurisdiction and authority under the Maryland Rules to **control its judgments** that are non-final. And the Trustee concedes that he is **barred** under Bankruptcy Rule 9027(a)(3) from removing the State Court Litigation to this Court, citing Bankruptcy Rule 9027 and *Roberts v. Creighton*, 2009 WL 7083320 (D. Md. Feb. 27, 2009). Yet, on December 11, 2023, this Court (Chavez-Ruark, J) entered an Order (Doc 1029) in Case 15-26033, which states:

> "The Settlement Procedure Motion is the **mechanism** by which the Trustee is seeking authority to resolve a stayed cause of action in the State Court."

The Bankruptcy Court (Chavez-Ruark, J) has no jurisdiction or authority to approve a "**mechanism**" which amounts to an **improper collateral attack** on the Remand Order entered on December 5, 2019 (Adv. No. 19-00427; Dkt. No. 5). An order remanding a claim or cause of action to the State Court is not reviewable by appeal "or otherwise" (which includes this Court). Only a

---

conduct implicates several cannons of the Model Rules of Professional Conduct. For instance, Rule 1.2(d), which proscribes a lawyer from "counsel[ing] a client to engage, or assist[ing] a client, in conduct that the lawyer knows is criminal or fraudulent"; Rule 3.1, which requires that a lawyer only bring or defend a proceeding when "there is a basis in law and fact for doing so that is not frivolous"; Rule 3.3(4) regarding candor toward the tribunal, which proscribes a lawyer from presenting a "[l]egal argument based on a knowingly false representation of law"; and Rule 3.3(12) which provides that "[l]awyers have a special obligation to protect a tribunal against criminal or fraudulent conduct that undermines the integrity of the adjudicative process[.]" Mr. Myers will be filing a complaint with the Attorney Grievance Commission to determine what, if any, Rules of Professional Conduct counsel might have violated.

Appellees' Appendix 0068

district court or bankruptcy appellate panel may review a bankruptcy court's remand order under 28 U.S.C. § § 1334(d), 1447(d) and 1452(b). See *Things Remembered, Inc. v. Petrarca,* 516 U.S. 124, 129, 116 S.Ct. 494, 133 L.Ed.2d 461 (1995). Accordingly, this Court's (Chavez-Ruark, J) "mechanism" is unlawful and is an affront to the proper jurisdiction of the State Court.

Maryland adheres to the *Frow Doctrine. See Curry v. Hillcrest Clinic, Inc.*, 337 Md. 412, 428-33 (1995) discussing *Frow v. De La Vega*, 82 U.S. (15 Wall.) 552, 21 L.Ed. 60 (1872)( "But a final decree on the merits against the defaulting defendant alone, pending the continuance of the cause, would be incongruous and illegal."). "If the court in such a case as this can lawfully make a final decree against one defendant separately, on the merits, while the cause was proceeding undetermined against the others, then this absurdity might follow: there might be one decree of the court sustaining the charge of joint fraud committed by the defendants; and another decree disaffirming the said charge, and declaring it to be entirely unfounded, and dismissing the complainant's bill. And such an incongruity, it seems, did actually occur in this case. Such a state of things is unseemly and absurd, as well as unauthorized by law." *Id.*

It has long been established that courts "'can make no decree affecting the rights of an absent person, and can make no decree between the parties before it which so far involves or depends upon the rights of an absent person that complete and final justice cannot be done between the parties to the suit without affecting those rights.'" *Greeley v. Lowe*, 155 U.S. 58, 70 (1894) (quoting *Shields v. Barrow*, 58 U.S. 130, 141-42 (1854)). This rule is just as strong today as when it was first set forth. *See, e.g., Republic of Philippines v. Pimentel*, 553 U.S. 851, 871 (2008) (recognizing that the non-joined parties "would not be bound by the judgment in an action where they were not parties").

7

Appellee's Appendix 0069

The U.S. Supreme Court has clearly stated that if a court is "without authority, its judgments and orders are regarded as nullities. They are not voidable, but simply void, and form no bar to a remedy sought in opposition to them, even prior to a reversal. They constitute no justification, and all persons concerned in executing such judgments or sentences are considered in law as trespassers." *Elliot* v. *Lessee of Piersol*, 26 U.S. 328 (1828). Thus, according to *Elliot*, by filing the instant Motion, the Trustee is "considered in law [a] trespasser." *Id.*

The State Court has made no final determination in the State Court Litigation. Accordingly, the Settlement Motion must be denied because there is no justiciable controversy or cause of action "affecting the estate" and therefore there is nothing for the Trustee "to compromise or settle." See *E.F. Hutton & Co., Inc. v. Hadley*, 901 F .2d 979 (11th Cir.1990) (When standing has been contested, it is the burden of the party claiming standing "'to plead and prove injury in fact, causation, and redressability.'"). The Trustee and the King Plaintiffs cannot meet that burden and "the court is not required to accept as true unwarranted legal conclusions or unwarranted factual inferences." *Id.* at 753. The Trustee and the King Plaintiffs must assert more than a conclusory statement that they have "suffered damages." It is the burden of the party claiming standing "to plead and prove injury in fact, causation, and redressability." Id. At 984. But here, they cannot.

Until the State Court Litigation concludes (i.e., with a final order , the Trustee lacks standing to file this Motion or any other motion affecting Serv Trust or Mr. Myers. This is not a core proceeding (it's a sham) and Mr. Myers does not consent to the entry of any final orders or judgments by the bankruptcy court. To the extent the Settlement Motion is not dismissed for lack of subject matter jurisdiction or some other reason, the bankruptcy court must submit proposed findings of fact and conclusions of law to the Maryland District Court for an Article III Judge to make a final determination. The U.S. Supreme Court has clearly stated that if a court is "without

8

authority, its judgments and orders are regarded as nullities. They are not voidable, but simply void, and form no bar to a remedy sought in opposition to them, even prior to a reversal. They constitute no justification, and all persons concerned in executing such judgments or sentences are considered in law as trespassers." *Elliot v. Lessee of Piersol*, 26 U.S. 328 (1828). Thus, according to Elliot, by filing the Settlement Motion, the Trustee is "considered in law [a] trespasser." *Id*.

The Trustee has the burden of proof on the Settlement Motion, and Mr. Myers intends to show at an evidentiary hearing on the Settlement Motion that the Trustee cannot meet that burden. Accordingly, the Trustee's Settlement Motion should be denied

## REQUEST FOR EVIDENTIARY HEARING

Mr. Myers demands that the Court schedule a full evidentiary hearing on the Trustee's Settlement Motion and demands **strict proof** on the substance and merits of the Trustee's Settlement Motion.

RESPECTFULLY SUBMITTED on this 21st day of January, 2025.

Gregory B. Myers, *pro se*
700 Gulf Shore Blvd. N.
Naples, Florida 34102
(301) 325-2312
gregbmyers@verizon.net

9

Appellee's Appendix 0071

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of January, 2025, a copy of the foregoing

GREGORY B. MYERS'S PRELIMINARY OBJECTION TO THE TRUSTEE'S MOTION FOR

APPROVAL OF PROPOSED COMPROMISE AND SETTLEMENT WITH KING

PLAINTIFFS was furnished via first class U.S. Mail, postage prepaid to the following parties:

Roger Schlossberg
Frank J. Mastro
P.O. Box 2017
Hagerstown, MD 21742-2017

_____
Gregory B. Myers, *pro se*

10

Appellee's Appendix 0072

# FIRST AMENDED AND RESTATED OPERATING AGREEMENT

## OF

## 6789 GOLDSBORO LLC

---

THE INTERESTS DESCRIBED HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES ACT OF ANY STATE OR JURISDICTION.  NO SALE, OFFER TO SELL, OR OTHER TRANSFER OF THESE INTERESTS MAY BE MADE BY A MEMBER UNLESS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT, OR UNLESS IN THE OPINION OF COUNSEL TO 6789 GOLDSBORO LLC THE PROPOSED DISPOSITION FALLS WITHIN A VALID EXEMPTION FROM THE REGISTRATION PROVISIONS OF THOSE ACTS.

- 1 -

Appellees' Appendix 0078

Trustee Ex. 1

**6789 GOLDSBORO LLC**

**FIRST AMENDED AND RESTATED OPERATING AGREEMENT**

THIS FIRST AMENDED AND RESTATED OPERATING AGREEMENT (this "Agreement") is made and entered into and shall be effective as the 18th day of July, 2013, by and among the undersigned (each a "Member" and collectively the "Members"), as all of the members of 6789 GOLDSBORO LLC (the "Company"), a Maryland limited liability company.

**Explanatory Statement**

WHEREAS, the Company was formed by the filing of Articles of Organization with the SDAT on January 12, 2012; and

WHEREAS, the Members desire to set forth their agreements and understandings with respect to the Company, and to enter into this Agreement for the purpose of amending and restating the operating agreement of the Company in its entirety as follows:

NOW, THEREFORE, the Members, intending to be legally bound, agree as follows:

**Section I**
**Defined Terms**

The following capitalized terms shall have the meanings specified in this Section I. Other terms are defined in the text of this Agreement; and, throughout this Agreement, those terms shall have the meanings respectively ascribed to them.

"Act" means the Maryland Limited Liability Company Act, as amended from time to time.

"Adjusted Capital Account Deficit" means, with respect to any Interest Holder, the deficit balance, if any, in the Interest Holder's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(i)     the deficit shall be decreased by the amounts which the Interest Holder is obligated to restore (if any), or is deemed obligated to restore pursuant to Sections 1.704-2(g)(1) and (i)(5) of the Regulations (i.e., the Interest Holder's Share of Minimum Gain and Member Minimum Gain); and

(ii)     the deficit shall be increased by the items described in Section 1.704-1(b)(2)(ii)(d)(4), (5), and (6) of the Regulations.

"Agreement" means this Agreement, as amended from time to time.

"Capital Account" means, with respect to any Interest Holder, the capital account on the books of the Company determined and maintained in accordance with applicable Treasury Regulations to Section 704(b) and (c) of the Code. It is intended that the Capital Accounts of all

- 2 -

Appellees' Appendix 0074

Interest Holders shall be maintained in compliance with the provisions of Section 1.704-1(b) of the Regulations, and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation.

"Capital Contribution" means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Section 1.704-1(b)(2)(iv)(d) of the Regulations) to the Company by a Member, net of liabilities assumed or to which the assets are subject. A Member's "Initial Capital Contribution" shall be the total amount contributed by a Member (net of liabilities) pursuant to Section 3.2, including the amounts specified in Exhibit A and the amounts contributed by the Class A Members pursuant to Section 3.2.2. A Member's "Additional Capital Contribution" shall be the total amount contributed by a Member (net of liabilities) pursuant to Section 3.3.2.

"Cash Flow" means all cash funds derived from operations of the Company (including proceeds from the sale of Company assets and interest received on reserves), without reduction for any noncash charges, but less cash funds used to pay Development Costs.

"Class A Member" means those Members listed on Exhibit A, as it may be amended from time to time, as having Class A Interests.

"Class B Member" means those Members listed on Exhibit A, as it may be amended from time to time, as having Class B Interests.

"Code" means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

"Cumulative Additional Capital Return" means a cumulative but non-compounded annual return equal to ten percent (10%) of the Unrecovered Additional Capital balance of the Members for each taxable year of the Company, distributable to the Members out of the Cash Flow of the Company. If for any taxable year the Cumulative Additional Capital Return is not paid in full, the portion of the Cumulative Additional Capital Return not paid for that year, together with any accumulated unpaid Cumulative Additional Capital Return for prior taxable years (collectively the "Unpaid Cumulative Additional Capital Return") shall be payable out of Cash Flow in subsequent years. If a Member's Unrecovered Additional Capital changes during the course of any taxable year, the Cumulative Additional Capital Return payable to the Member for that year shall be calculated based upon the weighted average of the Member's Unrecovered Additional Capital balances during the course of the year.

"Cumulative Initial Capital Return" means a cumulative but non-compounded annual return equal to ten percent (10%) of the Unrecovered Initial Capital balance of the Members for each taxable year of the Company, distributable to the Members out of the Cash Flow of the Company. If for any taxable year the Cumulative Initial Capital Return is not paid in full, the portion of the Cumulative Initial Capital Return not paid for that year, together with any accumulated unpaid Cumulative Initial Capital Return for prior taxable years (collectively the "Unpaid Cumulative Initial Capital Return") shall be payable out of Cash Flow in subsequent years. If a Member's Unrecovered Initial Capital changes during the course of any taxable year,

- 3 -

Appellees' Appendix 0075

the Cumulative Initial Capital Return payable to the Member for that year shall be calculated based upon the weighted average of the Member's Unrecovered Initial Capital balances during the course of the year.

"Decision Date" means the date which is thirty-six (36) months after the date the Company closes on the acquisition of the Property.

"Depreciation" means, for each taxable year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such taxable year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such taxable year, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such taxable year bears to such beginning adjusted tax basis, provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such taxable year is zero (0), Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Class A Members.

"Development Costs" means all costs incurred by the Company in acquiring, maintaining (e.g., annual real estate taxes, hazard insurance, utilities, security, repairs, mowing, etc.), entitling, and developing the Property, including but not limited to, fees and expenses for attorneys (including attorneys' fees associated with the contract for the purchase of the Property and for preparing and reviewing the Members' term sheet and this Agreement), engineers, architect, environmental, geotechnical, traffic and other engineers and consultants.

"Entitlements" means all governmental approvals necessary to permit the subdivision (or equivalent) of the Property for no fewer than twenty-six (26) single family or townhouse dwellings.

"Fiscal Year" means each calendar year of existence of the Company.

"Gross Asset Value" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Members, provided that the initial Gross Asset Values of the assets contributed to the Company pursuant to Section 3.2 hereof shall be as set forth in such Section;

(ii)     The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account), as determined by Members, as of the following times:  (A) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (B) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for an interest in the Company; (C) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); and (D) in connection with the grant of an interest in the Company (other than a de minimis interest) as

- 4 -

Appellees' Appendix 0076

consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a member capacity, or by a new Member acting in a partner capacity in anticipation of being a Member; provided that an adjustment described in clauses (A), (B), and (D) of this paragraph shall be made only if the Members reasonably determine that such adjustment is necessary to reflect the relative economic interests of the Members in the Company;

(iii)   The Gross Asset Value of any item of Company assets distributed to any Member shall be adjusted to equal the gross fair market value (taking Code Section 7701(g) into account) of such asset on the date of distribution as determined by the Members; and

(iv)   The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to (A) Regulations Section 1.704-1(b)(2)(iv)(m) and (B) subparagraph (vi) of the definition of "Profits" and "Losses" or Section 3.3(g) hereof, provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (iv) to the extent that an adjustment pursuant to subparagraph (ii) is required in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraph (i), (ii), or (iv), such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset, for purposes of computing Profits and Losses.

"Interest" means a Person's share of the Profits and Losses of, and the right to receive distributions from, the Company.

"Interest Holder" means any Person who holds an Interest, whether as a Member or as an unadmitted assignee of a Member.

"Involuntary Withdrawal" means, with respect to any Member, the occurrence of any of the following events:

(i)   the Member makes an assignment for the benefit of creditors;

(ii)   the Member files a voluntary petition of bankruptcy;

(iii)   the Member is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding;

(iv)   the Member files a petition or answer seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation;

- 5 -

(v)    the Member seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Member or of all or any substantial part of the Member's properties;

(vi)    the Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in Subsections (i) through (v);

(vii)    any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver, or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated;

(viii)    if the Member is an individual, the Member's death or adjudication by a court of competent jurisdiction as incompetent to manage the Member's person or property;

(ix)    if the Member is acting as a Member by virtue of being a trustee of a trust, the termination of the trust;

(x)    if the Member is a partnership or another limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company;

(xi)    if the Member is a corporation, the dissolution of the corporation or the revocation of its charter; or

(xii)    if the Member is an estate, the distribution by the fiduciary of the estate's entire interest in the limited liability company.

"Majority in Interest of Class A Members" means Class A Members whose Percentage Interests in the aggregate are greater than 51% of the Percentage Interests owned by the Class A Members (i.e., 26% of all Interests as of the date of this Agreement).

"Majority in Interest of All Members" means a Majority in Interest of Class A Members, plus the Class B Member.

"Manager" is the Person designated as such in Section VI.

"Member" means each Person signing this Agreement.

"Member Loan Nonrecourse Deductions" means any Company deductions that would be Nonrecourse Deductions if they were not attributable to a loan made or guaranteed by a Member within the meaning of Section 1.704-2(i) of the Regulations.

- 6 -

Appellees' Appendix 0078

"Membership Rights" means all of the rights of a Member in the Company, including a Member's: (i) Interest; (ii) right to inspect the Company's books and records; (iii) right to participate in the management of and vote on matters coming before the Company; and (iv) unless this Agreement or the Articles of Organization provide to the contrary, right to act as an agent of the Company.

"Minimum Gain" has the meaning set forth for the term "partnership minimum gain" in Section 1.704-2(b)(2) of the Regulations. Minimum Gain shall be computed separately for each Interest Holder in a manner consistent with the Regulations under Code Section 704(b).

"Negative Capital Account" means a Capital Account with a balance of less than zero (0).

"Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Regulations. The amount of Nonrecourse Deductions for a taxable year of the Company equals the net increase, if any, in the amount of Minimum Gain during that taxable year, determined according to the provisions of Section 1.704-2(c) of the Regulations.

"Nonrecourse Liability" has the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

"Percentage" means, as to a Member, the percentage set forth after the Member's name on Exhibit A, as amended from time to time, and as to an Interest Holder who is not a Member, the Percentage of the Member whose Interest has been acquired by such Interest Holder.

"Person" means and includes any individual, corporation, partnership, association, limited liability company, trust, estate, or other entity.

"Positive Capital Account" means a Capital Account with a balance greater than zero (0).

"Profit" and "Loss" means, for each taxable year of the Company (or other period for which Profit or Loss must be computed), the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

      (i)     all items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss;

      (ii)     any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss;

      (iii)     any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Section 1.704-1(b)(2)(iv)(i)) of the Regulations and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss;

      (iv)     gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of,

- 7 -

notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes;

(v)    in lieu of the depreciation, amortization, or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

(vi)    notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Sections 4.2 hereof shall not be taken into account in computing Profit or Loss.

"Property" shall have the meaning given in Section 2.2.

"Regulation" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

"SDAT" means the State Department of Assessments and Taxation of Maryland.

"Target Amount" means the amount, for any Fiscal Year, which a Member would then be entitled to receive if, immediately following such Fiscal Year: (a) all of the assets of the Company (other than cash and claims of the Company for contributions) were sold for cash equal to their respective Gross Asset Values (or, in the case of assets subject to liabilities for which the creditor's right is limited to assets of the Company, the amounts of such liabilities, if greater than the aggregate Gross Asset Values of such assets); (b) all unconditional obligations to contribute to the Company were collected in full; and (c) the proceeds of such sale and collections, and all other cash of the Company, were applied to pay all debts of the Company with the balance distributed as provided in Section V of this Agreement.

"Transfer" means, when used as a noun, any voluntary sale, hypothecation, pledge, assignment, attachment, or other transfer, and, when used as a verb, means, voluntarily to sell, hypothecate, pledge, assign, or otherwise transfer.

"Unrecovered Additional Capital" means, at any time, the excess, if any, of (i) a Member's Additional Capital Contributions over (ii) the sum of all previous distributions made to such Member as a return of Additional Capital Contributions pursuant to this Agreement.

"Unrecovered Initial Capital" means, at any time, the excess, if any, of (i) a Member's Initial Capital Contributions over (ii) the sum of all previous distributions made to such Member as a return of Initial Capital Contributions pursuant to this Agreement.

"Voluntary Withdrawal" means a Member's dissociation with the Company by means other than by a Transfer or an Involuntary Withdrawal.

- 8 -

## Section II
## Formation and Name; Office; Purpose; Term

2.1     <u>Name of the Company; Organization</u>.  The name of the Company shall be "6789 Goldsboro LLC."  The Members hereby ratify the Articles of Organization as filed with SDAT, as amended by the Resolution attached hereto as <u>Exhibit B</u> and intended to be filed with SDAT on or about the date of this Agreement (as amended, the "<u>Articles of Organization</u>").

2.2     <u>Purpose</u>.  The Company is organized solely to purchase, acquire, buy, own, trade in, hold, develop, lease, manage, entitle, subdivide, sell, and otherwise deal in and with the real property and improvements thereon known as 6789 Goldsboro Road, Bethesda, Maryland 20817 (the "<u>Property</u>") and to do any and all things necessary, convenient, or incidental to that purpose, and for no other purpose whatsoever.

2.3     <u>Term</u>.  The term of the Company commenced on the date the Articles of Organization were filed with the SDAT and shall be perpetual, unless sooner terminated pursuant to <u>Section VIII</u> of this Agreement.

2.4     <u>Principal Office and Resident Agent</u>.  The principal office of the Company in the State of Maryland shall be located at 3925 Beech Avenue, Baltimore, Maryland 21211 or at any other place within the State of Maryland upon which the Manager selects and a Majority in Interest of Class A Members approve.  The name and address of the Company's resident agent in the State of Maryland is as set forth in the Articles of Organization.

2.5     <u>Title to Company Property</u>.  All property owned by the Company shall be owned by the Company as an entity, and no Member, individually, shall have any ownership interest in such property.  The Company must hold any of its assets in its own name.

## Section III
## Members; Capital; Capital Accounts

3.1     <u>Members</u>.  The Members of the Company are set forth in <u>Exhibit A</u> attached hereto, as may be amended from time to time.

3.2     <u>Initial Capital Contributions</u>.

3.2.1.     Contemporaneously with the execution of this Agreement, each Member shall pay and contribute to the Company such Member's Initial Capital Contribution as specified on <u>Exhibit A</u>.  The Members acknowledge that the Initial Capital Contributions made by the Class A Members as specified in <u>Exhibit A</u>, totaling $1,785,000, cover (i) the purchase price for the Property ($1,350,000), (ii) all closing costs associated with the purchase of the Property ($35,000), (iii) $300,000 to be applied to the Class B Payment (as defined in <u>Section 3.10</u>), and (iv) the first $100,000 of the total $300,000 that the Class A Members will contribute pursuant to <u>Section 3.2.2</u>.  The Members also acknowledge that the Initial Capital Contribution made by the Class B Member, totaling $306,192, equals (i) the Gross Asset Value of the Regional Sales Contract for the purchase of the Property ($300,000), and (ii) certain Developments Costs previously incurred by the Company and paid for by the Class B Member (totaling $6,192).

- 9 -

3.2.2.    The Members recognize that the Company intends to fund the Development Costs with Capital Contributions made by the Class A Members. If the Manager at any time prior to the Decision Date determines that the Company requires additional Capital Contributions for the sole purpose of funding Development Costs, then the Manager shall give notice to the Class A Members of (i) the total amount of Capital Contribution required, (ii) the reason the Capital Contribution is required, (iii) each Class A Member's proportionate share of the total Capital Contribution (determined in accordance with this Section), and (iv) the date each Class A Member's Capital Contribution is due and payable, which date shall be no fewer than ten (10) business days after the notice has been given. Each Class A Member shall contribute its proportionate share of additional funds as an additional Initial Capital Contribution. The total additional Capital Contributions which the Manager may require the Class A Members to contribute during the term of this Agreement shall not exceed Three Hundred Thousand Dollars ($300,000) in the aggregate and all such amounts shall also be deemed Initial Capital Contributions under this Agreement (i.e., with respect to the Class A Members, all references to Initial Capital Contributions in this Agreement shall mean and include the Capital Contributions made by the Class A Members pursuant to both Section 3.2.1 and this Section 3.2.2). Pursuant to Section 3.2.1, the Class A Members are contributing the first $100,000 of the $300,000 on the date of this Agreement. A Class A Member's proportionate share of the total additional Capital Contribution required under this Section shall be equal to the product obtained by (1) multiplying the Class A Member's Percentage and the total additional Capital Contribution required, and (2) multiplying such amount by two (2). A Class A Member's proportionate share shall be payable in cash or by certified check. Notwithstanding anything to the contrary in this Agreement, the Class B Member shall not be obligated to make any Capital Contribution to the Company beyond that set forth in the last sentence of Section 3.2.1, which the Company acknowledges has already been made.

3.3    Additional Capital Contributions.

3.3.1.    Except as provided in Section 3.2.2, no Member shall be required to contribute any additional capital to the Company, lend any funds to the Company or guarantee any loans for the Company, and, except as set forth in the Act, no Member shall have any personal liability for any obligation of the Company.

3.3.2.    If additional capital is needed to fund Development Costs after the initial $300,000 is contributed by the Class A Members in accordance with Section 3.2.2, any Member may thereafter make such contributions ("Additional Capital Contributions") in cash to the Company.

3.4    No Interest on Capital Contributions. Interest Holders shall not be paid interest on their Capital Contributions, except as expressly provided otherwise in this Agreement. No Interest Holder shall be entitled to withdraw any part of his, her or its Capital Account or Capital Contribution or to receive any distributions from the Company except as expressly provided in this Agreement. Unless otherwise provided by law, no Interest Holder shall be personally liable for the return or repayment of all or any part of any other Member's Capital Account or Capital Contribution, it being expressly agreed that any such return of capital pursuant to this Agreement shall be made solely from the assets of the Company.

- 10 -

Appellees' Appendix 0082

3.5    Return of Capital Contributions. Except as otherwise provided in this Agreement, no Interest Holder shall have the right to receive the return of any Capital Contribution.

3.6    No Right to Partition. No Interest Holder shall have the right to require partition of the Property or to compel any sale or appraisal of the Property or any sale of a deceased Interest Holder's Interest in the Company's assets, except as specifically provided in Section VII of this Agreement.

3.7    Form of Return of Capital. If an Interest Holder is entitled to receive a return of a Capital Contribution, the Interest Holder shall not have the right to receive anything but cash in return of the Interest Holder's Capital Contribution.

3.8    Capital Accounts. A separate Capital Account shall be maintained for each Interest Holder.

3.9    Loans to the Company. The Members shall not be obligated to make loans to the Company. Upon the agreement of a Majority in Interest of All Members, any Member may make loans to the Company upon commercially reasonable terms agreed upon by the Company and the Member. The amount of any loan shall not be an increase in the Member's Capital Contribution, or entitle the Member to any increase in the Member's share of the Profits or Losses of the Company, but the loan shall be repaid to the Member out of the net Cash Flow, together with interest at the rate of a cumulative but non-compounded annual return equal to ten percent (10%). Each payment made by the Company to a Member with respect to any loan shall be applied first to accrued interest and then to the outstanding balance of the principal thereof. The Company shall be deemed to have waived the statute of limitations in any action which may be brought for the collection of any loan by a Member to the Company.

3.10    Payment to Class B Member. Simultaneously with the closing on the Company's purchase of the Property, the Company shall make a distribution of capital to the Class B Member in the amount of $300,000 (the "Class B Payment"), such that the Class B Member's Unrecovered Initial Capital shall thereafter be $6,192.

**Section IV**
**Allocations of Profit and Loss**

4.1    Allocations of Profit or Loss. After giving effect to the special allocations set forth in Sections 4.2, for any taxable year of the Company, Profit or Loss shall be allocated among the Members, pro rata, to the extent necessary to cause the Capital Account balance of each Member (determined after reflection therein of allocations for such period under this Section IV) to equal his Target Amount; provided, however, that Losses allocated to a Member shall not exceed the amount that can be so allocated without causing the Member to have an Adjusted Capital Account Deficit at the end of such taxable year. Any Loss so disallowed shall be allocated to the other Members.

4.2    Regulatory Allocations. The following special allocations shall be made in the following order:

- 11 -

4.2.1.   <u>Company Minimum Gain Chargeback</u>. Except as set forth in Section 1.704-2(f)(2), (3), and (4) of the Regulations, if, during any taxable year, there is a net decrease in Company Minimum Gain, each Interest Holder, prior to any other allocation pursuant to this <u>Section IV</u>, shall be specially allocated items of gross income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Interest Holder's share of the net decrease of Company Minimum Gain, computed in accordance with Section 1.704-2(g)(2) of the Regulations. It is the intent of the parties hereto that any allocation pursuant to this <u>Section 4.2.1</u> shall constitute a "minimum gain chargeback" under Section 1.704-2(f) of the Regulations.

4.2.2.   <u>Qualified Income Offset</u>. If an Interest Holder receives (1) an allocation of Loss or deduction (or item thereof), or (2) any distribution, which causes the Interest Holder to have an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Interest Holder, before any other allocation is made of Company items for that taxable year, in the amount and in proportions required to eliminate the excess as quickly as possible. This <u>Section 4.2.2</u> is intended to comply with, and shall be interpreted consistently with, the "qualified income offset" provisions of the Regulations promulgated under Code Section 704(b).

4.2.3.   <u>Nonrecourse Deductions</u>. Nonrecourse Deductions for a taxable year or other period shall be specially allocated among the Interest Holders in proportion to their Percentages.

4.2.4.   <u>Member Loan Nonrecourse Deductions</u>.   Any Member Loan Nonrecourse Deduction for any taxable year or other period shall be specially allocated to the Interest Holder who bears the risk of loss with respect to the loan to which the Member Loan Nonrecourse Deduction is attributable in accordance with Section 1.704-2(b) of the Regulations.

4.2.5.   <u>Code Section 754 Adjustment.</u> To the extent an adjustment to the tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Section 1.704-1(b)(2)(iv)(m) of the Regulations, to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases basis), and the gain or loss shall be specially allocated to the Interest Holders in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Regulations.

4.3   <u>Tax Allocations.</u>

4.3.1. Subject to <u>Section 4.3.2</u> through <u>Section 4.3.4</u>, all income, gains, losses and deductions of the Company shall be allocated, for federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses and deductions among the Members for computing their Capital Accounts, except that if any such allocation for tax purposes is not permitted by the Code or other applicable law, the Company's subsequent income, gains, losses and deductions shall be allocated among the

- 12 -

Members for tax purposes, to the extent permitted by the Code and other applicable law, so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

4.3.2. Items of Company taxable income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) and the traditional method of Treasury Regulations Section 1.704-3(b), so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Gross Asset Value.

4.3.3. If the Gross Asset Value of any Company asset is adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f) as provided in clause (c) of the definition of Gross Asset Value, subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) using the traditional method of Treasury Regulations Section 1.704-3(b).

4.3.4. Allocations pursuant to this Section 4.3 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profit and Loss, distributions or other items pursuant to any provisions of this Agreement.

4.4    Curative Allocations. In the event that the Tax Matters Member determines, after consultation with counsel experienced in income tax matters, that the allocation of any item of Company income, gain, loss or deduction is not specified in this Section IV (an "Unallocated Item"), or that the allocation of any item of the Company income, gain, loss or deduction hereunder is clearly inconsistent with the Members' economic interests in the Company (determined by reference to the general principles of Treasury Regulations Section 1.704-1(b) and the factors set forth in Treasury Regulations Section 1.704-1(b)(3)(ii)) (a "Misallocated Item"), then the Tax Matters Member may allocate such Unallocated Items, or reallocate such Misallocated Items, to reflect such economic interests; provided, that no such allocation will be made without the prior consent of each Member that would be adversely and disproportionately affected thereby; and provided, further, that no such allocation shall have any material effect on the amounts distributable to any Member, including the amounts to be distributed upon the complete liquidation of the Company.

<div align="center">

**Section V**
**Distributions**

</div>

5.1    Distributions of Cash Flow. Cash Flow shall be applied or distributed as follows and in the following order:

5.1.1.    to the payment of all unpaid expenses of the Company; then

5.1.2.    to the payment of debts and liabilities of the Company then due and outstanding (including all debts due to any Interest Holder); then

<div align="center">

- 13 -

</div>

5.1.3.   to the Class A Members in an amount equal to their Unpaid Cumulative Initial Capital Return, pro-rata in accordance with the amount of their relative Unpaid Cumulative Initial Capital Returns, until paid in full; then

5.1.4.   to the Class A Members in an amount equal to their Unrecovered Initial Capital, pro-rata in accordance with the amount of their relative Unrecovered Initial Capital balances, until reduced to zero ($0.00); then

5.1.5.   to the Class A Members, in an amount equal to: (i) $7,500 if such distribution is made before the first anniversary of the date of this Agreement, (ii) $15,000 if such distribution is made on or after such first anniversary and before the second anniversary of the date of this Agreement, and (iii) $22,500 if such distribution is made on or after the second anniversary of the date of this Agreement, minus in each case amounts previously distributed to the Class A Members pursuant to this Section 5.1.5, such amount to be distributed to the Class A Members in proportion to their respective Percentage Interests; then

5.1.6.   to the Class B Member in an amount equal to its Unpaid Cumulative Initial Capital Return, until paid in full; then

5.1.7.   to the Class B Member in an amount equal to its Unrecovered Initial Capital balance, until reduced to zero ($0.00); then

5.1.8.   to the Members in an amount equal to their Unpaid Cumulative Additional Capital Return, pro-rata in accordance with the amount of their relative Unpaid Cumulative Additional Capital Returns, until paid in full; then

5.1.9.   to the Members in an amount equal to their Unrecovered Additional Capital, pro-rata in accordance with the amount of their relative Unrecovered Additional Capital balances, until reduced to zero ($0.00); then

5.1.10.   the balance, to the Members in proportion to their respective Percentage Interests.

5.2    Liquidation and Dissolution.

5.2.1.   If the Company is liquidated, the assets of the Company shall be distributed to the Interest Holders in accordance with Section 5.1.

5.2.2.   No Interest Holder shall be obligated to restore a Negative Capital Account.

5.3    Withholding.  All amounts required to be withheld pursuant to Code Section 1446 or any other provision of federal, state, or local tax law shall be treated as amounts actually distributed to the affected Interest Holders for all purposes under this Agreement.

5.4    Tax Distributions.  During each fiscal year, the Manager will use reasonable efforts to make cash distributions from the Company (each a "Tax Distribution") to each Member in an amount equal to the excess, if any, of (i) the product of (a) the highest federal,

- 14 -

state and local marginal income tax rate applicable to a person living in Maryland, multiplied by (b) the amount of net income allocated to such Member for such fiscal year (the "Tax Allocation"), over (ii) the aggregate net cash distributions made to such Member by the Company for such fiscal year or portion thereof (such excess of (i) over (ii) is hereinafter referred to as the "Tax Shortfall").  For the purposes of the preceding sentence, the Tax Allocation for a fiscal year or portion thereof shall be reduced by any net losses of the same character previously allocated to such Member, to the extent such losses were not previously taken into account under this Section. The Company may make Tax Distributions on an annual basis or on a quarterly basis, in the Manager's reasonable discretion.  To the extent that there is insufficient cash to make Tax Distributions in the full amount of the Tax Shortfall, Tax Distributions shall be made to the Members on a pro rata basis in proportion to their respective Tax Shortfall amounts.  No Member shall be required to make any Capital Contributions to fund Tax Distributions.  Any Tax Distributions made pursuant to this Section 5.4 shall be treated as advance payments of amounts otherwise payable under Sections 5.1 and 5.3 and shall be considered to have been distributed under the provisions which correspond to the allocation of net income for such Member.

### Section VI
### Management; Rights, Powers, and Duties

6.1    Management.

6.1.1.    Manager.    Except as otherwise provided herein, the day-to-day operations of the Company shall be managed by a Manager, who may, but need not, be a Member.  Gregory B. Myers is hereby designated to serve as the initial Manager.  The Manager shall use commercially reasonable good faith efforts to, without limitation, obtain the Entitlements, ensure that the Property is properly maintained, and otherwise act in the best interests of the Company.  If for any reason Gregory B. Myers cannot serve or resigns as Manager, Brian N. King shall be the successor Manager.  If at any time after the twenty-fourth (24th) month following the date the Company closes on the purchase of the Property, the Class A Members reasonably believe that the Manager has not diligently pursued the Entitlements or will not be able to obtain the Entitlements by the Decision Date, then upon the affirmative vote of a Majority in Interest of Class A Members, the Class A Members may remove the Manager then acting and elect a new Manager.  The Manager shall provide regular updates (no fewer than once per month) to the Members concerning the status of the Entitlements.

6.1.2.    General Powers.    Subject in all cases to the other provisions of this Agreement and the requirements of applicable law, the Manager shall have the general power and authority to manage and operate the day-to-day business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs, including, without limitation, for Company purposes, the power to:

6.1.2.1.    enter into agreements and contracts and to give receipts, releases, and discharges, provided that no one agreement or contract with any one Person shall have a value in excess of $25,000 without the prior approval of a Majority in Interest of Class A Members (such approval not to be unreasonably delayed, conditioned or withheld);

- 15 -

6.1.2.2.    purchase liability and other insurance to protect the Company's Property and business;

6.1.2.3.    execute any and all other instruments and documents which may be necessary or in the opinion of the Manager desirable to carry out the intent and purpose of this Agreement, including, but not limited to, documents whose operation and effect extend beyond the term of the Company, provided that the Manager shall not cause the Company to incur any liability or expense to any one Person, including Development Costs, in excess of $25,000 without the prior approval of a Majority in Interest of Class A Members (such approval not to be unreasonably delayed, conditioned or withheld);

6.1.2.4.    make any and all expenditures which the Manager, in its reasonable discretion, deems necessary or appropriate in connection with the management of the affairs of the Company and the carrying out of its obligations and responsibilities under this Agreement, including, without limitation, all legal, accounting and other related expenses incurred in connection with the organization and operation of the Company and obtaining the Entitlements, provided that no one such expenditure shall exceed $25,000 without the prior approval of a Majority in Interest of Class A Members.

6.1.3.    Major Decisions Requiring Consent.  Notwithstanding anything to the contrary in this Agreement, in addition to such matters reserved to the Members herein and subject to the general restrictions governing the operation of the Company contained within Section 2.2 hereof, the Manager shall not undertake any of the following without the prior approval of all Members:

6.1.3.1.    any financing, sale (except as provided in Section 7.6 or Section 7.7), exchange or other disposition of the Property and/or all of the Company's assets;

6.1.3.2.    the Company's lending any money to any Member or other Person;

6.1.3.3.    admitting additional Members to the Company or selling additional membership Interests;

6.1.3.4.    filing on behalf of the Company any petition in bankruptcy or assignment for the benefit of creditors or the failure to defend against an involuntary petition for same;

6.1.3.5.    merging or consolidating the Company with any other entity;

6.1.3.6.    dissolving the Company; and

6.1.3.7.    requiring Capital Contributions from a Member, except as provided in and as limited by Section 3.2.

- 16 -

### 6.1.4.    Limitation on Authority of Members.

6.1.4.1.    No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member.

6.1.4.2.    This Section 6.1 supersedes any authority granted to the Members pursuant to Section 4A-401 of the Act. Any Member who takes any action or binds the Company in violation of this Section 6.1 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to the loss or expense.

## 6.2    Meetings of and Voting by Members.

6.2.1.    A meeting of the Members may be called at any time by the Manager or by any Member. Meetings of Members shall be held at the Company's principal place of business or at any other place in Baltimore, Maryland designated by the Person calling the meeting. Not less than ten (10) nor more than ninety (90) days before each meeting, the Person calling the meeting shall give written notice of the meeting to each Member entitled to vote at the meeting. The notice shall state the time, place, and purpose of the meeting. Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of Members' meetings, or is present at the meeting in person or by proxy. A Member may vote either in person or by written proxy signed by the Member or by his duly authorized attorney-in-fact.

6.2.2.    Except as otherwise provided in this Agreement, the affirmative vote of Members holding fifty-one percent (51%) or more of the Percentages then held by Members shall be required to approve any matter coming before the Members.

6.2.3.    In lieu of holding a meeting, the Members may vote or otherwise take action by a written instrument executed by and indicating the consent of Members required by this Agreement to approve a particular matter coming before the Members.

## 6.3    Personal Services.

6.3.1.    No Member shall be required to perform services for the Company solely by virtue of being a Member. Unless approved by the Manager and a Majority in Interest of All Members, no Member shall perform services for the Company or be entitled to compensation for services performed for the Company.

6.3.2.    Unless approved by a Majority in Interest of All Members, the Manager shall not be entitled to compensation for services performed for the Company. However, upon substantiation of the amount and purpose thereof, the Manager shall be entitled to reimbursement for expenses reasonably incurred in connection with the activities of the Company.

- 17 -

6.4     Duties of Parties.

6.4.1.    The Manager shall not be liable, responsible, or accountable in damages or otherwise to the Company or to any other Member for any action taken or any failure to act on behalf of the Company within the scope of the authority conferred on the Manager by this Agreement or by law, unless the action was taken or omission was made fraudulently or in bad faith or unless the action or omission constituted gross negligence.

6.4.2.    Except as otherwise expressly provided in <u>Section 6.4.3</u> or <u>Section 6.6</u>, nothing in this Agreement shall be deemed to restrict in any way the rights of any Member or Manager to conduct any other business or activity whatsoever, and the Member and Manager shall not be accountable to the Company or to any Member with respect to that business or activity even if the business or activity competes with the Company's business. The organization of the Company shall be without prejudice to each Member's and Manager's respective rights to maintain, expand, or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of any other Member or Manager unrelated to the Company or the Property.

6.4.3.    Each Member understands and acknowledges that the conduct of the Company's business may involve business dealings and undertakings with Members and their affiliates. In any of those cases, those dealings and undertakings shall be at arm's length and on commercially reasonable terms.

6.5     Liability and Indemnification.

6.5.1.    Neither the Manager nor any officer of the Company shall be liable, responsible, or accountable, in damages or otherwise, to any Member or to the Company for any act performed in good faith by the Manager or such officer and within the scope of the authority conferred on the Manager or officer by this Agreement, except for fraud, gross negligence, willful or wonton misconduct or an intentional breach of this Agreement.

6.5.2.    The Company shall indemnify the Manager and any officer for any act performed by the Manager or officer in good faith believed to be within the scope of the authority conferred on the Manager or officer by this Agreement, except for fraud, gross negligence, or an intentional breach of this Agreement. The Company shall promptly notify the Members whenever the Manager or any officer has been indemnified by the Company for any act, matter, or thing whatsoever.

6.5.3.    No Member of the Company shall have any liability under this Agreement or under the Act except as provided herein or as required by the Act. Except as required by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member of the Company. The liability of each Member shall be limited solely to the amount of its Capital Contribution, except as provided in this <u>Section 6.5</u>. No Member of the Company shall be liable for any debts, obligations and liabilities,

- 18 -

Execution Copy
2779005.7 27336/122546 07/18/2013

whether arising in contract, tort or otherwise, of any other Member, the Manager or any officer of the Company.

6.6    Independent Activities. Each of the Members and Manager may engage in any other business activity. The Manager shall not be obligated to contribute its full time and efforts to the Company; however, the Manager shall diligently and faithfully devote such of its time to the business of the Company as may be necessary to properly conduct the affairs of the Company and obtain the Entitlements as promptly as reasonably possible. Except to the extent inconsistent with this Section, any of the Members or Manager may in the future engage in activities relating to the development and ownership of other real property, both for their own accounts and for others, and nothing contained herein shall be deemed to prevent such parties from continuing such activities, or initiating further such other limited or general partnerships, joint ventures, limited liability companies or other entities in which they are or may become a party, nor as requiring them to permit the Company or any of the Members or Manager to participate in any such operations in which they may be interested. Notwithstanding the foregoing to the contrary, neither the Manager nor any Member, or their affiliates, shall directly or indirectly purchase or develop any property in the immediate vicinity of the Property except through the Company.

### Section VII
### Transfer of Interests and Withdrawals of Members

7.1    Transfers.

7.1.1.    Except as specifically permitted by this Agreement or consented to by all of the Members, no Member may sell, assign, mortgage, pledge, grant a security interests in, or otherwise transfer or encumber all or any part of the Member's Membership Rights or Interest, whether voluntarily or involuntarily, by operation of law or otherwise.

7.1.2.    Each Member hereby acknowledges the reasonableness of the prohibition contained in this Section 7.1 in view of the purposes of the Company and the relationship of the Members. The Transfer of any Membership Rights or Interests in violation of the prohibition contained in this Section 7.1 shall be deemed invalid, null and void, and of no force or effect. Any Person to whom Membership Rights are attempted to be transferred in violation of this Section 7.1 shall not be entitled to vote on matters coming before the Members, participate in the management of the Company, act as an agent of the Company, receive distributions from the Company, or have any other rights in or with respect to the Membership Rights.

7.2    Voluntary Withdrawal. No Member shall have the right or power to Voluntarily Withdraw from the Company.

7.3    Involuntary Withdrawal. Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the Withdrawn Member shall thereupon become an Interest Holder but shall not become a Member, and shall have all the rights of an Interest Holder.

- 19 -

Appellees' Appendix 0091

7.4    Optional Buy-out in Event of Involuntary Withdrawal.

7.4.1.    If a Member Involuntarily Withdraws, the withdrawn Member shall be deemed to offer for sale (the "Withdrawal Offer") to the Company all of the Membership Rights owned of record and beneficially by the withdrawn Member (the "Withdrawal Interest").

7.4.2.    The Withdrawal Offer shall be and remain irrevocable for a period (the "Withdrawal Offer Period") ending at 11:59 P.M., local time, at the Company's principal office on the sixtieth (60th) day following the date the Members elect to continue the Company. At any time during the Withdrawal Offer Period, the Company may accept the Withdrawal Offer by notifying the withdrawn Member (the "Withdrawal Notice") of its acceptance. The withdrawn Member shall not be deemed a Member or Manager for the purpose of the vote on whether the Company shall accept the Withdrawal Offer.

7.4.3.    If the Company accepts the Withdrawal Offer, the Withdrawal Notice shall fix a closing date (the "Withdrawal Closing Date") for the purchase which shall be not earlier than ten (10) or later than ninety (90) days after the expiration of the Withdrawal Period.

7.4.4.    If the Company accepts the Withdrawal Offer, the Company shall purchase the Withdrawal Interest for a price equal to the amount the withdrawn Member would receive if the Company were liquidated and an amount equal to the Appraised Value were available for distribution to the Members pursuant to Section V (the "Withdrawal Purchase Price"). The Withdrawal Purchase Price shall be paid in cash on the Withdrawal Closing Date.

7.4.5.    If the Company fails to accept the Withdrawal Offer, then the withdrawn Member or the withdrawn Member's successor, as the case may be, upon the expiration of the Withdrawal Offer Period, thereafter shall be treated as the unadmitted assignee of a Member.

7.5    Appraised Value.

7.5.1.    The term "Appraised Value" means the appraised value of the Property determined as follows. Within fifteen (15) days after demand by either one or the other, the Company and the Withdrawing Member, pursuant to Section 7.4, or the Class A Members and the Class B Member, pursuant to Section 7.7, shall each appoint a MAI appraiser to determine the value of the Property. If the two (2) appraisers agree upon the value of the Property, they shall jointly render a single written report stating that value. If the two (2) appraisers cannot agree upon the value of the Property, they shall each render a separate written report and they shall appoint a third (3rd) MAI appraiser, who shall appraise the Property and determine the Property's value, and shall render a written report of his opinion thereon. If the appraisers cannot agree upon the third (3rd) MAI appraiser, then each of such appraisers will recommend one (1) MAI appraiser and the selection shall be by coin toss. Each party shall pay the fees and costs of the appraiser appointed by that party, and the fees and other costs of the third (3rd) appraiser shall be shared equally by both parties.

7.5.2.    The value contained in the aforesaid joint written report or written report of the third appraiser, as the case may be, shall be the Appraised Value; provided, however, that if the value of the Property contained in the appraisal report of the third (3rd) appraiser is more than the higher of the first two (2) appraisals, the higher of the first two (2) appraisals shall

- 20 -

Appellees' Appendix 0092

govern; and provided, further, that if the value of the Property contained in the appraisal report of the third appraiser is less than the lower of the first two (2) appraisals, the lower of the first two (2) appraisals shall govern.

7.6    Sale of Property.    In the event that (a) the Entitlement of the Property is not completed by the Decision Date, or (b) (i) the Company has incurred all $300,000 of the Initial Capital Contributions paid by the Class A Members in accordance with Section 3.2.2, and (ii) no Member elects to make Additional Capital Contributions to the Company sufficient to cover any remaining or arising deficit, then the Class A Members shall have the unilateral right and authority (without the consent of the Class B Member), at their option, to require the Company to sell the Property, in its then-current development state, to an unaffiliated third-party purchaser.

7.7    Redemption of Class B Member.    In the event that (a) the Entitlement of the Property is not completed by the Decision Date, and (b) the Class A Members do not elect to require the Company to sell the Property in accordance with Section 7.6, then the Class A Members may elect to determine the Appraised Value of the Property in accordance with Section 7.5. If the Appraised Value is less than or equal to the sum of Unpaid Cumulative Initial Capital Return, Unrecovered Initial Capital, Unpaid Cumulative Additional Capital Return, and Unrecovered Additional Capital, of the Class A Members, from the date of the contribution through the date the Appraised Value has been determined pursuant to Section 7.5 (collectively, the "Class A Investment"), then the Class A Members shall have the unilateral right and authority (without the consent of the Class B Member) to cause the Company to redeem the Class B Member's Membership Rights solely in consideration for the Company's previous distributions or other previous payments to the Class B Member. If the Appraised Value is greater than the Class A Investment, then in such event the Class B Member shall retain its Membership Rights; provided, however, the Class A Members shall continue to have the unilateral right and authority thereafter (without the consent of the Class B Member), at their option, to require the Company to sell the Property, in its then-current development state, to an unaffiliated third-party purchaser.

7.8    Prohibition of Pledges.    No Member shall at any time pledge, mortgage, hypothecate or otherwise encumber any of its Interest, or permit any of its Interest to be pledged, mortgaged, hypothecated, encumbered or otherwise subjected to any lien, without the prior written consent of a Majority in Interest of All Members. No purported pledge, mortgage, hypothecation or encumbrance of, or lien on or security interest in, any Interest in violation of the provisions of this Agreement shall be valid or enforceable.

## Section VIII
## Dissolution, Liquidation, and
## Termination of the Company

8.1    Events of Dissolution.    The Company shall be dissolved upon the happening of any of the following:

8.1.1.    The sale or disposition of all of the Property;

8.1.2.    The unanimous written agreement of all of the Members; or

- 21 -

8.1.3.    The entry of a decree of judicial dissolution.

8.2    <u>Procedure for Winding Up and Dissolution</u>. If the Company is dissolved, the Manager shall wind up its affairs.  On winding up of the Company, the assets of the Company shall be distributed, first, to creditors of the Company, including Interest Holders who are creditors, in satisfaction of the liabilities of the Company, and then to the Interest Holders in accordance with <u>Section V</u>.

8.3    <u>Filing of Articles of Cancellation</u>. If the Company is dissolved, the Manager shall promptly file Articles of Cancellation with SDAT.  If there is no Manager, then the Articles of Cancellation shall be filed by the remaining Members; if there are no remaining Members, the Articles of Cancellation shall be filed by the last Person to be a Member; if there is neither a Manager, remaining Members, nor a Person who last was a Member, the Articles of Cancellation shall be filed by the legal or personal representatives of the Person who last was a Member.

<div align="center">

**Section IX**
**Books, Records, Accounting, and Tax Elections**

</div>

9.1    <u>Treasurer</u>.  The Class A Members may appoint a Treasurer, who shall maintain the Company's books of account and shall perform such other duties as may be assigned by the Manager or the Members.  The initial Treasurer shall be Brian N. King.  In the event Brian N. King resigns or is removed as Treasurer, the Class A Members may appoint Cristina J. King as replacement Treasurer (without the prior approval of the Class B Member); provided, however, that if the Class A Members appoint a replacement Treasurer other than Cristina J. King, such appointment shall be subject to the prior approval of the Class B Member (such approval not to be unreasonably delayed, conditioned or withheld).   The Treasurer shall use commercially reasonable good faith efforts to, without limitation, discharge its duties as set forth in this Agreement and act in the best interests of the Company.

9.2    <u>Bank Accounts</u>.  All funds of the Company shall be deposited in a bank account or accounts maintained in the Company's name.  The Treasurer shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

9.3    <u>Books and Records.</u>

9.3.1.    The Treasurer shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business.  The records shall include, but not be limited to, complete and accurate information regarding the state of the business and financial condition of the Company, a copy of the Articles of Organization and this Agreement and all amendments to the Articles of Organization and this Agreement; a current list of the names and last known business, residence, or mailing addresses of all Members; and the Company's federal, state, or local tax returns.  The Manager shall promptly provide to the Treasurer all documentation related to the Company's business as necessary for the Treasurer to maintain complete and accurate books and records. The Treasurer shall promptly provide to the Manager all information related to the Company's business as necessary for the Manager perform its obligations under this

<div align="center">- 22 -</div>

Agreement and must diligently keep the Manager informed of and immediately upon receipt provide copies to Manager of any notices received by the Company at its principal office.

        9.3.2.    The books and records shall be maintained in accordance with sound accounting practices and shall be available at the Company's principal office for examination by any Member or the Member's duly authorized representative at any and all reasonable times during normal business hours.

        9.3.3.    Each Member shall reimburse the Company for all costs and expenses incurred by the Company in connection with the Member's inspection and copying of the Company's books and records.

    9.4    Annual Accounting Period. The annual accounting period of the Company shall be its taxable year. The Company's taxable year shall be selected by the Treasurer, subject to the requirements and limitations of the Code.

    9.5    Reports. Within seventy-five (75) days after the end of each taxable year of the Company or as soon thereafter as the reports become available, the Treasurer shall cause to be sent to each Person who was a Member at any time during the accounting year then ended: (i) an annual compilation report, prepared by the Company's independent accountants in accordance with standards issued by the American Institute of Certified Public Accountants; and (ii) a report summarizing the fees and other remuneration paid by the Company to any Member or the Manager in respect of the taxable year. In addition, within seventy-five (75) days after the end of each taxable year of the Company or as soon thereafter as tax information becomes available, the Treasurer shall cause to be sent to each Person who was an Interest Holder at any time during the taxable year then ended, that tax information concerning the Company which is necessary for preparing the Interest Holder's income tax returns for that year. At the request of any Member, and at the Member's expense, the Treasurer shall cause an audit of the Company's books and records to be prepared by independent accountants for the period requested by the Member.

    9.6    Tax Matters Partner. Brian N. King shall be the Company's tax matters partner ("Tax Matters Partner"). The Tax Matters Partner shall have all powers and responsibilities provided in Code Section 6221, et seq. The Tax Matters Partner shall keep all Members informed of all notices from government taxing authorities related to the Company which may come to the attention of the Tax Matters Partner. The Company shall pay and be responsible for all reasonable third-party costs and expenses incurred by the Tax Matters Partner in performing those duties. A Member shall be responsible for any costs incurred by the Member with respect to any tax audit or tax-related administrative or judicial proceeding against any Member, even though it relates to the Company. The Tax Matters Partner may not compromise any dispute or extend the statute of limitations with the Internal Revenue Service without the approval of the Members.

    9.7    Tax Elections. The Tax Matters Partner shall have the authority to make all Company elections permitted under the Code, including, without limitation, elections of methods of depreciation and elections under Code Section 754. The decision to make or not make an election shall be at the Tax Matters Partner's sole and absolute discretion; provided, however,

- 23 -

that no such election will be made without the prior consent of each Member that would be adversely and disproportionately affected thereby.

## Section X
## General Provisions

10.1    Assurances. Each Member shall execute all such certificates and other documents and shall do all such filing, recording, publishing, and other acts as the Manager deems appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

10.2    Notifications. Any notice, demand, consent, election, offer, approval, request, or other communication (collectively a "notice") required or permitted under this Agreement must be in writing and either delivered personally or sent by certified or registered mail, postage prepaid, return receipt requested. Any notice to be given hereunder by the Company shall be given by the Manager. A notice must be addressed to an Interest Holder at the Interest Holder's last known address on the records of the Company. A notice to the Company must be addressed to the Company's principal office. A notice delivered personally will be deemed given only when acknowledged in writing by the person to whom it is delivered. A notice sent by mail will be deemed given three (3) business days after it is mailed. A notice sent by overnight courier will be deemed given on the first (1) business day following the day it is deposited with the courier. Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.

10.3    Specific Performance. The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach, or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

10.4    Complete Agreement. This Agreement constitutes the complete and exclusive statement of the agreement among the Members. It supersedes all prior written and oral statements, including any prior representation, statement, condition, or warranty. Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of all of the Members.

10.5    Applicable Law. All questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Maryland.

- 24 -

Appellees' Appendix 0096

10.6    <u>Section Titles</u>. The headings herein are inserted as a matter of convenience only, and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

10.7    <u>Binding Provisions</u>. This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and permitted assigns.

10.8    <u>Jurisdiction and Venue</u>. Any suit involving any dispute or matter arising under this Agreement may only be brought in the United States District Court for the District of Maryland or any Maryland State Court having jurisdiction over the subject matter of the dispute or matter. All Members hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

10.9    <u>Terms</u>. Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the identity of the Person may in the context require.

10.10    <u>Separability of Provisions</u>. Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

10.11    <u>Counterparts</u>. This Agreement may be executed simultaneously in two or more counterparts and electronically, including by transmission of PDF (Portable Document Form) or a comparable image, each of which shall be deemed an original for all purposes and all of which, when taken together, shall constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart. An electronically executed and/or delivered counterpart or copy of this Agreement shall be effective and admissible as an original for all purposes.

10.12    <u>Estoppel Certificate</u>. Each Member shall, within ten (10) days after written request by any Member or the Manager, deliver to the requesting Person a certificate stating, to the Member's knowledge, that: (a) this Agreement is in full force and effect; (b) this Agreement has not been modified except by any instrument or instruments identified in the certificate; and (c) there is no default hereunder by the requesting Person, or if there is a default, the nature and extent thereof.

<p style="text-align:center">[The remainder of this page is intentionally left blank.]</p>

<p style="text-align:center">[Signatures contained on the following pages.]</p>

<p style="text-align:center">- 25 -</p>

Execution Copy
2779005.7 27336/122546 07/18/2013

Appellees' Appendix 0097

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed, under seal, as of the date set forth hereinabove.

WITNESS OR ATTEST:                    MEMBERS:

                                      **SERV TRUST**, a Maryland statutory trust

_____    By: _____, _TRUSTEE_ (SEAL)
                                      Gregory B. Myers, Trustee

_____    By: _____ (SEAL)
                                      Daniel J. Ring, Trustee

_____        _____ (SEAL)
                                      **Brian N. King**

_____        _____ (SEAL)
                                      **Cristina J. King**

                                      **CRISTINA AND BRIAN KING
                                      CHILDREN'S TRUST**

_____    By: _____ (SEAL)
                                      Vevita Leon, Trustee

_____    By: _____ (SEAL)
                                      Brian N. King, Trustee

_____    By: _____ (SEAL)
                                      Timothy Lynch, Trustee

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed, under seal, as of the date set forth hereinabove.

WITNESS OR ATTEST:

MEMBERS:

**SERV TRUST**, a Maryland statutory trust

By: _____ (SEAL)
        Gregory B. Myers, Trustee

_____
*Sandra Capone*
SANDRA CAPONE

By: _____ (SEAL)
        Daniel J. Ring, Trustee

_____

_____ (SEAL)
**Brian N. King**

_____

_____ (SEAL)
**Cristina J. King**

**CRISTINA AND BRIAN KING
CHILDREN'S TRUST**

_____

By: _____ (SEAL)
        Vevita Leon, Trustee

_____

By: _____ (SEAL)
        Brian N. King, Trustee

_____

By: _____ (SEAL)
        Timothy Lynch, Trustee

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed, under seal, as of the date set forth hereinabove.

WITNESS OR ATTEST:                    MEMBERS:

                                      **SERV TRUST**, a Maryland statutory trust

_____          By: _____ (SEAL)
                                      Gregory B. Myers, Trustee

_____          By: _____ (SEAL)
                                      Daniel J. Ring, Trustee

_____          By: _____ (SEAL)
                                      Brian N. King

_____          _____ (SEAL)
                                      Cristina J. King

                                      **CRISTINA AND BRIAN KING**
                                      **CHILDREN'S TRUST**

_____          By: _____ (SEAL)
                                      Vevita Leon, Trustee

_____          By: _____ (SEAL)
                                      Brian N. King, Trustee

_____          By: _____ (SEAL)
                                      Timothy Lynch, Trustee

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed, under seal, as of the date set forth hereinabove.

WITNESS OR ATTEST:                  MEMBERS:

                                    **SERV TRUST**, a Maryland statutory trust

_____      By: _____ (SEAL)
                                    Gregory B. Myers, Trustee

_____      By: _____ (SEAL)
                                    Daniel J. Ring, Trustee

_____          _____ (SEAL)
                                    **Brian N. King**

_____          _____ (SEAL)
                                    **Cristina J. King**

                                    **CRISTINA AND BRIAN KING
                                    CHILDREN'S TRUST**

_____      By: _____ (SEAL)
                                    Vevita Leon, Trustee

_____      By: _____ (SEAL)
                                    Brian N. King, Trustee

_____      By: _____ (SEAL)
                                    Timothy Lynch, Trustee

MANAGER:

_____, MANAGER (SEAL)
Gregory B. Myers

- 27 -

Appellees' Appendix 0102

## 6789 GOLDSBORO LLC

## AMENDED AND RESTATED OPERATING AGREEMENT

### Exhibit A
### List of Members, Capital, and Percentages

| Name, Address, and Taxpayer I.D. Number | Membership Class | Initial Cash Capital Contribution (as of July 18, 2013) | Percentage Interests |
|---|---|---|---|
| Brian N. King 3925 Beech Avenue Baltimore, MD 21211 SS#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 | Class A Member | $714,000 | 20% |
| Cristina J. King 3925 Beech Avenue Baltimore, MD 21211 SS#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 | Class A Member | $714,000 | 20% |
| Cristina and Brian King Children's Trust 3925 Beech Avenue Baltimore, MD 21211 EIN#20-6405435 | Class A Member | $357,000 | 10% |
| Serv Trust 4505 Wetherill Road Bethesda, MD 20816 EIN#27-6725119 | Class B Member | $306,192 | 50% |

- 28 -

**6789 GOLDSBORO LLC**

**AMENDED AND RESTATED OPERATING AGREEMENT**

**Exhibit B**

**Resolution to Change Principal Office and Resident Agent**

[See attached]

Execution Copy
2779005.7 27336/122546  07/18/2013

Appellees' Appendix 0104

## RESOLUTION TO CHANGE PRINCIPAL OFFICE OR RESIDENT AGENT

The ~~directors/stockholders/general partner/~~authorized person of _____

6789 Goldsboro LLC
_____ ,

(Name of Entity)

organized under the laws of _____ Maryland _____, passed the following resolution:

(State)

### [CHECK APPLICABLE BOX(ES)]

☑ **The principal office is changed from:  (old address)**

3158 Braverton Street, Suite 206

Edgewater, MD  21037

**to:    (new address)**

3925 Beech Avenue

Baltimore, MD  21211


☑ **The name and address of the resident agent is changed from:**

Daniel J. Ring

3158 Braverton Street, Suite 206, Edgewater, MD  21037

**to:**

Danielle Stager Zoller

233 E. Redwood St., Baltimore, MD  21202


I certify under penalties of perjury the foregoing is true.

_____, MANAGER   /Gregory B. Myers, Manager

~~Secretary or Assistant Secretary~~

~~General Partner~~

Authorized Person


I hereby consent to my designation in this document as resident agent for this entity.

SIGNED_____

Resident Agent



**VerStandig**
LAW FIRM

Maurice B. VerStandig, Esq.
Sender's Direct Dial: (301)444-4600
Sender's E-mail: mac@mbvesq.com

August 23, 2017

**VIA CERTIFIED MAIL**
Serv Trust
4505 Wetherill Road
Bethesda, Maryland 20816

                    Re: 6789 Goldsboro LLC

To Whom it May Concern:

        Please take note that the undersigned and this firm represent Brian King ("Mr. King"), Cristina King ("Ms. King"), and the Cristina and Brian King Children's Trust (the "King Trust") in their capacity as the collective Class A Members of 6789 Goldsboro LLC (collectively, the "Class A Members"). If Serv Trust is represented by counsel in connection with its dealings with 6789 Goldsboro LLC, please forward this letter to such attorney(s) and ask her/him to contact me as soon as may be practicable.

        Pursuant to the allowances of Section 7.7 of the First Amended and Restated Operating Agreement of 6789 Goldsboro LLC (the "Operating Agreement"), the Class A Members are hereby electing to determine the Appraised Value (as that term is defined in the Operating Agreement) of the Property (as that term is defined in the Operating Agreement), so as to determine if 6789 Goldsboro LLC may redeem the membership of Serv Trust.

        Pursuant to Section 7.5.1 of the Operating Agreement, the Class A Members hereby appoint M. Ronald Lipman, MAI as their designated appraiser.

        Pursuant to Section 10.2 of the Operating Agreement, the Class A Members hereby designate The VerStandig Law Firm, LLC, 9812 Falls Road, #114-160, Potomac, Maryland 20854 as the address to which notices shall be given for the sole and limited purpose of designating an appraiser under Section 7.5.1 of the Operating Agreement.

                            Sincerely,

                            Maurice "Mac" VerStandig, Esq.
                            *For the Firm*

cc:     Brian King

Appellees' Appendix 0106
**Trustee Ex. 2**



Proposed Goldsboro Place Subdivision
6789 Goldsboro Road
Bethesda, Maryland 20817

Report Date:
August 17, 2017

**LIPMAN
FRIZZELL &
MITCHELL**
Real Estate Consultants

6240 Old Dobbin Lane, Suite 140
Columbia, Maryland 21045
Phone: 410-423-2300
Fax:    410-423-2410
www.LFMvalue.com

**APPRAISAL REPORT**
**Prepared for:**

**Gordon Feinblatt LLC**
Ms. Danielle S. Zoller, Esquire
233 East Redwood Street
Baltimore, Maryland 21202

**LFM #:17-237**

Appellees' Appendix 0107
**Trustee Ex. 3**



August 17, 2017


Ms. Danielle S. Zoller, Esquire
Gordon Feinblatt LLC
233 East Redwood Street
Baltimore, Maryland 21202


RE:    Appraisal Report
        Proposed Goldsboro Place Subdivision
        6789 Goldsboro Road
        Bethesda, Maryland 20817

Dear Ms. Zoller:

In accordance with your request, we have prepared an appraisal of the above-referenced property. This appraisal report sets forth the pertinent data gathered, the techniques employed, and the reasoning leading to our value opinions.

The subject property consists of a 5.23 acre site located at 6789 Goldsboro Road in Bethesda, Maryland 20817 currently improved with a vacant residence and proposed to be improved with a residential townhouse subdivision. The subject is further identified as Tax Map GN41, Parcels P619 and P735. The current zoning is R-60 which allows townhouse development under the "Optional Method Cluster Development". The subject property is currently not subdivided and there are no approvals in place.

The property is located in the Bethesda section of Montgomery County, an upscale, primarily residential section of the Washington Metropolitan area. The site enjoys 475+/- front feet on the north side of Goldsboro Road, just east of its intersection with MacArthur Boulevard and west of its intersection with Tulip Hill Terrace.

The following is a summary of the subject's strengths and weaknesses:

## Strengths

- Housing prices and the demand for housing in the subject property's market area are strong, as the subject neighborhood and market area are part of the prestigious River Road corridor.

- The surrounding neighborhood is largely built-out, with limited opportunity for developing new housing units.

Appellees' Appendix 0108

Danielle S. Zoller, Esquire
Page 2



## Weaknesses

- The site exhibits steep slopes and a stream which traverses the majority of its length, greatly impacting and limiting potential development. The only buildable portion of the property is along its Goldsboro Road frontage, east of where the on-site stream crosses Goldsboro Road.

- There are no approvals in place for subdivision into a townhouse subdivision, which is itself a conditional use.

## Highest and Best Use

Residential development of the site is both financially feasible and maximally productive and therefore, the subject's highest and best use. However, due to the topography of the site and the stream which traverses it, in addition to its lack of approvals for townhouse development which is a conditional use with unknown lot yield at this time, this potential use of the site is speculative as of the date of valuation.

## Bethesda Chevy Chase Master Plan /Density Implications

Review of the current Master Plan for the area provides critical insights into the ability of the subject property to be developed. Pertinent sections from page 67 of that Plan are as follows:

| P8 | P619 P735 | MacArthur Blvd and Goldsboro Rd | 5.23 acres | House (26 du potential) | R-60 | Town- house (26 du potential) | R-60 | -Should not expect to receive full density<br>-Development Should cluster in relatively flat area adjacent to Goldsboro Rd<br>-Suitable for cluster to preserve steep slopes | -Reduce density due to extreme environmental constraints (slopes, possible wetlands)<br>-Enhance and protect the environmental character of site |
|---|---|---|---|---|---|---|---|---|---|

It becomes quite clear that, while zoning allows a density of 26 dwelling units, ostensibly in a townhouse format, the site's physical constraints severely limit its potential buildout; further confirmation of the property's development limitations. Excerpts of a telephone conversation we had with Marco Fuster, lead reviewer of the subject's plan and on staff at MNCPPC-MC, relating specifically to the most recent development proposal submitted by the property owners are as follows:

1) The site poses extreme environmental constraints and impacts
2) There are overlapping regulations which impact the site
3) The site has numerous features which impact on potential development including a stream with possible wetlands, flood plain, steep slopes and severe topography issues, forest conservation areas, soil conditions, and a sewer line which runs along Goldsboro Road.

Based on the issues raised in the Master Plan and those again cited by the MNCPPC-MC representative, it is obvious that the subject developer's proposed density of 19 townhouses could never have been achieved and was therefore unrealistic from the get-go, so much so that a density of less than half of that originally proposed is more likely. It should be noted that realistic density potential directly affects the site's market value.

Danielle S. Zoller, Esquire
Page 3

Based on our physical inspection of the subject property and site conditions we have studied via topographical maps and other publicly available data, together with plans submitted by the developer which note the physical features we saw on-site, and consistent with the development criteria set forth in the Master Plan and addressed by Marco Fuster, we have attempted to lay out townhouse units on the flat area of the subject property along its Goldsboro Road frontage.

We have measured the site's frontage along Goldsboro Road, east of the stream crossing (frontage west of the crossing is too shallow for development) to be 264 ft. Assuming 26 ft. wide luxury garage townhouses (the narrowest acceptable in this market) and imposing the appropriate side yard setbacks, we conclude that six to eight townhouse units would maximize the site's potential.

Specifically, such density could be achieved in two sticks of three units each, one stick of three and one stick of four, or two sticks of four each. This then becomes the baseline for our valuation of the subject property in terms of its density potential.

## Value Conclusion:
Based upon a lot yield of six to eight townhouse lots, we apply a unit value of $165,000/lot derived later in this report in the sales comparison approach. This results in a market value range as follows: (6 lots x $165,000/lot = $1,000,000, rounded) or (8 lots x $165,000/lot = $1,325,000, rounded) resulting in a final value range of $1,000,000 to $1,325,000 [ONE MILLION DOLLARS to ONE MILLION THREE HUNDRED TWENTY FIVE THOUSAND DOLLARS].

We developed our analyses, opinions, and conclusions and prepared this report in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP) of the Appraisal Foundation; the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA); the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute; and the requirements of our client as we understand them.

Ms. Danielle S. Zoller, Esquire is the client in this assignment. The intended users are Gordon Feinblatt LLC and their client in this matter.

No borrower, property purchaser or property seller, and no party other than those parties specifically identified above shall rely on the appraisal for any purpose or be considered an intended user of the appraisal. However, we have abstracted the operating agreement for 6789 Goldsboro Road LLC (see addenda) and acknowledge that this report may be utilized in the context of a redemption of the Class B member's interest.

The acceptance of this appraisal assignment and the completion of the appraisal report submitted herewith are contingent on the following extraordinary assumptions and/or hypothetical conditions:

## Extraordinary Assumptions:
In this assignment we make the assumption that the subject property will yield up to eight townhouse lots, although it has not received site plan approval for any lots at the present time.

Danielle S. Zoller, Esquire
Page 4

## Hypothetical Conditions:
No hypothetical assumptions were employed in this assignment.

Based on the analysis contained in the following report and by way of summary, our value conclusions involving the subject property are as follows:

### VALUE CONCLUSION

| Value Premise | Interest Appraised | Effective Date | Indicated Value Range |
|---|---|---|---|
| As Is | Fee Simple | July 3, 2017 | $1,000,000 to $1,325,000 |

This letter of transmittal is not considered valid if separated from this report, and must be accompanied by all sections of this report as outlined in the Table of Contents, in order for the value opinions set forth above to be valid.

Respectfully submitted,
Lipman Frizzell & Mitchell LLC

M. Ronald Lipman, MAI
Principal
Maryland License #04-1072
License Expires December 31, 2018

Sheldon A. Stern, MAI
Senior Appraiser
Maryland License # 04-1976
License Expires January 14, 2019

**6789 Goldsboro Road**



# Table of Contents

Summary of Salient Facts ........................................................................ 1

Aerial & Street Map Views ..................................................................... 2

Introduction ............................................................................................ 3

Washington, D.C. Metropolitan Area Analysis ...................................... 7

Montgomery County, Maryland Analysis.............................................. 10

Neighborhood Analysis ......................................................................... 21

Market Analysis .................................................................................... 23

Property Description.............................................................................. 25

Zoning Overview.................................................................................... 29

Assessment and Tax Data ..................................................................... 31

Subject Strengths & Weaknesses ........................................................ 33

Highest and Best Use ............................................................................ 34

Appraisal Methodology .......................................................................... 35

Sales Comparison Approach ................................................................. 36

Conclusion ............................................................................................. 50

General Assumptions and Limiting Conditions .................................... 51

Certification .......................................................................................... 55

Certification .......................................................................................... 56

Addenda.................................................................................................. 57

6789 Goldsboro Road



# Summary of Salient Facts

| | |
|---|---|
| Property Name:<br>Address: | Proposed Goldsboro Place Subdivision<br>6789 Goldsboro Road<br>Bethesda, Montgomery County, Maryland 20817 |
| Tax Parcel Number: | Tax Map GN41, Parcels P619 and P635 |
| Property Owner: | 6789 Goldsboro LLC |
| Property Rights Appraised: | Fee Simple |
| Zoning: | R-60, Residential – Moderate Density |
| Site Size: | 5.46 acres (237,650 square feet) |
| Property Description: | The subject property consists of a residential parcel containing irregular topography with steep slopes and a stream which traverses the site and is improved with a vacant residential dwelling built in 1935. |
| Extraordinary Assumptions: | In this assignment we make the assumption that the subject property will yield up to eight townhouse lots, although it has not received site plan approval for any lots at the present time. |
| Hypothetical Conditions: | No hypothetical assumptions were employed in this assignment. |
| Highest and Best Use: | Residential Cluster Development |
| Date of Inspection: | July 3, 2017 |
| Report Date: | August 17, 2017 |

## VALUE CONCLUSION

| Value Premise | Interest Appraised | Effective Date | Indicated Value Range |
|---|---|---|---|
| As Is | Fee Simple | July 3, 2017 | $1,000,000 to $1,325,000 |

Appellees' Appendix 0113

6789 Goldsboro Road

# Aerial & Street Map Views



Note: Outlined above is the entire proposed Goldsboro Place townhouse subdivision.



Appellees' Appendix 0114

6789 Goldsboro Road



# Introduction

## Client and Other Intended Users of the Appraisal

The client in this assignment is Gordon Feinblatt LLC and the intended users of this report are Gordon Feinblatt LLC and their client and no others.

## Intended Use of the Appraisal

The intended use of this report is to support an analysis by Gordon Feinblatt LLC of the subject property as it relates to its current development potential and the operating agreement for 6789 Goldsboro Road LLC .

## Real Estate Identification

The subject property is located at 6789 Goldsboro Road, Bethesda, Maryland 20817. The Montgomery County Assessor identifies the subject property as Tax Map GN341, Parcels P619 and P735.

### TAX MAP



## Real Property Interest Appraised

We have appraised the fee simple interest in the subject property.

## Type and Definition of Value

The purpose of this appraisal is to develop an opinion of the market value of the subject property. "Market Value," as used in this appraisal, is defined as "the most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus." Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1) Buyer and seller are typically motivated.

---

Lipman Frizzell & Mitchell LLC                    3                    INTRODUCTION

Appellees' Appendix 0115



**6789 Goldsboro Road**

2) Both parties are well informed or well advised, each acting in what they consider their own best interests;
3) A reasonable time is allowed for exposure in the open market;
4) Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
5) The price represents the normal consideration for the property sold unaffected by special or creative financing or sale concessions granted by anyone associated with the sale."

(Source: The Dictionary of Real Estate Appraisal, Sixth Edition, pg. 142)

The "as is" value is the value of the property in its present condition under market conditions prevalent on the date of the appraisal.

Please refer to the Glossary in the *Addenda* for further definitions of terms employed in this report.

## Date of Report
The date of this report is August 17, 2017, the date of the letter of transmittal.

## Valuation Scenarios and Effective Dates of Value
We developed opinions of value for the subject property under the following scenarios and corresponding effective dates of value:

| Valuation | Effective Date of Value |
|-----------|-------------------------|
| "As Is" | July 3, 2017 |

We completed an appraisal inspection of the subject property on July 3, 2017.

## Use of Real Estate as of the Effective Date of Value
The subject property existed as a single lot with a vacant single family dwelling completed in 1935 as of the effective date of value.

## Use of Real Estate as of the Date of this Report
Assumed to be the same as above.

Appellees' Appendix 0116

6789 Goldsboro Road

## Ownership and Sales History

According to tax assessment records, title to the subject property is vested in 6789 Goldsboro LLC. This entity purchased the property in July 2013 from Virginia J. Dawson, Trustee for $1,350,000. Other than the above, we are not aware of any more sales, listings, or offers for the subject property within the past three years.

## Scope of Work

The scope of work includes all steps taken in the development of the appraisal. These include 1) the extent to which the subject property is identified, 2) the extent to which the subject property is inspected, 3) the type and extent of data researched, 4) the type and extent of analysis applied, and 5) the type of appraisal report prepared. These items are discussed as follows:

### Extent to Which the Property was Identified

#### Legal Characteristics
The subject was legally identified via an inspection of the property, State of Maryland and Montgomery County tax assessment records.

#### Economic Characteristics
Economic characteristics of the subject property were identified via an analysis of the local housing market, as well as a comparison to properties with similar locational and physical characteristics.

#### Physical Characteristics
The subject was physically identified via a general inspection of the property by the appraiser, as well as a visual review of aerial photography.

### Extent to Which the Property was Inspected
We inspected the subject on July 3, 2017.

### Type and Extent of the Data Researched
We researched and analyzed: 1) market area data, 2) property-specific, market-analysis data, 3) zoning and land-use data, and 4) current data on comparable sales in the competitive market area.

### Type and Extent of Analysis Applied
Surrounding land use trends, the condition of the property, demand for the subject, and relative legal limitations were observed and analyzed in concluding the subject's highest and best use. The subject was then valued based on the highest and best use conclusion, relying on the sales comparison approach.

### Appraisal Report Type
This is an Appraisal Report as defined by the Uniform Standards of Professional Appraisal Practice under Standards Rule 2-2a. Please see the Scope of Work above for a description of the level of research completed.

### Appraisal Conformity
We developed our analyses, opinions, and conclusions and prepared this report in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP) of the Appraisal Foundation; the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA); the

Appellees' Appendix 0117

6789 Goldsboro Road

Interagency Appraisal and Evaluation Guidelines; the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute; and the requirements of our client as we understand them.

## Extraordinary Assumptions

In this assignment we make the assumption that the subject property will yield up to eight townhouse lots, although it has not received site plan approval for any lots at the present time.

## Hypothetical Conditions

No hypothetical assumptions were employed in this assignment.

Appellees' Appendix 0118

6789 Goldsboro Road



# Washington, D.C. Metropolitan Area Analysis

The Washington-Arlington-Alexandria, DC-VA-MD-WV Metropolitan Statistical Area (MSA) includes: Calvert, Charles, Frederick, Montgomery and Prince George's Counties in Maryland; Arlington, Clarke, Culpeper, Fairfax, Fauquier, Loudoun, Prince William, Rappahannock, Spotsylvania, Stafford and Warren Counties, and the Cities of Alexandria, Fairfax, Falls Church, Fredericksburg, Manassas and Manassas Park, located in Northern Virginia; Jefferson County, in West Virginia; and the District of Columbia.



The Washington MSA's population grew by an average annual rate of 1.5% between 1990 (4,122,259) and 2000 (4,796,183), according to the U.S. Census Bureau. In 2016, the MSA had an estimated population of 6,131,977, an increase of 0.9% over 2015, at 6,078,469. The population for the MSA had an average annual change of 1.5% and a total change of 16.5% from 2006 to 2016. The Washington MSA's population is projected to increase to 6,446,853 in 2020 and 7,231,458 in 2030, according to reports from the Metropolitan Washington Council of Governments Cooperative Forecasts 9.0 for the District of Columbia and Jefferson County, West Virginia, the Weldon Cooper Center for Public Service for Virginia counties and cities, and the Maryland Department of Planning for Maryland counties.

Appellees' Appendix 0119

**6789 Goldsboro Road**

In 2016, the Washington, D.C. MSA had an estimated average annual labor force of 3,313,056, with an average unemployment rate of 3.8%, compared to an average rate of 6.0% for the District of Columbia, 4.3% for Maryland, 4.0% for Virginia, 6.0% for West Virginia and the U.S. average unemployment rate of 4.9%.

In June 2017, the Washington, D.C. MSA had an estimated labor force of 3,424,661 with an unemployment rate of 3.9%, compared to a rate of 6.4% for the District of Columbia, 4.2% for Maryland, 3.9% for Virginia, 5.1% for West Virginia and the U.S. unemployment rate of 4.4%.

The early 1990s produced a depressed economic environment for the Metropolitan area with cutbacks in employment by the Federal Government, the area's largest employer. This was followed by corporate mergers and layoffs in the mid-1990s. By the late 1990s the economy had improved and private sector hiring was strong, with low unemployment and resurgence in demand for commercial development. During 2002, the economy in the Metropolitan area was stagnant with low mortgage interest rates responsible for a strong housing market. By 2005, a strong seller's market developed for both residential and commercial real estate that began to slow down by year end, as interest rates rose. Sales activity in the housing market declined in 2006 through 2009, while commercial activity remained relatively stable.

According to reports from the U.S. Census Bureau, the estimated median household income for the Washington, D.C. MSA increased from $71,013 in 2005 to $85,844 in 2015, an average annual increase of 1.9% and a total change of 20.9%. The MSA's 2015 median income was 0.9% higher than the 2014 median income of $85,059. Median income for the MSA was 17.4% higher than the District of Columbia's median household income of $73,115, 13.3% higher than Maryland's income of $75,784, 29.6% higher than Virginia's income of $66,263 and 104.5% higher than West Virginia's median household income of $41,969.

The residential market in the Washington Metropolitan area was extremely active during the first half of this decade, although home sales began to slow in 2006 and pricing began to decline since that time. The extreme expansion experienced between 2000 and 2005 ended and the market is in the process of finding equilibrium.

According to reports from the Metropolitan Regional Information Systems, Inc. (MRIS), in 2016, the MSA had an average home sale price of $400,431, an increase of 2.0% over 2015, at $392,474 (previous data has been changed with the addition of Culpeper and Rappahannock counties to the MSA). During the same period, the number of units sold in the MSA went from 80,115 in 2015 to 86,071 in 2016, an increase of 7.4%.

In June 2017 the average home sale price in the MSA was $425,115, an increase of 3.4% over June 2016, at $411,111. During the same period, the number of units sold in the MSA went from 9,561 in June 2016 to 10,035 in June 2017, an increase of 5.0%. The average year-to-date (YTD) 2017 home sale price in the MSA was $408,901, an increase of 3.0% over YTD 2016, at $396,854. The total number of units sold in the MSA (YTD) went from 40,247 in 2016 to 43,121 in 2017, an increase of 7.1%.

Appellees' Appendix 0120

In late 2007, financial markets began to deteriorate from a period of rapid growth in real estate prices and economic activity during the 2000s. What followed was a deep and unprecedented global economic recession, which has come to be known as The Great Recession. Real estate markets in particular were profoundly affected by this recession in comparison to past recessions.

The duration and far reaching impact of The Great Recession has been unprecedented as have been measures in monetary and fiscal policy undertaken by the U.S. Government to combat the ongoing problems. The Federal Reserve has lowered the Federal Funds Target Rate to a range of 0 to 0.25%, the lowest rate since December of 2008 and over $5 trillion has been added to the nation's debt since January of 2008. Standard & Poor's Ratings Services revised its outlook on the U.S. long-term credit rating from AAA to AA+ to reflect future concerns regarding the ability of the U.S. Government to fulfill its obligations as a result of its increased debt loads, without major policy changes.

During the last three years, the Washington, D.C. MSA has shown signs of stabilization. The MSA experienced increases in the average home sale price from 2010 through 2016, after decreases in 2008 and 2009. The average unemployment rate decreased in 2011 through 2016, after increasing unemployment in 2009 and 2010. These recent signs of stabilization indicate a recovery from the late 2000s and early 2010s.

Going forward, the Washington, D.C. MSA's economic base will continue to be a positive influence as it recovers. Economic growth may not again reach the pace set in the mid-2000s, however, the MSA's favorable demographic trends and location will assist in stabilizing and, ultimately, growing its economy.

Appellees' Appendix 0121

6789 Goldsboro Road



# Montgomery County, Maryland Analysis

### Location

Bordering Washington, D.C. to the immediate northwest, Montgomery County represents one of Maryland's most populated and affluent jurisdictions. It comprises a land area of 495± square miles and is bordered by Frederick County to the northwest, Howard County to the northeast, Prince George's County to the southeast and the District of Columbia and Virginia to the south and west, respectively. Montgomery County has 19 municipalities including: Barnesville, Brookville, Town of Chevy Chase, Chevy Chase View, Chevy Chase Village, Village of Chevy Chase (Section 3), Village of Chevy Chase (Section 5), Gaithersburg, Garrett Park, Glen Echo, Kensington, Laytonsville, Martin's Additions, North Chevy Chase, Poolesville, Rockville, Somerset, Takoma Park and Washington Grove. The centrally located City of Rockville serves as the County seat and is 15 miles from Washington, D.C., 37 miles from Baltimore, MD, 132 miles from Philadelphia, PA and 223 miles from New York, NY.



Appellees' Appendix 0122

Case 8:25-cv-02103-TDC   Document 29-113   Filed 08/08/25   Page 125 of 618

**6789 Goldsboro Road**



## Population

The U.S. Census Bureau estimated Montgomery County's 2000 population at 873,874, which had an average annual growth rate of 2.1% from 1980, at 579,053. In 2016, the County had an estimated population of 1,043,863, an increase of 0.7% over 2015, at 1,036,233. The County experienced an overall total increase in population of 12.7% and an average annual increase of 1.2%, from 2006 to 2016. Montgomery County is projected to have a population of 1,067,000 in 2020 and 1,153,900 in 2030, according to reports from the Maryland Department of Planning. The County's anticipated modest rate of growth in this decade is expected to occur primarily outside the Capital Beltway (I-495). A summary of population history and forecast is shown in the following chart.

### HISTORICAL AND PROJECTED POPULATION – SUBURBAN WASHINGTON REGION

|  | 2006 | 2016 | 2006-2016 | 2020 | 2016-2020 | 2030 | 2020-2030 |
|---|---|---|---|---|---|---|---|
|  |  |  | Average Annual Growth Rates |  |  |  |  |
| MARYLAND | 5,627,367 | 6,016,447 | 0.7% | 6,224,510 | 0.9% | 6,612,190 | 0.6% |
| Suburban Washington Region | 2,002,800 | 2,199,503 | 0.9% | 2,247,150 | 0.5% | 2,402,500 | 0.7% |
| Frederick County | 224,211 | 247,591 | 1.0% | 265,650 | 1.8% | 304,050 | 1.4% |
| Montgomery County | 926,492 | 1,043,863 | 1.2% | 1,067,000 | 0.5% | 1,153,900 | 0.8% |
| Prince George's County | 852,097 | 908,049 | 0.6% | 914,500 | 0.2% | 944,550 | 0.3% |

*Sources: 2006 & 2016 - U.S. Census Bureau, Release Date: March 2017; 2020 & 2030 - Projections: Maryland Department of Planning.*

## Employment

The County's talented workforce and strategic location have influenced its development as one of the nation's largest centers of research and development activity and private and governmental employment. The County's anticipated future employment growth is expected in the private sector, particularly in the areas of service, high technology and related industries. A survey of the County's total employment, broken down by sector of work, is shown in the following chart.

### SUMMARY OF EMPLOYMENT

| SOURCE | Annual 2014 | Annual 2015 | % Change 2014-15 | Annual 2016 | % Change 2015-16 |
|---|---|---|---|---|---|
| Government | 89,580 | 89,344 | -0.3% | 89,763 | 0.5% |
| Natural Resources & Mining | 304 | 308 | 1.3% | 310 | 0.6% |
| Construction | 23,662 | 23,585 | -0.3% | 23,332 | -1.1% |
| Manufacturing | 11,304 | 11,666 | 3.2% | 11,946 | 2.4% |
| Trade, Transportation & Utilities | 57,824 | 57,695 | -0.2% | 56,846 | -1.5% |
| Information | 12,608 | 12,354 | -2.0% | 11,780 | -4.6% |
| Financial Activities | 30,040 | 30,607 | 1.9% | 29,790 | -2.7% |
| Professional & Business Services | 98,782 | 99,022 | 0.2% | 102,397 | 3.4% |
| Education & Health Services | 67,618 | 69,925 | 3.4% | 71,561 | 2.3% |
| Leisure & Hospitality | 41,005 | 41,827 | 2.0% | 43,203 | 3.3% |
| Other Services & Unclassified | 22,616 | 22,552 | -0.3% | 22,521 | -0.1% |
| Total | 455,343 | 458,885 | 0.8% | 463,449 | 1.0% |

*Source: Maryland Department of Labor, Licensing & Regulation*

Appellees' Appendix 0123

In June 2017, the estimated civilian labor force for Montgomery County was 567,794, with an unemployment rate of 3.5% (not seasonally adjusted), compared to a rate of 3.9% for the Washington, D.C. MSA, 4.2% for the State of Maryland and the U.S. unemployment rate of 4.4% (seasonally adjusted). Government employment accounts for 19% of the Montgomery County work force with the remaining 81% in the private sector. The top ten employers in Montgomery County are listed in the following chart.

## TOP TEN EMPLOYERS

| Employer | Product/Service | Employees |
|----------|----------------|-----------|
| National Institutes of Health* | HQ/Medical research/Federal government | 17,580 |
| U.S. Food and Drug Administration* | HQ/Food & drug R&D & standards/Federal government | 13,855 |
| Naval Support Activity Bethesda* | Medical services/Federal government | 12,000 |
| Marriott International | HQ/Hotels, motels/Accommodation & food services | 5,800 |
| Adventist Healthcare | HQ/Medical services/Health care | 4,290 |
| Montgomery College | Higher Educations/Educational services | 3,190 |
| National Oceanic & Atmospheric Admin.* | HQ/Weather analysis & reporting/Federal government | 2,920 |
| National Institute of Standards & Technology* | HQ/testing and standards; R&D | 2,835 |
| Kaiser Foundation Health Plan | Medical services/Health care | 2640 |
| U.S. Nuclear Reg. Comm.* | HQ/utilities regulation | 2340 |

*Note: Excludes post offices, state and local governments; national retail and national food service; includes higher education. Sources: Economic development agencies statewide and Maryland Department of Business and Economic Development, 2016.*

*\*Employee counts for federal and military facilities exclude contractors to the extent possible; embedded contractors may be included.*

### Income

According to the U.S. Census Bureau, estimated median household income for Montgomery County increased from $81,874 in 2005, to $98,314 in 2015, an average annual increase of 1.8% and a total increase of 20.1%. The County's 2015 estimated income was 29.7% higher than Maryland's median income of $75,784. Median household income growth in the County from 2005 to 2015 is shown in the following chart.

## MEDIAN HOUSEHOLD INCOME

| Year | Income | Annual % Change | Total % Change |
|------|--------|-----------------|----------------|
| 2005 | $81,874 | - | - |
| 2006 | $87,019 | 6.3% | 6.3% |
| 2007 | $91,440 | 5.1% | 11.7% |
| 2008 | $93,895 | 2.7% | 14.7% |
| 2009 | $93,774 | -0.1% | 14.5% |
| 2010 | $88,559 | -5.6% | 8.2% |
| 2011 | $92,288 | 4.2% | 12.7% |
| 2012 | $94,365 | 2.3% | 15.3% |
| 2013 | $97,873 | 3.7% | 19.5% |
| 2014 | $97,279 | -0.6% | 18.8% |
| 2015 | $98,314 | 1.1% | 20.1% |
| Average Annual % Change | | 1.8% | |

*Sources: U.S. Census Bureau*

Appellees' Appendix 0124

**6789 Goldsboro Road**

## Assessable Tax Base

The assessable tax base is affected by physical growth, the economy and market prices. In FY 2016 (as of the November 30, 2016 base estimate date), the County had an estimated assessable tax base of $178.612 billion, an increase of 4.3% over 2015, at $171.300 billion. The County experienced an average annual increase of 2.4% and a cumulative change of 26.5% from 2006 to 2016, as set forth in the following chart.

### ASSESSABLE TAX BASE

| Year* | Tax Base (In $Billions) | Annual % Change | Cumulative % Change |
|---|---|---|---|
| 2006 | $141.182 | – | – |
| 2007 | $163.916 | 16.1% | 16.1% |
| 2008 | $182.492 | 11.3% | 29.3% |
| 2009 | $182.804 | 0.2% | 29.5% |
| 2010 | $174.841 | -4.4% | 23.8% |
| 2011 | $163.570 | -6.4% | 15.9% |
| 2012 | $158.918 | -2.8% | 12.6% |
| 2013 | $160.520 | 1.0% | 13.7% |
| 2014 | $164.438 | 2.4% | 16.5% |
| 2015 | $171.300 | 4.2% | 21.3% |
| 2016 | $178.612 | 4.3% | 26.5% |
| Average Annual % Change | | 2.4% | |

*Source: State Department of Assessments and Taxation.*
*\* For Tax Years beginning July 1st.*

## Retail Sales

According to reports from the Comptroller of Maryland, Bureau of Revenue Estimates (BRE), Montgomery County had sales totaling $9.135 billion in 2016 an increase of 0.7% over 2015, at $9.072 billion. The County experienced an average annual increase of 0.2% and a cumulative growth rate of 1.8% from 2006 to 2016, as shown in the following chart.

### RETAIL SALES

| Year* | Retail Sales (In $Billions) | Annual % Change | Cumulative % Change |
|---|---|---|---|
| 2006 | $8.976 | – | – |
| 2007 | $9.052 | 0.8% | 0.8% |
| 2008 | $8.985 | -0.7% | 0.1% |
| 2009 | $8.537 | -5.0% | -4.9% |
| 2010 | $8.065 | -5.5% | -10.2% |
| 2011 | $8.337 | 3.4% | -7.1% |
| 2012 | $8.716 | 4.5% | -2.9% |
| 2013 | $8.631 | -1.0% | -3.8% |
| 2014 | $8.697 | 0.8% | -3.1% |
| 2015 | $9.072 | 4.3% | 1.1% |
| 2016 | $9.135 | 0.7% | 1.8% |
| Average Annual % Change | | 0.2% | |

*Source: Comptroller of Maryland – Bureau of Revenue Estimates (BRE) Consolidated Revenue Reports; Sales and Use Tax Summaries.*
*\* Fiscal Years through June 30th.*

Appellees' Appendix 0125

## Housing

The housing stock of Montgomery County mostly consists of single family housing for the upper income purchaser. Metropolitan Regional Information Systems, Inc. (MRIS), in their report on housing statistics, stated that the average sale price of an existing home in Montgomery County in 2016 was $505,285, an increase of 0.8% over 2015, at $501,305. The number of units sold in the County went from 12,191 in 2015 to 12,896 in 2016, an increase of 5.8%. Historical changes in average sale price and number of units sold from 2006 to 2016 are shown in the following chart.

### AVERAGE HOME SALE PRICES AND UNITS SOLD

| Year | Units Sold | % Change | Avg. Price | % Change |
|------|-----------|----------|------------|----------|
| 2006 | 13,494 | -- | $529,046 | -- |
| 2007 | 10,355 | -23.3% | $550,188 | 4.0% |
| 2008 | 8,519 | -17.7% | $503,965 | -8.4% |
| 2009 | 10,375 | 21.8% | $434,246 | -13.8% |
| 2010 | 10,408 | 0.3% | $441,618 | 1.7% |
| 2011 | 9,500 | -8.7% | $451,963 | 2.3% |
| 2012 | 10,155 | 6.9% | $465,510 | 3.0% |
| 2013 | 11,461 | 12.9% | $500,338 | 7.5% |
| 2014 | 10,976 | -4.2% | $503,956 | 0.7% |
| 2015 | 12,191 | 11.1% | $501,305 | -0.5% |
| 2016 | 12,896 | 5.8% | $505,285 | 0.8% |

*Source: Metropolitan Regional Information Systems, Inc. (MRIS)*

In June 2017 the average home sale price in the County was $545,893, a decrease of 0.1% from June 2016, at $546,394. During the same period, the number of units sold in the County went from 1,532 in June 2016 to 1,519 in June 2017, a decrease of 0.8%. The average year-to-date (YTD) 2017 home sale price in the County was $524,221, an increase of 4.6% over YTD 2016, at $501,290. The total number of units sold in the County (YTD) went from 6,127 in 2016 to 6,300 in 2017, an increase of 2.8%. A comparison of 2017 to 2016, for average home sale prices and number of units sold in Montgomery County on a monthly and YTD basis, is shown in the following chart.

### AVERAGE HOME SALE PRICES & NO. OF UNITS SOLD - MONTHLY/YTD COMPARISON

| Month | 2016 Units Sold | 2017 Units Sold | 2016-2017 % Change | 2016 Average Price | 2017 Average Price | 2016-2017 % Change |
|-------|-----------------|-----------------|--------------------|--------------------|--------------------|--------------------|
| January | 646 | 704 | 9.0% | $451,298 | $482,017 | 6.8% |
| February | 658 | 701 | 6.5% | $494,907 | $517,511 | 4.6% |
| March | 841 | 1,013 | 20.5% | $473,902 | $510,481 | 7.7% |
| April | 1,103 | 1,117 | 1.3% | $527,180 | $546,156 | 3.6% |
| May | 1,347 | 1,246 | -7.5% | $514,061 | $543,266 | 5.7% |
| June | 1,532 | 1,519 | -0.8% | $546,394 | $545,893 | -0.1% |
| YTD | 6,127 | 6,300 | 2.8% | $501,290 | $524,221 | 4.6% |

*Source: Metropolitan Regional Information Systems, Inc. (MRIS)*

Appellees' Appendix 0126

According to reports from the U.S. Census Bureau, in 2016, Montgomery County issued new residential building permits for 2,170 dwelling units (including multi-family), an increase of 4.3% over 2015, at 2,080. Of those permits issued in 2016, 1,414 were for single-family units, an increase of 3.4% over 2015, at 1,367 single-family units. During the same period, the County issued multi-family permits for 756 units, an increase of 6.0% over 2015,' at 713 multi-family units.

The dollar value of all new permits issued in Montgomery County, in 2016, was $425.0 million, a decrease of 4.7% from 2015, at $445.8 million. The number of units and the construction costs for building permits issued in the County from 2006 to 2016 are shown in the following chart.

## RESIDENTIAL BUILDING PERMITS

| Year | Number of Units | | | | Construction Costs [$millions] | | | |
|------|-----------------|----------|-------|----------|-----------------|----------|--------|----------|
|      | Single-Family | Multi-Family | Total | % Change | Single-Family | Multi-Family | Total | % Change |
| 2006 | 1,237 | 1,794 | 3,031 | -- | $343.4 | $230.8 | $574.2 | -- |
| 2007 | 1,408 | 2,051 | 3,459 | 14.1% | $387.6 | $276.5 | $664.0 | 15.6% |
| 2008 | 997 | 479 | 1,476 | -57.3% | $259.8 | $76.2 | $336.1 | -49.4% |
| 2009 | 862 | 0 | 862 | -41.6% | $244.5 | $0.0 | $244.5 | -27.2% |
| 2010 | 909 | 990 | 1,899 | 120.3% | $225.1 | $118.3 | $343.3 | 40.4% |
| 2011 | 1,031 | 1,481 | 2,512 | 32.3% | $236.5 | $197.9 | $434.5 | 26.5% |
| 2012 | 1,174 | 2,807 | 3,981 | 58.5% | $238.3 | $265.6 | $503.8 | 16.0% |
| 2013 | 1,652 | 1,862 | 3,514 | -11.7% | $326.7 | $197.3 | $523.9 | 4.0% |
| 2014 | 1,440 | 2,399 | 3,839 | 9.2% | $297.3 | $327.8 | $625.1 | 19.3% |
| 2015 | 1,367 | 713 | 2,080 | -45.8% | $298.7 | $147.1 | $445.8 | -28.7% |
| 2016 | 1,414 | 756 | 2,170 | 4.3% | $322.5 | $102.5 | $425.0 | -4.7% |

*Source: U.S. Census Bureau*

## Commercial/Industrial Markets

In second quarter 2017, CoStar reported Montgomery County's existing office space at 72.8 million square feet, with a vacancy rate of 13.8%. Industrial/flex space totaled 25.9 million square feet, with a vacancy rate of 9.3%. Retail space in the County totaled 41.9 million square feet, with a vacancy rate of 3.5%. The County had a total combined existing RBA of 140.7 million square feet, with an overall vacancy rate of 9.9%. Montgomery County's RBA for office, industrial/flex, retail, and combined space and vacancy rates for fourth quarters 2010 through 2016 and second quarter 2017, are shown in the following chart.

## COMMERCIAL RBA AND VACANCY RATES

| Year/Qtr. | Office | | Industrial/Flex | | Retail | | Combined | |
|-----------|--------|---------|-----------------|---------|--------|---------|----------|---------|
|           | Sq. Ft. | Vacancy | Sq. Ft. | Vacancy | Sq. Ft. | Vacancy | Sq. Ft. | Vacancy |
| 2017 2Q | 72,832,744 | 13.8% | 25,934,240 | 9.3% | 41,907,009 | 3.5% | 140,673,993 | 9.9% |
| 2016 4Q | 72,813,634 | 13.8% | 25,934,240 | 8.7% | 41,830,784 | 3.3% | 140,578,658 | 9.7% |
| 2015 4Q | 72,495,725 | 14.1% | 25,734,160 | 10.0% | 40,943,966 | 3.7% | 139,173,851 | 10.3% |
| 2014 4Q | 72,345,503 | 13.7% | 25,727,160 | 10.7% | 40,855,521 | 3.9% | 138,928,184 | 10.3% |
| 2013 4Q | 71,176,577 | 12.6% | 25,713,560 | 11.1% | 40,317,439 | 4.2% | 137,207,576 | 9.8% |
| 2012 4Q | 70,803,616 | 12.1% | 25,713,560 | 11.7% | 39,759,794 | 4.2% | 136,276,970 | 9.7% |
| 2011 4Q | 69,844,809 | 12.1% | 25,713,560 | 12.8% | 39,613,395 | 4.2% | 135,171,764 | 9.9% |
| 2010 4Q | 69,806,861 | 12.6% | 25,713,560 | 13.0% | 39,333,142 | 4.4% | 134,853,563 | 10.3% |

*Source: CoStar*

Appellees' Appendix 0127

Traditionally, Montgomery County is considered one of the metropolitan area's strongest and most desirable office markets. As a result of negative market forces, new project delivery and construction activity was very modest in the early 1990's with build-to-suit developments being the only new construction. As the aggregate economy strengthened in the late 1990's, Montgomery County experienced a positive building environment. In the current economy, new commercial construction has leveled off with almost no speculative activity. The Federal government is expanding its facilities by lease arrangements with developers on private land and government owned land as they establish new requirements based on recent events.

Montgomery County is currently home to 250 biotech companies. New technology parks are planned along the I-270 and Rt. 29 corridors, adding to the County's global reputation as a technology center. According to the Maryland Department of Business & Economic Development, the County's business parks include:

- White Oak Science Gateway (formerly the East County Science Center) – 115-acre site to include a business incubator, a pilot manufacturing facility, lab facility, build-to-suit office space and a higher education facility adjacent to the new U.S. FDA headquarters campus.

- Montgomery College Germantown Campus Technology Park – Up to one million square feet of planned development which includes an academic and training facility that is tied in with the college's biotech program. It also includes a business incubator and build-to-suit facilities.

- LifeSci Village (formerly East County Science Center) – 300-acre mixed-use development focusing on advanced technologies; adjacent to the U.S. FDA headquarters campus.

- Great Seneca Science Corridor – This area (17.5 million sq.ft.) is being developed for scientific research and development.

- Johns Hopkins University Belward Research Campus – 108 acres are to be developed for research and education in addition to the 36 acres currently under use.

Appellees' Appendix 0128

Business incubators in Montgomery County include: Germantown Innovation Center, Germantown; Bethesda Green Business Incubator, Bethesda; Association for Entrepreneurial Science (AES), Rockville; Rockville Innovation Center, Rockville; William E. Hanna, Jr. Innovation Center at Shady Grove, Rockville; Silver Spring Innovation Center, Silver Spring; and the Wheaton Business Innovation Center, Wheaton, Maryland. A Market Profile for Montgomery County's industrial and office properties is shown in the following chart.

### MARKET PROFILE DATA

| Land - cost per acre | Low | High | Average |
|---|---|---|---|
| Industrial | $146,200 | $2,500,000 | $972,430 |
| Office | $154,800 | $2,892,400 | $1,147,700 |
| **Rental Rates - per square foot** | | | |
| Warehouse / Industrial | $10.00 | $29.00 | $11.88 |
| Flex / R&D / Technology | $17.00 | $28.50 | $22.84 |
| Class A Office | $13.50 | $51.00 | $32.09 |

*Source: Montgomery County Department of Economic Development, 2016*

## Transportation

Despite consistently heavy traffic patterns and vehicular congestion within its major highway corridors, transportation throughout the County and its surrounding metropolitan area is considered adequate. Montgomery County is served by the Capital Beltway (I-495) which travels in an east/west direction through Prince George's County and Virginia, and in a generally circular orientation around the District of Columbia. It is linked to the north by U.S. Route 29, and Interstates 270 and 95 which provide access between the Capital Beltway and Baltimore and Howard Counties, as well as Rockville/Shady Grove, Bethesda, Gaithersburg, and Frederick County. There are 150 buses, including Metrobus, operating along 39 routes in the County, plus extensive service via the County's Ride-On bus system. Taking advantage of this highway system, are 123 local and long-distance trucking companies.

An 18.8-mile Inter County Connector (I-200) toll road has been completed from I-270/I-370 to I-95 (Contracts A-C), which greatly eases east/west travel linking Prince George's and Montgomery Counties, according to reports from the Maryland Department of Transportation. The limited access highway begins from the west at I-270/I-370 in Montgomery County, MD and ends at US 1 in Prince George's County, MD.

Appellees' Appendix 0129

The ICC is a limited access toll facility that has been constructed in the following sequence:

A. .I-270/I-370 to MD 97 – 7.2 miles of six-lane highway (opened February 2011).

B. MD 97 to US 29 – 6.9 miles of six-lane highway (opened November 2011).

C. US 29 to I-95 - 3.8 miles of six-lane ICC highway, 1.3 miles of US 29 road improvements and 1.9 miles of I-95 auxiliary lane and C-D roadway improvements (opened November 2011).

D/E. Contract D/E Modified is the fourth design build contract of the ICC. It consists of collector-distributor lanes along I-95 from the ICC to just north of MD 198 and includes the extension of the ICC from the eastern terminus of Contract C to a partial interchange at Virginia Manor Road and a new signalized intersection at U.S. 1, near the Muirkirk MARC commuter rail station (opened to traffic as of November 2014).

The County also has extensive rail service in the form of twelve Metrorail stations that serve three of the system's busiest stops. Commuters have access to the MARC commuter rail and long-distance passenger service is provided by AMTRAK. CSX Transportation provides freight rail service to the area.

Montgomery County is also served by the Helen Delich Bentley Port of Baltimore (renamed for former Congresswoman, Helen Delich Bentley on June 2, 2006, in celebration of the 300th anniversary of the Port), which is located at Dundalk, Curtis Bay, Locust Point and Canton Yards. The Port is a significant economic engine for the region and considered to be a leading U.S. automobile and break-bulk port with six public terminals, including a state-of-the-art Intermodal Container Transfer Facility, adjacent to Seagirt Marine Terminal, which serves import and export accounts, accommodating loading and discharge at the seaport. Another ICTG is located at Dundalk Marine Terminal, a general cargo facility with direct rail access. The Port is one of America's top container terminals due to its strategic Mid-Atlantic location, inland setting and 50' channel, and is ranked as one of the nation's top "Ro-Ro" (roll-on, roll-off) ports. The Port is generally ice-free year round and can be approached from the south via the Chesapeake Bay or from the north via the Delaware Bay and Chesapeake-Delaware Canal.

Montgomery County's commercial passenger and air cargo services are available through the Baltimore/Washington International Thurgood Marshall Airport, Washington Dulles International Airport and Ronald Reagan Washington National Airport. The County is also served by the Montgomery County Airpark which provides regional, commuter and corporate air service and is owned by the Montgomery County Revenue Authority.

Appellees' Appendix 0130



## The Great Recession

In late 2007 financial markets began to deteriorate from a period of rapid growth in real estate prices and economic activity during the 2000s. What followed was a deep and unprecedented global economic recession which has come to be known as The Great Recession. Real estate markets in particular were profoundly affected by this recession in comparison to past recessions.

One of the most destructive legacies of The Great Recession has been the nationwide erosion in home prices following dramatic increases in the mid-2000s which were fueled by easy credit and speculation. In Montgomery County the **average home sale price** increased from $253,507 in 2000 to $550,188 in 2007, or 117%. In 2016, the average sale price was $505,285, down 8.2% from the high. **Residential building permit values** decreased from a peak of $717.4 million in 2005 to $425.0 million in 2016, a decrease of 40.8%.

On a positive note, **retail sales** in Montgomery County grew from $8.976 billion in 2006 to $9.135 billion in 2016, a cumulative increase of 1.8%.

The effects of The Great Recession can also be found in **unemployment,** which, in Montgomery County, averaged 3.5% annually between 2006 and 2009, with a high of 5.3% in 2009, and a low of 2.6% in 2007. In 2010 unemployment jumped to 5.6% in 2010. The average unemployment rate decreased to 5.3% in 2011, 5.2% in 2012, 5.0% in 2013 4.4% in 2014, 3.9% in 2015 and 3.3% in 2016.

**Median household income** in the County increased by 6.3% in 2006 then slowed to an increase of 1.1% in 2015. Montgomery County's **assessable tax base** decreased from 2010 to 2012, after steady increases from 2004 to 2009 and then increased in 2013 through 2016. **Vacancy rates** have also increased for office RBA but decreased for industrial/flex and retail commercial property types since 2010.

The duration and far reaching impact of The Great Recession has been unprecedented as have been measures in **monetary and fiscal policy** undertaken by the U.S. Government to combat the ongoing problems. The Federal Reserve has lowered the Federal Funds Target Rate to a range of 0 to 0.25%, the lowest rate since December of 2008 and over $5 trillion has been added to the nation's debt since January of 2008. Standard & Poor's Ratings Services revised its outlook on the U.S. long-term credit rating from AAA to AA+ to reflect future concerns regarding the ability of the U.S. Government to fulfill its obligations as a result of its increased debt loads, without major policy changes.

## Conclusions

Montgomery County represents one of the Washington MSA's most populated and affluent submarkets. Due to its stable population base and proximity to a variety of quality educational facilities, its civilian labor force is generally considered talented and highly educated. This characteristic is evidenced by the extensive concentration of high tech industries within its boundaries and its historically low unemployment rates.

Appellees' Appendix 0131

**6789 Goldsboro Road**

During the last four years, Montgomery County has shown signs of stabilization. Home prices increased in 2010 through 2014, after two years of decreases in 2008, 2009 and 2015 and then increased again in 2016. Retail sales decreased every year from 2008 through 2010, increased in 2011 and 2012, decreased in 2013, and then increased in 2014 through 2016. The average unemployment rate decreased in 2011 through 2016, after two years of increasing unemployment in 2009 and 2010. These recent signs of stabilization indicate a recovery from the late 2000s and early 2010s.

Going forward, Montgomery County, as well as the Washington, D.C. Region, will continue to benefit from the presence of the Federal Government. The County's proximity to Washington and Baltimore and its economic base will be a positive influence as it recovers. Economic growth may not again reach the pace set in the mid-2000s, however, Montgomery County's favorable demographic trends and location will assist in stabilizing and, ultimately, growing its economy.

Appellees' Appendix 0132



# Neighborhood Analysis

**NEIGHBORHOOD MAP**



The subject property is situated in Bethesda, Montgomery County, Maryland. Bethesda is just north of the District of Columbia, within the southern portion of Montgomery County. Its general boundaries are formed by the Capital Beltway to the north, Connecticut Avenue (Route 185) to the east, Bradley Boulevard (Route 191) to the south, and Bradley Lane to the west. Commercial development of varying age and form can be found along the neighborhood's major arteries and residential uses are oriented along minor roads. The area is largely built-out, being an inner suburb of Washington, D.C. The largest land users are the National Institutes of Health (NIH) and National Naval Medical Center located on the east and west sides of Wisconsin Avenue, just south of the Capital Beltway. The subject property's location is in the northwestern portion of the neighborhood near the Glen Echo area and the Potomac River.

The subject property is located in zip code 20817 within Montgomery County. Information from ESRI Business Analyst Online was obtained regarding this area known as Bethesda. ESRI estimated the number of households in 2017 at 38,385, an increase of 6.5% (1.3% on average per year) over the 2010 population of 36,050 and an increase of 4.4% (0.9% on average per year) over 2017 to 40,065 in 2022. ESRI projects the 2017 households at 13,812 and an increase in the number of households by 535, or 2.9% (0.8% on average per year), over the next five years, totaling 14,347 in 2022. The area's 2017 median household income of $180,412 is well above the State of Maryland ($76,754) and the United States ($56,124).

The area is well served by road and public transportation systems. Major north/south arteries include Old Georgetown Road (Route 187), River Road (Route 190), Connecticut Avenue (Route 185) and Wisconsin Avenue (Route 355), all of which carry traffic from Montgomery County into

Appellees' Appendix 0133

**6789 Goldsboro Road**

Washington, D.C., with interchanges at the Capital Beltway (I-495). Major east/west arteries include East West Highway (Route 410) which carries traffic from New Carrollton and Hyattsville through the Bethesda area, and Bradley Boulevard (Route 191), which carries traffic from Connecticut Avenue into the Potomac area of southwestern Montgomery County. The Capital Beltway (I-495) runs along the northern boundary of the neighborhood and is the primary east/west artery in the area. I-495 has interchanges with Connecticut Avenue, Wisconsin Avenue/Rockville Pike, Old Georgetown Road, and Interstate 270. In addition, the neighborhood has access to mass transit along major routes, and access to the Metro system with the Bethesda station at Wisconsin Avenue and Old Georgetown Road.

Residents have access to all necessary amenities. Shopping is readily available throughout the area with most of the retail uses in Bethesda concentrated in the Woodmont Triangle area formed by Woodmont Avenue, Old Georgetown Road and Battery Lane. The Montgomery Mall is location on Democracy Boulevard, west of Old Georgetown Road adjacent to I-270. Retail uses are also found along Rockville Pike corridor, north of I-495. Shopping needs in the immediate neighborhood can be found along the River Road corridor, northwest of Little Falls Parkway. Employment opportunities exist within the commercial and office developments in the area and to the south within the limits of Washington, D.C. Residents have access to public and private recreational amenities and public and private schools.

The area is served by all necessary utilities. The Washington Suburban Sanitary Commission (WSSC) provides public water and sewer service. Electricity is provided by PEPCO, while Washington Gas provides natural gas service. Verizon Communications provides local phone service. All utilities are available in sufficient quantities to serve the neighborhood and support development.

In summary, Bethesda is a neighborhood with households of above-average economic means. Growth is limited due to the neighborhood's built-out nature. New residential development is primarily achieved by builders or households purchasing older units, which are razed for redevelopment. The subject is situated along Goldsboro Road, west of River Road, a major north/south artery in Bethesda. The subject is well located in the neighborhood with good access to commuter routes, public transportation, and employment centers.

Appellees' Appendix 0134



# Market Analysis

The purpose of this section is to provide relevant information about the marketplace in which the subject's residential component will compete.

## Local Housing Market Statistics

The Maryland Association of Realtors (MAR) track residential sales statistics that provide a context for neighborhood-specific and property-specific data. It should be noted that, generally, these reports do not include new house offerings and sales. It does, however, provide insight into the market environment in which the subject neighborhood and surrounding areas exist. We researched housing trends within Maryland and Prince George's County.

### HOUSING MARKET PERFORMANCE

| STATE OF MARYLAND | | | | | MONTGOMERY COUNTY | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Year | # of Sales | % Change | Average Sales Price | % Change | Year | # of Sales | % Change | Average Sales Price | % Change |
| 2001 | 80,169 | n/a | $184,953 | n/a | 2001 | 15,543 | n/a | $275,079 | n/a |
| 2002 | 84,976 | 6.0% | $210,015 | 13.6% | 2002 | 16,030 | 3.1% | $320,418 | 16.5% |
| 2003 | 89,371 | 5.2% | $241,025 | 14.8% | 2003 | 16,533 | 3.1% | $363,147 | 13.3% |
| 2004 | 98,242 | 9.9% | $286,554 | 18.9% | 2004 | 17,753 | 7.4% | $429,480 | 18.3% |
| 2005 | 98,858 | 0.6% | $341,006 | 19.0% | 2005 | 17,011 | -4.2% | $507,340 | 18.1% |
| 2006 | 82,787 | -16.3% | $357,674 | 4.9% | 2006 | 13,523 | -20.5% | $529,511 | 4.4% |
| 2007 | 63,585 | -23.2% | $362,197 | 1.3% | 2007 | 10,360 | -23.4% | $550,210 | 3.9% |
| 2008 | 46,910 | -26.2% | $341,066 | -5.8% | 2008 | 8,516 | -17.8% | $503,958 | -8.4% |
| 2009 | 53,025 | 13.0% | $300,573 | -11.9% | 2009 | 10,376 | 21.8% | $434,297 | -13.8% |
| 2010 | 54,605 | 3.0% | $291,202 | -3.1% | 2010 | 10,401 | 0.2% | $441,492 | 1.7% |
| 2011 | 53,971 | -1.2% | $277,897 | -4.6% | 2011 | 9,490 | -8.8% | $451,479 | 2.3% |
| 2012 | 56,530 | 4.7% | $282,179 | 1.5% | 2012 | 10,094 | 6.4% | $465,597 | 3.1% |
| 2013 | 63,556 | 12.4% | $308,950 | 9.5% | 2013 | 11,051 | 9.5% | $501,345 | 7.7% |
| 2014 | 62,791 | -1.2% | $307,154 | -0.6% | 2014 | 10,612 | -4.0% | $505,458 | 0.8% |
| 2015 | 73,044 | 16.3% | $305,055 | -0.7% | 2015 | 11,789 | 11.1% | $504,038 | -0.3% |
| 2016 | 79,956 | 9.5% | $309,502 | 1.5% | 2016 | 12,471 | 5.8% | $503,261 | -0.2% |
| Jan - Jul 2016 | 46,093 | n/a | $313,567 | n/a | Jan - Jul 2016 | 7,377 | n/a | $511,856 | n/a |
| Jan - Jul 2017 | 48,410 | 5.0% | $326,788 | 4.2% | Jan - Jul 2017 | 7,460 | 1.1% | $528,431 | 3.2% |

Source: MAR

The data indicates growth in sales volumes through 2005 with significant declines in 2006, 2007, and 2008. Pent up demand was released in 2009, during which time the number of sales increased by 13.0% in the State and 42.7% in the County. Since then, demand has been stable for most years in the State with significant growth in 2013, 2015, and 2016. In the County, growth was positive in 2010 and 2011, declined in 2012-2014 and increased significantly in 2015 and 2016. In terms of sales prices, the peak was reached in 2006/07, then declined through 2011. Prices in the State, overall, have been relatively stable for the past four years, while Montgomery County has experienced growth. Year-to-date statistics for 2017 indicated continued strong growth in demand and prices. We expect continued growth in the residential market over the near term.

Appellees' Appendix 0135

Using MRIS, the regional multiple list database, we analyzed sales data for townhouses aged five years or less within Zip Code 20817, the subject's neighborhood. This data identifies two townhouse subdivisions. River Quarry Subdivision located along River Road just outside the Capital Beltway (I-495) near Seven Locks Road recorded nine MRIS townhouse sales between the years 2012 and 2015. These large units which ranged from 3,900 to 4,500sq.ft., indicated sales prices ranging from $950,000 to $1,150,00 over this time period.

More current in the subject property's zip code is the opening of Montgomery Row Subdivision being developed by EYA Builders. The development reached the market in mid-2016 and is planned with 168 townhouses. This subdivision is located along the Democracy Boulevard corridor on Fernwood Road, near the Montgomery Mall, the current Marriott International headquarters and the I-270 spur. These 22 foot wide townhouse contain from 1,700 to 2,650sq.ft. Current sales prices have ranged from $850,000 to $1,200,000. Reports indicate that 54 units have sold.

EYA Builders are also developing the Grosvenor Heights Subdivision on Grosvenor Lane just outside the Capital Beltway near the Grosvenor Metro. These townhouse units are 24 foot wide with 2,500 to 3,400 sq.ft. and are being offered from $1,100,00 to $1,350,000. The development will contain 142 units. The property is located at 5315 Merriam Street in the adjacent Bethesda zip code 20814.

## Conclusion

The housing market in Montgomery County is strong, as evidenced by countywide statistics presented at the beginning of this section. The current average sales price for Montgomery County is $528,431 for the first seven months of 2017. New townhouse communities in the subject property zip code begin in the mid $800,000 to well over $1,000,000.

The subject property will consist of no more than 8 townhouse lots located along the north side of Goldsboro Road, which is a well-established, luxury single-family market. Considering the subject property's proposed small size and configuration as a townhouse project, we project an accelerated sellout period for the project. We estimate sales prices for the finished townhouse product to be in excess of $1,000,000 and the townhouse lots to be 26 foot wide. We assume the subject lots will capture their fair share of total demand for the market and as such, we project a sellout for the subject townhouses to be less than one year.

Appellees' Appendix 0136

6789 Goldsboro Road



# Property Description

The subject is an irregularly shaped parcel located on the north side of Goldsboro Road, between MacArthur Boulevard and Massachusetts Avenue. The site contains 5.46 acres (237,650 sq.ft.) in two parcels found on Montgomery County Tax Map GN341, Parcels P619 and P735. It is improved with an older, vacant dwelling completed in 1935 and containing 4,236sq.ft.

The site exhibits irregular topography with severe slopes and contains a stream which bisects the property. It also exhibits numerous other features including steep slopes, flood plain area, forest conservation areas and potential soil conditions. The topography is relatively flat along its 475+/- frontage on Greensboro Road, rising steeply to the north. Impacting the site is a sewer line which runs along its southern boundary adjacent to Goldsboro Road.

Based upon the site conditions described above, a proposed site plan that was submitted in late 2015 and now before MNCPPC Planning Board found below proposing 19 townhouse lots is unrealistic. The Bethesda Chevy Chase Master Plan approved and adopted in 1990, outlines the challenges for the site and complex development requirements that must be met in order to receive planning board approval for any realistic site plan. The unapproved plan submitted is shown below.

## PROPOSED SITE PLAN



---

Appellees' Appendix 0137

The topography map below identifies steep slopes which negatively impact the subject property. Currently improving the site is an older, vacant structure in poor condition indicated on the map, which will be demolished to make way for new townhouse construction. This improvements does not contribute value to the subject.

### TOPOGRAPHY MAP



Appellees' Appendix 0138

According to Montgomery County Flood Hazard Map. No. 24031C0435D, effective September 296, 2006, the subject is located in Zone X, an area of minimal flooding on most of the site except certain areas which border Goldsboro Road.

## FLOOD PLAIN MAP



The subject has access to all necessary public utilities. Electricity is provided by Potomac Electric Power, natural gas is provided by Washington Gas, while Verizon provides local telephone service. Washington Suburban Sanitary Commission serves the site with both domestic water and sanitary sewer. This appraisal has identified environmental and soil conditions that could negatively impact development.

We have determined that the site could conceivably be developed with anywhere from six to eight townhouse units in two sticks of three, one stick of three and one stick of four, or two sticks of four each. This then becomes the baseline for our valuation of the subject property in terms of its density potential.

Appellees' Appendix 0139

6789 Goldsboro Road

## Subject Photographs



View of Subject Frontage Along Goldsboro Rd.   View of Entry to Property from Goldsboro Rd.

 

View of Subject Improvements

View of Stream Which Traverse Subject Property

 

View of Stream Which Traverse Subject Property

View Looking West Along Goldsboro Road With Subject Property on the Right

Appellees' Appendix 0140



# Zoning Overview

**ZONING MAP**



## Zoning Designation

The subject property is zoned R-60, Residential, One-Family, Detached, within Montgomery County. The purpose of this zone is:

1. To provide designated areas of the County for moderate density uses;

2. The predominant use is residential in a detached house;

3. A limited number of other building types may be allowed under the optional method of development.

## Development Regulations

Permitted uses under the standard method development standards include single-family detached residences, and townhouse development under the cluster development method.

The minimum lot size for detached residential lots is 6,000 sq.ft. Lot width at front building line is 60 ft. Lot width at front lot line is 25ft. The maximum density is 7.26 units per acre. Maximum lot coverage is 35%.

Minimum setback requirements are: (1) Front Yard – 25 feet, (2) Side Yard – 8 feet per side, and (4) Rear Yard – 20 feet.

Appellees' Appendix 0141

## Cluster Development Method

Under the cluster development method, the minimum usable area is 5.0 acres. The Planning Board may allow development to proceed under optional development method Cluster Development on a smaller site than allowed in Usable Area if the subject property is recommended for cluster development in a master plan or if it finds that cluster development on a smaller site would be more suitable than standard method development for environmental reasons.

The minimum lot area is 1,500sq.ft., with the lot width at front building line to be determined at site plan stage of approvals. The lot width at front lot line is 14ft. for a townhouse.

## Legal, Conforming Status

The Goldsboro Road site in its current configuration as a single family lot does not have an approved site plan consistent with zoning regulations under the cluster development method which allows townhouse development. The appraiser estimates the site can be developed with up to eight townhouse lots under the optional Cluster Development Method.

Appellees' Appendix 0142

6789 Goldsboro Road



# Assessment and Tax Data

## Assessment Methodology

The State of Maryland has enacted a real estate assessment procedure called the Triennial Assessment. Under this procedure, one-third of all properties are re-assessed each year. The increase, if any, in assessment is phased-in during a three-year period, one-third per year. Decreases take effect immediately. Assessments are based on 100% of market value.

## Assessed Values and Property Taxes

The subject property was assessed as of January 1, 2017 for a total of $1,418,900. The current assessment is slightly less than its prior cycle value of $1,429,400.

| Account No. | Year Assessed | Land | Improvements | Total |
|---|---|---|---|---|
| 07-00421275 | 2017 | $997,800 | $421,100 | $1,418,900 |
| 07-00421264 | 2017 | $29,400 | $0 | $29,400 |
| | | | Total Assessment | $1,448,300 |

The subject's phase-in values are as follows:

### PHASE-IN ASSESSMENTS

| | Tax Year | Assessment |
|---|---|---|
| Base Year | 2016/17 | $1,458,800 |
| Phase-in Yr. 1 | 2017/18 | $1,448,300 |
| Phase-in Yr. 2 | 2018/19 | $1,448,300 |
| Phase-in Yr. 3 | 2019/20 | $1,448,300 |

## Tax Rates

The appropriate tax rates for the subject property are as follows:

### TAX RATES

| Jurisdiction | Rate |
|---|---|
| Montgomery County | $1.0129 /$100 of Assessment |
| State of Maryland | $0.1120 /$100 of Assessment |
| Total | $1.1249 /$100 of Assessment |

## Property Taxes

The real estate tax burden for the subject is calculated as follows:

### TAX CALCULATION

| | 2017/18 | 2018/19 | 2019/20 |
|---|---|---|---|
| Assessed Value | $1,448,300 | $1,448,300 | $1,448,300 |
| Times: Tax Rate/$100 | $1.1249 | $1.1249 | $1.1249 |
| Estimated Tax | $16,292 | $16,292 | $16,292 |

Appellees' Appendix 0143

## Metropolitan Charges

As the subject property is provided metropolitan services, a charge of $686 has been levied against it by Montgomery County for the 2017/18 levy year. It is estimated that these charges will remain relatively constant over a reasonable holding period.

## Summary of Taxes

|  | 2017/18 | 2018/19 | 2019/20 |
|---|---|---|---|
| Real Estate Taxes | $16,292 | $16,292 | $16,292 |
| Metropolitan Charges | $686 | $686 | $686 |
| Total Taxes Due | $16,978 | $16,978 | $16,978 |

## Conclusions

According to the Montgomery Tax Assessor's Office the subject's property taxes are current as of the date of value. The property's assessed value is above our indicated value conclusion.

Appellees' Appendix 0144

**6789 Goldsboro Road**



# Subject Strengths & Weaknesses

At this point, we pause to summarize the subject's strengths and weaknesses.

## Strengths

- The subject property is located in a largely built-out area in Bethesda consisting of single family homes with residents having above average income levels.

- Due to the size of the subject property, the site represents a small infill development with potential yield no more than eight townhouse lots.

## Weaknesses

- The property faces development challenges dues steep slopes, forest conservation areas, a stream which crosses the site, environmental concerns including a potential flood plain area and irregular topography.

These strengths and weaknesses were considered in our analysis and valuation of the subject property.

Appellees' Appendix 0145

**6789 Goldsboro Road**



# Highest and Best Use

The Highest and Best Use of a property is the reasonably probable and legal use of vacant land or an improved property that is: physically possible, appropriately supported, financially feasible, and that results in the highest value. These four conditions are discussed as follows:

### Physically Possible:
The subject property includes a single undivided lot with physical and environmental challenges which limit its development potential.

### Legally Permissible:
There is no approved site developed plan. Townhouse development must receive site plan approval under the Optional Method Development Standard utilizing cluster development, in order for the subject property to be a legal, conforming use.

### Financially Feasible:
The subject property is situated in Bethesda along the River Road corridor in Montgomery County. As previously indicated, demand is strong for housing in this portion of the county. Development of townhouse lots along the flat portion of the site situated along Goldsboro Road is most likely. This approach will hold development costs down and help create a financially feasible development.

### Maximally Productive:
Townhouse construction is maximally productive.

## Conclusion
Our analysis of the project indicates that highest and best use of the subject's site is townhouse construction. The most likely buyer of the subject property's townhouse lots is a local builder or developer. The most likely users are owner-occupied households upon completion of vertical improvements.

Appellees' Appendix 0146

6789 Goldsboro Road



# Appraisal Methodology

## Three Approaches to Value
There are three traditional approaches typically available to develop indications of real property value: the cost, sales comparison, and income capitalization approaches.

## Cost Approach
The cost approach is based upon the principle of substitution, which states that a prudent purchaser would not pay more for a property than the amount required to purchase a similar site and construct similar improvements without undue delay, producing a property of equal desirability and utility. This approach is particularly applicable when the improvements being appraised are relatively new or proposed, or when the improvements are so specialized that there is little or no sales data from comparable properties.

## Sales Comparison Approach
The sales comparison approach involves the direct comparison of sales and listings of similar properties, adjusting for differences between the subject property and the comparable properties. This method can be useful for valuing general purpose properties or vacant land. For improved properties, it is particularly applicable when there is an active sales market for the property type being appraised – either by owner-users or investors.

## Income Capitalization Approach
The income capitalization approach is based on the principle of anticipation, or the assumption that value is created by the expectation of benefits to be derived in the future, such as expected future income flows including the reversion, or future re-sale of the property appraised. Its premise is that a prudent investor will pay no more for the property than he or she would for another investment of similar risk and cash flow characteristics. The income capitalization approach is widely used and relied upon in appraising income-producing properties, especially those for which there is an active investment sales market.

## Subject Valuation
The subject includes a 5.46 acre site with potential for subdivision with up to eight townhouse lots. As such, the only applicable valuation method is the Sales Comparison Approach. We fully developed the Sales Comparison Approach to reflect bulk townhouse lot purchases in the market.

---

Appellees' Appendix 0147

6789 Goldsboro Road



# Sales Comparison Approach

## Introduction
The Sales Comparison Approach is developed to derive a market value for the subject property under its highest and best use as townhouse lots. However, there are currently no site plan approvals in place for any development at the subject property.

## Methodology
Land is most often valued using the Sales Comparison Approach. This approach is based on the premise that a buyer would pay no more for a specific property than the cost of obtaining a property with the same utility. In the sales comparison approach, the opinion of market value is based on closed sales, listings and pending sales of properties similar to the subject property, using the most relevant units of comparison. The comparative analysis focuses on the difference between the comparable sales and the subject property using all appropriate elements of comparison.

A systematic procedure for applying the sales comparison approach includes the following steps: (1) researching and verifying transactional data, (2) selecting relevant units of comparison, (3) analyzing and adjusting the comparable sales for differences in various elements of comparison, and (4) reconciling the adjusted sales into a value indication for the subject site.

## Unit of Comparison
The unit of comparison depends on land use economics and how buyers and sellers use the property. The unit of comparison for the residential lots in this analysis is the price paid per townhouse lot.

## Elements of Comparison
Elements of comparison are the characteristics or attributes of properties and transactions that cause the prices of real estate to vary. The main elements of comparison that are considered in sales comparison analysis are as follows: (1) real property rights conveyed, (2) financing terms, (3) conditions of sale, (4) expenditures made immediately after purchase, (5) market conditions, (6) location and (7) physical characteristics.

## Comparable Sales Data
A search of data sources and public records, a field survey, and interviews with knowledgeable real estate professionals in the area was conducted to obtain and verify sales of comparable townhouse lots. We used the sales summarized on the following pages in our analysis, as these sales are judged to be the most useful in developing an opinion of the market value of the subject property.

## 6789 Goldsboro Road



Summarized in the chart below are comparable land sales of sites which were developed with townhouses. We analyzed the comparable land sales to derive a market value for the subject property's site which has the potential to be subdivided into up to eight townhouse lots.

### COMPARABLE SALES SUMMARY – TOWNHOUSES

| Sale No. | Subject | 1 | 2 | 3 | 5 |
|---|---|---|---|---|---|
| Address | 6789 Goldsboro Road | 1902 Chapman Ave. | 3605 Chevy Chase Lake Dr. | 1166 Findley Road | 10435 Fernwood Road |
| City, State | Bethesda, MD | Rockville, MD | Chevy Chase, MD | Kensington, MD | Bethesda, MD |
| Date of Sale | | Nov-16 | Feb-16 | Sep-15 | Jun-15 |
| Sale Price | | $10,365,000 | $16,640,000 | $3,665,000 | $22,000,000 |
| No. of Lots | 8 | 61 | 62 | 26 | 168 |
| No. of MPDU Units | 0 | 9 | 10 | 4 | 21 |
| Lots Net of MPDU's | 8 | 52 | 52 | 22 | 147 |
| Lot Size (Sq.Ft.) | 1,690 | 720 | 1,073 | 1,205 | 1,050 |
| Lot Width (Ft.) | 26 | 18 | 24 | 23 | 22 |
| Price/Lot (Net of MPDU's) | | $199,327 | $320,000 | $166,591 | $149,660 |
| House Price | | Asking Price: Not Available | Asking Price: $1,500,000 | Asking Price: $570,000 | Asking Price: $775,000 |
| Lot-to-House Price Ratio | | n/a | 21.3% | 29.2% | 19.3% |

Appellees' Appendix 0149

6789 Goldsboro Road



## COMPARABLE SALES MAP



Appellees' Appendix 0150

**6789 Goldsboro Road**



## Land Comparable Sale No. 1



1902 Chapman Avenue Subdivision

### Property Identification

| | |
|---|---|
| Property/Sale ID | 111723/17211 |
| Property Type | Subdivision-Residential |
| Address | 1902 Chapman Avenue |
| City, State Zip | Rockville, Maryland 20852 |
| County | Montgomery |
| MSA | Washington, DC-MD-VA-WV |
| Tax ID | Tax Map GQ63, Subdivision 201, Block 5, Lot 16, Plat 25184 |
| Latitude/Longitude | 39.060199/-77.120010 |

### Transaction Data

| | |
|---|---|
| Sale Status | Closed |
| Sale Date | 11-17-2016 |
| Sale Price | $10,365,000 |
| Gross Land Acres | 2.407 |
| $/Gross Land Acre | $4,306,011 |
| Gross Land SF | 104,853 |
| $/Gross Land SF | $98.85 |
| No. of Lots | 61 |
| $/Lot | $169,918 |
| Grantor | 1900 Chapman Project Owner LLC |
| Grantee | Winchester Homes, Inc. |
| Property Rights | Fee Simple |
| Deed Book/Page | 53231/00406 |
| Financing Descrip. | None Recorded |

Appellees' Appendix 0151

## 6789 Goldsboro Road

### Property Description

| | | | |
|---|---|---|---|
| Gross Acres | 2.407 | Proposed Use | For Sale Townhouses |
| Gross SF | 104,853 | Utilities | All Available |
| No. of Lots | 61 | Zoning Code | MXTD |

### Verification

| | |
|---|---|
| Confirmed With | Co-Star, Assessment Records |

### Remarks

The site is located on east side of Chapman Avenue between Twinbrook Parkway, Thompson Avenue and CSX Railroad/WMATA right-of-way. It is also a short distance east of Rockville Pike and the nearby Twinbrook Metro stop. The site will contain 61 townhouse units. The townhouses will be 16 to 18 foot wide and 40 ft. deep with front loaded, two car garages. All site plan approvals were in place. The property was about 60% thru the process to ultimately obtain a building permit. There will be 9 MPDU units or about 15% of the total units. The adjacent parcel from which the subject was subdivided will contain 319 apartments on Lot 15.



1902 Chapman-Aerial

Appellees' Appendix 0152



**6789 Goldsboro Road**

## Land Comparable Sale No. 2



The Brownstones at Chevy Chase Lake Subdivision

### Property Identification

| | |
|---|---|
| Property/Sale ID | 111724/17212 |
| Property Type | Subdivision-Residential |
| Address | 3605 Chevy Chase Lake Drive |
| City, State Zip | Chevy Chase, Maryland 20815 |
| County | Montgomery |
| MSA | Washington, DC-MD-VA-WV |
| Tax ID | Tax Map HN43, Parcel E, Chevy Chase Lake Station, Plat 25182 |
| Latitude/Longitude | 38.995572/-77.073019 |

### Transaction Data

| | |
|---|---|
| Sale Status | Closed |
| Sale Date | 02-05-2016 |
| Sale Price | $16,640,000 |
| Gross Land Acres | 3.270 |
| $/Gross Land Acre | $5,088,685 |
| Gross Land SF | 142,441 |
| $/Gross Land SF | $116.82 |
| No. of Units | 62 |
| $/Unit | $268,387 |
| No. of Lots | 62 |
| $/Lot | $268,387 |
| Grantor | Chevy Chase Lake Development Corporation |
| Grantee | CC Homes Associates LLC |
| Property Rights | Fee Simple |
| Deed Book/Page | 51624/0347 |
| Financing Terms | Partially seller financed |

Appellees' Appendix 0153

## 6789 Goldsboro Road

### Property Description

| | | | |
|---|---|---|---|
| Gross Acres | 3.270 | Density (Units/Ac) | 18.96 |
| Gross SF | 142,441 | Proposed Use | For Sale Townhouses |
| No. of Units | 62 | Utilities | All Available |
| No. of Lots | 62 | Zoning Code | CRT-1.5 |

### Verification

| | |
|---|---|
| Confirmed With | SDAT/CoStar |

### Remarks

The grantor was the Housing Opportunities Commission of Montgomery County (HOC) which took back substantial financing in the transaction. The development to be built by EYA will contain 62 townhouses selling for $1,500,000 to $1,800,000 with 2,900 to 3,100 sq.ft. that will be 22-24 ft. wide with two car garages and elevators. There will be with 10 MPDU units selling in the low $200,000's. The property backs up to the Capital Crescent Trail and the proposed Purple Line.



Brownstones at Chevy Chase Lake Aerial

Appellees' Appendix 0154

**6789 Goldsboro Road**



## Land Comparable Sale No. 3



Kensington Overlook Subdivision

## Property Identification

| | |
|---|---|
| Property/Sale ID | 110121/16262 |
| Property Type | Subdivision-Residential |
| Address | 1166 Findley Road |
| City, State Zip | Kensington, Maryland 20895 |
| County | Montgomery |
| MSA | Washington, DC-MD-VA-WV |
| Tax ID | Tax Map HQ61 , Block G, Lots 1-26 and A-K, Plat 24829 |
| Latitude/Longitude | 39.036107/-77.060955 |

## Transaction Data

| | |
|---|---|
| Sale Status | Closed |
| Sale Date | 09-03-2015 |
| Sale Price | $3,665,000 |
| Gross Land Acres | 3.020 |
| $/Gross Land Acre | $1,213,576 |
| Gross Land SF | 131,551 |
| $/Gross Land SF | $27.86 |
| No. of Units | 26 |
| $/Unit | $140,962 |
| No. of Lots | 26 |
| $/Lot | $140,962 |
| Grantor | Wheaton Land Investment, LLC |
| Grantee | K. Hovanian Homes of Maryland, LLC |
| Property Rights | Fee Simple |
| Deed Book/Page | 51096/17 |
| Financing Descrip. | None recorded |
| Financing Terms | None |

Appellees' Appendix 0155

**6789 Goldsboro Road**

## Property Description

| | | | |
|---|---|---|---|
| Gross Acres | 3.020 | Density (Units/Ac) | 8.61 |
| Gross SF | 131,551 | Proposed Use | 25 TH & 1 SFD |
| No. of Units | 26 | Zoning Code | RT-8 |
| No. of Lots | 26 | | |

## Verification

| | |
|---|---|
| Confirmed With | Seller, DAIC, Deed |

## Remarks

DAIC indicates the location of Kensington Heights as being at the SW corner of University Boulevard West and Valley View Avenue

The property description in the deed is lengthy. Refer to the deed for more information. The seller indicated that these were engineered and recorded lots at the time of sale. They were not finished lots. The seller confirmed that this is the sale of 25 single family attached lots and 1 single family home lot. At the time of sale the lots were recorded and the development approved/entitled. The site was lightly wooded and level to gently rolling. Site development work commenced within a month of the sale. All utilities were available along University Boulevard and Valley View. The TH units are being marketed in early 2016 for a base price of $570,000 containing 1,900 to 2,000sq.ft., with lots widths ranging from 21 to 24 foot. There are 4 MPDU units selling in the $170,000's. Property was subsequently marketed as Kensington Overlook.



Kensington Overlook Aerial

Appellees' Appendix 0156

6789 Goldsboro Road



## Land Comparable Sale No. 4



Montgomery Row at Rock Spring Subdivision

## Property Identification

| | |
|---|---|
| Property/Sale ID | 108169/15134 |
| Property Type | Residential (Single-Family) |
| Address | 10435 Fernwood Road |
| City, State Zip | Bethesda, Maryland 20817 |
| County | Montgomery |
| MSA | Washington, DC-MD-VA-WV |
| Tax ID | Map GP43, Lot P5 in Rock Spring Park, Plat 24078 |
| Latitude/Longitude | 39.026141/-77.138760 |

## Transaction Data

| | |
|---|---|
| Sale Status | Closed |
| Sale Date | 06-15-2015 |
| Sale Price | $22,000,000 |
| Gross Land Acres | 9.070 |
| $/Gross Land Acre | $2,425,579 |
| Gross Land SF | 395,089 |
| $/Gross Land SF | $55.68 |
| No. of Lots | 168 |
| $/Lot | $130,952 |
| Grantor | Rock Spring III, IV & V LLC (Founders) |
| Grantee | RS Homes Associates (EYA) |
| Property Rights | Fee Simple |
| Deed Book/Page | 50481/301 |
| Days on Market | Unknown |
| Financing Descrip. | Cash to grantor |
| Financing Terms | Conventional |

Appellees' Appendix 0157

### 6789 Goldsboro Road

#### Property Description

| | | | |
|---|---|---|---|
| Gross Acres | 9.070 | Proposed Use | Residential |
| Gross SF | 395,089 | Utilities | Available |
| No. of Lots | 168 | Zoning Code | I-3 |

#### Verification

| | |
|---|---|
| Confirmed With | Kevin McGloon, Cushman |

#### Remarks

This vacant parcel is is situated in the Rock Spring office park and was approved for 440,000 sq.ft. of office space. The sellers (Founders) were asking $50/FAR, but were unable to obtain an office user for the site. Founders shifted its buyer pool and went residential. EYA is the buyer who will improve the site with 168 townhouses (21 MPDU & 147 market rate) with prices ranging from-$770,000 to $1,050,000 and containing 1,800 to 2,700sq.ft. of improvements and 20 to 22 foot wide. The MPDU units are selling for the low $200,000's. The site has roughly eight developable acres, but was able to obtain a density based on 17 acres based on the area of the larger Rock Spring Park project. The property was under contract for 3.5 years while approvals were obtained. Approximately 1.5 acres along Fernwood Road will be dedicated to Montgomery County for the North Bethesda Transitway. The site is bound by Rockledge Drive on the west, Fernwood Road on the south, and Rock Spring Drive on the east. As of mid-2017 it was reported the community was 50% sold out.



Montgomery Row at Rock Spring-Aerial

Appellees' Appendix 0158

**6789 Goldsboro Road**



## Analysis of Comparable Land Sales – Townhouse Lots

In developing an estimate of land value, we investigated transactions of bulk townhouse lots located within somewhat comparable locations in Montgomery County. From our investigations, we obtained information on numerous sales, the most pertinent of which are summarized on the previous pages. We compared these sales to each other and to the subject and made adjustments for significant differences including location, conditions of sale, physical characteristics including lot size and width and any other significant differences. The characteristics of the comparable land sales in relation to the subject property are discussed in the following paragraphs. Our analysis of the comparable sales is summarized below.

### Transaction Adjustments

Transaction adjustments include 1) real property rights conveyed, 2) financing terms, 3) conditions of sale, 4) expenditures made immediately after purchase, and 5) market conditions.

#### Property Rights

All of the comparable sales reflect fee simple property rights as does the subject property.

#### Financing

Comparable Sale No. 2 was adjusted upward for financing provided to support the transaction by the grantor the Housing Opportunities Commission of Montgomery County (HOC) which affected the transaction.

#### Conditions of Sale/Motivation

None of the comparable sales were affected by the conditions of sale or motivation of the grantor.

#### Anticipated Expenditures

All of the comparable sales have approved site plans unlike the subject property's raw condition with no approvals in place. This necessitated each property undergoing the approval process which defined the number of approved lots and added significant value to each comparable sale.

#### Market Conditions/Time

Comparable Sale No. 4 was adjusted upward for market conditions to reflect its long contract period and the subsequent improvements in the residential markets.

### Property Adjustments

Property adjustments are based on locational, lot size and lot width adjustments and are applied after the application of transactional adjustments.

#### Location/Amenities

Comparable Sale Nos. 1, 3 and 4 were adjusted upward for their inferior locations in comparison to the subject property's Goldsboro Road location along the River road corridor. Comparable No. 2 was adjusted downward for a superior Chevy Chase location.

#### Lot Size

Based upon the surrounding neighborhood characteristics and that of the site, the appraiser assumes the subject's lot sizes to be above average in size and at a minimum to measure 26 foot wide by 65 foot deep, resulting in a lot containing 1,690sq.ft. Upward adjustments were therefore made to all of the comparable sales for their inferior lot size.

---

Appellees' Appendix 0159

**6789 Goldsboro Road**

Lot Width
The subject's lot widths at 26ft. are also assumed to have the greatest width based upon its location and the high end townhouse product envisioned for the site. We adjusted Comparable Sales Nos. 1, 2, 3 and 4 upward for their inferior lot width.

## Summary of Adjustments & Conclusion: Townhouse Lots

Based on the preceding comparative analysis, adjustments made to the comparable sales are summarized on the summary chart found on the following page. The analysis of comparable sales suggests a raw lot price (without site plan approval) ranging between $154,930 and $165,391 for the subject's proposed townhouse lots.

We conclude an average raw townhouse lot value without any site plan approvals at $165,000/lot for the subject's proposed townhouse lots ranging from 6 to 8 lots. This results in a market value ranging from **$1,000,000 to $1,325,000.**

Found on the following page is an adjustment grid which reflects that all of the comparable townhouse lot sales have site plan approvals in place, in comparison to the subject property's totally raw condition with no site plan approvals.

Appellees' Appendix 0160

**6789 Goldsboro Road**



## SUMMARY OF ADJUSTMENTS

| Sale No. | Subject | 1 | 2 | 3 | 4 |
|---|---|---|---|---|---|
| Address | 6789 Goldsboro Road | 1902 Chapman Ave. | 3605 Chevy Chase Lake Dr. | 1166 Findley Rd. | 10435 Fernwood Rd. |
| Subdivision | | Chapman Ave. | Brownstones at Chevy Chase Lake | Kensington Overlook | Montgomery Row at Rock Spring |
| City | Bethesda | Rockville | Chevy Chase | Kensington | Bethesda |
| Date of Sale | Aug-17 | Nov-16 | Feb-16 | Sep-15 | Jun-15 |
| Sale Price/Lot | | $199,327 | $320,000 | $166,591 | $149,660 |
| No. of Lots | 8 | 52 | 52 | 22 | 147 |
| Typical Width (Ft.) | 26 | 18 | 24 | 23 | 22 |
| Typical Size (Sq.Ft.) | 1,690 | 720 | 1,073 | 1,205 | 1,050 |
| **Transactional Adjustments** | | | | | |
| Property Rights | | 0% | 0% | 0% | 0% |
| Financing | | 0% | -15% | 0% | 0% |
| Conditions of Sale/Motivation | | 0% | 0% | 0% | 0% |
| Anticipated Expenditures | | -40% | -40% | -40% | -40% |
| Market Conditions/Time | | 0% | 0% | 0% | 20% |
| **Adjusted Sales Price** | | $119,596 | $144,000 | $99,955 | $119,728 |
| **Property Adjustments** | | | | | |
| Location/Amenities | | 10% | -5% | 40% | 15% |
| Lot Size | | 20% | 15% | 10% | 15% |
| Lot Width | | 15% | 5% | 5% | 10% |
| Composite Adjustment | | -13% | -48% | -7% | 12% |
| Total Adjusted Price/Lot | | $173,414 | $165,600 | $154,930 | $167,619 |

| | |
|---|---|
| Minimum Adjusted Price | $154,930 |
| Maximum Adjusted Price | $173,414 |
| Average Adjusted Price | $165,391 |

Appellees' Appendix 0161

6789 Goldsboro Road



# Conclusion

## Summary of Value Indications

The Sales Comparison Approach was developed to derive market value, as is, of the subject property. We have developed the value conclusion in a range to reflect the subject property's raw condition and the fact that the site plan approval process faces challenges based upon the site's severe topography and other critical factors. The summary chart below summarizes our final value conclusion for the property, developed within a range.

### VALUE CONCLUSION

| Value Premise | Interest Appraised | Effective Date | Indicated Value Range |
|---|---|---|---|
| As Is | Fee Simple | July 3, 2017 | $1,000,000 to $1,325,000 |

## Exposure Time and Marketing Periods'

As part of the appraisal process, it is necessary to estimate the exposure time for the subject property. The Appraisal Institute defines exposure time as "the estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale on the effective date of the appraisal; a retrospective estimate based upon an analysis of past events assuming a competitive and open market".

The definition assumes that the property was actively exposed and aggressively marketed to potential purchasers through marketing channels commonly used by sellers of similar type properties. The definition also assumes that the property was offered at a price reflecting the most probable mark-up over market value and that a sale was consummated under the terms and conditions of the definition of market value required by the regulation.

In estimating the subject's exposure time, we considered current economic and real estate market conditions and information from brokers and other market participants. We focused on market conditions existing prior to and as of the effective date of this appraisal. After a significant decline in the residential market, conditions in the subject's market have stabilized and demand for residential properties has increased.

The subject must be realistically priced in order to be marketable. Our analysis of the property is based on current market conditions and the outlook of today's buyers. It is our opinion that the subject property would be attractive to land developers and could be sold within a period of 12 months, if reasonably priced. If the property is not priced reflective of today's market, it likely will not sell.

Based on this analysis, it is concluded that the subject's exposure time would be 12 months. This opinion assumes that the property is priced consistent with your appraisers' opinion of market value and marketed through normal channels. A change in market conditions is not foreseen for at least 24 months for this type of development property. Therefore, the marketing time for the subject property is also 12 months.

Appellees' Appendix 0162

**6789 Goldsboro Road**



# General Assumptions and Limiting Conditions

This appraisal is subject to the following limiting conditions:

1) The legal description – if furnished to us – is assumed to be correct.

2) No responsibility is assumed for legal matters, questions of survey or title, soil or subsoil conditions, engineering, availability or capacity of utilities, or other similar technical matters. The appraisal does not constitute a survey of the property appraised. All existing liens and encumbrances have been disregarded and the property is appraised as though free and clear, under responsible ownership and competent management unless otherwise noted.

3) Unless otherwise noted, the appraisal will value the property as though free of contamination. Lipman Frizzell & Mitchell LLC will conduct no hazardous materials or contamination inspection of any kind. It is recommended that the client hire an expert if the presence of hazardous materials or contamination poses any concern.

4) The stamps and/or consideration placed on deeds used to indicate sales are in correct relationship to the actual dollar amount of the transaction.

5) Unless otherwise noted, it is assumed there are no encroachments, zoning violations or restrictions existing in the subject property.

6) The appraiser is not required to give testimony or attendance in court by reason of this appraisal, unless previous arrangements have been made.

7) Unless expressly specified in the engagement letter, the fee for this appraisal does not include the attendance or giving of testimony by Appraiser at any court, regulatory, or other proceedings, or any conferences or other work in preparation for such proceeding. If any partner or employee of Lipman Frizzell & Mitchell LLC is asked or required to appear and/or testify at any deposition, trial, or other proceeding about the preparation, conclusions or any other aspect of this assignment, client shall compensate Appraiser for the time spent by the partner or employee in appearing and/or testifying and in preparing to testify according to the Appraiser's then current hourly rate plus reimbursement of expenses.

8) The values for land and/or improvements, as contained in this report, are constituent parts of the total value reported and neither is (or are) to be used in making a summation appraisal of a combination of values created by another appraiser. Either is invalidated if so used.

9) The dates of value to which the opinions expressed in this report apply are set forth in this report. We assume no responsibility for economic or physical factors occurring at some point at a later date, which may affect the opinions stated herein. The forecasts, projections, or operating estimates contained herein are based on current market conditions and anticipated short-term supply and demand factors and are subject to change with future conditions.

10) The sketches, maps, plats and exhibits in this report are included to assist the reader in visualizing the property. The appraiser has made no survey of the property and assumed no responsibility in connection with such matters.

Appellees' Appendix 0163

11) The information, estimates and opinions, which were obtained from sources outside of this office, are considered reliable. However, no liability for them can be assumed by the appraiser.

12) Possession of this report, or a copy thereof, does not carry with it the right of publication. Neither all, nor any part of the content of the report, or copy thereof (including conclusions as to property value, the identity of the appraisers, professional designations, reference to any professional appraisal organization or the firm with which the appraisers are connected), shall be disseminated to the public through advertising, public relations, news, sales, or other media without prior written consent and approval.

13) No claim is intended to be expressed for matters of expertise that would require specialized investigation or knowledge beyond that ordinarily employed by real estate appraisers. We claim no expertise in areas such as, but not limited to, legal, survey, structural, environmental, pest control, mechanical, etc.

14) This appraisal was prepared for the sole and exclusive use of the client for the function outlined herein. Any party who is not the client or intended user identified in the appraisal or engagement letter is not entitled to rely upon the contents of the appraisal without express written consent of Lipman Frizzell & Mitchell LLC and Client. The Client shall not include partners, affiliates, or relatives of the party addressed herein. The appraiser assumes no obligation, liability or accountability to any third party.

15) Distribution of this report is at the sole discretion of the client, but third-parties not listed as an intended user on the face of the appraisal or the engagement letter may not rely upon the contents of the appraisal. In no event shall client give a third-party a partial copy of the appraisal report. We will make no distribution of the report without the specific direction of the client.

16) This appraisal shall be used only for the function outlined herein, unless expressly authorized by Lipman Frizzell & Mitchell LLC.

17) This appraisal shall be considered in its entirety. No part thereof shall be used separately or out of context.

18) Unless otherwise noted in the body of this report, this appraisal assumes that the subject property does not fall within the areas where mandatory flood insurance is effective. Unless otherwise noted, we have not completed nor have we contracted to have completed an investigation to identify and/or quantify the presence of non-tidal wetland conditions on the subject property. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

19) The flood maps are not site specific. We are not qualified to confirm the location of the subject property in relation to flood hazard areas based on the FEMA Flood Insurance Rate Maps or other surveying techniques. It is recommended that the client obtain a confirmation of the subject's flood zone classification from a licensed surveyor.

20) If the appraisal is for mortgage loan purposes 1) we assume satisfactory completion of improvements if construction is not complete, 2) no consideration has been given for rent loss during rent-up unless noted in the body of this report, and 3) occupancy at levels consistent with our "Income and Expense Projection" are anticipated.

Appellees' Appendix 0164

## 6789 Goldsboro Road



21) It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures which would render it more or less valuable. No responsibility is assumed for such conditions or for engineering which may be required to discover them.

22) Our inspection included an observation of the land and improvements thereon only. It was not possible to observe conditions beneath the soil or hidden structural components within the improvements. We inspected the buildings involved, and reported damage (if any) by termites, dry rot, wet rot, or other infestations as a matter of information, and no guarantee of the amount or degree of damage (if any) is implied. Condition of heating, cooling, ventilation, electrical and plumbing equipment is considered to be commensurate with the condition of the balance of the improvements unless otherwise stated. Should the client have concerns in these areas, it is the client's responsibility to order the appropriate inspections. The appraiser does not have the skill or expertise to make such inspections and assumes no responsibility for these items.

23) This appraisal does not guarantee compliance with building code and life safety code requirements of the local jurisdiction. It is assumed that all required licenses, consents, certificates of occupancy or other legislative or administrative authority from any local, state or national governmental or private entity or organization have been or can be obtained or renewed for any use on which the value conclusion contained in this report is based unless specifically stated to the contrary.

24) When possible, we have relied upon building measurements provided by the client, owner, or associated agents of these parties. In the absence of a detailed rent roll, reliable public records, or "as-built" plans provided to us, we have relied upon our own measurements of the subject improvements. We follow typical appraisal industry methods; however, we recognize that some factors may limit our ability to obtain accurate measurements including, but not limited to, property access on the day of inspection, basements, fenced/gated areas, grade elevations, greenery/shrubbery, uneven surfaces, multiple story structures, obtuse or acute wall angles, immobile obstructions, etc. Professional building area measurements of the quality, level of detail, or accuracy of professional measurement services are beyond the scope of this appraisal assignment.

25) We have attempted to reconcile sources of data discovered or provided during the appraisal process, including assessment department data. Ultimately, the measurements that are deemed by us to be the most accurate and/or reliable are used within this report. While the measurements and any accompanying sketches are considered to be reasonably accurate and reliable, we cannot guarantee their accuracy. Should the client desire a greater level of measuring detail, they are urged to retain the measurement services of a qualified professional (space planner, architect or building engineer). We reserve the right to use an alternative source of building size and amend the analysis, narrative and concluded values (at additional cost) should this alternative measurement source reflect or reveal substantial differences with the measurements used within the report.

26) In the absence of being provided with a detailed land survey, we have used assessment department data to ascertain the physical dimensions and acreage of the property. Should a survey prove this information to be inaccurate, we reserve the right to amend this appraisal (at additional cost) if substantial differences are discovered.

27) If only preliminary plans and specifications were available for use in the preparation of this appraisal, then this appraisal is subject to a review of the final plans and specifications when available (at additional cost) and we reserve the right to amend this appraisal if substantial differences are discovered.

Appellees' Appendix 0165

28) Unless otherwise stated in this report, the value conclusion is predicated on the assumption that the property is free of contamination, environmental impairment or hazardous materials. Unless otherwise stated, the existence of hazardous material was not observed by the appraiser and the appraiser has no knowledge of the existence of such materials on or in the property. The appraiser, however, is not qualified to detect such substances. The presence of substances such as asbestos, urea-formaldehyde foam insulation, or other potentially hazardous materials may affect the value of the property. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required for discovery. The client is urged to retain an expert in this field, if desired.

29) The Americans with Disabilities Act ("ADA") became effective January 26, 1992. We have not made a specific compliance survey of the property to determine if it is in conformity with the various requirements of the ADA. It is possible that a compliance survey of the property, together with an analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act. If so, this could have a negative effect on the value of the property. Since we have no direct evidence relating to this issue, we did not consider possible noncompliance with the requirements of ADA in developing an opinion of value.

30) This appraisal applies to the land and building improvements only. The value of trade fixtures, furnishings, and other equipment, or subsurface rights (minerals, gas, and oil) were not considered in this appraisal unless specifically stated to the contrary.

31) No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated, unless specifically stated to the contrary.

32) Any estimate of insurable value, if included within the scope of work and presented herein, is based upon figures developed consistent with industry practices. However, actual local and regional construction costs may vary significantly from our estimate and individual insurance policies and underwriters have varied specifications, exclusions, and non-insurable items. As such, we strongly recommend that the Client obtain estimates from professionals experienced in establishing insurance coverage. This analysis should not be relied upon to determine insurance coverage and we make no warranties regarding the accuracy of this estimate.

33) The data gathered in the course of this assignment (except data furnished by the Client) shall remain the property of the Appraiser. The appraiser will not violate the confidential nature of the appraiser-client relationship by improperly disclosing any confidential information furnished to the appraiser. Notwithstanding the foregoing, the Appraiser is authorized by the client to disclose all or any portion of the appraisal and related appraisal data to appropriate representatives of the Appraisal Institute if such disclosure is required to enable the appraiser to comply with the Bylaws and Regulations of such Institute now or hereafter in effect.

34) Acceptance and/or use of this appraisal report constitutes acceptance of the foregoing general assumptions and limiting conditions.

Appellees' Appendix 0166

**6789 Goldsboro Road**



# Certification

I certify that, to the best of my knowledge and belief:

1.  The statements of fact contained in this report are true and correct.

2.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3.  I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4.  I have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of the appraisal within the three-year period immediately preceding acceptance of this assignment.

5.  I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6.  My engagement in this assignment was not contingent upon developing or reporting predetermined results.

7.  My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8.  My analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

9.  M. Ronald Lipman, MAI made a personal inspection of the property that is the subject of this report.

10. No one provided significant real property appraisal assistance to the person signing this certification.

11. The reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

12. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

13. As of the date of this report, I, M. Ronald Lipman, MAI have completed the continuing education program for Designated Members of the Appraisal Institute.

M. Ronald Lipman, MAI
Principal
Maryland License #04-1072
License Expires December 31, 2018

Appellees' Appendix 0167

6789 Goldsboro Road

# Certification

I certify that, to the best of my knowledge and belief:

1.  The statements of fact contained in this report are true and correct.

2.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3.  I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4.  I have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of the appraisal within the three-year period immediately preceding acceptance of this assignment.

5.  I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6.  My engagement in this assignment was not contingent upon developing or reporting predetermined results.

7.  My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8.  My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

9.  Sheldon A. Stern, MAI made a personal inspection of the property that is the subject of this report.

10. No one provided significant real property appraisal assistance to the person signing this certification.

11. The reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

12. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

13. As of the date of this report, I, Sheldon A. Stern, MAI have completed the continuing education program for Designated Members of the Appraisal Institute.

Sheldon A. Stern, MAI
Senior Appraiser
Maryland License #04-1976
License Expires January 14, 2019

Appellees' Appendix 0168

6789 Goldsboro Road



# Addenda

Glossary
Abstract of Operating Agreement
Qualifications
      M. Ronald Lipman, MAI - Principal
      Sheldon A. stern, MAI- Senior Appraiser
Client List

Appellees' Appendix 0169



**6789 Goldsboro Road**

## Glossary

Definitions are taken from the Dictionary of Real Estate Appraisal, 5th Edition (Dictionary), the Uniform Standards of Professional Appraisal Practice (USPAP) and Building Owners and Managers Association International (BOMA).

**Absolute Net Lease**
A lease in which the tenant pays all expenses including structural maintenance, building reserves, and management; often a long-term lease to a credit tenant. (Dictionary)

**Additional Rent**
Any amounts due under a lease that is in addition to base rent. Most common form is operating expense increases. (Dictionary)

**Amortization**
The process of retiring a debt or recovering a capital investment, typically though scheduled, systematic repayment of the principal; a program of periodic contributions to a sinking fund or debt retirement fund. (Dictionary)

**As Is Market Value**
The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date. (Dictionary)

**Base (Shell) Building**
The existing shell condition of a building prior to the installation of tenant improvements. This condition varies from building to building, landlord to landlord, and generally involves the level of finish above the ceiling grid. (Dictionary)

**Base Rent**
The minimum rent stipulated in a lease. (Dictionary)

**Base Year**
The year on which escalation clauses in a lease are based. (Dictionary)

**Building Common Area**
The areas of the building that provide services to building tenants but which are not included in the rentable area of any specific tenant. These areas may include, but shall not be limited to, main and auxiliary lobbies, atrium spaces at the level of the finished floor, concierge areas or security desks, conference rooms, lounges or vending areas food service facilities, health or fitness centers, daycare facilities, locker or shower facilities, mail rooms, fire control rooms, fully enclosed courtyards outside the exterior walls, and building core and service areas such as fully enclosed mechanical or equipment rooms. Specifically excluded from building common areas are; floor common areas, parking spaces, portions of loading docks outside the building line, and major vertical penetrations. (BOMA)

**Building Rentable Area**
The sum of all floor rentable areas. Floor rentable area is the result of subtracting from the gross measured area of a floor the major vertical penetrations on that same floor. It is generally fixed for the life of the building and is rarely affected by changes in corridor size or configuration. (BOMA)

**Certificate of Occupancy (COO)**
A statement issued by a local government verifying that a newly constructed building is in compliance with all codes and may be occupied.

**Common Area (Public) Factor**
In a lease, the common area (public) factor is the multiplier to a tenant's useable space that accounts for the tenant's proportionate share of the common area (restrooms, elevator lobby, mechanical rooms, etc.). The public factor is usually expressed as a percentage and ranges from a low of 5 percent for a full tenant to as high as 15 percent or more for a multi-tenant floor. Subtracting one (1) from the quotient of the rentable area divided by the useable area yields the load (public) factor. At times confused with the "loss factor" which is the total rentable area of the full floor less the useable area divided by the rentable area. (BOMA)

**Common Area Maintenance (CAM)**
The expense of operating and maintaining common areas; may or may not include management charges and usually does not include capital expenditures on tenant improvements or other improvements to the property.

Appellees' Appendix 0170

CAM can be a line-item expense for a group of items that can include maintenance of the parking lot and landscaped areas and sometimes the exterior walls of the buildings. CAM can refer to all operating expenses.

CAM can refer to the reimbursement by the tenant to the landlord for all expenses reimbursable under the lease. Sometimes reimbursements have what is called an administrative load. An example would be a 15 percent addition to total operating expenses, which are then prorated among tenants. The administrative load, also called an administrative and marketing fee, can be a substitute for or an addition to a management fee. (Dictionary)

## Condominium
A form of ownership in which each owner possesses the exclusive right to use and occupy an allotted unit plus an undivided interest in common areas.

A multiunit structure, or a unit within such a structure, with a condominium form of ownership. (Dictionary)

## Conservation Easement
An interest in real property restricting future land use to preservation, conservation, wildlife habitat, or some combination of those uses. A conservation easement may permit farming, timber harvesting, or other uses of a rural nature to continue, subject to the easement. In some locations, a conservation easement may be referred to as a conservation restriction. (Dictionary)

## Contributory Value
The change in the value of a property as a whole, whether positive or negative, resulting from the addition or deletion of a property component. Also called deprival value in some countries. (Dictionary)

## Debt Coverage Ratio (DCR)
The ratio of net operating income to annual debt service (DCR = NOI/Im), which measures the relative ability to a property to meet its debt service out of net operating income. Also called Debt Service Coverage Ratio (DSCR). A larger DCR indicates a greater ability for a property to

withstand a downturn in revenue, providing an improved safety margin for a lender. (Dictionary)

## Deed Restriction
A provision written into a deed that limits the use of land. Deed restrictions usually remain in effect when title passes to subsequent owners. (Dictionary)

## Depreciation
In appraising, the loss in a property value from any cause; the difference between the cost of an improvement on the effective date of the appraisal and the market value of the improvement on the same date. 2) In accounting, an allowance made against the loss in value of an asset for a defined purpose and computed using a specified method. (Dictionary)

## Disposition Value
The most probable price that a specified interest in real property is likely to bring under the following conditions:

1) Consummation of a sale within a exposure time specified by the client; 2) The property is subjected to market conditions prevailing as of the date of valuation; 3) Both the buyer and seller are acting prudently and knowledgeably; 4) The seller is under compulsion to sell; 5) The buyer is typically motivated; 6) Both parties are acting in what they consider to be their best interests; 7) An adequate marketing effort will be made during the exposure time specified by the client; 8)Payment will be made in cash in U.S. dollars or in terms of financial arrangements comparable thereto; and 9) The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. (Dictionary)

## Easement
The right to use another's land for a stated purpose. (Dictionary)

## EIFS
Exterior Insulation Finishing System. This is a type of exterior wall cladding system. Sometimes referred to as dry-vit.

Appellees' Appendix 0171

## 6789 Goldsboro Road

**Effective Date**
The date at which the analyses, opinions, and advice in an appraisal, review, or consulting service apply. 2) In a lease document, the date upon which the lease goes into effect. (Dictionary)

**Effective Gross Income (EGI)**
The anticipated income from all operations of the real property after an allowance is made for vacancy and collection losses and an addition is made for any other income. (Dictionary)

**Effective Rent**
The rental rate net of financial concessions such as periods of no rent during the lease term and above- or below-market tenant improvements (TIs). (Dictionary)

**EPDM**
Ethylene Diene Monomer Rubber. A type of synthetic rubber typically used for roof coverings. (Dictionary)

**Escalation Clause**
A clause in an agreement that provides for the adjustment of a price or rent based on some event or index. e.g., a provision to increase rent if operating expenses increase; also called an expense recovery clause or stop clause. (Dictionary)

**Estoppel Certificate**
A statement of material factors or conditions of which another person can rely because it cannot be denied at a later date. In real estate, a buyer of rental property typically requests estoppel certificates from existing tenants. Sometimes referred to as an estoppel letter. (Dictionary)

**Excess Land**
Land that is not needed to serve or support the existing improvement. The highest and best use of the excess land may or may not be the same as the highest and best use of the improved parcel. Excess land may have the potential to be sold separately and is valued separately. (Dictionary)

**Expense Stop**
A clause in a lease that limits the landlord's expense obligation, which results in the lessee paying any operating expenses above a stated level or amount. (Dictionary)

**Exposure Time**

1) The time a property remains on the market. 2) The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective estimate based on an analysis of past events assuming a competitive and open market. (Dictionary)

**Extraordinary Assumption**
An assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions. Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property such as market conditions or trends; or about the integrity of data used in an analysis. (Dictionary)

**Fee Simple Estate**
Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat. (Dictionary)

**Floor Common Area**
Areas on a floor such as washrooms, janitorial closets, electrical rooms, telephone rooms, mechanical rooms, elevator lobbies, and public corridors which are available primarily for the use of tenants on that floor. (BOMA)

**Full Service (Gross) Lease**
A lease in which the landlord receives stipulated rent and is obligated to pay all of the property's operating and fixed expenses; also called a full service lease. (Dictionary)

**Going Concern Value**
The market value of all the tangible and intangible assets of an established and operating business with an indefinite life, as if sold in aggregate; more accurately termed the market value of the going concern.

The value of an operating business enterprise. Goodwill may be separately measured but is an integral component of going-concern value when it exists and is recognizable. (Dictionary)

Appellees' Appendix 0172

## 6789 Goldsboro Road



### Gross Building Area
The total constructed area of a building. It is generally not used for leasing purposes (BOMA)

### Gross Measured Area
The total area of a building enclosed by the dominant portion (the portion of the inside finished surface of the permanent outer building wall which is 50 percent or more of the vertical floor-to-ceiling dimension, at the given point being measured as one moves horizontally along the wall), excluding parking areas and loading docks (or portions of the same) outside the building line. It is generally not used for leasing purposes and is calculated on a floor by floor basis. (BOMA)

### Gross Up Method
A method of calculating variable operating expense in income-producing properties when less than 100 percent occupancy is assumed. The gross up method approximates the actual expense of providing services to the rentable area of a building given a specified rate of occupancy. (Dictionary)

### Gross Retail Sellout
The sum of the appraised values of the individual units in a subdivision, as if all of the units were completed and available for retail sale, as of the date of the appraisal. The sum of the retail sales includes an allowance for lot premiums, if applicable, but excludes all allowances for carrying costs. (Dictionary)

### Ground Lease
A lease that grants the right to use and occupy land. Improvements made by the ground lessee typically revert to the ground lessor at the end of the lease term. (Dictionary)

### Ground Rent
The rent paid for the right to use and occupy land according to the terms of a ground lease; the portion of the total rent allocated to the underlying land. (Dictionary)

### HVAC
Heating, ventilation, air conditioning. A general term encompassing any system designed to heat and cool a building in its entirety.

### Highest and Best Use
The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are 1) legal permissibility, 2) physical possibility, 3) financial feasibility, and 4) maximally profitability. Alternatively, the probable use of land or improved –specific with respect to the user and timing of the use–that is adequately supported and results in the highest present value. (Dictionary)

### Hypothetical Condition
That which is contrary to what exists but is supposed for the purpose of analysis. Hypothetical conditions assume conditions contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis. (Dictionary)

### Industrial Gross Lease
A lease of industrial property in which the landlord and tenant share expenses. The landlord receives stipulated rent and is obligated to pay certain operating expenses, often structural maintenance, insurance and real estate taxes as specified in the lease. There are significant regional and local differences in the use of this term. (Dictionary)

### Insurable Value
A type of value for insurance purposes. (Dictionary)
(Typically this includes replacement cost less basement excavation, foundation, underground piping and architect's fees).

### Investment Value
The value of a property interest to a particular investor or class of investors based on the investor's specific requirements. Investment value may be different from market value because it depends on a set of investment criteria that are not necessarily typical of the market. (Dictionary)

### Just Compensation
In condemnation, the amount of loss for which a property owner is compensated when his or her property is taken. Just compensation should put the owner in as good a position as he or she would be if the property had not been taken. (Dictionary)

Appellees' Appendix 0173

## 6789 Goldsboro Road

### Leased Fee Interest
A freehold (ownership interest) where the possessory interest has been granted to another party by creation of a contractual landlord-tenant relationship (i.e., a lease). (Dictionary)

### Leasehold Interest
The tenant's possessory interest created by a lease. (Dictionary)

### Lessee (Tenant)
One who has the right to occupancy and use of the property of another for a period of time according to a lease agreement. (Dictionary)

### Lessor (Landlord)
One who conveys the rights of occupancy and use to others under a lease agreement. (Dictionary)

### Liquidation Value
The most probable price that a specified interest in real property should bring under the following conditions:

1) Consummation of a sale within a short period.
2) The property is subjected to market conditions prevailing as of the date of valuation.
3) Both the buyer and seller are acting prudently and knowledgeably.
4) The seller is under extreme compulsion to sell.
5) The buyer is typically motivated.
6) Both parties are acting in what they consider to be their best interests.
7) A normal marketing effort is not possible due to the brief exposure time.
8) Payment will be made in cash in U.S. dollars or in terms of financial arrangements comparable thereto.

The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. (Dictionary)

### Loan to Value Ratio (LTV)
The amount of money borrowed in relation to the total market value of a property. Expressed as a percentage of the loan amount divided by the property value. (Dictionary)

### Major Vertical Penetrations
Stairs, elevator shafts, flues, pipe shafts, vertical ducts, and the like, and their enclosing walls. Atria, lightwells and similar penetrations above the finished floor are included in this definition. Not included, however, are vertical penetrations built for the private use of a tenant occupying office areas on more than one floor. Structural columns, openings for vertical electric cable or telephone distribution, and openings for plumbing lines are not considered to be major vertical penetrations. (BOMA)

### Market Rent
The most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement including permitted uses, use restrictions, expense obligations; term, concessions, renewal and purchase options and tenant improvements (TIs). (Dictionary)

### Market Value
The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:
a. Buyer and seller are typically motivated;
b. Both parties are well informed or well advised, and acting in what they consider their own best interests;
c. A reasonable time is allowed for exposure in the open market;
d. Payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto; and
e. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

### Market Value As If Complete
Market value as if complete means the market value of the property with all proposed construction, conversion or rehabilitation hypothetically completed or under other specified hypothetical conditions as of the date of the appraisal. With regard to properties wherein anticipated market conditions indicate that stabilized occupancy is not likely as of the date of

Appellees' Appendix 0174

completion, this estimate of value shall reflect the market value of the property as if complete and prepared for occupancy by tenants.

## Market Value As If Stabilized

Market value as if stabilized means the market value of the property at a current point and time when all improvements have been physically constructed and the property has been leased to its optimum level of long term occupancy.

## Marketing Time

An opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of the appraisal. Marketing time differs from exposure time, which is always presumed to precede the effective date of an appraisal. (Advisory Opinion 7 of the Standards Board of the Appraisal Foundation and Statement on Appraisal Standards No. 6, "Reasonable Exposure Time in Real Property and Personal Property Market Value Opinions" address the determination of reasonable exposure and marketing time). (Dictionary)

## Master Lease

A lease in which the fee owner leases a part or the entire property to a single entity (the master lease) in return for a stipulated rent. The master lessee then leases the property to multiple tenants. (Dictionary)

## Modified Gross Lease

A lease in which the landlord receives stipulated rent and is obligated to pay some, but not all, of the property's operating and fixed expenses. Since assignment of expenses varies among modified gross leases, expense responsibility must always be specified. In some markets, a modified gross lease may be called a double net lease, net net lease, partial net lease, or semi-gross lease. (Dictionary)

## Operating Expense Ratio

The ratio of total operating expenses to effective gross income (TOE/EGI); the complement of the net income ratio, i.e., OER = 1 − NIR (Dictionary)

## Option

A legal contract, typically purchased for a stated consideration, that permits but does not require the holder of the option (known as the optionee) to

buy, sell, or lease real property for a stipulated period of time in accordance with specified terms; a unilateral right to exercise a privilege. (Dictionary)

## Partial Interest

Divided or undivided rights in real estate that represent less than the whole (a fractional interest). (Dictionary)

## Pass Through

A tenant's portion of operating expenses that may be composed of common area maintenance (CAM), real estate taxes, property insurance, and any other expenses determined in the lease agreement to be paid by the tenant. (Dictionary)

## Potential Gross Income (PGI)

The total income attributable to real property at full occupancy before vacancy and operating expenses are deducted. (Dictionary)

## Prospective Future Value Upon Completion

Market value "upon completion" is a prospective future value estimate of a property at a point in time when all of its improvements are fully completed. It assumes all proposed construction, conversion, or rehabilitation is hypothetically complete as of a future date when such effort is projected to occur. The projected completion date and the value estimate must reflect the market value of the property in its projected condition, i.e., completely vacant or partially occupied. The cash flow must reflect lease-up costs, required tenant improvements and leasing commissions on all areas not leased and occupied.

## Prospective Future Value Upon Stabilization

Market value "upon stabilization" is a prospective future value estimate of a property at a point in time when stabilized occupancy has been achieved. The projected stabilization date and the value estimate must reflect the absorption period required to achieve stabilization. In addition, the cash flows must reflect lease-up costs, required tenant improvements and leasing commissions on all unleased areas.

## Replacement Cost

The estimated cost to construct, at current prices as of the effective appraisal date, a substitute for the building being appraised, using modern materials and current standards, design, and layout. (Dictionary)

Appellees' Appendix 0175

**6789 Goldsboro Road**

Reproduction Cost
The estimated cost to construct, at current prices as of the effective date of the appraisal, an exact duplicate or replica of the building being appraised, using the same materials, construction standards, design, layout, and quality of workmanship and embodying all of the deficiencies, super-adequacies, and obsolescence of the subject building. (Dictionary)

Retrospective Value Opinion
A value opinion effective as of a specified historical date. The term does not define a type of value. Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgments, estate tax, and condemnation. Inclusion of the type of value with this term is appropriate, e.g., "retrospective market value opinion." (Dictionary)

Sandwich Leasehold Estate
The interest held by the original lessee when the property is subleased to another party; a type of leasehold estate. (Dictionary)

Sublease
An agreement in which the lessee (i.e., the tenant) leases part or all of the property to another party and thereby becomes a lessor. (Dictionary)

Subordination
A contractual arrangement in which a party with a claim to certain assets agrees to make his or her claim junior, or subordinate, to the claims of another party. (Dictionary)

Substantial Completion
Generally used in reference to the construction of tenant improvements (TIs). The tenant's premises are typically deemed to be substantially completed when all of the TIs for the premises have been completed in accordance with the plans and specifications previously approved by the tenant. Sometimes used to define the commencement date of a lease.

Surplus Land
Land that is not currently needed to support the existing improvement but cannot be separated from the property and sold off. Surplus land does not have an independent highest and best use and may or may not contribute value to the improved parcel. (Dictionary)

Triple Net (Net Net Net) Lease
A lease in which the tenant assumes all expenses (fixed and variable) of operating a property except that the landlord is responsible for structural maintenance, building reserves, and management. Also called NNN, triple net lease, or fully net lease. (Dictionary)

(The market definition of a triple net lease varies; in some cases tenants pay for items such as roof repairs, parking lot repairs, and other similar items.)

Usable Area
The measured area of an office area, store area or building common area on a floor. The total of all the usable areas or a floor shall equal floor usable area of that same floor. The amount of floor usable area can vary over the life of a building as corridors expand and contract and as floors are remodeled. (BOMA)

Value-in-Use
The value of a property assuming a specific use, which may or may not be the property's highest and best use on the effective date of the appraisal. Value in use may or may not be equal to market value but is different conceptually. (Dictionary)

Appellees' Appendix 0176

6789 Goldsboro Road

# Abstract of 6789 Goldsboro Road LLC – First Amended & Restated Operating Agreement

| | |
|---|---|
| Date: | July 18, 2013 |
| Definitions: | Cumulative Initial Capital Return: means a cumulative but non-compounded return equal to 10% on the Unrecovered Initial Capital Balance. |
| | Cumulative Additional Capital Return: means a cumulative but non-compounded return equal to 10% on the Unrecovered Additional Capital Balance. |
| | Decision Date: 36 months after the date the Company closes on the acquisition (that date is July 19, 2016). |
| | Entitlements: means all governmental approvals necessary to permit the subdivision of the property for no fewer than 26 single family or townhouse dwellings. |
| | Majority in Interests of Class A Members is greater than 51%. |
| | Majority and Interest of All Members: means majority in interests of Class A Members, plus the Class B Member. |
| | Manager: Gregory B. Myers for day-to-day operations of the Company. |
| Term: | Perpetual |
| Initial Capital Contributions: | Class A Members: $1,785,000 |
| | Class B Members: $306,192 (reflects the Gross Asset Value of the sale contract [$300,000] and certain development costs previously incurred [$6,192]) |
| Additional Capital Contributions: | Class A Members are subject to Capital Calls not to exceed $300,000. |
| Partition: | No Interest Holder shall have the right to require partition of the Property. |
| Allocation of Profits & Loss: | Pro rata |
| Distributions of Cash Flow: | After the payment of all unpaid expenses, debts and liabilities, distributions shall be made first to the Class A Members in an amount equal to their Unpaid Cumulative Capital Return (pro rata), then to Class A Members in the amount equal to their Unrecovered Initial Capital (pro rata); next to the Class A Members in an amount equal to $7,500/year for the first three years for a total of $22,500. Then to the Class B Member in an amount equal to its |

Appellees' Appendix 0177

**6789 Goldsboro Road**

Unpaid Cumulative Initial Capital Return, then to the Class B Member in an amount equal to its Unrecovered Initial Balance, next to the Members in an amount equal to the Unpaid Cumulative Additional Capital Return. Next to the Members in an amount equal to their own unrecovered additional capital (pro rata), thence, the balance to the Members in proportion to their Respective Percentage Interest.

Management:

The Manager, Gregory B. Myers, has the general power and authority to manage and operate the day-to-day business and affairs of the Company, however, contracts in excess of $25,000 require prior approval of the Majority and Interest of Class A Members. Major decisions require approval of all Members including financing and sale.

Transferability:

No Member may sell, assign, mortgage, pledge, grant, security interests in or otherwise transfer or encumber all or any part of the Member's Membership Rights or Interests.

Withdrawal:

No Member shall have the right to or power to voluntarily withdraw from the Company.

Redemption of Class B Member:

In the event that a) the entitlement of the property is not completed by the Decision Date and b) the Class A Members do not elect to require the Company to sell the property in accordance with Section 7.6, then the Class A Members may elect to determine the appraised value of the property in accordance with Section 7.5.  If the appraised value of the property is less than or equal to the sum of Unpaid Cumulative Initial Capital Return, Unrecovered Initial Capital, Unpaid Cumulative Initial Additional Capital Return and Unrecovered Additional Capital, then the Class A Members shall have the unilateral right and authority (without consent of the Class B Member) to cause the Company to redeem the Class B Membership Rights solely in consideration for the Company's previous distributions or other previous payments to the Class B Member. If the appraised value is greater than the Class A Investment, then in such event the Class B Member shall retain its Membership Rights; provided, however, the Class A Members shall continue to have the unilateral right and authority thereafter (without the consent of the Class B Member) at their option to require the Company to sell the Property, in its then current development state to an unaffiliated third party purchaser.

Appellees' Appendix 0178

6789 Goldsboro Road



## Qualifications of M. Ronald Lipman, MAI
### Principal
### Lipman Frizzell & Mitchell LLC



### State Certifications
State of Maryland
Commonwealth of Virginia
District of Columbia

### Education

Masters Degree in Business
Administration (Real Estate
Major) – American University,

Bachelor of Arts Degree
(Business Administration
Major) Duke University

### Contact Details

410-423-2328 (p)
410-423-2410 (f)

Lipman Frizzell & Mitchell LLC
6240 Old Dobbin Lane
Suite 140
Columbia, MD 21045

www.LFMvalue.com
rlipman@LFMvalue.com

**Membership/Affiliations**
Member (MAI): Appraisal Institute (Chapter Pres.-'78 & '79)
Licensed Broker - Maryland Real Estate Commission
Board of Trustees - Mid Atlantic Realty Trust (NYSE), Chairman
Investment Committee (1993-2003)

**Teaching/Instructor Assignments**
SREA 101 and 201 Courses, 1971-1980, Loyola & Notre Dame Colleges
Annual School of Maryland Assessing Officers, 1969-1973, 1978-1980
Condemnation Course IV for Appraisal Institute, Baltimore 1979/80
Capitalization Theory & Techniques, for Appraisal Institute, Balt/, 1981
Income Property Valuation for Maryland Tax Court, 1984
Md. Chapter, Appraisal Institute - R41-c Seminar, 1985
Internal Rate of Return Seminar for Md. Commercial Assessors, 1986
Acquisition of Real Estate - John Hopkins Univ. Continuing Studies, 1987
The Appraisal of Real Estate, Masters Prog. - JHU MBA program, 1992

No articles have been published in the last ten years
**Qualified as Expert Witness Before the Courts of:**
Baltimore City; Baltimore, Anne Arundel, Montgomery, Howard, Prince
Georges, Carroll, Frederick & Cecil Counties; Fairfax County, VA, District
of Columbia Superior Court; U.S. District Court of Maryland; Federal
Bankruptcy Court; Los Angeles County Superior Court; Federal Tax
Court; Maryland Tax Court; American Arbitration Association, NY; Court
of Common Pleas, Erie, PA

Numerous appraisals have been completed for all types of income and
owner/user properties including office buildings, apartment complexes,
shopping centers and industrial properties in addition to raw land and
finished sites for development of these uses and special purpose
properties such as mobile home parks, marinas and assisted living
facilities.

Appellees' Appendix 0179

**6789 Goldsboro Road**

## QUALIFICATIONS OF SHELDON A. STERN, MAI
### Senior Appraiser
Lipman Frizzell & Mitchell LLC

### State Certifications

State of Maryland

### Education

Masters Degree in Real Estate and Urban Development – American University

Master of Business Administration – University of Baltimore

Bachelors Degree in Business Administration/Accounting – University of Maryland College Park
Johns Hopkins University – School of Continuing Studies

### Contact Details

410-423-2366 (p)
410-423-2410 (f)

Lipman Frizzell & Mitchell LLC
6240 Old Dobbin Lane
Suite 140
Columbia, MD 21045

sstern@LFMvalue.com
www.LFMvalue.com

### Membership/Affiliations
Member:       Appraisal Institute – MAI Designation
Licensed Broker:   Maryland Real Estate Commission
Certified Property Manager (CPM):     Institute of Real Estate Mgmt.

### Appraisal Institute & Related Courses
Basic Valuation Procedures
Real Estate Appraisal Principles
Capitalization Theory and Techniques, I, II, III
Cade Studies in Real Estate Valuation
Valuation Analysis and Report Writing
Standards of Professional Practice

### Seminars
Current Trends in Real Estate Acquisition, Commercial Real Estate Leasing, Market Research in Real Estate, Site Evaluation and Land Development

### Experience
### Senior Associate
Lipman Frizzell & Mitchell LLC (2016-Present)
Valbridge Property Advisors | Lipman Frizzell LLC (2013-2016)
Lipman Frizzell & Mitchell LLC (1987-2013)

### Property Manager/Real Estate Analyst
Dreyfuss Brothers, Inc. (1978-1986)
I. Stern – Real Estate (1975-1979)

### Board of Directors
CHAI, Comprehensive Housing Assistance, Inc.
(1990-2003, 2007-Present)

### Expert Witness
Federal Bankruptcy Court, Property Tax Assessment Appeals Board (PTAAB), Participant: MICPEL Trial Advocacy Program

### Speaker
MD Assoc. of Assessment Officers 1998 Conference – Apartment/Low Income Housing Valuation

Appraisal/valuation and consulting assignments include: apartment buildings; retail buildings and shopping centers; office buildings; industrial buildings; residential subdivisions; and vacant industrial, commercial and residential land. Assignments also include tax credit valuations, Fannie Mae and Freddie Mac reports, and HUD MAP valuations and comparability studies. Assignments have been concentrated in the Baltimore/Washington Metropolitan areas including northern Virginia.

Appellees' Appendix 0180

6789 Goldsboro Road

## Representative Clients of Lipman Frizzell & Mitchell LLC

Developers/Investors/Advisors:

A&R Development Corporation
ATAPCO
Bavar Properties Group
Bozzuto Group
Casey Management, Inc.
Cignal Corporation
Clark Enterprises, Inc.
Continental Realty
Cordish Companies
Corporate Office Properties Trust
Enterprise Homes Inc.
Federal Realty Investment Trust
Forest City Enterprises
FRP Development Corporation
General Growth Properties
Greenebaum & Rose
H & S Properties
Harrison Group
Heritage Properties
Himmelrich Associates, Inc.
Home Properties
James Keelty & Co.
James F. Knott Realty Group
The JBG Companies
J.P. Morgan Investment
Jones Lang LaSalle
Kimco Realty
KLNB Retail
Lerner Enterprises
Lubert-Adler Management Inc.
MacKenzie Commercial
Manekin Corporation
Merritt Properties
Muni Cap, Inc.
NVR, Inc.
Riparius Development Corp.
Ryland Homes
Shelter Development
Southern Management Corp.
St. John Properties
Time Group
Toll Brothers, Inc.
Trammel Crow
Vornado Realty Trust
Whiting Turner

Accounting Firms:

Grant Thornton
Ernst & Young
Ellin & Tucker Chartered
Hertzbach & Company
PWC

Corporate:

7-Eleven, Inc.
Allied Chemical
Amtrak
Apple Computer
AT&T
Black & Decker
Blue Cross/Blue Shield
Chaney Enterprises
Chrysler Realty Corp.
Costco Wholesale Corp.
CSX
Exxon Mobil
Ford Motor Company
GEICO
General Electric
General Motors
Google
Home Depot
Hyatt Hotels
IBM
Intel
JCPenney
Kaiser Permanente
Lockheed Martin Corp.
Lord & Taylor
Macy's
Marriott Corporation
McDonalds Corporation
Noxell
Peebles Stores
PEPCO
Percontee, Inc.
Safeway Inc.
Sears Roebuck & Co.
Solo Cup
Target Corporation
Toyota
T. Rowe Price
Verizon Wireless
Wal-Mart
Washington Gas
Wawa, Inc.

Lenders/Mortgage Brokers:

Aetna Insurance
Allstate Investments LLC
Artisan's Bank
AXA Equitable
Bank of America
Bank of New England
BB&T
CalPERS
Canada Life Assurance Co.
Capital Funding Group, Inc.
Cecil Bank
Chesapeake Bank
Citibank Bank
Columbia Bank
Community Bank of the Chesapeake
Eagle Bank
FCNB Bank
FNMA
GE Capital
GMAC
Goldman Sachs
Harford Bank
HSBC
JP Morgan Chase
Key Bank
M & T Bank
Money Store
Morgan Stanley Capital I Inc.
Nationwide Insurance Co.
New York Life
NorthMarq Capital Inc.
Northwest Savings Bank
Old Line Bank
PNC Bank
Revere Bank
Prudential Ins. Co. of America
Sandy Spring Bancorp
State Farm Insurance Co.
Travelers
Sun Life of Canada
SunTrust
TIAA/CREF
Transamerica
United Bank
Walker & Dunlop
Wells Fargo Bank
Wilmington Trust

Law Firms:

Abramoff, Neuberger, LLP
Arent Fox LLP
Ballard Spahr LLP
Blank, Rome LLP
DLA Piper (US)
Eccleston & Wolfe
Fedder & Garten
Friedman & Friedman, LLP
Gallagher, Evelius & Jones LLP
Gibbs & Haller
Goodwin Procter LLP
Gordon Feinblatt LLC
Hogan Lovells
Jacobs & Dembert, P.A.
Lerch Early & Brewer
Linowes & Blocher LLP

## 6789 Goldsboro Road

London & Mead
McGuire Woods LLP
Miles & Stockbridge P. C.
Miller, Miller & Canby
Niles, Barton & Wilmer LLP
Paley Rothman
Pasternak & Fidis, P.C.
Rosenberg Martin & Greenberg
Saul Ewing LLP
Semmes, Bowen & Semmes
Shapiro, Sher Guinot & Sandler
Shulman Rogers
Squire Patton Boggs, L.L.P.
Steptoe & Johnson LLP
Tydings & Rosenberg LLP
Venable LLP
Whiteford, Taylor & Preston LLP
Wilkes Artis Chartered
Zuckerman Spaeder LLP

### Institutional:

American University
Archdiocese of Baltimore
Bon Secours Health System
Catholic Charities
Coppin State University
Franklin Square Hospital
Greater Baltimore Medical Center
Good Samaritan Hospital
Harry & Jeanette Weinberg Foundation
Johns Hopkins Hospital
Mass. Institute of Tech. (MIT)
Morgan State University
Northwest Hospital Center
St. Agnes Hospital
St. Joseph Medical Center

St. Paul School
Sinai Hospital/LifeBridge Health
Sisters of Notre Dame
Towson University
University of Maryland
University of MD Medical System

### Governmental/Other:

Baltimore City
Baltimore County
Baltimore Development Corp.
Blaustein Family Interests
BOMA
Carroll County
Cecil County
District of Columbia
D.C. Housing Finance Agency
Estate of Jack Kent Cooke
Federal Communication Commission
Federal Deposit Insurance Corp.
Federal Home Loan Bank Board
Frederick County
Harford County
Anne Arundel County
Howard County
Internal Revenue Service
MD Dept. of Natural Resources
MD Economic Development Corp.
Maryland Historical Trust
Maryland Insurance Deposit Fund
MNCPPC
Maryland Stadium Authority
Mass Transit Administration
Montgomery County
Prince George's County

MD State Highway Administration
U.S. Army Corps of Engineers
U.S. Dept. of Housing & Urban Development
U.S. Dept. of Justice
U.S. Dept. of the Navy
U.S. General Services Admin.
U.S. Naval Academy Athletic Assoc.
U.S. Postal Service
Washington, D.C. Office of Tax & Revenue
Washington Suburban Sanitary Commission

### Recreational:

Argyle Country Club
Baltimore Country Club
Bethesda Country Club
Burning Tree Golf Club
Caves Valley Golf Club
Columbia Association
Country Club of Maryland
Country Club at Woodmore
Elkridge Club
Four Streams Golf Club
Green Spring Valley Hunt Club
Hillendale Country Club
Hunters Oak Golf Course
Lakewood Country Club
Maryland Club
Norbeck Country Club
Suburban Country Club
Woodmont Country Club

Appellees' Appendix 0182

E-FILED; Montgomery Circuit Court
Docket: 1/12/2023 5:03 PM; Submission: 1/12/2023 5:03 PM

## IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

BRIAN KING, *et al.*                          :

    Plaintiffs,                          :

                        :       Case No. 436977-V

    v.                          :

SERV TRUST, *a Maryland Statutory Trust, et al.* :

    Defendants.                          :

> **Entered: Clerk, Circuit Court for Montgomery County, MD January 12, 2023**

---

6789 GOLDSBORO ROAD LLC,                          :

    Plaintiff,                          :

v.                          :       Case No. 451611-V
                                  (Consolidated)

SERV TRUST, *et al.*                          :

    Defendants                          :

## ORDER ENTERING PARTIAL JUDGMENT AND STAY

Upon consideration of the evidence adduced at a trial of this matter on January 3, 2023 (the "Trial"), the arguments of counsel for various represented parties at said trial, the record herein, and governing law, it is, by the Circuit Court for Montgomery County, Maryland, hereby:

ORDERED, pursuant to Maryland Rule 2-519, and for those reasons stated on the record at the Trial, that judgment be entered in favor of Brian King, Cristina King, and the Cristina and Brian King Children's Trust (collectively, the "King Parties"), and against Serv Trust, on all claims set forth in the Second Amended Counterclaim filed by Serv Trust herein; and it is further

ORDERED, for those reasons stated on the record at the close of Trial, that judgment be entered in favor of the King Parties on Count II of the First Amended Complaint for Declaratory Judgment (the "Alter Ego Declaratory Claim"); and it is further

FOUND AND ADJUDGED, for those reasons stated on the record at the close of Trial,

1

Appellees' Appendix 0186

**Trustee Ex. 10**

that Serv Trust is regarded herein as a statutory trust under the doctrine of judicial admission; and it is further

FOUND AND ADJUDGED, pursuant to the Alter Ego Declaratory Claim, and for those reasons stated on the record at the close of Trial, that Serv Trust is, and as of November 18, 2015 was, the alter ego of Gregory B. Myers ("Mr. Myers"), pursuant to Maryland law; and it is further

FOUND AND ADJUDGED, pursuant to the Alter Ego Declaratory Claim, and for those reasons stated on the record at the close of Trial, that Serv Trust is a disregarded entity, being the alter ego of Mr. Myers; and it is further

FOUND AND ADJUDGED, pursuant to the Alter Ego Declaratory Claim, and for those reasons stated on the record at the close of Trial, that inasmuch as Serv Trust is the alter ego of Mr. Myers, all further proceedings in this case are stayed pursuant to the provisions of Section 362 of Title 11 of the United States Code, with all such proceedings constituting proceedings within the scope of those set forth in Section 157(b) of Title 28 of the United States Code; and it is further

ORDERED, that all remaining matters in this case are accordingly stayed pending the first to occur of (i) the above-captioned proceeding being removed to the United States Bankruptcy Court for the District of Maryland; (ii) a court of competent jurisdiction affording relief from the stay set forth in Section 362 of Title 11 of the United States Code; or (iii) the occurrence of other events constituting a termination of the stay provided for in Section 362 of Title 11 of the United States Code.

1-9-2023
Dated

Hon. David W. Lease, JUDGE
Circuit Court for Montgomery County

**Entered: Clerk, Circuit Court for
Montgomery County, MD
January 12, 2023**

2

Appellees' Appendix 0184

The order below is hereby signed.

Signed: June 11 2025

Elizabeth L. Gunn
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLUMBIA

| In re: | Case No. 25-00069-ELG |
|---|---|
| **Gregory Brian Myers,** **Debtor.** | **Chapter 13** |

## MEMORANDUM OPINION AND ORDER ON SHOW CAUSE

On March 20, 2025, the Court entered the *Order to Show Cause*[1] (the "Show Cause Order")

requiring the Debtor to appear at a hearing on April 16, 2025 (the "Hearing") and show cause why

(i) the automatic stay of 11 U.S.C. § 362(a)[2] should not be annulled retroactively to the petition

date for bad faith and granting prospective relief from the automatic stay as to the NBC Entities[3];

(ii) this case should not be dismissed as a bad faith filing, with a bar to refiling in any bankruptcy

court of no less than ten (10) years, such that the filing of any case prior to expiration of any bar

would not cause the automatic stay to become operative; and (iii) this Court should not find the

Debtor to be a vexatious litigant and/or enter an injunction prohibiting any person or entity

---

[1] ECF No. 24.

[2] Unless specified otherwise, all chapter, code, and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532.

[3] Collectively, Naples Property Holding Company, LLC; Naples Beach Club Land Trust Trustee, LLC, as Trustee; Naples Beach Club Phase II and III Land Trust Trustee, LLC, as Trustee; and NBC Club Owner, LLC.

Appellees' Appendix 0185

**Trustee Ex. 11**

related to the Debtor from filing any further matters or removals in the United States Bankruptcy Court for the District of Columbia and/or the United States District Court for the District of Columbia absent certain enumerated circumstances. The Show Cause Order also stayed all proceedings in the adversary proceeding filed by the Debtor (the "Adversary Proceeding").[4] At the conclusion of the Hearing, the Court took the matter under advisement. This Memorandum Opinion and Order sets forth the Court's findings of fact and conclusions of law regarding the Show Cause Order.

## I.    Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409. Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate.[5]

## II.    Background

### a.    The Debtor's D.C. Chapter 13

The Debtor initiated this case by filing a voluntary petition for relief on February 26, 2025 (the "Petition Date"), just 37 days after the expiration of the two-year (2) refiling bar against the Debtor issued by the United States Bankruptcy Court for the Middle District of Florida.[6] On March 24, 2025, without ever filing schedules or a statement of financial affairs (though after filing a motion to enforce the automatic stay[7] and an adversary proceeding[8]) and while the Show Cause Order remained pending, the Debtor moved to voluntarily dismiss his chapter 13 case.[9] On March

---

[4] *Myers v. Naples Property Holding Company, LLC*, Case No. 25-10005-ELG.
[5] *See* Fed. R. Bankr. P. 7052.
[6] Voluntary Petition for Individuals Filing for Bankruptcy, ECF No. 1; *see In re Myers*, Case No. 2:21-bk-00123-FMD, 2023 WL 350183 at *5 (Bankr. M.D. Fla. Jan. 20, 2023)
[7] Debtor's Emergency Motion to Enforce Automatic Stay, ECF No. 14.
[8] Complaint and Demand for Trial by Jury, ECF No. 22.
[9] Debtor's Motion Requesting This Case be Dismissed, ECF No. 29.

Appellee's Appendix 0186

26, 2025, the Court granted dismissal of the case under § 1307(b), but retained jurisdiction over the Show Cause Order as to the questions of whether (i) the case was filed in bad faith and whether the dismissal would be with or without prejudice for the reasons set forth in the Show Cause Order; (ii) the Debtor should be declared a vexatious litigant; and (iii) the Adversary Proceeding should be dismissed with prejudice (the "Dismissal Order").[10] On April 11, 2025, despite the stay of the Adversary Proceeding, the Debtor filed a *Notice of Dismissal Without Prejudice* attempting to have the Adversary Proceeding dismissed before the Court could address the issue of prejudice.[11]

Responses to the Show Cause Order were due on or before April 2, 2025. Timely responses were filed by the NBC Entities and the chapter 7 trustee (the "Chapter 7 Trustee") for the Debtor's still open and pending 2015 case in the United States Bankruptcy Court for the District of Maryland (the "Maryland Chapter 7").[12] The Debtor did not timely respond to the Show Cause Order (other than seeking to dismiss his case), however, the filings by the NBC Entities and Chapter 7 Trustee precipitated a filing of a Line by the Debtor apparently as a responsive pleading.[13] The Line does not address the issues raised by this Court in the Show Cause Order, instead addressing grievances with the Chapter 7 Trustee.

At the Hearing, the Court heard argument on the Show Cause Order from the Debtor, the Office of the United States Trustee (the "UST")[14], the NBC Entities, counsel for the chapter 13 trustee in this dismissed case, and counsel for the Chapter 7 Trustee.

---

[10] Order Granting Dismissal and Retaining Jurisdiction, ECF No. 30. On April 2, 2025, the Debtor filed an appeal of the Dismissal Order (without paying the filing fee). *See* Notice of Appeal, ECF No. 32.

[11] Adversary Proceeding, ECF No. 6.

[12] Response to Order to Show Cause, ECF No. 35; Response to Order to Show Cause by Interested Party, Roger Schlossberg, Chapter 7 Trustee, ECF No. 36. *See In re Myers*, Case No. 15-26033-MCR.

[13] Line, ECF No. 39.

[14] On March 11, 2025, the UST filed a Motion to Dismiss Case and Impose Additional Bar on Re-filing (ECF No. 13) (the "UST Motion"), requesting that the Court issue an order with a four-year (4) bar to refiling. The UST Motion was noticed and set for hearing on April 24, 2025. The UST provided argument at the Hearing and referenced both the Show Cause Order and the UST Motion. Due to the fulsome argument at the Hearing, the hearing on the UST Motion

Appellee's Appendix 0187

       *b.*      *The Debtor's History of Abuse of the Bankruptcy Process and the Courts*

Since 2015, hundreds of pages of opinions from more than a dozen different courts (both federal and state) have been written regarding the legal machinations, "sprawling tapestry of bad faith abuse of the bankruptcy process,"[15] and "dilatory and abusive litigation tactics"[16] by the Debtor, his spouse, Barbara Ann Kelly ("Ms. Kelly"), and the entities they own, including the 700 Trust (as discussed below). The "long and sordid history of bankruptcy filings"[17] by the Debtor, Ms. Kelly, and/or their entities is well-documented in the opinions issued in bankruptcy cases, adversary proceedings, appeals, and removed matters involving the Debtor, Ms. Kelly, and/or their entities issued prior to the filing of this case, including, but certainly not limited to, the following selected opinions:

1) *In re Kelly*, Case No. 18-13244-WIL, 2018 WL 4354653 (Bankr. D. Md. Sep. 11, 2018).

2) *Myers v. United States Tr.*, No. 19-cv-00637-PX, 2020 WL 758157 (D. Md. Feb. 13, 2020) (noting that as of February 2020 "Myers ha[d] filed 15 bankruptcy appeals and five civil cases related to his 2015 bankruptcy action, the overwhelming majority of which have been dismissed either by the Court or by Myers voluntarily after he failed to designate the record, file a brief, or pay his filing fees").

3) *Myers v. McNamee, Hosea, Jernigan, Kim, Greenan, & Lynch, P.A.*, No. 18-cv-03460-PX, 2020 WL 758151 (D. Md. Feb. 14, 2020) (noting that the "case represents one matter in a litany of litigation stemming from Myers' bankruptcy petition filed over four years ago" in 2015), *reconsideration denied*, No. 18-cv-03460-PX, 2020 WL 1064810 (D. Md. Mar. 5, 2020).

4) *Kelly v. McNamee*, Lead Case: GJH-21-1186, Members Cases GJH-21-1184; GJH-21-1185, 2022 WL 861395 (D. Md. Mar. 23, 2022).

5) *In re Myers*, Case No. 2:21-bk-00123-FMD, 2023 WL 350183 (Bankr. M.D. Fla. Jan. 20, 2023) (imposing a two (2) year bar to refiling as to Mr. Myers).

---

was continued pending issuance of this Memorandum Opinion and Order. Due to the relief granted in this Memorandum Opinion and Order, the relief sought in the UST Motion is duplicative and deemed resolved.
[15] *In re 700 Tr.*, Case No. 24-10230-KKS, 2024 WL 5242058, at *1 (Bankr. N.D. Fla. Dec. 27, 2024).
[16] *In re Kelly*, 656 B.R. 541, 548 (Bankr. D. Md. 2023).
[17] *Kelly v. Naples Prop. Holding Co., LLC*, Civ. No. DLB-24-184, 2025 WL 974345, at *1 (D. Md. Mar. 31, 2025).

6)  *In re 700 Tr.*, Case No. 24-10230-KKS, 2024 WL 5242058 (Bankr. N.D. Fla. Dec. 27, 2024).

7)  *In re Myers*, Case No. 2:22-v-478-JES, 2023 WL 5720739 (M.D. Fla. Sep. 5, 2023), *appeal dismissed*, No. 23-13408, 2024 WL 1827262 (11th Cir. Apr. 26, 2024).

8)  *In re Kelly*, 656 B.R. 541 (Bankr. D. Md. 2023) (imposing a four-year (4) bar to refiling as to Ms. Kelly, among other sanctions), *aff'd*, Civ. No. DLB-24-184, 2025 WL 974345 (D. Md. Mar. 31, 2025), *appeal filed*, Case No. 25-1474 (4th Cir. Apr. 30, 2025).

9)  *In re Myers*, Case No. 2:21-bk-00123-FMD, 2022 WL 2827475 (Bankr. M.D. Fla. July 15, 2022), *aff'd*, Case No. 2:22-cv-498-JES, 2023 WL 5697379 (M.D. Fla. Sep. 5, 2023), *appeal dismissed*, No. 23-13409, 2025 WL 1113148 (11th Cir. Apr. 15, 2025).

10) *Myers v. Naples Golf and Beach Club, Inc.*, 1:24-cv-03127-ACR (D.D.C. Nov. 19, 2024), *appeal dismissed*, No. 24-7180 (D.C. Cir. Feb. 5, 2025) (finding Mr. Myers "brought this appeal, and the underlying district court action, in bad faith and for an improper purpose," and imposing sanctions against Mr. Myers in the amount of appellees' attorney's fees and costs), *imposing additional sanctions*, No. 24-7180 (D.C. Cir. June 2, 2025) (potentially enjoining Mr. Myers from filing any appeals or initiating any proceedings in that court until proof submitted that sanctions had been paid).

11) *In re 700 Tr.*, Case No. 2:25-bk-00051-FMD (Bankr. M.D. Fla. May 12, 2025) (dismissing bankruptcy case and imposing a four (4) year bar as to Ms. Kelly, Mr. Myers, and the 700 Trust to refiling in any jurisdiction).[18]

The Court gives full faith and credit to the rulings of each of these courts (and any others not specifically mentioned herein) and, rather than repeating the thorough and substantial histories already set forth therein, only seeks to supplement in this Memorandum Opinion those facts that have occurred related to this case. For the avoidance of doubt, the Court joins the United States Bankruptcy Court for the District of Maryland and the United States Bankruptcy Court for the

---

[18] After this matter was taken under advisement, the United States Bankruptcy Court for the Middle District of Florida issued a ruling in the 700 Trust case barring the 700 Trust, the Debtor, and Ms. Kelly from filing a future petition in any bankruptcy court for a period of four (4) years after the date upon which Judge Ruark's order became final and non-appealable. *See In re 700 Tr.*, 2:25-bk-00051-FMD, ECF No. 141.

Appellee's Appendix 0189

Middle District of Florida in their stated intention to preclude the Debtor from further abusing the bankruptcy process.[19]

>    c.    *Status of Other Cases Related to the Debtor as of the Petition Date*

In considering the Show Cause Order, it is beneficial to understand the status of the Debtor, Ms. Kelly, and the 700 Trust's various cases as of the Petition Date. In the days leading up to the filing of this case, the Debtor, Ms. Kelly, and the 700 Trust suffered significant setbacks in their pending cases. On November 8, 2024, 110 days before the Petition Date, the Debtor and Ms. Kelly purportedly caused the creation of the 700 Trust and executed a quitclaim deed which sought to convey the Debtor's and Ms. Kelly's former house in Naples, Florida to the 700 Trust, in part, in order to circumvent the existing filing bars (two (2) years as to the Debtor and four (4) years as to Ms. Kelly[20]). On December 27, 2024, the United States Bankruptcy Court for the Northern District of Florida entered an opinion finding that the case was "a thinly disguised attempt to continue several years' worth of bad faith litigation under cover of a 'business trust' formed, apparently, for the sole and exclusive purpose of continuing Mr. Myers' and Ms. Kelly's bad faith legal actions"[21] and put the Debtor and Ms. Kelly "on notice that the Court reserves jurisdiction to consider whether they should be deemed 'vexatious litigants,' possibly subject to an additional sanction in the form of a bar against future filings in this and other courts."[22] On January 10, 2025, the United

---

[19] *See Kelly*, 656 B.R. at 548 ("Ms. Kelly and Mr. Myers have exploited and subverted the bankruptcy process for over eight years. It is the intention of this Court that they be precluded from doing so any longer."); *see 700 Tr.*, 2024 WL 5242058 at *2 ("The Court takes no pleasure in imposing such extraordinary relief, but it is the duty of this Court to prevent further abuse of the bankruptcy process by Ms. Kelly. The Court determines that the relief granted is necessary and appropriate under the unique facts of this case to protect the integrity of the Court and the bankruptcy process.").

[20] Ms. Kelly's appeal of her bar order was pending in the United States District Court for the District of Maryland. As noted *supra*, the bar order was subsequently affirmed. Not deterred, Ms. Kelly has appealed the District Court order to the Fourth Circuit Court of Appeals. *See Kelly*, Case No. 25-1474, ECF No. 1. Ms. Kelly has already asked for an extension of the initial briefing deadline through and including June 26, 2025. *Id.*, ECF No. 5.

[21] *In re 700 Tr.*, 2024 WL 5242058 at *3.

[22] *Id.* at *7.

Appellee's Appendix 0190

States Bankruptcy Court for the Northern District of Florida transferred the 700 Trust's chapter 11
bankruptcy case to the United States Bankruptcy Court for the Middle District of Florida to stop
the "Debtor's, its Trustees', and its counsel's continued, well-demonstrated mockery of and
disdain for the entire judicial system."[23] A hearing in the United States Bankruptcy Court for the
Middle District of Florida on a motion to dismiss the 700 Trust case with prejudice was set for
hearing on March 5, 2025.[24]

On January 7, 2025, the Eleventh Circuit Court of Appeals affirmed the district court
denying reconsideration of its order to remand the Debtor's and Ms. Kelly's easement lawsuit
against the NBC Entities to Florida state court.[25] In late January 2025 and early February 2025,
the Eleventh Circuit also dismissed several appeals filed by the Debtor against the NBC Entities.[26]
On February 5, 2025, the Court of Appeals for the District of Columbia Circuit issued a per curiam
order dismissing the Debtor's appeal for lack of jurisdiction (related to the removal of an action
from Florida state court as to the NBC Entities to the United States District Court for the District
of Columbia) and ordering sanctions in the amount of reasonable attorneys' fees and costs against
the Debtor.[27] Further, the United States District Court for the District of Columbia set a status
conference in the case underlying the denied appeal for March 10, 2025.[28]

In the face of resuming litigation with the NBC Entities in either state court or the United
States District Court, the continued decade-long administration of the Maryland Chapter 7, and
the expiration of the two (2) year bar, the Debtor chose to again file a skeletal petition to obtain
the benefit of the automatic stay—this time in the United States Bankruptcy Court for the District

---

[23] *In re 700 Tr.*, Case No. 24-10230-KKS, 2025 WL 77751, at *6 (Bankr. N.D. Fla. Jan. 10, 2025).
[24] *In re 700 Tr.*, Case No. 2:25-bk-0051-FMD, ECF No. 133.
[25] *In re Myers*, No. 23-11906, 2925 WL 39995 (11th Cir. Jan. 7, 2025).
[26] *See Myers v. City of Naples, Fla.*, No. 24-14007-AA, 2025 WL 752488 (11th Cir. Jan. 28, 2025); *see Myers v. City of Naples, Fla.*, No. 25-10179-A, 2025 WL 1155805 (11th Cir. Feb 11, 2025).
[27] *See Myers*, No. 24-7180, Doc. #2098926.
[28] See *Myers*, 1:24-cv-03127-ACR.

7

Appellees' Appendix 0191

of Columbia, a court the Debtor may have presumed to be unfamiliar with his, Ms. Kelly's, and

their entities' byzantine and copious filing history. The Debtor was mistaken.[29]

  *d. The Debtor's History of Use of Bankruptcy Filings as a Sword and Delay Tactic*

  Since 2018, the Debtor and/or Ms. Kelly have filed at least eight (8) individual chapter 13

petitions across four (4) different jurisdictions seeking to take advantage of the automatic stay for

litigation purposes.[30] Additionally, since 2015, the Debtor, Ms. Kelly, and the 700 Trust have filed

at least three (3) chapter 11 petitions across two jurisdictions for the same reason.[31] This chapter

13 case is no different from its predecessors. The Debtor and Ms. Kelly are not "honest but

unfortunate debtors," but instead seek only to utilize the bankruptcy system as a sword to delay

unfavorable litigation results and frustrate their creditors. This abuse of the bankruptcy system is

particularly acute here where the Debtor filed a skeletal petition, without any statements or

schedules, and yet utilized his bankruptcy case number to file at least four Suggestions of

Bankruptcy in an attempt to stall or otherwise delay proceedings, including proceedings before the

United States District Court for the District of Columbia and United States Court of Appeals for

the District of Columbia Circuit.[32]

---

[29] The Court recalls that the Debtor in this case previously filed a chapter 11 petition in this jurisdiction for his entity the 1712 Property Holding Trust on June 19, 2022. *See* 22-00104-ELG, ECF No. 1. On July 1, 2022, the Court dismissed the case for failure to pay the balance of the chapter 11 filing fee. *See id.* at ECF No. 15.

[30] The totality of the Debtor's and Ms. Kelly's chapter 13 bankruptcy history, as well as the outcomes of those cases, are briefly recited herein: *See In re Barbara Ann Kelly*, Case No. 18-13244-LSS (Bankr. D. Md.) (dismissed for exceeding chapter 13 jurisdictional debt limit); *In re Barbara Ann Kelly*, Case No. 18-07142-FMD (Bankr. M.D. Fla.) (Debtor voluntarily dismissed); *In re Gregory B. Myers*, Case No. 19-10392-BLS (Bankr. D. Del.) (dismissed for improper venue); *In re Gregory B. Myers*, Case No. 19-17428-LSS (Bankr. D. Md.) (Debtor voluntarily dismissed); *In re Barbara Ann Kelly*, Case No. 19-24525-LSS (Bankr. D. Md.) (Debtor voluntarily dismissed); *In re Gregory B. Myers*, Case No. 21-00123-FMD (Bankr. M.D. Fla.) (dismissed with prejudice as a bad faith filing and two (2) year refiling bar imposed); *In re Barbara Ann Kelly*, Case No. 23-12700-MCR (Bankr. D. Md.) (Debtor voluntarily dismissed and bankruptcy court imposed prospective relief including modifying the automatic stay, imposing a four (4) year equitable servitude, and prospectively lifting the automatic stay), *aff'd on appeal*, Civ. No. DLB-24-184 (Mar. 31, 2025); *In re Gregory B. Myers*, Case No. 25-00069-ELG (Bankr. D.D.C.).

[31] *See In re* Myers, Case No. 15-26033-MCR (Bankr. D. Md.) (converted to chapter 7 and still pending); In *re Barbara Ann Kelly*, Case No. 23-11566-LSS (Bankr. D. Md.) (dismissed *sua sponte* by the court); *In re 700 Tr.*, Case No. 25-00051-FMD (Bankr. M.D. Fla.) (dismissed, initially filed in Bankr. N.D. Fla. as Case No. 24-10230-KKS).

[32] *See* Suggestion of Bankruptcy, *In re 700 Tr.*, Case No. 25-00051-FMD (Bankr. M.D. Fla. Mar. 4, 2025), ECF No. 130; Suggestion of Bankruptcy, *In re Myers (King v. Schlossberg)*, Case No. 15-26033-MCR, Adv. No. 24-00007

Appellee's Appendix 0192

No further clarity of the intent or purpose for the Debtor's bankruptcy case as anything other than a continuation of the Debtor's decade long crusade to evade creditors was offered at the Hearing. Despite the fact that the Debtor had not filed a responsive pleading, the Court provided the Debtor with all the time he wanted (ultimately, over two hours) to address the merits of the case and the Show Cause Order. However, instead of addressing the purpose of his bankruptcy case, the Debtor accused the Court of bias and disparaged the other parties in interest present. Further, at the Hearing, the Court repeatedly asked the Debtor why he had filed a chapter 13 petition in this jurisdiction. The Debtor refused to provide a straightforward answer and insisted on casting aspersions on the integrity of sister bankruptcy courts. Instead of providing any clarity as to the purpose for his bankruptcy filing or any basis upon which the Court might find a modicum of good faith, the Debtor instead chose to maintain, as he has in his previous bankruptcy cases, that he is being unfairly targeted and receiving unequal treatment from the American judiciary. Notably, the Debtor did not show remorse for his past bankruptcy filings or take any responsibility for his behavior in this or any past cases, instead continuing to try to paint himself as a "victim." The only victims here are the bankruptcy system itself in the thousands of hours of judicial resources expended upon the Debtor's filings and the innocent creditors who have sought for years, or in some cases over a decade, to exercise their rights.

## III.    Legal Analysis

In considering whether cause exists to sanction the Debtor, and if so, what sanctions are appropriate, the Court finds persuasive the District Court of Maryland's recent memorandum opinion[33] affirming the order dismissing Ms. Kelly's 2023 chapter 13 case and granting

---

(Bankr. D. Md. Mar. 6, 2025), ECF No. 25; Suggestion of Bankruptcy, *Myers v. Naples Golf and Beach Club, Inc.*, Case No. 24-03127-ACR (D.D.C. Mar. 7, 2025), ECF No. 23; Suggestion of Bankruptcy, *Myers*, No. 24-7180, Doc. #2105042.
[33] *Kelly*, 2025 WL 974345.

Appellee's Appendix 0193

prospective relief (the "Opinion"). In the Opinion, the court found that absent sanctions "Kelly and Myers will continue to manipulate the bankruptcy system to prevent the foreclosure of [their] properties and harm their innocent creditors."[34] The Court wholeheartedly agrees and, for the reasons stated herein and as stated by sister courts, finds that sanctions are appropriate in this case as to the Debtor. The question is: If the previous two (2) year and four (4) year bars were insufficient to stop the Debtor, Ms. Kelly, and their entities from manipulating the bankruptcy system, then what *will* stop them? The Show Cause Order raised three proposed sanctions, each discussed herein.

      *a. Bar to Refiling*

The Debtor cannot avoid an adverse ruling or bar to refiling simply by requesting voluntary dismissal of this case.[35] The Court retained jurisdiction on the question of a bar to refiling in the Dismissal Order and finds, as the United States Bankruptcy Court for the Middle District of Florida has found on two separate occasions, that a bar to refiling is appropriate. Sections 105(a) and 349(a) of the Bankruptcy Code authorize the Court to issue a lengthy bar, for cause. As the United States Bankruptcy Court for the District of Maryland found as to Ms. Kelly, "[i]f ever there were a case that screams out for the extraordinary relief allowed by Sections 105(a) and 349(a), this is it."[36] The Debtor has more than demonstrated that he can manipulate the litigation process to take several years (or a decade or more) to obtain a final order. Thus, it is necessary and appropriate that the bar to refiling be effective immediately, but the bar time period shall not begin until the date that this Memorandum Opinion and Order becomes final and nonappealable.

---

[34] *Id*. at *20.
[35] *Id*. at *11.
[36] *See Kelly*, 656 B.R. at 607.

Appellee's Appendix 0194

The question is: what is the correct time period? The Show Cause Order required the Debtor to show cause as to why a ten (10) year bar to refiling should not be entered. Relying on *In re Balmer*,[37] the Chapter 7 Trustee urges the Court to impose a ten (10) year bar on the Debtor. In *Balmer*, after a period of eight (8) years of abuse of the bankruptcy system by the debtor, the bankruptcy court barred the debtor for eight (8) years—a period equal to the duration of the debtor's abuse of the bankruptcy system.[38] Based upon the totality of the circumstances, including but not limited to (i) the Debtor's abuse of the bankruptcy system spanning a decade beginning in 2015 with his first chapter 11 filing (which remains open to this date as a chapter 7 and is the basis for over a dozen written opinions in the main case and associated adversary proceedings); (ii) the apparent unpersuasive nature of the previous two (2) year bar as to the Debtor and the existing four (4) year bar as to Ms. Kelly; (iii) the consistent and persistent burden on the bankruptcy system by the Debtor; (iv) the Debtor's lack of recognition or perception of his ongoing and unfettered abuse of the bankruptcy system; and (v) the Debtor's apparent incapacity to understand or abide by an adverse ruling, the Court finds that a ten (10) year bar to refiling in any court is appropriate beginning on the date that this Memorandum Opinion and Order becomes final and nonappealable. For avoidance of any doubt, the bar is effective immediately, however, the ten-year (10) period will not begin to run until after any and all appeals of this Memorandum Opinion and Order have been exhausted.

   *b.  Annulment of the Stay*

The Show Cause Order also required the Debtor to show cause why the automatic stay should not be annulled retroactively to the Petition Date for bad faith and why the Court should not grant prospective relief from the automatic stay as to the NBC Entities in any bankruptcy case

---

[37] No. 1:03-BK-19058 E, 2003 WL 22658196 (Bankr. E.D. Ark. Oct. 10, 2003).
[38] *Id*. at *4.

Appellee's Appendix 0195

filed in any jurisdiction by the Debtor. However, because the Debtor voluntarily dismissed this chapter 13 case, the question of annulment of the stay is moot. Furthermore, given the ten (10) year bar to refiling, the Court finds that prospective relief from the stay is unnecessary and may be duplicative.

    *c.  Vexatious Litigant Pre-Filing Injunction*

A vexatious litigant injunction is an "extreme sanction and should be imposed in only the most egregious cases."[39] Prior to imposing such a sanction, courts must look to (i) whether there have been numerous, similar actions filed by the party; (ii) whether the party's previous filings were adjudicated as frivolous filings and completely lacked substantive allegations; (iii) whether the party is seeking to harass a certain adversary; and (iv) whether the administration of justice has been impeded so that a vexatious litigant injunction is required.[40] Despite the Debtor's prolific and abusive filing history across multiple jurisdictions as described herein, the Court finds that due to the bar imposed herein and at this time and case posture (solely based upon the filings in this Court), the Debtor is not a vexatious litigant.[41]

    *d.  Dismissal of the Adversary Proceeding with Prejudice*

Dismissal with prejudice is "an appropriate response to a debtor's egregious misconduct, contumacious actions, or abuse of the bankruptcy process."[42] Despite the stay of the Adversary Proceeding, the Debtor filed a *Notice of Dismissal Without Prejudice* attempting to dismiss the Adversary Proceeding to avoid an adverse ruling less than one month after the matter was filed.[43]

---

[39] *Duru v. Mitchell*, 289 F. Supp. 3d 112, 117 (D.D.C. 2018) (citing *In re Powell*, 851 F. 2d 427, 434 (D.C. Cir. 1988)).
[40] *Id*.
[41] It is also not clear that such prohibition would have the desired impact on the Debtor in any event. The United States Bankruptcy Court for the Middle District of Florida imposed a bar against filing any further matters absent either the prior authorization of the Court or such filing be signed by an attorney in good standing with the bar. Notwithstanding this requirement, the Debtor caused an attorney to file the 700 Trust case and recently sanctions were entered against the Debtor and the attorney. *See in re 700 Tr.*, Case No. 2:25-bk-00051-FMD, ECF No. 140.
[42] *In re Ebersole*, 452 B.R. 920, 922 (Bankr. W.D. Va. 2011).
[43] Adversary Proceeding, ECF No. 6.

Appellee's Appendix 0196

This tactic echoes those used previously by the Debtor to evade adverse rulings and warranted repercussions and to preserve future avenues of legal abuse resulting in harm to innocent creditors and a waste of judicial resource. No such escape route is available to the Debtor in this case. The Adversary Proceeding is another example of the Debtor's contumacious actions and abuse of the bankruptcy process.[44] Thus, the Court shall dismiss the Adversary Proceeding, with prejudice.

## IV.    Conclusion

Therefore, for the reasons stated herein, the Court finds that cause exists to sanction the Debtor. Accordingly, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that:

1.    This case is **DISMISSED WITH PREJUDICE**.

2.    The Debtor, Gregory Brian Myers, is barred from filing any case under any chapter of the Bankruptcy Code for a period of ten (10) years in any jurisdiction, effective immediately, but with such ten-year (10) period beginning on the date that this Memorandum Opinion and Order becomes final and nonappealable.

3.    By separate order, the Adversary Proceeding (25-10005-ELG) shall be dismissed with prejudice.

[Signed and dated above.]

Copies to: recipients of electronic notification.

---

[44] Adversary Proceeding, ECF No. 1 (pleading a cause of action under § 362(k) and a tort claim originating from alleged stay violations and seeking damages in the millions of dollars).

Appellee's Appendix 0197

**MARIA ELLENA CHAVEZ-RUARK, U.S. BANKRUPTCY JUDGE**

Evidentiary Hearing:  YES
Exhibits Filed:  YES

PROCEEDING MEMO − CHAPTER 7

**Case: 24-00007-MCR**                     Date:  6/30/2025 at 10:00 a.m.
**Brian King, et al. vs. Roger Schlossberg, Trustee**        and 7/1/2025 at 10:00 a.m.

Appearances:  Maurice Belmont VerStandig, counsel for Plaintiffs
                      Frank J. Mastro, counsel for Defendant

Also present:  Roger Schlossberg, Defendant/Chapter 7 Trustee
                    Gregory B. Myers, Debtor (pro se Debtor)

[17] Application to Compromise Controversy with King Plaintiffs, Filed by Roger
Schlossberg. (Attachments: # 1 Notice of Motion # 2 Proposed Order # 3 Certificate of
Service # 4 Certificate of Service # 5 List of All Creditors)

> [19] Preliminary Objection to the Trustee's Motion for Approval of Proposed
> Compromise and Settlement with King Plaintiffs on behalf of Gregory B. Myers Filed
> by Gregory B. Myers (related document(s)17 Application to Compromise
> Controversy filed by Defendant Roger Schlossberg). (Attachments: # 1 Exhibit A # 2
> Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G)

> [22] Supplement to Gregory B. Myers's Preliminary Objection to the Trustee's Motion
> for Approval of Proposed Compromise and Settlement with King Plaintiffs Filed by
> Gregory B. Myers (related document(s)17 Application to Compromise Controversy
> filed by Defendant Roger Schlossberg, 19 Objection filed by Debtor Gregory B.
> Myers). (Attachments: # 1 Exhibit H # 2 Exhibit I)

[20] Motion *to Strike Debtor's Objection to Trustee's Motion for Approval of Proposed
Compromise and Settlement with King Plaintiffs* Filed by Roger Schlossberg.(related
document(s) 19 Objection filed by Debtor Gregory B. Myers) (Attachments: # 1 CMECF
Mailing Information # 2 Proposed Order)

> [23] Response on behalf of Gregory B. Myers Filed by Gregory B. Myers (related
> document(s)20 Motion to Strike Debtor's Objection to Trustee's Motion for Approval
> of Proposed Compromise and Settlement with King Plaintiffs filed by Defendant
> Roger Schlossberg).

> [24] Response on behalf of Roger Schlossberg Filed by Frank J. Mastro (related
> document(s)23 Response filed by Debtor Gregory B. Myers, 20 Motion to Strike
> Debtor's Objection to Trustee's Motion for Approval of Proposed Compromise and
> Settlement with King Plaintiffs filed by Defendant Roger Schlossberg). (Attachments:
> # 1 Mailing Information)

COMMENTS:          Mr. Schlossberg testified on 6/30/25, and Mr. Myers testified on
                   7/1/25.  With regard to exhibits:
                   ➢ The Court admitted Trustee's Exhibits 1-2 and 4-11 and did not
                     admit Trustee's Exhibit 3 (the Trustee's exhibits are filed at Dkt.
                     No. 36 in Adv. No. 24-00007);
                   ➢ The Court admitted King Parties' Exhibits 1-3 (the King Parties'
                     exhibits are filed at Dkt. No. 1062 in Case No. 15-26033); and
                   ➢ The Court admitted Debtor's Exhibits 1, 3, 4, and 6, took judicial
                     notice of Debtor's Exhibits 2 and 7-9, and did not admit Debtor's
                     Exhibit 5 (the Debtor's exhibits are attached to this proceeding
                     memo).

                   The parties put on their evidence and made their closing arguments.

DISPOSITION:       Hearing held.  Court will give oral ruling on 7/3/25 at 10:00 a.m. by
                   videoconference.  Court will issue hearing notice.

Appellees' Appendix 0199

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

In re:

GREGORY B. MYERS,

       Debtor.

_____/

Case No.  15-26033-MCR
(Chapter 7)

BRIAN KING, *et al.*,

       Plaintiffs,

v.

ROGER SCHLOSSBERG, TRUSTEE,

       Defendant.

_____/

Adv. No. 24-00007

## SUPPLEMENTAL OBJECTION TO TRUSTEE'S MOTION FOR APPROVAL OF PROPOSED COMPROMISE AND SETTLEMENT WITH KING PLAINTIFFS

Gregory B. Myers ("Mr. Myers" or "Movant"), *pro se*, files this supplemental objection

(the "Supplement Objection") to the *Trustee's Motion For Approval Of Proposed Compromise*

*And Settlement With King Plaintiffs* (Doc. 17) (the "Motion"), and states:

**I.     A Bankruptcy Rule 9019 settlement cannot be approved without a copy of the actual signed settlement agreement being produced.**

The purpose of Rule 9019 is to prevent hidden agreements and ensure the court can make

an informed decision about the fairness and equitability of the settlement. This requires the Court

to have access to all facts necessary for an intelligent and objective opinion. This Court cannot

make a determination if such settlement is fair to such debtor's estate and the paramount interest

of creditors, *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,

1

Appellee's Appendix 0200

390 U.S. 414, 424 (1968), if the Chapter 7 Trustee has never provided a copy of the **actual signed settlement agreement** to all parties in interest. *See* Fed. R. Bankr. P. 9019(a); 11 U.S.C. § 102(a) (defining "notice and a hearing"); Fed. R. Bankr. P. 2002(a)(3) (requiring 21 days' notice for hearing to approve settlement).

Bankruptcy Rule 9019 is a procedural rule; Bankruptcy Code § 363 is the substantive basis for the debtor's disposition of property in bankruptcy. *See Northview Motors, Inc. v. Chrysler Motors Corp.*, 186 F.3d 346, 351 (3d Cir. 1999). Under § 363, if a debtor disposes of estate assets outside the "ordinary course of business," then it must do so only after notice and a hearing. 11 U.S.C. § 363(b)(1). *See, e.g.*, *Seminole Walls*, 388 B.R. at 393 & n.5; *Pineo v. Turner (In re Turner)*, 274 B.R. 675, 680 (W.D. Pa. 2002); *Stroud*, 205 B.R. at 725–26.

The purpose of Rule 9019 is to prevent **"concealed agreements which are unknown to the creditors and unevaluated by the court"**. *United Shipping Co.*, 1989 WL 12723 at *5 (Rule 9019's purpose "is to protect other creditors against bad deals made between one creditor and the debtor."). Therefore, although Rule 9019 doesn't explicitly mention signed settlement agreements, the practical requirements of seeking and obtaining court approval make providing a copy of the agreement to the court and interested parties a standard and necessary step. All parties in interest need to review the the signed settlement agreement itself to determine if they are prejudiced. **This assessment requires the Court reviewing the signed settlement agreement itself**. This enables the court to fulfill its duty of ensuring the fairness and equity of the settlement.

In essence, the court cannot approve an agreement it hasn't seen. The court needs to examine the details of the agreement to ensure it is fair and equitable to all parties involved, including creditors Without the actual settlement agreement, the court lacks the necessary

2

information to make a determination regarding the fairness and appropriateness of the compromise.

## II.     This Court cannot approve a settlement agreement involving *non-estate* property.

The Trustee's Settlement Motion cannot be approved as it constitutes fraud on the Court and a breach of the Trustee's fiduciary duties. The proposed settlement—which contemplates the Chapter 7 Trustee conveying ***non-estate property*** to the King Parties in exchange for $150,000— is tantamount to **fraud** and, therefore, would be in violation of the Chapter 7 Trustee's fiduciary duty to administer the bankruptcy estate in a lawful manner. See *In re Anderson*, 377 B.R. 865 (2007).[1] See also *Etgen v. Washington County Bldg. Loan Ass'n.,* 184 Md. 412, 41 A.2d 290 (1945) ("where two or more persons conspire to carry out a fraud to cheat another, each of them is liable to the defrauded party irrespective of the degree of his activity in the fraudulent transaction or whether he shared in the profits of the scheme. In order to establish liability of a participant in a fraud, it is not necessary to show that he was a party to its contrivance at its inception. If it is shown that he knew of the fraudulent scheme and willfully aided in its execution, he is chargeable with the consequences. All persons who participate in such a transaction are jointly liable for the ensuing injury regardless of the degree of culpability. *Lomita Land W*ater Co. v. Robinson, 154 Cal. 36, 97 P. 10, 14."). Id. at 418.

The Trustee has not met his burden of proof that Serv Trust's property is property of the bankruptcy estate, *Genger*, No. 19-13895 (JLG), 2024 WL 4438857 (Bankr. S.D.N.Y. Oct. 5, 2024, and section 105 does not authorize a bankruptcy court to create substantive rights that are

---

[1] On December 18, 2018, **The Honorable Anne K. Albright** found that Brian King as the Managing Member of 6789 Goldsboro LLC breached his fiduciary duty to Serv Trust "in order to benefit himself and the other class A members" (his family), concluding that Mr. King's actions "**would amount to constructive fraud.**".

3

Appellee's Appendix 0202

otherwise unavailable under applicable law. Accordingly, the Trustee's Settlement Motion must

be denied.

    RESPECTFULLY SUBMITTED on this 3rd day of July, 2025.

                      _____

                      Gregory B. Myers, *pro se*
                      700 Gulf Shore Blvd. N.
                      Naples, Florida 34102
                      (301) 325-2312
                      gregbmyers@verizon.net

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on ~~February 4~~ July 3, 2025, a copy of the foregoing Supplement was

furnished via first class U.S. Mail, postage prepaid to the following parties:

Roger Schlossberg
Frank J. Mastro
P.O. Box 2017
Hagerstown, MD 21742-2017

Maurice B. VerStandig, Esq.
The VerStandig Law Firm, LLC
1452 W. Horizon Ridge Pkwy., Suite 665
Henderson, NV 89012

                      _____

                      Gregory B. Myers, *pro se*

4

Appellee's Appendix 0203

Entered: July 3rd, 2025
Signed: July 3rd, 2025

**SO ORDERED**



MARIA ELLENA CHAVEZ-RUARK
U.S. BANKRUPTCY JUDGE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | | |
|---|---|---|
| In re: | ) | |
| GREGORY B. MYERS, | ) | Case No. 15-26033-MCR |
|     Debtor. | ) | (Chapter 7) |
| | ) | |
| | ) | |
| BRIAN KING, *et al*., | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. No.:  24-00007 |
| | ) | |
| ROGER SCHLOSSBERG, TRUSTEE, | ) | |
|     Defendant. | ) | |
| | ) | |

**ORDER APPROVING TRUSTEE'S COMPROMISE
AND SETTLEMENT WITH KING PARTIES**

Before the Court is the *Motion for Approval of Proposed Compromise and Settlement with King Plaintiffs* (the "*Rule 9019 Motion*"), [Dkt. No. 17], filed by Roger Schlossberg, the Chapter 7 Trustee herein, and the objections thereto filed by the Debtor, Gregory B. Myers, [Dkt. Nos. 19 and 22]. The Court conducted an in-person evidentiary hearing on June 30, 2025 and July 1, 2025. The Court then convened a virtual hearing on July 3, 2025 to orally issue its findings of fact and conclusions of law, and to deliver its ruling. For the reasons stated on the

record at the aforementioned virtual hearing on July 3, 2025, it is by the United States Bankruptcy Court for the District of Maryland, hereby

**ORDERED**, that the *Rule 9019 Motion* shall be, and the same hereby is, **GRANTED**; and it is further

**ORDERED**, that the compromise and settlement set forth below, which is described in the *Rule 9019 Motion* and which was clarified and affirmed by the Trustee and the King Parties at the evidentiary hearing on June 30, 2025 and July 1, 2025, shall be, and the same hereby is, **APPROVED**:

    (1)    The King Parties shall pay to the Trustee, for the benefit of the Estate, the sum of $150,000.00 (the "Settlement Payment") which shall be accepted by the Trustee as full consideration for: (i) the transfer by the Trustee to the King Parties of all of the right, title and interest of the Trustee, the Debtor and the bankruptcy estate in and to any and all membership interest in or property of 6789 Goldsboro LLC; and (ii) settlement of all claims asserted by the King Parties in the above-captioned adversary case;

    (2)  Upon successful negotiation of the Settlement Payment by the Trustee, the parties shall file a Stipulation of Dismissal with prejudice all claims asserted in the above-captioned adversary case;

    (3)  The King Parties shall reimburse the Trustee for all reasonable and necessary legal fees and expenses that the Trustee incurs in connection with the litigation of any appeals, and any motions for reconsideration or motions to alter/amend judgment, taken by any party with respect to this *Order*; and

<div align="center">2</div>

   (4) Proofs of Claim Nos. 21-1, 22-1, and 23-1 filed by the King Parties in Case No. 15-26033 shall be deemed withdrawn by the King Parties effective as of the date that this *Order* becomes final and non-appealable.

<center>**END OF ORDER**</center>

cc: Roger Schlossberg, Esq.
   Frank J. Mastro, Esq.
   Maurice B. VerStandig, Esq.
   Gregory B. Myers, Debtor
   United States Trustee
   All persons requesting notice

<center>3</center>

Appellees' Appendix 0206



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

In re:

GREGORY B. MYERS,

     Debtor.

_____/

Case No.  15-26033-MCR
(Chapter 7)

BRIAN KING, *et al.*,

     Plaintiffs,

v.

ROGER SCHLOSSBERG, TRUSTEE,

     Defendant.

_____/

Adv. No. 24-00007

## NOTICE OF APPEAL

Gregory B. Myers appeals to the United States District Court for the District of Maryland from the ORDER APPROVING TRUSTEE'S COMPROMISE AND SETTLEMENT WITH KING PARTIES (Doc 61) entered on July 3, 2025, by the United States Bankruptcy Court for the District of Maryland in Adversary Case No. 24-00007, a copy of which is attached hereto as **Exhibit A**.

The parties to this appeal are as follows:

     Appellant: Gregory B. Myers

     Appellee: Roger Schlossberg, Chapter 7 Trustee

          Counsel:
          Frank J. Mastro
          Roger Schlossberg
          Schlossberg & Mastro

<center>1</center>

18421 Henson Blvd., Suite 201
Hagerstown, MD 21742

Appellee: Brina King
Appellee: Cristina King
Appellee: Cristina and Brian King Children's Trust

Counsel:
Maurice B. VerStandig, Esq.
The VerStandig Law Firm, LLC
1452 W. Horizon Ridge Pkwy., Suite 665
Henderson, NV 89012

Dated: July 17, 2025.


Gregory B. Myers, *pro se*
700 Gulf Shore Blvd. N.
Naples, Florida 34102
(301) 325-2312
gregbmyers@verizon.net

2

Appellees' Appendix 0208

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 17, 2025, a copy of the foregoing was furnished to the

following parties:

Roger Schlossberg
Frank J. Mastro
P.O. Box 2017
Hagerstown, MD 21742-2017

Maurice B. VerStandig, Esq.
The VerStandig Law Firm, LLC
1452 W. Horizon Ridge Pkwy., Suite 665
Henderson, NV 89012

_____

Gregory B. Myers, *pro se*

3

Appellees' Appendix 0209

**Fill in this information to identify the case:**

Debtor 1      Gregory B. Myers

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:   District of Maryland

Case number    15-26033-MCR

---

Official Form 410

# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense.** Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

---

## Part 1:   Identify the Claim

| | |
|---|---|
| 1. Who is the current creditor? | Brian King |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor _____ |
| 2. Has this claim been acquired from someone else? | ☑ No<br>☐ Yes. From whom? _____ |

| 3. Where should notices and payments to the creditor be sent? | Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|---|
| Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | The VerStandig Law Firm, LLC<br>Name | Name |
| | 1452 W. Horizon Ridge Pkwy, #665<br>Number    Street | Number    Street |
| | Henderson        NV        89012<br>City          State        ZIP Code | City          State          ZIP Code |
| | Contact phone   (301) 444-4600 | Contact phone _____ |
| | Contact email   mac@mbvesq.com | Contact email _____ |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |
| | __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ | |

| 4. Does this claim amend one already filed? | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____     Filed on _____<br>MM / DD / YYYY |
|---|---|

| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No<br>☐ Yes. Who made the earlier filing? _____ |
|---|---|

---

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$_____ 0.00 **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Equitable and statutory claim, as set forth in Case No. 24-00007

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:                    $_____

Amount of the claim that is secured:       $_____

Amount of the claim that is unsecured:  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:       $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**       $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

Appellee's Appendix 0211

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  01/10/2024
  MM / DD / YYYY

/s/ Maurice B. VerStandig
_____
Signature

Print the name of the person who is completing and signing this claim:

| Name | Maurice | Belmont | VerStandig |
|---|---|---|---|
| | First name | Middle name | Last name |

| Title | Attorney |
|---|---|

| Company | The VerStandig Law Firm, LLC |
|---|---|
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |

| Address | 1452 W. Horizon Ridge Pkwy, #665 |
|---|---|
| | Number        Street |
| | Henderson                    NV            89012 |
| | City                              State        ZIP Code |

| Contact phone | (301) 444-4600 | Email | mac@mbvesq.com |
|---|---|---|---|

Appellee's Appendix 0212

**Fill in this information to identify the case:**

Debtor 1 ___Gregory B. Myers___

Debtor 2 _____
(Spouse, if filing)

United States Bankruptcy Court for the: District of Maryland

Case number ___15-26033-MCR___

## Official Form 410

# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense.** Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Cristina King
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

The VerStandig Law Firm, LLC
Name

1452 W. Horizon Ridge Pkwy, #665
Number          Street

Henderson          NV          89012
City                    State              ZIP Code

Contact phone    (301) 444-4600

Contact email    mac@mbvesq.com

**Where should payments to the creditor be sent?** (if different)

Name

Number          Street

City                    State              ZIP Code

Contact phone    _____

Contact email    _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____    Filed on _____
                                                                MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

Official Form 410                          Proof of Claim

**Part 2:**    **Give Information About the Claim as of the Date the Case Was Filed**

6. **Do you have any number you use to identify the debtor?**

  ☑ No

  ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

7. **How much is the claim?**    $_____ 0.00    **Does this amount include interest or other charges?**

  ☑ No

  ☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Equitable and statutory claim, as set forth in Case No. 24-00007

9. **Is all or part of the claim secured?**

  ☑ No

  ☐ Yes. The claim is secured by a lien on property.

    **Nature of property:**

    ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

    ☐ Motor vehicle

    ☐ Other. Describe: _____

    **Basis for perfection:** _____

    Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

    **Value of property:**    $_____

    **Amount of the claim that is secured:**    $_____

    **Amount of the claim that is unsecured:**    $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

    **Amount necessary to cure any default as of the date of the petition:**    $_____

    **Annual Interest Rate** (when case was filed) _____%

    ☐ Fixed

    ☐ Variable

10. **Is this claim based on a lease?**

  ☑ No

  ☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

11. **Is this claim subject to a right of setoff?**

  ☑ No

  ☐ Yes. Identify the property: _____

Appellee's Appendix 0214

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:  Sign Below**

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  01/10/2024
                   MM / DD / YYYY

/s/ Maurice B. VerStandig
Signature

Print the name of the person who is completing and signing this claim:

| Name | Maurice | Belmont | VerStandig |
|---|---|---|---|
| | First name | Middle name | Last name |

| Title | Attorney |
|---|---|

| Company | The VerStandig Law Firm, LLC |
|---|---|
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |

| Address | 1452 W. Horizon Ridge Pkwy, #665 |
|---|---|
| | Number          Street |
| | Henderson                    NV          89012 |
| | City                    State    ZIP Code |

| Contact phone | (301) 444-4600 | Email | mac@mbvesq.com |
|---|---|---|---|

Appellee's Appendix 0215

**Fill in this information to identify the case:**

Debtor 1    Gregory B. Myers

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the: District of Maryland

Case number    15-26033-MCR

Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

## Part 1: Identify the Claim

| | |
|---|---|
| 1. Who is the current creditor? | Cristina and Brian King Children's Trust |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor _____ |
| 2. Has this claim been acquired from someone else? | ☑ No<br>☐ Yes. From whom? _____ |

| 3. Where should notices and payments to the creditor be sent? | Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|---|
| Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | The VerStandig Law Firm, LLC<br>Name<br><br>1452 W. Horizon Ridge Pkwy, #665<br>Number   Street<br><br>Henderson   NV   89012<br>City   State   ZIP Code<br><br>Contact phone   (301) 444-4600<br><br>Contact email   mac@mbvesq.com | Name<br><br>Number   Street<br><br>City   State   ZIP Code<br><br>Contact phone _____<br><br>Contact email _____ |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br><br>__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ | |

| | |
|---|---|
| 4. Does this claim amend one already filed? | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____     Filed on ____ / ____ / _____<br>                                                               MM / DD / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No<br>☐ Yes. Who made the earlier filing? _____ |

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**   $_____ 0.00   **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Equitable and statutory claim, as set forth in Case No. 24-00007

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**   $_____
**Amount of the claim that is secured:**   $_____
**Amount of the claim that is unsecured:**   $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $_____

**Annual Interest Rate** (when case was filed)_____%
☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

Appellees' Appendix 0217

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:  Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   01/10/2024
                   MM / DD / YYYY

/s/ Maurice B. VerStandig
_____
Signature

Print the name of the person who is completing and signing this claim:

| Name | Maurice | Belmont | VerStandig |
|---|---|---|---|
| | First name | Middle name | Last name |

Title   Attorney

Company   The VerStandig Law Firm, LLC
          Identify the corporate servicer as the company if the authorized agent is a servicer.

Address   1452 W. Horizon Ridge Pkwy, #665
          Number        Street
          Henderson                    NV        89012
          City                         State     ZIP Code

Contact phone   (301) 444-4600          Email   mac@mbvesq.com

Appellee's Appendix 0218

1                    UNITED STATES BANKRUPTCY COURT
                    FOR THE DISTRICT OF MARYLAND
2                         Greenbelt Division

3        In Re:                          Case No. 15-26033

4        GREGORY B. MYERS,               Chapter 7

5              Debtor.                    Greenbelt, Maryland
                                          Monday, June 30, 2025
6        : : : : : : : : : : : : : : :

7        BRIAN KING, ET AL.,             Adv. Proc. 24-00007

8              Plaintiffs.

9        v.

10       ROGER SCHLOSSBERG,

11             Defendant.

12       : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

13

14                    TRANSCRIPT OF HEARING ON

15                        RE: 24-00007
         17 APPLICATION TO COMPROMISE CONTROVERSY FILED BY DEFENDANT
16                        ROGER SCHLOSSBERG
             19 OBJECTION FILED BY DEBTOR GREGORY B. MYERS
17       20 MOTION FOR MISCELLANEOUS RELIEF FILED BY DEFENDANT ROGER
                              SCHLOSSBERG
18          22 SUPPORT DOCUMENT FILED BY DEBTOR GREGORY B. MYERS
              23 RESPONSE FILED BY DEBTOR GREGORY B. MYERS
19          24 RESPONSE FILED BY DEFENDANT ROGER SCHLOSSBERG

20                        RE: 15-26033
         1051 OBJECTION TO CLAIM FILED BY DEBTOR GREGORY B MYERS
21       1052 OBJECTION TO CLAIM FILED BY DEBTOR GREGORY B MYERS
         1053 OBJECTION TO CLAIM FILED BY DEBTOR GREGORY B MYERS
22        1060 OPPOSITION FILED BY INTERESTED PARTY BRIAN KING,
                    INTERESTED PARTY CRISTINA KING
23
             BEFORE THE HONORABLE MARIA ELLENA CHAVEZ-RUARK,
24                 UNITED STATES BANKRUPTCY JUDGE

25

2

```
1    APPEARANCES:

2    For Roger Schlossberg,          Frank J. Mastro, Esq.
     Chapter 7 Trustee:              Roger Schlossberg, Esq.
3                                    SCHLOSSBERG & MASTRO
                                     18421 Henson Boulevard
4                                    Suite 201
                                     Hagerstown, MD 21742
5
     For Brian King:                 Maurice B. VerStandig, Esq.
6                                    THE VERSTANDIG LAW FIRM, LLC
                                     9812 Falls Road
7                                    Suite 114-160
                                     Potomac, MD 20854
8
     Also Present:                   Gregory B. Myers
9                                    Pro Se Debtor

10

11

12

13

14

15

16

17

18
     Audio Operator:                 Jennifer Whitfield
19                                   (301)344-3965

20
     Transcript prepared by:         ESCRIBERS
21                                   7227 North 16th Street
                                     Suite #207
22                                   Phoenix, Arizona 85020
                                     (800)257-0885
23

24   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.
25
```

escribers
www.escribers.net | 800-257-0885

```
 1                   GREENBELT, MARYLAND - JUNE 30, 2025

 2            THE CLERK:  All rise.  Silence, please, and come to

 3     order.  The United States Bankruptcy Court for the District of

 4     Maryland is now in session, the Honorable Maria Ellena Chavez-

 5     Rurak presiding.

 6            Please be seated.  Calling the case of Gregory B.

 7     Myers, case number 15-26033.  The matters for consideration

 8     for the Court today are docket entry 1051, objection to claim

 9     number 22, filed by the debtor, docket entry 1052, objection

10     to claim number 23, filed by the debtor, docket entry 1053,

11     objection to claim number 21, filed by the debtor, and docket

12     entry 1060, opposition to objections, filed on behalf of the

13     King parties.

14            And we're also calling adversary number 24-00007,

15     King, et al. v. Schlossberg.  The matters before the Court are

16     docket entry 17, application to compromise controversy, filed

17     on behalf of the defendant, docket entry 19, preliminary

18     objection to trustee's application to compromise controversy

19     filed by the debtor, docket entry 22, supplement to

20     preliminary objection, filed by the debtor, docket entry 20,

21     motion to strike debtor's objection, filed on behalf of the

22     defendant, docket entry 23, response to motion to strike,

23     filed by the debtor, and docket entry 24, response to

24     opposition filed on behalf of the defendant.

25                   Starting with counsel for the plaintiffs, please
```



Appellees' Appendix 0221

www.escribers.net | 800-257-0885

4

```
1    state your name and clients for the record.

2           MR. MASTRO:  Good morning, Your Honor.  Frank Mastro

3    on behalf of the Chapter 7 trustee, Roger Schlossberg.

4           THE COURT:  Good morning.

5           MR. SCHLOSSBERG:  Good morning, Your Honor.  Roger

6    Schlossberg, trustee, counsel to the trustee.

7           THE COURT:  Good morning.

8           MR. VERSTANDIG:  Good morning, Your Honor.  Maurice

9    VerStandig on behalf of Brian King, Cristina King, and Brian

10   and Cristina King in their capacity as trustees of the

11   Cristina and Brian King Children's Trust.

12          THE COURT:  Good morning to you.

13          MR. MYERS:  Good morning, Your Honor.  Gregory Myers.

14          THE COURT:  Good morning, Mr. Myers.

15          MR. MYERS:  Morning.

16          THE COURT:  All right.  Well, we have a number of

17   matters on the docket for today.  We have, in the main

18   bankruptcy case, Mr. Myers' objections to the three claims

19   filed by we'll just refer to them as the King parties.  And

20   then in the adversary proceeding, we have the application to

21   compromise controversy filed by the trustee and a motion to

22   strike the debtor's objection to the trustee's motion.

23          The Court understands that there was also a motion to

24   intervene filed by Mr. Myers and a motion to dismiss the

25   adversary proceeding filed by Mr. Myers.  Apparently, they
```

escribers

www.escribers.net | 800-257-0885

1    were filed after business hours on Friday evening and were

2    just docketed literally just moments ago.  So I don't know if

3    the plaintiff and -- the plaintiffs and the defendant have had

4    an opportunity to look at that.  The Court is not going to

5    consider the motion to intervene or the motion to dismiss

6    today because they were just filed.

7           With regard to the motion to strike, and the Court

8    has given Mr. Myers an opportunity to be heard on other

9    matters, but the Court is going to deny the motion to strike

10   filed by the trustee.

11          So Willemain v. Kivett, 764 F.2d 1019, decided by the

12   Fourth Circuit in 1985 --

13         Please, everyone, have a seat.  I'm sorry.  You don't

14   have to continue standing.

15         The court set forth the well-known rule that when a

16   Chapter 7 case has an insolvent debtor, that the debtor -- or

17   has an insolvent bankruptcy estate, that the debtor does not

18   have a right to be heard.  Here, Mr. Myers has been denied a

19   discharge or his discharge was revoked.  And therefore, to the

20   extent any claims are not discharged in the bankruptcy

21   proceeding, he has a pecuniary interest.  So the Court is

22   going to give him an opportunity to be heard.

23         Let me cite to a couple of cases.  Grausz v.

24   Englander, 321 F.3d 467, out of the Fourth Circuit, 2003.

25   McGuirl v. White, 86 F.3d 1232, out of the D.C. Circuit, 1996.

1   And In re: Byrd, decided by Judge Catliota of this court, 2011

2   WL 589907, decided on February 10th, 2011, which was affirmed

3   in the decision Byrd v. Johnson, 467 B.R. 832, out of the

4   District of Maryland, 2012, and also affirmed in In re: Byrd,

5   484 Fed.Appx. 845, out of the Fourth Circuit, 2012.

6          And so those cases say that Willemain v. Kivett does

7   not apply where a debtor is denied a discharge because

8   bankruptcy actions could have an effect on the amount of the

9   discharge claims that the debtor remains obligated to pay once

10  the automatic stay is terminated.

11         So for all of those reasons, the Court is going to

12  deny the motion to strike and allow Mr. Myers an opportunity

13  to be heard.

14         All right.  So that leaves us with the application to

15  compromise controversy and the three claim objections.  I

16  propose that we put witnesses on the stand one time, instead

17  of having them on the stand and then off.  So the Court

18  proposes that we hear the application and the claim objections

19  together.

20         Let me start by asking the plaintiffs and the

21  defendant if they have anything to say before the Court

22  continues.

23         MR. VERSTANDIG:  Your Honor, no objection to doing so

24  in that manner.  I would note, if the application to

25  compromise is granted, my clients will withdraw the three

1    claims upon entry of an order granting the application

2    becoming a final order beyond any appellate deadline.

3         THE COURT:  All right.  Thank you, Mr. VerStandig.

4         Mr. Mastro, is there anything you'd like to say

5    before the Court continues?

6         MR. MASTRO:  We have no objection to proceeding in

7    the fashion that Your Honor has outlined.

8         THE COURT:  All right.  Mr. Myers, you're standing.

9    What would you like to say?

10         MR. MYERS:  Yes, Your Honor.  Preliminary matter.

11    There was a complaint demand for trial by jury filed this

12    morning against you in your official capacity, Ramona D.

13    Elliott, Roger Schlossberg, Frank Mastro, Schlossberg &

14    Associates, P.A., and Maurice VerStandig.  And there was also

15    a motion to disqualify you that was filed in my bankruptcy

16    case -- well, in this adversary and my bankruptcy case,

17    predicated upon this complaint demand for jury trial being

18    filed.

19         You have a per se conflict of interest.  It's not

20    even bias and prejudice.  It goes far beyond that.  And for

21    those reasons, I don't believe you can hear this matter.  I

22    believe you need to recuse yourself, and another judge needs

23    to take this matter up.  And that's a matter that I believe

24    needs to be heard before anything else can be heard in this

25    case.

1           Additionally, if I understood the -- well, I'll leave

2    that first.  And then if I understood, did you suggest the

3    order is they do their --

4           THE COURT:  We're doing it all together, Mr. Myers.

5           MR. MYERS:  But something was after something,

6    according to what Mr. VerStandig said?

7           THE COURT:  Mr. VerStandig said that his clients will

8    withdraw their claims if the settlement is approved.

9           MR. MYERS:  Okay.  Will their claims go first, the

10   claim objections to their claims?

11          THE COURT:  The Court's going to hear them together.

12          MR. MYERS:  Well, they won't have any standing in the

13   adversary if they don't have a claim.

14          THE COURT:  That's not true, Mr. Myers.  Thank you.

15          MR. MYERS:  Okay.  Well --

16          THE COURT:  With regard to your -- as I've told you

17   numerous times, if you file something moments before a hearing

18   is scheduled to begin, the Court does not have time to

19   consider it.  This hearing has been scheduled for almost two

20   months, and so we're going to go forward with the hearing.

21   And the Court will deal with your motions in the ordinary

22   course.

23          I'm giving you an opportunity to be heard.  So with

24   regard to your motion to intervene, the Court will address

25   that, if and when the time comes.  I'm giving you an

1    opportunity to be heard as a party-in-interest.

2          With regard to your other motions, they were filed --

3    some were filed on Friday evening.  Apparently, some were

4    filed moments before this hearing began.  I haven't seen what

5    you filed this morning, and so I'm not going to consider it.

6    If you wanted -- if you wanted the Court to consider a motion

7    before this hearing, you should have filed it earlier.  So --

8          MR. MYERS:  Respectfully, respectfully, Your Honor,

9    there's no time limit.  Subject matter jurisdiction can be

10   raised at any time.  You have an obligation to consider and

11   resolve your subject matter jurisdiction.

12         You have a clear conflict of interest.  It cannot

13   wait.  It must be resolved.  You must rule on it.  That is the

14   case law.  I know it.  You know it.  And so if you don't, then

15   everything here will be void.  So you need to consider this

16   and rule on it because you do have a clear conflict of

17   interest.

18         THE COURT:  Mr. Myers, I --

19         MR. MYERS:  Thank you.

20         THE COURT:  -- don't need you to tell me what I need

21   to do.  You can sit down.  I'm going to go forward with the

22   hearing.  Thank you.

23         MR. MYERS:  Okay.  Well, then I'll place --

24         THE COURT:  All right.  So --

25         MR. MYERS:  -- my objection on the record for --



10

```
 1              THE COURT:  It's on the record, Mr. Myers.  Have a

 2    seat.

 3              MR. MYERS:  No, you can't cut me off.

 4              THE COURT:  Have a seat.

 5              MR. MYERS:  I can put my comments on the record.  I

 6    object because of a lack of subject matter jurisdiction.

 7              THE COURT:  I heard you ten minutes ago.  Thank you.

 8              MR. MYERS:  Okay.

 9              THE COURT:  All right.  So Mr. Mastro, we're going to

10    hear from I'm going to have you put on your case first

11    since --

12              MR. MYERS:  Judge Rurak, there's other jurisdictional

13    matters.

14              THE COURT:  Mr. Myers.

15              MR. MYERS:  Jurisdiction has to be considered first.

16    There is other jurisdictional matters.

17              THE COURT:  I'm not going to hear --

18              MR. MYERS:  Unrelated to this.

19              THE COURT:  I'm not going to hear -- you can raise

20    them as objections in connection with the case.  I'm not going

21    to have you try and derail the proceedings at this late hour.

22    You've had time to file motions.  You've raised subject matter

23    jurisdiction in almost every proceeding, and I've rejected it.

24              If you want to raise an objection, you can raise it

25    in connection with the proceeding.  But we're going to get
```



1    started with our witnesses.  Please have a seat.  Thank you.

2              Mr. Mastro, call your first witness.  We're not going

3    to have opening statements.

4              MR. MASTRO:  Okay.  I call Roger Schlossberg,

5    trustee.

6              MR. MYERS:  I object to not having opening

7    statements.

8              THE COURT:  Objection's noted.  Thank you.

9              Mr. Schlossberg, please come up and have a seat.

10   Now, I'm going to ask what you have in your hands there.  Are

11   these your exhibits?

12             MR. SCHLOSSBERG:  One of these books is our exhibits,

13   and the others are materials that I think I might need to make

14   reference to, and I'll be happy to identify them at any time

15   I'm looking at them.

16             THE COURT:  Okay.

17             MR. SCHLOSSBERG:  And that's a blank page.

18             THE COURT:  Okay.  All right.

19             MR. MYERS:  Objection, Your Honor.  In the past,

20   witnesses aren't allowed to bring materials up to the stand.

21             THE COURT:  But do you have authority for that?

22             MR. MYERS:  Every hearing in this case, Judge Lipp

23   and yourself do not allow witnesses to bring materials to the

24   stand.

25             THE COURT:  You can take materials to the stand, but

1   you'll have to make them available to the other side if you're

2   going to do that.

3       MR. MYERS:  I don't have them.  And I don't know what

4   he's got.  And he shouldn't be allowed to have up there any

5   materials --

6       THE COURT:  Mr. Schlossberg.

7       MR. SCHLOSSBERG:  Your Honor, I'm not familiar with

8   that rule.  I apologize.  Perhaps I'm an inexperienced

9   litigant, and I'm an inexperienced witness.  But I'm neither.

10      And I've been in this courtroom before.  I have

11  brought materials up with me.  If I am making reference to

12  something that's not an exhibit, I make a point of telling the

13  Court what I'm looking at.

14      THE COURT:  And that's fine.  Just, we should be

15  prepared to mark whatever you look at as an exhibit.

16      MR. MYERS:  Let counsel mark it and hand it to --

17      THE COURT:  Mr. Myers, I don't need any help from

18  you.  Thank you.

19      MR. MYERS:  Well, I'm sorry, Your Honor.

20      THE COURT:  Please stop talking.

21      MR. MYERS:  Your Honor, you have.  You have not

22  allowed me to bring materials.

23      THE COURT:  If you are not going to observe the

24  decorum of this court and the rules and the procedures of this

25  court, then you will not participate in these proceedings, Mr.

1   Myers.  We've been through this before.

2           MR. MYERS:  Yeah.  You're violating my due process

3   rights.  You have ruled previously --

4           THE COURT:  How am I doing that now?

5           MR. MYERS:  You have ruled previously, you, in this

6   court in one of my cases, many of my cases, and so has Judge

7   Lipp.  You are not allowed to bring materials up to the

8   witness stand with you.

9           THE COURT:  There is no rule that says that.  If Mr.

10  Schlossberg wants to bring materials to the stand with him, he

11  can do that.  And the materials will stay on the stand so that

12  any other witnesses can look at them as well.  We'll mark them

13  as exhibits.

14          So Mr. Schlossberg, it's your choice.  We can mark

15  whatever as an exhibit, or we can put it back on the table.

16  It's your call.

17          MR. SCHLOSSBERG:  Your Honor, I wouldn't know what to

18  mark at this point because I don't know that I'll need to look

19  at something.  So I will have them here.  And if I get to that

20  point, I'll pull them out of the notebook.  And I will offer

21  them to the Court.

22          MR. MYERS:  I'm sorry.  Excuse me, Your Honor.

23          THE COURT:  That's fine.  Thank you.  All right.

24          MR. MYERS:  He's not representing himself.  He's up

25  there as a Chapter 7 trustee.  I'd like clarification on that.

1        THE COURT:  Mr. Myers, if you keep speaking out of
2   turn -- I want you to be able to participate in these
3   proceedings, but you keep interrupting everyone.  That is not
4   the way it works.  Stop it.  I will give you a chance to be
5   heard.  And when it's your turn, I will hear from you.  I'm
6   speaking to Mr. Schlossberg right now.
7        Mr. Schlossberg, thank you.  If you do pull anything
8   out, we'll mark it as an exhibit, and we'll make it available
9   to all of the parties in the room.
10       MR. SCHLOSSBERG:  Understood, Your Honor.
11       THE COURT:  Thank you.  If you would turn and face
12  Ms. Whitfield, she will place you under oath.  Thank you.
13       THE CLERK:  Please raise your right hand.
14   (Witness sworn)
15       THE CLERK:  Please be seated and state your name and
16  business address for the record.
17       THE WITNESS:  Roger Schlossberg.  Office is at 18421
18  Henson Boulevard, Suite 201, Hagerstown, Maryland 21742.
19       THE COURT:  All right.  Mr. Mastro, you may proceed.
20       MR. MASTRO:  Thank you, Your Honor.
21  DIRECT EXAMINATION
22  BY MR. MASTRO:
23  Q.   Good morning, Mr. Schlossberg.
24  A.   Good morning, Mr. Mastro.
25  Q.   You are the Chapter 7 trustee in this case; is that



1    correct?

2    A.    I have that privilege.

3    Q.    And how long have you been the Chapter 7 trustee in this

4    case?

5    A.    February of 2017, I believe I was appointed, Your Honor.

6    Q.    And how long have you been a Chapter 7 trustee in this

7    district?

8    A.    I have been a Chapter 7 trustee since July of 1982.  I'm

9    in my forty-second year.

10   Q.    And --

11   A.    Finishing it, actually.

12   Q.    And in your forty-two years of being a Chapter 7 trustee,

13   have you had occasion before to put forth before the Court a

14   Rule 9019 motion for approval of a settlement?

15   A.    I have.

16   Q.    And what I want to focus on today, Mr. Schlossberg, is

17   what informed your judgment to cause you to seek approval of

18   the settlement that's currently before the Court.

19          MR. MASTRO:  And I'll assume the Court's familiar

20   with the papers, since we haven't gone through an opening

21   so -- but Your Honor, if there's anything that you need

22   clarification, please say so, and I'm happy to jump in and add

23   that.

24          THE COURT:  The Court has read all of the

25   pleadings --



1          MR. MASTRO:  Great.

2          THE COURT:  -- that were noticed for today.  Thank

3     you.

4     Q.   Mr. Schlossberg.

5     A.   Yes, sir.

6     Q.   We have an adversary proceeding, in which the trustee has

7     been named as a defendant, and the King parties have been

8     named as the -- they're the plaintiff, correct?

9     A.   That is correct.

10    Q.   And are you familiar with the claim that has been

11    asserted by the King plaintiffs in this adversary proceeding?

12    A.   I am.

13    Q.   Okay.  And just briefly, can you describe the nature of

14    their claim?  I believe it's a declaratory judgment claim.

15    A.   Okay.

16         MR. MYERS:  No.  Objection.

17         THE COURT:  On what basis?

18         MR. MYERS:  He's testifying.

19         THE COURT:  Overruled.  You can describe the nature

20    of the complaint, Mr. Schlossberg.

21         THE WITNESS:  Thank you, Your Honor.

22    A.   The -- the complaint is a two-count complaint.  It

23    includes -- oh, excuse me.  No, this complaint is not.  This

24    complaint seeks the redemption, a declaration by the Court,

25    that Mr. VerStandig's client, 6789 Goldsboro and the Kings --

Appellees' Appendix 0234

www.escribers.net | 800-257-0885

1   and the King parties, as you described them earlier.  If we're

2   going to define them that way, I'll do that continuously, Your

3   Honor.  And the King parties have the right to redeem the

4   class B stock.  Oh, it was class B membership interests, I

5   should say.  The class B equity held by Serv Trust, a Maryland

6   statutory trust, which -- of which Mr. Myers is the principal.

7       The theory is that under the terms of the operating

8   agreement for 6789 -- I'm just going to call it that.  The

9   operating agreement for 6789 provided -- maybe I should take a

10  moment to talk about what that provided.  These folks entered

11  into a deal in 2013.  The King parties and Serv Trust, acting

12  through Mr. Myers, entered into a deal in 2013 with regard to

13  the acquisition of the property at 6789 Goldsboro Road in

14  Montgomery County.

15      This tract of land was thought to be valuable and capable

16  of subdivision into nineteen luxury townhouse lots.  And these

17  lots required subdivision approval from Montgomery County and

18  from the MN -- Montgomery -- excuse me, Maryland-National

19  Capital Park and Planning Commission.  Montgomery County

20  component.  MC at the end.  They -- they set it up.  In order

21  to be able to make this subdivision.

22      The agreement, and I'm referring to the first amended and

23  restated operating agreement of 6789 Goldsboro LLC.

24  Q.  And Mr. Schlossberg, can I jump in here?  And I want to

25  show you Exhibit 1.  And I put that up on the screen because I

escribers

Appellees' Appendix 0235

www.escribers.net | 800-257-0885

```
 1   think that may be helpful.  And ask you to identify it and
 2   then continue with your understanding of --
 3   A.   That is the document to which I'm making reference.
 4        MR. MYERS:  Objection, Your Honor.  The problem with
 5   him having stuff up there is he just started to identify a
 6   document that hasn't been placed in the record as evidence.
 7   This is a evidentiary hearing.  And then there's things popped
 8   up the screen.
 9        THE COURT:  Mr. Myers, stand up when you're
10   addressing the Court.
11        MR. MYERS:  Oh, I'm sorry, Your Honor.
12        THE COURT:  Thank you.
13        MR. MYERS:  Objection.  He's just referenced a
14   document that is not in the record.  Has not been placed --
15   has not been marked as an evidentiary exhibit.  I don't know
16   what he's looking at.  And now, there's a screen here that's
17   not an exhibit.
18        This is improper.  I'm entitled.  If he wants to mark
19   an exhibit, hand it to Mr. Schlossberg, and hand me a copy so
20   I can see what it is so the exhibits are identified so the
21   record is clear.  Thank you.
22        THE COURT:  Your objection's overruled.  We use
23   electronic copies of exhibits in this courtroom.  And the
24   exhibit that is being identified and described and in the
25   process of being -- it's already been marked as Exhibit Number
```

1    1, and it's in the process of being identified.  So your

2    objection, I don't understand it, but the screen is showing

3    you the exhibit.

4            MR. MASTRO:  Thank you.

5            THE COURT:  Mr. Mastro, you may continue.

6            MR. MASTRO:  Thank you, Your Honor.

7    BY MR. MASTRO:

8    Q.   Mr. Schlossberg, do you recognize what I've put on the

9    screen that's been marked as pre-marked as Trustee Exhibit 1?

10   A.   I do.

11   Q.   And --

12   A.   And I have the same copy in front of me in my notebook,

13   Your Honor.

14   Q.   And what are we looking at here?

15   A.   We are looking at the operating agreement of 6789, which

16   was formed in July of 2013.  The execution date on this

17   document -- how do I get to the end of that?

18   Q.   I can scroll down.

19   A.    No, it's right in the first paragraph, on page --

20   probably page 2.  There we go.  July 18th, 2013, they entered

21   into this agreement.  This agreement provided for a three-year

22   period, during which Mr. Myers, as the manager of this LLC,

23   was to act on behalf of the parties -- excuse me, on behalf of

24   6789 and the equity partners therein to --

25            MR. MYERS:  Objection.  The document speaks for

1    itself.

2         THE COURT:  Objection overruled.  Mr. Schlossberg can

3    testify as to what his understanding of this agreement is.

4    A.   For the purposes of getting the property approved for

5    subdivision into hopefully nineteen town -- nineteen townhouse

6    lots.  The agreement went on to provide that Mr. Myers put

7    precious little into it in terms of cash, whereas the class A

8    members put $1,785,000 in as the initial capital investment.

9    That initial capital investment was utilized to purchase the

10   property from its then-owner for $1,350,000, plus roughly

11   $35,000 of settlement expenses.  And the remainder of the

12   money was to be used as required in the administration of the

13   purposes of the entity, and I just described what the purposes

14   were.  The agreement went on to --

15        MR. MYERS:  Your Honor, objection.  This isn't just,

16   like, a running thing.  He needs to ask a question.  He needs

17   to answer it.  And I have a -- I need to have a chance to

18   object.  He can't just stand up there and testify for an hour

19   about what he thinks about different subjects.

20        THE COURT:  Objection overruled.  You may continue.

21        THE WITNESS:  Thank you.

22   A.   The agreement goes on to provide that the class A members

23   are obliged to bring additional capital to the table, as

24   required for the purposes of the entity.  They've committed

25   themselves to three -- committed themselves to $300,000 of



1   additional capital, with no restriction on their ability to

2   exceed that number, if they so choose.

3          The agreement goes on to make clear that the three-year

4   period that I've just described as the period within which

5   they expected or hoped or prayed to get the subdivision

6   approval, that the expiration of that three-year period, the

7   class A members have the right to seek to redeem their -- the

8   class B -- I referred to it as stock, again.  I apologize.

9   It's membership interest, of course.  Have the right to redeem

10  the class B membership interest under an appraisal and

11  redemption scheme that's set out in 7.7, I think it is.  No,

12  no, the -- the -- how do I move this page here?

13  BY MR. MASTRO:

14  Q.   Yeah, I'll move it.

15  A.   Fingers?  Yeah, apparently so.

16         THE CLERK:  Mr. Schlossberg, you don't have the

17  option to move it at this time.

18         MR. MYERS:  Oh, I can't move it?

19         THE CLERK:  No, Mr. Fasano (ph.) has to move that.

20         MR. MYERS:  Oh, that's not like the district court,

21  where I did this.  Okay.  All right.  I'm sorry.

22  BY MR. MASTRO:

23  Q.   All right.  I moved, Mr. Schlossberg, to section 7 of

24  the --

25  A.   Okay.



Appellees' Appendix 0239

1    Q.    -- operating agreement --

2    A.    Go to the next page.

3    Q.    All right.

4    A.    Go to the next page, please.

5    Q.    Okay.  Did you review this portion of the operating

6    agreement?

7    A.    Yes.

8    Q.    Okay.  And what section would you like me to scroll down

9    to?

10   A.    I believe it's 7.7.  There we go.  Redemption.

11   Q.    Okay.

12   A.    The scheme is established through various sections, but

13   I'm just going to focus on this.  So let me set you up for it.

14   The -- at -- at -- after the three-year period, the class A

15   members had the right to demand an appraisal of the property.

16        The mechanism for doing that is it's a variation of the

17   three-step that we've all seen lawyers in this sort of thing,

18   where one party asks for an appraisal.  The other party

19   then -- and designates who their appraiser would be.  The

20   other party has a similar right to choose an appraiser.  The

21   appraisers get together.  If they can't agree, they agree on a

22   third appraiser.  And you establish the appraised value of the

23   property in that fashion.

24        That number, that appraised value number, is then

25   utilized in connection with the redemption provision in

escribers

www.escribers.net | 800-257-0885

1   section 7.7.  Under 7.7, if the class A members at any time

2   after the three years wish, and if the property has not

3   reached a state of entitlement, as it's used in this document,

4   that is the zoning and subdivision has been approved -- I

5   should say subdivision.  I don't think it was a zoning issue

6   per se.  But they had entitlement to develop it for nineteen

7   townhouse lots.

8        If they don't have that by the end of the three-year

9   period, and they have the right, then, to exercise the

10  appraisal option in connection with a proposed redemption.

11           THE COURT:  All right.  Hold on just one moment.  Mr.

12  Myers is standing.

13           Yes, Mr. Myers.

14           MR. MYERS:  Objection, Your Honor.  Relevance.  Why

15  is he even talking about this Serv Trust property is not

16  property of this estate.  He's never filed an adversary

17  against Serv Trust.  The Maryland case is ongoing and is on

18  appeal currently.  And there's no final judgment.  What is the

19  basis of his testimony?  I'd like to know what the basis of

20  this whole exercise in discussing Serv Trust, the King

21  parties, and 6789 Goldsboro Road is because he has no -- he

22  has no involvement in it.

23           THE COURT:  Well, you will have an opportunity to

24  cross-examine him.  And you can ask those questions at that

25  time.  Your objection --

```
 1          MR. MYERS:  I can't get a proffer is what the basis
 2    of this is?
 3          THE COURT:  No.  You can cross-examine him.  Your
 4    objection's overruled.
 5          I interrupted you, Mr. Schlossberg.  Were you
 6    finished answering the question?
 7          THE WITNESS:  I don't think I was, Your Honor.
 8    BY MR. MASTRO:
 9    Q.   Mr. Schlossberg, if I could just direct you here to
10    the -- I think where you left off was you were getting into
11    once the appraised value is established, what's the next step
12    in the appraisal process and the redemption of class B member
13    under 7.7?
14    A.   Under the provisions of the agreement, and specifically
15    section 7.7, the class A members have the right to seek to
16    redeem the class B interest, the membership interest, if
17    they -- if it is determined that the appraised value is less
18    than the sum of the following items.
19          And we are looking here, Your Honor, at the fourth line
20    in 7.7, Your Honor.  Two.  Three four.  Oh, excuse me.  Fifth
21    line.  Sentence.  That line in the second word commences with,
22    "If the appraised value is less than or equal to the sum of",
23    and then there are four items that have to be summed up.
24    There is the unpaid cumulative initial capital return, the
25    unrecovered initial capital, the unpaid cumulative additional
```

Appellees' Appendix 0242

1     capital return, and the unrecovered additional capital.

2          Now, Your Honor, the order in which they're put makes it

3     a little unusual, so I'm going to try and explain what that is

4     all about.  The second phrase, the unrecovered initial

5     capital, that refers to the $1,785,000 that had to be put up

6     by the class A members.

7          MR. MYERS:  Objection, Your Honor.  The document is

8     very complicated, drafted by Pillsbury, and he's out of the

9     blue making up definitions that are not in the operating

10    agreement.

11         THE WITNESS:  That's not so Your Honor.

12         MR. MYERS:  And he doesn't even have the final

13    operating agreement.

14         THE COURT:  Your objection's overruled.  Mr. Myers,

15    you'll have an opportunity to cross-examine him.

16         Please continue.

17    A.   The unrecovered initial capital.  The initial capital is

18    the $1,785,000.  The capital return referred to in the first

19    phrase, unpaid cumulative initial capital return, refers to a

20    provision earlier in this agreement, which says that the class

21    A members are entitled to that phrase, initial capital return,

22    which is calculated at ten percent per annum on the initial

23    capital.  That is a number which continues to run for the

24    entire period from 2013, when it was first put in, until

25    there's been a return of that capital.  Excuse me.  There's



```
 1    been a recovery of that capital.   At ten percent per year on

 2    $1,785,000, that's $178,500 per year.

 3        Unrecovered initial capital is the initial capital that

 4    has not been paid back to these folks, that they have not

 5    recovered, which they could recover from operations if there

 6    was operational cash to take it from or on a sale or other

 7    development, just the way property works.   Now, again, it's

 8    the sum of four things.   So first, it's the sum of the 1

 9    million-785 plus interest at ten percent per annum running on

10    that rate up until the present time.   Then you have the third

11    item, unpaid cumulative additional capital return.   And then

12    the fourth, sort of out of order, the unrecovered additional

13    capital.

14        The unrecovered additional capital, or let's just say the

15    additional capital.   Additional capital is monies that had to

16    be put in to fund the operations of the entity as it tried to

17    reach its goals, which initially was committed to be expended

18    in the sum of $300,000 by the class A members.

19        MR. MYERS:   Objection, Your Honor.   There's no

20    question here.   I don't know what he is answering.   What is

21    the question that he's answering?

22        THE COURT:   Objection overruled.

23        Mr. Schlossberg, you may continue.

24        THE WITNESS:   Thank you, Your Honor.

25        MR. MYERS:   On what question?   What is the question,
```

escribers

www.escribers.net | 800-257-0885

1   please?

2          THE WITNESS:  Yeah.  I'm sorry.  I keep getting

3   interrupted here, as I'm trying to --

4          MR. MYERS:  Yes, I'd like to know what the question

5   is that he has --

6          THE WITNESS:  It's obvious he's trying to disrupt me.

7          MR. MYERS:  -- been answering for thirty minutes.

8          THE COURT:  His understanding of the document.  That

9   was the original question.

10          MR. MYERS:  So it's Roger Schlossberg, Chapter 7

11   trustee's understanding of this document.  And he can just sit

12   here for forty-five minutes and conjecture about what it

13   means?

14          THE COURT:  Yes, he can.  Objection's overruled.

15          Mr. Schlossberg, please continue.

16          THE WITNESS:  Thank you, Your Honor.

17   A.   The additional capital was originally committed at

18   $300,000, with no limitation on the ability of the class A

19   members to put additional funds in.

20          Over a period of time, a very substantial additional sum

21   was put in in excess of another million dollars, including

22   some $600,000 plus that was put in by those, the class A

23   members, put into Goldsboro as additional capital so that it,

24   Goldsboro, could then lend that money to Serv Trust, and Serv

25   Trust then lent that money to Mr. Myers.  That $1 million is

1   additional capital on top of the million-3.  I don't know how

2   much additional was put in after May 2nd, 2018.  Sorry.  I was

3   trying to remember the -- I have a note on that, but now I can

4   remember it.

5          Since May 2nd, 2018, obviously there have been continuing

6   expenses involved in the operation of this entity.  There was

7   taxes that had to be paid on an annual basis, which as of the

8   date of the Lipman appraisal, were $17,000 a year.  I'm sure

9   they've gone up some, but if they haven't, let's just use the

10  17,000 --

11         MR. MYERS:  Objection, Your Honor.  This has nothing

12  to do with the agreement.  Now, he's testifying about taxes

13  and the operation of 6789 Goldsboro LLC.

14         THE COURT:  Objection overruled.

15         You may continue.

16  A.   Those taxes would have to be paid on an annual basis from

17  2018 to this year.  That's another 140, $150,000.

18         There are other expenses involved in the operation, which

19  included utility charges, upkeep, landscaping, et cetera.  I

20  don't know what all those numbers are.  I just know that

21  somebody had to pay it, and the -- only the class A members

22  were obliged to advance the money for that purpose.  Perhaps

23  Mr. Myers paid some of it, and if he did, I'm sure he'll tell

24  us about that at some point.  And he'll correct me on that

25  apprehension that I have.

 1      The important thing is here, Your Honor, on all that

 2  additional capital, it also has a return that was assured to

 3  the class A members.  Just as there was an assured return of

 4  ten percent on the initial capital, there is also an assured

 5  return of ten percent on the additional capital.  As of May

 6  2nd, 2018, there was over $1 million of additional capital

 7  which had been expended.  From that date forward --

 8      MR. MYERS:  Objection, Your Honor.  There has been no

 9  basis set for him to make that statement.  He has no knowledge

10  of that, unless somebody can show a predicate for that

11  testimony.

12      THE COURT:  Your objection's overruled.  You can

13  question him on cross-examination as to the basis for that

14  knowledge.

15      You may proceed.

16  A.  I do not know, Your Honor, because it would require an

17  extensive calculation.  How much of that $1 million was

18  expended on the first day in 2013, on July 13th -- July 18th,

19  2013, or if it was expended on May 1st -- excuse me.  That was

20  '13, of 2013, or if it was expended at the end of that period.

21  So I'm not going to try and calculate how much of that should

22  have accrued each year until 2018.

23      But as of 2018, there was over $1 million, slightly over

24  $1 million, in expenditures funded by additional capital.  At

25  the ten percent additional capital return assured under the

1    terms of this agreement, that's another $100,000 a year, which

2    would have been added in to the form -- the redemption

3    formula.  It's seven years since then, Your Honor.  That's

4    another $700,000, not including the calculation of the return

5    on additional capital for the first five years from 2013 to

6    2018 and not including any additional capital put in after

7    2018.

8    BY MR. MASTRO:

9    Q.    And Mr. Schlossberg, if I may, you pointed out before.

10   You have you get an appraised value and then you have the sum

11   of these four values that you're talking about.  What happens

12   next in the appraisal process?

13   A.    The class A members get their appraisal, Your Honor.

14   They obtained an appraisal, which is an exhibit here.

15   Q.    Look, just, before we get to that, Mr. Schlossberg --

16   A.    Yeah.

17   Q.    -- just, under the agreement, what happens when you

18   compare the two sets of numbers?

19   A.    Thank you.  I misunderstood.

20   Q.    Then we can get to that.

21   A.    Okay.  If the appraised value is in excess of the -- if

22   the appraised value is in excess of the sum, which is --

23   excuse me, in excess of the sum of those four items that I

24   just described that the class A members are entitled to get as

25   a return, either recovery of -- of initial or additional

1    capital or accrual of return on investment, as it is phrased

2    in here as initial capital return or additional capital

3    return.  If the appraised value exceeds those numbers, there

4    is no automatic right of redemption given to the class A

5    members.

6        If, on the other hand, the expenses -- excuse me, the sum

7    of the four items, if the sum of the four items exceeds the

8    appraised value as a matter of law, as by operation of the

9    document, the class A members are entitled to redeem the --

10   redeem the class B membership interest in consideration of

11   past consideration, that is, these items which they haven't

12   been paid.

13       MR. MYERS:  Objection.  Is he testifying as Chapter 7

14   trustee, or is he now, as a matter of law, "testifying" as

15   some kind of expert?  Because he's up there as a Chapter 7

16   trustee.  He's not up there as a legal expert in operating

17   agreements.

18       THE COURT:  He is testifying as the Chapter 7 trustee

19   appointed in this case.

20       You may continue.  Objection's overruled.

21       MR. MASTRO:  Thank you, Your Honor.

22   Q.  Mr. Schlossberg, we have on the screen Exhibit 1.  Again,

23   just for the record, is this something that you reviewed and

24   relied on in reaching your conclusion as to the settlement

25   agreement and your support for it?



1    A.    Yes.

2    Q.    And is what we have on the screen a true and accurate

3    copy of what you, in fact, reviewed?

4    A.    Yes, it is.

5            MR. MASTRO:  Your Honor, I would like to move

6    Trustee's Exhibit 1 into evidence.

7            MR. MYERS:  May I see it, please?  Do you have an

8    extra copy?

9            MR. MASTRO:  It's on the screen, and I emailed you an

10   extra -- I emailed you these exhibits.

11           MR. MYERS:  But do you have an extra copy I can look

12   at?

13           MR. MASTRO:  No, I don't.

14           THE COURT:  Mr. Myers, did --

15           Ms. Whitfield.

16           THE CLERK:  Yes.

17           THE COURT:  Was he included on the email with the

18   protocols?

19           THE CLERK:  Yes.

20           THE COURT:  Mr. Myers, it is the procedure of this

21   Court to use electronic exhibits.  It's on the court's

22   website.  Those protocols were emailed to you.  And so you're

23   expected to look at the exhibits that have been docketed on

24   the docket.

25           The trustee has eleven exhibits, and the King parties



Appellees' Appendix 0250

1    have three exhibits.  You, I note for the record, did not pre-

2    file your exhibits as required, but we'll get to that if and

3    when we need to.  But these exhibits were pre-filed with the

4    Court and sent to you.  So if you do not have copies --

5          MR. MYERS:  So Mr. --

6          THE COURT:  So you did not bring copies with you?

7          MR. MYERS:  I don't have copies, Your Honor.  Mr.

8    Mastro holding what he says is Exhibit 1.  And Mr. Schlossberg

9    is not reading off the screen.  He's reading off of something.

10   Piece of paper on the desk.

11        THE COURT:  Well, he brought his own --

12        MR. MASTRO:  Just for the record --

13        THE COURT:  He brought his own copy of the exhibits

14   so that he could look at them on paper form, which is what

15   anybody is entitled to do, including you.

16        MR. MYERS:  Okay.  But don't you typically mark the

17   exhibits and let him look at it first?

18        THE COURT:  It's marked.

19        MR. MASTRO:  Well, don't you mark it and hand it to

20   him and let him read from the exhibit that's marked that's

21   going to go into evidence?

22        THE COURT:  It's marked.  We use electronic exhibits

23   in this courtroom.

24        MR. MYERS:  Okay.

25        THE COURT:  It's marked.  If you would like the Court



1    to take a recess and print off a copy of the agreement, which

2    has your signature on it, I'm happy to do that.  Do we need to

3    do that, Mr. Myers?  Would you like a paper copy?

4            MR. MYERS:  As long as I can look at it when I cross-

5    examine him, if that's possible, then we don't need to take a

6    break.  But if not, yeah, I'd like to have a copy.

7            THE COURT:  Court will take a five-minute recess.

8    The Court will print copies for Mr. Myers because he did not

9    bring his own copies, as instructed.

10           MR. VERSTANDIG:  Thank you, Your Honor.

11           THE COURT:  We will take five minutes.

12           THE CLERK:  All rise.

13           THE COURT:  Mr. Schlossberg, you are still on the

14   stand.  I would like you to stay in the witness box.  You are

15   not able to discuss your testimony with anyone.

16           THE WITNESS:  I just want to get my bottle of water,

17   if I can.

18           MR. MASTRO:  I can bring it to him.

19           THE COURT:  Thank you.

20           MR. MASTRO:  Thank you.

21           THE CLERK:  All rise.  Court is now in recess.

22       (Whereupon a recess was taken)

23           THE CLERK:  All rise.  United States Bankruptcy Court

24   for the District of Maryland now resumes its regular session,

25   the Honorable Maria Ellena Chavez-Rurak presiding.



1            Please be seated.

2            THE CLERK:  All right.  So Mr. Mastro --

3            MR. MYERS:  Thank you, Your Honor.

4            THE COURT:  You're welcome.

5            So Mr. Mastro had moved for the admission of Exhibit

6    1.

7            Mr. Myers, do you have any objection?

8            MR. MYERS:  Objection.  Relevance.

9            THE COURT:  Your objection's overruled.  The Court

10   will admit Exhibit Number 1.

11       (Agreement was hereby received into evidence as Trustees'

12   Exhibit 1, as of this date.)

13           MR. MYERS:  Well, what is the relevance of this

14   exhibit?

15           THE CLERK:  Mr. Mastro, ask your next question.

16           MR. MASTRO:  Thank you, Your Honor.

17   RESUMED DIRECT EXAMINATION

18   BY MR. MASTRO:

19   Q.   Mr. Schlossberg, did there ever come a point where the

20   King parties demanded an appraisal pursuant to the appraisal

21   procedures in the operating agreement that you just described?

22   A.   Yes, sir.

23   Q.   Okay.  And I want to show you what we've pre-marked as

24   Trustee's Exhibit 2.  Do you recognize this document that's on

25   the screen?



Appellees' Appendix 0253

www.escribers.net | 800-257-0885

A. I do.
Q. Okay. And what are we looking at here?
A. We are looking at a letter from Mr. VerStandig on behalf of the King parties making a demand on Serv Trust as the class B party to -- to designate -- to designate an appraiser. Again, I can't move down the page as quickly so --
MR. MYERS: Objection. The letter speaks for itself.
THE COURT: Your objection's overruled.
Q. Okay. And Mr. Schlossberg, the letter is dated August 23rd, 2017. Does that fall more or less than three years after the operating agreement was entered into?
A. That's -- that's just over four years afterwards.
MR. MYERS: Clarification, Your Honor. You overruled my objection that the letter speaks for itself. Are you suggesting that it doesn't speak for itself, or you're noting my objection, for the record?
THE COURT: Your objection is noted, and it's overruled.
Mr. Mastro, please continue.
MR. MASTRO: Thank you, Your Honor.
Q. So Mr. Schlossberg, I believe your testimony is that you understand this letter to be a demand for an appraisal?
A. It is. It is a demand for appraisal. Yes, sir.
Q. Okay. And is this something that you reviewed and relied upon in forming your opinion regarding the settlement at

1    issue?

2    A.   Yes.

3    Q.   And is this a true and accurate copy of the demand letter

4    sent by Mr. VerStandig?

5    A.   It's true and accurate copy of the one that I --

6    Q.   The one that you reviewed?

7    A.   -- that I reviewed.  Yes.

8             MR. MASTRO:  Correct.  Your Honor --

9             MR. MYERS:  Objection.  I don't know what that even

10   means.

11            THE COURT:  Objection's overruled.  You can cross-

12   examine the witness.

13            MR. MASTRO:  Your Honor, I'd like to move Exhibit 2

14   into evidence at this time.

15            THE COURT:  Any objection, Mr. Myers?

16            MR. MYERS:  Yes, I object.

17            THE COURT:  And the basis is?

18            MR. MYERS:  The basis is this is just a copy that was

19   filed in the Court record.  I have no idea if it's a true and

20   accurate copy.

21            THE COURT:  Your objection's overruled, and Exhibit 2

22   is admitted.

23       (Demand letter from King parties was hereby received into

24   evidence as Trustees' Exhibit 2, as of this date.)

25   Q.   And Mr. Schlossberg, after this letter was sent, what is

1   your understanding as to whether or not an appraisal was ever

2   performed?

3   A.   My understanding is that there was an appraisal performed

4   by the class A member -- at the request of the class A members

5   by Lipman Frizzell prior to the date of that letter.

6   Q.   And Mr. Schlossberg, let me show you what's been pre-

7   marked as Exhibit 3.  Do you recognize this exhibit?

8   A.   I do.

9   Q.   And is this the appraisal report from Lipman Frizzell

10  that you were just referring to?

11  A.   That is the one that I reviewed, and that is my

12  understanding.

13  Q.   And this is the appraisal report that you reviewed in

14  connection with your evaluation of the settlement, the

15  proposed settlement?

16  A.   That is correct, Your Honor.

17  Q.   Okay.  And what did the appraisal say as to the value of

18  the property?

19  A.   The appraisal opined that as of July 3rd, 2017, the

20  property had a value in a range between $1 million and

21  $1,325,000.

22  Q.   And is that value more or less than those four numbers we

23  saw before that represented the contributions and returns of

24  the class A member in Goldsboro?

25  A.   Even without the consideration of the items as to which I

1    indicated a lack of knowledge, or in one case, computation,

2    this valuation is by an order of magnitude less than the total

3    that is the sum of those four items, Your Honor.

4          MR. MASTRO:  And Your Honor, at this time, I'd like

5    to move Exhibit 3 into evidence.

6          THE COURT:  Well, isn't the appraisal hearsay, Mr.

7    Mastro?

8          MR. MASTRO:  Well, this is what Mr. Schlossberg

9    relied upon in forming his opinion.  So it's not necessarily

10   offered for the truth, Your Honor.  That it's just simply what

11   he relied on and what the evidence would show in the adversary

12   case.

13         MR. MYERS:  Objection.  Hearsay.  It won't show

14   anything, Your Honor.

15         THE COURT:  Mr. Myers, please stand when you address

16   the Court.

17         Mr. VerStandig, I see you standing.

18         MR. VERSTANDIG:  Objection.

19         THE COURT:  What would you like to say regarding

20   this?

21         MR. VERSTANDIG:  Your Honor, under 9019, the question

22   is the reasonable exercise of the trustee's business judgment,

23   not a mini trial of the underlying case.  So the question for

24   the Court is whether it's a true and accurate copy of what the

25   trustee relied upon, not whether it's a true and accurate copy

escribers

www.escribers.net | 800-257-0885

1    of what an appraiser said, nor even of the underlying

2    veracity.  It's not being introduced for the underlying

3    truthfulness thereof.  It's being introduced to the

4    truthfulness of the trustee's diligent review and reliance

5    thereupon.

6            THE COURT:  Mr. Myers, you're standing.  What would

7    you like to say?

8            MR. MYERS:  Objection.  Hearsay.  Just as the Court

9    said.  This is a bogus appraisal, and it's worthless.

10           THE COURT:  All right.  Well, the Court is not going

11   to admit the appraisal based on hearsay grounds.  Of course,

12   Mr. Schlossberg is welcome to testify about what he reviewed

13   and what he considered, and he has already done that so -- but

14   the Court does not need to admit Exhibit Number 3 to

15   understand his testimony.  So the Court will not admit it as

16   hearsay.

17   Q.   And Mr. Schlossberg, in your review of the position

18   asserted by the King parties in this adversary case, did you

19   come to any conclusions on your own as to the relative merits

20   of their position?

21   A.   As to the question of whether the four cited items in

22   section 7.7, if the some of those items vastly exceeded the

23   valuation performed by the -- the Lippman Frizell firm, and as

24   such, I reached the conclusion in my valuation of what a trial

25   would result in if this -- if the adversary went to trial.  It

escribers

www.escribers.net | 800-257-0885

1   is my opinion that the conclusion of the fact finder would be

2   that the total return to which the class A members are

3   entitled under section 7.7 and the -- and the balance of the

4   agreement, what they're entitled to is much higher than the

5   valuation of the tract of property.  And as such, they had the

6   right to redeem without payment of any sums, other than that

7   consideration they had already provided.

8   Q.   Now, Mr. Schlossberg, did you also consider any potential

9   defenses to the Kings' claim in the adversary case, including

10  any defenses that were raised by Serv Trust when the case was

11  in state court?

12  A.   Of course, I did, Your Honor.  My job as a Chapter 7

13  trustee in evaluating a compromise and settlement offer is to

14  determine what's going to happen if I don't settle this case,

15  if I take it to trial.  If it goes to trial, I've told you

16  already my initial conclusion, that they could reach the

17  number that would allow them, that is, the class A members,

18  that would allow the class A members to a declaration that the

19  property had been redeemed and properly so.

20       On the other hand, Mr. Myers raised objections in the

21  state court proceedings.  Several objections.  Number 1, he

22  raised the objection that the -- that he had, in fact -- let

23  me take this in order.  I'm sorry.  I want to get my thoughts

24  in order, Your Honor.

25  Q.   Mr. Schlossberg, maybe if I could just direct you here.



Appellees' Appendix 0259

www.escribers.net | 800-257-0885

1   A.   Go ahead.

2   Q.   You had mentioned earlier in your testimony that the

3   Lippman appraisal was dated six days prior to the date of the

4   letter, what we what we saw marked as Exhibit 3, that is dated

5   three days prior to what's been admitted as Exhibit 2.  Did

6   you have any --

7   A.   I'm sorry, Mr. Mastro.  I -- I had this problem in this

8   courtroom a couple weeks ago.  I really can't hear.

9   Q.   I'm sorry.  Let me get closer to the microphone.

10  A.   Thank you.

11  Q.   You mentioned in your testimony that the date of Exhibit

12  2 is August 23, 2017 --

13  A.   Yes.

14  Q.   -- and that the Exhibit 3, the appraisal, actually

15  predates August 23.

16  A.   Yes.

17  Q.   Did that create a potential defense, in your mind, in

18  your evaluation?

19  A.   It -- it did not raise a -- a defense in my mind, but it

20  did raise a defense, apparently, in Mr. Myers' mind.  Mr.

21  Myers urged in state court that the appraisal could not be

22  considered to be a proper appraisal for purposes of the

23  redemption analysis required because it was dated prior to the

24  date that a demand was made for appraisal.

25          MR. MYERS:  Objection, Your Honor.



1   Q.   And --

2              MR. MYERS:  Objection.

3              THE COURT:  Basis.

4              MR. MYERS:  I was not a party to the proceeding in

5   state court.  I didn't make an objection to the appraisal.

6   He's making things up.

7              THE COURT:  Well, you'll have an opportunity --

8              MR. MYERS:  The transcript is clear that I'm not a

9   party to that proceeding.

10             THE COURT:  Your objection's overruled.  You'll have

11  an opportunity to testify and to cross-examine the witness.

12             Mr. Mastro.

13             MR. MYERS:  Well, I'd appreciate if he says, when I

14  made an objection, be specific as to what proceeding that I

15  made such an objection.

16             THE COURT:  All right.  Your objection's overruled.

17             Mr. Mastro.

18             MR. MASTRO:  Thank you, Your Honor.

19  Q.   Mr. Schlossberg, you were saying you were considering the

20  objections raised by Serv Trust in the state court.  Is there

21  anything in your review of the operating agreement that --

22             MR. MYERS:  Objection.

23             THE COURT:  Basis.

24             MR. MYERS:  Mr. Mastro -- Mr. Schlossberg testified

25  that the objection was by me.  Now, Mr. Mastro is eliding over

1    that fact and saying the objection was by Serv Trust.  I am

2    not Serv Trust.  So please be specific.  Rephrase the

3    question.  Do something.

4         THE COURT:  All right.  Thank you.

5         Mr. Mastro, rephrase your question, please.

6    Q.   Mr. Schlossberg, in considering the objection that was

7    raised in the state court regarding the date of the appraisal,

8    did you review it the -- in your review of the operating

9    agreement, did you discover any provision addressing when the

10   appraisal needed to be dated?

11   A.   Well, in considering the objection that was raised in the

12   state court on behalf of the class B member -- and I may have

13   confused the issue.  I didn't mean to confuse Mr. Myers.  I

14   thought he would be up to speed on it, but I apologize.

15        In considering that, Your Honor, I did review the

16   operating agreement to see if the operating agreement had an

17   express requirement that the appraisal be dated after the date

18   of demand for appraisal.  And in fact, not unsurprisingly, it

19   is not.  There is no such clause in the agreement that I could

20   find.  Perhaps I'll learn of some on cross-examination.

21   Q.   Now, you testified you understood there was an appraisal

22   that was done by the King -- you testified that you understood

23   there was an appraisal done by the King parties?

24   A.   Yes.

25   Q.   Do you have any knowledge as to whether there was an



1    appraisal done by Serv Trust?

2    A.    It is my understanding from review of the state court

3    proceedings that there was none ever done by the Serv Trust

4    parties by the class B -- class B member.

5    Q.    And in your --

6          MR. MYERS:  Objection.  Basis.

7          THE COURT:  You'll have an opportunity to cross-

8    examine him.  Your objection's overruled.

9          Please continue.

10   Q.    And Mr. Schlossberg, did the fact that this Serv Trust

11   did not have its own appraisal, is that a potential defense

12   that you evaluated?

13   A.    It -- it -- it is a defense that I evaluated because it

14   was raised by the class B member in state court as a reason,

15   as a defense, somehow, to the position of the King parties in

16   that litigation.  But in evaluating it, I don't think it's any

17   defense at all.  I mean, the reality is, Your Honor, when you

18   have an appraisal provision --

19         MR. MYERS:  Objection.  He answered the question.

20   Next question, please.

21         THE COURT:  Objection overruled.  Please continue.

22   A.    When you have an appraisal provision similar to the one

23   that's here, it's common practice.  I can't ever remember not

24   doing this.  You go get your appraisal first and find out

25   whether or not you're barking up the wrong tree.  You've got

1    to know what you've got before you go into the process.

2         MR. MYERS:  Objection.

3         THE COURT:  Basis.

4         MR. MYERS:  Common practice is irrelevant.

5         THE COURT:  Objection overruled.

6         MR. MYERS:  And by the way, Your Honor, Mr. Mastro

7    seemed to suggest that Serv Trust didn't get an appraisal, and

8    that's not been established and is a question.  Thank you.

9         THE COURT:  Well, you'll have an opportunity to put

10   on evidence, Mr. Myers.

11        MR. MYERS:  I just want to correct the record.

12        Mr. Mastro.

13        MR. MASTRO:  Thank you, Your Honor.

14   BY MR. MASTRO:

15   Q.   Mr. Schlossberg, were there any other defenses that you

16   considered that perhaps were raised by Serv Trust or other

17   defenses?

18   A.   Yes, Your Honor.  There -- there was a -- there was

19   apparently a laudable attempt by -- by all parties, the class

20   A members and the class B members, to resolve the -- the

21   matter of the redemption by some kind of negotiation.  And

22   this, Your Honor, occurred in after the expiration of the

23   three-year period in July of 2016.  There apparently was some

24   back and forth, and the parties entered into a memorandum of

25   understanding.  Excuse me.  The parties considered a

1    memorandum of understanding, which was executed by the class A

2    members and then delivered to Mr. Myers on behalf of the class

3    B membership interest for execution.

4    Q.    Okay.  And Mr. Schlossberg, let me show you what I've

5    marked -- what we've pre-marked as Exhibit 4.  And is this the

6    memorandum of understanding you were just referring to that

7    you reviewed?

8    A.    This is.

9    Q.    And you reviewed this in connection with your evaluation

10   of the proposed settlement?

11   A.    I did.

12   Q.    Okay.  And you state that it was -- well, what's your

13   understanding of the terms of the memorandum of understanding

14   and when it needed to be accepted?

15   A.    This document, Your Honor, is it's a very simple

16   document.  It's a simple transaction --

17        MR. MYERS:  Objection.  The document speaks for

18   itself.

19        THE COURT:  Objection's overruled.  Please continue.

20   A.    This is a simple document, Your Honor.  And it's a

21   simple, relatively simple, transaction.  The class A members

22   are going to buy-out the class B member by a purchase of the

23   class B membership for $2 million.  This document, it's hard

24   to say what date it was prepared because there's no date on

25   the document, but it is not difficult to figure out the range

Appellees' Appendix 0265

1   of dates within which it could have happened.

2        It had to have happened after July 13th of 2016, the end

3   of the three-year period, and it had to have occurred before

4   September the 12th of 2016 because this document has at

5   paragraph 6 provisions for mandatory execution and closing

6   dates.  The document had to be executed by September 12th of

7   2016, or the document shall be null and void.  And I'm quoting

8   from paragraph 6.  And then the closing on the purchase would

9   have had to have been made by less than a month later, October

10  7th, 2016.

11       So I know that the document was prepared or you can

12  impute that the document was -- was -- was drafted between the

13  13th of July and the 12th of September.  The copy that the

14  Court sees is a copy that's signed by the King parties.  It is

15  not a copy that's signed by Mr. Myers.

16       In the state court litigation, the class B member urged

17  that he, in fact, had executed that agreement and had caused

18  it to be delivered by United States mail, having been posted

19  on September 12th, 2016, within the terms of paragraph 6.

20  Q.   Mr. --

21       MR. MYERS:  Objection, Your Honor.  The state record

22  has a fully signed copy of this.  Judge Albright reviewed it,

23  and Judge Albright ruled it was an enforceable agreement.  Mr.

24  Schlossberg knows it, and they've intentionally put in here a

25  document that's half signed, which is their typical MO.

1           This is outrageous.  The document's been fully

2    signed.  There was a hearing in front of Judge Albright.

3    Judge Albright ruled.  Told Mr. VerStandig to his face, this

4    is an enforceable agreement.  Thank you.

5           THE COURT:  Your objection is noted, and it's

6    overruled.  You are welcome to introduce another copy of the

7    agreement as part of your case.

8           Mr. Mastro --

9           MR. MYERS:  He doesn't have standing anyway so --

10          THE COURT:  -- you may continue.

11          MR. MYERS:  -- we'll get to that.

12   Q.   And Mr. Schlossberg, let me show you what I've marked as

13   Exhibit 5.  It's an email chain that begins at the bottom,

14   January 10, 2017, and concludes January 16th, 2017.  Do you

15   recognize this?

16   A.   Yes, I've seen this before, and I relied on this in my

17   exercise of my judgment.

18   Q.   Okay.  And --

19          MR. MYERS:  Objection.  Hearsay.

20   Q.   And --

21          THE COURT:  Your objection's overruled.  He is the

22   Chapter 7 trustee for you, Mr. Myers, and you were a party to

23   this communication.

24          MR. MYERS:  This still doesn't make it not hearsay.

25          THE COURT:  All right.  He stands in your shoes.  He

1    is a Chapter 7 trustee.  So he has the same right to the

2    document that you would have outside of bankruptcy.

3         MR. MYERS:  Excuse me, Your Honor.  He would not have

4    the same right.  My estate was established on November 18,

5    2015.  This document's dated January 16, 2017.  He has no --

6    he doesn't stand in my shoes at all past November 18, 2015.

7    Period.

8         THE COURT:  All right.  Well, he can offer it as a

9    document that he reviewed and relied on in making his decision

10   to enter into this settlement agreement, but it will not be

11   offered for the truth of the matter asserted, Mr. Mastro.

12        MR. MYERS:  Thank you.

13   BY MR. MASTRO:

14   Q.   Okay.  Mr. Schlossberg, you said you had reviewed this

15   exhibit.  I believe it's Number 5.  And what, if any,

16   conclusions did you draw from your review of this exhibit?

17   A.   on its face, Mr. King rejects the assertion that Mr.

18   Myers made that it had been sent to him by mail on September--

19   they put it into issue.  Puts the question at issue, I think.

20        MR. MASTRO:  Okay.  And Your Honor, at this time, I

21   want to move into evidence Exhibits 4 and 5.

22        MR. MYERS:  Objection, Your Honor.  Exhibit 4 is

23   incomplete, and it's hearsay.

24        THE COURT:  The objection is overruled, and it is

25   admitted.



1          (Memorandum of understanding was hereby received into

2     evidence as Trustees' Exhibit 4, as of this date.)

3          THE COURT:  And Mr. Myers, you are welcome to

4     introduce a copy of the memorandum of understanding in your

5     case.

6          Exhibit 5 is also, for the reasons I stated, admitted

7     not to prove the truth of the matter asserted but simply as a

8     document that the trustee reviewed and considered in making

9     his decision to enter into this settlement.

10         MR. MYERS:  Objection.  Same objection for Exhibit 5.

11    It's hearsay.

12         THE COURT:  Okay.  It is not hearsay.

13         MR. MYERS:  Why isn't it hearsay?

14         THE COURT:  It's an agreement.

15         MR. MYERS:  It's not an agreement.  It's an unsigned,

16    partial whatever.  It's not the agreement.

17         THE COURT:  All right.  Well, to eliminate yet

18    another issue for the appeal that is likely to follow whatever

19    the Court's decision may be, the Court will admit Exhibit 4

20    not for the truth of the matter asserted but as a document

21    that was considered by Mr. Schlossberg in reaching his

22    decision.

23         For the same reason, the Court should admit Exhibit

24    3, but I'm not going to because the Court doesn't need to.  We

25    have the testimony of Mr. Schlossberg.



Appellees' Appendix 0269

1          So Exhibit 4 and 5 are admitted not for the truth of

2   the matter asserted.

3          (Email chain was hereby received into evidence as

4   Trustees' Exhibit 5, as of this date.)

5   BY MR. MASTRO:

6   Q.   And Mr. Schlossberg, did you consider anything else in

7   evaluating this potential defense that the memorandum of

8   understanding was executed by Serv Trust?  Or by Mr. Myers

9   here?  I guess it's two members here that -- but something

10  that Serve Trust asserted below.

11  A.   I'm sorry.  Can you clarify the question, please?  I

12  didn't understand it.

13         THE COURT:  Reask the question.

14  Q.   Yeah, I should do that.  That wasn't a very artful ask.

15  Mr. Schlossberg --

16         THE WITNESS:  What exhibits are admitted at this

17  moment, Your Honor?  I'm sorry.  I'm just getting confused.

18         THE COURT:  At this point, Exhibits 1, 2, 4, and 5

19  have been admitted.

20         THE WITNESS:  All right.  1, 2, 4, and 5.  Okay.

21         THE COURT:  Yes

22         THE WITNESS:  Thank you.

23         THE COURT:  You're welcome.

24  A.   Go ahead, Mr. Mastro.

25  Q.   Mr. Schlossberg, did you do any further investigation or



1    further review of any documents or materials in connection

2    with the issue that was raised regarding the memorandum of

3    understanding?

4    A.    Yes.

5    Q.    Okay.  And what, if anything, did you look at or review?

6    A.    Your Honor, it was brought to my attention that

7    notwithstanding that the class B member takes -- was taking

8    the position that he had accepted the terms of the memorandum

9    of understanding in a timely way.  It was my understanding

10   that there was no closing on that by the date required for

11   closing.  Further, it was my understanding that there was

12   continued action taken by the class B member towards the

13   development of the property, notwithstanding the fact that he

14   had exercised his right to be bought out for $2 million.

15           MR. MYERS:  Objection.

16           THE WITNESS:  I'm talking.

17           MR. MYERS:  Objection.  You say exercise his right.

18   What are you talking -- the agreement is with Serv Trust.

19           THE WITNESS:  Well, the memorandum --

20           MR. MYERS:  Serv Trust is not a his.

21           THE COURT:  You will have the opportunity to put on

22   evidence and to cross-examine this witness, Mr. Myers.

23           Please continue, Mr. Schlossberg.

24   A.    And that that was inconsistent with the assertion that

25   there was a binding deal made under the memorandum of

1    understanding that would have yielded the class B member a net

2    payment of about $1,250,000.  I think $1,254,000.  Because the

3    $2 million was to be netted out under the terms of the

4    memorandum of understanding so that the loans that had been

5    made to -- by Goldsboro to Serv Trust for the purpose of then

6    lending it to Mr. Myers had to be paid back.  And there was a

7    balance of $635,000 due on the principal, and there was

8    approximately another 100, 105, 110 apparently due in

9    interest, leaving a net that Mr. -- that the class B member

10   could have walked away with for about a million and a quarter.

11   Q.    Okay.  And Mr. Schlossberg, you mentioned some possible

12   inconsistencies.  I want to show you Exhibit -- let me go to

13   Exhibit 6, I believe.  Let's start with that one.  Showing you

14   what's marked as Trustee's Exhibit 6.  Again, it's an email

15   chain, in which both Mr. Myers and Mr. King are parties to.

16   It's in October of 2016.  Do you recognize this?

17   A.    I do.

18   Q.    And is this one of the documents that you considered in

19   connection with your evaluation of the MOU defense, I'll call

20   it?

21   A.    Yes, it is.

22   Q.    Okay.  And let me show you Trustee's Exhibit 7.  This is

23   another email chain with --

24   A.    And that document's significant also because that's the

25   day before closing was supposed to happen.



1          MR. MYERS:  Objection.  Hearsay.

2     Q.    You're referring to Exhibit 6?

3     A.    Yes.

4     Q.    Okay.

5          THE COURT:  Your objection's overruled.  Continue.

6     Q.    And Exhibit 7, as I was saying, this is an email chain in

7     late November of 2016.  Again, Mr. King and Mr. Myers are on

8     this chain.  Is this Exhibit 7 a document that you reviewed

9     and considered in connection with your evaluation of the MOU

10    defense?

11    A.    It absolutely is, yes.

12    Q.    Okay.  And lastly, I want to show you Trustee's Exhibit

13    8, which is a single email from Mr. Myers to Mr. King and

14    others dated December 15th, 2016.  Is this an email that you

15    considered as well?

16    A.    I'm -- I'm sorry.  I got caught up in -- in 7.  So many

17    pages.  It's a very lengthy series of emails.

18    Q.    Sorry.  Exhibit 8.

19    A.    Okay.  8.  Got it.

20    Q.    Is this an email that you considered?

21    A.    Yes, it is.

22    Q.    And are Exhibits 6, 7, and 8 true and accurate copies of

23    emails that you reviewed?

24    A.    They are true and accurate copies of the emails which I

25    reviewed.



www.escribers.net | 800-257-0885

1          MR. MASTRO:  And Your Honor, I'd like to move in

2     Trustee's Exhibit 6, 7, and 8 at this time.

3          MR. MYERS:  Objection.  Hearsay.

4          THE COURT:  The objection's overruled.  The Court

5     will admit Exhibits 6, 7, and 8, not to prove the truth of the

6     matter asserted, but simply as documents and information

7     considered by the trustee.

8          (Email chain was hereby received into evidence as

9     Trustees' Exhibit 6, as of this date.)

10          (Email chain was hereby received into evidence as

11     Trustees' Exhibit 7, as of this date.)

12          (Email chain was hereby received into evidence as

13     Trustees' Exhibit 8, as of this date.)

14          THE COURT:  Mr. VerStandig, you're standing.

15          MR. VERSTANDIG:  Your Honor, solely for

16     supplementation of the record.  Had our position been elicited

17     on the hearsay objection, we would have additionally noted

18     them to each be statements by a party opponent.  Simply noting

19     for the record, understanding there may be a record.  Thank

20     you.

21          THE WITNESS:  Your Honor, I'm sorry.  I didn't hear

22     Mr. VerStandig.

23          THE COURT:  Mr. VerStandig made the point that they

24     should also be admitted as an admission of a party opponent.

25          THE WITNESS:  Okay.

escribers

www.escribers.net | 800-257-0885

Case 8:25-cv-02103-TDC    Document 29-14    Filed 02/10/26    Page 277 of 618

1          THE COURT:  And the Court will admit them as an

2    admission of a party opponent.

3          MR. MYERS:  Objection, Your Honor.

4          MR. VERSTANDIG:  Thank you, Your Honor.

5          MR. MYERS:  Who's the party opponent?

6          THE COURT:  Are you not opposed to the trustee today,

7    Mr. Myers?

8          MR. MYERS:  I'm not a party to this case.

9          THE COURT:  You're --

10         MR. MYERS:  I'm a party-in-interest, but I'm not a

11   party opponent.  And they shouldn't be admitted on that basis.

12         THE COURT:  Your objection's noted.  Thank you.  It's

13   overruled.  The Court admitted it not to prove the truth of

14   the matter asserted as well.

15         So Mr. Mastro, please continue.

16         MR. MYERS:  And that statement you just made is for

17   Exhibits --

18         THE COURT:  5, 6, 7, and 8.

19         MR. MASTRO:  Thank you, Your Honor.

20   BY MR. MASTRO:

21   Q.   Mr. Schlossberg, in connection with the MOU defense and

22   any other defenses that you considered, had you considered how

23   these defenses might play out at a trial and what you'd need

24   to do to prove these defenses?

25   A.   Were I to embrace the positions that Serv Trust had taken



1  at trial in the state court, I -- I, of course, would have had

2  to prove up all -- offer some evidence to support those

3  defenses that they were raising.  With respect to multiple of

4  those defenses, there is clearly a difference of opinion as to

5  what's the truth of -- of what was -- what happened and what

6  was intended.  So there was going to have to be witness

7  testimony in this court on the adversary proceeding if I were

8  to embrace those same theories of defense.  That's going to

9  have to be competent evidence with regard to the truth of the

10  matter asserted by each of the documents we just discussed and

11  the theories that they underpin.

12  Q.   And who would your witness be?

13  A.    I would only have one witness that I could possibly

14  consider, Your Honor.  I'd have to have Greg Myers be my

15  witness as to all of these matters.

16        MR. MYERS:  Objection.

17        THE COURT:  Well, stand when you address the Court,

18  please.

19        MR. MYERS:  Objection.

20        THE COURT:  What's the basis?

21        MR. MYERS:  What's the basis of him saying he only

22  has one witness, me?  I'm not a trustee of Serv Trust.

23        THE COURT:  Your objection's overruled.  You'll have

24  an opportunity to cross-examine him.

25        Mr. Mastro, continue.



1    Q.    And you were saying, Mr. Schlossberg, that you would have

2    Mr. Myers as --

3    A.    Was interrupted, so let -- if I may continue?

4    Q.    -- as your witness?  Go ahead.

5    A.    Mr. Myers is the -- was the manager of 6789 Goldsboro.

6    He was critically involved in everything that happened while

7    he was the manager of 6789.  Mr. Myers was negotiating the

8    memorandum of understanding.  Mr. Myers was going to be a

9    very --

10           MR. MYERS:  Objection.  There's no basis for that.

11           THE WITNESS:  Your Honor, It's very hard to testify

12   when you're constantly interrupted by somebody who's waiting

13   until he finishes.

14           MR. MYERS:  Well, fine.  There's no objection for him

15   to testify --

16           THE COURT:  Mr. Myers.

17           MR. MYERS:  -- as to what I was doing.  He wasn't

18   there.

19           THE COURT:  Your objection is overruled.  He is a

20   Chapter 7 trustee who did an investigation.  You can cross-

21   examine him later.

22           Please continue.

23   A.    Despite the fact that I don't like being interrupted,

24   he's correct about what he just said.  I wasn't there.  He

25   was.  He just made the point for me.  He has to be a witness



Appellees' Appendix 0277

1    if any of these things are going to be tried to a trier of

2    fact.  That raises a big problem because Mr. Myers is patently

3    a witness of questionable credibility.

4              MR. MYERS:  Objection.

5              THE COURT:  Basis.

6              MR. MYERS:  Objection.  Untrue.

7              THE COURT:  Overruled.  You may continue.

8    A.   That's something else Mr. Myers and I would disagree

9    about, I guess, but I -- I cannot imagine advancing to the

10   Court Mr. Myers under oath.  I -- my experience with Mr. Myers

11   in this case has been such that he is a terrible witness.  He

12   insists that he is the only person who knows anything about

13   anything.  And he does not present a credible nor a very

14   attractive witness for a trier of fact to embrace.  I

15   considered that I would be entirely hamstrung by having the

16   witness to these events, the critical person with actual

17   knowledge, getting on the stand and not being believed.

18             THE COURT:  Mr. Mastro, your next question.

19   BY MR. MASTRO:

20   Q.   And Mr. Schlossberg, I want to show you what I've marked

21   as Trustee Exhibit 11.

22   A.   Speak up, please.

23   Q.   I want to show you what's been marked as Trustee Exhibit

24   11.  This is a June 11, 2025 order of the bankruptcy court in

25   the District of Columbia.

1          MR. MYERS:  Excuse me, Your Honor.  Did we skip 9 and
2    10?
3          THE COURT:  We haven't gotten to them yet, Mr. Myers.
4          MR. MYERS:  Oh, I just --
5          THE COURT:  We're on Exhibit 11.
6    Q.   And Mr. Schlossberg, do you recognize this exhibit?
7    A.   I do.  This is Judge Gunn's recent decision Mr. Myers
8    last Chapter 13 case.
9    Q.   Okay.  And did you review it in connection --
10   A.   Yes, I did.
11   Q.   -- with your testimony today and your recommendation to
12   the Court?
13   A.   It certainly forms a portion of my -- my conclusions.
14   Not that something fresh came to me from the reading of it,
15   but it's a judicial determination regarding Mr. Myers and his
16   propensity for abuse of the bankruptcy process.
17          MR. MYERS:  Objection.
18   A.   A sprawling tapestry of bad-faith abuse.
19          MR. MYERS:  It's not a judicial anything.  It's
20   subject to a motion for reconsideration.  There's no final
21   order.
22          THE COURT:  Your objection's overruled, Mr. Myers.
23   You can't object simply because you disagree with something.
24   You're going to have an opportunity to put on your case.  If
25   you disagree, you can bring it in then.  But please, please

escribers
www.escribers.net | 800-257-0885

1    stop interrupting.

2          MR. MYERS:  So he can misstate the facts?

3          THE COURT:  You have an opportunity to cross-examine

4    him.

5          MR. MYERS:  Okay.

6          THE COURT:  You don't get to interrupt him every time

7    he speaks.

8          I'm sorry.  Please continue.

9    Q.   And Mr. Schlossberg, is Exhibit 11 an item that you

10   reviewed and relied upon in forming your opinion relating to

11   Mr. Myers' (indiscernible)?

12   A.   Before I came into the courtroom today, I relied on this.

13   I did not rely on this particular exhibit at the time that I

14   filed the 9019 because Judge Gunn just entered this opinion,

15   what, nineteen days ago.

16         MR. MASTRO:  Your Honor, I'd like to move Trustee's

17   Exhibit 11 into evidence.

18         MR. MYERS:  Objection.  It's not a final order.

19         THE COURT:  Objection's overruled.  It is admitted.

20         (Judge Gunn's order was hereby received into evidence as

21   Trustees' Exhibit 11, as of this date.)

22   Q.   And so Mr. Schlossberg, did you form a conclusion as to

23   your likelihood of success in the adversary case?

24   A.   I did.

25   Q.   And what was that opinion?



1    A.    Your Honor, I don't think I have much of a chance --

2    chance of a snowball in hell, as they would say, of

3    prosecuting this case with a witness, the only witness that I

4    could possibly put on the stand, and I would not ask anyone to

5    accept that witness.  I think that the defenses are -- weak

6    is -- weak is too weak a term for the -- the defenses that

7    were asserted below in the state court.  They are I do not

8    think going to prevail.

9         And as a result of that, I accepted the solicitation of

10   interest of the King parties and tried to do that without

11   looking too excited because I knew I needed to get this case

12   settled and extract something for the estate out of this

13   litigation because this litigation was going to be futile,

14   expensive, and incredibly time consuming in this case, which

15   has already going on, for my purposes, for eight years plus.

16   Q.    And Mr. Schlossberg, let's pivot now to the settlement

17   proposal that's before the Court and the proposed terms.  One

18   of the -- let me just read the proposed terms.  Then I want to

19   ask you about your --

20   A.    Sure.

21   Q.    -- consideration of these terms.  First, the King

22   plaintiffs, and I'm reading from document 17-1.  This is our

23   notice that was filed back on December 30th of 2024.  Page 6.

24        THE WITNESS:  May I get that from Your Honor?  I have

25   a copy of that?



1         THE COURT:  Yes, you may.

2  Q.   It's page 6, Mr. Schlossberg.  Just let me know when

3  you're there.

4  A.   Just a sec.

5         MR. VERSTANDIG:  Is this up on the screen, Mr.

6  Mastro?

7         MR. MASTRO:  Yes.

8         THE COURT:  It's in the motion.

9         MR. MASTRO:  Yeah, that's Exhibit 11 that's on the

10  screen.

11  A.   Yes, sir.

12  Q.   Okay.

13         THE COURT:  I'm sorry.  It's not in the motion.  It's

14  in the notice of motion, docket number 17.

15         MR. MASTRO:  Correct.  Okay.

16         THE WITNESS:  17-1.

17         MR. MASTRO:  17-1.  Page 6.  I'm reading from the

18  top, Your Honor.

19  Q.   "The trustee and the King plaintiffs have agreed as

20  follows: number 1, the King plaintiffs will pay to the trustee

21  for the benefit of the estate the sum of $150,000, the

22  settlement payment, upon court approval of the settlement, in

23  order to redeem the entirety of Serv Trust's interest in

24  Goldsboro and settle the redemption claim in the adversary

25  case."



Appellees' Appendix 0282

1    A.    Yes, sir.

2    Q.    "Number 2, upon successful negotiation of the settlement

3    payment by the trustee, the parties will file a stipulation of

4    dismissal in the adversary case, dismissing all claims therein

5    with prejudice.  And 3, the King plaintiffs also will

6    reimburse the trustee for all reasonable legal fees and

7    expenses that the trustee incurs in connection with the

8    litigation of any appeals taken by any party in the event that

9    the settlement motion is granted by this Court."

10        Are those are the terms of the settlement, as you

11   understand it, Mr. Schlossberg?

12   A.    They are.  One element was added that I think makes it

13   even more attractive, and that is the agreement of the King

14   parties that they will withdraw their proofs of claim, which

15   mirror the relief that sought in -- in the -- in the -- in the

16   complaint.

17   Q.    Okay.  And Mr. Schlossberg, let's focus first on the

18   first element of the settlement.  The estate is receiving

19   $150,000 from the King parties to redeem Serv Trust's interest

20   in 6789 Goldsboro LLC.  What is your take on that?

21   A.    Well, Your Honor, you have to read that with item 3.

22   They have to be read together, 1 and 3, because in -- in one

23   settlement made in this case long ago, the settlement monies

24   that were paid to me on behalf of the estate were somewhat

25   chewed up by appellate litigation that resulted from it.  As

escribers

www.escribers.net | 800-257-0885

1    of that date, I no longer entertain settlement proposals

2    without a provision similar to this so that the monies that I

3    get, paragraph 1, are the monies that I net at the end of the

4    day.  And in order to have that get-net result, I needed to

5    have that.

6         As I've already explained, I don't think I could try this

7    case.  I'm fairly good in the courtroom.  Mr. Merrit -- Mastro

8    is better, but he knows what he's doing.  At the end of the

9    day, though, I don't think all of our talents brought to bear

10   could prevail in the adversary proceeding.

11        So it's a very simple win-loss.  I can't win on the one.

12   And I take home $150,000 here on the other.  So for that

13   reason, I -- I think this is the sensible monetary decision to

14   make in the case.

15   Q.   Let me ask you this, Mr. Schlossberg.  If,

16   hypothetically, you were to prevail in the adversary case,

17   this asset, the Serv Trust interest in the LLC, which is the

18   only asset of the estate, correct?

19   A.   Your Honor, that -- that -- that's -- that's the other

20   side of it.  If -- if the case goes to trial and we pull a

21   rabbit out of our hat and we win, what do we do?  We've denied

22   Mr. VerStandig's client the ability to have the class B

23   interest.  I still got the class B interest.  What a wonderful

24   thing to have.

25        Now, who am I going to sell it to?  Who is going to want

 1    to buy into this position?  This is a property which was

 2    apparently a little overoptimistically expected to yield

 3    nineteen townhouse lots in a very valuable section of -- of

 4    Montgomery County.  According to the appraisal, which I read

 5    in this case, it is suitable for six to eight townhouse lots

 6    max.

 7         According to my calculations, which admittedly are

 8    missing some numbers along the way for the -- for the class A

 9    interests, which have to be paid first before you start

10    cutting up the equity that the people would be buying into, if

11    I sell someone -- excuse me.  If I sell someone the class B

12    membership interest, they get to be a class B member under the

13    operating agreement.

14         Under the operating agreement, the class B interest does

15    not get to enjoy any of the proceeds, any of the income

16    generated, by 6 -- 6789 until after the class A members have

17    gotten back their initial capital, all of it, their initial

18    capital return, all of it, the additional capital investment,

19    and the additional capital return, as well as some other

20    smaller niggling numbers.  I think each of the class A members

21    were entitled to $7,500 at the end of the first year.  I'm not

22    sure what that was all about.  It's -- it's a -- it's a

23    rounding error at this point.

24         As I calculate it -- calculated it -- calculate it today,

25    we're talking about something in excess of 6 or $7 million and

1    maybe more than that that would have to be paid before anybody

2    could ever get any kind of value or return for the class B

3    membership interest.  So who's going to -- who's going to jump

4    at the opportunity to throw money at that opportunity?  I

5    don't think there's any buyers out there.

6         I'm going to have to go back to him.  I'm going to have

7    to go back to Mr. VerStandig and -- and negotiate with him

8    again to buy it.  To offer me a better number.  Maybe they'll

9    come back and offer me the memorandum -- the MOU number that

10   they had offered in mid-2016.  Not likely, but maybe they

11   would.  That's where I'd have to go.

12   Q.   Okay.  Mr. Schlossberg, is there any risk to the estate

13   that the King parties could do a new appraisal and invoke the

14   appraisal procedures once again?

15   A.   Your Honor, if they lose, all it says is the appraisal

16   process was flawed.  I should say, let's say that the section

17   7.7 process.  I don't want to call it appraisal or redemption

18   because it's a melange of both.  The process was flawed.

19   Okay.  Fine.  What's going to stop Mr. VerStandig from sending

20   me another letter, saying I got a new appraisal.  You have

21   fifteen days to designate your appraiser.

22        No, I don't want to be there because I'm pretty sure I

23   know where it's going to be now, again.  I -- I don't think

24   that would be a very wise business decision to make in the

25   exercise of my business judgment, which, of course, is the

1    standard here.

2    Q.   And did you do any investigation as to what the

3    property's value is worth now?

4    A.   I -- I don't have the kind of money that would be

5    necessary to go engage appraisers that I could justify the

6    expense to the estate, Your Honor.  I've done a little bit of

7    online valuation review, but I don't call those online

8    appraisals.  We just call those online valuations.

9    Q.   And --

10   A.   And those valuations seem to be looking at the property

11   as value for the old mansion that's still on the property.

12   And they -- they are -- they are like $2 million.  The range

13   of that range.  I -- I wasn't much impressed with the value of

14   that.

15        It might be less.  It might be more.  I -- I don't know.

16   I know this.  The million-350 that they paid for it in 2013,

17   Your Honor, is slightly higher than what the Lipman Frizzell

18   appraisal showed the property to be worth five years -- or

19   excuse me, four years later.

20   Q.   And Mr. Schlossberg, I want to direct your attention to

21   Exhibit 9, which I've put on the screen.  You mentioned you

22   looked at some online valuations.  This is a Redfin

23   valuation --

24   A.   Sorry.

25   Q.   -- that has the estimate range between 1.92 and 2.28 --

```
 1   are you --

 2   A.   I'm sorry.  I'm getting rid of the other book because

 3   we're not talking about anything out of that.

 4   Q.   Is Exhibit 9 one of the valuations you looked at

 5   (indiscernible)?

 6   A.   This is -- yeah, this is the Redfin, Your Honor.  And

 7   this was printed a week ago.  Well, two weeks ago.  Thirteen

 8   days ago.  And at that time, Redfin said it was worth, as I

 9   said, in the neighborhood of $2 million.  They said

10   $2,016,270.  Again, for what that's worth.  It's a -- it's an

11   online valuation.  It's not an appraisal.

12        MR. MASTRO:  And Your Honor, I'd like to move Exhibit

13   9 into evidence at this time.

14        MR. MYERS:  Objection.  Hearsay.  This is garbage.

15   This has nothing to do with the development of that property.

16        THE COURT:  The objection's overruled.  This is

17   publicly available information, and it is information that he

18   relied on in reaching his decision.

19        So Mr. Mastro, at this point, Exhibits 1, 2, 4

20   through 9 and 11 have been admitted.  Exhibit 3, the Court did

21   not admit.  And Exhibit 10 has not been discussed.

22        (Redfin valuation was hereby received into evidence as

23   Trustees' Exhibit 9, as of this date.)

24        MR. MASTRO:  Right.  Court's indulgence for a second.

25        THE COURT:  Okay.
```



1    Q.   Okay.  Mr. Schlossberg, let me just show you, then,

2    Exhibit 10, since we haven't addressed that yet.  Okay.  And

3    do you see Exhibit 10 on your screen, or do you have it in

4    your binder there?

5    A.   I have it in my binder right in front of me, and I see it

6    on the screen as well.

7    Q.   Okay.

8    A.   It's the same document.

9    Q.   And could you identify Exhibit 10 for the Court, please?

10   A.   Your Honor, this is the decision that was made in the

11   state court proceedings, as we've been referring to them, back

12   in January of 2023, whereby Judge Lease entered a judgment on

13   the alter ego declaratory judgment claim, wherein the court

14   found that Serv Trust, a statutory trust under the laws of

15   Maryland, was and is as of November 18th, 2015 the alter ego

16   of Mr. Myers.  And with that, the court then took note of the

17   fact that in light of his bankruptcy proceedings and my role

18   as his trustee, that the other claims in the case, the one

19   that we're now talking about settling, were stayed by

20   operation of Section 362 of the Bankruptcy Code.

21   Q.   All right.  And is this in Exhibit 10, is this an item

22   that you reviewed and considered in connection with your

23   evaluation of the proposed settlement?

24   A.   It is.

25              MR. MASTRO:  All right.  And Your Honor, I move



Appellees' Appendix 0289

```
 1    Exhibit 10 into evidence.

 2              THE COURT:  Mr. Myers.

 3              MR. MYERS:  No objection.

 4              THE COURT:  Exhibit 10 is admitted.

 5        (Judge Lease's decision was hereby received into evidence

 6    as Trustees' Exhibit 10, as of this date.)

 7    Q.   And Mr. Schlossberg, we've looked at the settlement

 8    terms.  What is your recommendation, your opinion, regarding

 9    this settlement and the interests of the estate?

10    A.   I -- Your Honor, I feel very strongly.  I think I've

11    expressed that probably by my vigor.  But I think that the

12    proposed 9019 settlement in this case is in the best interests

13    of the bankruptcy estate and that it -- it is perhaps the last

14    meaningful opportunity to get some value out of the redemption

15    claim.

16              MR. MASTRO:  Mr. Schlossberg, I have no further

17    questions.

18              THE WITNESS:  Okay.

19              MR. MASTRO:  Thank you for your time.

20              THE COURT:  All right.  Thank you.

21              Mr. VerStandig, would you like to ask this witness

22    any questions?

23              MR. VERSTANDIG:  Yes, Your Honor.

24    CROSS-EXAMINATION

25    BY MR. VERSTANDIG:
```



1    Q.   Mr. Schlossberg, I want to go back to what you referred

2    to as the MOU defense, which is the memorandum of

3    understanding that may or may not have been executed and the

4    dispute thereof.  Do you recollect that?

5    A.   Yes, sir.

6    Q.   What is the date range you shared where the memorandum of

7    understanding could theoretically have been executed?

8    A.   That would be the three-year anniversary of the operating

9    agreement, which was the effective date under that operating

10   agreement of July 18th, 2013.  The anniversary, July 18th,

11   2016.

12   Q.   So not before July 18th, 2016, correct?

13   A.   That is correct.

14   Q.   Okay.  And we heard a moment ago with Exhibit 10 that

15   Serv Trust was found to be Mr. Myers alter ego, effective as

16   of November 18th, 2015, correct?

17   A.   Yes.

18   Q.   Has Mr. Myers been a debtor in bankruptcy in this Court

19   since November 18th, 2015?

20   A.   Yes.  This case has been pending -- I've -- I've -- I've

21   forgotten the petition date, but I'm assuming you've given it

22   to me accurately.

23   Q.   Are you familiar with the docket in this case?

24   A.   Yes, I'm familiar with that.  Looked -- I've looked at it

25   lots.



www.escribers.net | 800-257-0885

1    Q.    At any point in time, did Mr. Myers as a debtor-in-

2    possession or you as his Chapter 7 trustee seek leave of court

3    to enter into the memorandum of understanding?

4    A.    Well, now that -- now that you mention it, no.  I --

5    I'm -- I am certain that there is no such entry.

6    Q.    Thank you.  Are you also familiar with the claims

7    register in this case?

8    A.    Yes.

9    Q.    I'm showing you what's been marked as King Parties'

10   Exhibit 1.  Do you recognize this document?

11   A.    You're going to have to spin it up for me.

12   Q.    It's on your screen.

13   A.    Yeah, but I can't move it.

14   Q.    Oh.  Sure.

15   A.    That's a flaw in this system.

16   Q.    Yeah.  I will scroll --

17   A.    Scroll it slowly enough so that I can read.  Okay.  I

18   just saw what -- I know what this one is.  So this is the

19   proof of claim filed by you on behalf of the King parties with

20   respect to the relief that has been sought in the complaint

21   that is now pending in the adversary proceeding, which is 24-

22   007.

23   Q.    Thank you.  Is this a true and accurate copy of proof of

24   claim 21?

25   A.    I can't tell you that, sir.  I -- I -- I'm -- I'm not the



Appellees' Appendix 0292

1    guy who looked at this recently.

2    Q.    Okay.

3    A.    This has been some time since I've looked at this.  I

4    trust you, as an officer of the court, that you're not trying

5    to cook the books by putting a document on here with docket

6    legends on it and that it's going to be -- turn out to not be

7    a true and accurate copy.  But I will assume that, and that's

8    the basis for my assumption, Your Honor.

9          MR. VERSTANDIG:  Your Honor, I move King Parties

10   Exhibit 1 into evidence, mirroring entry 21 in the claims

11   register.

12         THE COURT:  Any objection, Mr. Myers, to the

13   admission of Mr. King's proof of claim?

14         MR. MYERS:  Other than all the writing at the very

15   top is all -- I don't even understand what it's all typed

16   over.  So it's not a true and accurate copy.

17         THE COURT:  The objection's overruled.  The Court

18   will admit King Parties' Exhibit 1.  It appears to be -- and

19   the Court did look at the proofs of claim that were filed.  It

20   appears to be a copy of claim number 21 filed on the claims

21   register.

22         (Proof of claim 21 was hereby received into evidence as

23   King Parties' Exhibit 1, as of this date.)

24         MR. VERSTANDIG:  Your Honor, I move Exhibits 2 and 3

25   as well, being copies of claims 22 and 23 in the claims

 1    register, respectively.

 2              THE COURT:  Mr. Myers, any objection?

 3              MR. MYERS:  No objection to the form, but not as to

 4    the truth of the matter.

 5              THE COURT:  All right.  Well, the Court will admit

 6    King Parties' Exhibits 2 and 3.  They appear to be duplicates

 7    of claim number 22 and claim number 23 on the claims register.

 8         (Proof of claim 22 was hereby received into evidence as

 9    King Parties' Exhibit 2, as of this date.)

10         (Proof of claim 23 was hereby received into evidence as

11    King Parties' Exhibit 3, as of this date.)

12              MR. VERSTANDIG:  Thank you, Your Honor.  Nothing

13    further.

14              Your Honor, if the Court would permit, I would ask

15    for a brief recess at the Court's convenience, but it is not a

16    matter of urgency.

17              THE COURT:  We will be taking a recess very shortly

18    for the lunch break and to give Mr. Myers an opportunity to

19    get his thoughts together for the cross-examination.

20              So is there any reason why now would not be a good

21    time for a lunch break?  That clock is about half an hour

22    slow.  It's 12:27.

23              MR. MASTRO:  That's fine with me, Your Honor.

24              THE COURT:  All right.

25              MR. VERSTANDIG:  That's fine with me, Your Honor.



1            THE COURT:  Mr. Myers.

2            MR. MYERS:  It's fine.

3            THE COURT:  Mr. Schlossberg.

4            THE WITNESS:  Fine with me, Your Honor.

5            THE COURT:  Okay.  All right.  Well, we are going to

6    take a luncheon recess.  As I said, it's 12:27.  How much time

7    would the parties like for a lunch break?

8            Mr. Mastro, how much time?

9            MR. MASTRO:  I think an hour would be sufficient,

10   Your Honor.

11           THE COURT:  Okay.  Would forty-five minutes be

12   sufficient?

13           THE WITNESS:  I don't know what fast food's like

14   around here, Your Honor.

15           THE COURT:  Okay.  All right.  So you are going to go

16   out and -- okay.

17           THE WITNESS:  Yes.

18           THE COURT:  All right.  We will reconvene at 1:30.

19           Mr. Myers, does that work for you?

20           MR. MYERS:  That's fine.

21           THE COURT:  Mr. VerStandig?

22           MR. VERSTANDIG:  Yes, Your Honor.

23           THE COURT:  All right.  We will take a recess, and we

24   will reconvene at 1:30.

25           Mr. Schlossberg, I know I don't have to tell you



1    this, but you are still under oath.  You are still a witness

2    on the stand.  And therefore, you may not discuss your

3    testimony with anyone, including your counsel.

4         THE WITNESS:  Understood, Your Honor.

5         THE COURT:  All right.  Thank you.

6         THE CLERK:  All rise.

7         MR. MYERS:  Your Honor, is the room going to be open

8    so I can work, or what do I do?  Take all this with me or --

9         THE COURT:  Mr. Myers, there is a conference room

10   right between this set of double doors and the next set of

11   double doors.  There's a conference room on each side, and

12   you're welcome to use either one of those.

13        MR. MYERS:  Okay.  Thank you.

14        THE COURT:  And we're going to lock the courtroom,

15   and we will unlock it just a few minutes before 1:30.  So

16   you're welcome to leave anything you'd like in the courtroom.

17        MR. MYERS:  Thank you.

18        THE CLERK:  All rise.  Court is now in recess.

19      (Whereupon a recess was taken)

20        THE CLERK:  All rise.  Silence, please, and come to

21   order.  The United States Bankruptcy Court for the District of

22   Maryland now resumes its regular session, the Honorable Maria

23   Ellena Chavez-Rurak presiding.

24        Please be seated.  Recalling the case of Gregory B.

25   Myers, case number 15-26033, and the adversary case of King,



 1   et al., v. Schlossberg, adversary number 24-00007.

 2          THE COURT:  All right.  Mr. Myers, are you ready?

 3          MR. MYERS:  Sort of.  Do my best.

 4          THE COURT:  All right.  So before you start asking

 5   questions, I just want to review what's been admitted.

 6          We have Trustee's Exhibits 1 and 2 have been

 7   admitted.  Exhibit 3 was not admitted.  Exhibit 4 was

 8   admitted.  Exhibits 5 through 8 are admitted as admissions of

 9   a party opponent.  Mr. Myers is a party-in-interest here in

10   this proceeding opposing this settlement, and they are

11   statements by him.  So they are admitted.  9 was admitted, 10

12   was admitted, and 11 was admitted.

13          King Exhibits 1, 2, and 3 were all admitted.

14          And Mr. Schlossberg, while Mr. Myers is getting

15   organized, I will remind you to let him finish his question

16   before you start answering.  We are recording, so let's try

17   not to talk over each other so that we can make a transcript

18   for the record.

19          THE WITNESS:  Certainly, Your Honor.

20          THE COURT:  All right.  Thank you.

21   CROSS-EXAMINATION

22   BY MR. MYERS:

23   Q.   Afternoon, Mr. Schlossberg.

24   A.   Good afternoon.

25   Q.   Do you recall on what date I filed my bankruptcy case?

1    A.   Sir, you got to look at me because I can't -- I do not

2    hear that well, sir.  It's the same thing I told Mr. Mastro.

3    Don't come over here, please.

4    Q.   I'm allowed.

5         THE COURT:  No, you are not allowed to come up here.

6    A.   No, you're not.

7         THE COURT:  Go back to the podium.

8         MR. MYERS:  So what am I supposed to do?  Look at him

9    when I'm looking at my notes?

10         THE COURT:  Yes.  Everyone else manages to do it.

11   I'm sure you can find a way to do it as well.

12         MR. MYERS:  Well, it's hard to look at hwhen I'm

13   doing this like this.

14         THE COURT:  Just keep your voice up, and that will

15   help.

16   Q.   Do you recall on what date I filed my bankruptcy petition

17   in this court?

18   A.   No, I do not.  I told, when I answered that question that

19   I think Mr. VerStandig raised, I said, I'm not sure of the

20   date that the case was actually filed in 2015.

21   Q.   Okay.  I will represent to you that I filed my bankruptcy

22   case originally as a Chapter 11 reorganization, case number

23   15-26033, on November 18, 2015.  That ring a bell?

24   A.   Actually, no, it does not.

25         THE WITNESS:  May I ask the Court to just confirm

escribers

www.escribers.net | 800-257-0885

1    that for me from the docket?

2          THE COURT:  Yes, just give me one moment here.  All

3    right.  So according to the Court's docket, Mr. Myers filed

4    this case on November 18th, 2015.

5          THE WITNESS:  18th.  Okay.  Thank you, Your Honor.

6          THE COURT:  Yes.

7    Q.    18?

8    A.    18.

9    Q.    Okay.  Now, we have that date.  November 18, 2015's the

10   petition date.  So pursuant to 11 U.S.C. 541, if I didn't own

11   something on November 18, 2015, then it wouldn't be property

12   of my bankruptcy estate; is that correct?

13   A.    I don't think it's proper for me to be giving legal

14   opinions.

15   Q.    I'm not asking you for your legal opinion.  I'm asking

16   you for your opinion as a Chapter 7 trustee.

17   A.    Everything that you own under the pervasive definition in

18   11 U.S.C. Section 541 that you own as of the date of the

19   filing, and that is a very broad everything, is property of

20   your bankruptcy estate.  And certain things that pop up

21   afterwards can also become property of your bankruptcy estate.

22   Q.    And what are the things that you referenced that can pop

23   up afterwards that would become property in my bankruptcy

24   estate?

25   A.    Inherited property.



Appellees' Appendix 0299

1    Q.   Okay.  And that's for 180 days, correct?

2    A.   Well, the date of death is, is the operative.  If the

3    date of death is within 180 days afterwards.

4    Q.   Okay.

5    A.   There's also some others.  I don't have a copy of 541 in

6    front of me.  I believe --

7    Q.   Okay.

8    A.   -- if someone wants to give me a Code, I'd be happy to--

9    Q.   Okay.

10   A.   -- go on with a --

11   Q.   Right.

12   A.   -- more complete answer.

13   Q.   So on November 18, 2015, I had no ownership interest in

14   Serv Trust?

15   A.   Is that supposed to be a question?

16        MR. MASTRO:  Objection.  Calls for legal conclusion.

17        MR. MYERS:  It's a fact question.

18        THE COURT:  Well, ask a question, Mr. Myers.  You're

19   not testifying.  You're asking him questions.

20   Q.   Okay.  When were you appointed Chapter 7 trustee in case

21   15-26033, my bankruptcy case?

22   A.   In February of 2017.

23   Q.   Yeah, I believe it was February 22, 2017.

24   A.   I'd ask the Court to confirm that, if that's okay.

25   Q.   Okay.

Appellees' Appendix 0300

```
 1              THE COURT:  That's the date the case was converted,
 2    February 22nd, 2017.
 3    A.    That's the date I was appointed.
 4    Q.    Okay.  And as Chapter 7 trustee, how long did you have to
 5    file an adversary proceeding against third parties?  In other
 6    words, what was the bar date for you to file an adversary
 7    proceeding against third parties to bring property into my
 8    bankruptcy estate?
 9    A.    Well, if you -- if you think this is controlled by
10    Section 546, it would be two years from the date of the
11    conversion, assuming -- assuming the conversion was within --
12    I'm going to need a Code in front of me.  I'm sorry.  I can't
13    do this by -- by guesswork because you're trying to get me to
14    say something, and I'm going to make sure it's accurate.
15              THE WITNESS:  If I have to answer those questions,
16    Your Honor, I'll need a Bankruptcy Code.
17    Q.    Forty-two years you've been a bankruptcy trustee, right?
18    A.    You've been a debtor in bankruptcy for eight or ten
19    years, sir.
20    Q.    I didn't ask what I've been.  I'm asking the questions.
21    So you don't know how long you have from the date you're
22    appointed as Chapter 7 trustee in a converted Chapter 11 to
23    bring an adversary, say, for example, a section 5 adversary
24    against Serv Trust?
25              MR. MASTRO:  Objection, Your Honor.  I don't see the
```

1  relevance of this, number 1, and it's beyond the scope of

2  direct.

3          MR. MYERS:  No, it's not.

4          THE COURT:  Mr. Myers, I'm not sure -- you're not

5  here to quiz him on provisions of the Code.  If you have a

6  question, ask him the question.  If you're trying to get him

7  to testify about how long he had to sue Serv Trust --

8          MR. MYERS:  Here's where I'm going with it, Your

9  Honor.

10         THE COURT:  -- or to sue a third-party, then ask that

11  question.  I think we're just going to be spinning wheels here

12  for a while if we're just going to quiz him.

13  Q.   Have you ever filed an adversary proceeding against Serv

14  Trust?

15  A.   No, sir.

16  Q.   So when you became Chapter 7 trustee on February 22,

17  2017, there would be a bar date.  You seem to not recall what

18  that is.  But you have never, ever filed a adversary

19  proceeding against Serv Trust to attempt to bring their

20  property into my bankruptcy estate; is that correct?

21  A.   I just answered that question.  I said, I've never filed

22  any action against Serv Trust.

23  Q.   Okay.  So you've never brought any of Serv Trust's

24  property into my bankruptcy?

25  A.   Judge Lease did that.



Appellees' Appendix 0302

1  Q.   No, I didn't ask.  I said you.

2  A.   I answered your question.

3  Q.   Okay.  No.  Okay.  Have you ever abandoned any property

4  or claims in my bankruptcy case?

5  A.   I honestly don't recall if I filed any abandonments in

6  this cause of -- this case, Your Honor.  I don't do them

7  often, but we do do them.  We did one in the last couple of

8  weeks.  But I -- I don't recall.

9        THE COURT:  Next question.

10  Q.   You ever abandon any claims against Serv Trust?

11  A.   I have no recollection of an abandonment in this case as

12  to Serv Trust or anyone else, but I'm not certain of that

13  without reviewing the docket or my files in my office.  This

14  is a pretty old case.

15  Q.   Well, I'll represent to you that I'm aware of the docket

16  in this case, and you've never filed an adversary against Serv

17  Trust.

18        THE COURT:  Mr. Myers, you are not testifying.

19  You're here to ask questions.  Is there a question?

20        MR. MYERS:  Yeah, there is.  There is lots of

21  questions.

22        THE COURT:  Ask them, and stop testifying.

23  Q.   Have you ever abandoned any property or any claims that I

24  would possess -- that I'd possess prior to filing bankruptcy

25  that once you became trustee were property of my estate?  Did

1     you ever abandon any of those claims?

2             MR. MASTRO:  Objection, Your Honor.  Again, I don't

3     really see the relevance of this, and it's well beyond the

4     scope of the direct examination.

5             THE COURT:  What does this have to do with the

6     proposed settlement with the King parties?

7             MR. MYERS:  The Chapter 7 trustee and his counsel

8     have completely elided over the fact that Serv Trust is not

9     property of my bankruptcy estate.  He has no ability

10    whatsoever to settle any claims in connection with nonestate

11    property.

12            THE COURT:  All right.  Well, you can make that

13    argument in your closing, and you can introduce any evidence

14    that you would like.  Your cross-examination of him has to

15    fall within the scope of the questions that have already been

16    asked to him so -- and he testified about his decision to

17    enter into the settlement.  He testified about --

18            MR. MYERS:  Exactly.

19            THE COURT:  -- the factors that he considered.  So

20    let's focus on the scope of, number 1, what is before the

21    Court, which is whether he exercised good business judgment in

22    reaching the settlement, and number 2, within the scope of his

23    testimony that he has already provided.

24    BY MR. MYERS:

25    Q.   Mr. Schlossberg, as Chapter 7 trustee, can you settle --



1   can you enter into a 9019 settlement agreement with the King

2   parties concerning nonestate property?

3          MR. MASTRO:  Objection, Your Honor.  I mean, we're

4   talking about estate property here.  This doesn't seem

5   relevant.

6          MR. MYERS:  It's not estate property.  That's my

7   question.

8          THE COURT:  Mr. Myers, let me talk.

9          I'm going to overrule the objection and give Mr.

10  Myers a little bit of leeway here to ask where I think he --

11  what I think he's trying to ask here.

12  A.   Please -- please ask the question again.

13  Q.   Sure.  Is it your opinion, as Chapter 7 trustee, that you

14  can enter into a Rule 9019 settlement agreement with another

15  party, for example, the King parties, to settle claims in

16  connection with nonestate property?

17  A.   You have asked -- you have posed a hypothetical question,

18  and I state that it's hypothetical, Your Honor, because the

19  Court has already decided this is entireties property, and of

20  course it is entireties property.  So it's a hypothetical.  If

21  you want me to answer hypotheticals, I will, Your Honor, but

22  it looks like a slippery slope of a lengthy afternoon.

23  Q.   Court has not decided this is a estate property.

24  A.   Oh, the Court has.

25         THE COURT:  Mr. Myers, please let me talk.  Okay.

1          MR. MYERS:  Okay.

2          THE COURT:  And then I'll give you a chance, if I

3    need more information from you.

4          Mr. Schlossberg, answer the question the best you

5    can.  I understand that it assumes things, facts that are not

6    in evidence.  But give a brief answer to this question,

7    please.

8    A.    Assuming, and it's hard to do that because the example

9    you gave of nonstate property, you expressly posited that the

10   property of Serv Trust would not be included among estate

11   property.  Let's take that particular example out of the way.

12   I cannot enter into an agreement binding nonestate property.

13   But I expressly note that the property of Serv Trust and that

14   Serv Trust itself is estate property.

15   Q.    How did Serv Trust property become a state property in my

16   bankruptcy estate?

17   A.    By order of Judge Lease in a case tried in the Circuit

18   Court for Montgomery County, where you were present.

19   Q.    Well, actually, I wasn't present, Mr. Schlossberg.  Was I

20   present?  Do you know if I was present at that trial?

21   A.    Be the first thing I know about that you weren't present

22   at.  I apologize if I'm wrong on that.  I was otherwise

23   engaged that day.  I wasn't at the trial.

24   Q.    Did you attend any hearings in the Montgomery County

25   litigation?



1    A.    No.

2    Q.    Were you aware of the fact, Mr. Schlossberg, that on

3    December 30th, 2022, I removed the Montgomery County

4    litigation, which, just for the record, I will refer to the

5    Montgomery County litigation as the King, et al., v. Serv

6    Trust, et al. case, 436977V, and the Goldsboro v. Serv Trust,

7    et al. case, 451611V.  Are you aware that I removed that

8    action to the United States District Court for the Middle

9    District of Florida on December 30th, 2022?

10   A.    Yes, I am.

11   Q.    Okay.  And are you aware that at 9:17 a.m. on January

12   3rd, before any hearing started in Montgomery County Circuit

13   Court, I filed a notice of appeal in the United States

14   Bankruptcy Court for the Middle District of Florida, appealing

15   to the Middle District -- to the United States District Court

16   for the Middle District of Florida from the order granting

17   emergency motion from remand, entered in adversary 2:22 AP

18   0048-FMD, which is the King removed case.  That's the caption

19   down in the bankruptcy court.  Were you aware that I filed

20   that notice of appeal before the hearing in Montgomery County

21   Circuit Court started?

22   A.    Yes, sir.

23   Q.    Okay.  And --

24   A.    Which restores the status quo.  That means there was

25   another --



Appellees' Appendix 0307

1    Q.   I didn't ask another question yet.

2    A.   -- at 9:30 a.m.

3    Q.   I didn't ask another question yet.  And are you aware

4    that the United States Bankruptcy Court for the District of

5    Florida has never mailed a certified copy of the order back to

6    Montgomery County Circuit Court?

7    A.   No, I am not.

8    Q.   Okay.  And have you had an opportunity since February of

9    this year to review a decision from the Fourth Circuit Court

10   of -- a published decision out of the Fourth Circuit Court of

11   Appeals, identified as City of Martinsville, Virginia v.

12   Express Scripts, Inc.  Have you ever reviewed that decision?

13   A.   I can't say that I recall having reviewed that decision,

14   Your Honor.

15   Q.   Okay.  It's rather prescient.  I, of course, will take

16   this up in my closing argument, but are you aware that if an

17   appeal is filed before the bankruptcy court in Florida

18   physically mails a copy of the remand order to Montgomery

19   County Circuit Court, there is an automatic stay under

20   Coinbase?

21        MR. MASTRO:  Objection, Your Honor.  I don't see the

22   relevance in it.  Assumes all kinds of facts not in evidence.

23        THE COURT:  We have a sophisticated witness here.

24   I'm going to overrule it, and let him answer.

25   A.   What's the question again?



1    Q.    Are you aware that under -- are you aware that when a

2    case is removed, in this case, from the Montgomery County

3    Circuit Court, to the United States District Court for the

4    District of Florida and then initiates an adversary theory

5    preceding.  The bankruptcy court issued an order on January

6    3rd, 2023.  I'm not sure exactly what time, but it was early

7    in the morning.  Granting emergency motion for remand but

8    never physically sent a copy of that order, certified copy of

9    that order, as required by 28 U.S.C. 1447(c), to the

10   Montgomery County Circuit Court to restore jurisdiction to the

11   Montgomery County Circuit Court?  Never.  Ever.  It's not in

12   the record.

13        MR. MASTRO:  Objection, Your Honor.  I mean, there's

14   so much legal conclusions bound in there.  If he wants to ask

15   the witness is he aware that an order of remand was sent with

16   or without --

17        MR. MYERS:  Okay.

18        MR. MASTRO:  -- a certification or something, I guess

19   that's proper.  But he's throwing in all these other

20   qualifications and legal conclusions.  I'm having a hard time

21   following it.  I don't know if Mr. Schlossberg can follow it.

22        THE COURT:  Well, I'm going to give Mr. Schlossberg

23   an opportunity to try and respond.  The objection's overruled.

24   A.    Your Honor, that question would require me to accept as

25   accurate a number of representations that just passed from Mr.

1    Myers.  I don't have any confidence in Mr. Myers to accurately

2    testify as to these matters, nor do I necessarily think that

3    he actually understands what it is he's talking about.  It may

4    be true, but I have no idea.  And I'm not about to rely on the

5    representations of Mr. Myers.  Period.

6        THE COURT:  Thank you.

7    Q.   Thank you.  Let me ask you a question, Mr. Schlossberg.

8    Are you aware if there is an order remanding the case from the

9    United States Bankruptcy Court for the Middle District of

10   Florida, certified copy of an order that was physically mailed

11   to the Montgomery County Circuit Court and entered in the

12   circuit court litigation that we're talking about?

13   A.   No, I have no idea, sir.

14   Q.   You have no idea?

15   A.   I have no -- no idea.  None whatsoever.

16   Q.   Okay.  Have you ever heard of the Griggs principle?  Have

17   you ever heard of Griggs principle?

18   A.   Grapes?

19   Q.   Griggs.

20   A.   No, sir.  Don't know what it is.

21   Q.   Okay.  Now, do you recall, Mr. Schlossberg, that in my

22   converted Chapter 11 as a Chapter 7 that the petition date

23   remains the same as November 18, 2015, do you recall a

24   memorandum opinion and order entering judgment issued by Judge

25   Lipp on September 28th, 2018 in adversary proceeding 17-00193

1  that would be docket 94, docket 93, the opinion and the order,

2  and that was in connection with the UST's objection to my

3  discharge?

4  A.   If you want to show me a copy of it, I'll be happy to

5  tell you if I remember it.  There's been lots of orders and

6  lots of decisions in this case, many of which, of course, were

7  issued by Judge Lipp.

8  Q.   Well, you've cited that order many times in your papers.

9  A.   I'm -- you're not going to trap -- try and trap me into

10 saying something because I'm embarrassed that I can't remember

11 something.

12 Q.   Okay.

13 A.   Mr. Myers, that's -- that intimidation stuff doesn't work

14 with me.

15       MR. MYERS:  Can I approach the witness and ask him to

16 read the findings of fact from that order?

17       THE COURT:  Do you have a copy for the Court and for

18 the other parties in the courtroom?

19       MR. MYERS:  No, it's verbatim out of Judge Lipp's

20 order.

21       THE COURT:  Is that a yes or a no?

22       MR. MYERS:  I don't have copies.  It's Judge Lipp's

23 order and --

24       THE COURT:  Show it to Mr. Schlossberg's counsel

25 first.



1        MR. MYERS:  Those are verbatim.  No, not that.  Just

2    that.  Just that paragraph.

3        MR. MASTRO:  No, I object, Your Honor.  This is not

4    Judge Lipp's order here.  This is just his outline.  It's not

5    Judge Lipp's order.

6        MR. VERSTANDIG:  Portions of it also appear to be

7    ellipsised.

8        THE COURT:  If it's not a copy of the -- I'm sorry.

9        MR. VERSTANDIG:  Portions of it appear to be

10    ellipsised as well.

11        THE COURT:  If it's not a copy of the order, then you

12    may not introduce it into evidence.

13    BY MR. MYERS:

14    Q.  Mr. Schlossberg, do you recall -- because you have

15    testified previously concerning this order, do you recall that

16    in Judge Lipp's -- I'm just going to call -- the memorandum

17    opinion and order entering judgment, I'm going to call it the

18    judgment.  Under findings of fact, Judge Lipp said the

19    following.  This is "verbatim".

20        "The following facts are relevant to the issues at hand

21    and are either uncontroverted or are supported by evidence in

22    this case."  Now, this is September 28th, 2018.  "Serv Trust

23    is a trust that was created by Myers' mother for the benefit

24    of Myers' five children.  Serv Trust was funded with an

25    initial deposit of $1,000 from Myers' mother.  Myers and

95

1    Daniel Ring are the cotrustees of Serv Trust."

2         Do you recall reading that in that opinion?

3         MR. MASTRO:  Objection, Your Honor.  I don't know

4    what he's reading from and if that's the exact verbatim quote.

5    And I also don't know what the relevance of it is to this.

6         THE COURT:  I don't know either, but I'm going to

7    give him a little bit of leeway to ask his questions.  And if

8    Mr. Schlossberg has that passage committed to his memory, then

9    he can testify about it.

10        Mr. Schlossberg.

11   A.   Mr. Schlossberg does not have that committed to memory.

12   Your Honor.  I don't recall the particular hearing.  I know we

13   had a lot of hearings in this courtroom over a long period of

14   time.

15        THE COURT:  Next question.

16   BY MR. MYERS:

17   Q.   Do you recall in Judge Lipp's order, "It is undisputed

18   that Serv Trust was established to pay educational and other

19   expenses related to Myers' children.  It is also undisputed

20   that Myers is a cotrustee of Serv Trust, with the authority to

21   direct Serv Trust to make payments on behalf of its

22   beneficiaries, the Myers children.  Myers was adamant at trial

23   that every payment that he or Kelly received from Serv Trust

24   was for the benefit of his children.  If, as irrefutably He

25   testified to by Myers," irrefutably testified to by Myers,



1    "Every payment from Serv Trust to Myers and/or Kelly was for

2    the benefit of their children, then it appears Serv Trust was

3    serving its intended purpose, i.e., providing for Myers'

4    children."

5         And then, she says, "Such payments would not be loans to

6    Myers and/or Kelly.  They would be distributions to the trust

7    beneficiaries."

8         Do you recall that, Mr. Schlossberg?

9              MR. MASTRO:  Same objection, Your Honor.  I'd also

10   point out, for the record, that the trustee was not a party to

11   the 727 adversary.  That was brought by the United States

12   Trustee.  So myself and Mr. Schlossberg were not a party to

13   this.

14             THE COURT:  Understood, and Mr. Schlossberg can

15   testify for himself as to that.

16             Mr. Schlossberg, the objection's overruled.

17   A.   Same answer as I just gave a moment ago, Your Honor.  I

18   can't remember it as such.

19             THE COURT:  Understood.  Thank you.

20   Q.   Did you ever appeal Judge Lipp's memorandum opinion and

21   order entering judgment on September 28th, 2018 in adversary

22   17-00193, docket 94 and docket 93, Mr. Schlossberg?

23   A.   If that's -- if that's the same proceeding, and -- and

24   I -- I'm careful saying if because I don't have a lot of

25   confidence that you're not going to take something out of



1   context.  But if that's the same proceeding, I just heard my

2   counsel say I wasn't a party to that proceeding.  I don't see

3   how I could have taken an appeal from the decision.

4   Q.   Well, maybe I could be educated.  If you're a Chapter 7

5   trustee and there's an adversary filed by the United States

6   Trustee to deny my discharge, you'd have a right to file an

7   appeal, wouldn't you?

8        MR. MASTRO:  Objection, Your Honor.

9   Q.   You don't know?  Okay.

10       THE COURT:  The objection's overruled.  Answer best

11   you can.

12   A.   Never did the research on the subject, Mr. Myers, but I

13   don't think I have any rights in that litigation, including

14   especially taking an appeal from something I wasn't a party

15   to.

16   Q.   You testified earlier at length about the first amended

17   and restated operating agreement of 6789 Goldsboro LLC.

18   That's Trustee's Exhibit 1.  Do you recall that?

19   A.   Yes, I remember testifying.

20   Q.   Okay.  Do you know the history of 6789 Goldsboro LLC

21   preceding that first amended and restated operating agreement?

22   A.   No.  I was commenting on this -- this contract of record

23   in this case.

24   Q.   Okay.  Have you ever reviewed a copy of the Serv Trust

25   agreement that was formed July 10, 2010 by my mother as the

1    trustee -- I mean, the settlor?

2    A.    I may have over the years, but I don't recall.

3    Q.    But you didn't review that agreement in connection with

4    this?

5    A.    No.

6    Q.    Okay.  And would it surprise you, if you read that

7    agreement, it said Serv Trust is a common law trust, a

8    Maryland common law trust, a Maryland common law spendthrift

9    trust?

10   A.    It would astonish me because Judge Lease is a pretty

11   careful guy.  And he made a decision on the merits in your

12   case in Montgomery County.  And he found, I believe I saw

13   this, that it was a statutory trust.  I'm not sure what the

14   difference would be, but he found that it would be a -- it was

15   a statutory trust and that it was your alter ego.

16   Q.    You weren't present, were you, at the December 16th, 2022

17   pre-trial conference in the Montgomery County litigation with

18   Judge Lease, were you?

19   A.    I was not.

20   Q.    Okay.  So you're not aware that Judge Lease, on December

21   16, 2022, said that because of the automatic stay in my

22   Florida case, which Judge Delano issued an order specifically

23   saying there could be no claims against me personally, and at

24   that point in time, I was no longer a trustee of Serv Trust,

25   that Judge Lease on the record said Myers is not a party to

escribers
www.escribers.net | 800-257-0885

1    this litigation?

2           MR. MASTRO:  Objection.  Hearsay, Your Honor.

3           MR. MYERS:  It's in the record.

4           THE COURT:  Mr. Myers, you're asking him if he knows

5    about things, and it's almost like you're testifying from the

6    podium.  If you want to say all those things, you're going to

7    have an opportunity in your case.  But ask him about

8    specifically his decision making in entering into this

9    settlement.  That's the issue for the Court.

10           The issue for the Court is not whether this Court was

11   right or that Court was wrong.  The issue for this Court is

12   whether he exercised good business judgment in determining

13   that this settlement is something he should enter into.

14   That's the sole question for me today.  So and that was the

15   focus of his testimony in his direct.

16           Your cross-examination is limited to the scope of

17   what was asked in direct.  I'm trying to give you some leeway.

18   You've gone outside the bounds of what was asked in direct,

19   and I'm trying to give you some leeway to give you an

20   opportunity to show how that's relevant to the issue before

21   the Court.  But I'm not seeing it.

22           So with that in mind --

23           MR. MYERS:  His business judgment --

24           THE COURT:  With that in mind, ask him your next

25   question.  Okay.



1          MR. MYERS:  Yeah.

2     BY MR. MYERS:

3     Q.   In your business judgment, Mr. Schlossberg, if I wasn't a

4     party to the trial on January 3, then how could I possibly be

5     determined to be the alter ego of Serv Trust?

6          MR. MASTRO:  Objection, Your Honor.  I don't see what

7     the relevance of this is.

8          MR. MYERS:  It's his business judgment.  I mean --

9          THE COURT:  But he's not the one -- a court

10    decided --

11         MR. MYERS:  It didn't.

12         THE COURT:  -- that you are the alter ego of Serv

13    Trust.  Mr. Schlossberg didn't decide that.

14         MR. MYERS:  Okay.  Let me go to the next question,

15    and maybe we can get to that.  Your Honor, where I'm going

16    with this is that he's elided over the entire fact that this

17    matter still rests in the Montgomery County Circuit Court.

18         THE COURT:  Well, ask him that question.

19    Q.   Okay. Mr. Schlossberg, are you aware that on -- are you

20    aware that Judge Simpson entered an order remanding the

21    litigation that we're talking about back to Montgomery County

22    Circuit Court?

23    A.   I don't know that I recall whose order it was that

24    remanded this case back, but I do recall that there was an

25    order remanding this case back to the circuit court for

1    Montgomery County after Judge Lease entered his final order

2    and sent the case back here for further action because of the

3    stay, which barred him from going forward --

4    Q.    That's not --

5    A.    -- the second issue.

6          THE COURT:  Next question.

7    Q.    Mr. Schlossberg, I wasn't referring to Judge Delano's

8    order.  I was referring to Judge Simpson's order in this court

9    in 2019.

10   A.    Okay.  Well, then I was not thinking of the same period

11   of time and transactions.  I apologize.  In the future, I'll

12   ask that you put the dates on the orders that you're trying to

13   characterize.

14         I do not recall whatever order it is you're talking about

15   that sent this case back to -- Judge Simpson sent it back to

16   Montgomery County?  I would like to see the document you're

17   talking about.

18         THE WITNESS:  I apologize, Your Honor.  I think that

19   I was confused.

20         THE COURT:  No apology needed.

21         MR. MYERS:  Your Honor, may I request?  I don't have

22   access to it.  It's Judge Simpson's remand order when Mr.

23   VerStandig removed the Montgomery County litigation to this

24   Court, and she remanded it very shortly thereafter.  Is it

25   possible I could ask you to look at that order so we can

1      refresh?

2             THE COURT:  All right.  This is what I'm going to do.

3      Mr. Myers, I would like you to give Ms. Fernandez -- Ms.

4      Fernandez, raise your hand -- whatever you need a copy of for

5      this cross-examination.  I want you to let her know.  And if

6      it's in the docket, we will make copies for everybody in the

7      courtroom and -- but I'm not going to keep getting off the

8      stand -- getting off the bench so that we can keep printing

9      exhibits for you.

10            So if there's anything other than this order that you

11     would like, please let Ms. Fernandez know, and we will make

12     copies for everybody in the courtroom.  Okay.

13            MR. MYERS:  Yes.

14            THE COURT:  All right.

15            MR. MYERS:  Thank you, Your Honor.

16            THE CLERK:  All rise.  Court is now in recess.

17        (Whereupon a recess was taken)

18            THE CLERK:  All rise.  Silence, please, and come to

19     order.  The United States Bankruptcy Court for the District of

20     Maryland now resumes its regular session, the Honorable Maria

21     Ellena Chavez-Rurak presiding.

22            Please be seated.

23            THE COURT:  All right.  Mr. Myers, your next

24     question.  And actually, before you ask that question, Mr.

25     Myers, can you tell me how much time you think you need for

1    your cross-examination?  I'm just trying to manage our time

2    for today.

3            MR. MYERS:  Well, it's hard for me because of the way

4    I am, because of the way Mr. Schlossberg is, and the

5    interaction.  So what time?

6            THE COURT:  It's 3 o'clock now.

7            MR. MYERS:  At least three --

8            THE COURT:  He's been on the stand for almost an hour

9    and a half.

10           MR. MYERS:  Yeah, probably two more hours.

11           THE COURT:  All right.  Well, I'll give you until 5

12   o'clock.  Okay.  I want to make sure you have an opportunity

13   to ask him what you want to ask him.  But I'm just trying to

14   manage our time because we come back tomorrow, but I have

15   other things scheduled in the afternoon,  so all right.

16           MR. MYERS:  Well, I'll probably bring Mr. Schlossberg

17   back in my case, so on direct.

18           THE COURT:  Okay.

19           MR. MYERS:  Your Honor, your nice clerk gave me

20   exhibits.  Are we going to mark these copies that I'm got?

21           THE COURT:  Are you marking them?

22           MR. MYERS:  Yeah, I'd like to put them in the record.

23           THE COURT:  Okay.  Well, you should have done that

24   already.

25           MR. MYERS:  So what exhibit do you want me to start

1    with?

2            THE COURT:  Well, you're debtor.  So Debtor's Exhibit

3    1 would be a good place to start.

4            MR. MYERS:  So do I ask him questions?  Do I show it

5    to them?

6            THE COURT:  Well, so let's -- I have four exhibits.

7    So tell me what is Number 1.  What's Number --

8            MR. MYERS:  This is Judge Lipp's order entering

9    judgment, case 17-00193.93, dated 9/28/18.

10           THE WITNESS:  That's too much information.

11           THE COURT:  All right.  So that's Number 1.

12           THE WITNESS:  Which one was that?  I just hear

13   mumbling.

14           THE COURT:  It is the thicker one, docket number 93.

15           THE WITNESS:  The big one?  Big one?

16           THE COURT:  The big one.  Judge Lipp's decision from

17   September 28th, 2018.

18           THE WITNESS:  And this is Debtor's 1?

19           THE COURT:  That's Debtor's 1.  And what's going to

20   be Debtor's Number 2?

21           MR. MYERS:  I don't know until I finish this one.

22   I'm just going to grab them as I go.

23           THE COURT:  Okay.

24           MR. MYERS:  Thank you.

25           THE COURT:  All right.  Your next question.



1    RESUMED CROSS-EXAMINATION

2    BY MR. MYERS:

3    Q.    Okay.  So Debtor's Number 1, Mr. Schlossberg, do you have

4    that there?

5    A.    Yes.

6    Q.    Okay.  And on memorandum and opinion, which starts on

7    page 3, that's doc 94 in case 17-00193.

8    A.    Page 3.  Okay.

9    Q.    Okay.  And then that's the beginning of the memorandum

10   opinion.  And then the next page, page 2, findings of fact.

11   This is Judge Lipp making findings of fact.

12   A.    Wait a minute.  Page 3.  The page after that's not 2.

13   That's 4.

14   Q.    So the fourth page in on the exhibit should be 2 at the

15   bottom.

16         THE COURT:  He means page 2 of the memorandum

17   opinion.

18         THE WITNESS:  Thank you, Your Honor.

19         THE COURT:  You're welcome.

20   Q.    2 of 38.

21   A.    You got two documents combined there.  Okay.  Got it.

22   Q.    That's the way it was given to me so -- these are Judge

23   Lipp's findings of fact.  "The following facts are relevant to

24   the issues at hand are neither uncontroverted or supported by

25   the evidence in this case."  That's the first sentence.  Do



escribers

www.escribers.net | 800-257-0885

1    you see that?

2    A.    Yes.

3    Q.    And then do you see the footnote at the bottom, footnote

4    2, which is at the end of that sentence?

5    A.    I see it.

6    Q.    It says, "To the extent any of the following findings of

7    fact constitute conclusions of law, they are adopted as such,

8    and to the extent any conclusions of law constitute findings

9    of fact, they are so adopted."  Do you see that footnote?

10   A.    Yes.

11   Q.    So let me ask you a question in your business judgment is

12   Chapter 7 trustee.  If Judge Lipp made a finding of fact that

13   Serv Trust was a trust that was created by Myers' mother for

14   the benefit of Myers' five children, that Serv Trust was

15   funded with an initial deposit of 1,000 from Myers' mother,

16   Myers and Daniel Ring are the cotrustees of Serv Trust, that

17   would be a finding of fact and would be res judicata at

18   anything different in this case, correct?

19            MR. MASTRO:  Objection.  It calls for a legal

20   opinion, Your Honor.

21            MR. MYERS:  I'm asking for his business judgment.

22            THE COURT:  I'm going to overrule the objection and

23   let him answer the question.  Of course, this decision was

24   rendered on September 28th, 2018.

25            So Mr. Schlossberg, I'll let you answer the question.

1    A.    As the Court notes, this was entered on September 28th,

2    2018.    Subsequent to that date, Judge Lease conducted a trial

3    on the subject of the trust and fully adjudicated the issue of

4    the existence of the trust and that the trust was the alter

5    ego of Mr. Myers.    That's the important fact for the trustee

6    in even bringing this 9019 motion because it is that which

7    placed me in control of the asset by the decision of that

8    Court.

9         You can't take things out of context, respectfully.    And

10    if you find anything that is arguably favorable to your

11    construct of facts, Mr. Myers, you ignore everything else in

12    the world, including any other court decisions which must be

13    construed together with it.    That is the -- that is the signal

14    pitfall in your reasoning process, and it carries through to

15    each and every question you have put in front of me, which is

16    nothing more than an invitation to me to reject the decisions

17    of the courts --

18    Q.    Okay.

19    A.    -- that are in place here.

20    Q.    Thank you, Mr. Schlossberg.    Yeah.

21    A.    I'm sorry.    I'm still answering.

22    Q.    You're not answering the question I asked.

23    A.    Let me finish.

24         THE COURT:    Yes.    Mr. Myers, let him --

25    Q.    Not asking -- yeah.



```
1              THE COURT:  Mr. Myers, he's entitled to complete his
2     answer.  You asked him the question.  I'm not going to cut him
3     off.
4              MR. MYERS:  Okay.
5              THE COURT:  Please continue.
6     A.   Each and every one of the various contentions that you've
7     spent the last hour and a half on have been futile efforts to
8     get me to reject the prevailing law in this case.  You may try
9     the rest of the afternoon and all day tomorrow.  You're going
10    to get the same results.
11             THE WITNESS:  Thank you, Your Honor.
12             THE COURT:  Thank you, Mr. Schlossberg.
13             Mr. Myers, next question.
14             MR. MYERS:  Are you finished, Mr. Schlossberg?
15             THE WITNESS:  Your Honor, I've --
16             THE COURT:  Mr. Myers, next question.  We don't need
17    the snippiness from anyone.
18             MR. MYERS:  Well, the last time I questioned him --
19             THE COURT:  Next question.
20             MR. MYERS:  -- he started talking again.
21    Q.   So you just said, Mr. Schlossberg, that Judge Lease fully
22    adjudicated the case.
23    A.   No, I said he fully adjudicated the question.
24    Q.   What question?
25    A.   The question of the alter ego.  He expressly declined to
```

1   take on the redemption case because he said he was barred by

2   the stay because I, as the successor to Serv Trust, am

3   protected by the stay.

4   Q.    What stay?

5   A.    The bankruptcy stay.  Section 362(a) of the Bankruptcy

6   Code.

7   Q.    There was no stay.

8   A.    There is a stay, sir.  That's just silliness.  You know

9   better than that.

10  Q.    I don't need you to talk like that to me.

11           THE COURT:  Mr. Myers, next question.

12           MR. MYERS:  Well, please ask him to --

13           THE COURT:  Next question.

14           MR. MYERS:  -- control his remarks.

15  Q.    Okay.  We're in the -- we're going to mark this, or it's

16  already been marked, Trustee's Exhibit 10.  Do you want to

17  pull that out, Mr. Schlossberg?

18  A.    I have in front of me.

19  Q.    So you're saying that Judge Lease fully adjudicated the

20  question?  So this is order entering partial judgment.  How

21  did he fully adjudicate anything in that case with a nonfinal

22  order?

23           MR. MASTRO:  Objection, Your Honor.  I think this

24  (indiscernible) --

25           THE COURT:  Objection is overruled.  Thank you.

1    A.    Judge Lease fully adjudicated the issue of the alter ego

2    claim.   Judge Lease had in front of him a two-count complaint.

3    It had the alter ego, and it also sought the remand.   The

4    remand --

5    Q.    Do you mean the redemption?

6    A.    Please let me finish.

7    Q.    The remand.

8    A.    The remand could not go forward because to do so would be

9    to be taking acts that belong to this court because I am

10   protected by the bankruptcy stay.   And I am vested, was vested

11   by him on that date and have been ever since with the rights,

12   whatever they are, of Serv Trust.

13   Q.    So when you say remand, did you mean redemption?

14   A.    Sir, I don't know when you're talking about.   I use the

15   word remand.

16   Q.    Well, I'd like to know.   I don't understand what the

17   answer means.

18   A.    So --

19        THE COURT:   Next question.

20        MR. MYERS:   Well, he just used remand for the second

21   count.   There is no remand for the second count, Your Honor.

22        THE COURT:   Ask him a question, Mr. Myers.

23   Q.    What did you mean by remand just now?

24   A.    The Court.   I'm sorry.   I see that the -- the word that

25   was used by Judge Lease was that it was removed.   No, actually

1    it wasn't.  What he said was I am stayed by the bankruptcy by

2    Section 362, and this case will remain stayed until either the

3    case is removed, for the second time, back to the bankruptcy

4    court or someone lifts the stay or the stay otherwise is

5    lifted by operation of law.  I apologize for saying it had

6    been remanded.  I was leaping to the result.

7    Q.   And is there not a third item there in that paragraph

8    you're reading?

9    A.   I just said that at the end, sir.

10   Q.   So where in this order entering partial judgment of the

11   stay does it say that it's Serv Trust property is property of

12   the bankruptcy estate?

13   A.   Can't hear you, sir.  You're talking into your chest.

14   Q.   Where does it say in this order entering partial judgment

15   and stay, Mr. Schlossberg, that Serv Trust property is

16   property of my bankruptcy estate?

17   A.   At the top of the page 2, the first complete paragraph

18   says "Found and adjudged pursuant to the alter ego declaratory

19   claim, and for those reasons stated on the record at the close

20   of the trial, Serv Trust is, and as of November 18, 2015, was

21   the alter ego of Gregory B. Myers pursuant to Maryland law."

22   Q.   So is it your contention that after Judge Lipp makes a

23   ruling that's final and unappealable and is res judicata to

24   anything that Judge Lease does that he can just ignore her

25   ruling?



1    A.    I wouldn't be so bold as to say Judge Lease ignored any

2    other court's ruling.  I would say that he applied that ruling

3    in light of the facts in front of him, and he made the

4    decision.  And if you got a problem with it, take an appeal,

5    as you've done.  And if you have a real problem, maybe you

6    should have moved to stay everything and keep it in -- in that

7    court.  But you didn't do that.  So we're here now.  I'm

8    vested with Serv Trust's rights.  And I'm taking --

9    Q.    You can stop.  I didn't ask a question.

10         THE COURT:  Mr. Myers, don't --

11   Q.    I don't need you to continue on.

12         THE COURT:  Stop.  Mr. Myers, don't interrupt him.

13         MR. MYERS:  I didn't --

14         THE COURT:  Don't interrupt him.  I didn't let him

15   interrupt you.  I didn't let Mr. Mastro interrupt you.  I'm

16   not going to let you interrupt anyone either.

17         MR. MYERS:  Don't I get to ask the questions, and

18   then he answers my question and not go off on some tangent

19   about what he thinks the law is?

20         THE COURT:  He's answering the question.

21         MR. MYERS:  No, he's not.

22         THE COURT:  He is.  And you're not going to interrupt

23   him anymore.

24         Mr. Schlossberg, please continue.

25         THE WITNESS:  I'm sorry, Your Honor.  He just got

1    what he wanted.  Broke my chain of thought.  And I don't want

2    to sound like I'm not sensible about something, so I'm going

3    to stop right here.

4            THE COURT:  Okay.

5            THE WITNESS:  I'll wait for the next question.

6    Q.   Mr. Schlossberg, you just said that I should have filed a

7    notice of appeal.  I did file a notice of appeal, as you know,

8    in the Maryland Court of Appeals back in January of 2023, and

9    they determined that there is no final order in that case.  So

10   it has not been adjudicated, as you so state, unless you can

11   tell me something I don't know, which you like to do.

12   A.   I'm not going to parse words with you, Mr. Myers.  You

13   don't like some results, so you decide to, as you say -- you

14   overuse the word elide, by the way.  This is not what this

15   case is about.

16           MR. MYERS:  I'm sorry, Your Honor.  This --

17           THE COURT:  Stop interrupting.

18           This is not what this case is about.

19   A.   This case is about taking action based on what I'm

20   charged with by law and what Your Honor charges me with when

21   you allow me to continue in the case.  My actions are actions

22   to preserve property of the estate, a phrase you -- you take

23   exception to.  Take exception all you like, but that's the

24   fact of it.

25           If I'm wrong, you'll have an appellate court sometime

1    tell you that.  In the meantime, unless you get a stay of the

2    prior decision from which you are appealing, you're stuck with

3    the effect of it until such time.  I don't know why you can't

4    understand this after all the appeals you've been in in this

5    case alone.

6              THE COURT:  All right.  Thank you.

7              Mr. Myers, your next question, please.  And Mr.

8    Myers, are you moving Debtor's Exhibit 1 into evidence?

9              MR. MYERS:  Yes, please.

10             THE COURT:  Any objection?

11             MR. MASTRO:  Your Honor, it's a limited objection as

12   to 1 that's going to come into play later.  Since there was no

13   witness and exhibit list, we necessarily object to Mr. Myers

14   introducing anything into evidence.  However, Debtor's Exhibit

15   1 is on the docket in this case.  The Court is welcome to take

16   judicial notice of the docket in this case and related

17   adversary proceedings.  So preserving our objection as it may

18   pertain to later items, we do not object to Debtor's Exhibit

19   1.

20             THE COURT:  All right.  Debtor's Exhibit 1 is

21   admitted.

22             (Judge Lipp's decision was hereby received into evidence

23   as Debtors' Exhibit 1, as of this date.)

24   Q.   So Mr. Schlossberg, you just chided me about appellate

25   matters.  And on April 18th, 2023, in the Appellate Court of

1    Maryland, as you well know, I had filed a motion for stay

2    pending appeal.  On April 28th, 2023, the King parties, Mr.

3    VerStandig, counsel, filed a response to my motion, which

4    Goldsboro and the Chapter 7 trustee adopted and incorporated

5    in their respective responses filed in the Appellate Court of

6    Maryland.  And this is what it said in Mr. VerStandig's

7    motion, the King parties.

8        "The order from which Mr. Myers instantly seeks a stay

9    is, by its own express terms, nonfinal.  Indeed, the document

10   is titled order entering partial judgment and stay."  And the

11   order most certainly does not dispose of the totality of the

12   triable issues below.  Here's the next sentence.  "The order

13   from which appellants appealed did not adjudicate or complete

14   the adjudication of any claim in this matter."  It, therefore,

15   was not a final order.  Those are your words, sir.

16       THE COURT:  Mr. Myers, why does it matter?  Why does

17   it matter whether the judgment was final or not final?  You're

18   not here -- the Court is not determining any of the issues

19   that were before the state court.  The Court is only

20   determining whether Mr. Schlossberg exercised good business

21   judgment in reaching a settlement with the King parties.

22       MR. MYERS:  I'm befuddled, Your Honor.  If there's no

23   final -- this case was remanded to Montgomery County Circuit

24   Court from this Court.  This Court lost jurisdiction.  The

25   case -- I will answer --

```
 1              THE COURT:  I'm not determining -- I'm not
 2     determining the alter ego issue.  That issue was remanded to
 3     this -- that issue was -- the court abstained, and it was sent
 4     back to the state court.  That issue was decided.  Why does
 5     this Court no longer have jurisdiction over anything related
 6     to Serv Trust?  That's not the case.
 7              MR. MYERS:  Yes, it is, Your Honor.
 8              THE COURT:  That one issue, the Court abstained with
 9     regard to that one issue.  It was sent to the state court.
10     The state court, whether the state court -- what happened in
11     the state court after the state court issued this order
12     doesn't matter.
13              MR. MYERS:  Sure it does.  Once you remand a case,
14     once this Court remands that matter to Montgomery County
15     Circuit Court, this Court loses all jurisdiction over the
16     claims and issues in that matter.  And Rooker-Feldman prevents
17     you from exercising any kind of jurisdiction over the matters
18     in the state court.  And the state court has not completed any
19     determination of the claims in that case, which is exactly
20     what Mr. VerStandig just said.
21              He can't say, oh, Judge Lease entered a nonfinal
22     order deciding this one issue, and therefore, I can run back
23     to the bankruptcy court and say it's mine.  No.  Until there's
24     a final judgment on all claims against all parties, Judge
25     Lease can revise, can vacate, can do anything he wants with
```

1      that order, and that's in his court.  And Rooker-Feldman says

2      you can't interfere with that because now, you're sitting in

3      an appeal of a state court.

4           THE COURT:  Mr. Myers, what I am deciding today does

5      not depend on what Judge Lease did in state court.  The

6      question for this Court is whether the disputes between the

7      King parties and the trustee should be settled.  What you're

8      talking about is one issue that the Court abstained from, and

9      that was a determination of whether you are the alter ego of

10     Serv Trust.  I'm not determining that.  That's not what's

11     being settled here.

12          What's being settled here is all disputes between the

13     King parties and the trustee.  And this Court has exclusive

14     jurisdiction over the allowance and disallowance of claims.

15     So this Court determines what claims are allowed.  What claims

16     are disallowed.  And so this Court has jurisdiction over the

17     settlement of things that are not related to the alter ego

18     issue.  That's all in the state court.  That's not what's

19     being decided here.

20          MR. MYERS:  How can you -- how can you adjudicate a

21     9019 settlement motion when Serv Trust property is not

22     property of the estate?

23          THE COURT:  Serv Trust property is property of the

24     estate, and that determination was made by Judge Lease in his

25     order.  I understand it says partial judgment.  Whether it's a

Appellees' Appendix 0335

1    final judgment or not does not impact whether the trustee can

2    and should enter into a settlement with these parties.  There

3    are numerous issues involved.

4              MR. MYERS:  Judge, the bottom line, the middle line,

5    the top line, and any line is until the Montgomery County

6    Circuit Court completes that case, Serv Trust property is not

7    property of my bankruptcy estate.

8              THE COURT:  Okay.  Well, let's complete the witness

9    examination.  You're welcome to make that argument in your

10   closing, and I look forward to your case citations to support

11   that.  So why don't you ask your next question?  We have a

12   witness on the stand.

13   BY MR. MYERS:

14   Q.   Mr. Schlossberg, I'm going to mark this as --

15   A.   Which one have you got there?

16   Q.   Okay.  Well, I'm going to mark the last one we just

17   talked about, which was Myers' preliminary objection to the

18   motion for approval of compromise.  I'm going to do that

19   Debtor's 2.

20             THE COURT:  Wait.  What are you marking?  I have an

21   email, I have a stipulation of dismissal, and I have an order

22   remanding case.

23             MR. MYERS:  This is.  Filed in this case, doc 19,

24   Gregory B. Myer's preliminary objection to the trustee's

25   motion for approval of proposed compromise and settlement with

escribers
www.escribers.net | 800-257-0885

1    the King plaintiffs.

2          THE COURT:  All right.  Do you have copies for

3    everyone?

4          MR. MYERS:  No.

5          THE COURT:  Mr. Mastro and Mr. VerStandig, do you

6    have --

7          MR. MYERS:  We've already --

8          THE COURT:  -- copies of Mr. Myers' objection to the

9    settlement?

10         MR. VERSTANDIG:  Your Honor, I do not have a copy.

11   I've reviewed it.  I would point out the parties' briefs are

12   not evidence for myriad reasons.

13         THE COURT:  Understood.

14         MR. MASTRO:  I might have a copy of it, Your Honor.

15         THE COURT:  All right.  Well, that's for you.  Mr.

16   Myers can give his copy to the witness.  And that will become

17   part of the body of exhibits on the witness stand.

18         MR. MYERS:  Are you going to give that to him so I

19   can read?

20         MR. MASTRO:  Can read over his shoulder.  That's

21   fine.

22         THE COURT:  You can hand it to the witness.

23         MR. MYERS:  I need to read from it to ask him a

24   question.

25         THE COURT:  Well, then you should have brought an

```
 1    extra copy.  Either it's being marked as Debtor's Exhibit 2,
 2    in which case you hand it to Mr. Schlossberg, or it's not
 3    being admitted, in which case you can keep it in your hand --
 4    or it's not being offered.  So if you're offering it as an
 5    exhibit, you need to hand it to Mr. Schlossberg so he can look
 6    at it.
 7              MR. MYERS:  Mr. Mastro didn't do that.
 8              MR. MASTRO:  Your Honor.
 9              THE COURT:  Because Mr. Myers, you did not pre-file
10    your exhibits.  I'm giving you a lot of leeway by even
11    allowing you to introduce exhibits because the protocols you
12    received by email said that if you did not pre-file them at
13    least three business days before this hearing, you would not
14    be able to introduce any exhibits.
15              MR. MYERS:  Okay.  I'll give a --
16              THE COURT:  So I'm trying to give you a little bit of
17    leeway here.
18              MR. MYERS:  All right.  Thank you.  Can I give it to
19    him?
20              THE COURT:  You may hand it to Mr. Schlossberg.
21              MR. MYERS:  Debtor's Number 2.
22         (Myers' objection to settlement was hereby marked for
23    identification as Debtors' Exhibit 2, as of this date.)
24              THE WITNESS:  Thank you.
25    BY MR. MYERS:
```



1   Q.    Can you read in the record starting at the top of that

2   page, Mr. Schlossberg?

3   A.    Page 2?

4   Q.    Yeah.

5         THE COURT:  You don't need to read it into the

6   record.  If you want to ask him a question about it, you can

7   ask him a question about it.

8         MR. MYERS:  Well, it states what Judge Lease said.

9         THE COURT:  Okay.  Well, then ask him --

10        THE WITNESS:  I'm sorry.  I didn't hear what he said.

11        THE COURT:  I said, you don't have to read it into

12   the record.  He's marked it as an exhibit.

13        THE WITNESS:  Okay.

14        THE COURT:  So it's docket number 19.

15        MR. MYERS:  Debtor's Number 2?  Oh, docket number 19.

16        THE COURT:  Okay.  So it's sixty-three pages long,

17   Mr. Schlossberg.

18        THE WITNESS:  No, this is a ten-page document.  This

19   is docket number 19 in --

20        MR. MYERS:  This adversary.

21        THE WITNESS:  -- this adversary proceeding.

22        THE COURT:  All right.  So it's the ten-page

23   objection without any of the exhibits, then?

24        THE WITNESS:  No exhibits.

25        MR. MYERS:  Yes.



1          THE COURT:  I'm asking Mr. Schlossberg because he's

2      the one who has it in his hand.

3          So it's a ten-page document?

4          THE WITNESS:  Yes, ma'am.

5          THE COURT:  Okay.  All right.  Next question.

6          MR. MYERS:  Well, I need -- I can't ask the question

7      if I can't look at the document.  So I'll take it back.

8          THE COURT:  Well, it's been offered as an exhibit.

9      You don't take it back now.

10          MR. MYERS:  Well, I can't ask a question about it,

11      Your Honor, if I can't see it.

12          THE COURT:  Well, then you should have brought

13      another copy.  All right.  So that's Debtor's Number 2.  The

14      Court will take judicial notice of the filing of the document.

15      But the statements made therein do not have evidentiary effect

16      because it's a pleading.

17          MR. MYERS:  Well, you can take judicial notice,

18      correct, of what happened in the Montgomery County Circuit

19      Court?

20          THE COURT:  Are you going to -- what are you offering

21      me?  Are you offering me orders from the court or a transcript

22      of the proceedings?

23          MR. MYERS:  Transcripts are already in the record of

24      this case.

25          THE COURT:  And where are they?



www.escribers.net | 800-257-0885

1          MR. MYERS:  In one of the filings, I attached the

2    December 16th, 2022 hearing transcript from Judge Lease in the

3    Montgomery County Circuit Court matter.

4          THE COURT:  All right.  Well, let me see if it's

5    attached to this pleading.  Give me one moment.

6          MR. MYERS:  It's possible it was attached to doc 22,

7    which was a supplement.  Actually, it was a doc attached to

8    doc 22, which is a supplement.  And it was attached as exhibit

9    H.

10          THE COURT:  All right.  So this is a seventeen-page

11    transcript, correct?

12          MR. MYERS:  It sounds right.  I don't know.  But

13    December 16, 2016.

14          THE COURT:  16 pages.

15          MR. MYERS:  Okay.

16          THE COURT:  All right.  So the Court will take --

17          MR. VERSTANDIG:  Your Honor, may I inquire, not

18    having it in front of me, who the transcript is by, meaning is

19    it from a court reporter, or is it from --

20          THE COURT:  It was prepared by Deposition Services,

21    Inc.

22          MR. VERSTANDIG:  Thank you, Your Honor.

23          THE COURT:  All right.  It's a sixteen-page

24    transcript.  It's at -- we'll call this Debtor's Number 3.  It

25    is at docket number 22-1.  It's exhibit H, and it's sixteen

1    pages.  And it appears to be a transcript from December 16th,

2    2022.

3         (Transcript of hearing 12/16/2022 was hereby marked for

4    identification as Debtors' Exhibit 3, as of this date.)

5         THE COURT:  All right.  So the Court will admit this

6    into evidence.  It appears to be a complete copy.

7    (Transcript of hearing 12/16/2022 was hereby received into

8    evidence as Debtors' Exhibit 3, as of this date.)

9         THE COURT:  So your next question, Mr. Myers.

10        MR. MYERS:  Yeah.  I'm going to read this paragraph

11   from that transcript and then ask Mr. Schlossberg a question.

12        Judge Lease said on December 16, 2022, "There would

13   not be a ruling that would impose liability on you", meaning

14   me, Mr. Myers.  "However, these plaintiffs would have to, if

15   they wanted to proceed against you, would be required to try

16   that matter again separately, and there would not be any

17   rescue or collateral estoppel issues because you were not a

18   party to that case at that time.  Because you were stayed, you

19   were not considered a party."

20   BY MR. MYERS:

21   Q.   How could there be any ruling against me, Mr.

22   Schlossberg?

23        MR. MASTRO:  Objection, Your Honor.

24   A.   Is there something I'm supposed to be reading because I

25   have nothing in front of me.  And I keep -- I am hearing most

1    of the words that you say, but I have no confidence that

2    I'm -- I'm hearing something that -- that I can rely on.  So

3    if I may see it, I'll be happy to comment on it, or to tell

4    you that I don't think it has much relevance to anything

5    anyhow.  But so be it.

6              THE COURT:  Let me see if I can have somebody print

7    it.

8              MR. MYERS:  It's okay, Your Honor.  I'll take care of

9    it in argument.  It's a transcript.  It's Judge Lease

10   statement that I wasn't a party and --

11             THE COURT:  Okay.  Next question.

12   Q.   Is it your contention, Mr. Schlossberg, if I was not a

13   live party in that case on January 3 because, according to

14   Judge Lease, the upcoming trial does not involve you?  Is it

15   possible that there could ever be an alter ego ruling when I'm

16   not even present?

17             MR. MASTRO:  Objection, Your Honor.  I don't see what

18   this has to do with what we're here today about.  I mean --

19             THE COURT:  The objection's overruled.  I'll let him

20   answer.

21             Mr. Schlossberg.

22   A.   Your Honor, I'm being asked to comment on the effect of a

23   ruling that I'm bound honored to accept as the rule of law in

24   the case.  I am acting on that.  I have brought to the Court a

25   means of taking an asset, which otherwise essentially has zero

Appellees' Appendix 0343

1  realizable value for this estate.  And through an act of

2  alchemy, I've turned it into $150,000 --

3          MR. MYERS:  Your Honor, I didn't ask this question.

4  A.   -- worth of gold.

5          THE COURT:  Stop interrupting.

6          MR. MYERS:  Well, he's --

7          THE COURT:  Stop interrupting.  Mr. Schlossberg.

8  A.   I have turned that asset into gold.  It's only $150,000.

9  It's not a great big nugget, but it's gold.  That's what I'm

10 here for today.  If he doesn't like the other rulings in the

11 case, go get relief where you can get relief.  You can't get

12 it for me.  My job is to liquidate the assets that are placed

13 in my hands.

14 Q.   And they weren't placed --

15 A.   I have done so.

16 Q.   -- in your hands, Mr. Schlossberg.

17 A.   You're arguing with me.  You're not supposed to argue

18 when you ask questions.

19 Q.   And you're not supposed to just run on and testify about

20 legal matters.

21         MR. MASTRO:  Your Honor (indiscernible) --

22 A.   I'd ask that somebody be controlled.

23         THE COURT:  Stop.  Stop.  Everybody, stop.  Stop.

24         Mr. Myers, stop interrupting him.  Stop interrupting

25 him.  Please do not put me in a position where I have to have

escribers

www.escribers.net | 800-257-0885

1    you silenced in these proceedings.  I want to hear from you.

2    I want you to have an opportunity to be heard.  I want you to

3    have an opportunity to question whatever witnesses are here.

4         But you have to observe the decorum of the Court.

5    You cannot argue with the witness.  When you're at that podium

6    and there's a witness on the stand, you are asking questions.

7    You are not testifying.  You are not stating what you think is

8    right or wrong about what he says.  And you are not offering

9    facts.  You are simply asking questions.  Please do not

10   interrupt any more.

11        Mr. Schlossberg, please finish your --

12        MR. MYERS:  Your Honor, may I respond?  Am I not --

13        THE COURT:  No, you may not.

14        MR. MYERS:  To you?

15        THE COURT:  No, you may not.

16        MR. MYERS:  Well, in my --

17        THE COURT:  There's a witness on the stand.

18        MR. MYERS:  And in my --

19        THE COURT:  He's in the middle of an answer.  Stop

20   interrupting.

21        MR. MYERS:  You're interrupting my examination.

22        THE COURT:  No, you're interrupting me.  You're

23   interrupting him.  You're interrupting everyone.  Stop it.

24        Mr. Schlossberg, please continue.

25        THE WITNESS:  Your Honor, I'm sorry.  I've completely



Appellees' Appendix 0345

www.escribers.net | 800-257-0885

1  lost -- I don't even know what question we had going.

2          THE COURT:  Okay.  All right.  Next question, Mr.

3  Myers.

4          MR. MYERS:  It's a stipulation of dismissal.  Mr.

5  Schlossberg has a copy.

6          THE COURT:  All right.  We'll call that --

7          MR. MYERS:  3.

8          THE COURT:  -- Debtor Number 4.

9          MR. MYERS:  4?  Well, number 2 was your opposition to

10  the settlement.  Number 3 was the transcript.  So this is

11  Debtor Number 4.

12      (Stipulation of dismissal was hereby marked for

13  identification as Debtors' Exhibit 4, as of this date.)

14  BY MR. MYERS:

15  Q.   Do you have Debtor Number 4 in front of you, Mr.

16  Schlossberg?

17  A.   Yes.

18  Q.   Stipulation of dismissal?

19  A.   Yes.

20  Q.   Can you tell me what that is?

21  A.   Stipulation of dismissal.  What do you --

22  Q.   Can you describe what you did there?

23  A.   This is the dismissal of the state court iteration of the

24  redemption dispute, which was wholly appropriate when this

25  Court took over the proceedings in 24-007.



Appellees' Appendix 0346

1    Q.    How did this Court take over the proceedings from the

2    Montgomery County Circuit Court case if the Montgomery County

3    Circuit Court case was not removed to this Court, which you

4    stated in your settlement motion couldn't be done?

5    A.    You asked me the question.  I gave you the answer.

6    Again, you don't like the answer.  When you don't like the

7    answer, you try to --

8    Q.    Please answer my question, Mr. Schlossberg.

9          THE COURT:  Do not interrupt him.

10   A.    I'm answering your question.

11         THE COURT:  Do not interrupt.

12         Go ahead.

13   A.    I answered the question just now, Your Honor.

14         THE COURT:  All right.  Thank you.  Next --

15   A.    I believe I answered it fully.

16   Q.    Well, I don't know what your answer was.  What was your

17   answer to my question?

18   A.    Well, I'll defer to the Court.  The Court can determine

19   whether I --

20   Q.    No, I'm asking you.

21   A.    No, because if you do that, that's asked and answered.

22   It's a proper objection.

23         MR. MYERS:  I'm sorry.

24         THE WITNESS:  I'm sorry, Your Honor.  I don't do --

25         MR. MYERS:  Can his attorney do that, or --

1           THE WITNESS:  I don't mean to be --

2           MR. MYERS:  -- is he going to just be his own

3    attorney?

4           MR. MASTRO:  Objection, Your Honor.  Asked and

5    answered.

6           THE COURT:  He can raise the objection.

7           MR. MYERS:  He's here as a Chapter 7 trustee, not

8    counsel for Chapter 7 trustee.

9           THE COURT:  He's also counsel in the case.  Read the

10   order.

11          MR. MYERS:  Okay.  Well, he can't be both on the

12   stand.

13          THE COURT:  He's not testifying as an attorney.  He's

14   testifying as a Chapter 7 trustee.  And you have asked the

15   same question over and over and over again.  I was going to

16   let you do it because you have an hour and seventeen minutes

17   left.  And if you want to ask the same question for an hour

18   and seventeen minutes, I was going to let you do it.  But if

19   you'd like to move on to something else, that probably would

20   be advisable so you can cover more ground.

21          MR. MYERS:  Your Honor, I just object to this entire

22   proceeding.  This case was removed to Montgomery County

23   Circuit Court and has never come back to this court.

24          THE COURT:  You can make that argument.  There's a

25   witness on the stand.  Ask him a question.

1        MR. MYERS:  Right.  And I ask him, and he wouldn't

2    answer.

3        THE COURT:  Ask him the next question.

4    Q.   How did the Montgomery County Circuit Court litigation

5    come back to this court?

6    A.   I'll defer to the record of the proceedings.  It came

7    back by proper orders of the court.

8    Q.   What order?

9    A.   Your Honor, I don't have the docket in front of me.  I'm

10   not going to be second guessing the way counsel put together

11   the docket and which item happened first and what went down.

12   This case is properly in this court.  I don't think you have

13   any doubt about it.  I doubt that you'd be conducting this

14   hearing if you had that doubt, Your Honor.

15       This is what we're here for.  We're not here on any of

16   these issues.  This is an irrelevant inquiry because the only

17   inquiry that matters that is a factual one, which justifies

18   inquiring of a witness under oath, is my judgment and how I

19   got to it.  It doesn't matter.  Nothing else matters here for

20   that.  Those are all interesting questions, and you certainly

21   have the right to argue them.  They're issues of law.  Raise

22   them up.

23       MR. MYERS:  Can I sit down, Your Honor?

24   A.   Raise them as issues of law.

25       MR. MYERS:  Because he just keeps going on.

1          THE COURT:  Stop interrupting, Mr. Myers.

2          MR. MYERS:  I am not interrupting, Your Honor.  He is

3    just going on and on.

4          THE COURT:  You asked him a question.  I'm letting

5    him answer it.  Stop interrupting.

6          MR. MYERS:  This is a sham proceeding.

7          THE COURT:  Well, you're welcome to leave, Mr. Myers.

8          MR. MYERS:  It's a sham proceeding.  There's --

9          THE COURT:  You're welcome to leave if you don't like

10   it.

11         MR. MYERS:  That litigation is in Montgomery County

12   Circuit Court.  You have no subject matter jurisdiction.

13   Rooker-Feldman prevents it.  The case was removed to Florida

14   and was never remanded.  And it was dismissed in Florida.

15         THE COURT:  And you can make those arguments in your

16   closing arguments.  There is a witness on the stand.  Either

17   ask him a question, or I'm dismissing the witness and you're

18   done with him.

19   BY MR. MYERS:

20   Q.   Were you aware if I ever had an interest in Serv Trust?

21   A.   Asked and answered.

22   Q.   Just answer the question, please.

23         THE COURT:  No, Mr. Myers, you don't instruct the

24   witness to answer.  I do.  That's my job.  Okay.  So stop --

25         MR. MYERS:  Well, his attorney's job is to say ask

```
 1    and answer --
 2              THE COURT:  Stop.  Stop.
 3              MR. MYERS:  -- if he wants to do an objection.
 4              THE COURT:  Stop.  Stop.  Stop.  I'm trying to give
 5    you some leeway, and you're making it painful.  So stop
 6    arguing with me.
 7              Mr. Schlossberg, would you please answer the
 8    question?
 9    A.   Yes, ma'am.
10              THE COURT:  One more time.
11    A.   Yes, ma'am.
12              THE COURT:  Last time.
13    A.   Thank you for acknowledging I've tried to answer this
14    question before.  I will answer it again.
15              Mr. Myers' interest in Serv Trust was determined by the
16    Circuit Court for Montgomery County to be affected by his
17    alter ego status individually with Serv Trust.  When that
18    Court determined that Serv Trust's interests were bound up in
19    Mr. Myers such that the alter ego doctrine took effect, they
20    passed to me, as his bankruptcy trustee under Section 541
21    because it was part of the pervasive description of property
22    contained in -- contained in that statute.  To the extent that
23    Mr. Myers had interests, they passed to me.  And since then,
24    I've been acting on those.  I hope that's a complete answer.
25              THE COURT:  Thank you.
```



1          Mr. Myers.

2    Q.   Has the court ever entered a judgment with me present at

3    trial?

4    A.   You've told me you weren't present on the day of trial.

5    I'll take you at your word.  Judgment was entered --

6    Q.   Are you aware that Mr. VerStandig filed papers in that

7    Court that says I am an indispensable party to that case, and

8    without it, it can't go forward?

9          THE COURT:  You're talking about in the state court

10   case, not this case, correct?

11         MR. MYERS:  Correct, Your Honor.  I guess, let's

12   just -- here's where I'm going.  He's trying --

13         THE COURT:  No.  Wait.  Wait.  Stop.  There's a

14   witness on the stand.  I'm just trying to make sure the

15   questions --

16         MR. MYERS:  I'm trying to save us all some trouble.

17         THE COURT:  The questions.  You don't get to argue

18   with people while a witness is on the stand.  You get to ask

19   questions.

20         MR. MYERS:  Okay.

21         THE COURT:  I'm trying to clarify what you're talking

22   about.  Are you talking about being an indispensable party in

23   this adversary proceeding or in the state court proceeding?

24         MR. MYERS:  Either one, I guess, I would be a

25   required indispensable party, and I'm not named as a party.

1          THE COURT:  Mr. Schlossberg, if you have an opinion

2    on that, please answer.

3    A.    To the extent that Mr. Myers is an indispensable party,

4    those characteristics which make him an -- an indispensable

5    party necessarily passed to me with the entry of the alter ego

6    decision by Judge Lease.  So to the extent that he was

7    indispensable prior to the court determining the alter ego and

8    rendering the alter ego decision, I believe that makes me that

9    party.

10          THE COURT:  All right.  Thank you.

11          Mr. Myers, your next question.

12    BY MR. MYERS:

13    Q.    So Mr. Schlossberg, property of my estate is determined

14    on November 18, 2015, not one day after.  Do you think a state

15    court can enter an order eight years later nunc pro tunc and

16    put property back in my estate?

17    A.    I believe you've made a false statement of -- of law,

18    that is, that the decision is made on that date, and nothing

19    ever after that can ever affect it in any way, including

20    decisions of the courts determining exactly what your rights

21    were under state law as of that date.

22    Q.    But there has been no determination of what my rights

23    were on November 18, 2015 because Judge Lease said, I'm not a

24    party.

25    A.    You're -- you're -- you're testifying and arguing with me

escribers

Appellees' Appendix 0353

www.escribers.net | 800-257-0885

1    both.  I -- I mean, I don't know what I'm supposed to do with

2    you.  You didn't ask me a question.  You say, you said, but,

3    but.  Well, it's not a but-but situation.  You don't get to

4    argue with me.  You get to argue with the judge.  You get to

5    argue with other counsel.  But not with me.  I'm just a

6    witness.

7    Q.    Were you aware that Mr. VerStandig was my attorney

8    beginning in 2010?

9    A.    I knew that Mr. VerStandig had that privilege at some

10   point prior to all this litigation in another matter.

11   Q.    And do you realize he was my attorney at the beginning of

12   my bankruptcy case?

13   A.    To be honest with you, I've never given much thought to

14   Mr. VerStandig's role with you or without you.

15   Q.    Did you ask Mr. VerStandig to litigate this case for you?

16   A.    Mr. VerStandig is not litigating anything for me.

17   Q.    The Montgomery County Circuit Court case?

18   A.    He's not litigating anything for me.  He's never

19   litigated anything for me.

20   Q.    Well, not according to Mr. VerStandig.

21   A.    Well, you'll have to call -- call Mr. VerStandig to the

22   stand, although I think you may have some problems getting him

23   as -- to testify as a witness here.  But you'd have to get Mr.

24   VerStandig to explain any statement he made to that effect.

25   And as I said earlier, based on my judgment as to your

1    credibility, I doubt that Mr. VerStandig said that.

2    Q.    Well, I have the transcript, so I'll show it to you.

3    A.    Is it one that you typed up yourself?  You have a habit

4    of doing that.

5            THE COURT:  Next question.

6            MR. MYERS:  I don't need to hear that, Your Honor.

7            THE WITNESS:  It's true.

8            THE COURT:  Move on.  You're arguing with the

9    witness.  It's inappropriate.

10   Q.    So did Mr. VerStandig ever ask you or Mr. Mastro, to your

11   knowledge, to pursue the declaratory judgment action in

12   Montgomery County Circuit Court?

13           MR. MASTRO:  Objection to the extent he's calling for

14   the disclosure of attorney-client privilege.

15           THE WITNESS:  Oh, that's good.

16   Q.    Mr. VerStandig's not your attorney.

17           THE COURT:  No.  I'll allow the witness to answer the

18   question.  He knows he's not going to disclose attorney-client

19   privilege communications, if there are any, that are relevant.

20   A.    I have no knowledge of Mr. VerStandig ever having been

21   employed on my behalf or my firm's behalf or Mr. Mastro, as my

22   partner, having been done.  And anyone who makes an allegation

23   to the contrary is going to have to explain that to me because

24   I don't know it.

25   Q.    Well, I didn't ask you if he was employed.  I said, did

1    you ever ask Mr. VerStandig to pursue this matter, whether

2    he's employed or not?  I don't know what you mean by employed,

3    but to pursue this matter for you because you were time barred

4    in this case?

5    A.    Now, I see where you think you're going.  The answer is

6    no.  Your Honor, I never requested Mr. VerStandig at any time

7    to do anything for me in any fashion.

8    Q.    So if Mr. VerStandig told Judge Lease that you did, what

9    do you think of that?

10    A.    I think you're posing hypotheticals again, and

11    considering your reputation for credibility, I doubt that it

12    actually happened.

13    Q.    Do the King parties have -- since you never abandoned any

14    claims or causes of action in this case, are you aware if the

15    King parties were ever sought and an order was entered

16    providing them with derivative jurisdiction to litigate claims

17    that are exclusively the province of the Chapter 7 trustee?

18    A.    I know of absolutely no derivative action requests made

19    in this litigation.  I doubt sincerely that there are any such

20    actions ever filed, and I doubt that they very seriously that

21    they exist.  But you go ahead.

22    Q.    When you say in this litigation, are you referring to the

23    Montgomery County litigation or this case?

24    A.    I'm referring to any matters involving Gregory Myers.

25    Q.    That's not my question, Mr. Schlossberg.

1    A.    Well, it's my answer.

2    Q.    Well, that's not my question.  So please answer my

3    question.  Are you aware --

4    A.    Well, you want me to answer your question.

5    Q.    Are you aware --

6    A.    If you articulate a question that can be answered

7    intelligibly, I will answer it.

8    Q.    Fine.

9    A.    Why don't you try and frame it again?

10    Q.    Thank you.  Are you aware if the King parties, any of

11    them, ever came into this court to obtain an order providing

12    them with derivative jurisdiction to litigate claims that are

13    exclusively the property of the Chapter 7 trustee?

14    A.    Asked and answered, Your Honor.  I clearly answered that

15    question not three minutes ago.

16         THE COURT:  All right.  Answer it one more time,

17    please.

18    A.    No, there are none.

19    Q.    So would it surprise you if Mr. Mastro told Judge Lease

20    that they were provided with derivative jurisdiction?

21    A.    That they asked for derivative jurisdiction and were

22    granted it by some court?

23    Q.    No, that the bankruptcy court understood they had

24    derivative jurisdiction?

25    A.    I wasn't there.  I haven't heard it.  I don't believe it

escribers
www.escribers.net | 800-257-0885

1    actually was said.  I'd like to see it in context.

2    Q.    Okay.

3    A.    You have an awful habit of taking things out of context.

4    Q.    Sure.  But would that surprise you?

5    A.    Not a bit.  Not a bit, coming from you.

6    Q.    No, would it surprise you that, Mr. Mastro, when the

7    issue of jurisdiction came up in the hearing before Judge

8    Dwyer and she recognized that alter ego claims are the

9    exclusive jurisdiction of the bankruptcy trustee.  And she

10   said, well, what are you doing here?  And Mr. Mastro said,

11   well, the bankruptcy court, and he kind of worked his way

12   around it, is aware of this.

13   A.    The bankruptcy court is aware that we're in the circuit

14   court for Montgomery County.  That Mr. Mastro was there on

15   behalf of the Chapter 7 trustee.  That's scarcely derivative

16   jurisdiction.  Is this an intentional -- do you, like, make

17   these things up?

18        MR. MYERS:  Your Honor.  Mr. Mastro, I am not

19   suggesting --

20   Q.    I mean, Mr. Schlossberg, I am not suggesting stating the

21   obvious.  Mr. Mastro represented to the Court that the King

22   parties had derivative jurisdiction, as did Mr. VerStandig.

23        THE COURT:  Well, he said he wasn't there.  You're

24   asking him to opine on things that he has said he doesn't have

25   any knowledge of.



1    Q.    Okay.  So as the Chapter 7 trustee, Mr. Schlossberg, when

2    your counsel files papers in cases, are you aware of what

3    they're doing?  Are you aware of what they're saying in court

4    cases?

5    A.    If I'm not in the courtroom, I don't know what he said.

6    If he files a pleading, I know what's in the pleadings.

7    Q.    Okay.

8    A.    You want to show me the pleading that says that we hereby

9    grant -- excuse me hereby grant jurisdiction to assert these

10   claims?  And Mac (ph.) can do it for us.

11   Q.    Well, there is --

12   A.    You must have something like that.

13   Q.    There is no order granting the King parties derivative

14   jurisdiction.

15   A.    Well, it sounds like you --

16   Q.    When the --

17   A.    Sounds like that -- that's not what you were saying a

18   couple minutes ago.

19   Q.    No, I said he misrepresented that it happened.  So

20   anyway, do you recall when Goldsboro filed the adversary in

21   this case before the King parties filed their adversary in

22   Montgomery County Circuit Court?

23   A.    You have to give me a year.  When was that filed?

24   Q.    2018 or so, Goldsboro came in here and said, we want to

25   litigate that Serv Trust is Myers' alter ego and Judge Lipp

escribers
www.escribers.net | 800-257-0885

1    said, not a chance.  And she abstained and accused you all of

2    forum shopping.  And in that case, do you recall that they

3    requested that would you give them derivative jurisdiction?

4    Do you recall what your answer was?

5    A.    Don't recall the whole thing.  And I know that Judge Lipp

6    never said on the stand -- sat on her -- on the bench and

7    said, not a chance.  That's not her style.

8    Q.    Yeah.  I'm paraphrasing.

9    A.    No, you're not paraphrasing.  You're characterizing.

10   Q.    I'm paraphrasing.

11   A.    It's like a leading.  You mess up on these things.

12   Q.    Thank you, Mr. Schlossberg.  So let's go back to Mr.

13   VerStandig.  So here you are, with your Chapter 7 trustee

14   forty-two years of business judgment, and you find out that

15   Mr. VerStandig has been my attorney since 2010.  He has

16   represented Serv Trust.  He has represented 6789 Goldsboro

17   LLC.  He has represented me.  And now, all of a sudden, he

18   decides, wow, I'm going to represent just the King parties and

19   kick everybody else to the curb.  Does that not raise a red

20   flag in your business judgment?

21         MR. VERSTANDIG:  Objection.  Assumes facts not in

22   evidence, specifically that I ever represented Serv Trust or

23   6789 Goldsboro LLC.

24         MR. MYERS:  We'll put that in evidence tomorrow.

25   I'll call Mr. VerStandig.



www.escribers.net  |  800-257-0885

1          THE WITNESS:  Is he on your witness list for

2     tomorrow?  I missed that.

3          MR. MYERS:  Well, he just spoke, so now he is.

4     Q.   Are you aware of that, Mr. Schlossberg?

5     A.   Aware of what?

6     Q.   That he represented all those parties --

7     A.   I don't think -- I --

8     Q.   -- and has a conflict of interest, and now he's

9     representing the King parties in this bogus 9019 settlement.

10         THE COURT:  Hold on.

11    A.   You know, I'd love to know your --

12         MR. MASTRO:  Objection, Your Honor.

13         THE COURT:  Hold on.  Objection.  Yes.

14         MR. MASTRO:  I mean, it's hearsay.  He's just saying

15    what Mr. VerStandig said in open court.  Is he aware of that?

16    We don't have a transcript.  I don't know what's going on

17    here.  I mean, we're getting so far afield, Your Honor.  I'd

18    throw in a relevance objection as well.

19         THE COURT:  Thank you.

20         MR. VERSTANDIG:  And assumes facts not in evidence,

21    namely, that I ever represented Serv Trust or 6789 Goldsboro

22    LLC.

23         THE COURT:  All right.  So Mr. Schlossberg, I'm going

24    to ask the question a different way.  To your knowledge, has

25    Mr. VerStandig represented the King parties, Serv Trust, and

1    6789 Goldsboro at different times?

2         THE WITNESS:  At different times, I believe -- I know

3    that he has represented the King parties since this dispute

4    about redemption started.  Maybe a little bit -- maybe before

5    that.  I don't know.  I know that Mr. VerStandig represented

6    Mr. Myers.  Mr. Myers seems to be saying continues to

7    represent him.  I -- is -- maybe that representation's still

8    going on, but I can't believe that Mr. Myers couldn't find his

9    way to the Attorney Grievance Commission if that were the

10   case.

11        And maybe you have.  Have you brought a proceeding?

12        MR. MYERS:  You don't ask the questions.

13        THE WITNESS:  Oh, I'm sorry.  You're right.

14        THE COURT:  So okay.  So to your knowledge, Mr.

15   VerStandig represents the King parties and has represented

16   them for some time and at some point in the past represented

17   Mr. Myers?

18        THE WITNESS:  That is my understanding.  Yes, Your

19   Honor.

20        THE COURT:  Okay.

21        THE WITNESS:  And -- and -- and -- and Mr.

22   VerStandig, I don't know.  I think he just said he never

23   represented Goldsboro and Serv Trust.  Whatever he said.  But

24   you know, I don't know those things, Your Honor.  So I do the

25   best that I can, judging the credibility of the -- the -- the

1    people who are asking the questions and the reasonable

2    implications of answers that are given by others.

3            THE COURT:  All right.  Thank you.

4    BY MR. MYERS:

5    Q.    So Mr. Schlossberg, you said I wouldn't be a good

6    witness, but can you rely on an attorney if he has a conflict

7    of interest in this proceeding?

8    A.    There's no evidence of a conflict.

9    Q.    Okay.  There will be tomorrow.

10   A.    And I don't -- excuse me.  He is not my attorney.

11   Q.    Well, according to him, he is.

12   A.    Your Honor, I'd love to know the proof on this.

13   Q.    I have it right here.  Here's the transcript.  It's going

14   into evidence, and I'll mark it.

15   A.    Did you type that one?

16   Q.    Yeah, I did.  I typed it with a crayon.  I don't need

17   your comments, Mr. Schlossberg.

18           THE COURT:  Well, Mr. Myers, we don't need yours.

19           MR. MYERS:  Okay.

20           THE COURT:  All right.  Next question.

21   Q.    So Mr. Schlossberg ,did you know that Mr. VerStandig was

22   employed at Offit Kurman up until, I don't know, about 2017?

23   A.    Yes, I did know that he worked at Offit Kurman.

24   Q.    Okay.  And do you know that Offit Kurman represents the

25   King parties, 6789 Goldsboro, and Serv Trust at one point or

1    another, same time, while Mr. VerStandig was there?  In fact,

2    he -- well, you'll see it in the evidence when it's presented.

3    A.    He represented you when he was working at Offit.

4    Q.    No, he represented 6789 Goldsboro LLC and Serv Trust.

5         MR. VERSTANDIG:  Same objection.  Assumes facts not

6    in evidence.

7         THE COURT:  Understood.  Mr. Myers, next --

8         MR. MYERS:  I'm going to bring the evidence tomorrow.

9    They're his emails.  They're his time sheets.

10        THE COURT:  Okay.  Stop.  Stop.  Stop talking.  There

11   is a witness on the stand.  I don't need your dialog.

12        Mr. Schlossberg, if you're able to answer the

13   question, can you answer the question?

14   A.    Give me the question again.

15   Q.    If Mr. VerStandig was representing 6789 Goldsboro LLC,

16   Serv Trust, me, Dan Ring as another trustee of Serv Trust, and

17   Brian King, Cristina King, and the Cristina and Brian King

18   Children's Trust, whether he was at Offit Kurman or after he

19   left, would that give you pause in your experienced business

20   judgment that there's a problem here?

21   A.    Your Honor, if there's a problem there, it's not my

22   problem.  I'm the bankruptcy trustee.  I'm trying to liquidate

23   an asset that I have.  And I'm happy to -- I'll sell it to any

24   one of them or any combination of them if they bring me the

25   money and the Court approves the -- the proposed purchase,

escribers

www.escribers.net | 800-257-0885

1    sale and purchase.  But I -- I don't get to vet the -- the

2    purchasers when I'm selling something at an auction.  I stand

3    on the steps.  I got my hands up.  I'm trying to build a crowd

4    and get the prices to go up.

5    Q.   Thank you, Mr. Schlossberg.

6    A.   Green is green.  I'm answering your question.  Green is

7    green, and I try to do what I can do.

8    Q.   Okay.

9    A.   I don't care much of anything about the -- this conflict

10   issue that you're raising.  Doesn't affect me.

11   Q.   Well, apparently you -- Mr. Schlossberg, didn't you care

12   earlier on direct exam by Mr. Mastro that I couldn't be a good

13   witness because I couldn't be trusted?  I couldn't tell the

14   truth?

15   A.   Demonstrably so.

16   Q.   Okay.  But you're okay with an attorney on the other side

17   of this settlement agreement who's got a conflict of interest,

18   a clear conflict of interest?

19   A.   Well, the part --

20        MR. VERSTANDIG:  Again, just for clarity of record,

21   because there is a propensity to sometimes take things out of

22   context --

23        THE COURT:  I understand.

24        MR. VERSTANDIG:  Objection.

25        THE COURT:  Your objection is noted.



Appellees' Appendix 0365

1          MR. VERSTANDIG:  That's not in evidence.

2          THE COURT:  Your objection is noted.  And I'll let

3     Mr. Schlossberg answer.

4          THE WITNESS:  Thank you, Your Honor.

5     A.   If there is a conflict between Mr. VerStandig and 6789

6     and Serv Trust and the King family but they're all comfortable

7     with the fact that they're generally on the same side of one

8     another and not raising an issue about it, it's not my

9     business.  Not your business.  Not anybody's business but the

10    parties who allegedly are the subjects of that conflict.  And

11    they can certainly waive that.

12    Q.   Are you aware that Serv Trust has ever waived their

13    privilege?

14    A.   I am not aware of any of this, and I don't believe in any

15    of it.

16    Q.   Are you aware that I have ever waived my privilege?

17    A.   I didn't include you in the laundry list just there of

18    the people with conflicts.  I --

19    Q.   Why not?

20    A.   Because we heard earlier, I believe, that this was a

21    representation 2010 or something like that in some other

22    matter.  If I understood it correctly --

23    Q.   No, you didn't.  This was a representation that in 2013,

24    Mr. VerStandig organized the meeting for 6789, Serv Trust, and

25    the King parties.  He was there present, and you'll see it in

escribers
www.escribers.net | 800-257-0885

1    the evidence.  So let's move on.

2    A.    Okay.

3         MR. MYERS:  So I'm going to mark this as -- what are

4    we up to, Your Honor?

5         THE COURT:  Debtor Number 5.  What are you marking,

6    Mr. Myers?

7         MR. MYERS:  This is a motion to disqualify Mr.

8    VerStandig in my Florida bankruptcy case, which was written by

9    an attorney.  Not me.  Not in crayon.  And I'll be happy to

10   hand it to Mr. Schlossberg.

11        THE COURT:  Do you have copies for everyone?

12        MR. MYERS:  Actually, this was a subsequent one.

13   There was a previous one written by my attorney down there.

14        THE COURT:  So no --

15        MR. MYERS:  I don't have copies for everybody, but I

16   can put it in on my case when I get Mr. VerStandig on the

17   stand.

18        THE WITNESS:  Can we make sure we get copies for

19   tomorrow so that we can look at them tonight, like --

20        MR. MYERS:  Well --

21        THE COURT:  -- he's had the chance to look at ours?

22        MR. MYERS:  -- I didn't look at yours.

23        THE COURT:  Mr. Myers, that was your choice not to

24   look at theirs.  But all of this had to be filed three

25   business days ago.  So you're now almost a week late.

1            If there are any documents that you intend to

2    introduce into evidence tomorrow, then you need to let me know

3    before 5 o'clock today.  So you have -- or at 5 o'clock.

4            You have Mr. Schlossberg on the stand for another

5    forty-eight minutes.

6            MR. MYERS:  Your Honor, are you saying I cannot

7    complete my examination of Mr. Schlossberg if it goes over?

8            THE COURT:  I asked you how much time you needed.

9    You said two hours.

10           MR. MYERS:  I said approximately.

11           THE COURT:  Okay.  So --

12           MR. MYERS:  And you limited me to 5 o'clock.  Are you

13   limiting my examination of Mr. Schlossberg?

14           THE COURT:  I am not going to let you have an

15   unlimited amount of time to question this witness because you

16   have chosen to argue with him over every little thing since

17   he's been on the stand.  That's your choice.  You said you

18   needed approximately two hours.  I'm going to give you

19   approximately two hours to complete your cross-examination.

20   You are now an hour and thirteen minutes into that.

21           MR. MYERS:  Yes, and every time --

22           THE COURT:  So use your --

23           MR. MYERS:  -- I ask a question --

24           THE COURT:  So use your time wisely.

25           MR. MYERS:  Every time I ask a question, Mr.

1    Schlossberg decides to filibuster.

2            THE COURT:  Next question.

3            MR. MYERS:  This is Debtor's Number 5.  It's been

4    passed out.  It's an email chain dated October 11, 2019.

5            MR. VERSTANDIG:  Your Honor, I'm going to object

6    before this is read in court or otherwise referenced.

7            THE COURT:  I'm sorry.  Say that again, Mr.

8    VerStandig.

9            MR. VERSTANDIG:  I'm objecting before this is read on

10   the record.  The Email chain in question is a hybrid of

11   communications that are protected by the attorney-client

12   privilege and the accountant-client privilege.  This was

13   surreptitiously obtained by, I don't remember, Mr. Myers'

14   counsel or Serv Trust's counsel through issuance of a subpoena

15   without proper notice during state court proceedings.

16           At no point in time have the King parties, who are

17   the holders of the subject privilege, waived or abrogated the

18   privilege.  The communications in here are exclusively between

19   clients, their attorneys, and their accountants.  Maryland

20   recognizes both the attorney-client privilege and the

21   accountant-client privilege.

22           Mr. Myers is aware that this is privileged.  This has

23   been raised several times in proceedings over time.  Yet, he

24   persists in trying to introduce it into the record, despite

25   knowing that no one who holds the privilege has ever waived

Appellees' Appendix 0369

1    it.  And as my client's counsel, I will be clear, they are not

2    waiving their privilege.

3            MR. MYERS:  Your Honor, there's no privilege.  The

4    subpoena was issued to the CPA firm, and the CPA firm answered

5    the request for documents.  And they were submitted.  That's

6    as simple as it is.

7            THE COURT:  Well, there is an accountant-client

8    privilege --

9            MR. MYERS:  The account is a --

10           THE COURT:  -- and unless you have -- and if this is

11   an inadvertent disclosure, then it is still privileged.  Do

12   you have anything to substantiate any argument that the

13   privilege was waived?

14           MR. MYERS:  Privilege of who?

15           THE COURT:  The privilege belongs to the clients.  It

16   belongs to the King parties.  Do you have anything --

17           MR. MYERS:  The King parties?  The CPAs are CPAs for

18   Serv Trust and 6789 Goldsboro LLC.

19           THE COURT:  Well, then, do you have anything to show

20   that Serv Trust and 6789 Goldsboro have waived the privilege?

21           MR. MYERS:  I was a manager when this happened of

22   Serv Trust -- I mean, of 6789 Goldsboro LLC.

23           MR. VERSTANDIG:  Your Honor, I --

24           MR. MYERS:  They produced the tax returns.

25           MR. VERSTANDIG:  Hold on.  I don't --



Appellees' Appendix 0370

www.escribers.net | 800-257-0885

1          MR. MYERS:  There's no privilege.

2          MR. VERSTANDIG:  -- believe Mr. Myers was the

3    manager.  These are post-litigation emails.  It starts with an

4    email from my client to myself on the last page, dated October

5    10th, 2019.

6          THE COURT:  Well, the state court determined --

7          MR. MYERS:  It didn't.

8          THE COURT:  -- that as -- excuse me.  The state court

9    determined that as of November 18th, 2015, you were the alter

10   ego of Serv Trust.  And so your rights as of November 18th,

11   2015 are being exercised by Mr. Schlossberg.

12         MR. MYERS:  I disagree.  There is no final order from

13   the state court, and you can't --

14         THE COURT:  I don't need a final order.

15         MR. MYERS:  -- do anything with a nonfinal order.

16   You know that.  I know that.

17         THE COURT:  Don't tell me what you think I know.

18         MR. MYERS:  Maryland law knows that.

19         THE COURT:  Don't tell me what you think I know.

20         MR. MYERS:  Well --

21         THE COURT:  Because what you think and what I think

22   are so diametrically opposed that there's no overlap.  So

23   don't presume to know what I know.  You don't.

24         MR. MYERS:  I don't presume to know, but I disagree

25   with what you're saying.



Appellees' Appendix 0371

1          THE COURT:  Well, and you're welcome to say that you

2    disagree when you get to your closing argument.

3          So the Court is not admitting Debtor's Exhibit Number

4    5.

5          Would you like to move Debtor's Exhibit Number 4 --

6          MR. MYERS:  So how is Mr. VerStandig --

7          THE COURT:  -- the stipulation of dismissal, into

8    evidence?

9          MR. MYERS:  How would Mr. VerStandig have --

10         THE COURT:  Is that a yes?

11         MR. MYERS:  I'm asking a question.

12         THE COURT:  Debtor's Exhibit Number 4.

13         MR. MYERS:  We're still on the other exhibit.

14         THE COURT:  Stop talking over me.  Debtor's Exhibit

15    Number 4 is the --

16         MR. MYERS:  Well, you're not letting me respond.

17         THE COURT:  Debtor's Exhibit Number 4 --

18         MR. MYERS:  So you're violating my due process right.

19         THE COURT:  So Debtor's Exhibit Number 1, Number 3,

20    and Number 4 have been admitted.  5 is not admitted.  And

21    Debtor's Exhibit Number 2, the Court has taken judicial

22    notice.

23         (Stipulation of dismissal was hereby received into

24    evidence as Debtors' Exhibit 4, as of this date.)

25         THE COURT:  Next question, Mr. Myers.



1  BY MR. MYERS:

2  Q.   Yeah.  So were you aware that Mr. VerStandig, as counsel

3  for 6789 Goldsboro LLC, filed a complaint in Garrett County.

4  A.   I don't know what the possible relevance is, but I -- I

5  don't -- I don't have any recollection of that.  It may be

6  that it was --

7  Q.   It was a claim on a note.

8  A.   I -- I -- I don't have any recollection of it.  If I knew

9  it, I don't remember it now.

10  Q.   Okay.  So he was 6789 Goldsboro LLC's attorney in the

11  Garrett County action and --

12  A.   I'm sorry.  When was that?

13  Q.   Somewhere around 2018 maybe.

14  A.   Again --

15  Q.   And then that action --

16  A.   -- if I ever knew it, I don't recall it now.  But go

17  ahead.

18  Q.   Okay.  Do you have any knowledge of why he might file

19  something in Garrett County?

20  A.   I haven't --

21  Q.   Isn't that where you are?

22  A.   No, it is not where I am.

23  Q.   Um-hum.

24  A.   You don't know much about the geography of Maryland.  I'm

25  pretty far from there.



1    Q.    Yeah.  Thank you, Mr. Schlossberg, for that insult.  So

2    if Mr. VerStandig is representing 6789 Goldsboro LLC and the

3    King parties, and Brian King is the manager of 6789 Goldsboro

4    LLC, and he represented Serv Trust and me and Dan Ring, don't

5    you think there's a conflict there?

6           MR. VERSTANDIG:  Objection.

7           THE COURT:  We've covered this ground.  Move on to

8    another subject, Mr. Myers.

9           MR. VERSTANDIG:  Your Honor, just for clarity of the

10   transcript so the context matters, there is no evidence that I

11   ever represented Serv Trust.  There is no evidence that I ever

12   represented Mr. Ring.  For what it's worth, I believe Mr.

13   Myers is right.  I think I did represent Goldsboro in filing

14   an action, but I -- there is no evidence before the Court that

15   I've represented Serv Trust or Mr. Ring.

16          THE COURT:  Thank you, Mr. VerStandig.  Your

17   objection is noted.

18          MR. MYERS:  Yeah.  So that's --

19          THE COURT:  And the objection is sustained for all

20   the reasons Mr. VerStandig said and also because it's been

21   asked and answered at least six or seven times at this point.

22   Q.    Were you aware that Mr. King filed tax returns with the

23   IRS that said Serv Trust was in bankruptcy?

24   A.    I don't think that I do.

25   Q.    Would that change your business judgment on this



1   transaction if Mr. King, as the manager, filed tax returns at

2   the IRS that said Serv Trust is in bankruptcy?

3   A.   Well, it wouldn't change my view of my role, my job, and

4   the fact that I'm getting $150,000 for something that probably

5   would liquidate on the market for 0.

6   Q.   Okay.  Let's talk about that.  What do you mean when you

7   say I would get?

8   A.   Sorry.  I take my cases personally.  I'm -- I'm a little

9   parochial about my job.  If I am trusted with handling the

10   assets of an estate, I try, Your Honor, to say the estate,

11   this.  The estate, that.  But sometimes, especially when

12   perhaps there is a degree of irritation in the circumstances,

13   I will let you know just how personally I take my role in this

14   job, and I will refer to the estate and myself as being one

15   and the same.  The trustee and the estate have the same

16   interests, but I don't -- I'm not wild about the fact that

17   from time to time, I might identify myself, as opposed to the

18   estate.

19   Q.   So if there were tax returns filed by Mr. King as manager

20   of Serv Trust and it showed Serv Trust had zero percent

21   before --

22   A.   And it showed Serv Trust what?

23   Q.   Zero percent interest.

24   A.   Is there a question behind that?

25   Q.   Yeah.  Would that cause you to be concerned about a

escribers
www.escribers.net | 800-257-0885

1    settlement when Mr. King has already said in 2018 that Serv

2    Trust had zero percent?  False.

3    Q.   I'm sorry.  Are you answering your own question?  Because

4    I don't think I'd agree with that answer.  If Mr. King was

5    signing a tax return for Goldsboro and stated with respect to

6    the K-1s that would have to go with it, Your Honor, that

7    the -- to be wholly consistent with his articulated position

8    because he has said that on -- excuse me just a minute, Your

9    Honor.

10        By the fall of 2017, it was -- it was Mr. King's position

11   and that of the King parties that they had successfully

12   redeemed the class B stock.  So if they had redeemed the class

13   B stock, in 2018, looking back at it, maybe when he's filed

14   the 2017 return or maybe Mr. Myers is referring to the '18

15   returns, it wouldn't be too surprising that someone who

16   thought that they had successfully redeemed the stock -- the

17   membership interest, the B membership -- class B membership

18   interest, would state, perhaps in -- in trying to explain why

19   the People who had K-1s before don't have K-1s anymore and why

20   they don't no longer have an interest.

21        I've never seen these alleged returns, so it's a little

22   hard for me to speculate further than that, but I think that

23   would be wholly consistent with his position.  Now, if he's

24   wrong, Mr. Myers, if he's wrong and he -- and he didn't have a

25   right to redeem it, then that return that he filed for

escribers

www.escribers.net | 800-257-0885

1    Goldsboro would be a bad return.

2    Q.   Well, can you elaborate on bad?

3    A.   I just did.

4    Q.   No, what do you mean by bad return?  Like, fraudulent

5    return or --

6    A.   No, it would be --

7    Q.   -- illegal return or --

8    A.   It would be an incorrect return.  If you're right, it

9    would be an incorrect return.  But I can see also where

10    there's an argument to be made either way on that.  And I

11    guess we'll figure out how that goes at some point down the

12    road.

13    But you started the thing off would it changed my

14    business judgment in making a deal with them.  Might make them

15    a little more unsavory if I had known that.  But it doesn't

16    change the fact that they're bringing money to the table for

17    the creditors of my estate that I can't get any other way.

18    Q.   Well, just so we're clear, Mr. Schlossberg, I don't think

19    it's property of your estate.

20    A.   Well, I -- I -- I'll concede you said that, sir.  I

21    concede.

22    THE COURT:  Next question.  We don't need dialog

23    while a witnesses on the stand.

24    Q.   So Mr. Schlossberg, you -- going back, I couldn't recall.

25    Did you say you've reviewed the Serv Trust trust agreement?



Appellees' Appendix 0377

```
 1   Did you say earlier, either on cross or direct, that you've

 2   ever reviewed the Serv Trust trust agreement?

 3   A.   No, I said I've never seen it.

 4   Q.   Okay.

 5   A.   I don't think I've ever seen it.

 6   Q.   So if there is no final decision in the Montgomery County

 7   Circuit Court case, and I've never been -- there's never been

 8   a trial where I've been a party.  And I wasn't a settler of

 9   Serv Trust, which you well know because you would have done

10   something before the King parties tried to do it.  I wasn't a

11   settler.  I wasn't a beneficiary.  And I've never put any of

12   my own property into Serv Trust.  How, then, is it possible

13   that it could be my alter ego?

14   A.   I'm not going to revisit the judge's decision.

15   Q.   Okay.

16   A.   The judge made that decision.  Judge Lease --

17   Q.   Made a nonfinal order --

18   A.   -- of the Circuit Court for -- let me answer my question.

19   Your question.

20   Q.   Okay.

21   A.   Judge Lease of the Circuit Court for Montgomery County

22   made his decision in this case and determined that you were

23   the alter ego.  I'm not going behind this decision.

24   Q.   Yeah.  That's not a final decision.  It's not a judgment.

25   A.   You're arguing.
```

1    Q.    Well, that case is on appeal in the Maryland Court of

2    Appeals.

3    A.    You're arguing.

4    Q.    So it divests this Court of jurisdiction.  And this case

5    is on appeal in the district court, so that divests this Court

6    of jurisdiction.  And then there's probably two or three other

7    appeals that are out there, where you've brought up the issue

8    of this Goldsboro thing.  So pretty sure that this Court

9    doesn't have any jurisdiction to be considering this.  At any

10   rate, you --

11            THE COURT:  What's your question?

12   Q.    You reference one document, the first amended and

13   restated operating agreement.  Are you aware that there was a

14   second amended and restated operating agreement?

15   A.    Asked and answered, Your Honor.

16            THE COURT:  Answer it again, Mr. Schlossberg.

17   A.    The only agreement that I'm aware of is the one that is

18   in evidence here today.

19   Q.    Okay.  So is that, in your business judgment, a problem

20   that you don't even know what agreements exist for 6789

21   Goldsboro LLC?

22            THE COURT:  That's argumentative.  You don't need to

23   answer that.

24            Next question.

25   Q.    So you don't know all of the agreements for 6789

Appellees' Appendix 0379

```
 1    Goldsboro LLC?  You haven't reviewed the second amended
 2    operating agreement?
 3    A.   Your question --
 4         THE COURT:  That question is argumentative.  You
 5    don't need to answer it.
 6         THE WITNESS:  Thank you, Your Honor.
 7         THE COURT:  The second question, I would like you to
 8    answer.  Have you reviewed any other agreements?
 9    A.   No, that's the only one I've ever seen for their
10    operating agreement.
11         THE COURT:  All right.  Thank you.
12    Q.   So how can you form a business judgment based on one
13    agreement out of numerous agreements?
14    A.   Let's see how I can put this.
15         THE COURT:  That's --
16         THE WITNESS:  No, Your Honor, I can do this, if you
17    allow me.
18         THE COURT:  Okay.
19    A.   I did not attend any meetings of the 6789 Goldsboro LLC.
20    I've never seen any of its membership resolutions.  I haven't
21    seen the subscription agreements.  I haven't seen the receipts
22    for the capital contributions.  But what I am aware of is they
23    have $150,000 that they want to give to me for my bankruptcy
24    estate so that I can swell the coffers of the bankruptcy
25    estate.
```



1    Q.    So if --

2    A.    In the -- not finished.

3    Q.    Yeah, well, I didn't ask that question.

4    A.    I'm not finished.

5          THE COURT:  Stop.

6    Q.    I didn't ask you this question.

7          THE COURT:  Stop.  Stop.  Do not interrupt him again.

8          MR. MYERS:  He's going off.

9          THE COURT:  I don't know how many times I have to say

10   it, Mr. Myers.  Stop it.  You will observe --

11         MR. MYERS:  Aren't I allowed to ask questions?

12         THE COURT:  -- the decorum of this court -- do not

13   interrupt me either.

14         MR. MYERS:  Yeah, this is -- okay.

15         THE COURT:  You will observe the decorum of this

16   court.  Stop interrupting people.

17         Mr. Schlossberg, finish your answer, please.

18         THE WITNESS:  He did it again, Your Honor.  I don't

19   remember where I was going.

20         THE COURT:  Okay.  So --

21         MR. MYERS:  No, we're good.

22   Q.    Okay.  So let me ask you this hypothetical.  If the

23   Maryland Court of Appeals or Judge Lease determines and he

24   vacates the nonfinal order, which he certainly has

25   jurisdiction to do, then you would be settling and accepting

1    money from the King parties for property that this estate

2    doesn't own, which would constitute fraud and a violation of

3    your fiduciary duties as a Chapter 7 trustee.

4             MR. MASTRO:  Your Honor, objection.

5    Q.    Is that correct?

6             THE COURT:  I'm going to object.  You don't need to

7    answer that question.

8             MR. MYERS:  Oh, yeah.  Okay.

9             THE COURT:  Next question.  You have thirty minutes.

10   Q.    This all boils down, Mr. Schlossberg, to a question,

11   which is why your counsel never brought it up, is whether Serv

12   Trust's property is property of the estate.  You know it's

13   not, so you elide it over it.

14   A.    Asked and answered whatever question's come in, Your

15   Honor.

16            THE COURT:  That's stricken from the record.

17            Next question.

18   Q.    Okay.  So let's talk about value.  Did you ever read

19   Brian King's deposition testimony in the Montgomery County

20   Circuit Court case?

21   A.    No, sir.

22   Q.    Okay.  Would it surprise you if Brian King testified

23   after Mr. VerStandig filed the amended declaratory judgment

24   action that it was his opinion that the lots were worth

25   $450,000 each --



1    A.    It would --

2    Q.    -- the nineteen lots?

3    A.    It would neither surprise me or -- or not surprise me.

4    I -- it --

5    Q.    You don't care?

6    A.    Really don't care.

7    Q.    Okay.  Would you care, based on your disparaging remarks

8    about the value of the property, and oh, aren't you so lucky

9    you get 150,000?  Would you care that in August of 2016,

10   before Brian King sent the memorandum of understanding, which

11   was fully executed, that the Wormald Group made a written

12   offer through CBRE for $8-1/2 million?

13           MR. VERSTANDIG:  Your Honor, objection.

14           MR. MASTRO:  Objection.

15           MR. VERSTANDIG:  Assumes facts not in evidence.

16   Assumes hearsay that's it's not in evidence.  Attempts to

17   proffer hearsay.  Relevance.  And I'm probably missing one or

18   two things that Mr. Mastro will pick up on.

19           MR. MASTRO:  What he said.

20           THE COURT:  The objection is sustained.  Next

21   question.

22   Q.    Would it surprise you that a builder would offer $8-1/2

23   million in 2016 for nineteen preliminary plan lots in that

24   location?

25   A.    It would surprise me in this fashion, sir.  If there was

escribers

www.escribers.net | 800-257-0885

1  someone out there with an interest in this property, at those

2  kind of numbers, it would surprise me that you waived the

3  right to present a competing appraisal to slap down the

4  attempted redemption under section 7.7.  So yes, it would

5  surprise me.

6  Q.   I didn't waive anything because Mr. --

7  A.   Arguing with the witness.

8  Q.   I'm not arguing with you.  On September 12, I believe, if

9  my memory strikes me correct, you had looked at the memorandum

10  of understanding.  It was completely signed by all parties.

11  I'm going to see if I can find a copy of that.

12       So this memorandum of understanding that Brian King sent

13  to Serv Trust was executed by Serv Trust on September 12.

14  I'll bring the copy that was submitted into the Montgomery

15  County filing that Judge Albright said is enforceable

16  agreement.  I'll also bring the portion of the transcript

17  where she said Brian -- she said Brian --

18       THE COURT:  What's your question, Mr. Myers?  We

19  don't need to hear what your --

20       MR. MYERS:  Can I do what he does?

21       THE COURT:  No.  No.

22       MR. MYERS:  No?  Okay.

23       THE COURT:  Because you're asking questions.

24       MR. MYERS:  Okay.

25       THE COURT:  That's why.  So --



1          MR. MYERS:  So on September 12th --

2          THE COURT:  -- stop giving narrative on what you're

3    going to do and --

4          MR. MYERS:  Uh-huh.

5          THE COURT:  -- what you're not going to do.  Ask a

6    question.

7    Q.   Okay.  Why did you submit an incomplete copy of the

8    memorandum of understanding as an exhibit in this record?

9    A.   Because Your Honor, if there had been a timely executed

10   memorandum of understanding, it called for a closing by

11   October 6th, I think it was, or October 7th of -- October 7th

12   of 2016.

13         And after that date -- oh, and there was supposed to be a

14   $75,000 deposit have been paid to Mr. Myers between the time

15   that the agreement got signed and that date of closing.  It's

16   my understanding that there was never a $75,000 payment

17   made because it is the position of Mr. King, as I understand

18   it and as makes sense to me, that he didn't receive back a

19   signed copy.

20         That's further confirmed by the fact that Mr. Myers

21   wasn't yelling and screaming that he wanted his $75,000

22   deposit and when October 7th passed without a closing and he

23   didn't have the rest of his $2 million he was supposed to get.

24   He would have been making trouble.

25         But instead, what we see is that Mr. Myers demonstrably

1    is working forward together with these folks at Goldsboro,

2    trying to get -- look like some stream permit.  I'm not going

3    to pretend I understand that.  I know there's a stream through

4    the property, and that was something that affected its -- it's

5    value.  Not -- not favorably.  I think they were trying to

6    move it.

7         But Mr. -- Mr. Myers wouldn't have been working with them

8    hand in glove in meetings.  Very polite emails among them.

9    Mr. Myers would have been raising all sorts of cane, Your

10   Honor.

11        So the fact that there is a dispute about when Mr. Myers

12   signed this thing and whether it was, in fact, done in a

13   timely fashion and whether the absence of Mr. Myers taking

14   action back against the Goldsboro guys for his two million

15   bucks, there's an absence of that makes me believe -- makes me

16   believe Mr. King's position on this.

17        I suppose I could have put either one in.  I could have

18   put both of them in and said, there's a dispute over this.

19   But I don't believe Mr. Myers position on it.  It doesn't make

20   sense.  And I'm not sure why -- I'm not sure why I chose that

21   one over the other one.  I don't think it makes much matter of

22   a difference.

23   Q.   Mr. Schlossberg, do you think it matters that Judge

24   Albright reviewed the fully signed one at a hearing and

25   determined that this is an enforceable agreement?

1    A.    I don't know anything about anything from Judge Albright.

2    Q.    Okay.  Well, you will.  We'll put that in the record.

3    And you seem concerned that I would continue to work on this

4    project,  Paragraph 7 of this agreement.  Manager's actions,

5    that's me.

6    A.    Um-hum.

7    Q.    Prior to closing, the manager shall continue to act in

8    the best interests of Goldsboro.  So if I just dropped off and

9    didn't do anything, then potentially Serv Trust would be in

10   breach of this agreement?

11   A.    Where is you making noise about your $75,000?  Where is

12   you making noise --

13   Q.    I didn't ask you that question.

14   A.    -- about the closing an your $2 million??

15   Q.    Doesn't matter.  And let me ask you another question, Mr.

16   Schlossberg.  It says execution and closing dates.  Paragraph

17   6.  It says, "This agreement must be executed by September

18   12th, 2016, or this agreement shall be null and void."  So if

19   the agreement was executed by September 12, 2016, then the

20   agreement is not null and void, which is what Judge Albright

21   found.  And there is affidavits in the record from me.  Mr.

22   Ring signed it.  He's a CPA.  He's a well respected CPA.  So I

23   went down to Annapolis.  We signed it. I mailed it.  So now

24   you're going to call him a liar?

25             MR. VERSTANDIG:  Objection.



Appellees' Appendix 0387

1          MR. MYERS:  Yeah.

2          MR. VERSTANDIG:  Assumes facts not in evidence, mot

3     the least of which being Mr. Myers is repetitively construing

4     a ruling on a motion to dismiss that, as matter of law, must

5     assume facts in favor of the nonmoving party as some sort of

6     series of binding judicial findings of fact.

7          I would also note there is no evidence that Mr. Ring

8     is a respected CPA, but that seems less material.

9          THE COURT:  I'm going to sustain the objection and

10    direct Mr. Schlossberg not to answer.

11         Next question.

12    Q.   So if, in fact, this agreement is a valid agreement, then

13    in that event they've breached the agreement, and everything

14    that comes after that, which is what Mr. VerStandig tried to

15    pull a fast one --

16    A.   Excuse -- I just make sure I heard you right because you

17    said -- did you say assuming that this agreement is -- is

18    not -- is -- is an invalid agreement or --

19    Q.   No.

20    A.   Okay.  You said valid?

21    Q.   I'm sorry.

22    A.   Okay.  Please continue.

23    Q.   Assuming the Court determines that this agreement is a

24    valid and enforceable contract entered into on September 12,

25    2016, which is what Judge Albright indicated, then all of Mr.



1    VerStandig's end run after in 2017 with his, oh, we want to do

2    an appraisal and try and redeem Serv Trust's interest after

3    they've already entered into a contract to purchase Serv

4    Trust's interest, that would be a problem, wouldn't it?

5    A.    Well, not with what I've just heard in Mr. VerStandig's

6    objection sustained by the Court, which was that that was the

7    judge explaining what the standard is on a motion to dismiss.

8    And of course, that's a -- a proper statement of law that the

9    Court has to assume all the allegations of the motion or the

10   complaint, I'm not sure which thing we're dealing with there,

11   in the light most favorable to the other party.  Well, I

12   assume you were the other party at that point, and they were

13   getting -- you were getting the benefit of those assumptions

14   for the purposes of a preliminary ruling that said not going

15   to dismiss it.

16   Q.    Well, that would be very similar to Judge Lease's

17   preliminary ruling, wouldn't it, Mr. Schlossberg?

18   A.    I don't even know what you're talking about.

19   Q.    Sure you do.

20   A.    But I'm probably not alone.

21   Q.    Sure you do.  Okay.  And please, I would ask that you not

22   refer to me.  Serv Trust had counsel there.  I wasn't the one

23   talking.  I wasn't the one filing the pleadings.

24         THE COURT:  What?  You don't get to tell him how to

25   answer questions.  You get to ask him --



Appellees' Appendix 0389

1           MR. MYERS:  No --

2           THE COURT:  You get to ask him questions, so ask your

3    next question.

4           MR. MYERS:  Okay.  I am requesting that he --

5           THE COURT:  No.  No.  No.

6           MR. MYERS:  -- not refer to me as Serv Trust.

7           THE COURT:  No.  No.  Next question.

8           MR. MYERS:  No.  Nothing I do is worth anything.

9    Q.   So we talked a little bit earlier about Judge Lipp's

10   ruling in 2018, where, now you have it in front of you, the

11   Debtor's Exhibit 1, where she says, Serv Trust is a trust that

12   was created by Myers' mother for the benefit of Myers' five

13   children.  Serv Trust was funded with an initial deposit of

14   1,000 from Myers' mother.  Myers and Daniel Ring are the

15   cotrustees of Serv Trust.  Myers testified that Serv Trust has

16   a fifty percent interest in Maryland limited liability company

17   named 6789 Goldsboro LLC.  These are her findings of fact in

18   2018.  But you think that Judge Lease isn't bound by these

19   findings of fact that are final and unappealable.

20          And then Judge Lippe continues.  Goldsboro continued to

21   make post-petition -- these are her findings of fact.  Judge

22   Lipp.  Goldsboro continued to make post-petition advances to

23   Serv Trust, which funds were then made available to Myers

24   and/or Kelly to pay for their children's education and

25   household expenses.  That was her finding.

```
 1          She then went on to say, it is undisputed that Serv Trust
 2     was established to pay educational and other expenses related
 3     to Myers' children.  She said it is also undisputed that Myers
 4     is a cotrustee of Serv Trust, with the authority to direct
 5     Serv Trust to make payments on behalf of its beneficiaries,
 6     the Myers children.  And then, she says, if, as irrefutably
 7     attested to by Myers.
 8          Okay.  So you think it's okay that in a nonfinal order in
 9     a proceeding in circuit court that isn't over yet that I've
10     never even been on trial.  No party.  I'm not a party.  And by
11     the way, that trial was not only never remanded by the Middle
12     District of Florida, but Judge Delano entered an order saying
13     no claims against me could go forward.
14          MR. MASTRO:  Objection, Judge.  He's arguing.
15          THE COURT:  What's your question, Mr. Myers?  What's
16     the question?
17     Q.   That question is that that doesn't give you any pause?
18     A.   Asked and answered.  That entire preface was done forty-
19     five minutes ago, almost word for word, Your Honor, and the
20     same question at the end.
21          THE COURT:  The objection is sustained.
22          MR. MYERS:  This is -- excuse me, Your Honor.  What
23     are we up to?
24          THE COURT:  Debtor Number 6.
25          MR. MYERS:  So we've admitted 1?
```



Appellees' Appendix 0391

```
 1              THE COURT:  1 was admitted.  The Court took judicial
 2    notice of Number 2.  The Court admitted Number 3.  Admitted
 3    Number Four.  Did not admit Number 5.
 4              MR. MYERS:  And I'm sorry.  Number 3 was which?
 5              MR. VERSTANDIG:  Transcript.
 6              THE COURT:  Number 3 is the transcript from the
 7    December 16th, 2022 hearing.
 8              MR. MYERS:  And you took take judicial notice of 2?
 9              THE COURT:  And that was your objection to the
10    proposed settlement.
11              MR. MYERS:  Oh, okay.  So this will be 6, correct?
12    Debtor's 6?
13              THE COURT:  Yes.  This is still Debtor Number 6.
14              MR. MYERS:  Okay.  And Debtor's Number 6 is -- and
15    I'm not sure if you all -- it's the trustee's opposition to
16    debtor's motion to dismiss filed in the Montgomery County
17    case.
18              MR. VERSTANDIG:  No, Your Honor.  I did not have a
19    crystal ball.  I did not know what exhibits that were not on a
20    list would be introduced today.  If (indiscernible) --
21              THE COURT:  Mr. Myers -- I get it.
22              MR. VERSTANDIG:  -- from state court, it's not
23    evidentiary.
24              THE COURT:  I gave you an opportunity.  I told you,
25    if you wanted to admit any documents into evidence, you had to
```

1    give them to the Court during either the last recess or the

2    recess before that, and we would make copies for you, even

3    though you did not comply with the Court's procedures and did

4    not pre-file the exhibits.  And I told you I was not going to

5    be getting on and off the bench to make copies of exhibits for

6    you.

7           So if you want to offer that, you can bring copies

8    with you tomorrow, and maybe I will change my mind between now

9    and tomorrow.

10          MR. MYERS:  Okay.  Thank you.

11   BY MR. MYERS:

12   Q.   So Mr. Schlossberg, what would you think if Mr. Mastro on

13   December 30, 2022, three days before this alleged trial, told

14   the Montgomery County Circuit Court in a pleading, here, the

15   claim asserted by the King parties in the declaratory judgment

16   complaint has nothing whatsoever to do with the trustee's

17   performance of his duties in Myers' Maryland bankruptcy case.

18          MR. MASTRO:  Objection, Your Honor.  He's taking this

19   out of context.  This was written --

20          MR. MYERS:  It's not --

21          MR. MASTRO:  -- in connection with an argument

22   that -- it has to do with the Barton doctrine.  And so that's

23   where that came up because he wanted to dismiss the trustee, I

24   believe, as a party to the case because we were named as a

25   nominal defendant.  And so that's what that's -- that's what

1    that's about.

2            MR. MYERS:  Yeah, I'm not arguing Barton doctrine.

3            MR. MASTRO:  He didn't --

4            MR. MYERS:  Just a statement.

5            MR. MASTRO:  In fairness to the witness --

6            THE COURT:  Stop interrupting.

7            MR. MASTRO:  In fairness to the witness, he's taking

8    that out of context and just making it appear that I'm,

9    stating this proposition for something that it was not

10   intended to.  So I would object to that extent, Your Honor.

11           THE COURT:  So what is the question, Mr. Myers?

12           MR. MYERS:  This is a statement by Mr. Mastro,

13   Chapter 7 trustee's counsel.  I don't care about the Barton

14   doctrine.  It simply says here the claim asserted by the King

15   parties in the declaratory judgment complaint has nothing

16   whatsoever to do with the trustee's performance of his duties

17   in Myers' Maryland bankruptcy case.

18           THE COURT:  And what's your question?

19   BY MR. MYERS:

20   Q.   Is that true, Mr. Schlossberg?

21           THE COURT:  If you're able to answer based on that

22   snippet of information he's read from, and that's something

23   you don't have in front of you.

24   A.   Well, Your Honor, that's -- I'm -- I'm -- I'm afraid to

25   answer something because I know I'm going to see this later on

escribers
www.escribers.net | 800-257-0885

1    in a -- in a noncontextual fashion.

2         Mr. Myers, I do not know exactly what was said in court.

3    I would need to see that.  And frankly, I'd have to think

4    about what was up because I understand what Mr. Mastro was

5    saying to the Court.  I was not -- in that proceeding, at that

6    point, I'm not really sure where the Barton doctrine would

7    have even been a subject matter.

8         We were not bringing the cause of action.  I was a

9    defendant in that case.  And I was not raising any Barton

10   doctrine issues.  I had participated in the proceedings

11   because I was trying to get that case moved along.  I was a

12   necessary party and didn't have any interest other than that,

13   unless it became successful, as it did.  And then Serv Trust

14   became part of my bankruptcy estate.

15        MR. MASTRO:  Your Honor, and it's coming back to me

16   now.  I think the argument was that Mr. VerStandig didn't

17   invoke the Barton doctrine prior to naming the trustee as a

18   defendant, and that's why Mr. Myers sought to dismiss the

19   trustee.  And I think I was pointing out that the Barton

20   doctrine wasn't applicable to this circumstance so --

21        THE COURT:  And I have no idea why any of this has to

22   do with whether the trustee has exercised good business

23   judgment.

24        MR. MASTRO:  You and me both, Your Honor.

25        THE COURT:  Next question, Mr. Myers.  You have seven

escribers
www.escribers.net | 800-257-0885

1    minutes.

2            MR. MYERS:  I'll place an objection on the record

3    that you cut me short.  So and Mr. --

4            THE COURT:  Your objection's noted.

5            MR. MYERS:  And Mr. Schlossberg's filibuster.

6    BY MR. MYERS:

7    Q.   So Mr. Mastro also told the court further, "Although the

8    trustee has been joined herein as a nominal 'defendant'",

9    "defendant", "the bankruptcy estate's interest in this

10   litigation is more properly aligned with the King parties than

11   it is with Myers or Serv Trust.  The court, therefore, may

12   properly reclassify and realign the trustee as a nominal

13   plaintiff in this matter.  Maryland Rule 2-213."

14           THE COURT:  Mr. Myers, I'm going to cut you off.  If

15   you're going to read from a document, I'm not going to require

16   the witness to answer your question because you haven't marked

17   the document as an exhibit.  You haven't provided a copy to

18   him so that he could review the whole document.  Instead,

19   you're taking snippets out of pleadings and reading them to

20   the trustee without him having the context of the pleading.

21   So I'm not going to require him to answer any questions that

22   you ask in that manner.

23   Q.   If you dismissed -- if Count II was dismissed, the

24   redemption claim, what are you doing here?

25   A.   Mr. Myers, again, you have an uncanny ability to take

1    things out of context and ignore the rest of the context.

2    Can't do that.

3    Q.    Help me out.

4    A.    The case was dismissed, as I explained before, and I know

5    you were listening.  As I explained before, the case was

6    dismissed because by that point, we were in the bankruptcy

7    court.  We had brought the parallel claim.  He had brought the

8    parallel claim, and we consented to being sued in this court

9    in this adversary proceeding.  And at that time, the -- the

10   agreed fashion of disposing of the -- of the dispute was that

11   we would come back to this court.  An adversary proceeding

12   would proceed here.  The parties were encouraged to negotiate

13   and to try and reach an accord, like the one we have before

14   the Court today.  And if not, then we were going to go ahead

15   and try the case.

16        And our negotiations failed.  And we scheduled this case

17   for trial.  But we kept talking, and we reached a point where

18   we reached an accord.

19        At that point, though, Mr. Myers, there was a case moving

20   on its way to trial in this Court.  There was no reason for

21   the proceedings in Montgomery County to duplicate this

22   proceeding, even just as a matter of record.  And that is why

23   that doesn't give me trouble in any way.  It doesn't affect my

24   judgment in any way.  It doesn't implicate any thinking about

25   why this is a good deal here today, which is why we're here,

1    Your Honor.

2        On the one hand, nothing.  On the other hand, $150,000.

3    I don't know, Your Honor, but the scales seemed to go like

4    that.

5    Q.  Well, you would agree that it'd be great if you could get

6    $150,000 for property that's not nonestate property any day of

7    the week, right?  So you just said that the case was --

8        THE COURT:  Hold.  Wait. Wait a minute.  Are you

9    asking him a question?

10        MR. MYERS:  Yeah.  I'm asking this question.

11   Q.  You just --

12        THE COURT:  Then that's stricken then.

13        MR. MYERS:  What?

14        THE COURT:  Then that comment is stricken --

15        MR. MYERS:  Yeah.

16        THE COURT:  -- from the record.

17   Q.  So you just testified that the case in Montgomery County

18   was dismissed.  It wasn't dismissed.  Is that your testimony?

19   That's part of the problem.

20   A.  Mr. Myers, your exhibit, Debtor's Number 4, is a

21   stipulation of dismissal that the redemption claim was

22   dismissed in the Montgomery County Circuit Court, and I just

23   explained it was dismissed so that we did not have parallel

24   proceedings of record.  The case is here.  This Court has

25   jurisdiction over it.  This Court, if there -- the settlement

 1   doesn't get approved, we have to try the case.  This Court

 2   will try the case.

 3   Q.   Okay.  Well, there are parallel proceedings because the

 4   case still exists in Montgomery County.

 5   A.   So says you.

 6   Q.   Are you disputing that the case --

 7   A.   I'm not giving legal opinions.

 8   Q.   I'm asking you your opinion.  Are you disputing that the

 9   litigation in Montgomery County is still not open?

10   A.   Those proceedings have been dismissed, Your Honor.

11   There's a stipulation of dismissal.

12   Q.   The whole case?

13   A.   I just told you.  There's a stipulation of dismissal.

14   Q.   Of one count.

15   A.   So be it.

16   Q.   Great.  You can't do that voluntarily.

17        THE COURT:  What's your question, Mr. Myers?  Stop

18   arguing with the witness.

19   A.   Mr. Myers is suggesting I didn't have the ability to --

20   Q.   No, you didn't.

21   A.   -- sign that stipulation.

22   Q.   You didn't.  It's fraudulent.

23   A.   Fraudulent?  That's a big word.

24        THE COURT:  What's your question, Mr. Myers?

25   Q.   How did you have authority on May 7, 2024, with no final

```
 1    judgment in that case, to execute --

 2    A.    You -- you don't seem to understand.  Once the --

 3    Q.    I'm asking my question.

 4    A.    Once the --

 5    Q.    Let me finish my question before you interrupt me.

 6    A.    You're right.  I did interrupt you.

 7          THE COURT:  Finish your question.

 8    Q.    What authority did you have as a nominal defendant in a

 9    case that's still open, with no final judgment, to sign a

10    stipulation of dismissal with Mr. -- well, you didn't sign it,

11    but VerStandig Law Firm and Schlossberg Mastro.  But it says

12    the Chapter 7 trustee, who is by operation of law.  What

13    operation of law are you talking about?

14    A.    Asked and answered, Your Honor.

15    Q.    Well, I'm asking you.  What operation of law?  You put it

16    in here.

17    A.    Asked and answered, Your Honor.  We've been over this.

18          THE COURT:  The objection's sustained.  Move onto the

19    next question.

20          MR. MYERS:  Okay.

21          THE WITNESS:  Your Honor, I take note that it's 5

22    o'clock.  May I inquire --

23          THE COURT:  Mr. Myers, how much more time do you need

24    to wrap this up?

25          MR. MYERS:  I don't know.  We can continue tomorrow.
```



1          THE COURT:  No, we're not continuing tomorrow.  I'm

2    asking you how much time you need to (indiscernible).

3          MR. MYERS:  I don't know, Your Honor.

4          THE COURT:  Well, hours ago, you told me you needed

5    two hours.

6          MR. MYERS:  No, I said approximately.

7          THE COURT:  You approximately two hours.  So you

8    need --

9          MR. MYERS:  Well, he's --

10         THE COURT:  So you need another five minutes?  Ten

11   minutes?

12         MR. MYERS:  Probably another thirty minutes.

13         THE COURT:  All right.  I'll give you twenty.

14         MR. MYERS:  Okay.

15         THE COURT:  And then I'm cutting -- and then that's

16   the end of your cross-examination of this witness.

17         MR. MYERS:  Right.

18         THE WITNESS:  Your Honor, may I ask one further

19   question?

20         THE COURT:  Yes.

21         THE WITNESS:  Tomorrow's proceedings --

22         THE COURT:  We'll talk about tomorrow after you're

23   off the --

24         THE WITNESS:  We need -- we need exhibits in the next

25   couple hours, not at 10 o'clock tonight.



1          THE COURT:  Understood.  We'll talk about that after

2     you're off the stand.

3          Mr. Schlossberg.

4          THE WITNESS:  Thank you, Your Honor.

5     BY MR. MYERS:

6     Q.   Mr. Schlossberg, before the hearing today, you saw a

7     complaint and demand for trial by jury filed by me against

8     Judge Ruark, Ramona D. Elliott, Roger Schlossberg, Frank

9     Mastro, Schlossberg & Associates, P.A., and Maurice

10    VerStandig; is that correct?

11    A.   I saw the first page.

12    Q.   Did you review anything else in here?

13    A.   Nothing.

14    Q.   Okay.  So --

15    A.   I did hear, though, that you're asking for $40 million.

16    Is that correct?  I -- I don't --

17    Q.   So you're aware --

18    A.   That's what I heard.

19    Q.   You're aware there's a complaint demand for jury trial

20    where you're a defendant, Judge Rurak's a defendant, Frank

21    Mastro's a defendant, Maurice VerStandig's a defendant, and

22    Schlossberg & associates is a defendant?

23         THE COURT:  What's the question?

24         MR. MYERS:  I'm just confirming what he said.

25         THE COURT:  No, ask him a question.



Appellees' Appendix 0402

www.escribers.net | 800-257-0885

1            MR. MASTRO:  Move to strike, Your Honor.

2    Q.   Are you --

3            THE COURT:  Objection's denied.

4    Q.   Are you aware that a notice of appeal was filed in this

5    case a few days ago to the --

6            THE COURT:  Okay.  Then I am going to grant the

7    motion to strike.  You did not ask a question.  You just --

8            MR. MYERS:  I'm asking it.

9            THE COURT:  -- just had a soliloquy.  Now, you're

10   asking about a notice of appeal.  You just talked about a

11   complaint that was filed and did not ask a question, even

12   though I asked you to.  So let's move on to the notice of

13   appeal.  It's been stricken from the record

14           MR. MYERS:  No, Your Honor.  He answered the

15   question.

16           THE COURT:  Yes, Mr. Myers.  It's been stricken from

17   the record.

18           MR. MYERS:  Then I'll ask it again.

19           THE COURT:  You can tell me no all you want.

20           MR. MYERS:  I know.

21           THE COURT:  It's been stricken.

22           MR. MYERS:  Right.  You'd strike everything from me.

23           THE COURT:  Next question.  You were asking about a

24   notice of appeal.

25           MR. MYERS:  What did you strike from the record, so I

1    know.

2           THE COURT:  Your soliloquy about the complaint that

3    was filed.

4    Q.   Okay.  So you've already answered, correct, Mr.

5    Schlossberg, you saw this complaint this morning before this

6    hearing started?

7    A.   Told you --

8           THE COURT:  He testified that he looked at the first

9    page and that he heard that you're asking for $40 million.

10   Next question.

11          MR. MYERS:  Thank you.  And that's in the record,

12   correct?  That answer is in the record?

13          THE COURT:  What --

14          MR. MYERS:  What you just said?

15          THE COURT:  Yes.  Yes, that's the record.

16          MR. MYERS:  Thank you.  Okay.  I'm going to mark this

17   as Defendant's 7.  7?

18          THE COURT:  Well, 6 did not get marked because you

19   were reading from it and not offering copies so --

20          MR. MYERS:  Okay.  So 6?

21          THE COURT:  So this is 6.

22          MR. MYERS:  They have copies of this, Your Honor.

23          THE COURT:  Okay.  Show a copy to Mr. Mastro and Mr.

24   VerStandig.

25          MR. MYERS:  I think they already have it.



 1              MR. VERSTANDIG:  No.

 2              MR. MASTRO:  No.  No.  We don't have it.

 3              MR. VERSTANDIG:  Your Honor, I'm confident I've seen

 4    this before in my life, but again, I think this was not on an

 5    exhibit list.

 6              MR. MYERS:  The clerk handed them out.

 7              MR. VERSTANDIG:  No.

 8              THE COURT:  Is this the order remanding case?

 9              MR. MYERS:  No.

10              MR. MASTRO:  No.

11              THE COURT:  What?  Then what--

12              MR. MASTRO:  This looks like some pleading

13    (indiscernible) --

14              MR. VERSTANDIG:  This is --

15              MR. MYERS:  This the order --

16              MR. VERSTANDIG:  -- the Judge Delano --

17              MR. MYERS:  It's in the case already in the record.

18    It's the order sustaining -- this is out of my Florida

19    bankruptcy case.  This is the order sustaining debtor's

20    objection to proof of claim 3 filed by Brian King and Cristina

21    King.

22              THE COURT:  You didn't pre-file it.  You don't have

23    copies for everyone.

24              MR. MYERS:  I believe she made copies.

25              THE COURT:  I have copies of everything that she made

```
1    a copy of.  And I'm telling you, that is not one of the
2    documents that you gave.  The only document I have left that
3    you have not marked as an exhibit is an order remanding case
4    issued by this Court on December 5th, 2019.  It's a three-page
5    order.
6              MR. MYERS:  Okay.  Let me take that one up, then.
7              THE WITNESS:  I don't have such a document, Your
8    Honor.
9              THE COURT:  I don't know what he's --
10             The order remanding case, do we have copies of that?
11             MR. VERSTANDIG:  Yes.
12             THE COURT:  It's one of the documents that was given
13   to me.  Was it not given to the witness?
14             MR. VERSTANDIG:  I can pass my copy to Mr.
15   Schlossberg.
16             THE COURT:  It's a two-page order from Judge Simpson
17   on December 5th, 2019.
18             THE WITNESS:  That's not here.  I have four
19   documents, Judge.
20             THE COURT:  I'm going to have Ms. Fernandez come up
21   and take a look.
22             THE WITNESS:  Can you guys give me one of yours?
23             MR. VERSTANDIG:  Yep.  Your Honor, may I approach?
24             THE COURT:  You may.  So is this Debtor Number 6, Mr.
25   Myers, the order remanding case?
```



1              MR. MYERS:  As soon as I find it.

2              THE WITNESS:  All right.  I -- I've got it here.  And

3    what number is this, Your Honor, now?  6?

4              THE COURT:  It would be 6.

5              (Judge Simpson's order was hereby marked for

6    identification as Debtors' Exhibit 6, as of this date.)

7              THE WITNESS:  Got it.

8    BY MR. MYERS:

9    Q.   Do you have that in front of you, Mr. Schlossberg,

10   Debtor's 6, order remanding case?

11        (Pause)

12   Q.   I was waiting for you to say you've --

13   A.   I -- I told the Judge I've got it.

14   Q.   -- had a chance to look at it.

15             THE COURT:  He's reading it.

16             MR. MYERS:  Okay.

17   A.   I'm done.  I'm ready.

18             THE COURT:  Okay.

19   A.   Let's go.

20             THE COURT:  And so what is your question, Mr. Myers?

21   Q.   So this is an order remanding the case.  So Mr.

22   VerStandig had removed the Montgomery County case to this

23   Court, establishing adversary 19-00427.  And then on December

24   5, 2019, this Court entered an order remanding the adversary

25   proceeding to Montgomery County, Maryland, pursuant to 28

Appellees' Appendix 0407

1  U.S.C. 1452(b).  So how does the case get back here?  Because

2  in your -- I'll add a piece of information for you.  In your

3  notice of stipulation of settlement or whatever you called it,

4  you specifically said in there, there's no way to bring that

5  case back here.  It's too late.

6          MR. VERSTANDIG:  Your Honor, objection.  Assumes

7  facts not in evidence.  I think Mr. Myers is suggesting that

8  the Montgomery County Circuit Court case, which was removed to

9  this Court the first time Mr. Myers sued me and then remanded

10  when he dismissed the claim against me for allegedly violating

11  the automatic stay, is the case that is in front of you today,

12  whereas the record has been clear that that case has a

13  judgment on one count and a dismissal on the other.  And the

14  adversary proceeding in front of you today is a fresh, clean,

15  new, whatever the terminology may be, that was filed on

16  whatever date in 2024, I believe.

17          THE COURT:  I don't even understand the question.

18  Q.  The question is, is that when a case is remanded to the

19  state court, under 28 U.S.C. 1452(b), this court loses all

20  jurisdiction over the matters and claims in that case, and

21  Rooker-Feldman prevents this Court from considering anything

22  to do with that case.  So you're essentially, in this case,

23  sitting in review of a case that's ongoing in Montgomery

24  County Circuit Court.  Mr. VerStandig incorrectly stated that

25  the one count was a --

 1                MR. MASTRO:  Your Honor, this is argumentative.

 2                THE COURT:  What's your question?

 3                MR. MYERS:  I'm responding to what Mr. VerStandig

 4       said.  He misstated that he may -- he's trying convince the

 5       Court that the Montgomery County circuit case is over.  It's

 6       not.

 7                THE COURT:  No, the Montgomery County case was

 8       seeking -- it was a declaratory judgment action to determine

 9       whether you are and were the alter ego of Serv Trust.

10                MR. MYERS:  And that claim was stayed by Judge

11       Delano.

12                THE COURT:  There was a determination made on that.

13                MR. MYERS:  Void.  Was stayed.

14                THE COURT:  Well, okay.  You can make that argument.

15       What is your question about this adversary proceeding, which

16       has one count for a declaratory judgment regarding the

17       redemption of interest?

18                MR. MYERS:  So you can't have the same case in two

19       different courts.

20                THE COURT:  What's your question --

21                MR. MYERS:  Never mind.

22                THE COURT:  -- for this witness?

23                MR. MYERS:  Okay.

24                THE COURT:  What are you asking?

25                MR. MYERS:  I'll move on.  I mean, obviously, we

escribers

www.escribers.net | 800-257-0885

Appellees' Appendix 0409

1    have --

2            THE COURT:  We've been talking about this for four

3    hours.

4            MR. MYERS:  Right.  And it's my position that once

5    this case --

6            THE COURT:  And you can make your position in closing

7    argument.  Ask this witness a question.

8            MR. MYERS:  Well, we might not get that far.

9            THE COURT:  You have eight minutes left.  Seven

10   minutes now.

11   BY MR. MYERS:

12   Q.   Are you familiar that there was an order entered, Mr.

13   Schlossberg, on -- are you looking at your phone?

14   A.   No, I'm not looking at my phone.

15   Q.   Are you familiar that there was an order entered on June

16   29, 2021, in my bankruptcy case in Florida, case number 2:21-

17   bk-00123 sustaining my objection to a proof of claim filed by

18   Brian King and Cristina King by Mr. VerStandig and the

19   objection was sustained and the claim of Brian and Cristina

20   King is disallowed in its entirety?  Do you dispute that that

21   would not have res judicata effect on this little charade

22   you're doing here?

23   A.   Well, I think that's insulting to everybody who's here

24   trying to do this case and to the Court.

25   Q.   Legal.



1    A.    Excuse me.

2    Q.    I said, what you're trying to do is legal.

3          THE COURT:   So Mr. Schlossberg, are you familiar with

4    the claims --

5          THE WITNESS:   Your Honor --

6          THE COURT:   -- that were filed --

7          THE WITNESS:   Your Honor --

8          THE COURT:   -- in the Florida proceeding, and if

9    so --

10         THE WITNESS:   I -- I'm not familiar with it.   I heard

11   some discussion about it today.   But I've -- I've never looked

12   at it.

13         THE COURT:   Okay.

14         THE WITNESS:   To my knowledge.   Maybe some --

15   maybe -- maybe it was put in front of me someday to say, you

16   know, this is interesting, but I -- I don't know anything

17   about it.

18         THE COURT:   All right.

19         THE WITNESS:   I couldn't give you a -- a sensible

20   answer.

21         THE COURT:   Thank you.   Mr. Myers.

22         MR. MYERS:   Yeah.   I want to get to his -- I'll mark

23   this is defendant's answer to the complaint in this case.   Can

24   I mark it as an exhibit, or do I have to have copies of that

25   too?



1          THE COURT:  Same as the other exhibits that you don't

2     have copies of.

3          MR. MYERS:  Well --

4          THE COURT:  Why don't you ask him a question about

5     the answer?

6     BY MR. MYERS:

7     Q.   Okay.  This is your -- Mr. Schlossberg, I'll represent to

8     you, this is your defendant's answer to the complaint in this

9     case, adversary 24-00007.  This is filed on April 15, 2024,

10    doc 13, in this adversary.  And in this answer, it says on

11    page 5 of 7 -- this is paragraph 37 of your response, general

12    allegations bankruptcy.

13         "The trustee admits that the parties engaged in

14    settlement negotiation in the weeks prior to the filing of the

15    complaint and that no agreement between the parties was

16    reached as a result of such pre-filing settlement

17    negotiations.  The trustee is advised that plaintiffs filed

18    the instant complaint in order to protect and preserve their

19    litigation rights and not to stymie or otherwise interfere

20    with the continuation of settlement negotiations between the

21    parties."

22         So do you have any opinion at all on the King parties'

23    standing in this case if their proofs of claim are -- if my

24    objections to their proof of claims are overruled, why they're

25    even here?  What standing they would have to come into this

escribers

www.escribers.net | 800-257-0885

1    Court?

2    A.    Mr. Myers, you're asking me if, if this Court should

3    sustain your objections to the proofs of claim filed by the

4    Kings, what's left in this case to decide?  Is that what

5    you're -- you're asking me?

6    Q.    Well, let me rephrase it.  The King parties, they're all

7    identical, their proofs of claim.  This is a Chapter 7 case,

8    and they say they're owed $0.  And the basis for their relief

9    is equitable relief in this adversary.  I've done a little

10   reading, and that's not a valid basis for a proof of claim in

11   a Chapter 7 case.  So they have to have some monetary request.

12        Now, we just palavered a little bit about the fact that

13   their objection, their proof of claim filed in my Florida

14   case, which is good across the world, was my objection was

15   sustained.  And their claim, any claim they could bring,

16   related claim, is gone forever.

17        MR. VERSTANDIG:  Objection.

18   Q.    So how is it that they're filing a claim in this case,

19   and you're not concerned that their claim has already been

20   overruled?

21        MR. VERSTANDIG:  Objection.  Assumes facts in

22   evidence, specifically that there would be a prejudicial

23   impact to the denial of a claim in a Florida case that was

24   subsequently dismissed without a plan being confirmed and with

25   the bar order being entered against the debtor.  Assumes

escribers

www.escribers.net | 800-257-0885

 1    various theories of law.  Calls for an expert opinion.  Calls

 2    for speculation.  Lack of foundation.

 3             THE COURT:  The objection's sustained.  Next

 4    question.

 5             MR. MYERS:  An objection to a proof of claim that's

 6    been sustained in a Chapter 13 case is a final order,

 7    regardless of whether the case is --

 8             THE COURT:  What's your question, Mr. Myers?  Stop

 9    arguing.

10             MR. MYERS:  Yeah, well, this is just so much garbage.

11             MR. VERSTANDIG:  I'm sorry.  What did you just say?

12             THE WITNESS:  I'm sorry.  I didn't hear that.

13             MR. MYERS:  I don't know.

14             THE COURT:  Mr. Myers, if you're going to say

15    something, don't mumble.  Have the guts to stand behind what

16    you're saying.

17             MR. MYERS:  Oh, I have guts, Your Honor.

18             THE WITNESS:  What did you say?

19             THE COURT:  Well, if you want to --

20             MR. MYERS:  I've been here.  I've been in this court

21    for eight years putting up with this.  I have guts.

22             THE COURT:  Actually, you've been in this court for

23    ten years.  Ten years.  And --

24             MR. MYERS:  Yeah, and I've been -- and I've been --

25             THE COURT:  And you have not yet learned the decorum

escribers

www.escribers.net | 800-257-0885

1    of the court.

2              MR. MYERS:  I've been defrauded and ripped off.

3              THE COURT:  You have not learned the court's

4    procedures.  You haven't learned the --

5              MR. MYERS:  Well, oh, oh, I know the court's

6    procedures.

7              THE COURT:  -- Federal Rules of Bankruptcy

8    Procedures.  So if you're going to --

9              MR. MYERS:  So --

10             THE COURT:  -- say something, don't mumble.  Have the

11   guts to say it out loud so that I can hear it, and I can deal

12   with it.

13             MR. MYERS:  Yeah, well, okay.  I think this whole

14   thing is a sham.  I think that they're trying to steal Serv

15   Trust property.  There's no final order in the Maryland case.

16             THE COURT:  Okay.  Well, you can make those arguments

17   in your closing.

18             MR. MYERS:  But here I'm going to ask my last

19   question.

20             THE COURT:  There's a witness on the stand.

21             MR. MYERS:  Yeah, I'm going to ask him a question.

22             THE COURT:  Okay.  Ask him.

23   BY MR. MYERS:

24   Q.   So as affirmative defenses signed by your attorney, the

25   complaint, in whole or in part, fails to state a claim upon



1    which relief can be granted, wherefore the trustee prays for

2    relief as follows.  Dismiss plaintiff's complaint.  Did you

3    ever amend this?

4    A.   May I see the document just a minute because I want to

5    make sure that this isn't being taken as poorly out of

6    context --

7          THE COURT:  Here, I will actually -- you stay where

8    you are, Mr. Myers.  I will tell you that, under affirmative

9    defenses, it says in paragraph number 1, the complaint, in

10   whole or in part, fails to state a claim upon which relief can

11   be granted, and this answer was filed on April the 15th, 2024.

12         THE WITNESS:  Are there any following prayers, Your

13   Honor?

14         THE COURT:  It says the trustee reserves the right to

15   amend this answer to assert any and all affirmative defenses,

16   which may become known to it through discovery, wherefore, the

17   trustee prays for relief as follows.  Dismiss plaintiff's

18   complaint and award such other and further relief as the court

19   may deem just and proper.

20   A.   Your Honor were this case going to trial, I would either

21   be relying on my omnibus request for relief, or I'd be

22   prosecuting the defense of it should be dismissed.  We'd be

23   having a hearing, I'm sure, on our motion to dismiss.  But

24   instead, we got to this glorious point, where we could get rid

25   of this dispute, and we could liquidate this asset for the

1    benefit of the estate.  And that is why we're here today.  I
2    don't have a clue what the relevance of that particular
3    question was, but I've answered it.
4    BY MR. MYERS:
5    Q.   Well, let me ask a follow-up question.  You're here
6    trying to do a settlement for a claim for their adversary that
7    it's your position they don't even have a claim.  Fails to --
8    A.   Oh --
9    Q.   -- state a claim upon which relief can be granted.  How
10   are you entering into a settlement?  Why would you enter into
11   a settlement, which is so far below the reasonable business
12   judgment, when you think their claim -- when you think they
13   failed to state a claim?
14   A.   You can't possibly be that naive about the operations of
15   business in this court and how the pleadings work.
16   Q.   I'm fully aware of how things work in this court.
17         MR. MYERS:  I don't have any further questions today,
18   Your Honor.
19         THE COURT:  All right.  So Mr. Mastro, let me ask.
20   Do you intend to do a redirect?
21         MR. MASTRO:  No, Your Honor.
22         THE COURT:  Mr. VerStandig.
23         MR. MYERS:  No, Your Honor.
24         THE COURT:  All right.  Mr. Schlossberg, thank you
25   for your testimony.  The Court does not have any questions for

1    you.  I would like you to leave on the witness stand only the

2    documents that have been entered into evidence, which, again

3    are Trustee's Exhibits 1, 2, and 4 through 11 --

4                THE WITNESS:  Your Honor.  I'm sorry, Your Honor.

5    This, I brought this binder.  Yeah.  You're welcome to it.

6                THE COURT:  No.  Nope.  Nope.  You're right.  That's

7    your binder.  You take that.  The exhibits, the Trustee's

8    exhibits and the King parties' exhibits are on the docket, and

9    we have the electronic copies.

10               What I need you to leave on the witness stand are

11   Debtor's Exhibits 1.  I don't know that you ever had exhibit

12   2.  That was Mr. Myers' objection to settlement.

13               THE WITNESS:  I have 2.

14               THE COURT:  You have 2?  Okay.  So 1, 2, 3, 4 --

15               THE WITNESS:  Do not have 3.

16               THE COURT:  -- 5, and 6.

17               THE WITNESS:  I have 4 and 6.

18               THE COURT:  5 was not admitted, but still leave it.

19               THE WITNESS:  Do you want that left on the bench?

20   Left on the --

21               THE COURT:  1 through 6 should be on the bench.  And

22   to be clear --

23               THE WITNESS:  Well, I don't have -- I don' have 6.

24               THE COURT:  -- 1 through 4 were admitted, and 6, the

25   order remanding, Judge Simpson's order remanding, the Court is

escribers
www.escribers.net | 800-257-0885

1    going to admit that.  That's an order of this Court.

2         (Judge Simpson's order was hereby received into evidence

3    as Debtors' Exhibit 6, as of this date.)

4              THE WITNESS:  So Your Honor, I --

5              THE COURT:  So Debtor's 1 through 6 should be on the

6    witness stand, and 5 was not admitted.

7              What?

8              THE WITNESS:  I do not have 3.

9              THE COURT:  You don't have the transcript?

10             THE WITNESS:  No.

11             THE COURT:  It looks like this.  Transcript, you do

12   not have?

13             THE WITNESS:  No transcript, Your Honor.

14             THE COURT:  Okay.  I am going to have my copy put on

15   the witness stand so that any additional witnesses will have

16   the benefit of these exhibits.

17             Okay.  Okay.  So we do have it --

18             THE WITNESS:  Okay.

19             THE COURT:  -- and we will put it on the witness

20   stand.

21             THE WITNESS:  Oh, so you had mine?  Okay.

22             THE COURT:  All right.  Thank you, Mr. Schlossberg.

23             MR. SCHLOSSBERG:  Thank you, Your Honor.  Can we talk

24   about exhibits?

25             THE COURT:  Yes.  So let me ask you, Mr. Mastro, at



1    this point in time, do you anticipate calling other witnesses?

2         MR. MASTRO:  No.  The trustee has no further

3    witnesses, and we'll rest our case in chief.

4         THE COURT:  All right.  And Mr. VerStandig, do you

5    have any witnesses that you intend to introduce tomorrow?

6         MR. VERSTANDIG:  No, we do not.

7         THE COURT:  All right.  Mr. Myers, how many witnesses

8    do you have for tomorrow?

9         MR. MYERS:  Three.

10        MR. MASTRO:  Objection, Your Honor.

11        THE COURT:  And who are these witnesses?

12        MR. MYERS:  Roger Schlossberg, Frank Mastro, and

13   Maurice VerStandig.

14        MR. MASTRO:  Your Honor, we object.

15        MR. MYERS:  They're here in the Court.

16        THE COURT:  All right.  Well, I'm not going to allow

17   you to put an attorney on the stand who is acting in their

18   capacity as attorney unless you have a darn good reason so --

19        MR. MYERS:  I do.  Impeachment of their testimony in

20   the Montgomery County case.

21        THE COURT:  Who testified that Mr. Mastro testified

22   in the Montgomery County case?

23        MR. MYERS:  Well, he made representations to the

24   Court --

25        THE COURT:  All right.  Well, you can --



www.escribers.net | 800-257-0885

1          MR. MYERS:  -- which now, Mr. Schlossberg said are

2    not true.

3          THE COURT:  You can address that -- you can address

4    that in your argument.  And then --

5          MR. MYERS:  What is the basis that I can't call Mr.

6    Mastro?  He's here in court.

7          THE COURT:  Because he's an attorney, and you're not

8    going to call him as a witness, which would have the impact of

9    disqualifying him as counsel, which I think is part of your

10   goal here to derail these proceedings.  So I'm not going to

11   allow it.

12         If you don't agree with something Mr. Mastro said,

13   you're going to have an opportunity to address it with the

14   Court.  If you don't agree with something Mr. VerStandig said,

15   you're going to have an opportunity to address it with the

16   Court.

17         So you are not going to call Mr. Mastro or Mr.

18   VerStandig.  Are you going to testify, Mr. Myers?

19         MR. MYERS:  When are you going to rule on the motion

20   to disqualify -- disqualification of you?

21         THE COURT:  Not before we resume first thing tomorrow

22   morning.

23         MR. MYERS:  Okay.  Well, then I would ask for an

24   emergency stay so I can go to the district court and --

25         THE COURT:  Denied.

```
1              MR. MYERS:  Denied?

2              THE COURT:  So are you testifying --

3              MR. MYERS:  Okay.  Are you going to enter an order,

4    please?

5              THE COURT:  Are you testifying?

6              MR. MYERS:  I don't know.

7              THE COURT:  All right.

8              MR. MYERS:  Think I will.

9              THE COURT:  So I'll put you down as a possible

10   witness.  And then you said you may be recalling Mr.

11   Schlossberg, which I may or may not allow.  So you're going to

12   have --

13             MR. MYERS:  I will be on my direct.

14             MR. MASTRO:  We would object to that.

15             THE COURT:  Hold on.  Hold on.

16             MR. MYERS:  Of course he would object.

17             THE COURT:  Hold on.  You're going to have to be

18   prepared to address the Court tomorrow morning and convince me

19   why I should allow you to recall him, when he has been on the

20   stand all day.  I'm not going to allow you to call him as part

21   of your case simply to prolong his testimony after you told me

22   you needed a certain amount of time, and I've given you much

23   more than what --

24             MR. MYERS:  On cross-examination.  This is my case,

25   Your Honor.  I'm entitled to call my witnesses.
```



```
 1              THE COURT:  Well, if I --
 2              MR. MYERS:  And that's in violation of my due process
 3     right.
 4              THE COURT:  Okay.  If I do allow you to call him,
 5     it's going to be very limited in scope and --
 6              MR. MYERS:  So you're limiting my case.
 7              MR. VERSTANDIG:  Your Honor.
 8              THE COURT:  I'm limiting your case to the subject
 9     matter --
10              MR. MYERS:  He had three hours.
11              THE COURT:  -- that's before this Court.
12              MR. MYERS:  Okay.  I've told you time and time again
13     that the issue for this Court is whether he has exercised good
14     business judgment in reaching this settlement.  You had an
15     opportunity --
16              MR. MYERS:  And I disagree that that's the issue.
17              THE COURT:  Well, you can disagree all you want, Mr.
18     Myers.
19              MR. MYERS:  I will.
20              THE COURT:  And you're going to disagree that today
21     is Monday as well.
22              MR. MYERS:  No.
23              THE COURT:  You're entitled to do that.
24              MR. MYERS:  That's insulting.
25              THE COURT:  You can disagree.
```



```
 1              MR. MYERS:  That's insulting.

 2              THE COURT:  But I've told you the standard for this

 3    Court -- I have an application to compromise a controversy

 4    before me.  The standard, the question, the sole question for

 5    me, is whether the Chapter 7 trustee has exercised good

 6    business judgment in deciding to enter into this settlement.

 7    That's the sole issue for me to decide.  Not what your --

 8              MR. MYERS:  You have to decide jurisdiction.

 9              THE COURT:  -- not what your rights may have been in

10    other litigation.  Not what another court has decided.  You

11    spent all this time and all this stuff, even though I've told

12    you numerous times what the question is for this Court.  If

13    you want to spend your time on other things, then you're

14    welcome to spend your time on other things.  But I'm not going

15    to allow you to put him back on the stand to ask him about

16    things that are not relevant to the issue before this Court.

17              MR. MYERS:  Jurisdiction.

18              THE COURT:  So I'm going to give you until tomorrow

19    morning --

20              MR. MYERS:  Jurisdiction is relevant.

21              THE COURT:  Stop interrupting me.

22              MR. MYERS:  Well, you're wrong.  Jurisdiction is

23    relevant.

24              THE COURT:  Stop interrupting me.

25              MR. MYERS:  No, I'm done.
```



1              THE COURT:  You are done.  You are welcome --

2              MR. MYERS:  Are you going to issue the order?

3              THE COURT:  -- to leave at any time, Mr. Myers.

4              MR. MYERS:  Are you going to issue the order:?

5              THE COURT:  Stop interrupting me.  I'm talking.

6              MR. MYERS:  This is a sham proceeding.

7              THE COURT:  I told you.  I told you, you cannot file

8    pleadings minutes before a hearing begins and expect the Court

9    to act on them before the hearing begins.  And you and I both

10   know that you filed these pleadings simply to derail these

11   proceedings.  I'm not going to allow it.

12             This has been pending too long.  It is time to wrap

13   up --

14             MR. MYERS:  I am allowed.

15             THE COURT:  -- these issues.  It is time to wrap up

16   these issues.  I'm going forward with the hearing tomorrow

17   morning.

18             Let's talk about timing.  So --

19             MR. MYERS:  Not if you have a conflict of interest.

20             THE COURT:  Mr. Myers.

21             MR. MYERS:  And you know it.

22             THE COURT:  Mr. Myers, again, don't tell me what I

23   know --

24             MR. MYERS:  Okay.

25             THE COURT:  -- because you don't have a clue what I



www.escribers.net | 800-257-0885

1    know --

2            MR. MYERS:  Oh.

3            THE COURT:  -- which is obvious from the way you have

4    prosecuted this case.  I have encouraged you time and time

5    again to get experienced bankruptcy counsel to represent you.

6    You've refused to do it.  Instead, you want to come in here

7    and prosecute the case on your own.  You're welcome to do

8    that.

9            MR. MYERS:  I don't want to.

10            THE COURT:  You're welcome to do that.

11            MR. MYERS:  I don't want to.  But he stole a million-

12    110 of my money.

13            THE COURT:  Stop interrupting me.  Stop interrupting

14    me.

15            MR. MYERS:  I'm done.

16            THE COURT:  You are welcome -- no, you've said you're

17    done four times, and you're still going back and forth,

18    interrupting me.

19            MR. MYERS:  Because this is a sham.

20            THE COURT:  You are welcome to prosecute your case as

21    a pro se litigant.  You are still bound by the statutes and

22    the rules that govern this Court.  You did not pre-file your

23    exhibit and witness list, even though I know that that

24    protocol was sent to you, even though I know it is on the

25    court's website that you're required to do that.  You didn't

escribers

www.escribers.net | 800-257-0885

 1   do it.  But I still gave you a chance to be heard.  I still

 2   gave you an opportunity to introduce documents.

 3           Now, let's talk about tomorrow.

 4           MR. MYERS:  I don't believe you --

 5           THE COURT:  If you want to --

 6           MR. MYERS:  -- have addressed jurisdiction yet.

 7           THE COURT:  If you want to introduce documents

 8   tomorrow into evidence, you must file them on the docket

 9   tonight with an exhibit list.  Even then, I don't know if I'm

10   going to allow you to introduce all of the documents that you

11   offer.  I'm going to give you until -- it's 5:32 now.  I'm

12   going to give you until 9 p.m.  Whatever documents you want to

13   introduce into evidence, file on the docket with an exhibit

14   list.  You must follow the protocol that was sent to you last

15   week.  It may have even been sent to you before that.

16           But you must file an exhibit list.  You must identify

17   the exhibits.  You must attach the exhibits.  You would be

18   starting with Debtor's Number 7 because we have 1 through 6

19   already marked.

20           So I will excuse you from having to file a witness

21   list.  You have identified Mr. Mastro, Mr. VerStandig, Mr.

22   Schlossberg, and then yourself as potential witnesses.  And

23   whoever you call as a witness tomorrow, I will deal with it

24   tomorrow.  But I can tell you that I am not going to allow you

25   to put Mr. Mastro or Mr. VerStandig on the stand, and I very,

1    very well may not allow you to put Mr. Schlossberg back on the

2    stand either.  So --

3            MR. MYERS:  Okay.  When are you going to issue the

4    order denying my motion to stay?  Tonight, please?

5            THE COURT:  So you know what?  I don't believe you

6    have the ability to file on the docket, and the clerk's office

7    is closed.  So what I'm going to tell you is that you must

8    email your documents to Mr. Mastro and Mr. VerStandig with a

9    copy to -- with a copy to the Court by email by 9 p.m.  Again,

10   you need an exhibit list.  You need the numbered exhibits

11   attached.  And you will start with Number 7.

12           MR. MYERS:  Your Honor, I don't believe you have

13   jurisdiction --

14           THE COURT:  So that will be --

15           MR. MYERS:  -- so I don't know.

16           THE COURT:  -- by 9 p.m. tonight.  And Mr. Myers, as

17   I told you at the beginning of the hearing, if you want to

18   raise jurisdictional arguments, you are welcome to do that in

19   your closing argument.  We're going to complete the

20   presentation of evidence, and I will hear --

21           MR. MYERS:  Well --

22           THE COURT:  -- whatever arguments you have after

23   that.

24           MR. MYERS:  Yeah.  Okay.

25           THE COURT:  All right.  So --



Appellees' Appendix 0428

1              MR. MYERS:  So --

2              THE COURT:  -- what time should we start tomorrow?

3      Is 9 a.m. good for everyone?

4              MR. MYERS:  may I have an answer to my question?  Are

5      you going to enter the order denying my motion to stay?

6              THE COURT:  Is 9 a.m. good for everyone?

7              MR. VERSTANDIG:  Your Honor, 9 a.m. is agreeable to

8      the King parties.

9              MR. MYERS:  10 o'clock was what the schedule said.

10             THE COURT:  Well, I wanted to give you additional

11     time to put on your case.  Okay.  We'll start at 10 o'clock.

12             All right.  So 10 o'clock.  I will see everyone at 10

13     o'clock in person tomorrow.

14             Mr. Myers, I'm not going to give you an unlimited

15     amount of time to put your case on.  I was trying to give you

16     a little more time.  You don't want it.  That's fine.  We'll

17     start at 10.

18             I am not ruling on the motions that you filed minutes

19     before this hearing began today.  I am not ruling on those

20     motions before tomorrow.  You have filed other motions against

21     me, against the trustee, against others, and none of them have

22     had --

23             MR. MYERS:  That's not a motion, Your Honor.

24             THE COURT:  -- none of them have had --

25             MR. MYERS:  That's a complaint and a demand for jury

1    trial.

2            THE COURT:  You filed a motion to disqualify.  You

3    didn't file a complaint in this court.

4            MR. MYERS:  Filed a complaint.

5            THE COURT:  Don't misstate the facts.

6            MR. MYERS:  I filed the complaint.  You're the one

7    who's misstating what I'm saying.  I filed the complaint in

8    the district court before this hearing ever began.

9            THE COURT:  You asked me if I was going to rule on

10   any motions.

11           MR. MYERS:  I asked you if you were going to enter

12   an --

13           THE COURT:  I'm not ruing on your motion to

14   disqualify --

15           MR. MYERS:  -- order on the --

16           THE COURT:  Let me finish.  I am not ruling on your

17   motion to disqualify, which was docketed minutes before this

18   hearing began.  And that was only because you said you filed

19   pleadings, and we had no knowledge of them.  You've known

20   about this hearing for two months.  You waited until five

21   minutes before the hearing began to file these things.

22           I'm not ruling on the motions you filed last night,

23   and I'm not ruling on any motions you filed this morning

24   because I haven't read them.  I haven't seen them because you

25   waited until the last minute, even though I've told you time

1    and time again not to wait until the last minute to file.

2              MR. MYERS:  Then you should continue the hearing and

3    rule on the motion to disqualify.

4              THE COURT:  So I am not continuing the hearing.  I am

5    not continuing the hearing.

6              MR. MYERS:  Okay.

7              THE COURT:  We are going forward tomorrow.  I'm going

8    to give you a limited amount of time to put on your case.  And

9    then I'm going to rule.

10             MR. MYERS:  Well, are you going to enter an order

11   tonight denying my motion to stay?  You just denied it.

12             THE COURT:  I denied it.  It's on the record.  You

13   didn't file a motion, and so I'm not going --

14             MR. MYERS:  You denied it.  Are you going to enter an

15   order tomorrow then?

16             THE COURT:  I'm not going to enter a written order

17   when you have not filed a written motion.  You made an oral

18   motion.  I denied it.  Denied.  I'm not staying it.

19             MR. SCHLOSSBERG:  Your Honor.  Your Honor, a motion

20   to disqualify, it was docketed sometime during the day today.

21   It was docketed this morning --

22             THE COURT:  I haven't even read it yet.

23             MR. MASTRO:  We haven't seen it.  Haven't had a

24   chance to respond to it.  Nobody (indiscernible) --

25             MR. SCHLOSSBERG:  Filing after 10 o'clock this

1    morning.

2            THE COURT:  And parties-in-interests are going to

3    have an opportunity to --

4            MR. SCHLOSSBERG:  I just now (indiscernible).

5            MR. MYERS:  Well, we'll see what the district court

6    says.

7            THE COURT:  Let me finish.  Parties-in-interest will

8    have an opportunity to respond.  And so I am not ruling on

9    anything before the hearing begins at 10 a.m. tomorrow, and we

10   will wrap this hearing up by 1 or 1:30 tomorrow.

11           Anything further before we conclude?

12           Mr. Myers.

13           MR. MYERS:  I think this is a sham.  I think you

14   don't have jurisdiction.  I think you have a conflict of

15   interest.  And I'll be in the district court in the morning.

16           THE COURT:  You have fun with that.  Your objection's

17   noted.

18           Mr. Mastro.  Mr. Schlossberg.  Mr. VerStandig.

19   Anything further?

20           MR. VERSTANDIG:  No, Your Honor.  Nothing further.

21   Just looking forward on scheduling, I want to be open with the

22   Court.  I'm obligated in another court on Wednesday, so I look

23   forward to concluding tomorrow.

24           THE COURT:  The Court has a full docket on Wednesday.

25   We will not be continuing on Wednesday.


www.escribers.net | 800-257-0885

```
1              MR. VERSTANDIG:   Thank you.

2              MR. SCHLOSSBERG:   Thank you, Your Honor.

3              THE COURT:   All right.   Thank you.

4              MR. MASTRO:   Thank you.

5              THE CLERK:   All rise.   Court is now adjourned.

6         (Whereupon these proceedings were concluded)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

escribers

www.escribers.net | 800-257-0885

```
 1                        I N D E X

 2                                                              VOIR
         WITNESSES:              DIRECT   CROSS   REDIRECT   RECROSS   DIRE
 3       Trustee:
         Roger Schlossberg          14      72,79
 4

 5       EXHIBITS:    DESCRIPTION                    I.D.     EVID.
         Debtor:
 6       1            Judge Lipp's decision          114       114
         2            Myers' objection to settlement 120       120
 7       3            Transcript of hearing          124       124
         4            Stipulation of dismissal       128       154
 8       6            Judge Simpson's order          189       201

 9       Trustee:
         1            Operating agreement             35        35
10       2            Demand letter from King parties 37        37
         4            Memorandum of understanding     51        51
11       5            Email chain                     52        52
         6            Email chain                     56        56
12       7            Email chain                     56        56
         8            Email chain                     56        56
13       11           Judge Gunn's order              62        62
         9            Redfin valuation                70        70
14       10           Judge Lease's decision          72        72

15       King Parties:
         1            Proof of claim 21               75        75
16       2            Proof of claim 22               76        76
         3            Proof of claim 23               76        76
17

18       RULINGS:                                    PAGE     LINE
         Trustee's motion to strike is denied          5        7
19       Debtor's oral motion to stay is denied       203       25

20

21

22

23

24

25
```

1

2                              CERTIFICATION

3      I certify that the foregoing is a correct transcript from the

4      electronic sound recording of the proceedings in the above-

5      entitled matter.

6

7                                               January 6, 2026

8      _____        _____

9      RIVER WOLFE                      DATE

10     TTA-Certified Digital Legal Transcriber CDLT-265

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

escribers
www.escribers.net | 800-257-0885

```
 1                  UNITED STATES BANKRUPTCY COURT
                    FOR THE DISTRICT OF MARYLAND
 2                        Greenbelt Division

 3   In Re:                   :    Case No. 15-26033

 4   GREGORY B. MYERS,        :    Chapter 7

 5           Debtor.          :    Greenbelt, Maryland
                                   Tuesday, July 1, 2025
 6   : : : : : : : : : : : : : :

 7   BRIAN KING, ET AL.       :    Adv. Proc. 24-00007

 8          Plaintiffs        :

 9           - against -      :

10   ROGER SCHLOSSBERG, TRUSTEE  :

11          Defendant.        :

12   : : : : : : : : : : : : : : :

13

14                  TRANSCRIPT OF HEARING ON
                         RE: 24-00007
15       17 APPLICATION TO COMPROMISE CONTROVERSY FILED BY DEFENDANT
                         ROGER SCHLOSSBERG;
16          19 OBJECTION FILED BY DEBTOR GREGORY B. MYERS;
         20 MOTION FOR MISCELLANEOUS RELIEF FILED BY DEFENDANT ROGER
17                         SCHLOSSBERG;
         22 SUPPORT DOCUMENT FILED BY DEBTOR GREGORY B. MYERS;
18          23 RESPONSE FILED BY DEBTOR GREGORY B. MYERS;
         24 RESPONSE FILED BY DEFENDANT ROGER SCHLOSSBERG
19
                         RE: 15-26033
20      1051 OBJECTION TO CLAIM FILED BY DEBTOR GREGORY B. MYERS;
        1052 OBJECTION TO CLAIM FILED BY DEBTOR GREGORY B. MYERS;
21      1053 OBJECTION TO CLAIM FILED BY DEBTOR GREGORY B. MYERS;
           1060 OPPOSITION FILED BY INTERESTED PARTY BRIAN KING
22                 INTERESTED PARTY CRISTINA KING;
           BEFORE THE HONORABLE MARIA ELLENA CHAVEZ-RUARK
23                 UNITED STATES BANKRUPTCY JUDGE

24

25
```



Appellees' Appendix 0436

```
1    APPEARANCES:

2    For the Debtor:              Gregory B. Myers, Pro se

3    For Chapter 7 Trustee        Frank J. Mastro, Esq.
     Roger Schlossberg:           Roger Schlossberg, Esq.
4                                 SCHLOSSBERG & MASTRO
                                  18421 Henson Boulevard
5                                 Suite 201
                                  Hagerstown, MD 21742

6

7    For King parties:            Maurice Belmont VerStandig, Esq.
                                  THE VERSTANDIG LAW FIRM, LLC
8                                 9812 Falls Road
                                  #114-160
9                                 Potomac, MD 20854

10

11

12

13

14

15

16

17

18   Audio Operator:             JENNIFER WHITFIELD
                                  301-344-3965
19

20
     Transcript prepared by:      ESCRIBERS
21                                7227 North 16th Street
                                  Suite #207
22                                Phoenix, Arizona 85020
                                  (800)257-0885
23

24   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.
25
```

Appellees' Appendix 0437

www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1              Greenbelt, MD - July 1, 2025

2         THE CLERK:  All rise.  Silence, please, and come to

3    order.  The United States Bankruptcy Court for the District of

4    Maryland is now in session, the Honorable Maria Ellena Chavez-

5    Ruark presiding.

6         Please be seated.  Calling the case of Gregory Myers,

7    case number 15-26033.  The matters for consideration for the

8    Court today are docket entry 1051, objection to claim number

9    22, filed by the debtor; docket entry 1052, objection to claim

10   number 23, filed by the debtor; docket entry 1053, objection

11   to claim number 21, filed by the debtor; docket entry 1060,

12   opposition to objections filed on behalf of the King parties.

13        We're also here for the adversary case of King, et

14   al. v. Schlossberg, adversary number 24-00007.  The matters

15   for consideration are docket entry 17, application for

16   compromise controversy, filed on behalf of the defendant;

17   docket entry 19, preliminary objection to trustee's

18   application to compromise controversy, filed by the debtor;

19   docket entry 22, supplemental to the preliminary objection,

20   filed by the debtor; docket entry 20, motion to strike

21   debtor's objection, filed on behalf of the defendant; docket

22   entry 23, response to motion, filed by the debtor; and docket

23   entry 24, response to opposition, filed on behalf of the

24   defendant.

25             Starting with counsel for the plaintiff in the



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    adversary, please identify yourself and your clients for the

2    record.

3        MR. VERSTANDIG:  Good morning, Your Honor.  Maurice

4    VerStandig, on behalf of Brian King, Cristina King, and the

5    Cristina and Brian King Children's Trust.

6        THE COURT:  Good morning.

7        MR. MASTRO:  Good morning, Your Honor.  Frank Mastro,

8    on behalf of Roger Schlossberg, the Chapter 7 trustee and

9    defendant in the adversary proceeding.

10       THE COURT:  Good morning.

11       MR. SCHLOSSBERG:  Good morning, Your Honor.  Roger

12   Schlossberg, Chapter 7 trustee, counsel to trustee.

13       THE COURT:  Good morning.

14       MR. MYERS:  Good morning, Your Honor.  Greg Myers,

15   sorry for being late.  There was an accident.

16       THE COURT:  Good morning.

17       All right.  So I believe where we left off is that

18   the trustee had completed -- had finished putting on his case.

19       MR. MASTRO:  Correct.

20       THE COURT:  Do you have any other evidence, Mr.

21   Mastro, that you would like to offer?

22       MR. MASTRO:  Not at this time, Your Honor.

23       THE COURT:  All right.  Thank you.

24       Mr. VerStandig, any evidence you want to offer --

25       MR. VERSTANDIG:  Your Honor --



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1          THE COURT:  -- at this time?

2          MR. VERSTANDIG:  -- no, being mindful that my client

3  is not the moving party in the adversary, and is also not the

4  moving party in the case.  But I do not anticipate offering

5  any further evidence.

6          THE COURT:  All right.  Thank you.

7          So Mr. Myers call your first witness.

8          Mr. Myers?

9          MR. MYERS:  I'm coming, please.  One second.

10          I call myself.

11          THE COURT:  All right.  So you're taking a whole

12  handful of stuff up there, which you're welcome to do.  If you

13  refer to any of it, we'll mark it as an exhibit like we did

14  with Mr. Schlossberg.

15          And Mr. Myers, you should see on the witness stand

16  your Exhibits 1 through 6, Debtor's Exhibits 1 through 6 from

17  yesterday.  And we will have the trustee's exhibits and the

18  King party's exhibits available electronically.

19          MR. MYERS:  Yeah.  Thank you.

20          THE COURT:  All right.  Ms. Whitfield will place you

21  under oath.

22      (Witness sworn)

23          THE CLERK:  Please be seated and state your name and

24  address for the record.

25          THE WITNESS:  Gregory B. Myers, 700 Gulf Shore



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   Boulevard N., Naples, Florida, 34102.

2          THE COURT:  All right.  So Mr. Myers, 700 Gulf Shore

3   Boulevard N., Naples, Florida is still your mailing address

4   and your residential address?

5          THE WITNESS:  Yes, it has been for years.

6          THE COURT:  Okay.  All right.  So you do not have

7   counsel.  So I'm just going to let you say what you want to

8   say on the stand.  I want to remind you that witness testimony

9   is for facts, and I'll give you an opportunity to make your

10  closing arguments later.

11  So what would you like to say with regard to the application

12  to approve the settlement and the objections to the three King

13  parties' claims?

14  DIRECT EXAMINATION

15  BY MR. MYERS:

16          THE WITNESS:  Sure.

17          THE COURT:  Okay.  So tell me what you're referring

18  to.

19          THE WITNESS:  So I guess my question to myself is,

20  why can't this settlement be approved?

21          THE COURT:  Okay.  Tell me what you're looking at.

22  Because, as we discussed, if you're going to have anything on

23  the stand with you, we're going to mark it as an exhibit.

24          THE WITNESS:  Okay.  All right.

25          THE COURT:  So you took a whole stack up there.  Are



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1  you going to be referring to all of that or just certain

2  items?

3          THE WITNESS:  Yeah, just certain items, but a lot of

4  it.

5          THE COURT:  Okay.

6          THE WITNESS:  It may not -- you know, some -- most of

7  it's already been in the -- put in the record.

8          THE COURT:  Okay.  And I also want to remind you that

9  I'm going to give you until 1 o'clock  today to put on your

10  case.  So I encourage you to use your time wisely.

11          Do you have copies of those exhibits for everyone

12  else in the courtroom?

13          THE WITNESS:  No, I don't.

14          THE COURT:  Okay.  And did you email them to Mr.

15  Mastro, Mr. Schlossberg, Mr. VerStandig and to the Court by 9

16  p.m. yesterday?

17          THE WITNESS:  Well, a lot of these are already

18  marked.

19          THE COURT:  Did you email an exhibit list and attach

20  the exhibit email as I --

21          THE WITNESS:  I didn't email anything to them.

22          THE COURT:  Let me finish my question, please,

23  because we're recording, and I want to make sure we have a

24  clear transcript.

25          Did you email an exhibit list and your exhibits to



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   the counsel who are appearing today, and to the Court, as I

2   instructed you to do, by 9 p.m. last night?

3        THE WITNESS:  I did not email anything to them last

4   night.  I am a party-in-interest.  I'm not a party to this

5   case.  They've never joined me as a party in this case.  And

6   so I'm going to be referring to documents that are already in

7   the record.  They're ECF documents, filed in court

8   proceedings, which the Court can take judicial notice of.  I

9   don't need to put them in as exhibits.  I can just ask you to

10  take judicial notice, and you can take judicial notice.

11       THE COURT:  All right.  Well, I'm willing to do that

12  with regard to pleadings that have been filed in the

13  proceedings in your bankruptcy case and this adversary

14  proceeding.  But anything else, I'm not going to, because you

15  have not provided them to everyone in advance to look at, as

16  instructed, both on the Court's website and by an email from

17  this Court a week or two ago, and then, again, as I instructed

18  you yesterday.

19       So I will take judicial notice of pleadings that have

20  been filed in your bankruptcy case, in this Court, and in the

21  adversary proceeding that is before the Court today, but

22  nothing else.  And so you may not refer to any documents, you

23  may not have anything at the witness stand with you other than

24  what is being marked as exhibits and what the Court is taking

25  judicial notice of.  Do you understand?

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1       THE WITNESS:  This is just my testimony, Judge.

2       THE COURT:  Yes, and you are --

3       THE WITNESS:  I don't have to submit exhibits.

4       THE COURT:  You do not have to submit exhibits.  But

5   you are not going to be referring to documents, and you're not

6   going to be offering documents into evidence while you're

7   testifying.  If you wanted to do that, you should have done as

8   I instructed you.  So again --

9       THE WITNESS:  I'm not offering them into evidence.

10      THE COURT:  -- you have until 1 o'clock.  Please do

11  not interrupt me.  You have until 1 o'clock today to put on

12  your case.  And I'm going to give you lots of leeway in how

13  you do that, but you are not going to be referring to

14  documents on the witness stand without us marking them as

15  exhibits.  And I told you, we're not going to mark anything as

16  an exhibit unless you shared it in advance of the hearing,

17  which you did not do.  So if you want to refer to pleadings

18  filed in this bankruptcy case, in this adversary proceeding,

19  I'll allow you to do that.  Okay.  So let's start from there.

20      THE WITNESS:  Well, I believe that's unfair.

21      THE COURT:  And let's --

22      THE WITNESS:  I should be able to refer to pleadings

23  in my Florida bankruptcy case that involves this matter.  And

24  I should be able to refer to pleadings in the Montgomery

25  County Circuit Court case which involved this matter.



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1          THE COURT:  Do you have copies for everyone?

2          THE WITNESS:  Well, if I testify and I just say

3    please take judicial notice, it's my testimony --

4          THE COURT:  Okay.  Well, let's --

5          THE WITNESS:  -- and you can review it.

6          THE COURT:  Let's just start.  Okay?  Instead of

7    wasting valuable time arguing with the Court, let's go right

8    into your testimony.

9          THE WITNESS:  Thank you.

10         THE COURT:  So you're reading something.  Tell me

11   what you're reading from.

12         THE WITNESS:  So as a threshold matter, this is the

13   complaint and demand for a trial by jury that was filed

14   yesterday against you, Judge Ruark, and Mr. Schlossberg, Mr.

15   Mastro, Schlossberg & Associates, and Morris VerStandig.  As a

16   threshold matter, it's my contention that you have a conflict

17   of interest --

18         THE COURT:  Okay.  You're making argument.

19         MR. VERSTANDIG:  Objection, Your Honor.  This is --

20         THE COURT:  I'm giving you an opportunity.  You're

21   making argument.  I'm giving you an opportunity to testify

22   about facts that are relevant to the application to compromise

23   the controversy and the objections to the claims that you

24   filed.  So you can make your argument later.

25         I encourage you, Mr. Myers, to listen to what I'm



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    saying because I'm trying to help you here.  This is your

2    opportunity to testify about facts that are relevant to the

3    pleadings before the Court.  If you want to make argument

4    about conflicts and jurisdiction, you'll have an opportunity

5    to do that later.

6          THE WITNESS:  Okay.  Well, I'd just like to comment

7    that yesterday, Mr. Schlossberg  made hours of nonfactual

8    testimony about law, and why he can do this, and why he can't

9    do that, this, that, and the other.  So now I'm -- I'm being

10   held to a different standard.

11         THE COURT:  Okay.  I'll tell you what we're going to

12   do, Mr. Myers.  Mr. Schlossberg had two hours for his direct.

13   I'm actually giving you three for yours, although we're

14   starting late because you arrived late.  I'm giving you until

15   1 o'clock to put on your case, and I'm going to try not to

16   interrupt.  I'm going to ask opposing counsel to try not to

17   interrupt.  Obviously, you need to make objections as you see

18   fit, for purposes of making a record.

19         But if you want to -- I'm going to let you say

20   whatever you want to say, even though I think what you're

21   saying is really argument and you're taking valuable time away

22   from your testimony time.  But I'm going to give you the time

23   to say what you want to say on the stand.  I am going to

24   caution you that what you say on the stand and what you say in

25   argument should not be duplicative.  I'm going to have a time

escribers

www.escribers.net | 800-257-0885

12

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    limit on closing arguments as well.  But I am listening.  You

2    have my full attention.  And so I'm going to let you say what

3    you want to say.

4         THE WITNESS:  Thank you, Judge.  So my Chapter 11

5    bankruptcy case was filed on November 18th, 2015.  It was

6    later converted, on February 22, 2017, to a Chapter 7.

7    However, the petition date is the date on which my estate was

8    determined, for all purposes, going forward.  So to the extent

9    anything happened after November 18th, 2015, it would not be

10   property of my estate.  That's my first point.

11        Serv Trust never filed a proof of claim in my

12   bankruptcy case.  So they were never before the Court.  They

13   were served by -- they were sued by Offit Kurman, and that

14   case was resolved.  And in that case, the Chapter 7 trustee

15   took the position that I had no standing because I didn't have

16   any interest in Serv Trust.  So he's judicially estopped from

17   taking a different position, in my opinion.  And the record

18   will show that in that adversary proceeding.

19        Next, I'm referring to Debtor's Exhibit 1, which is

20   Judge Lipp's order in adversary proceeding 17-00193, in this

21   Court, which the Chapter 7 trustee is bound by, this Court is

22   bound by.  And in her order entering judgment, she made the

23   following findings of fact, and she states, "The following

24   facts are relevant to the issues at hand and are either

25   uncontroverted or are supported by evidence in this case.  To

www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   the extent any of the following findings of fact constitute

2   conclusions of law, they are adopted as such, and to the

3   extent any conclusions of law constitute findings of fact,

4   they are so adopted".

5         Judge Lipp made the following factual findings and, I

6   guess, conclusions of law.  "Serv Trust is a trust that was

7   created by Myers' mother for the benefit of Myers' five

8   children.  Serv Trust was funded with an initial deposit of

9   1,000 from Myers' mother.  Myers and Daniel Ring are the

10  co-trustees of Serv Trust.  Myers testified that Serv Trust

11  has a fifty-percent interest in a Maryland limited liability

12  company named 6789 Goldsboro LLC.  Goldsboro advanced

13  significant sums of money to Serv Trust to enable Serv Trust

14  to make substantial distributions to Myers and/or Kelly for

15  the benefit of their children.  Goldsboro continued to make

16  post-petition advances to Serv Trust, which funds were then

17  made available to Myers and to Kelly to pay for their

18  children's education and household expenses.  It is undisputed

19  that Serv Trust was established to pay educational and other

20  expenses related to Myers' children.  It is also undisputed

21  that Myers is a co-trustee of Serv Trust, with the authority

22  to direct Serv Trust to make payments on behalf of its

23  beneficiaries, the Myers children.  Myers was adamant at trial

24  that every payment that he and/or Kelly ever received from

25  Serv Trust was for the benefit of his children.  If, as

escribers

Appellees' Appendix 0448

www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    irrefutably testified to by Myers, every payment was -- every

2    payment from Serv Trust to Myers and/or Kelly was for the

3    benefit of their children, then it appears, Serv Trust was

4    serving its intended purpose, i.e., providing for Myers'

5    children.  Such payments would not be loans to Myers and/or

6    Kelley.  They would be distributions to the trust

7    beneficiaries."

8            Those are Judge Lipp's findings of fact and

9    conclusions of law on September 28th, 2018.  Neither the U.S.

10   Trustee, nor the Chapter 7 trustee, nor any other party, other

11   than me, appealed the order.  That order is now final and

12   unappealable and is binding on the Chapter 7 trustee, this

13   Court, for all purposes, going forward.  It's res judicata to

14   these proceedings.

15           The Chapter 7 trustee had that -- had that -- the

16   Chapter 7 trustee had the order entering judgment from Judge

17   Lipp and referenced it in the Offit Kurman v. Serv Trust

18   adversary.  And Mr. Mastro also referenced it in the

19   Montgomery County litigation.  And Judge Lease also read

20   directly from it -- the comments I just -- the statements I

21   just made, he read directly from it in the circuit court case.

22           THE COURT:  And Mr. Myers, direct me to the pages

23   that you were reading from, so I can refer to that later.

24           THE WITNESS:  Can I after -- can I highlight it after

25   this is over and hand it to you?



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1        THE COURT:  No, but you can refer me to the pages.

2    It's a thirty-eight-page opinion.  I want to focus on the part

3    that you're reading on.

4        THE WITNESS:  This is doc 94, on page 2 of 38, near

5    the top is "Findings of fact:  The following facts are

6    relevant to the issues at hand and are either uncontroverted

7    or are supported by the evidence in this case."  Footnote 2,

8    which says, "To the extent any of the following findings of

9    fact constitute conclusions of law, they are adopted as such.

10   And to the extent any conclusions of law constitute findings

11   of fact, they are so adopted".

12       THE COURT:  So Mr. Myers, I'm just asking you to

13   direct me to the passages that you just read.  So I know you

14   read --

15       THE WITNESS:  I read those.

16       THE COURT:  -- at the bottom of page 2, "Serv Trust

17   is a trust that was created by" up to the top of page 3.

18   Where else were you reading from?

19       THE WITNESS:  Well, I'm going to go there.  I read

20   you the first sentence that I read to you.  I'm giving you the

21   page of the first statement I made.

22       THE COURT:  Just give me the page numbers.  You don't

23   need to reread everything.  I'm trying to be judicious with

24   your time.

25       THE WITNESS:  Okay.  Page 2 of 38.  At the bottom of

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   page 2 of 38 was the statement.

2            THE COURT:  Right.  So pages 2 --

3            THE WITNESS:  2 of 38, okay.

4            THE COURT:  Page 2, page 3.  Just give me page

5   numbers.  I don't need you to direct me.

6            THE WITNESS:  Okay.  All right.  Page 4 of 38.

7        (Pause)

8            THE WITNESS:  Page 16 of 38, page 17 of 38.  I don't

9   think I said this, but "Goldsboro's existence was even raised

10  at the 341 meeting, at which Myers explained that Serv Trust

11  is a fifty-percent owner of Goldsboro".

12           Page 17 of 38.  Again, "Goldsboro continued to make

13  post-petition advances to Serv Trust, which funds were then

14  made available to Myers and Kelley to pay for their children's

15  education and household expenses".

16           Page 18 of 38 at the top.  "It is undisputed that

17  Serv Trust was established to pay educational and other

18  expenses related to Myers' children."

19           Same, top of page 18.  "It is also undisputed that

20  Myers is co-trustee of Serv Trust with the authority to direct

21  Serv Trust to make payments, on behalf of its beneficiaries,

22  the Myers children."

23           And top of 38 -- top -- page 18 to 38, the top.

24  "Myers was adamant at trial that every payment that he or

25  Kelley ever received from Serv Trust was for the benefit of

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    his children."

2          And page 18 of 38.  "If, as irrefutably testified to

3    by Myers, every payment from Serv Trust to Myers and/or Kelly

4    was for the benefit of their children, then it appears Serv

5    Trust was serving its intended purpose providing for Myers'

6    children.  Such payments would not be loans to Myers or Kelly.

7    They would be distributions to the trust beneficiaries."

8          Okay.  And then I want to go to Claim 5 in this -- or

9    Count V, I guess it was, the U.S. Trustee's Count V.  So this

10   is on page 35 of 38.  It's critical to this case, to this

11   bogus settlement agreement.  This is subsection (e) of Judge

12   Lipp's decision.  This is under 11 U.S.C. subsection

13   727(a)(2).

14         It says, "The Court shall grant the debtor a

15   discharge unless the debtor, with intent to hinder, delay, or

16   defraud a creditor or an officer of the estate charged with

17   custody of property under this title, has transferred,

18   removed, destroyed, mutilated, or concealed, or has permitted

19   to be transferred, removed, destroyed, mutilated, or concealed

20   property of the debtor, within one year before the date of the

21   filing of the petition; or property of the estate, after the

22   date of the filing of the petition."

23         "To bar debtor's discharge under Section 727(a)(2),

24   the plaintiffs must prove each of the following four elements

25   by a preponderance of the evidence:  the debtor transferred,

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   removed, destroyed, mutilated, or concealed; 2) his or her

2   property; 3) within one year of the bankruptcy petition

3   filing; 4) with the actual intent to hinder, delay, or defraud

4   a creditor."

5        Count V of the complaint, the U.S. Trustee's

6   complaint, alleges that:  "Myers, with the intent to hinder,

7   delay, or defraud creditors of the estate, transferred to Serv

8   Trust additional equity in the Lot 6 sale proceeds by

9   increasing the amount of Serv Trust's claim as a result of

10   pre- or post-petition transfers of funds to Myers and/or

11   Kelley."

12        Count V also alleges that:  "Myers, with the intent

13   to hinder, delay, or defraud creditors, transferred estate

14   assets to or for the benefit of his children, and transferred

15   assets to pay his and Kelly's joint creditors, to the

16   detriment of Myers' sole creditors."

17        Lastly, Count V alleges that:  "Myers transferred

18   assets to various attorneys retained by Kelly, who also

19   represented Myers' interests.  At trial, the United States

20   argued that Myers also violated 727(a)(2)(A) by concealing the

21   fact that he guaranteed the loans to Serv Trust from

22   Goldsboro."

23        The United State Trustee recognized that, although

24   Myers' obligations to Goldsboro were not an asset, she argued

25   that his concealment of the obligations severely prejudiced --

escribers

www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    severely prejudiced his creditors.

2         Judge Lipp's decision:  "The United State Trustee

3    does not prevail on Count V.  There was insufficient evidence

4    to conclude that Myers transferred estate assets to or for the

5    benefit of his children, or that he transferred assets to the

6    attorneys retained by Kelly, or to his joint creditors, with

7    the intent to hinder, delay, or defraud creditors.  Moreover,

8    his guarantee of Serv Trust's obligations to Goldsboro was not

9    an asset of his bankruptcy estate.  It was an unsecured

10   liability.  For these reasons, judgment is awarded" -- to

11   Myers favor -- "in Myers' favor on Count V of the complaint".

12        That's a final judgment by this court that destroys

13   this whole bogus settlement agreement.

14        So notwithstanding that Judge Lipp put an end to this

15   whole thing when she entered that order, the 6789 Goldsboro

16   LLC filed an adversary in this case trying to assert exactly

17   what Judge Lipp said wasn't the case, that Serv Trust was my

18   alter ego.

19        Judge Lipp promptly abstained from that adversary

20   proceeding which was dismissed.  Then, after Judge Lipp

21   abstained -- apparently Mr. VerStandig never read Judge Lipp's

22   order -- in February of 2019, he -- he filed his original

23   adversary in Montgomery County in 2017 with one count against

24   Serv Trust.  I wasn't even a defendant.

25        He then filed a separate case in Garrett County, as

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    counsel for 6789 Goldsboro, against Serv Trust, for the Serv

2    Trust promissory note to Goldsboro.  The question came up as

3    to why is he in Garrett County.  The Garrett County court

4    transferred the Goldsboro v. Serv Trust case to Montgomery

5    County, and the two cases were consolidated for administrative

6    purposes.

7         Serv Trust then filed a counterclaim against the King

8    parties, in 2018, for claims including breach of contract on

9    the memorandum of understanding, constructive fraud, and other

10   counts that I can't recall right now.

11        There was then -- Mr. VerStandig -- the King parties

12   filed a motion to dismiss Serv Trust's counterclaim, which

13   Judge Albright heard.  And I recognize that an order on a

14   motion to dismiss is just that; it's not a final adjudication.

15   However, Judge Albright reviewed the memorandum of

16   understanding, and it was her opinion, and it's in the

17   record -- the Court can take judicial notice of that

18   transcript; I believe I might have filed it in this case --

19   that that memorandum of understanding has all of the required

20   terms and conditions, and in her opinion, it was an

21   enforceable contract.  It was not an agreement to agree.

22        Two, on the constructive fraud claim against Mr.

23   King, as manager of Goldsboro, after he kicked me out in early

24   2017, she said, if what Serv Trust is saying here is true,

25   then Mr. King is guilty of constructive fraud because he's



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   benefiting himself and the Class A members, and he's -- he's

2   not fulfilling his fiduciary duties to Serv Trust.

3   Understood, again, that was an order on a motion to dismiss.

4        She then granted leave to Serv Trust to amend its

5   counterclaim, which it did in January of 2019.  The King

6   parties never filed an answer to the amended counterclaim, nor

7   did they ever file a motion to dismiss the amended

8   counterclaim.  Therefore, the amended counterclaim of Serv

9   Trust still exists in the Montgomery County Circuit Court case

10  because that case is not over.  And I'm going to read a

11  statement from Judge Lease where he said there is no

12  adjudication of any claim.  So he can revise any order he

13  entered in that case until such time as there is a final order

14  against all parties and all claims, as this Court well -- well

15  knows.

16       So the King parties have never filed an answer to

17  Serv Trust's counterclaim.  There's two problems with that.

18  That means, when they went to trial on January the 3rd,

19  there's an admission of all the allegations of fact in the

20  counterclaim, period, end of sentence.

21       Two, that also creates a problem because this Court

22  can't -- under Stern, Wellness, and the other decisions, this

23  Court can't interfere where there's a counterclaim pending in

24  a state court matter which is wrapped up in this matter.

25       So technically, because the King parties have never

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    responded to Serv Trust's counterclaim, they're in default.

2    And so there should be a default judgment entered against

3    them, which would mean that the memorandum of understanding --

4    that they breached the memorandum of understanding and that

5    Brian King is guilty of constructive fraud.

6         But the Montgomery County Circuit Court case is not

7    over yet.  So they can't have their cake and eat it too.  So

8    in February of 2019, Mr. VerStandig added me as a defendant.

9    He amended his declaratory judgment action, originally one

10   count against Serv Trust for the redemption claim, he added

11   claim 2, which was an alter ego claim, and he added me.

12        What he failed to recognize is that that would mean I

13   was added, I assume, relation back effective to the date of

14   filing of the adversary, which would mean he violated the

15   automatic stay in this case.  I did a little research on that.

16        So when he added me, instead of filing a new

17   complaint against me, after the automatic stay was resolved by

18   Judge Lipp's decision, when he added me, it was a stay

19   violation.  So that whole exercise is void for that reason.

20   So there is no alter ego claim.  And I will pursue that in

21   state court as that case proceeds.

22        I was then also added as a defendant in the Goldsboro

23   action, based on my guarantee, personal guarantee.  That too

24   would relate back to when Mr. VerStandig filed the original

25   Goldsboro complaint in Garrett County.  That too would be a

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    stay violation, which I will pursue against Mr. VerStandig and

2    his clients.

3          So we then, from that point forward, get to -- well,

4    no.  In the interim, after that, Mr. VerStandig removed the

5    Montgomery County Circuit Court case to this court, which

6    was -- which initiated adversary proceeding 19-00427.  This

7    was Judge Simpson.  And on December 5 -- and I note that Mr.

8    VerStandig removed the adversary proceeding in his personal

9    capacity.  So I question how he can continue to be an attorney

10    when he has a conflict of interest, so -- with the King

11    parties, et cetera.  And we'll get to the conflict with me.

12          On December 5, 2019, Judge Simpson entered an order

13    remanding that adversary proceeding, that litigation, that was

14    filed by Maurice VerStandig.  He removed the case on November

15    13th, 2019.  And at the end, it is accordingly -- "Accordingly

16    it is, by the United States Bankruptcy Court for the District

17    of Maryland, hereby ordered that the above-captioned adversary

18    proceeding is remanded" --

19          MR. VERSTANDIG:  Sorry.  Objection, Your Honor.  I

20    believe he's reading from a document.  I actually have no

21    objection to this document coming in.  But insofar as this

22    document would point out that it was remanded because he sued

23    me personally for violating the stay and then dismissed that,

24    I would ask that either what he's reading be marked and come

25    in, or not be permitted in the record.  But he can't

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    selectively quote from something, that's not within the scope

2    of what you delineated, so as to mar and tarnish opposing

3    counsel.

4         THE COURT:  So Mr. Myers, what are you reading from?

5         THE WITNESS:  Judge Simpson's order remanding case,

6    case number 19-00427.5, which was discussed yesterday.  I

7    don't know if it was marked as an exhibit.

8         THE COURT:  So this is the order remanding case

9    from --

10        THE WITNESS:  Let me look in here.

11        THE COURT:  -- case number 19-000427, docket number

12   5, entered on December 5th, 2019?

13        THE WITNESS:  Yes, ma'am.

14        THE COURT:  All right.  So that's docket number 6.

15   I'm sorry, Debtor's Number 6?

16        THE WITNESS:  Well, actually that was marked

17   yesterday as Debtor's 6.

18        THE COURT:  It's still Debtor's 6, yes.

19        THE WITNESS:  Yeah.  I was just reading from a

20   different copy that I had marked -- my copy that I had marked.

21   But yes, Debtor's 6.

22        THE COURT:  Okay.

23        THE WITNESS:  So Mr. VerStandig can --

24        MR. VERSTANDIG:  That's okay.  I have no objection.

25   I just --



Appellees' Appendix 0459

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1           THE COURT:  Okay.

2           MR. VERSTANDIG:  Given that the document does not

3   state what he is claiming, I thought it to be of some

4   importance.

5           THE WITNESS:  And let me just be clear --

6           THE COURT:  It's in evidence.  Thank you, Mr.

7   VerStandig.

8           THE WITNESS:  Let me just be clear.  I didn't testify

9   to everything that he was objecting to.  All I was testifying

10  to is that Mr. VerStandig removed the case, in his personal

11  capacity, which is what the notice of removal says, and that

12  after it was here, which is the Montgomery County action,

13  removed in total to this Court, on November 13th, 2019, on

14  December 5, 2019, Judge Simpson:  "Accordingly, it is, by the

15  United States Bankruptcy Court for the District of Maryland,

16  hereby ordered that the above-captioned adversary proceeding

17  is remanded to the Circuit Court for Montgomery County,

18  Maryland, pursuant to 28 U.S.C. Section 1452(b)".

19          I will point out, while I'm on the topic -- and I can

20  do it in closing -- but I'll point out that a relevant case

21  here is the Supreme Court's case in -- I think it's Petrarca

22  v. Things Remembered (sic), and it deals with 28 U.S.C.

23  1452(b).

24          So -- so now all matters and all issues in that

25  litigation go back to the Montgomery County Circuit Court.



www.escribers.net  |  800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    And this Court, under the Petrarca v. Things Remembered (sic),

2    has no further jurisdiction over those matters or those

3    issues.  They rely -- they rest solely with the state court

4    and cannot be interfered with.  That's that decision.

5          So the state court -- and I don't want to get into a

6    debate, but the state court hasn't resolved those matters and

7    those issues.  And they were the identical matters, because

8    when the case was removed, it was after Mr. VerStandig had

9    already filed his amended declaratory action adding me.  So

10   whatever gets decided eventually -- and there is no

11   adjudication; Judge Lease specifically said it on the record

12   on January 3, and I'm going to get to that in a minute -- then

13   that will be the case.  But as it stands now, under Supreme

14   Court precedent, this Court, after having remanded the case to

15   state court, cannot take up the issues that were part of that

16   case.  Okay.

17         I filed a Chapter 13 bankruptcy petition in Florida

18   on January 28th, 2021.  Mr. VerStandig, on behalf of the King

19   parties, came down to Florida, filed numerous pleadings in

20   that case, of which one was a motion to dismiss my case for

21   all manner of bad acts, which Judge Delano dismissed, flatly

22   dismissed.

23         Mr. VerStandig also, after he filed the motion to

24   dismiss, my attorney filed the objection, recognizing they

25   didn't have standing, so he filed a proof of claim.  And so we

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    filed an objection to that proof of claim.  And on June 29th,

2    2021, the Florida bankruptcy court, Judge Delano -- we can

3    mark it.

4            MR. VERSTANDIG:  No.  No, we can't, Mr. Myers.

5            Your Honor, the argument is as follows.

6            THE WITNESS:  Don't talk to me, Mr. VerStandig.

7            THE COURT:  Mr. Myers, please.

8            THE WITNESS:  Talk to the judge.

9            MR. VERSTANDIG:  Thank you, Your Honor.  The argument

10   is as follows.  Mr. Myers knows this Court's protocols.  And

11   there's actually an easier reason to show that than what's

12   been discussed.  About two months ago, there was an email

13   sending Mr. Myers the Court's protocols, to which he responded

14   multiple times.  And that led to a memorandum from the Court.

15   So we know he is in receipt of the Court's protocols.  As

16   you've pointed out, they were emailed to him last week or the

17   week before as well.  They're on the Court's website, and he's

18   exceedingly experienced litigating in this court.

19           The Court's protocols require exhibits to be marked

20   three days before.  We appreciate that you gave him until 9

21   p.m. last night.  I don't object to that by any means, and I'm

22   not suggesting that the three-day standard should apply versus

23   the 9 p.m. standard.

24           But what we are dealing with at the moment is a case

25   by ambush.  He is introducing exhibits without giving any

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    prior notice to the opposing parties.  And I believe what he

2    is about to make reference to is an order from Florida that

3    deals with a claim objection.  And what he is probably not

4    going to point out is that the proof of claim filed in Florida

5    was not the same proof of claim in this court.  The proof of

6    claim in Florida --

7           THE WITNESS:  Is he testifying, Your Honor?

8           MR. VERSTANDIG:  No, I'm explaining why I'm

9    objecting.

10          THE COURT:  Mr. Myers, please don't interrupt.

11          MR. VERSTANDIG:  The proof of claim in Florida dealt

12   with a pending sanctions motion against Mr. Myers in state

13   court.  Now, again, that's not in front of you.  But my point

14   is that, had there been an exhibit list, we would have come

15   armed with appropriate rebuttal and response exhibits, and the

16   ability to put on a case that is not in response to an ambush.

17          Because there has been no exhibit list, because

18   there's been no advance notice, we haven't had the ability to

19   do that.  There is enormous prejudice that comes from running

20   afoul of the Court's rules, and we would ask that you enforce

21   them by disallowing him to read from something that was not

22   marked as an exhibit in a timely fashion.

23          THE WITNESS:  It's filed --

24          THE COURT:  Mr. Myers --

25          THE WITNESS:  -- in this case, Your Honor.



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1        THE COURT:  Mr. Myers, if you're going to read from

2   an exhibit, it must be a pleading from your bankruptcy case in

3   this court or the adversary proceeding that is being heard

4   today.

5        THE WITNESS:  It is.

6        THE COURT:  If it's anything else, then -- okay.

7   What are you reading from?

8        THE WITNESS:  It's attached to my motion to strike

9   the trustee settlement motion that was originally filed --

10       THE COURT:  Give me a docket number.

11       THE WITNESS:  I don't know what docket number that

12  was.  It was right before you entered the -- what you referred

13  to as the settlement procedures motion.

14       THE COURT:  All right.  Give me a moment.

15       THE WITNESS:  And I believe it was also attached to

16  my objection to their proof of claim filed in --

17       THE COURT:  Okay.  Hold on.  Just give me a moment.

18       THE WITNESS:  All right.

19       THE COURT:  Can you give me the date of the pleading?

20       THE WITNESS:  I don't have access to the ECF.

21       THE COURT:  Okay.  So it's the --

22       THE WITNESS:  So --

23       THE COURT:  It's the Middle District of Florida's

24  order that you're referring to?

25       THE WITNESS:  Correct.  So I filed -- they filed in



Appellees' Appendix 0464

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    the --

2         THE COURT:  Okay.  Just give me a moment, okay?  Just

3    give me a moment.

4         THE WITNESS:  Well --

5         THE COURT:  Look, I could just cut you off

6    completely, Mr. Myers, which is what I really should be doing.

7    But I'm trying to give you some leeway here.

8         THE WITNESS:  I was just trying to help you get to

9    the docket.

10        THE COURT:  Okay.  Well, just give me a moment here.

11   So you said it's an order by the Middle District of Florida.

12        THE WITNESS:  So if you find my motion to strike, the

13   original motion to strike their settlement agreement, it --

14        THE COURT:  Okay.  The order sustaining debtor's

15   objection to proof of claim 3, filed by Brian King and

16   Cristina King.

17        THE WITNESS:  Yes.

18        THE COURT:  This is Judge Delano's order from -- it

19   looks like June 29th, 2021.

20        THE WITNESS:  Yes, ma'am.

21        THE COURT:  It simply states that the objection is

22   sustained and the claim is disallowed.  But you didn't attach

23   your objection to claim.  So I don't know what the basis of

24   your objection to claim is.

25        THE WITNESS:  Okay.  So --



www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1       THE COURT:  Why don't you --

2       THE WITNESS:  -- are these --

3       THE COURT:  Why don't you tell me --

4       THE WITNESS:  -- in the record?

5       THE COURT:  Excuse me?

6       THE WITNESS:  Should we mark it?

7       MR. VERSTANDIG:  No.

8       THE WITNESS:  Let's go ahead and mark it.

9       THE COURT:  It -- I --

10      THE WITNESS:  Well, it's in the record.

11      THE COURT:  Okay.  It is attached to your objection

12   to claim 22-1 filed by Cristina King.  And it may be attached

13   to the others.  And so the Court will take judicial notice

14   that an order was issued, but it doesn't give me any

15   information about what the basis for the claim objection is.

16   And it doesn't attach the proof of claim that was filed.  So I

17   don't understand what the context of the claim is or what the

18   basis of the objection is.

19      But the Court will take judicial notice of the June

20   29th, 2021 order out of the Bankruptcy Court for the Middle

21   District of Florida, case number 21-00123, docket number 108.

22   It is a one-page order, and the Court has taken judicial

23   notice of it.

24      THE WITNESS:  Okay.  And so my testimony concerning

25   this order is that -- and I heard your comments just now, and

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    I heard Mr. VerStandig's comments yesterday, and that is that

2    an objection to a proof of claim, even in a dismissed Chapter

3    13 case, a final order.  And if the objection to proof of

4    claim is disallowed in its entirety, then whatever claims they

5    needed to bring is the res judicata effect.  Whatever claims

6    they had, they needed to bring at this time, they are now

7    foreclosed in this court, in any other court in the world,

8    based on this order sustaining my objection to the King's

9    proof of claim.  And that's the way the case law works.  I've

10   read it a million times.

11           So we'll put that aside.  So they can't come in here

12   now.  So in terms of the objection -- in terms of their proof

13   of claims filed in this case, they've already been resolved by

14   that order for all times.

15           On -- I'm sure this is in the -- in the record

16   attached to one of my pleadings as well.  This is a March 14,

17   2022 order, from Judge Delano, in my Florida bankruptcy case,

18   2:21-bk-00123.  This is docket 168.

19           THE COURT:  And where can I find this in --

20           THE WITNESS:  I'm sure it's --

21           THE COURT:  -- this docket?

22           THE WITNESS:  I would suspect it's attached to my

23   motion to strike.

24           THE COURT:  So your motion to strike in the --

25           THE WITNESS:  In the main case.



Appellees' Appendix 0467

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1      THE COURT:  -- main bankruptcy case that you filed.

2   Do you remember when you filed that?

3      THE WITNESS:  For some reason, I think that you

4   entered your order in October of '24, somewhere in there, I

5   think.

6      THE COURT:  Okay.  Give me one moment here.  I think

7   I found it.  I'm looking at debtor's motion to strike

8   trustee's -- motion to dismiss or strike trustee's motion for

9   approval of proposed compromise.

10      THE WITNESS:  Yeah.

11      THE COURT:  That is at docket number 1010, filed on

12   February 28th, 2023.  Let me take a look and see what is

13   attached to that.  It's seventeen pages long, so give me a

14   moment.

15      Okay.  There are no attachments to that.  So where

16   else would I find it?

17      THE WITNESS:  Well, are the attachments docketed

18   separately?

19      THE COURT:  I'm sorry?

20      THE WITNESS:  Are the attachments docketed

21   separately?

22      THE COURT:  Let me look.

23      No.  So you have the motion.  There was a deficiency

24   notice.  There was an opposition by the trustee.  There was a

25   line submitting a proposed order, filed by you, to address the

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   deficiency.  And so the deficiency was satisfied.  Then your

2   reply to the trustee's opposition, which was four pages long.

3   And then the court's order.  Those are the only pleadings in

4   your motion to strike.  So no attachments.

5        If you'll give me a moment, I'll look at your claim

6   objections and see if maybe you included it there.

7        And it was not attached to the claim objections.

8   Actually, give me one moment.  It looks like your exhibits are

9   different on one of these.  Let me look at these real quick.

10       THE WITNESS:  Yeah, I recall something with the clerk

11  where they got screwed up, and then they were redocketed.

12       THE COURT:  Okay.  I don't see them as attachments to

13  the claim objections or the motion to strike.

14       THE WITNESS:  Can I ask the Court to take judicial

15  notice?

16       THE COURT:  Take judicial notice of a document that I

17  don't have and I haven't seen?  No.

18       THE WITNESS:  I can hand it to you.  It's an order

19  from Judge Delano.

20       THE COURT:  Hand it up.  I'm going to allow it.

21       MR. SCHLOSSBERG:  Your Honor?

22       THE COURT:  I know --

23       MR. SCHLOSSBERG:  The Court's patience --

24       THE COURT:  -- Mr. Schlossberg.

25       MR. SCHLOSSBERG:  The Court's patience is



Appellees' Appendix 0469

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    extraordinary, Your Honor.

2         THE COURT:  I'm trying really hard to be patient and

3    trying to give him some leeway here.

4         MR. SCHLOSSBERG:  Please note my objection.

5         THE COURT:  Because if there's going to be an appeal

6    by one party or the other, I want it to be on the merits, not

7    on procedural issues.

8         MR. SCHLOSSBERG:  Understood completely, Your Honor.

9    Please note my objection.

10        THE COURT:  Your objection is noted, Mr. Schlossberg.

11        MR. SCHLOSSBERG:  I believe also Mr. VerStandig's.

12        THE COURT:  And so Mr. Myers, if you would hand that

13   up to Ms. Whitfield, I will take a look at it.  I will also

14   have copies made for the other parties in the courtroom.  This

15   is the March 14th, 2022 order.

16        THE WITNESS:  Let me figure out what I just did with

17   it.

18        THE COURT:  We will mark that Debtor's Number 8.

19   Debtor's Number 7 is the June 29th, 2021 order.  So this is

20   Debtor's Number 8.

21   (March 14, 2022 Judge Delano order in bankruptcy case, 2:21-

22   bk-00123 was hereby marked for identification as Debtors'

23   Exhibit 8, as of this date.)

24        THE CLERK:  June 29th, what year was that, the June

25   29th order?  What year was the June 29th order?



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1        THE COURT:  June 29th, 2021.  That's Debtor's Exhibit

2   Number 7.  And so just give us one moment here.

3        Hold on one second.

4   (Pause)

5        THE COURT:  All right.  Mr. Myers, we are making

6   copies of Debtor's Number 7 and Debtor's Number 8, and we will

7   have that momentarily.  But please continue with your

8   testimony.

9        THE WITNESS:  Should I refer to that or no?  Use

10  something different?

11       THE COURT:  It may be more helpful --

12       THE WITNESS:  Not refer to that until you hand it

13  out.

14       THE COURT:  -- for you to wait to refer to it until

15  you have it in front of you and everyone else has it in front

16  of them.

17       THE WITNESS:  Okay.

18       THE COURT:  Yes, Mr. VerStandig?

19       MR. VERSTANDIG:  Your Honor, if we are waiting for a

20  copy to be made, and I understand time is precious, if we

21  could steal a two-minute recess -- and I'm not exaggerating --

22  it would be appreciated.  But it is not overly urgent.

23       MR. SCHLOSSBERG:  I join in that particular request,

24  Your Honor.

25       THE COURT:  Okay.



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1          MR. SCHLOSSBERG:  And I'm the oldest one here.

2          THE COURT:  Mr. Myers, I want you to remember where

3    you are with your testimony.  What are you looking at right

4    now, sir?

5          THE WITNESS:  The debtor's exhibits.

6          THE COURT:  Okay.  All right.  I'm going to ask you

7    to --

8          THE WITNESS:  I'm not going anywhere.

9          THE COURT:  -- return to your seat during the recess.

10   Leave everything at the witness stand.

11         THE WITNESS:  I can't sit here?

12         THE COURT:  Excuse me?

13         THE WITNESS:  I can't sit here?

14         THE COURT:  I would like you to return to your seat

15   and leave everything on the witness stand.  We're going to

16   take a two-minute bathroom break.

17         THE WITNESS:  Okay.

18         THE CLERK:  All rise.  Court is now in recess.

19      (Whereupon a recess was taken)

20         THE CLERK:  All rise.  United States Bankruptcy Court

21   for the District of Maryland now resumes its regular session,

22   the Honorable Maria Ellena Chavez-Ruark presiding.

23         Please be seated.

24         THE COURT:  All right.  Mr. Myers, if you'll come

25   back to the witness stand, please.



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1        We have now marked the two orders that you referenced

2    as Debtor's Exhibits 7 and 8.

3    (Order was hereby marked for identification as Debtor's

4    Exhibit 7, as of this date.)

5    (Order was hereby marked for identification as Debtor's

6    Exhibit 8, as of this date.)

7        MR. VERSTANDIG:  Your Honor, we have a bit of a

8    procedural problem.  Debtor's Exhibit 7 is Exhibits E and F to

9    docket entry 1051.  Exhibit F is the privileged email chain.

10       THE COURT:  That was our mistake.  It should be --

11       MR. VERSTANDIG:  Okay.

12       THE COURT:  It should be -- Exhibit E is just two

13   pages.

14       MR. VERSTANDIG:  Okay.  So Exhibit F is not part of

15   what is coming into --

16       THE COURT:  Exhibit F is -- no, it's just two pages.

17   It's the Exhibit E cover page and the one-page order.

18       MR. VERSTANDIG:  Thank you, Your Honor.

19       THE COURT:  So Ms. Whitfield, can we make that

20   correction?  As a matter of fact, let's just make this easy,

21   and let's just make it the one page, Ms. Whitfield, just the

22   one-page order.

23       Thank you for pointing that out, Mr. VerStandig.

24       MR. VERSTANDIG:  Thank you, Your Honor.  I'm sorry.

25   Thank you, Your Honor.  I was sitting.



Appellees' Appendix 0473

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1          THE COURT:  So Debtor No. 7 is a one-page order from

2   Judge Delano from the Middle District of Florida.  It is the

3   order that she signed dated June 29th, 2021.  All right.  So

4   the Court will take judicial notice of Debtor's No. 7 and

5   Debtors No. 8.

6          (Counsel confer)

7          THE COURT:  Mr. Myers, you may proceed.  I'm waiting.

8          THE WITNESS:  Oh, all right.  Okay.  So Exhibit 7 was

9   the order -- Debtor's Exhibit 7 was the order sustaining

10  Debtor's objection to the proof of claim filed by Brian King,

11  the King parties, in my Florida bankruptcy case.  And it was

12  disallowed in its entirety, and that was on June 29, 2021, so

13  they have no claim after that.

14          On March 14, 2022, after the Florida bankruptcy court

15  denied their motion to dismiss my case, and after sustaining

16  my objection to their proof of claim -- and they had filed a

17  motion for relief from the automatic stay.  And Debtor's

18  Exhibit No. 8 is the order granting Brian King, Cristina King,

19  and the Cristina and Brian King Children's Trust amended

20  motion for relief from the automatic stay, which was -- in the

21  title, it says doc 145.

22          And so on March 14, 2022, Judge Delano entered an

23  order, which is doc 168 in case 2:21-bk-00123.  And it says,

24  "The Court, having reviewed the motion", blah, blah.

25  "Accordingly, it is ordered the motion is granted in part and



1    denied in part".  It says, "The" -- 2, paragraph 2, "The

2    automatic stay is modified to allow the lawsuit filed in

3    Montgomery County Circuit Court captioned King, et al. v. Serv

4    Trust, et al., case 436977V, to proceed subject to the terms

5    of this order, the automatic stay is lifted as to all

6    nondebtor parties, including Gregory B. Myers in his

7    representative capacity as trustee of Serv Trust, the

8    automatic stay shall remain in effect and is not lifted as to

9    any claims against Gregory Brian Myers" -- in parentheses,

10   "defined as the debtor individually" -- "all other relief

11   requested in the motion is denied".

12          So I resigned as trustee -- I can't remember the

13   exact date, but it was after this order was entered, so I was

14   no longer trustee of Serv Trust.  So this order, which the

15   parties had.  The trustee, Mastro, VerStandig, the court, they

16   all had this order, and this order says the automatic stay

17   shall remain in effect and is not lifted as to any claims

18   against Gregory Brian Myers individually.

19          THE COURT:  And so what action --

20          THE WITNESS:  All four of the claims --

21          THE COURT:  What action are you claiming has violated

22   the automatic stay, the filing of the proofs of claim in this

23   case?

24          THE WITNESS:  All four of the claims, the -- the

25   entire proceeding in Montgomery County Circuit Court, I'm a

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   defendant in all four of those claims.  And --

2          THE COURT:  You're talking about the proofs of claim

3   filed by the King parties in your bankruptcy case in this

4   court?

5          THE WITNESS:  No, I'm talking about the fact that

6   they went forward in Montgomery County Circuit Court.  The

7   entire basis of their settlement motion is a nonfinal order

8   that is completely unenforceable and nonexecutable and cannot

9   be relied upon anybody until there's a final adjudication, for

10  any purpose.  And that order was entered in a proceeding that

11  was stayed by Judge Delano.  This order was discussed in the

12  Montgomery County Circuit Court.  There could be no trial on

13  January 3 because I was a defendant in all -- I was a

14  defendant in the alter-ego claim, and therefore it couldn't go

15  forward.  I was an individual defendant in the alter-ego

16  claim.

17          On top of that, that is why, on December 16th of

18  2022, two weeks -- at the pre-trial hearing, Judge Lease

19  specifically said, no claims against you can go forward.

20  However, they got to January 3, and Mr. VerStandig and Mr.

21  Mastro went ahead with claims against me.  And if you read the

22  transcript of the January 3 hearing, it's all about me.  And

23  Judge Lease even said, this is going to impose liability on

24  Mr. Myers.  Nothing that happened on January 3 in that

25  court -- and there's many reasons; this is one of them --

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    is -- it's void, anything that came out of that.  So

2    anything -- the only basis for them to be in this court trying

3    to do a settlement motion is because Mr. Schlossberg thinks

4    that Serv Trust property is property of this estate, and

5    it's -- and we'll get to that in argument.  Anyway, that's the

6    point of this one.

7            On -- we discussed yesterday that the case was

8    removed to the Montgomery County litigation, state court case,

9    consolidated cases.  And let me point out another thing about

10   this order to you, Judge.  These were consolidated actions in

11   Montgomery County.  This order only permits case 436977V to

12   proceed.  This case doesn't -- this doesn't -- this case

13   doesn't allow the Goldsboro case to proceed.  So because they

14   were consolidated for all purposes, there's no way either case

15   could proceed unless they were bifurcated.  And as I said to

16   Judge Lease, they would have had to file a separate amended

17   complaint to go forward without me in it, which they didn't

18   do.

19           So on December 30, I filed a notice of removal

20   because I -- this is just my testimony -- because I knew these

21   guys were underhanded and they were going to try and pull a

22   stunt, even though this order that says they couldn't do

23   anything against me -- it was clear to me that they were going

24   to try and go forward and -- because that's just the way they

25   are.

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1          THE COURT:  Mr. Myers, that's not helpful to your

2    case, to make sniping comments like that,

3          THE WITNESS:  He -- he --

4          THE COURT:  So just testify about the facts of this

5    case.

6          THE WITNESS:  Mr. Schlossberg ripped me apart

7    yesterday, and my character.  So you know what?  They don't

8    have any character.  I will refrain from saying what I really

9    want to say they are, but they're unethical.  So -- and they

10   were aware of this order, and they violated the stay.

11   Interestingly, Mr. Mastro took the position that the Barton --

12   that the Barton Doctrine doesn't apply, so that's going to be

13   an interesting thing.

14         So in any event, knowing how underhanded they are, on

15   December 30th, 202022 [sic] -- December 30, 2022 -- I filed a

16   notice of removal of the state court action to the United

17   States District Court for the Middle District of Florida.  And

18   then Mr. VerStandig filed a -- he went and filed a motion to

19   remand.  And then on -- and then I guess it was on January 3,

20   early in the morning on January 3.  I guess Tuesday was a --

21   Monday was a holiday.

22         Anyway, Judge Delano -- this was discussed

23   yesterday -- she entered an order granting emergency motion

24   for remand.  So that was on -- so when -- when I removed, it

25   established an adversary in Florida.  Adversary proceeding was

escribers

www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    2:22-ap-0048-FMD.  That was for the King case.  There was a

2    separate adversary for the Goldsboro case.  That was 2:22-ap-

3    0049.  So on January 3, Judge Delano entered an order granting

4    emergency motion for remand.  However, there is nothing in the

5    record.  Judge Delano never mailed, physically mailed, a

6    certified copy of her order back to the Montgomery County

7    Circuit Court.  And you can take judicial notice of the

8    bankruptcy court records, or you can take judicial notice of

9    the Montgomery County Circuit Court records, and you will

10   find --

11        THE COURT:  I don't have the Montgomery County

12   Circuit Court records, so I can't take judicial notice of

13   something I don't have.

14        THE WITNESS:  Okay.  Well, it was never mailed back,

15   physically mailed back, a certified copy of the remand order,

16   which is required by Fourth Circuit case law, which I'll get

17   to.  All right.

18        And then just to show you that jurisdiction never

19   left the Florida court, I filed a notice of appeal at 9:17

20   a.m. of her order, under recent Fourth Circuit precedent, that

21   automatically stayed any actions by Judge Delano until that

22   appeal was resolved, which wasn't resolved until months later.

23   And under the Fourth Circuit case law -- which, I'm happy to

24   give you a copy of the case.  I made a copy for you.  May I

25   hand this up, please, to you?

escribers

www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1          THE COURT:  What is that?

2          THE WITNESS:  Fourth Circuit published decision,

3     recently entered, (indiscernible) --

4          THE COURT:  Okay.  Why don't you do that as part of

5     your argument?  You're not arguing law now.  You're testifying

6     as to facts.

7          THE WITNESS:  Okay.  So once I filed the appeal at

8     9:17 a.m. on January 3, there could be no order of remand.

9     Judge Delano's hands were tied.  That's the published

10    decision.  And until everything was resolved, it would only be

11    then that she could return jurisdiction to the Montgomery

12    County Circuit Court.  That means, which I'll -- you'll see in

13    the appeal very clear, that everything that happened in the

14    Montgomery County Circuit Court after 9:17 a.m. on January 3

15    is void, period.

16         So another thing is that I also filed a motion for --

17    I want to also note, in her order granting emergency motion

18    for remand, she reserved jurisdiction to supplement this

19    order, so she still had jurisdiction.  Jurisdiction never

20    returned to Montgomery County Circuit Court.  And then she had

21    jurisdiction.  I filed a motion for rehearing in that

22    adversary, which Judge Delano did not resolve until January 31

23    of 2023, when -- and Mr. VerStandig filed a opposition to my

24    motion for rehearing in the middle of January somewhere.  And

25    Judge Delano entered an order denying debtor's motion to

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    reconsider, alter, amend order granting emergency motion to

2    remand.

3            And it was only at this point -- which, according to

4    the Fourth Circuit decision, she couldn't -- she shouldn't

5    have even done this.  But it was only at this point that she

6    says, on January 31, 2023, since she had reserved jurisdiction

7    in the January 3 order, and the court exercises its discretion

8    to relinquish jurisdiction of the removed case to the state

9    court.  So she had jurisdiction all the way up until she

10   entered this order on 1/31/23.  And of course, she had

11   jurisdiction because Mr. VerStandig was filing pleadings in

12   the case down there in the middle of January.  And then we'll

13   get to the -- and it was on appeal in the United States

14   District Court for the Middle District of Florida.  And then,

15   like I said, we'll get to this case, which this court is bound

16   by.

17           I would note that -- that Mr. -- that the King

18   parties, through Mr. VerStandig, filed a motion in the state

19   court -- the Montgomery County litigation specifically taking

20   the position that the automatic stay and the debtor's Florida

21   bankruptcy court -- debtor's Florida bankruptcy case, quote --

22           MR. VERSTANDIG:  Your Honor, same objection.  He's

23   referencing a document that's not on the docket here, that's

24   not on exhibit list because there was no exhibit list.  I

25   don't dispute that it exists.  I'm not saying it would be

Appellees' Appendix 0481

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   hearsay.  Apparently, it's a statement by my clients.  I'm

2   disputing that because we weren't given notice to prepare,

3   this is essentially trial by ambush.

4              THE COURT:  What are you reading from, Mr. Myers?

5              THE WITNESS:  I'm reading from an excerpt from a

6   motion that Mr. VerStandig filed in the state action.

7              THE COURT:  You cannot read from that.  Set it aside.

8   You can testify from your recollection.  Mr. Myers, set it

9   aside now.  You can testify based on your recollection.  You

10  cannot read from it.  Mr. Myers, set it aside.

11             THE WITNESS:  I'm trying to put it aside, Your Honor.

12             MR. VERSTANDIG:  Thank you, Your Honor.

13             THE WITNESS:  Mr. VerStandig filed a motion in the

14  Montgomery County -- in the state court litigation where he

15  referenced the automatic stay and acknowledged -- this was

16  after he added me as a defendant in the alter-ego claim.  And

17  he said that the case could not go forward against Serv Trust

18  without me based on the Robbins (ph.) and Queenie (ph.) line

19  of cases, which you're familiar with, and the Fourth Circuit

20  line of cases, because we would be basically joined at the

21  hip.  And because of Judge Delano's order, because no case --

22  no claim could go forward against me, then no claim could go

23  forward against Serv Trust.  And that was Mr. VerStandig's --

24  that was the King parties' statement on the record to the

25  Montgomery County Circuit Court.  And they're now judicially

Appellees' Appendix 0482

1    estopped from taking a different position.  They'll take any

2    position that serves them at the time.

3          So -- so based on Judge Delano's order staying all

4    claims against me, no claims against -- where I'm -- where I'm

5    individually involved as a defendant could go forward.  Based

6    on the -- Mr. VerStandig's own judicial admissions or the King

7    parties' own judicial admissions, those claims could not go

8    forward.  And in fact, in his memorandum, he said if they did,

9    any decision would be void.

10          So this is -- I'm looking at doc 22 filed in this

11    adversary proceeding, filed February 4 of '25, which is my

12    supplement to my preliminary objection to this bogus motion

13    for approval of proposed compromise and settlement with the

14    King plaintiffs.  And I attached as Exhibit H -- which was

15    admitted, or you took judicial notice of yesterday, but it's

16    in the record -- the December 16, 2022 hearing transcript in

17    the state court action, which is the consolidated King case

18    and Goldsboro case.  And -- and this was what Judge Lease said

19    on December 16th.  He was aware of the -- he had in his

20    possession the -- Judge Delano's order staying any claims

21    against me.  He said, "The matters against you are stayed in

22    this case".  And then he said -- I said, "If the King parties

23    prevail in either of their two counts, I have potential

24    liability".  Court, "Well" --

25          THE COURT:  So Mr. Myers, so the document, the



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   transcript, is in evidence, which means I have read it.  I

2   read it last night.  I'll read it again.  You may want to

3   spend your time testifying about facts instead of reading from

4   documents that are in evidence, because you're just taking up

5   valuable time.

6        THE WITNESS:  I'm not going to be that much longer,

7   so I'd like -- I'd like to --

8        THE COURT:  Okay.  All right.  Then, do what you

9   wish.

10       THE WITNESS:  I'd like to make sure everybody hears

11  this.

12       Judge Lease said, "If the King" -- Mr. Myers, "If

13  King parties prevail in either of their two counts, I have

14  potential liability, individual liability".  The court, "Well,

15  they would have to then prove those counts against you in a

16  separate trial, and the matter would not be -- there would not

17  be any collateral estoppel or res judicata because you did not

18  participate in the case as a party, you were stayed and out of

19  the case, there would not be a ruling" -- this is Judge Lease.

20  "There would not be a ruling that would impose liability on

21  you, these plaintiffs would have to -- if they wanted to

22  proceed against you, would be required to try that matter

23  again separately, and there would not be any res judicata or

24  collateral estoppel issues because you were not a party to

25  that case at that time, because, well, you were stayed, so you

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   were not considered a party".  The court, "And again, the

2   matters" -- referring to Judge Delano's order, "And again, the

3   matters against you in this case have been stayed", very clear

4   with the parties here, apparently not with some.

5           The court -- I said -- let's see.  He goes on to say,

6   "Because to the extent that they want to come back

7   subsequently and seek these claims against you, they're going

8   to be required to retry that case against you without the

9   benefit of anything that occurred in the case against Serv

10  Trust".  "But if these claims survive the bankruptcy and come

11  into court, then they'll have to try them all over again

12  against me".  "You're not a live party in this case right now

13  because the upcoming trial does not involve you".

14          And then Judge Lease discussed the case of -- he

15  called it Frow.  It's Frow v. De La Vega, 82 U.S.C. 15 Wall.,

16  1872.  And he said it applies in Maryland.  And essentially,

17  having a trial against Serv Trust with me not being there, and

18  based on these Robbins and Queenie line of cases, and based on

19  the Fourth Circuit case -- and I can't recall the name of it

20  right now.  It escapes me.  Could be Celotex; I don't know.

21  It says, "And such an incongruity, it seems, did actually

22  occur in this case", where --

23          THE COURT:  And where are you reading from?

24          THE WITNESS:  This is on page 4 of 7.

25          THE COURT:  Okay.



Appellees' Appendix 0485

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1          THE WITNESS:  "If the court, in such a case as this,

2     can lawfully make a final decree against one defendant

3     separately on the merits while the cause was proceeding

4     undetermined against the others" -- that would be me.

5          THE COURT:  What document are you reading from?

6          THE WITNESS:  This is document 22 in this case, page

7     4 of 7.

8          THE COURT:  Okay.  Just give me a moment so I can get

9     there.  So this is your supplement to your objection?

10          THE WITNESS:  Yes, ma'am.

11          THE COURT:  Okay.  Give me a moment.  Let me get

12     there.  Okay.  You may proceed.

13          THE WITNESS:  So this is Frow, the case that Judge

14     Lease mentioned many times in -- in the January 3 hearing.  He

15     told them right up front that they couldn't do anything with

16     anything he did that day.  I have that transcript here.

17          At any rate, Frow says, "If the court in such a case

18     as this can lawfully make a final decree against one defendant

19     separately on the merits while the cause was proceeding

20     undetermined against the others, then this absurdity might

21     follow:  there might be one decree of the court sustaining the

22     charge of joint fraud committed by the defendants, and another

23     decree disaffirming the said charge and declaring it to be

24     entirely unfounded and dismissing the complainant's bill.  And

25     such an incongruity, it seems, did actually occur in this

escribers

www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   case."  And it did in my case, in that Maryland case.  And it

2   says, "Such a state of things is unseemly and absurd as well

3   as unauthorized by law."  That's exactly what happened on

4   January 3.

5          And it says, "It has long been established that

6   courts", quote, "can make no decree affecting the rights of an

7   absent person and can make no decree between the parties

8   before it which so far involves or depends upon the rights of

9   an absent person that complete and final justice cannot be

10  done between the parties to the suit without affecting those

11  rights".  And that's Greeley v. Lowe, 1894.

12         And then Republic of Philippines, [Pi'-men-tel], [Pi-

13  men'-tel], U.S. Supreme Court, 2008, "Recognizing that the" --

14  this is the U.S. Supreme Court.  "Recognizing that the

15  nonjoined parties would not be bound by the judgment in an

16  action where they were not parties".  I was not a party to

17  that action.  I -- there can be no alter-ego decision against

18  me.  Judge Lease made that clear.  He goes, they're going to

19  have to come back and retry the whole case, and he even told

20  them it was a waste of time.  But they insisted on going

21  forward because, in my opinion, Mr. Schlossberg was going to

22  take any piece of paper that got him anywhere close to saying

23  that Serv Trust was property of this estate to come in here

24  and do -- try and do exactly what he's doing.  Okay.

25         And further, and -- I'll do this more in -- I'll do

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    this in closing argument.

2         So this is the transcript that I did not type up

3    myself, was done by eScribers.  It's a transcript.  I paid for

4    it.  It's ordered it from the Montgomery County Circuit Court.

5         THE COURT:  And you cannot refer to it, so set it

6    aside.

7         THE WITNESS:  Why not?

8         THE COURT:  Because you didn't pre-file it as an

9    exhibit, even though I gave you numerous opportunities to do

10   that.  You didn't follow the Court's protocol.  It's been on

11   the Court's website for ages.  It was sent to you two months

12   ago.  It was sent to you again two weeks ago.  You didn't

13   comply with it.  Then, as a courtesy to you, giving you yet

14   another opportunity, I gave you until 9 o'clock last night to

15   pre-file any exhibits.  You didn't do it.  And as I've told

16   you numerous times, if it's something that's on the docket in

17   your bankruptcy case or this adversary proceeding, I will

18   consider it.  But that is a transcript from the Montgomery

19   County proceeding that is at least an inch thick.  I don't

20   recall seeing that on the docket.  You can correct me if I'm

21   wrong.

22        THE WITNESS:  I did not file this in the case, but I

23   will.

24        THE COURT:  Okay.  Well, it's not on the docket now,

25   and I'm not going to consider it for purposes of this



Appellees' Appendix 0488

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    application --

2            THE WITNESS:  But I can't read from it?

3            THE COURT:  -- the claim objections.  And you cannot

4    read from it.

5            THE WITNESS:  That's the rule --

6            THE COURT:  You can testify from the best of your

7    recollection of what may have happened, and I will allow that,

8    which, frankly, I shouldn't be doing, either, because the best

9    evidence, as you said, is the transcript.  But I'm trying to

10   give you some leeway here, Mr. Myers.

11           THE WITNESS:  Okay.

12           THE COURT:  So maybe instead of arguing with me about

13   it, you should take advantage of the benefit I'm trying to

14   give you.  I'm giving you way more than I would give --

15           THE WITNESS:  I just put it down.

16           THE COURT:  -- normally in any situation.  I'm trying

17   to give you a break here.

18           THE WITNESS:  Okay.  So at the trial on January 3,

19   they completely ignored Judge Delano's order.  I wasn't a

20   party.  I wasn't present.  And Judge Lease specifically said,

21   there will be no adjudication today, anything I do today, you

22   can't do anything with.  That's what he told the parties in

23   that trial, there's nothing I do today that you can do

24   anything with because it would be a nonfinal judgment.  And a

25   nonfinal judgment is -- until there's a final judgment, it

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    might as well be a proceeding memo, can't execute on it,

2    can't -- can't -- can't depend on it in another court to

3    determine rights.  It's a nonfinal judgment.

4         Judge Lease was also concerned, based on what I just

5    told you, that they were going forward with the alter-ego

6    claim in light of Judge Delano's order and in light of the

7    Frow doctrine, which he had referenced to them many times.

8    And he said, I'm concerned that you're trying to establish an

9    alter ego with Mr. Myers, he's not here, and that would

10   establish liability against him.  And of course, Mr.

11   VerStandig did his dance and tried to get out of it, and you

12   know, his Kafkaesque stuff he does, and -- but here -- here's

13   the important part.

14        (Counsel confer)

15        THE WITNESS:  Yeah, Mr. VerStandig uses that word all

16   the time.

17        Here's the important part.  The Serv Trust document

18   was never placed into evidence in the Montgomery County

19   Circuit Court, intentionally.  And Judge Lease specifically

20   asked, is that a revocable trust.  And Mr. VerStandig

21   represented to the court, counterfactually, that it is.  It is

22   an irrevocable spendthrift trust.  Mr. VerStandig lied to the

23   court.

24        Mr. Mastro, when the court said he's concerned about

25   going forward, misconstrued Judge Delano's order and said, oh,

escribers

Appellees' Appendix 0490

www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   well, that -- that only applies if Mr. Myers is a trustee,

2   which is complete garbage.  You can read the order.  It's

3   clear as day.  So Mr. Mastro intentionally misled the Court.

4   Anyway, I'll file the transcript.

5         Your Honor, yesterday we discussed Mr. VerStandig's

6   conflict of interest and Offit Kurman's conflict of interest.

7   And because in -- which, I did file Judge Dwyer's hearing

8   transcript, where Mr. VerStandig states in that transcript

9   that the trustee asked us to pursue this claim.  And that's

10  relevant because Mr. VerStandig was my client --

11        MR. SCHLOSSBERG:  Your Honor, I just heard that this

12  was filed.  Where was it filed?  I'm trying to keep track of

13  those things.

14        THE COURT:  Where was it filed, Mr. Myers?

15        THE WITNESS:  Filed last week, in this case.

16        THE COURT:  Where?  Where was it --

17        THE WITNESS:  This case.  Judge Dwyer's transcript

18  was a copy -- an exhibit.

19        THE COURT:  And where does that appear?

20        THE WITNESS:  It's --

21        THE COURT:  It was filed in the main bankruptcy case

22  or the adversary?

23        THE WITNESS:  No, in the adversary.

24        THE COURT:  Okay.  Where is it?

25        THE WITNESS:  It was very recent.  We had this



Appellees' Appendix 0491

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   hearing on Monday, so it might have been -- you said you saw

2   it docketed on Friday or Thursday.

3        THE COURT:  What are you talking about, the motion to

4   dismiss or the motion to intervene?

5        THE WITNESS:  Motion to dismiss, probably.  Is there

6   an attachment, Judge Dwyer's hearing transcript?

7        THE COURT:  Okay.  Give me a moment here.  All right.

8   He filed a motion to dismiss this adversary proceeding on

9   Friday, June 27th at 5:20 p.m.  And Exhibit B, which of

10  course, the Court has not reviewed, looked at, or considered,

11  is a transcript of a motions hearing from September 23rd,

12  2019.  Is that what you're referring to?

13       THE WITNESS:  In the state court action.

14       THE COURT:  In the Montgomery County action.

15       THE WITNESS:  When -- and -- and with Judge Dwyer.

16       THE COURT:  Okay.  All right.  Continue.

17       THE WITNESS:  Yes, that's what I'm referring to.

18       MR. SCHLOSSBERG:  Is that attached, Your Honor?

19       THE COURT:  It's attached as Exhibit B to Docket No.

20  45, filed on Friday evening.

21       MR. SCHLOSSBERG:  Court's indulgence just a moment,

22  Your Honor.

23       (Counsel confer)

24       MR. SCHLOSSBERG:  Your Honor, I don't want -- I don't

25  want to confuse the situation.  I'll reserve that because in

Appellees' Appendix 0492

www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    any event, I object.  I renew the objection I've been making

2    throughout.  I object to it.  It was not on the exhibit list,

3    which doesn't exist.  It was not provided to us.  And he's now

4    in court without copies for the parties, and we're supposed to

5    meaningfully consider this.  Respectfully, Your Honor, it's

6    not fair to the parties.

7         THE COURT:  Understood, Mr. Schlossberg, and I will

8    tell you that I am going to take a break to hear two hearings

9    this afternoon.  And the parties will come back for closing

10   argument after that, so I will give you an opportunity to

11   review it, so we will --

12        MR. SCHLOSSBERG:  I'm sorry, Your Honor.  We all

13   thought that we were hard stop at 1:30.

14        THE COURT:  His case ends at 1 o'clock, is what I

15   said.  He has until 1 o'clock to put on his case.

16        MR. SCHLOSSBERG:  Oh, so you had a docket after that.

17   I'm sorry.  I assumed that -- I know my cocounsel assumed that

18   we were done then.  Frankly, I made other -- I'll cancel my

19   plans.  No problem.  This is important.

20        THE COURT:  Let's talk about it after the witness is

21   off the stand.  Okay?

22        MR. SCHLOSSBERG:  All right.  All right.

23        THE COURT:  I'll work with the parties on timing.

24        MR. SCHLOSSBERG:  All right.  Thank you.

25        THE COURT:  All right.  And I'm going to -- we will



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    make five copies of -- it's Docket No. 45-2.  And we will mark

2    that as Debtor No. 9.

3    (Transcript was hereby marked for identification as Debtor's

4    Exhibit 9, as of this date.)

5          THE COURT:  So we will have those copies momentarily

6    for everyone.

7          Mr. Myers, please continue.  So the Court will take

8    judicial notice of the transcript from September 23rd, 2019.

9    All right.  Please continue, Mr. Myers.  You have about thirty

10   minutes left.  You said you were wrapping up.

11         THE WITNESS:  So Judge Lipp, the U.S. Trustee, Mr.

12   VerStandig -- he was at my 2004 examination of my main case --

13   they all had the Serv Trust document.  Serv Trust document was

14   established in 2010 by my mother, who's now deceased.  She was

15   the settlor.  I was not a settlor.  I am not a beneficiary.  I

16   am simply a cotrustee.  And Serv Trust -- not by me, but by

17   Daniel J. Ring, my mother's CPA, the other cotrustee.  Daniel

18   J. Ring, in 2012, I believe it was, filed articles of

19   incorporation up in the State of Maryland and established 6789

20   Goldsboro LLC.  I didn't.  And 6789 Goldsboro LLC was owned

21   one hundred percent by Serv Trust, not me.

22         6789 Goldsboro LLC then entered into a -- through a

23   term sheet, through a mountain of paper where the King parties

24   had counsel.  Serv Trust was represented by Pillsbury (ph.).

25   There were term sheets.  There were operating agreement

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    drafts.  Okay.  There was -- there is zero debate that I have

2    no interest in Serv Trust.  Any suggestion by Mr. VerStandig

3    and his clients is bogus because the first time anybody ever

4    mentioned that Serv Trust was my property was two months after

5    Judge Albright told Mr. VerStandig that that memorandum of

6    understanding was an enforceable contract and that his client

7    was going in front of a jury for fraud.

8         Mr. VerStandig scrambled, looked for a way out the

9    back door, Montgomery County Circuit Court.  And then he

10   colluded with Roger Schlossberg to come up with this bogus

11   alter-ego thing, and there is no connection to me.  This --

12   none of the cases -- you can read a million of them.  They all

13   involve people who own property and put it into their own

14   self-settled trust, anything like that.  I've never put any

15   property into Serv Trust.  I have never had any ownership in

16   6789 Goldsboro LLC, and the King parties have admitted this

17   over and over.  And that's why I said yesterday, when Mr.

18   Schlossberg is reading one document, there are numerous

19   documents associated with 6789 Goldsboro LLC that confirm,

20   confirm, affirm that all of what I just said is true, that I

21   have no interest in it.

22        It's -- so -- so what happened on January 3 in the

23   Montgomery County Circuit Court is irrelevant.  It's not over.

24   There -- I'm going -- there's going to be more proceedings.

25   And I will -- in my opinion, the circuit court didn't have

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    jurisdiction because of Judge Delano's order, because it was

2    removed and never remanded.  And therefore, even if --

3    notwithstanding those two things, Judge Lease made clear, you

4    all, meaning the King parties and Goldsboro, need to come back

5    to my court because nothing I do today -- you can't use

6    anything I do today, there is no adjudication.

7        And as I mentioned yesterday in cross-examination,

8    I -- I told the Court that Mr. VerStandig filed in the

9    Maryland Court of Appeals, and he confirmed exactly that.

10   Those were his words, and the trustee joined in it, that there

11   is no adjudication of any claim against any party in the

12   Montgomery Circuit Court proceeding.

13       So where does that bring us?  That brings us to a

14   trustee that has come into this court, filed a 9019 settlement

15   motion with the King parties.  And he's -- and he's trying to

16   obtain money payment from the King parties, and he in -- in

17   turn is fraudulently conveying to them property that this

18   bankruptcy estate does not own.  There has never, ever been an

19   adversary filed by Mr. Schlossberg against Serv Trust, which

20   would have to happen under 547.  He was time-barred from doing

21   so.  He then asked VerStandig and the King parties to

22   prosecute it.

23       And to the extent there is a conflict of interest

24   because VerStandig represented me -- and by the way, you were

25   going to rule on it today.  I -- I have the -- there's two

escribers
www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   motions for disqualification.  One was filed by my attorney in

2   the Florida case when Mr. VerStandig came down.  And I would

3   note for the Court, as soon as she filed it, he hightailed it

4   out of there.  He withdrew his appearance, so.

5       THE COURT:  And so what is it I'm ruling on today,

6   other than the --

7       THE WITNESS:  I'm asking -- I would like to have in

8   the record the motions for disqualification because I have

9   counsel here that are my former counsel, that are counsel to

10  6789.  There's legal bills in here.  There are -- it's

11  absolutely incontrovertible that Mr. VerStandig represented

12  6789 Goldsboro LLC, Serv Trust, me, and Offit Kurman did, as

13  well.  And because Mr. Schlossberg asked Mr. VerStandig to

14  bring that claim on behalf of the trustee, in the trustee's

15  stead, because he was time-barred, my contention is the

16  trustee is now disqualified, fruit of the poisonous tree.

17      So I would like to have in the record the records

18  because Mr. VerStandig stood up here yesterday, Judge, and he

19  lied to you.  He said he's never represented Serv Trust.  His

20  name is all over numerous invoices in 2013 discussing the 6789

21  Goldsboro development, discussing King.  Timothy Lynch, who

22  was my original attorney, who's the president of Offit Kurman,

23  is the ringleader of this whole thing.  He's Brian King's

24  personal attorney.  He introduced me to Brian King, and he

25  specifically put in writing that he could not, his firm could

escribers

Appellees' Appendix 0497

www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    not, represent any parties if there was ever a disagreement.

2    Well, that went by the wayside when I got sideways with Offit

3    Kurman, but I've never waived my privilege.  Serv Trust has

4    never waived its privilege.  And 6789 Goldsboro LLC, when I

5    was a manager, never waived its privilege.  And Mr. VerStandig

6    is in the exhibits that are attached to this.

7         And then, by the way, that was won in the Florida

8    case.  In the Maryland state court action, Roger Simmons (ph.)

9    filed a motion to disqualify Mr. VerStandig.  And because I

10   was stayed and there was no final adjudication, Judge Lease

11   says, well, we haven't even taken up those motions yet.  So

12   none of those motions have even been heard yet because that

13   case is far from over.

14        And so my contention is, unless Mr. Schlossberg has

15   filed a 547 action against Serv Trust, a party who's never

16   filed a proof of claim in this case, to bring their property

17   into my bankruptcy estate -- and even -- and even Judge Lease

18   recognized that the claim that Mr. VerStandig was trying to

19   bring -- and you -- and you can see it in Judge Dwyer.  She

20   was confused, and they -- and they basically just ran her down

21   a rabbit hole and confused the hell out of her with a pack of

22   lies.  But she understood that alter-ego claims are the

23   exclusive property of the bankruptcy estate, and the trustee

24   is the only party that can bring them.  And he failed to bring

25   it.  He's time-barred, and -- and so he had the King parties

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    go try and do an end run and get that property here, and that

2    doesn't work.

3              Even if the King parties file a claim in state court,

4    that doesn't obviate the fact that Mr. Schlossberg, the

5    Chapter 7 trustee, is time-barred, and he has to file an

6    action in this court.  This court has to determine that Serv

7    Trust is property of my estate, not the Maryland court.  The

8    Maryland court hasn't adjudicated it yet.

9              So this whole thing is illegal.  It's unlawful.  It's

10   unethical.  It smells.  And -- and -- and again, Serv Trust

11   never filed a proof of claim in my case, so this court has no

12   jurisdiction over Serv Trust.  And so he -- and -- and you

13   know, I'm not getting into the discussion of, could a trustee

14   enter into a settlement agreement if, in fact, the property

15   was property of the estate.  That's not the point of this.

16   The point of this is Serv Trust property is now property of

17   the estate.

18             And I read a bunch of case law last night, and this

19   court, before it can even consider a 1919 motion, has to make

20   a determination that what he's trying to do involves property

21   of the estate, and it doesn't.  It's the first thing.  Without

22   property of the estate, this court has no jurisdiction.

23   Without that res, this Court has no jurisdiction to resolve

24   state court claims that are going on.

25             And in fact, because -- as I mentioned earlier,

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   because Serv Trust has a pending counterclaim and is not a

2   party in this case, it would -- the -- the most that could

3   happen would be findings of fact and conclusions of law that

4   could be submitted to the district court because it would be a

5   violation of Stern and Wellness and the rest of that pack of

6   cases, because Serv Trust is not here.  Serv Trust -- he's --

7   he's -- he's failed to -- to join all the indispensable

8   parties.  Dan Ring's not here.  I'm not a party, but I'm not a

9   trustee anymore, so I guess I don't have to be a party.

10  But -- but for Serv Trust's purposes, he'd need to join Dan

11  Ring, and he'd need to join all the beneficiaries.  It's their

12  property.

13          And it's a -- it's a common law trust.  It's right in

14  the document.  And King even recognized it was a common law

15  trust back in 2013 when VerStandig and Offit Kurman were

16  representing Serv Trust, 6789, and me, and Dan Ring.  And when

17  the term sheet was being put together -- and in the term

18  sheet, it says Serv Trust is a common-law trust.

19          So the fact that, you know, he wanted to bank on some

20  kind of statutory trust, even Judge Lease said, that's

21  irrelevant.  It doesn't really matter.  That trust agreement

22  is a contract.  The property belongs to the beneficiaries.

23  There is no possible way, under Maryland law, in a -- in a

24  common-law spendthrift trust, which Judge Lipp found is valid

25  and is for the benefit of my five children, the

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    beneficiaries -- there is no way under Maryland law that a

2    trustee could -- could ever be charged with the res of that

3    trust, absolutely not a possibility.  It's not -- it's not my

4    irrevocable trust, and -- and it is -- it is irrevocable.

5            And it's disgraceful that Mr. VerStandig would lie to

6    the Court because he knew it's an irrevocable trust.  He's

7    been involved in many proceedings.  As a matter of fact, he

8    was there helping form the deal with the King parties in 2013

9    with Offit Kurman.  And I can certainly provide all the

10   invoices, and it's voluminous, voluminous.  He was involved in

11   the deal structure.  Offit Kurman represented me in the note

12   with the King parties.  Tim Lynch, Offit Kurman, and now he's

13   in bed with the trustee, which -- which is a conflict of

14   interest.  Trustees should be disqualified from this.  I mean,

15   you know, this whole thing is just a sham.

16           And I want to go to the valuation, end up at the

17   valuation.  The -- the property was purchased in 2013 for a

18   million, 350.  I get calls weekly --

19           MR. VERSTANDIG:  Objection.  Hearsay.

20           THE WITNESS:  Okay.  Fine.  This -- this appraisal

21   that was never let in was a total --

22           THE COURT:  The objection is sustained.

23           MR. VERSTANDIG:  Thank you, Your Honor.

24           THE WITNESS:  Yeah.  The -- the -- the -- Mr.

25   VerStandig tried to end run the memorandum of understanding

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    that was executed, fully executed, and returned to King.  I

2    believe it was executed, if my memory serves me, September

3    12th, 2016.  We had come back from a meeting with Park and

4    Planning in August of 2016.  And Park and Planning said, we

5    love it, we didn't think you'd ever get the Army Corps

6    approval, we never thought you'd get the MDE approval, we love

7    it, nineteen townhouses.  That was in August.

8              MR. SCHLOSSBERG:  Objection.  Hearsay, Your Honor.

9              THE COURT:  That's all hearsay, Mr. Myers.

10             THE WITNESS:  Okay.  Well, is it hearsay if I'm

11   there?

12             THE COURT:  It's hearsay if it's someone else's

13   statement.

14             THE WITNESS:  Okay.  Well, after I was at a meeting

15   in August at Park and Planning, Brian King, not but three

16   weeks later and after the Warm L. (ph.) company sent us a

17   offer to buy the property for $8.5 million --

18             MR. SCHLOSSBERG:  Objection.  Hearsay.

19             MR. VERSTANDIG:  Objection.  Hearsay.

20             THE COURT:  That's all hearsay, Mr. Myers.

21             THE WITNESS:  Well, it's odd to me that the trustee

22   stands up here disingenuously because he wants to line his

23   pocket with $150,000 that he knows is never going to this

24   estate -- it's going right in his back pocket -- that he says,

25   oh, this property has no value.  Okay.  I was told, okay -- I

escribers
www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    can tell you that the estimated value of that property --

2          MR. SCHLOSSBERG:  Objection, Your Honor.

3          MR. VERSTANDIG:  Objection.

4          THE WITNESS:  My opinion.

5          MR. VERSTANDIG:  Foundation.

6          MR. SCHLOSSBERG:  Hearsay.

7          MR. VERSTANDIG:  Hearsay.  (Indiscernible).

8          THE COURT:  And he's misstating the trustee's

9    testimony, so.

10         MR. VERSTANDIG:  Thank you, Your Honor.

11         THE COURT:  The Court is aware.

12         THE WITNESS:  And I am an expert in land development.

13   I've been doing it for forty years.

14         MR. VERSTANDIG:  (Indiscernible).

15         THE COURT:  Okay.  Mr. Myers, please direct your

16   comments to the Court, and the objections are sustained.  So

17   if you want to testify as to what you believe the value is and

18   why you have the knowledge and the foundation to be able to

19   testify as to the value, then you can do that, Mr. Myers.

20         THE WITNESS:  Sure.  Broker price opinion obtained

21   from Cushman & Wakefield, the number-1 broker.

22         MR. VERSTANDIG:  Objection.

23         THE COURT:  Okay.

24         THE WITNESS:  That's where I obtained it from.  You

25   just --



Appellees' Appendix 0503

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1      THE COURT:  And that's hearsay.  That --

2      THE WITNESS:  Okay.  My opinion of the value is 13.5

3  million.  Right now, townhouse projects are the hottest

4  product in the market.  I could sell that ten times over

5  for -- for $13 million.

6      MR. SCHLOSSBERG:  Your Honor, objection.

7      THE WITNESS:  My opinion.

8      THE COURT:  And your objection is overruled.  I'm

9  going to allow it, and I'm going to give it the weight that I

10  deem appropriate.

11      MR. SCHLOSSBERG:  Thank you, Your Honor.

12      THE WITNESS:  And when the Montgomery County

13  litigation proceeds forward -- and Serv Trust did have an

14  attorney, and he looked at the operating agreement.  And

15  there's no -- there's no requirement after you enter into a --

16  according to Judge Albright, a valid, enforceable agreement,

17  that you would never -- you would never then say, oh, ignore

18  the fact that there's a buyout agreement, and -- and the King

19  parties can come in September of 2016, they can come in, and

20  whenever Mr. VerStandig filed his bogus appraisal letter

21  trying to get out of the buyout agreement, and say, oh, well,

22  we want to redeem your property, and we're going to do an

23  appraisal.  Well, guess what?  He never did an appraisal.  The

24  appraisal, in his letter, he says he's going to do an

25  appraisal.  The appraisal that he came up with was two months

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   old at that point, and it's a piece of crap, anyway, because I

2   have been doing development for forty years.  And --

3          MR. SCHLOSSBERG:  Objection, Your Honor.  It's

4   hearsay.  He's talking about the appraisal he brought -- he

5   came up with.  That obviously refers to something that's an

6   out-of-court declaration.

7          THE COURT:  The objection is sustained as to that,

8   but the Court --

9          THE WITNESS:  Yeah, I --

10          THE COURT:  -- will allow the remaining testimony.

11          THE WITNESS:  Yeah.  So Mr. VerStandig -- the King

12   parties never actually did an appraisal.  So the -- the --

13   the -- he sent a letter saying, we're going to do an

14   appraisal.  The fact that there may have been an old

15   appraisal, two months old or two years old or twenty years

16   old, is irrelevant.  They never did an appraisal.  And so it

17   wouldn't matter, anyway, because we would -- we would -- if

18   the memorandum of understanding is a valid, enforceable

19   agreement -- which it is.  Serv Trust filed the counterclaim,

20   breach of contract.  The King parties never filed an answer.

21   Therefore, they admit the allegations in the complaint.

22   They're in default, end of discussion.  And you know what?

23   That's all going to be decided by Judge Lease.

24          This is an end run around every -- this is -- I can't

25   think of anything more appropriate than -- and I -- and I said

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    this right up front.  The minute he found anything, a nonfinal

2    order is not executable.  It's -- nothing you can do with it.

3    It means nothing.  It doesn't mean that Mr. Schlossberg has

4    anything.  He would have to, in this court, in this case, file

5    an adversary against Serv Trust.  And this court would then

6    have to determine with that adversary whether or not Serv

7    Trust property was property in my bankruptcy estate.

8           Judge Lease hasn't made any decision yet.  But even

9    if he did, or when he finally does, that still means nothing

10   to this court.  The bankruptcy court has exclusive

11   jurisdiction to determine whether something's property of the

12   estate.  And there's never been a proceeding in this case to

13   allow that to happen, and Mr. Schlossberg knows full well he's

14   time-barred, and he was time-barred a long time ago.  He stood

15   in here and told Judge Lipp, when she asked him, are -- is

16   there any -- any other things you're going to bring --

17          MR. SCHLOSSBERG:  Objection, Your Honor.  Hearsay yet

18   again.

19          THE WITNESS:  Well, you can look up the transcript.

20          THE COURT:  I'm going to allow it, Mr. Schlossberg.

21   Thank you.

22          THE WITNESS:  He -- he had -- he had Serv Trust in

23   front of him since he's been in this case.  He read the thing.

24   He knew it.  He knows it's a common-law spendthrift trust.  He

25   knows that, under well-settled law, it can never be property

escribers
www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    of this estate, and he passed on it.  And the only reason he's

2    here now is it's a freebie, which you can see in his

3    settlement thing, because the King parties are paying his

4    fees.  I have no idea whether they've already paid him some

5    money.  I suspect they have; I don't know.

6         But I can guarantee you, when I sue the King parties

7    for fraud, okay -- because I have an indemnity provision in

8    that operating agreement.  So the -- the 6789 Goldsboro LLC

9    has to indemnify me for any actions.  Okay.  And they -- they

10   didn't even bother to read that part.  And so I'm sure, when I

11   do discovery, I'm going to find out a lot of things about the

12   relationship between Mr. VerStandig and the trustee and Mr.

13   Mastro and the King parties and money that's changed hands, et

14   cetera, et cetera.  Okay.  So -- okay.  Judge Dwyer.

15        MR. SCHLOSSBERG:  I'd like to move to strike, Your

16   Honor, the scandalous remarks just made by Mr. Myers from the

17   witness stand.  He may have some immunity accorded to him as a

18   witness in this proceeding, but he doesn't have the right to

19   put scandalous, libelous remarks into the record, defamatory

20   to me, to Mr. VerStandig, to Mr. Mastro.  And I've sat

21   quietly, but just the last couple paragraphs -- and of course,

22   it's a very run-on paragraph.  But nonetheless, I think it

23   goes a step too far even for me to sit quietly.  The Court

24   knows we have an objection to the way this is being handled by

25   Mr. Myers.  But you can't allow that, Your Honor, I

escribers
www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    respectfully submit.  And I ask that the Court strike all of

2    his remarks concerning some alleged relationship between me

3    and Mr. VerStandig, including the payment of an apparent bribe

4    of some sort.  I can't sit quietly, Your Honor.

5              THE WITNESS:  I didn't --

6              THE COURT:  I understand, Mr. Schlossberg.

7              MR. SCHLOSSBERG:  Thank you.

8              THE COURT:  The Court's going to overrule your

9    objection, and I understand the point that you're making.  But

10   frankly, I'm just trying to get Mr. Myers --

11             MR. SCHLOSSBERG:  I understand, Your Honor.

12             THE COURT:  -- to the point where he's put on his

13   case and --

14             MR. SCHLOSSBERG:  I'd just ask my objection be noted.

15             THE COURT:  It is noted.

16             MR. SCHLOSSBERG:  There'll be other litigation, or

17   there'll be some sort of proceeding somewhere.

18             THE COURT:  Understood.  Thank you, Mr. Schlossberg.

19             MR. SCHLOSSBERG:  Thank you.

20             THE COURT:  So the objection is overruled.

21             THE WITNESS:  Okay.  This is --

22             THE COURT:  Mr. Myers, you have about five minutes

23   left.

24             THE WITNESS:  This is Debtor's Exhibit 9.  This is

25   the hearing transcript, September 23, 2019, with Judge Dwyer

escribers

www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1  in the state court action.  Judge Dwyer -- let me see.

2      (Pause)

3      THE WITNESS:  So this is on page 21 of 55.  This is

4  Mr. VerStandig talking.  "Thank you, Your Honor, Maurice

5  VerStandig again on behalf of the King parties, let me say at

6  the outset there's a bit of oddity to this motion, we joined

7  Mr. Myers as a necessary party because we're seeking

8  declaratory judgment on Serv Trust as an alter ego".  I was

9  not a party to that trial, so I was out of the case, according

10 to Judge Lease.

11      Then, he says -- on page 22 of 55, he tells Judge

12 Dwyer, "If Mr. Myers doesn't wish to be present to contribute

13 evidence or testimony or whatever it may be towards

14 adjudication of this matter, we have no objection to him being

15 let out of the case".

16      MR. VERSTANDIG:  Sorry.  What line?

17      THE COURT:  This is --

18      THE WITNESS:  Page 22 of 55.

19      THE COURT:  -- page 22 of 55, line 2.  So it's page

20 21 of the transcript, but 22 of 55 of the court stamp.

21      MR. VERSTANDIG:  Oh, thank you.  Sorry, that's --

22 thank you, Your Honor.

23      THE COURT:  You're welcome.

24      THE WITNESS:  Which page do you want me to refer to,

25 Your Honor, the docket page or the -- okay.



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1          THE COURT:  Whatever you want to refer to, Mr. Myers.

2          THE WITNESS:  All right.  This is page 21 of the

3    transcript, page 22 of 55 of the court filing.  This is Mr.

4    VerStandig.  "If Mr. Myers doesn't wish to be present to

5    contribute evidence or testimony or whatever it -- whatever it

6    may be towards adjudication of this matter, we have no

7    objection to him being let out of the case, he is here solely

8    as a necessary party, and they" -- referring to Serv Trust,

9    and I guess, me.  I don't know.  They, being our side.  "And

10   they are very much accurate when they say we are not

11   asserting, meaning my client, I don't speak for Mr. Pelletier

12   (ph.), we are not asserting a monetary claim against them".

13          He brought a -- he brought an improper declaratory

14   judgment action after Serv Trust filed the counterclaim.  And

15   he specifically told Judge Dwyer that -- that the only reason

16   he bought -- brought Count 2 is because Serv Trust filed the

17   counterclaim.  And so he's using a declaratory judgment action

18   as an affirmative defense to Serv Trust's standing to sue the

19   King parties.  Under Maryland law, that's completely

20   unallowed.  You cannot bring a declaratory judgment action to

21   assert an affirmative defense that you can assert in a -- in a

22   pending counterclaim.  That's not a proper declaratory

23   judgment action.

24          (Pause)

25          THE WITNESS:  And confirming that, on page 22 of the

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    transcript, page 23 of 55, Mr. VerStandig tells the Court,

2    "Your Honor, my clients are being sued by Serv Trust for" --

3    this is the counterclaim -- "for myriad claims that are not

4    subject to today's motions, but that are part of this case, my

5    clients are being sued for breach of fiduciary duty, breach of

6    contract, constructive fraud, and so on and so forth, our

7    position, very simply, is that Serv Trust cannot sue us for

8    these things because it does not own any litigation rights to

9    such claims, to the extent they exist at all".  Okay.  There's

10   been no ruling yet, and he's already making this statement.

11   "And the reason" -- let's see.  Blah, blah.  Okay.

12         So he sums up his -- his Count 2 on page 23 of the

13   transcript, page 24 of 55.  This is -- this is what Mr.

14   VerStandig describes his Count 2 alter ego as.  "In terms of

15   what is there that is a justiciable controversy, that is it,

16   we have alleged that they don't have standing, to be sniping

17   at us, for lack of a more eloquent term, and that in reality,

18   the claim endeavored to adjudicate in this court belonged to

19   the bankruptcy trustee".  You can't bring a declaratory

20   judgment action to raise an affirmative defense that -- when

21   there's a pending counterclaim.  You have to raise it in the

22   counterclaim.

23         (Counsel confer)

24         THE WITNESS:  Yeah, I'm smarter than you think, Mr.

25   Schlossberg.



Appellees' Appendix 0511

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1        THE COURT:  Mr. Myers, please do not make any more

2   comments to the parties in this case.  Direct your comments to

3   the Court, please.

4        MR. VERSTANDIG:  I would note that it is 1:02 on the

5   East Coast.

6        THE COURT:  Thank you, Mr. VerStandig.

7        Mr. Myers, are you wrapping up?

8        THE WITNESS:  Yeah, I'm wrapping up.  I'm -- I'm just

9   getting through to the end of this.  This will be it.

10        MR. SCHLOSSBERG:  With due respect, Your Honor, at

11   twenty minutes after 12, we were told he was wrapping up and

12   wouldn't be using all the time to 1 o'clock.  We're now after

13   1 o'clock.  We have a very short window of opportunity.

14        THE COURT:  Understood, Mr. --

15        MR. SCHLOSSBERG:  Thank you.

16        THE WITNESS:  I'm almost finished.

17        THE COURT:  -- Schlossberg.

18        THE WITNESS:  So -- so he tells Judge Dwyer on

19   September 23, 2019 these are assets of the bankruptcy court.

20   There was -- there was no proceeding in this bankruptcy case

21   on 23 -- in 2019 determining that Serv Trust property was

22   property in my bankruptcy estate.  Mr. Schlossberg was time-

23   barred.  He never brought an adversary against Serv Trust.  So

24   that's a -- that's a false statement.  He says, we seek that

25   determination.  Well, that determination is the sole province

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1  of the Chapter 7 trustee, but he's time-barred, so he couldn't

2  bring it.  And the King parties didn't have derivative

3  standing, and Goldsboro didn't have derivative standing.  This

4  court's never given them derivative standing, and Mr.

5  Schlossberg has never abandoned any claims or causes of

6  action.

7      (Pause)

8      THE WITNESS:  And so Judge Dwyer is confused after

9  hearing all of the argument.  And she says, "So I guess I

10  just -- how do I not take into consider [sic] what Mr. Andrews

11  (ph.) argues because the alter -- alter-ego claims" -- and

12  then she says, "So tell me what I'm missing, alter-ego claims

13  belong to the trustee exclusively".  She wasn't missing

14  anything, but then they pulled the wool over her eyes.  And

15  VerStandig says, the very next line -- I'm sorry.  This is on

16  page 26 of the transcript.  Judge Dwyer, "Alter-ego claims

17  belong to the trustee".  VerStandig, "Yes" -- and here's

18  the -- here's the line I was looking for.  "Yes, the trustee

19  has asked us to pursue such matters in this case, and the

20  bankruptcy court has been very clear in suggesting, through

21  its order of extension, that the state court litigation was

22  ongoing and" -- blah, blah.  So he's basically misleading

23  Judge Dwyer into thinking that he has some kind of an order

24  granting him derivative jurisdiction.  He --

25      THE COURT:  And what page is that, Mr. Myers?



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1      THE WITNESS:  That is on page 26 of the transcript,

2  page 27 of 55.

3      THE COURT:  Okay.

4      THE WITNESS:  He basically lied to Judge Dwyer.

5  "Alter-ego claims" -- Judge Dwyer, "Alter-ego claims belong to

6  the trustee".  Mr. VerStandig, "Yes", confirms that they're

7  not his claims.  He has no standing to even bring them.  Then,

8  he says, "The trustee has asked us to pursue such matters in

9  this case".  And the -- and the bankruptcy court, he -- he

10 insinuates, is okay with this, which it wasn't.

11      This is an interesting statement he made in that same

12 page, page 26.  He says to Judge Dwyer, "If my" -- I'm

13 paraphrasing the beginning.  He says, "If you prevail on my

14 clients.  "If my clients prevail, they don't have the right to

15 start seizing Mr. Myers' assets".  I guess he's assuming --

16 talking about Serv Trust assets, not my assets.  At any rate,

17 he says, "I think that's a critical distinction".  He says,

18 "My clients can't do anything".  He says, at the end, "The

19 benefit of the claim goes to the bankruptcy trustee and then

20 derivatively to the creditors of Mr. Myers' bankruptcy

21 estate".  Well, he knows that's wrong.  That claim was always

22 the bankruptcy trustee's, and he's time-barred from bringing

23 it.  And Mr. VerStandig and the King parties have no

24 derivative standing to bring it.

25      This is interesting.  I don't know what he meant by

Case 8:25-cv-02103-TDC   Document 29-16   Filed 02/10/26   Page 517 of 618

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    this, but he says, "Even -- even then, Mr. Schlossberg, in the

2    bankruptcy court, would have to take discovery, determine what

3    those assets are, to levy upon them, to seize upon them, to

4    liquidate them, and to proceed accordingly".  So he still has

5    to take some action in this case.  And of course, the minute

6    he files the adversary proceeding, it's going to get dismissed

7    because it's time-barred to obtain Serv Trust property.

8            THE COURT:  Wrap it up, Mr. Myers.

9            THE WITNESS:  And Mr. VerStandig says, "My client

10   would have no standing to do that".  This is interesting.

11   "And candidly, my client, the King parties, have no interest

12   in doing that because my client, the King parties, is not a

13   creditor of the bankruptcy estate", meaning my estate.  Yet

14   they're filing a proof of claim.

15           THE COURT:  You have two minutes.

16           THE WITNESS:  He says, "We're not trying to pierce

17   the veil for purposes of recovering a monetary judgment".  You

18   can't do any of this in Maryland.  He's already said earlier

19   in a number of proceedings that there is no fraud, we're not

20   alleging a fraud.  And by the way, he said in an original

21   proceeding -- when he -- when he did his opening remarks with

22   Judge Albright, he said, first year, no problem, second year,

23   no problem.

24           MR. SCHLOSSBERG:  Objection, Your Honor.  Hearsay yet

25   again.



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1          THE COURT:  Mr. Myers --

2          THE WITNESS:  Anyway.

3          THE COURT:  -- you have thirty seconds.

4          THE WITNESS:  Mr. Mastro.  This is the bottom of page

5     28 of the transcript.  "And really, I think the purpose of me

6     standing here is not necessarily to argue one side or another,

7     but to just advise the court that, you know, in bankruptcy

8     cases, it's not uncommon for trustees to have very limited

9     resources to pursue all these actions, so many times a

10    creditor will pursue an action, and the creditor in this case

11    has been authorized by the trustee to do that".

12         THE COURT:  All right.  Thank you, Mr. Myers, for

13    your testimony.  You may return to your seat.

14         THE WITNESS:  And I'm sorry.  Let me just read the

15    one next sentence.  It's important.

16         THE COURT:  No, no.  Mr. Myers, return to your seat.

17    Thank you.

18         THE WITNESS:  "I believe" --

19         THE COURT:  All right.  Mr. Myers, return to your

20    seat.

21         THE WITNESS:  He said this has all been filed with

22    the bankruptcy --

23         THE COURT:  Mr. Myers, return to your seat.

24         THE WITNESS:  Yeah.  This is a sham.

25         THE COURT:  Take your documents with you that are not



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   marked as exhibits.  All exhibits should remain on the stand.

2   We have Debtor's Exhibits 1 through 9 on the stand at this

3   point.  All right.

4        So let's talk about where we go from here.

5        Mr. Mastro, do you have cross-examination for this

6   witness?

7        MR. MASTRO:  No, Your Honor.

8        THE COURT:  Mr. VerStandig?

9        MR. VERSTANDIG:  No, Your Honor.

10       THE COURT:  All right.  All right.  Mr. Myers, that

11  completes the presentation of evidence in your case.  So we

12  have --

13       MR. MYERS:  I just want the record to show that you

14  cut me short.

15       THE COURT:  Noted.

16       So we have closing arguments left.  Let's talk about

17  the timing of that.  So the Court has hearings at 1:30 and 2

18  o'clock.  We can come back this afternoon and have closing

19  arguments, or we can set another time to do that.

20       MR. VERSTANDIG:  We'll be here today, Your Honor.

21       MR. SCHLOSSBERG:  Yeah.

22       THE COURT:  All right.

23       MR. MYERS:  Your Honor, let me get off the witness

24  stand so I can stand down there, because I'm going to make a

25  different suggestion.

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1        THE COURT:  Make sure you leave the debtor's exhibits

2    on the witness stand, please.

3        MR. MYERS:  (Indiscernible).

4        THE COURT:  Okay.  Well, I saw you walking off.  I

5    just want to make sure you're doing that.  Take your time, Mr.

6    Myers.

7        (Pause)

8        MR. VERSTANDIG:  Your Honor, to aid the Court in

9    assessing what's needed for closing, I can share that my

10   closing is not drafted, but sketched.  I have my outline.  I

11   reasonably anticipate, without being hyperbolic, that it'll

12   take approximately five minutes.

13       THE COURT:  Okay.  Mr. Mastro, how much time do you

14   need for your closing?

15       MR. MASTRO:  I think about fifteen minutes.

16       THE COURT:  All right.  Mr. Myers, we can put them in

17   order.  That's fine.

18       MR. MYERS:  Nine total exhibits, right, Your Honor?

19       THE COURT:  Nine exhibits, and we can put them in

20   order.  Thank you.

21       MR. MYERS:  I wanted to make sure I'm not walking off

22   with them.

23       THE COURT:  Mr. Myers, how much time do you need for

24   your closing?

25       MR. MYERS:  Your Honor, I'm going to make a request



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   that we be allowed to file supplemental briefing on all this

2   so that you have it in front of you.  There's criminal

3   activity here.  There's collusion.  There is --

4          THE COURT:  Your request is denied.  I don't need any

5   further briefing.  Thank you, Mr. Myers.

6          How much time do you need for your closing?

7          MR. MYERS:  At least an hour.

8          THE COURT:  An hour.  Okay.  All right.  I'm going to

9   ask you to come back at 3:30.  I just want to make sure

10  that -- I don't want to bring you back and have you sit in the

11  courtroom while I'm hearing another matter.  You're welcome

12  to.  I will be doing my afternoon hearings by Zoom, so I'll be

13  doing them sitting here on the bench through my computer in

14  front of me.  You're welcome to come back at any time.  But

15  why don't we plan to start at around 3:30?  I'm hoping the

16  other two matters will be wrapped up by then.  I think they

17  will be, but I just want make sure that we have ample time,

18  and then I will give both sides one hour for closing

19  arguments.  It sounds like the trustee and the King parties

20  will not need a full hour.  I will give Mr. Myers one hour.

21         MR. VERSTANDIG:  Your Honor, Court's indulgence for

22  one moment.

23         THE COURT:  Yes.

24         MR. MYERS:  Your Honor, I'd like to make an ore

25  tenus --

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1          THE COURT:  Hold on.

2      (Counsel confer)

3          MR. VERSTANDIG:  Your Honor, we look forward to being

4      back at 3:30.

5          THE COURT:  Okay.  3:30, Mr. Myers?

6          MR. MYERS:  Your Honor, I'd like to make an ore tenus

7      motion for disqualification of Mr. VerStandig.  He's my

8      attorney.  He's been my attorney.  He's been the attorney for

9      6789 Goldsboro LLC and for Serv Trust.  There's documentation

10     of that.  And now, the trustee has jumped in bed with him, so

11     there's a conflict there.  And I request a continuance to file

12     a motion to disqualify him.  I should not be -- I should not

13     be forced to -- as a pro se litigant, to be here litigating

14     against my own attorney who is involved in this very

15     transaction and was for years, its formation.  He represented

16     the King parties.  He represented me.

17         THE COURT:  Mr. Myers, I'm not ruling on any motions

18     to disqualify today.  If you wanted to file those motions, you

19     could have filed them months, even years ago, and you didn't

20     do it.  Today, I have a settlement motion before me, and I

21     have your three objections to the claims of the King parties.

22     That's what's before the Court today.  I've said it numerous

23     times, and that's the last time I'm saying it.

24         MR. MYERS:  Okay.  Well, I just made an ore tenus

25     motion, so please rule on it.

escribers

www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1          THE COURT:  I'm not ruling on that.

2          MR. MYERS:  You're not ruling on it.  You're going to

3     let -- you're going to let counsel --

4          THE COURT:  I'm not ruling on it.

5          MR. MYERS:  Yeah, okay.

6          THE COURT:  That's the end.

7          MR. MYERS:  All right.  Well --

8          THE COURT:  I'll see you at 3:30.

9          MR. MYERS:  I'll file a motion for judicial

10    misconduct.

11         THE COURT:  You're welcome to do whatever you think

12    is appropriate, Mr. Myers.  And it will be dealt with in due

13    course, just like the motions that you filed late on Friday

14    and minutes before this hearing began.  I will rule on them in

15    due course.  Thank you.

16         MR. MYERS:  Well, I don't think you'll rule on those.

17         THE CLERK:  All rise.  Court is now in recess.

18      (Whereupon a recess was taken)

19         THE CLERK:  All rise.  United States Bankruptcy Court

20    for the District of Maryland now resumes its regular session,

21    the Honorable Maria Ellena Chavez-Ruark presiding.

22         Recalling the case of Gregory B. Myers, Case No. 15-

23    26033, and Adversary Case 24-00007, King, et al. v.

24    Schlossberg.

25         Counsel, please be seated.



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1        THE COURT:  All right.  Are the parties ready for

2   closing arguments?

3        MR. SCHLOSSBERG:  Yes, Your Honor.

4        MR. VERSTANDIG:  Yes, Your Honor.

5        THE COURT:  Mr. Myers, are you ready?

6        MR. MYERS:  Yes.

7        THE COURT:  Okay.  All right.  Mr. Mastro, Mr.

8   VerStandig, which one of you is going to take the lead?

9        MR. VERSTANDIG:  Your Honor, I will go first.  I will

10   be brief, and Mr. Mastro will follow.

11        THE COURT:  All right.  Give me just one moment,

12   please.

13        MR. VERSTANDIG:  Yes, Your Honor.

14        THE COURT:  I just want to get organized.

15   (Pause)

16        THE COURT:  All right.

17        MR. VERSTANDIG:  Thank you, Your Honor.

18        Your Honor, I'm going to start by addressing the

19   claim objection, which is the majority of my argument.

20        The Fourth Circuit standard, which I think is

21   familiar to the Court, is what was announced in Stancill v.

22   Harford Sands, which establishes the familiar burden-shifting

23   dynamic.  A proof of claim, once entered into evidence -- and

24   all three proofs of claim are in the record before you -- is

25   prima facie evidence of the validity thereof under Rule 3001.

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   The burden then shifts to the objecting party to establish

2   some core issue with the claim or some grounds of objection

3   thereupon.  And if and only if the objecting party meets that

4   burden does the burden then shift back to the claimant to

5   rebut what the objecting party has put forward.  There's no

6   doubt that we have the three claims in evidence, and thus

7   there's no doubt but that they are prima facie evidence of the

8   validity thereof.

9        Mr. Myers, in writing, although not discussed during

10  the past two days, has raised two technical objections.

11       One is that there are no writings appended to the

12  proof of claim.  The problem with that objection, and this is

13  the L.A. airport case we cited in our papers from the Ninth

14  Circuit, is that there is no writing required unless a proof

15  of claim is premised upon a writing.  And if you look at Rule

16  3001(c), subsection (1), it literally says, "Claim based on a

17  writing".  And what this generally refers to is a promissory

18  note, a settlement agreement, some written instrument

19  evidencing indebtedness.  And what the L.A. airport case

20  teaches us is that where a proof of claim is premised upon

21  something other than a written instrument, there is no legal

22  obligation to affix a copy thereto for the simple reason that

23  there isn't something obvious to affix thereto.  In the L.A.

24  airport case, the question was, did you need to affix the tax

25  code to the proof of claim.  Here, I suppose the suggestion

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    would have been that we affixed the entire adversary

2    proceeding.  That is clearly not what Rule 3001 requires.

3           The second technical issue raised by Mr. Meyers is

4    that the claims were filed beyond the claims bar date.  Now,

5    the Supreme Court made very clear in Pioneer that a court may

6    allow claims to be late filed in a Chapter 7 case.  Here, you

7    entered an order roughly eighteen months ago permitting my

8    clients to file proofs of claim within thirty days of the

9    entry of that order.  That is a final order that, in point of

10   fact, has been appealed.  And I'm not making reference to

11   the --

12          THE COURT:  All right.  Hold on one moment.

13          Did we lose our recording equipment?

14          THE CLERK:  No, the recorder is still going, but

15   everything else stopped.  My computer went out.

16          THE COURT:  Should we take a short recess?

17          THE CLERK:  Sure.

18          THE COURT:  Okay.  We'll take a short recess.  Mr.

19   VerStandig, put a pin in that.  Hold your thought.

20          MR. VERSTANDIG:  Thank you, Your Honor.

21          THE COURT:  We'll come back to it.

22          THE CLERK:  All rise.  Court is now in recess.

23      (Whereupon a recess was taken)

24          THE CLERK:  All rise.  United States Bankruptcy Court

25   for the District of Maryland now resumes its regular session,



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    the Honorable Maria Ellena Chavez-Ruark presiding.  Please be

2    seated.

3         THE COURT:  All right.  I'm sorry about that, Mr.

4    VerStandig.  There's quite a storm going on out there.

5         MR. VERSTANDIG:  Yes, Your Honor.

6         THE COURT:  So hopefully we do not lose electricity

7    again.

8         All right.  So you were saying that the Court entered

9    an order allowing the King parties to file their proofs of

10   claim?

11        MR. VERSTANDIG:  Yes, Your Honor.  That order was

12   entered approximately eighteen months ago.  And what's

13   significant about that order is it's been appealed.  And I'm

14   not making reference to the appeal that was filed last week.

15   It was actually appealed by Mr. Myers shortly after it was

16   entered.  It went up to the district court.  There was a show

17   cause order in the district court.  And upon receipt of the

18   show cause order, Mr. Myers dismissed his appeal.  It was

19   remanded back to this Court in October of 2024.

20        So we know that there is an order, under Pioneer,

21   allowing claims to be late filed.  And we know that despite an

22   effort to overturn or obstruct that order on appeal, no such

23   success has been had.

24        Moving aside from the technical objections, there is

25   this sort of omnipresent allegation that the claims ought to

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1  be denied because they are counterfactual, without merit,

2  whatever it may be.  And Mr. Mastro will speak more eloquently

3  to the merits of the adversary proceeding, and more

4  extensively than myself.

5          But I do want to briefly note a few things.  The most

6  meaningful defense that's been referenced by Mr. Myers over

7  the past two days is what's been referred to as the MOU

8  defense, the memorandum of understanding, where he asserts

9  that it was countersigned in a timely fashion.  My clients

10  have asserted it was not.  And Mr. Schlossberg has

11  intelligently testified as to why he believes my clients would

12  be more compelling.

13          But one point that I think gets overlooked is it

14  doesn't actually matter.  It doesn't matter whether it was

15  timely signed or not, because Mr. Myers was a debtor in this

16  court at that time.  Serv Trust, his alter ego, is the

17  counterparty to the memorandum of understanding to the extent

18  there is an enforceable MOU.  No leave of court was ever

19  sought, much less obtained, to enter into that agreement.  So

20  even if it had been timely executed, it would be a nullity and

21  cannot give rise to a substantive merits-based defense.

22          The Serv Trust alter ego finding is not at issue

23  before you at the moment, nor was it at issue in the adversary

24  proceeding challenging Mr. Myers' discharge.  My clients were

25  not a party to that proceeding.  The opinion in that

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   proceeding, if you look past the dozens of pages he

2   ellipsised, finds Mr. Myers, time and again, committed fraud

3   in this honorable court.

4          So it is strange to see him relying upon that as some

5   countervailing factual finding that ought to be binding.  But

6   since the issue was not relevant to that proceeding, since my

7   clients were not a party thereto, there are a myriad of legal

8   reasons that neither res judicata nor any variety of estoppel

9   would bind what are in fact dicta comments therein to be the

10   law of this case, especially when you consider that this Court

11   later, as Mr. Myers himself made much ballyhoo of, abstained

12   from hearing the alter ego issue so that it could be

13   adjudicated by a state court.  That would be an inconsistent

14   and irretrievably bizarre action if this Court found that it

15   had already adjudicated that it wasn't an alter ego.

16          The alter ego order out of the state court, whether

17   or not it is final, is not of any legal moment.  I believe Mr.

18   Myers places far too much reliance and faith upon the final

19   order doctrine.  But for what it is worth, it is a final

20   order.  It became a final order when the stipulation of

21   dismissal of the remaining cause of action in that case was

22   entered into, disposing of the last cause of action.

23          There were two counts in the complaint.  One was the

24   alter ego count.  The other was the count that ultimately

25   transmuted into this court.  Now, Mr. Myers has testified that

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    that cannot be so because Serv Trust filed a counterclaim and

2    that counterclaim has never been adjudicated.  In fact, he

3    asserts, there was never even an answer filed thereto, and

4    there, accordingly, should be a default thereupon.

5           But in so doing, Mr. Myers looks over at the

6    Trustee's Exhibit Number 10, which is the very order making

7    the alter ego finding wherein the Court expressly dismisses

8    Serv Trust's counterclaim.  With the counterclaim gone, Count

9    I ruled upon, and Count II subsequently dismissed, that became

10   a final order.  There was nothing left for the Montgomery

11   County Circuit Court to adjudicate.

12          Again, I'm not sure that matters.  Whether or not

13   it's a final order is actually not material, but it bears

14   notation.  It also goes to the somewhat suspect, even if

15   inadvertently, potentially, nature of Mr. Myers' testimony

16   over the past two days.  He was so certain that that

17   counterclaim persisted.  Yet one of the items in evidence

18   makes very clear that it was dismissed a great time ago.

19          Your Honor, there's an underlying hypocrisy in that

20   Mr. Myers relies greatly upon the abstention order, but at the

21   same time protests that he ought not be bound, or more

22   precisely, Serv Trust ought not be bound by what was beget by

23   that abstention order.  It is the same way he leans heavily

24   upon the fact that he removed a case two business days before

25   trial but ought not be bound by the fact that that case was

escribers

www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    subsequently remanded.

2          I believe such speaks to the credibility of Mr.

3    Myers, which matters only to bolster and support Mr.

4    Schlossberg's testimony that, if this matter were to go to

5    trial, and if there needed to be reliance upon Mr. Myers, it

6    would be a difficult case.

7          I believe my clients are paying a king's ransom for

8    something that, quite candidly, is not worth nearly that much

9    money.  But for reasons I will not get into, they believe that

10   to be a sensible business decision at the end of extensive

11   negotiations on their end.  And they respect and appreciate

12   that their negotiating counterparty, Mr. Schlossberg, is too

13   exercising his sound business discretion.

14         For that reason, we ask that the claim objections be

15   overruled, and we ask that the trustee's motion be granted.  I

16   reserve the balance of my time for rebuttal unless you have

17   any questions.  Thank you.

18         THE COURT:  Thank you.

19         MR. MASTRO:  Good afternoon, Your Honor.

20         THE COURT:  Good afternoon.

21         MR. MASTRO:  The 9019 motion that's before you is

22   probably a little different than a typical 9019 motion that a

23   trustee might bring in that the trustee is not bringing any

24   claims in the adversary proceeding.  The trustee is the

25   defendant.  And the settlement here liquidates an estate

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    asset, that asset being Serv Trust's interest in 6789

2    Goldsboro LLC, which Serv Trust having been previously

3    determined to be the alter ego of the debtor.

4         And just to review, the proposed settlement really

5    has three components.  The first component, the plaintiffs are

6    paying the trustee $150,000, the plaintiffs being the King

7    parties, in order to redeem the entirety of Serv Trust's

8    interest in Goldsboro.  And in the process, it moots out or

9    settles the claim in the adversary case.  The claim in the

10   adversary case, once the settlement payment is successfully

11   negotiated, that's going to be dismissed with prejudice.

12        And then the trustee testified to the third element,

13   which is important to him -- and we'll get to this -- that the

14   King plaintiffs have agreed to reimburse the trustee for all

15   reasonable legal fees and expenses that the trustee incurs in

16   connection with the litigation of any appeals taken by any

17   party in the event this motion is granted.  And I said we'll

18   get to that, and that is also going to be an important part of

19   this.

20        Now, the Court knows, in any 9019 motion, there's

21   certain standards the Court has to look at.  The factors the

22   Court considers are:  the probability of success in

23   litigation, the likely difficulties in collection -- and that

24   one is really not relevant here because, as I mentioned

25   before, the trustee is not bringing a claim.  He doesn't have

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   to contemplate that, okay, if I get a judgment, what are my

2   odds of collecting that judgment once I get it?  So that

3   number two is not really a factor.  Number three, the

4   complexity of litigation, and the expense, inconvenience and

5   delay involved with litigating the matter.  And four, the

6   paramount interest of the creditors in this case.

7        As the Court knows, the Court doesn't need to

8   necessarily conduct a mini trial, although over the last two

9   days, it sure seemed that way.  All the Court has got to do is

10  find that the proposed settlement doesn't fall below the

11  lowest level of reasonableness.  The Court does not substitute

12  its judgment for the business judgment of the trustee.

13       So with those standards in mind, Mr. Schlossberg

14  testified at length, both on direct, and in roughly four hours

15  of cross-exam, as to his process, his thought process, his

16  judgment in evaluating and ultimately recommending this

17  settlement to the Court in the 9019 motion.

18       The first thing he did is, as he testified, he

19  considered the merits of the claims in the adversary case

20  asserted by the King parties.  He went through, in exhaustive

21  detail, the operating agreement, including the provisions in,

22  I believe it was section 7, regarding the redemption of the

23  Class B interests.

24       The trustee determined that there was a demand for

25  the appraisal process made by the King plaintiffs.  That's the

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    demand letters, Exhibit 2.  The operating agreement was

2    Trustee's Exhibit 1.

3            After the demand was made, Serv Trust did not name

4    its own appraiser.  And there was an appraisal conducted,

5    actually prior to the demand, by Mr. Lippman (ph.).  And that

6    appraisal came in at one million to $1.3 million, was the

7    value of the property.  And Mr. Schlossberg testified, he

8    said, okay, once you get that appraisal, then you compare it

9    to the amounts that the King parties have invested.  And there

10   were four components to that.  The trustee walked through

11   that.  And it was well north of 3-,  3.5 million.

12           The trustee had examined the records and the evidence

13   that the King plaintiffs intended to use.  And he was

14   satisfied that, if this claim went to trial, the King

15   plaintiffs, at a minimum, would have a prima facie case.

16           So then the trustee said, okay, let me look at what

17   our potential defenses are.  And the trustee examined all of

18   the defenses that were asserted, when this case was in state

19   court, by Serv Trust.  And the defenses asserted by Serv Trust

20   really fall into two categories.  The first category I'll call

21   the procedural defenses, that is, that the King plaintiffs

22   didn't follow the procedures that are outlined in the

23   operating agreement in order to effect the redemption of the

24   Class B stock.  And the other was what we've termed the MOU

25   defense.

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    Let me deal first with the procedural defenses that

2    the King parties didn't follow the operating agreement.  The

3    first thing that was relied on by Serv Trust, and what the

4    trustee testified that he considered, was that, okay, the

5    appraisal that was done by Mr. Lippman, that was done actually

6    six days before Mr. VerStandig sent the letter demanding the

7    appraisal procedures.

8    And Mr. Schlossberg testified that there's nothing in

9    the operating agreement that would require the appraisal to be

10   done after the demand.  And he also testified that it was

11   really good business practice by Serv Trust to actually have

12   an appraisal done to know whether you want to invoke that

13   appraisal procedure in the first place.

14   And I'll point out that, again, the way the appraisal

15   procedure works is that the King parties, they go ahead and

16   name an appraiser.  And then there's a burden on Serv Trust to

17   name an appraiser.  Then those appraisers get together, and if

18   they agree, then they produce a joint appraisal.  If they

19   don't agree, they bring in a third party to do an appraisal,

20   and that appraisal governs.

21   Well, as Mr. Schlosberg testified, what happened?

22   Serv Trust did not appoint an appraiser.  That was one of the

23   points that Serv Trust relied on below to argue, kind of

24   counterintuitively, that well, therefore, the appraisal

25   procedures weren't satisfied.

escribers

www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1     Well, on one level, they waived their right to an

2 appraisal.  But on the second level, because they didn't put

3 an appraiser there, that meant that there was only one

4 appraiser, Mr. Lippman.  And so it really didn't matter

5 whether he did his appraisal before or afterward.  He came up

6 with his value.  His value was unchallenged.  So the trustee

7 concluded that that defense was not going to succeed.

8     Now, in terms of the MOU defense -- and the MOU is

9 set forth in Exhibit 4 of the trustee's exhibits.  And Exhibit

10 5 was an email that Mr. Myers sent to Mr. King, in January of

11 2017, attaching a copy of the executed MOU.  Again, in Exhibit

12 5, Mr. King responds fairly quickly and says it's not

13 effective.  It needed to be accepted by a date in September;

14 I believe it was the 12th.  And then the closing had to occur

15 by October 7th.  And he said, you're out of luck.  And then

16 Mr. Myers wrote back and said, well, I mailed it by mail back

17 at that time.

18     And then the trustee examined some other documents

19 that the King parties would be introducing at trial, if we go

20 to trial, and those are Trustee's Exhibit 6, 7, and 8.  And

21 they show that, subsequent to the date by which the MOU had

22 had to be accepted, Mr. Myers was not acting as if the MOU had

23 been accepted.  He was moving forward with plans to develop

24 the property.

25     You would think, the trustee testified, knowing Mr.



Appellees' Appendix 0534

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    Myers, where's the objections?  Why haven't you closed?  Why

2    haven't you put that 75,000 in escrow as required by the

3    agreement?  None of that what you would expect to see.  And so

4    the trustee concluded that that factual evidence weighs

5    against a finding that the MOU was timely accepted.

6          And then there's the critical fact.  In order for

7    this defense to succeed at trial -- and the trustee testified

8    at length on this -- is that he would have to put Mr. Myers on

9    the stand, and Mr. Myers' credibility would be at issue.  The

10   trustee testified that he's observed Mr. Myers in many

11   different court proceedings over the years.  And Your Honor,

12   had a chance to observe him in this very court yesterday and

13   today.  Mr. Myers is belligerent.  He is rude.  He is

14   disrespectful.  There is no way that Mr. Schlossberg could put

15   Mr. Myers on the stand and expect to be successful.  And if

16   those distasteful qualities weren't enough, Mr. Myers has a

17   problem telling the truth.

18          Let's look at Debtor's Exhibit 1, his own exhibit,

19   Judge Lipp's memorandum opinion, from 2018, denying him a

20   discharge.  I want to read from page 16.  And Mr. Myers, I

21   believe, read something from this page during his testimony.

22          The first full paragraph on page 16:  "The Court

23   agrees with the United States Trustee that Myers knowingly and

24   fraudulently made false oaths in his bankruptcy case

25   sufficient to deny him a discharge under Section

escribers

www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   727(a)(4)(A)."

2          Judge Lipp goes on to say his omissions and

3   misrepresentations were material and served to change the

4   course of his bankruptcy case in critical ways.  Two sentences

5   later:  "Myers' assertion that his failure to schedule

6   Goldsboro in the first several versions of his schedule was

7   inadvertent is simply implausible."

8          Page 17, which Myers, again, read from selectively.

9   First full paragraph, second sentence:  "The omission defies

10  credulity in light of the ongoing relationship between Serv

11  Trust, Myers, Kelly, and Goldsboro, and the substantial sums

12  of money transferred between the parties in the months leading

13  up to the bankruptcy filing and after the filing."

14         Judge Lipp goes on to say:  "It is not believable

15  that he simply forgot to include his largest unsecured

16  creditor in the first several versions of his schedules, when

17  he had executed a personal guarantee in favor of that creditor

18  six months prior to filing for bankruptcy and was requesting

19  advances from the creditor up to and after the filing of his

20  petition."

21         Next paragraph begins, "The Court further finds that

22  the various versions of Myers' Schedules I and J were

23  misleading and wholly unreliable, particularly with respect to

24  the funds received into the household from Serv Trust."

25         And then Myers -- this is the part he reads:  "It is

escribers

www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    undisputed that Serv Trust was established to pay educational

2    and other expenses related to Myers' children.  It is also

3    undisputed that Myers is a co-trustee of Serv Trust, with the

4    authority to direct Serv Trust to make payments on behalf of

5    its beneficiaries, the Myers children.  Myers was adamant at

6    trial that every payment that he and Kelly ever received from

7    Serv Trust was for the benefit of his children."

8        But here's what he leaves out:  "He then argued that

9    he always considered the Serv Trust payments to be loans,

10   regardless of how they were classified in his schedules, or

11   what was said at the 341 meeting, because neither he nor Kelly

12   is a beneficiary of Serv Trust.  Myers' classification of

13   payments he or Kelly received from Serv Trust as loans is

14   suspect."

15       And then the Court says:  "It is irrefutably

16   testified to by Myers every payment from Serv Trust to Myers

17   and/or Kelly was for the benefit of their children, then it

18   appears that Serv Trust was serving its intended purpose,

19   i.e., providing for Myers' children.  Such payments would not

20   be 'loans' to Myers and/or Kelly."  Mr. Myers leaves that part

21   out.  "They would be distributions to the trust

22   beneficiaries", which he also leaves out.

23       And then, Judge Lipp concludes:  "Regardless of their

24   classification, however, the payments needed to be included on

25   Myers' Schedule I, and the corresponding expenses included on

Appellees' Appendix 0537

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    Schedule J, because the funds were coming into the household.

2    However, as detailed below, his schedules never provided an

3    accurate financial picture."

4         Mr. Myers cannot be believed, Your Honor.  I'd submit

5    that a first year law student could very successfully impeach

6    Mr. Myers were he to take the stand and testify in the

7    adversary case.  And if the adversary case were to be tried,

8    we're not going against a first=year law student; we've got

9    Mr. VerStandig there, one of the most talented lawyers I know.

10   And I'm damn sure Mr. VerStandig would take apart Mr. Myers on

11   the stand.  And there is no way he would be able to prevail on

12   that defense.

13        And as Mr. VerStandig pointed out, and as what I just

14   read from Judge Lipp's opinion points out, Mr. Myers is very

15   selective.  He testified that the Serv Trust counterclaim is

16   still active.  Mr. Myers and Mr. VerStandig read you the

17   portion from Exhibit 10.  It's, like, the first full decretal

18   paragraph of the judge's order stating that that counterclaim

19   has been resolved in favor of Mr. VerStandig's clients.  You

20   can't believe what Myers says.

21        So taking this all together, as the trustee

22   eloquently testified, it was his opinion that he didn't stand

23   a very good chance of prevailing in the adversary case.  And

24   if he doesn't prevail in the adversary case, Your Honor, the

25   asset is worth zero to the estate because it gets redeemed for

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    past consideration.  Nothing new is coming into the estate.

2         So he negotiated a deal, and now we're getting, if

3    the deal is approved, $150,000.  But the trustee also

4    considered, okay, maybe I hit a home run, pull a rabbit out of

5    the hat.  Let's say we prevail at trial, after spending who

6    knows how much money that we don't have.  What happens then?

7    We still have this asset.  The trustee is statutorily charged

8    with liquidating the assets of the estate.  But as he

9    testified, there's no ready market for this.

10        And also, given the way the operating agreement is

11   laid out, it's not likely that whoever buys it may see any

12   income from this.  Plus we've also got to deal with the fact

13   that, if he's successful at trial on the grounds that perhaps

14   the King plaintiffs didn't follow the operating agreement,

15   then what's to stop them from doing the appraisal process once

16   again?  Their expenses have only increased in the last eight

17   years.

18        And he looked up the value of the property online

19   just to get a ballpark of it -- that's Exhibit 9, Trustee's

20   Exhibit 9 -- 1.8, 2.2 million, somewhere around there.  So

21   there's that risk, again, that we get nothing for it.

22        So the trustee ultimately concluded that this

23   settlement is in the best interest of the estate.  Mr. Myers,

24   it appears he wants to re-argue matters that were already

25   decided by this Court.  Mr. VerStandig mentioned this Court's

escribers
www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    opinion back from December of 2023.  And in there, the Court

2    considered several of the same arguments that Mr. Myers is

3    making now, and rejected them.

4         And I'm referring to the Court's -- this is docket --

5    document 1029.  This is "Order granting motion for approval of

6    proposed compromise and settlement with Brian King, Cristina

7    King, and the Cristina and Brian King Children's Trust", and

8    entered December 11th, 2023.

9         And on page 11, the Court lists a bullet point of

10   certain arguments that were made by Mr. Myers.  One of them:

11   "The alter ego order is not a final judgment and therefore has

12   no force or effect, pursuant to Maryland Rule 2-602."

13        The Court dealt with this on page 18 of that opinion.

14   "The debtor is incorrect in his argument that the alter ego

15   has no force or effect because it's not a final judgment."

16   And I'm not going to read the rest, but the Court knows what

17   it wrote.

18        The next bullet point, Mr. Myers argued that the

19   Serv Trust proof of claim prevents -- the proof of claim in

20   that Florida bankruptcy case, which Mr. VerStandig addressed,

21   creates an issue.  And that was already decided by the Court.

22        So to the extent Mr. Myers' arguments here, they're

23   just a regurgitation of what he argued before, the Court has

24   already ruled on that.  There's nothing new.  Mr. Myers, in

25   his cross-examination of the trustee, did not elicit any

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    information that should cause the Court to reconsider the

2    trustee's evaluation that this settlement is in the best

3    interest of the estate.  It's reasonable, it's a prudent

4    exercise of his business judgment, and we respectfully request

5    that the Court approve the settlement.  Thank you, Your Honor.

6          THE COURT:  Thank you, Mr. Mastro.

7          MR. MASTRO:  If I have any time left, I'll reserve

8    that for after Mr. VerStandig.

9          THE COURT:  All right.  Thank you.

10         Mr. Myers?  Mr. Myers, again, I will give you one

11   hour.

12         MR. MYERS:  I'll start with the three proofs of

13   claim.  They were filed six years after the claims bar date.

14   And Mr. VerStandig says they're prima facie evidence, claims

15   for zero dollars, no documents attached.  It says "See

16   adversary proceeding".  That's not a claim you can file in a

17   Chapter 7 bankruptcy case.  You need a monetary claim.

18         But let's go to why this Court can even allow those

19   claims.  First of all, this Court's order that was entered

20   instructing or allowing -- I'm not sure which; I can't

21   recall -- them to file a proof of claim -- let me say this

22   differently.  The King parties didn't file a motion for

23   allowance to file a late-filed proof of claim.  It filed no

24   motion.  And this Court cannot, sua sponte, extend the bar

25   date for them, out of the blue, to file proofs of claim.  So

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    if they wanted to file a late proof of claim, they needed to

2    file a motion before the bar date expired.

3            And then the next thing that Mr. VerStandig said that

4    your order allowing them to file a late-filed proof of claim

5    is a final order.  No, it's not.  An order allowing a creditor

6    to file a late-filed proof of claim is a nonfinal order and it

7    gets appealed at the end once whatever happens with the

8    claims.  It's not a final order.  So he's --

9            THE COURT:  Do you have case law to support that?

10           MR. MYERS:  There's plenty of case law.  I don't have

11   any with me to support it, but it's not a final order.  I

12   looked it up on AI, and it's crystal clear.

13           So it doesn't matter anyway because they never filed

14   a motion to file a late-filed proof of claim.  So this Court

15   can't allow them to file a late-filed proof of claim.

16           Now, let's go to the proofs of claim, notwithstanding

17   they're time barred.  And there is the order entered in the

18   Florida bankruptcy court, where they filed a proof of claim,

19   and I filed an objection, and the court sustained my objection

20   and overruled their proof of claim.

21           I do know the case law on this.  I don't have any

22   cites, but I know the case law is it doesn't matter that my

23   case was dismissed.  That claim objection is final in all

24   other proceedings going forward, and it's res judicata to

25   whatever they had in their claim, whatever they could have put

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   in their claim, et cetera.  And it's binding not only in that

2   court, it's binding in this bankruptcy court, and it's binding

3   in every other court in this land, going forward, in every

4   other proceeding.

5        THE COURT:  And what authority do you have for your

6   statement that the order sustaining the objection to claim in

7   Florida precludes the King parties from asserting any claims

8   whatsoever, not just the claims that were disallowed in that

9   proceeding, but any other claims as well?

10       MR. MYERS:  It's res judicata.

11       THE COURT:  And what authority do you have?

12       MR. MYERS:  So I don't have a case cite for it, but

13  there's plenty of cases that discuss, when you file a proof of

14  claim, and there's a claim objection, you bring all of your

15  claims.  And if you don't, whatever you didn't bring, you

16  don't get to relitigate later.  You don't get to add to it

17  later.

18       THE COURT:  Even if the claims -- I mean, the alter

19  ego decision was -- I forget what the date was.  But was the

20  decision by the Montgomery County Court before or after the

21  King parties filed their claims in Florida?

22       MR. MYERS:  They referenced that case in their claim.

23  So they can't bring any more claims.

24       THE COURT:  In the claim that they filed in Florida?

25       MR. MYERS:  Yes, ma'am.



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1      THE COURT:  Do you have -- well, okay.  None of

2  that's in evidence, but okay.

3      MR. MYERS:  Okay.  Well, they filed a one -- they

4  filed a zero dollar, no-backup, time-barred claim, no motion

5  to file late-filed proof of claim, and --

6      THE COURT:  In Florida?

7      MR. MYERS:  No, here.  Here.  Their claims here were

8  for zero dollars.  The basis is a hypothetical whatever

9  happens in an adversary proceeding, which is not a basis for a

10  proof of claim in a Chapter 7 case.  In a Chapter 7 case,

11  there has to be money.  So they don't want any money.  That's

12  the whole nature of this whole charade.  And so putting aside

13  that it's one page, zero dollars, no support, okay?

14      And Mr. VerStandig even said I guess we could have

15  fixed the entire adversary proceeding.  Well, that's not going

16  to get him anywhere anyway.  So it's a bogus proof of claim.

17  It was filed too late.  They never filed a motion to file a

18  late-filed proof of claim.

19      And Mr. VerStandig even testified, in the Montgomery

20  County Circuit Court case that the King parties don't have a

21  claim against the estate.  So he's judicially estopped there,

22  the King parties are.  It's in the transcript which I did file

23  in the Court record.  So for all those --

24      MR. VERSTANDIG:  Mr. Myers is referencing a

25  transcript that he docketed after evidence closed in this

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   case.  During the lunch break or the recess --

2         MR. MYERS:  You know, I'm speaking right now.  I'm in

3   my closing arguments.

4         THE COURT:  Hold on.  Hold on.  Mr. Myers, I've told

5   you, speak to the Court.  Don't speak to the lawyers.

6         MR. MYERS:  All right.  I'm in my closing argument.

7         THE COURT:  Okay.  Hold on.

8         MR. MYERS:  I didn't interrupt theirs.

9         THE COURT:  Okay.  Hold on.

10        Mr. VerStandig, you'll have an opportunity to address

11   that after Mr. Myers is finished.

12        MR. VERSTANDIG:  Thank you, Your Honor.

13        THE COURT:  Thank you.

14        MR. MYERS:  Okay.  And I did address that in my

15   testimony.  I read that sentence where Mr. VerStandig said

16   that the King parties have no claim against me, and they have

17   no claim against the estate.  They've got nothing.  The only

18   reason they filed that stupid adversary was because they were

19   trying to -- because they were caught by Judge Albright, and

20   they added me in so they could -- because they were trying to

21   prosecute an affirmative defense for Serv Trust's

22   counterclaim.

23        Now I'm going to move on.  Ninety-nine percent, 100

24   percent of what they said has nothing to do with the issues

25   you need to decide here.  I don't care about whether Roger

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1  Schlossberg thinks this is a good settlement, a bad

2  settlement, or a middle settlement.

3        THE COURT:  Well, isn't that the sole issue for the

4  Court?

5        MR. MYERS:  No, it is not, Your Honor.  So Serv Trust

6  has never filed a proof of claim in this Court ever.  Roger

7  Schlossberg has never filed an adversary against Serv Trust

8  ever.  He has one year, from when he was appointed on February

9  22, 2017, so February 22, 2018, to file a claim, a 547 claim,

10  fraudulent conveyance, whatever he wants to do.  He didn't do

11  it.

12        He has exclusive jurisdiction for alter ego claims.

13  The King parties have no standing whatsoever to bring an alter

14  ego claim that, to the extent Mr. Schlossberg wanted to file

15  it, he could have, he didn't, he passed on it.

16        And as I mentioned during my testimony, in one of the

17  hearings with Judge Lipp, she asked him, well, what other

18  claims do you have, Mr. Schlossberg, because Mr. Myers is

19  here; they want their money.  He goes, well, you know, people

20  bring me claims and, you know, fool's gold.  Well, I know

21  exactly what claim that was.  That was the King parties.  He

22  called it fool's gold.  Well, you know what?  He's the fool

23  because there's no gold.

24        So let's go to what is important.  It is crystal

25  clear in the case law that -- well, let me back up.  This case

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   was adversary -- the Montgomery County Circuit Court -- well,

2   this court, Judge Simpson, remanded that case to Montgomery

3   County Circuit Court.  No reservation of jurisdiction for

4   anything.  The Montgomery County Circuit Court has

5   jurisdiction.  You lost -- this Court lost jurisdiction over

6   all matters and issues in that case.

7          The case law will show that, once that case was

8   removed to Montgomery County Circuit Court, they have

9   jurisdiction to decide everything.  So whatever issues Mr.

10   Schlossberg has with the King parties, he has to do it in that

11   Court.  None of those issues can be decided in this Court,

12   unless they want to remove that case and bring it back to this

13   Court.  It's --

14          THE COURT:  I thought you said in your testimony, Mr.

15   Myers, that the case was not properly sent to the Montgomery

16   County Court, and therefore --

17          MR. MYERS:  You're missing my point.  That's a

18   different thing.  I'm talking about Judge Simpson.  Judge

19   Simpson entered the order in 2019, I think.  Judge Simpson --

20   I'm talking about this court, Judge Simpson being in this

21   Court.  Once this court remanded that case to Montgomery

22   County Circuit Court, your jurisdiction ended.

23          THE COURT:  Over the --

24          MR. MYERS:  And it's still ended today.

25          THE COURT:  Over the issues that were remanded.

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1          MR. MYERS:  Over the entire case, all matters, all

2    issues in that case.  That case is still open.  There's no

3    adjudication in that case.  You can -- you can look it up if

4    you want, Maryland law.  You can't execute on a nonfinal

5    order.  You can't enforce a nonfinal order.  There's nothing

6    you can do with a nonfinal order.

7          THE COURT:  Well, a nonfinal order -- if an order is

8    not final, what it means is that it's still subject to being

9    revised.  It doesn't mean that it's not a valid order.

10          MR. MYERS:  Okay.  Well, you can label it a valid

11    order because it's written, but it's not executable, and it's

12    not enforceable, and it doesn't provide -- and you can look it

13    up.  You will, I'm sure.  But you can look up that he cannot

14    base a 9019 settlement on a nonfinal order entered by a state

15    court.  That gives him no rights.

16          THE COURT:  And what authority do you have for that?

17          MR. MYERS:  I don't --

18          THE COURT:  Because I approve settlements all the

19    time that are not based on --

20          MR. MYERS:  I don't want to argue.

21          THE COURT:  Let me finish.  I'm asking you a

22    question.

23          MR. MYERS:  Okay.

24          THE COURT:  I approve settlements all the time that

25    are not based on a final nonappealable order.  I approve

1   settlements based on nonfinal orders.  I approve settlements

2   based on agreements of parties that haven't even gone through

3   litigation, where just parties have said that they have claims

4   against each other, or one party has a claim against the

5   other, and they've reached a settlement.  I approve that all

6   the time.

7           So what do you have that says that the Court cannot

8   approve a settlement unless there is a final nonappealable

9   order in place?  Because at that point, what is there left to

10  settle?

11          MR. MYERS:  You're --

12          THE COURT:  The whole purpose of the --

13          MR. MYERS:  You're missing --

14          THE COURT:  Let me finish.

15          MR. MYERS:  Well, I'm limited to an hour.

16          THE COURT:  Stop talking.  I'm talking.

17          MR. MYERS:  Yeah, but --

18          THE COURT:  I'm asking you a question about what you

19  just said.

20          MR. MYERS:  And I --

21          THE COURT:  Let me finish.  So if litigation has

22  concluded, and there is a final nonappealable order, then what

23  is there to settle?

24          MR. MYERS:  There is no --

25          THE COURT:  The rights have already been determined.



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    But I approve settlements all the time, and Rule 9019 is

2    applied all the time, even when there's not a final

3    nonappealable order.  So tell me what your authority is for

4    saying that I need a final nonappealable order before I can

5    apply Rule 9019.

6          MR. MYERS:  This is a bankruptcy court.  Your

7    jurisdiction is restricted to res, period.  If there's no

8    property -- if Serv Trust's property is not property of the

9    estate, that's the first question you ask.

10         THE COURT:  I'm not approving a settlement regarding

11   Serv Trust's property.  I'm approving a settlement regarding

12   claims that have been asserted against each other.

13         MR. MYERS:  No, you are.  You're approving a

14   settlement that would transfer nonestate property to the King

15   parties, which --

16         THE COURT:  No, I've been asked to approve a

17   settlement of whatever the estate's interest may be.  Maybe it

18   has all rights, maybe it has very little rights.

19         MR. MYERS:  I'd prefer to continue.

20         THE COURT:  Maybe even it has no rights at all.  But

21   I've been asked to approve a settlement of the estate's

22   interest.  And so I don't have to define what that is.  I only

23   have to say whether or not the trustee exercised good business

24   judgment in reaching that settlement.  So what do you have --

25         MR. MYERS:  May I continue?

Appellees' Appendix 0550

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1          THE COURT:  -- that says that I have to determine

2     that the estate has an interest in property to be able to

3     approve a settlement?

4          MR. MYERS:  That's a fundamental aspect of this

5     Court.  You can't approve any agreement for nonestate

6     property.  Judge Schneider (ph.) will tell you that.  And I

7     know you know that.  If it's not estate property, you have no

8     authority or jurisdiction to determine rights in it.

9          THE COURT:  I've been asked to approve a settlement

10    of whatever the estate's rights may be.  I have not been asked

11    to determine whether the bankruptcy estate has rights.  If the

12    bankruptcy estate has no rights at all, and Mr. Schlossberg

13    has negotiated a settlement that brings $150,000 into the

14    estate for no rights at all, then that is a huge win for the

15    bankruptcy estate.

16         MR. MYERS:  You're kidding me.  He cannot -- he

17    cannot, as a trustee, with a fiduciary duty, enter into an

18    agreement, on behalf of this bankruptcy estate, to transfer

19    nonestate property to the King parties in exchange for money.

20    That's the Anderson case.  That's fraud, period.  He

21    doesn't -- it's not estate property.  He doesn't have any

22    right in it.  He doesn't have any jurisdiction over it.  He

23    doesn't have any authority over it.

24         And your first obligation, before you can even

25    consider this bogus fraudulent 9019 crap, is to determine is

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   Serv Trust's property property of this estate.  And he

2   testified yesterday -- he testified yesterday he has never

3   filed an adversary against Serv Trust.  Serv Trust's property

4   has never come into this estate.  The only way that Serv

5   Trust's property can come into my bankruptcy estate is by some

6   action, because they're a third party, they have their own

7   property.  He would need to go and file an adversary to pull

8   that property back into the estate.  He didn't do that.  He

9   had one year after he was appointed to do it.  He elected not

10  to do it.  A nonfinal state court order does not make Serv

11  Trust's property of this estate.  Okay?

12          THE COURT:  Because you're saying the order is not

13  valid?

14          MR. MYERS:  Your Honor, a bankruptcy court has to

15  make a determination.

16          THE COURT:  Why?  I've never --

17          MR. MYERS:  The --

18          THE COURT:  I've never had to make a determination of

19  what the estate's interest is.  Instead, the settlement is

20  always a settlement of whatever rights and interests the

21  estate may have.  I don't have to define them.  We can argue

22  all day long about whether the Montgomery County order is a

23  valid order or not.  I'm not aware of anything that says it

24  only becomes valid when it's final and nonappealable.  You

25  haven't cited any case law to that.

1           But even if what you're saying is true, why do I have

2    to define what interest is being settled?  All I have to say

3    is that, whatever interest the estate may have, on a scale

4    from one to a hundred, it could be a hundred, it could be a

5    one --

6           MR. MYERS:  What if it's a zero?

7           THE COURT:  Whatever -- it could be a zero.

8           MR. MYERS:  It could be a zero?

9           THE COURT:  Whatever interest the estate may have,

10   that is what is being asked that I approve a settlement of.  I

11   do not have to define what the estate's interest is.  Why do I

12   have to define that?

13          MR. MYERS:  Because you have to -- you have to first.

14   At the beginning, you have to determine your jurisdiction over

15   the matter.

16          THE COURT:  I have jurisdiction over property of the

17   estate, whatever it may be.

18          MR. MYERS:  And there is no property of the estate.

19   You need to determine that.  So you need to determine your --

20   you can't close your eyes and say if -- what if Schlossberg

21   wanted to settle your home?  What if he wanted to do a

22   settlement with VerStandig?

23          THE COURT:  If he wants to do a settlement for the

24   estate's interest in my home?

25          MR. MYERS:  Yeah.



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1          THE COURT:  And he gets money for that?  Then good

2     for him.  Because guess what?  Whoever he's settling with is

3     getting zero.

4          MR. MYERS:  Why?

5          THE COURT:  Because the estate has no interest in my

6     home.  So maybe if -- and I'm not saying whether Serv Trust's

7     assets are or are not property of the estate; I don't have to

8     do that.  All I have to say is whether he exercised good

9     business judgment in reaching this settlement.

10          And what he is asking me to approve is a settlement

11     of the estate's interest, whatever it may be.  Maybe the

12     estate's interest is that it has exclusive rights to all of

13     Serv Trust's assets.  Maybe it's that it has a right under a

14     final nonappealable order.  Maybe it's that the estate has a

15     right under an order that is not final and nonappealable.  I

16     don't have to define that.

17          MR. MYERS:  Yes, you do.

18          THE COURT:  Okay.  Well, all right.

19          MR. MYERS:  And if you -- and if you -- I hope you --

20          THE COURT:  If you have any --

21          MR. MYERS:  -- review the case law before you enter a

22     decision.

23          THE COURT:  What case law would you like me to

24     review, Mr. Myers?  Cite me --

25          MR. MYERS:  I'll send it to you.



 1          THE COURT:  You're not sending me anything.  This is

 2   your chance.

 3          MR. MYERS:  Well, you know what, Judge?

 4          THE COURT:  This has been pending for years.

 5          MR. MYERS:  Judge --

 6          THE COURT:  Years.  This is your opportunity.

 7          MR. MYERS:  Okay.  Well, then let me speak.

 8          THE COURT:  And you have not --

 9          MR. MYERS:  Let me speak.

10          THE COURT:  You have not cited a single case, and

11   I've asked you to cite to authority.  I asked you yesterday.

12   I asked you earlier today.

13          MR. MYERS:  Okay.  You're --

14          THE COURT:  And I'm asking you now.

15          MR. MYERS:  Now, you've taken fifteen minutes of my

16   time.

17          THE COURT:  I --

18          MR. MYERS:  Okay.  So I'm going to disagree with you.

19   You just said that, if he were to do a settlement with your

20   house, he'd get nothing.  You can't approve a settlement, a

21   9019 settlement, by a bankruptcy trustee, for this bankruptcy

22   estate, if you have not first determined that what he's trying

23   to transfer to the King parties, in exchange for money, is

24   property of the estate.  The first thing you need to do is

25   determine property of the estate.

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1          So we can disagree on that.  But I will say to you --
2   and I'll say to you you're wrong, and you will find plenty of
3   case law on that.  And that's so fundamental, it's like the
4   sky is above and the ground is below.  You can't authorize an
5   order for nonestate property.
6          THE COURT:  I'm not authorized -- he hasn't asked me
7   to --
8          MR. MYERS:  It is.  It's right -- it's right in the
9   agreement.
10         THE COURT:  He's asked me -- this Court is only going
11  to approve a settlement with respect to the estate's
12  interests.  I'm not approving anything beyond that.
13         MR. MYERS:  But he does -- the state doesn't have an
14  interest in that property.
15         THE COURT:  Well, you can make that argument later
16  on.
17         MR. MYERS:  But you haven't even determined it.  At
18  least you've admitted that.
19         THE COURT:  I don't --
20         MR. MYERS:  So on appeal, it's easy.
21         THE COURT:  I don't have to.
22         MR. MYERS:  You don't have to determine if it's
23  estate property that he wants to transfer?
24         THE COURT:  I don't have to.  I may make that
25  determination.



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1          MR. MYERS:  I hope you do.

2          THE COURT:  I don't have to.

3          MR. MYERS:  Okay.  Well --

4          THE COURT:  And you have not cited any case law that

5    tells me I have to make that determination.

6          MR. MYERS:  Wow.  I didn't think that, on a

7    fundamental issue like that, that I had to cite that to you.

8          THE COURT:  Well --

9          MR. MYERS:  Okay.  So maybe --

10         THE COURT:  Mr. Myers, if you want to come in here

11   and play lawyer, then come in here and cite case law to me.

12   Okay?  If you're going to make a legal argument, be prepared

13   to back it up.

14         MR. MYERS:  So it's my position that you can't sign

15   your name to a 9019 settlement agreement authorizing the

16   transfer, which is what a settlement agreement is -- you've

17   got to look at it.  He's saying I want you, Court, to

18   authorize me to transfer nonestate property to the King

19   parties in exchange for $150,000.

20         The case law, by the way, is in my brief.  It's the

21   Anderson case.  Right on point.  A trustee cannot enter into a

22   9019 settlement for nonestate property and obtain money by

23   transferring nonestate property.  It's fraudulent.  Anderson,

24   In re Anderson.

25         THE COURT:  You continue to go down this path.  And



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    I've told you you're going down the wrong path.  I've told you

2    that this Court will only approve a transfer of the estate's

3    interest, whatever it may be.  And you continue to argue that

4    the Court cannot approve a settlement that involves a transfer

5    of nonestate property.  If you want to waste your time with

6    that argument --

7              MR. MYERS:  Are you saying you agree with that?

8              THE COURT:  I'm not saying either way.  I'm saying

9    that what I am going -- what I am asked to do is approve a

10   settlement with regard to -- with regard to the estate's

11   interest.

12             MR. MYERS:  And it's your contention that you don't

13   have to determine what the estate's interest is.  So he could

14   make up anything.

15             THE COURT:  I --

16             MR. MYERS:  He could come in here --

17             THE COURT:  I think I've said that half a dozen

18   times, Mr. Myers.  If you want to continue to talk about it,

19   we can continue to talk about it.

20             MR. MYERS:  Okay.  So in your example --

21             THE COURT:  You're eating up your time.

22             MR. MYERS:  In your example, when you said -- I said,

23   if he were to do a settlement with your house, you said he'd

24   get zero because it's not estate property.  Well, when is that

25   determined?



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1           THE COURT:  At some point --

2           MR. MYERS:  When is it --

3           THE COURT:  At some point, when somebody tries to

4    take my home from me, when somebody tries to say that they own

5    my home, or they try to kick me out of my home, at that point

6    I'll say, wait a minute, you got the estate's interest in my

7    home, and the estate had no interest in my home.

8           So again, we could be talking about an interest on a

9    scale from one to a hundred.  Maybe the estate's interest is a

10   hundred.  Maybe the estate's interest is a fifty.  Maybe it's

11   a one.  Maybe even it's a zero.  But I don't have to determine

12   whether it's a zero, 150 or 100.  All I have to determine is

13   whether the trustee exercised good business judgment in

14   deciding to enter into this settlement.

15          MR. MYERS:  So I want to move on from this.  I want

16   to -- I want to put a final comment on -- you said that only

17   when somebody comes to you to take your house would they find

18   out that they don't own it.  So you wouldn't be upset if a

19   judge entered that order where he was allowed to take your

20   house, obtain money for himself, and then a year later -- and

21   you know what he would argue?

22          THE COURT:  He's not taking my house.

23          MR. MYERS:  You know what he would argue?

24          THE COURT:  He's not taking my house.

25          MR. MYERS:  I'm using it as an example.  You know



Appellees' Appendix 0559

1    that.

2              THE COURT:  Well --

3              MR. MYERS:  Any other property, nonestate.

4              THE COURT:  You're talking about a transfer of the

5    estate's interest.

6              MR. MYERS:  It has no interest.

7              THE COURT:  It's talking about -- I'm looking at what

8    the --

9              MR. MYERS:  All right.  I'm going to move on.

10             THE COURT:  -- elements are.  "Number one, the King

11   plaintiffs and the trustee would jointly file a stipulation in

12   the state court cases pursuant to which the King plaintiffs

13   would dismiss" --

14             MR. MYERS:  I'd like to finish my argument.

15             THE COURT:  -- "without prejudice the redemption

16   claim".  So number one, they're talking about dismissing

17   litigation.  "Number two, in consideration, the trustee would

18   agree to toll the statute of limitations."

19             MR. MYERS:  Your Honor, I'd like to finish my

20   argument.

21             THE COURT:  "And number three" -- stop interrupting

22   me.

23             MR. MYERS:  Well, I'd like to finish my argument.

24             THE COURT:  "And number three" -- stop interrupting

25   me.  Mr. Myers, we've been going at this for two days.



Appellees' Appendix 0560

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1        MR. MYERS:  Well, I don't want to hear your view.

2        THE COURT:  You've been interrupting me.  I'm not --

3    I'm asking you a question --

4        MR. MYERS:  No, you're not.

5        THE COURT:  -- to give you an opportunity to address

6    it.

7        MR. MYERS:  I have my closing argument.

8        THE COURT:  "Number three, the King plaintiffs and

9    the trustee would endeavor in good faith to negotiate a

10   resolution to the redemption claim."  So that's what has

11   been -- that's the proposed settlement.  And I assume the

12   trustee is going to ask me to approve a transfer of the

13   estate's interest in whatever assets we're talking about.

14       MR. MYERS:  And they have no interest.  So what do

15   you do then?

16       THE COURT:  Then -- they get nothing then.  I will

17   approve, in a settlement, a transfer of the bankruptcy

18   estate's interest in property.  I am not being asked to

19   approve -- I do not understand, from the presentation of the

20   case, that I'm being asked to approve the transfer of

21   nonestate assets.

22       MR. MYERS:  You're being asked to approve a

23   settlement agreement.  And in the settlement agreement, it

24   says the King parties are going to pay him 150 grand.  I mean,

25   honest to God, I'm -- this is pretty incredible.  They're

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    going to pay him 150 grand, and he's going to -- you're going

2    to put your signature on a document.  And then he's going to

3    go in, and the King parties are going to say, oh, we already

4    did the deal.  Serv Trust's property is ours.  He's going to

5    say he got the money, and he's going to say equitable

6    mootness.  Okay?

7            But he doesn't -- this estate doesn't own any

8    property to transfer to the King parties.  And it is my

9    contention that, as a first step, fundamental, before you can

10    approve an agreement to transfer somebody else's property,

11    whether it's Serv Trust, or yours, or anybody else that's

12    nonestate property, you need to make a determination, because

13    there's no way that agreement doesn't fall below the lowest

14    level if it's not estate property.

15            And if -- and there is no possible way that you have

16    jurisdiction and authority to sign anything or approve

17    anything involving nonstate property.  So you have to make a

18    determination.  And my God, that's what bankruptcy courts do.

19    That's your only provision.  So I'm going to move on.

20            THE COURT:  Please do.

21            MR. SCHLOSSBERG:  Pardon me, Your Honor.  There was

22    confusion, I believe, a moment ago, when you were reading from

23    the motion.  I believe you were looking at the terms of the

24    procedural motion as opposed to the 9019 on the substance.

25    Those terms appear on page 6 of 18 of document docket number

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    17-1.

2            THE COURT:  All right.  Thank you.

3            MR. MYERS:  Okay.  So we've established that I filed

4    my bankruptcy petition on November 18th, 2015.  That's when my

5    estate is --

6            THE COURT:  And Mr. Schlossberg, that was what I was

7    reading from, 17-1.

8            MR. SCHLOSSBERG:  Your Honor?

9            THE COURT:  The notice, top of page 5.

10           MR. SCHLOSSBERG:  And these are on the procedural

11   motion.

12           THE COURT:  I understand.  Thank you.

13           MR. SCHLOSSBERG:  On the following page, it's

14   captioned at the top, "Proposed compromise and settlement".

15   Those are the terms that are before you here today.

16           THE COURT:  Understood.

17           MR. SCHLOSSBERG:  Thank you.

18           THE COURT:  Thank you.

19           MR. SCHLOSSBERG:  Sorry to interrupt.

20           THE COURT:  No problem.

21           Go ahead, Mr. Myers.

22           MR. MYERS:  It's a breach of a trustee's fiduciary

23   duty to touch nonestate property, period, whether it's a 9019

24   or anything else.  That's fundamental.

25           I filed my claim on November 18th, 2015.  Mr.



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    Schlossberg came in on February 22, 2017.  He filed no -- he

2    elected not to file an adversary.  He was aware of Serv Trust.

3    He knew about it.  It was discussed a lot in this case.  And

4    Judge Lipp then entered her order, which is res judicata in

5    this case and anywhere else, as to the matters that she made

6    findings of fact and conclusions of law on.  They are not

7    dicta, as Mr. Mastro -- Mr. VerStandig alluded to.  They are

8    findings of fact and conclusions of law which you're bound by.

9            THE COURT:  And Mr. Myers, even though the state

10   court later made a determination that, as of the date of your

11   bankruptcy filing, that you were an alter ego of Serv Trust,

12   and Serv Trust's assets and liabilities are assets and

13   liabilities of this estate?

14           MR. MYERS:  The state court did not make an

15   adjudication.  The trial judge said I'm making no

16   adjudication.

17           THE COURT:  Well, I'm --

18           MR. MYERS:  There's nothing --

19           THE COURT:  What about the order -- what about the

20   order entering judgment?

21           MR. MYERS:  It's not entering judgment.  It's

22   entering nonfinal.

23           THE COURT:  Judgment.

24           MR. MYERS:  No.

25           THE COURT:  Order -- it's called order entering

escribers
www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    partial judgment and stay.  And it says that judgment is

2    entered in favor of the King parties and against Serv Trust on

3    all claims set forth in the counterclaim.  And then it says --

4              MR. MYERS:  I know what it says, Your Honor.

5              THE COURT:  -- judgment is entered in favor of the

6    King parties on Count 2 which he defined as the alter ego

7    declaratory claim.  So how can you say that judgment was not

8    entered?

9              MR. MYERS:  Because it wasn't.  It's a nonfinal

10   order.

11             THE COURT:  This says --

12             MR. MYERS:  There is no --

13             THE COURT:  -- judgment is entered.

14             MR. MYERS:  Excuse me?

15             THE COURT:  It says judgment is entered.  How can you

16   say that judgment was not entered?

17             MR. MYERS:  There is no final order against all

18   claims against all parties.  Maryland case law is clear.  The

19   Maryland Court of Appeals even said there's no final order in

20   this case.  And I read from you Mr. VerStandig's filing in the

21   Maryland Court of Appeals, where he said there is no final

22   order for any claim.

23             THE COURT:  Well, that's different than judgment not

24   being entered.  What you're saying is that the judgment is not

25   final.

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1        MR. MYERS:  There's --

2        THE COURT:  You can't say a judgment wasn't entered.

3   Judgment was entered.  We have the order.

4        MR. MYERS:  A judgment is when the case is over.

5   It's a nonfinal order.

6        THE COURT:  So you're saying that -- so two different

7   questions here.  First of all, judgment was entered.  What

8   you're saying is that the judgment is not final.  But what is

9   your authority that says that a judgment that is not final is

10  not a valid judgment?  It means that the judgment can still be

11  revised.  It means it can be reversed on appeal.  It can be

12  revised under the court's revisory powers.  But what authority

13  do you have to say that an order that is not final and

14  nonappealable is not an order or is not a judgment?

15       MR. MYERS:  Your Honor, I don't know.  Maybe trust

16  AI:  "In Maryland, a nonfinal state court order cannot be

17  executed upon or enforced immediately.  Enforcement of

18  judgments and court orders occurs after final judgment is

19  entered."

20       THE COURT:  It says it can't be enforced immediately.

21  It doesn't say -- it does not say that the order is not a

22  valid determination by the court or is not a valid order.  It

23  just says it can't be enforced yet.

24       MR. MYERS:  Okay, Your Honor.

25       THE COURT:  Because it's still subject to the court's

escribers
www.escribers.net | 800-257-0885

1     revisory powers.

2              MR. MYERS:  Correct.  And you have no jurisdiction

3     over anything in the Montgomery County --

4              THE COURT:  I --

5              MR. MYERS:  You can't do anything with it.

6              THE COURT:  I'm not revising --

7              MR. MYERS:  You're reviewing it.

8              THE COURT:  -- Montgomery County's decision.

9              MR. MYERS:  And that's a violation of Rooker-Feldman.

10             THE COURT:  I'm not reviewing it.

11             MR. MYERS:  Yes, you are.

12             THE COURT:  I --

13             MR. MYERS:  You just did.

14             THE COURT:  I am not reviewing it to apply it or --

15    I'm not reviewing it for the purpose of revising it.  If

16    anything, I'm reviewing it to apply the decision of the court.

17             MR. MYERS:  There is no decision, Judge.

18             THE COURT:  Okay.  All right.  We can -- I don't want

19    to spend any more time.

20             MR. MYERS:  I suggest you look that up because --

21             THE COURT:  Why don't you --

22             MR. MYERS:  -- this will get destroyed in an appeal.

23    And I --

24             THE COURT:  I don't need your suggestions.  Thank

25    you.



www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1        MR. MYERS:  Well --

2        THE COURT:  What I want -- what I'm trying to do is

3   ask you questions and give you a chance to answer my

4   questions.  So we--

5        MR. MYERS:  Well, what if Judge Lease --

6        THE COURT:  We are going to agree to disagree.

7   You're saying that the Court cannot approve a settlement

8   unless there's a final nonappealable order.  And you're saying

9   that the order of the Montgomery County Court is not a

10  judgment, even though it's called a judgment, and says

11  judgment is entered, because it's not a final and

12  nonappealable order.  I hear you.  I disagree with you, but I

13  hear you.

14       So why don't you use your time on another argument?

15  I hear what you're saying, Mr. Myers.

16  (Pause)

17       THE COURT:  Just to let you know you have

18  approximately twenty-two minutes.

19       MR. MYERS:  You should grant me a few extra minutes

20  for all the interruptions.

21       THE COURT:  Well, part of closing argument is

22  answering questions by the Court, Mr. Myers.  You've been in

23  court enough to know how this works.

24       MR. MYERS:  Well, it sure sounds like you're arguing

25  with me.



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1          THE COURT:  I'm asking you questions because I'm

2     trying to understand your position and get authority for your

3     position.

4          MR. MYERS:  Okay.  So my position is this.

5          THE COURT:  I --

6          MR. MYERS:  I don't want to get lost in semantics.

7     Until -- once you remand a case to state court, until that

8     court resolves all claims against all parties, there is no

9     decision in that Court.  Even though they preliminarily can

10    enter something like a nonfinal order, it can be revised.  And

11    I'm not even a party to the trial, so they couldn't even

12    determine alter ego, which is what Judge Lease said.  It's in

13    all my filings.  You have the transcripts.  You have the

14    December 16th transcript, and you also have the trial

15    transcript now.

16         THE COURT:  Well, he entered judgment in favor of the

17    King parties on the alter ego claim.  The counterclaim was

18    dismissed, and the other count to the complaint was dismissed.

19    So why is the order not final?  What is there left for the

20    Montgomery County Court to decide?  Both of the counts of the

21    complaint have been fully resolved --

22         MR. MYERS:  No, they haven't.

23         THE COURT:  And the counterclaim has been -- judgment

24    has been entered in favor of the King parties on the

25    counterclaim.  So what is there left for the Montgomery County

escribers
www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    Court to determine?  Why is this not a final order?

2          MR. MYERS:  Judge, there were four claims, two from

3    Goldsboro, two from King parties.  He resolved -- without me

4    being there, in violation of the automatic stay, he

5    resolved -- he took evidence on this alter ego claim.  He's

6    never resolved Count 2.  He's never resolved either --

7          THE COURT:  Count 2 says, "Judgment entered in favor

8    of the King parties on Count 2".  So he did.

9          MR. MYERS:  I'm sorry.  He never resolved Count 1.

10   Count 2 was the alter ego.

11         THE COURT:  Well, the testimony was that Count 1 was

12   dismissed.

13         MR. MYERS:  Count 1 wasn't dismissed.

14         THE COURT:  That another count -- the other count was

15   dismissed.  I mean, all right.  Well, I'll ask Mr. Mastro to

16   clear it up.

17         MR. MYERS:  Here, I'll clear it up for you right now.

18   And the Fourth Circuit's already cleared it up with Mr.

19   VerStandig.  He can't go in and Mr. -- Mr. Schlossberg, when

20   there's no -- Serv Trust is not his property.  He can't agree

21   to dismiss Count 1 before the Montgomery County Circuit Court

22   even makes a decision, final decision, that Serv Trust is

23   property of whoever.

24         And guess what?  The case law also says that, even if

25   Montgomery County says the moon is made of green cheese, you,

1    as a bankruptcy court, still have to make a determination,

2    independently, as to whether Serv Trust is property of the

3    estate.  You can no longer do that because he's never filed a

4    547 or any action against Serv Trust.

5         You know, I know this law backwards and forwards.

6    And so there are still three claims left in that case.  And

7    Mr. VerStandig is trying to pull the same stunt he pulled in

8    Kiviti that the Fourth Circuit told him to go pound sand.  You

9    cannot create a final judgment by dismissing a claim, okay?

10   And that's what they were trying to do.

11        And he's all over the record in the transcript

12   saying, well, if you resolve the -- if you resolve the alter

13   ego, I'm sure Goldsboro's counsel and I could get together,

14   and we'd dismiss all of the other counts, and then you'd have

15   yourself a final judgment.

16        Read the Kiviti decision.  The Fourth Circuit told

17   him forget it; that's not how it works.  Every circuit court

18   has now taken up this issue because people were trying to

19   create finality.  They can't create it.

20        THE COURT:  And what is the citation for Kiviti?

21        MR. MYERS:  Kiviti v. -- well, he's -- he was in the

22   case.  It was Fourth Circuit.

23        THE COURT:  You're citing the case.  I'm asking you.

24        MR. MYERS:  K-I-V-I-T-I  v. something with a "B".

25   Okay?



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1        THE COURT:  Do you have a citation?

2        MR. MYERS:  For God's sakes.

3        THE COURT:  Mr. Myers, I caution you, you are walking

4    a fine line between showing extreme disrespect for the Court.

5    And I caution you to dial it back.

6        MR. MYERS:  I'm dealing with thieves here.  Kiviti v.

7    Bhatt, B-H-A-T-T.

8        THE COURT:  What's the citation?

9        MR. MYERS:  80 F.4th 520 (4th Cir. 2023).  He tried

10   to do the same thing here before.  Kiviti came out and told

11   him he couldn't do it.  So they're trying to create finality.

12   They can't do it.  There is no final order in the Maryland

13   case.

14       So this is Judge Lease at the trial, at the

15   beginning, explaining.  Under the doctrine, you can do either

16   one of two things.  You either abstain, because Myers isn't a

17   party, okay, it's a waste of time, because you've just got to

18   come back here again; I got no final judgment.  And then he

19   says, or two, I can do something, but then it's a nonfinal

20   judgment, because anything that I do today, in essence,

21   necessarily would be nonfinal, because we're not putting all

22   of the claims against all the parties for not getting to an

23   adjudication.  So we don't have a final judgment today under

24   any circumstances.  Maryland Court of Appeals came to the same

25   decision.



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1        Okay.  Let me go back.  I've covered the fact that

2   the only adjudication in this Court, relative to my

3   relationship with Serv Trust, was Judge Lipp's order in 2018.

4   And she determined -- she, either implicitly or explicitly,

5   determined that it is not my alter ego, because she made all

6   the findings of fact and conclusions of law.  So it's not my

7   alter ego.  So that's res judicata.  He's never filed the

8   action.  He's now time barred.

9        Do you mind?  While I'm trying to give my

10  presentation --

11       THE COURT:  Excuse me, Mr. Myers.

12       MR. MYERS:  I can't concentrate while they're

13  talking.

14       THE COURT:  Then you tell me that.

15       MR. MYERS:  Would you ask them to please be quiet

16  while I'm trying to give this presentation?

17       THE COURT:  Try and keep your talking low enough that

18  it does not disturb Mr. Myers, please.  Thank you.

19       MR. SCHLOSSBERG:  Will do, Your Honor.

20       MR. MYERS:  Okay.  So we discussed earlier where

21  Judge Dwyer said -- and I'll give you the case cites for

22  this -- Alter ego claims are the exclusive property of the

23  bankruptcy estate.  The King parties have no jurisdiction to

24  bring an alter ego claim in Montgomery County Circuit Court.

25  And the cases are Wilson v. Dollar General Corp., 717 F.3d

escribers
www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    337, and In re Charles Edward Enterprises 344 B.R. 788.

2          THE COURT:  So Mr. Myers, you just told me a moment

3    ago that this Court has no ability to review the decisions of

4    the state court, but now you're telling me that the state

5    court decision is not valid because the alter ego claim

6    couldn't be brought there.  And you're asking me to determine

7    that the state court decision is not enforceable.  So you're

8    asking me to do exactly what you just said five minutes ago I

9    couldn't do --

10         MR. MYERS:  No, ma'am.

11         THE COURT:  -- which is review the state court

12   decision.

13         MR. MYERS:  No, ma'am.  I'll explain.

14         THE COURT:  Please do.

15         MR. MYERS:  Okay.  A case goes over to Montgomery

16   County Circuit court.  The King parties bring an alter ego

17   claim that is exclusively -- the standing is exclusively in a

18   Chapter 7 trustee.  The reason the King parties are bringing

19   the claim, and the reason the Chapter 7 trustee asked them to,

20   is because the Chapter 7 trustee knows he's time barred.

21         Now, that's too bad.  Time bars are time bars.  Okay.

22   You lose.  He didn't bring the claim, so he's out.  And so now

23   the King parties don't have standing to bring an alter ego

24   claim on behalf of the estate.  Only a Chapter 7 trustee does.

25   But he's time barred.  So they have no standing to bring that

escribers
www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   claim, and it should be dismissed, and it will be eventually.

2   So --

3        THE COURT:  So you're saying that this Court should

4   not -- that -- this Court can't dismiss that case.  It's in

5   the state court.

6        MR. MYERS:  No, that's -- I didn't ask -- this Court

7   can't dismiss that case.  This Court can't interfere at all

8   with that case.  This Court can't consider a 9019 settlement

9   while that case is going on, because that Court hasn't made

10  its decision yet.  And this Court remanded everything to them,

11  and it's a violation of Rooker-Feldman to review state court

12  orders after you remand them.

13       THE COURT:  And as I said earlier, I am not reviewing

14  the state court's decision to say whether it's right, or

15  whether it's wrong, or to revise it, or to supersede it, or to

16  make a decision that conflicts with it.  I don't understand --

17       MR. MYERS:  That's not how -- Rooker-Feldman is when

18  a party --

19       THE COURT:  I --

20       MR. MYERS:  -- brings something from a state court --

21       THE COURT:  Thank you.  I understand what Rooker-

22  Feldman --

23       MR. MYERS:  Okay.  Well, let's just move on.

24       THE COURT:  Okay.

25       MR. MYERS:  So the authority to allege that alter ego



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    claim in state court -- and I don't really -- there's kind of

2    two things going on.  The state court has jurisdiction over

3    all of these issues.  Whatever they're trying to do here in

4    the back door, they need to be over in the state court.  The

5    state court is not done with them.

6         THE COURT:  You just said that an alter ego claim

7    lies exclusively with the Chapter 7 trustee and has to be

8    brought in this court.  And now you're saying the state

9    court --

10        MR. MYERS:  No, no, not in this court.  I'm saying

11   that the Chapter 7 trustee is the only party with standing to

12   bring an alter ego claim.  But once his time runs out, that's

13   the end of it.  The King parties don't have derivative

14   jurisdiction to therefore go in, after Schlossberg's time runs

15   out, and file an alter ego claim.  They have -- King parties

16   have no standing.  So once we get back into state court, that

17   will all be resolved, and the entire case will get dismissed.

18   Okay.  So --

19        THE COURT:  Did you appeal the decision of the

20   Montgomery County Court?  Did anybody appeal it?

21        MR. MYERS:  Yes, I appealed to the Maryland Court of

22   Appeals as a nonfinal order.  They said there's nothing to

23   appeal.  There is no decision yet.  And that's where I quoted

24   you from.  Mr. VerStandig filed a motion in the Maryland Court

25   of Appeals, and he said -- I asked for a stay, and they said

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    there's no final order.  There's no order determining any

2    claim against any party in the circuit court case.  That was

3    after Judge Lease entered the nonfinal order.

4        Mr. VerStandig knows the law.  He knows it's a

5    nonfinal order, and he knows that no claim against any party

6    is resolved until all claims against all parties in a final

7    judgment is entered by that court.  And Judge Lease knows

8    that.

9        THE COURT:  And did you take any action in the

10   Montgomery County decision after the stipulation of dismissal

11   was filed?

12       MR. MYERS:  The stipulation of dismissal was -- is

13   void.  The case is over.  They can file whatever they want,

14   but it's void because Schlossberg can't file something on

15   behalf of Serv Trust.  There's no final decision that does

16   anything.  I know he wants to jam it on through, but that's

17   not the way it works.

18       THE COURT:  So no, you did not?

19       MR. MYERS:  Well, I filed a -- well, I filed a motion

20   to dismiss for lack of prosecution because they haven't done

21   anything.  Their whole goal was to get over here in front of

22   you and pull this stunt.  And so I filed a motion to dismiss

23   for lack of jurisdiction.  And the judge entered an order

24   denying my motion.  I don't know why, because there hasn't

25   been any pleadings filed for a year -- over a year.

escribers

www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1          In any event, I appealed that order to the Maryland

2     Court of Appeals.  So this entire matter is now on appeal --

3     not -- it's on appeal in the U.S. District Court.  It's on

4     appeal in the Maryland Court of Appeals.  And I will go into

5     the Maryland Court of Appeals, treating that as a collateral

6     order, and this case will be dismissed for lack of subject

7     matter jurisdiction, because everything Judge Lease did, he

8     had never had jurisdiction returned.

9          But that's -- I'm not trying to argue that with you.

10    That's the Fourth Circuit case that -- I'm going to put this

11    in the record.  This is a published decision, United States

12    Court of Appeals for the Fourth Circuit, City of Martinsville,

13    Virginia v. Express Scripts, Inc.  This is decided February

14    10, 2025.

15         It says exactly what I told you that, when a case is

16    removed, and then a court enters a remand order, if a party

17    appeals, that court is stayed, under Coinbase and -- under

18    Coinbase, which refers to Coinbase, Inc. v. Bielski, 599 U.S.

19    736 (2023), Griggs v. Provident Consumer Discount Co., 459

20    U.S. 56 (1982).

21         It's the Griggs principle, and it basically says, in

22    that situation, the Florida court could do nothing.  It could

23    never have sent that remand order back to Montgomery County

24    because they were automatically -- nobody had to do anything.

25    They're automatically stayed under those circumstances.  And

escribers

www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    that's what the Fourth Circuit found on a case that was

2    removed -- remanded, or attempted to be remanded.  And they

3    said the state court can't do anything because the district

4    court can't send the required order remanding the case.

5         And it's 1447, "State court may not proceed after

6    remand until the remand order is physically mailed to it".  It

7    has to be a certified copy.  That's 28 U.S.C. 1447(c).  That

8    never happened here.

9         So what happened here, and where this is all going to

10   end up, is that the case was removed to Florida.  I appealed

11   the remand order.  I filed a motion for rehearing of that

12   order.  The Court reserved jurisdiction.  So the Court was

13   never intending to send that case back immediately.  The order

14   that the court entered says it's reserving jurisdiction.  I

15   filed a motion for rehearing, and then Mr. VerStandig filed an

16   opposition.  So clearly the bankruptcy court in Florida had

17   jurisdiction.  It didn't enter its order until January 31.

18   Then it went up on appeal, and then my case was dismissed and

19   the adversary was closed.

20        So in effect, the case that was in Maryland went down

21   to Florida, and it's gone.  And you're welcome to read the

22   case law.  What has to happen is, if Mr. VerStandig and his

23   clients want to do anything, because that case has now been

24   dismissed, they would have to go down to Florida and have that

25   case reopened, because that Court has never, ever mailed,

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   physically mailed, a copy of that order back to Montgomery

2   County Circuit Court.  Until they do, Montgomery County

3   Circuit Court had no jurisdiction to do anything.

4           And I would like to -- would you like this case or

5   no?

6           THE COURT:  Which one?

7           MR. MYERS:  A copy of it?  No?

8           THE COURT:  You're welcome to hand it up.  I'll take

9   a look at it.  Save me the printing.  You can hand it to Ms.

10  Whitfield.

11          MR. MYERS:  It's an important case.

12          THE COURT:  Well, I'd like to think all cases are

13  important, but --

14          MR. MYERS:  Well, it's --

15          THE COURT:  -- I'm happy to read this.

16          MR. MYERS:  Yeah.  So it resolves -- so where that

17  takes us is everything that happened in the Montgomery County

18  Circuit Court is going to be -- they never got jurisdiction

19  back.  So there are no orders, period.  There's no trial.

20  There's no nothing.

21          Schlossberg also argued in this Court, in the Offit

22  Kurman v. Serv Trust action -- and you can see it in the

23  record -- that I have no interest in Serv Trust.  So this is

24  in, what, 2000 whatever, I don't know, '19?  This is after

25  Judge Lipp said I have no interest, everything's fine.  Serv

Appellees' Appendix 0580

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    Trust is -- you know, Myers is the trustee for the benefit of

2    his five children, et cetera.

3          Let's talk about another thing.  Serv Trust property

4    is not property of the estate.  The only way that this Court

5    or any court could ever determine rights in Serv Trust

6    property is to bring in the beneficiaries' indispensable

7    parties.  They're the owners of the property.  There's never

8    been an adjudication yet whether they own or don't own, okay?

9    It's just this bogus January 3 trumped up trial that was void

10   because of lack of jurisdiction.  So they can't do anything

11   anyway.  That's why they need to bring the adversary against

12   third parties that claim an interest.

13         THE COURT:  Mr. Myers, you have about a minute left.

14   How much time do you need to wrap up?

15         MR. MYERS:  Maybe five to ten minutes.  Thank you.

16   Okay.

17         THE COURT:  Well, I will give you ten minutes.

18         MR. MYERS:  Okay.  Thank you.  So matters that are

19   outside this Court's jurisdiction.  So this case left this

20   Court's jurisdiction.  It's never been removed and brought

21   back here.  The case law is clear that you have no

22   jurisdiction once it's removed for any matters, any issues,

23   any adversary proceedings dealing with anything to do with the

24   case that was remanded back to the Court.  Okay?  I can read

25   you the AI legal if you'd like.

escribers

www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1          But so that being the case, you have a situation

2      where you have Serv Trust, a nondebtor, nonparty,

3      nonparticipant in this case, never filed a proof of claim in

4      this case.  You have no jurisdiction over Serv Trust.  So

5      under Stern v. Marshall, and under Wellness International

6      Network v. Sharif, Seventh Circuit 2015, you have no

7      jurisdiction to determine any of these claims.  The best you

8      could do -- and you shouldn't even do that, in my opinion,

9      but -- would be make recommendations -- findings of fact and

10     recommendations which would have to go to an Article III

11     judge.

12          THE COURT:  What claims do you think I'm being asked

13     to determine?  I'm not being asked to determine any claims.

14     I'm being asked to approve a settlement.  It's an entirely

15     different --

16          MR. MYERS:  Okay.  I don't want to argue with you.

17     If you read Wellness International, it deals with an alter ego

18     claim of a trust.

19          THE COURT:  I'm not being asked to determine an alter

20     ego claim.  I'm being asked to approve a settlement.

21          MR. MYERS:  And you can't when it involves nonestate

22     property.  That's what Wellness says best.  You have no

23     jurisdiction.  You're in Article I judge.  If somebody wants

24     to determine rights, or to transfer rights in property that he

25     doesn't have, but if they want to do anything with a

escribers
www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    nondebtor, nonestate property, then that's an Article III

2    judge.  That's not this Court.  This Court has no jurisdiction

3    over nonestate property.  That was Judge Schneider.  Point

4    blank.  If it's nonestate property, or it's exempt property,

5    but if it's nonestate property, he says I have no jurisdiction

6    to determine rights in it.

7           THE COURT:  Well, doesn't he have -- doesn't, at the

8    very least, even assuming what you're saying is true, that the

9    Chapter 7 trustee doesn't have the rights of Sun Trust,

10   doesn't he have.

11          MR. MYERS:  Serv Trust, you mean?

12          THE COURT:  I'm sorry, Serv Trust.

13          MR. MYERS:  Yeah.

14          THE COURT:  Doesn't he have your rights?  He's the

15   Chapter 7 trustee of your estate.  So whatever rights and

16   interests you had, as of the bankruptcy filing, he can settle

17   those rights and transfer those rights.  And he has --

18          MR. MYERS:  The --

19          THE COURT:  And why would the Court not have

20   jurisdiction over that?

21          MR. MYERS:  There's been no determination that Serv

22   Trust is my alter ego.

23          THE COURT:  Well, there has been a determination.

24   You disagree with it.  You don't want to abide by it.  But

25   that aside, why do I need a determination that there's been --

escribers

www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    I approve settlements all the time.

2          MR. MYERS:  Okay.  Well, then you're doing it wrong.

3          THE COURT:  Well, thank you for telling me that.

4          MR. MYERS:  Okay?  If you're approving settlements of

5    nonestate property, then that's a big problem.

6          THE COURT:  I told you, I'm approving settlements of

7    the estate's rights and interests.  I am entitled to do that.

8          MR. MYERS:  Okay.

9          THE COURT:  I don't have to define what those rights

10   and interests are.

11         MR. MYERS:  You --

12         THE COURT:  I only have to say whatever rights and

13   interests the estate may have you are authorized to settle

14   them.  That's all.

15         MR. MYERS:  No, ma'am.

16         THE COURT:  Okay.

17         MR. MYERS:  No, ma'am.

18         THE COURT:  All right.

19         MR. MYERS:  You cannot -- you cannot, as a Article I

20   judge, in a bankruptcy court, approve a settlement agreement

21   before you've even been convinced that there's property of the

22   estate.   If you --

23         THE COURT:  Who said I haven't been convinced that

24   there's property of the estate?

25         MR. MYERS:  Well, you --


www.escribers.net | 800-257-0885

Appellees' Appendix 0584

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1        THE COURT:  Now you're saying something entirely new.

2        MR. MYERS:  Well, you have to make that

3   determination.

4        THE COURT:  I --

5        MR. MYERS:  That's part of what you have to do.

6        THE COURT:  I don't disagree with that, but I don't

7   have to define what the estate's rights and interests are.

8   All I have to say is, to the extent the estate has any rights

9   and interests, I am authorizing you to settle.  That's all I

10   have to do.

11        MR. MYERS:  But you do have to determine if --

12   whatever rights and interest that Serv Trust property,

13   whatever he wants to define it as, you have to say, how did

14   Serv Trust property get into this bankruptcy estate?

15        THE COURT:  Well, why do I even have to say Serv

16   Trust property came into the estate?

17        MR. MYERS:  Well, how can he transfer Serv Trust

18   property if it never came into the estate?

19        THE COURT:  My understanding is he's asking for

20   authority to transfer the estate's interest, whatever it may

21   be.

22        MR. MYERS:  Well, it never came into the estate.  So

23   the estate has no interest because the Montgomery County

24   Circuit Court said I'm not making an adjudication.  This is

25   not final.

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1          THE COURT:  You mean the Court entered the judgment

2     that says I'm entering a judgment in favor of the King

3     parties, that court?

4          MR. MYERS:  The same court that says I'm not entering

5     an adjudication.  And you know, if you don't want to believe

6     him, maybe the Maryland Court of Appeals, and Mr. VerStandig,

7     who filed his motion there, and who the trustee joins.  And

8     they all say there's no adjudication.

9          Serv Trust property is not property to the estate,

10    period.  Zero.  Zero.  So whatever, if he wants to even look

11    at it, he can't do it because, as a Chapter 7 trustee, he

12    can't touch nonestate property.  It's a breach of his

13    fiduciary duty.  And it constitutes fraud for him to try and

14    transfer nonestate property to anybody, whoever the other

15    party is in his bogus 9019, and then take 150 grand.  He can't

16    go out and transfer other people's property in exchange for

17    money.

18         THE COURT:  Okay.  You have about four minutes.

19         MR. MYERS:  So this is a noncore matter.  This is not

20    a core matter.  Serv Trust's property is not part of the

21    estate.  So you have Stern v. Marshall, 131 S. Ct. 2594.  You

22    have Wellness International Network v. Sharif, Seventh Circuit

23    2015.  You have Executive Benefits v. Arkison, 134 S. Ct.

24    2165.

25         This is a noncore matter.  And the Supreme Court has

escribers
www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    said you can't determine rights in Serv Trust's property.    And

2    there is a pending counterclaim.    The judge that -- again,

3    there's been no final determination on anything against

4    anybody until he finally enters a final order.    What he's

5    going to find out is, when everybody comes back, he's going to

6    find out that the King parties didn't tell him, oh, judge, we

7    didn't file because Serv Trust wasn't even there.    Serv Trust

8    got sandbagged.    They weren't at the trial either.    There was

9    nobody at the trial other than Mastro and VerStandig.    You

10   think there was any truth there?    No.    So he didn't tell the

11   judge, oh, hey, judge, they filed a counterclaim and we didn't

12   file an answer, therefore, all of their allegations and their

13   counterclaim are admitted for purposes of this trial.    So

14   that's going to come out.

15        THE COURT:    For purposes of what trial?

16        MR. MYERS:    Purposes of when he brought up the

17   counterclaim.    He said, oh, I want to get rid of the

18   counterclaim.    And he didn't bother to tell the court, well,

19   we didn't file an answer.    It's not even an issue.    That's a

20   jury trial.

21        THE COURT:    You have about two minutes.

22        MR. MYERS:    Okay.    On the issue of case being

23   remanded, citation, Petrarca v. Things Remembered (sic),

24   Supreme Court case.    Stern claimed unlawful attempt to augment

25   the bankruptcy estate through a suit, asserting a claim under

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   nonbankruptcy law.  That's exactly what's happening here.

2          He asked the King parties.  Mr. VerStandig

3   testified -- or is in the court record here saying that

4   Schlossberg asked him.  I did file a motion to disqualify the

5   trustee, Mr. VerStandig, and Mr. Mastro.  I attached and

6   incorporated all the relevant time sheets and everything where

7   he was fully involved in this project.  There is no way he can

8   be on the other side of the table with me.  And because

9   Schlossberg asked him to do it for him, he's now part of the

10  pack and fruit of the poisonous tree.  So they're all gone.

11  It's all conflict of interest.

12         THE COURT:  And when did you file that motion?

13         MR. MYERS:  I filed it in the break.

14         THE COURT:  Okay.  So you filed that --

15         MR. SCHLOSSBERG:  I --

16         THE COURT:  -- this afternoon?

17         MR. SCHLOSSBERG:  I wasn't aware that I had a

18  motion --

19         MR. MYERS:  It's not for now.  I'm telling you, you

20  wouldn't let me do it, so I filed a motion.

21         MR. SCHLOSSBERG:  But you're arguing it now to the

22  judge.

23         THE COURT:  I wouldn't let you do what?

24         MR. MYERS:  You wouldn't let me talk about the time

25  sheets and whatever.  So now I'm just advising you that I

escribers

www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    filed a motion to disqualify the trustee, VerStandig, and

2    Mastro.  And in there is eighty-three pages of time sheets,

3    with Mr. VerStandig's name all over it, with 6789 Goldsboro,

4    with Serv Trust, et cetera.  It's not for today.

5          THE COURT:  Not for today.  And you have about thirty

6    seconds left.

7          MR. MYERS:  This Court's jurisdiction is in rem.

8    Serv Trust's property is not property of the estate.

9    Therefore, this Court cannot determine rights in it.  The

10   Court has an obligation to determine its jurisdiction first --

11   no court can enter an order retroactive eight years.  Case,

12   Supreme Court Asavito (ph.), nunc pro tunc order.  It never

13   happened.  Okay?  As the Supreme Court said, we're not dealing

14   with Orwellian things.  It never happened.  So there's no

15   determination --

16         THE COURT:  What nunc pro tunc order are you

17   referring to?

18         MR. MYERS:  A state court can't enter an order that

19   says that Serv Trust property was property of my estate eight

20   years ago.

21         THE COURT:  It can't make a determination --

22         MR. MYERS:  Retroactive?  No.

23         THE COURT:  -- of rights as of a particular date?

24         MR. MYERS:  Not eight years ago, no, ma'am.

25   Prospective, or as of that date.



Appellees' Appendix 0589

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1          THE COURT:  And what case law do you have for that?

2          MR. MYERS:  Maryland case law.

3          THE COURT:  Give it to me.

4          MR. MYERS:  I don't have it.  I mean, I have an AI

5    cite.

6          THE COURT:  Okay.

7          MR. MYERS:  It can't be retroactive.

8          THE COURT:  Okay.

9          MR. MYERS:  It can't be nunc pro tunc.  And I gave

10   you the cite for nunc pro tunc as --

11         THE COURT:  But it didn't --

12         MR. MYERS:  -- I'm sure you're aware.

13         THE COURT:  Nunc pro tunc is when you make an order

14   effective retroactively.  That's not what Montgomery County

15   Circuit Court did.

16         MR. MYERS:  I --

17         THE COURT:  What they said was they determined, as of

18   a particular date, what your rights were.  That's what the

19   court determined.

20         MR. MYERS:  Okay.  Well, let me just add this

21   comment.  The court didn't determine anything yet.  And Mr.

22   VerStandig is the one who drafted the order.  And it says "as

23   of", okay?  That's never going to work.  You can't do a

24   retroactive eight years for property rights.  And in any

25   event, that Court is also bound by Judge Lipp's ruling.  So --

escribers
www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1         THE COURT:  All right.  Let's wrap it up.

2         MR. MYERS:  -- you can't enter a 9019 order on the

3    rights of nonparties, beneficiaries of the trust.  They're not

4    here indispensable parties.

5         And on top of everything, I will mention that Judge

6    Delano said no claims can go forward against me.  They ignored

7    that.  They went forward.  So now VerStandig is in violation

8    of the stay, the King parties, the trustee, Mastro, they all

9    just blew apart that order that says you can't go forward.  So

10   everything that was done after that is void.

11        And this is from Judge Gunn.  You can't use a prior

12   stay violation to support future actions, as those future

13   actions would likewise be void, which is to say, when they

14   violated the stay in the Montgomery County Circuit Court,

15   everything they've done since then, according to the case law

16   cited in one of Judge Gunn's opinions, is absolutely void.

17   They cannot violate the stay and then build on it and come in

18   here.  Thank you, Your Honor.

19        MR. SCHLOSSBERG:  Your Honor, I'd like to know what

20   which decision of Judge Gunn he just cited.  Is it the one

21   where you --

22        THE COURT:  Mr. Myers?

23        MR. SCHLOSSBERG:  -- were barred from refiling --

24        THE COURT:  Mr. Myers, do you have a cite for Judge

25   Gunn's decision?

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1        MR. MYERS:  It wasn't in my case, and I can get her

2    order where she says that.

3        THE COURT:  All right.  So I --

4        MR. MYERS:  But I assume that you are aware of that.

5        THE COURT:  I --

6        MR. MYERS:  But I'll give you the cite and the cases.

7        THE COURT:  If you're going to cite a case, you

8    should give the citation for it.

9        MR. MYERS:  Okay.

10       THE COURT:  Because unfortunately, what happens too

11   often is people come into this court and they cite cases for

12   things that they don't say.

13       MR. MYERS:  Okay.  Let me give it to you.

14       THE COURT:  I don't need a case cite to tell me that

15   an action taken in violation of the automatic stay is void ab

16   initio.  I don't need that.

17       MR. MYERS:  That's not the point I'm making.

18       THE COURT:  But if you want to cite to a case, I'm

19   happy to take the citation and read the case.

20       MR. MYERS:  Yeah.

21       THE COURT:  So I'm going to hear from the other side

22   now.

23       MR. MYERS:  Okay.  But just to clarify what you said,

24   that wasn't my point.  My point was, of course, if you violate

25   the stay, the action is void ab initio.  Her point is, if you

escribers

www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    violate the stay, everything you do after --

2            THE COURT:  Is void ab initio.

3            MR. MYERS:  Yes.  Build upon that.  Well --

4            THE COURT:  Okay.  Okay.

5            MR. MYERS:  It's a different concept.

6            THE COURT:  All right.

7            MR. MYERS:  Thank you.

8            THE COURT:  So the Court gave you significantly more

9    time than what I had said.

10           Mr. VerStandig, I expect you to keep this brief.

11           MR. VERSTANDIG:  Yes, Your Honor.  Let me start with

12   a couple of factual points that came up.  The Court does have

13   in evidence that the alter ego ruling in Florida -- sorry --

14   the alter ego order in Maryland came after the Florida case

15   was filed.  And the very easy way that's in evidence is

16   there's been extensive discussion -- and I'm not talking about

17   closing; I'm talking about Mr. Myers' testimony -- of the fact

18   that there was a remand from the Florida bankruptcy Court.

19           THE COURT:  And what Mr. Myers has said is that the

20   remand is not effective because it was not certified.

21           MR. VERSTANDIG:  Your Honor, I can't speak to that

22   theory, which is one that has not been previously introduced.

23   I am going to have a response to that, in a more macroscopic

24   fashion, in a moment, with a citation.  But certainly the

25   alter ego order came after the Florida petition.  So if the

escribers
www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   question is whether my clients could have filed proofs of

2   claim, premised upon an alter ego order that did not yet

3   exist, as part of Mr. Myers' 13, they most certainly could not

4   have.

5        MR. MYERS:  I don't understand what you just said.

6   Am I allowed to ask?

7        THE COURT:  No, you're not.

8        Go ahead, Mr. VerStandig.

9        MR. MYERS:  Do you understand what he just said?

10        THE COURT:  I understand exactly what he said.

11        MR. VERSTANDIG:  Your Honor, the second point -- and

12   I think the Court got it, based upon the questions -- the

13   Montgomery County order is a final order.  There is Count 1,

14   which was disposed of by the stipulation of dismissal that's

15   in evidence.  There's Count 2, which was disposed of by Judge

16   Lease's order, which is in evidence.  And then there's the

17   counterclaim, which is disposed of by Judge Lease's order.

18        THE COURT:  Well, Mr. Myers is saying there are two

19   other counts.  I thought there was Count 1, Count 2 and a

20   counterclaim.  Count 1 was dismissed.  Count 2 is the subject

21   of Judge Lease's order.  And the counterclaim was disposed of

22   in Judge Lease's order.  So what else is there?

23        MR. VERSTANDIG:  Yes, Your Honor.  And this goes to

24   two points that Mr. Myers made that I believe are slightly

25   misleading.  Mr. Myers testified -- and I want to lean on the

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    record and what's in the record -- that the Montgomery County

2    case that we keep talking about was -- and I'm quoting his

3    testimony here -- administratively consolidated --

4            MR. MYERS:  I didn't testify to that today.  I

5    object.  I never said that.

6            THE COURT:  That is exactly what his testimony was.

7    Thank you.

8            MR. MYERS:  I said it was consolidated for all

9    purposes.  And Mr. VerStandig is all over the record --

10           THE COURT:  All right.  Please stop.  You had your

11   chance.

12           MR. MYERS:  Well, he's misstating --

13           THE COURT:  Just stop.  Stop.

14           Mr. VerStandig, please continue.

15           MR. VERSTANDIG:  Your Honor, if you look at some of

16   the Montgomery County items in the docket, you'll see a split

17   caption.  That is a reference to the administratively

18   consolidated case which is the action brought by 6789

19   Goldsboro against Mr. Myers.  There is no dispute that that

20   case, meaning the Goldsboro case against Mr. Myers, is not

21   concluded.  But under Maryland law an administrative

22   consolidation does not preclude entry of a final order, in one

23   of the two or more cases that are consolidated, once all

24   matters therein are finally adjudicated.

25           Now, Mr. Myers has also pointed to the fact that



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    there was this appeal, and he has accurately pointed out that

2    the King parties, through my counsel, represented to the

3    Maryland Appellate Court that it was not a final order.  And

4    the time space continuum is significant here.

5              At the time that representation was made, the

6    stipulation of dismissal disposing of Count 1 had not yet been

7    docketed in Montgomery County.  So at the time, the alter ego

8    order was not a final order.  It later became a final order.

9    It became a final order on May 7th, 2024.  That date is

10   significant because any appeals running therefrom would be

11   measured from that date.  Certain reconsideration deadlines

12   would be measured from that date.  I want to be careful to not

13   go beyond what's in the record before you.

14             But suffice it to posit, we are standing here more

15   than a year later, and if Mr. Myers is making references to an

16   appeal he recently filed, just as an untimely appeal does not

17   vest jurisdiction in the federal court system, an untimely

18   appeal does not create an appellate question in the Maryland

19   state court system.

20             In terms of what to do about the Montgomery County

21   ruling -- and this goes to what I said a moment ago about

22   having a more global answer and whether or not there is some

23   hair technical violation of a provision of Title 28 that,

24   honestly, I'm not familiar with.  The answer is, and I say

25   this quite respectfully, I don't believe you can make that

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    decision.  And here is why.

2              Under Article IV, Section 1 of the U.S. Constitution,

3    this Court is to afford full faith and credit to the orders

4    and judgments of the state courts of the United States.  Now,

5    there is case law that speaks to those as being final orders.

6    As I just laid out, the alter ego order is a final order, and

7    it has been a final order for more than a year.  Mr. Myers

8    cannot collaterally attack, in this court, whether there was

9    some jurisdictional defect in the Maryland state court

10   litigation.

11             And even though there's this familiar credence in the

12   legal profession that you can raise subject matter

13   jurisdiction at any time, including the famous apocryphal

14   story involving after a Supreme Court has taken a case under

15   advisement, there is no support for the proposition that you

16   can raise subject matter jurisdiction or any other jurisnal --

17   jurisdictional -- I apologize; it's been a long day -- defect

18   once a case has a final order that is beyond any appellate

19   deadline.

20             This Court cannot review the veracity or integrity of

21   any circuit court's order.  Among other reasons, this Court

22   also doesn't sit as an appellate court over the Montgomery

23   County Circuit Court.  And under Article IV, Section 1, this

24   Court must give full faith and credit to the alter ego order

25   out of the Montgomery County Circuit Court.

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1        MR. MYERS:  Your Honor, I'm going to object.

2        THE COURT:  No, no, no, no.  This is closing

3    arguments.  You don't get to object.

4        MR. MYERS:  Well, he's --

5        THE COURT:  Sit down.

6        MR. MYERS:  He's lying.

7        THE COURT:  Sit down.

8        MR. MYERS:  There is no final judgement.  He can't --

9        THE COURT:  Sit down.  I heard your argument for an

10   hour and fifteen minutes.

11       MR. MYERS:  Well --

12       THE COURT:  I heard you say it numerous times.

13       MR. MYERS:  -- the Fourth Circuit --

14       THE COURT:  Go ahead, Mr. VerStandig.

15       MR. VERSTANDIG:  Thank you.  Your Honor, and this is

16   the thing that I started to mention in Mr. Myers' argument.  I

17   should have reserved and waited till now.  I do just want to

18   point out, from a formalistic point of view, what Mr. Myers

19   puts on the docket, after the close of evidence in this case,

20   does not make it a part of the record.

21       Since there is going to be contemporaneous date marks

22   on the record, meaning something docketed today, and the fact

23   that a trial was had today, I want the record to be very clear

24   that the transcript he docketed during the break was docketed

25   after the close of evidence and is not a part of what is

escribers
www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   before you for consideration at the moment.

2          THE COURT:  That's correct.  It was docketed after

3   the close of evidence, and the Court's not going to look at

4   it.

5          MR. VERSTANDIG:  Your Honor, I will talk about Kiviti

6   v. Bhatt.  Mr. Myers is correct.  That is a case I argued in

7   the Fourth Circuit.  Kiviti v. Bhatt does not, however, stand

8   for the proposition Mr. Myers asserted.  In fact, it stands

9   for the exact opposite proposition.  Kiviti is a strange case.

10  It's a bankruptcy that came out of the Eastern District of

11  Virginia, where there was a two-count adversary proceeding in

12  front of Judge Kindred.

13         Count 1 of the adversary proceeding was to fix and

14  determine a debt that the debtor owed on account of violating

15  Washington, D.C.'s contracting laws.  Count 2 was to establish

16  that that debt was nondischargeable under 523 -- Your Honor,

17  it's either (a)(2) or (a)(6); and I'll be honest, my

18  recollection is not as sharp as it could be.

19         Judge Kindred granted a motion to dismiss the

20  nondischargeability count, but maintained the cause of action

21  to fix and determine the debt.  And what happened in that case

22  is, since the debtor had been granted a discharge, the

23  debtor's counsel and myself saw no utility in litigating over

24  the size of a debt that had been deemed dischargeable.  So we

25  stipulated to dismiss the remaining cause of action, we took

escribers
www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    an appeal to the district court, and the district court

2    affirmed Judge Kindred.

3            We then took an appeal to the Fourth Circuit.  The

4    Fourth Circuit has a doctrine that says you're not allowed to

5    manufacture finality for purposes of creating appellate

6    jurisdiction unless your case is -- and this is a quote --

7    "dead as a doornail", meaning there must be nothing you can

8    recover.

9            The Fourth Circuit has said that, if you lose your

10   motion for class certification, but the lead plaintiff still

11   has a claim for five dollars, that's something you can still

12   litigate.  But if there is a trial court order that decimates

13   any potential cognizable recovery of the remaining causes of

14   action, then you may stipulate to dismiss and take your

15   appeal.

16           In Kiviti, what the Fourth Circuit ruled -- and this

17   is interesting and a little bit harrowing -- is that even

18   though Judge Kindred's order rendered the case moot, it

19   doesn't matter because -- wait for it -- mootness is an

20   Article III doctrine arising under the case or controversy

21   provision of the Constitution, and bankruptcy courts are

22   Article I courts, and thus bankruptcy courts may hear moot

23   matters or offer advisory opinions.

24           It is a weird ruling.  But here's the interesting

25   part about the ruling that matters more for today.  Nothing in

Appellees' Appendix 0600

1    Kiviti said we couldn't stipulate to dismiss and make it a

2    final order.  Nothing in Kiviti questioned that it became a

3    final order when we stipulated to dismiss.  The holding in

4    Kiviti, and the whole controversy in Kiviti was whether or

5    not, by doing that, we waived the ability to appeal the final

6    order.

7             Everyone agreed that it was a final order once we

8    entered into the stip of dismissal, the Fourth Circuit, my

9    opposing counsel, and myself.  What Kiviti says is, because we

10   manufactured the finality, we are not to be rewarded with the

11   ability to take an appeal therefrom, since bankruptcy courts

12   can hear moot issues and thus we didn't need to manufacture

13   finality.

14            Applying that to what we have in Montgomery County,

15   there are two possibilities.  One, if you were to strictly

16   apply Kiviti, is that since Mr. Schlossberg, as the agent of

17   Serv Trust, and I stipulated to dismiss the remaining cause of

18   action, finality was manufactured, and it's not properly

19   reviewable on appeal.

20            I will tell you, that's not a position I would take.

21   I don't think the Maryland appellate system is bound by

22   Kiviti.  I think Kiviti is a bad decision.  I lost Kiviti.

23   I'll be very honest about that.  But that's also not a

24   position anyone ever had to take because no timely appeal was

25   filed.  Kiviti doesn't go to whether or not it's a final

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    order.  Kiviti goes to how the appeal flows if the final order

2    is arrived at by stipulating to dismissal.  And that is a

3    critical, critical distinction from what Mr. Myers represented

4    to the Court.

5         MR. MYERS:  He's misstating the case.

6         THE COURT:  Mr. Myers, stop.

7         MR. VERSTANDIG:  Your Honor, I trust the Court's

8    going to review Kiviti, if for no other reason than so you now

9    know that you have the right to issue advisory opinions, which

10   is a pretty cool trick in this circuit.

11        THE COURT:  Which no judge, I would imagine, would

12   embrace.  But --

13        MR. VERSTANDIG:  I appreciate that.  But yes, Your

14   Honor, I --

15        THE COURT:  All right.  So --

16        MR. VERSTANDIG:  I'm sorry.  I have three more

17   points, but I don't mean to interrupt you.

18        THE COURT:  Okay.  No, go ahead.

19        MR. VERSTANDIG:  Whatever question you have, I'm

20   happy to answer.

21        THE COURT:  Go ahead.

22        MR. VERSTANDIG:  Okay.  Your Honor, Mr. Myers

23   indicated that it's not a core proceeding.  I think a 9019 is

24   core under 157(b)(2), because it necessarily goes to the

25   administration of the debtor's estate.  There was --

escribers
www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1        MR. MYERS:  Not true, Your Honor.

2        MR. VERSTANDIG:  There was a good bit of back and

3   forth about whether or not a trustee can sell an estate's

4   interest, if the estate's interest is in question or

5   potentially even nonexistent.

6        And what I would anecdotally point to is, I know that

7   at least with Cheryl Rose -- I can't speak to other trustees,

8   including Mr. Schlossberg -- the going rate for a sale of an

9   estate's noninterest is 3,000 dollars.  And this frequently

10  happens where there is a pre-petition foreclosure that the

11  debtor fervently objects to, and where a creditor, who has bid

12  in the asset, or a third party who acquired it at auction,

13  wishes to have an order from a bankruptcy court making clear

14  that any interest, if at all, is being transferred.

15       And 3,000 dollars is the going rate, at least with

16  Ms. Rose -- I don't want to impute that to other trustees --

17  in this Court for those orders, which again, is not in

18  evidence, but it goes to the larger point, which is the Court

19  can bless a sale of the estate's interest, to the extent it

20  exists, if at all, expressly understanding that sometimes "if

21  at all" is critical verbiage.

22       THE COURT:  And so Mr. VerStandig, are the King

23  parties asking the Court to determine that Sun Trust's (sic)

24  assets and liabilities are assets and liabilities of Mr.

25  Myers' bankruptcy estate, or are the trustee and the King

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    parties asking the Court to approve a settlement of whatever

2    the estate's interests may be?

3          MR. VERSTANDIG:  Your Honor, the latter, because of

4    the abstention order that Mr. Myers keeps coming back to.

5    This Court ruled that we had to go to the Montgomery County

6    Circuit Court to determine whether or not Serv Trust was Mr.

7    Myers' alter ego.

8          THE COURT:  Right, but that's not the issue before

9    the Court today.

10          MR. VERSTANDIG:  Right.

11          THE COURT:  So --

12          MR. VERSTANDIG:  I'm not asking you to pass judgment

13    on that.

14          THE COURT:  So the issue of whether Mr. Myers is the

15    alter ego of Sun Trust, that is --

16          MR. VERSTANDIG:  Serv Trust.

17          THE COURT:  I'm sorry, Serv Trust, that is what was

18    the subject of the Court's abstention order.  But that's not

19    what the Court's being asked to do today.  The Court's being

20    asked to approve a settlement, which is different than the

21    issue that was sent to Montgomery County Circuit Court.

22          MR. VERSTANDIG:  Yes, Your Honor.

23          THE COURT:  So the abstention issue aside, exactly --

24    I want you to confirm whether you're asking the Court to

25    determine the estate's interest in Goldsboro.

1      MR. VERSTANDIG:  I am not asking the Court to
2   determine the estate's interest in Goldsboro.  And I'll do one
3   further.  With enormous respect, I don't believe you can make
4   that determination for the same full faith and credit reason I
5   spoke about a moment ago, because that determination has been
6   made by a state court and is beyond the point of appeal.  I
7   don't mean to question your powers.  105 can do wonderful
8   things.  And certainly, if you wish to go make that, I'm not
9   going to jump up and down.  But we're not asking you to make a
10  determination for which we've already spent the time and
11  effort of obtaining a final order in a sister court.

12      And then finally -- and I'm happy to answer any other
13  questions -- there is this suggestion that Judge Delano
14  reserved jurisdiction and didn't mean to send the case back to
15  Montgomery County.  There's extensive testimony about the fact
16  that it was removed on December 30th, 2022 and remanded before
17  9:17 a.m. on the first business day thereafter.

18      THE COURT:  Which was the first day of trial, I
19  believe.

20      MR. VERSTANDIG:  It was.  Trial was due to begin, I
21  think, either at 9:30 or 10; I don't remember which.  I think
22  the Court can infer the reason Mr. Myers and Serv Trust
23  weren't at trial is they didn't believe we'd be able to get a
24  remand in time.

25      But if the Court's looking at inferences to be

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1  reasonably drawn from evidence, it would seem that a judge

2  issuing a remand order, one or two business days after the

3  motion was filed, however many minutes before trial, assuredly

4  intended to remand the matter for trial.  I think any other

5  construction would be reductio ad absurdum.

6        Your Honor, if you have any questions, I'd be happy

7  to answer them.

8        THE COURT:  I don't have any questions.  Thank you.

9        MR. VERSTANDIG:  Thank you so much, and I appreciate

10  your consideration over the past two days.

11        THE COURT:  Thank you.

12        Mr. Mastro?  And I'm going to tell you to keep it

13  brief as well.

14        MR. MASTRO:  And I will keep it very brief, Your

15  Honor.  I think Mr. VerStandig covered a number of the points

16  that I would have been prepared to make.

17        I'll just point out that there was some suggestion by

18  Mr. Myers that the Chapter 7 trustee is the only party who

19  could bring the alter ego claim.  And that argument, if you

20  look at Debtor's Exhibit 9, was made in the Montgomery County

21  Court, and Judge Dwyer ruled against him and said that Mr.

22  VerStandig and his clients, they had the ability to bring the

23  alter ego claim, which they did, and they ended up getting a

24  judgment about it.  So --

25        MR. MYERS:  Objection.  That's not accurate.



Appellees' Appendix 0606

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1         THE COURT:  Stop.  Mr. Myers, do not interrupt.

2         MR. MASTRO:  The Court can --

3         THE COURT:  Do not interrupt.  Exhibit 9 is the

4    Redven (ph.) valuation.  What are you --

5         MR. MASTRO:  Oh, I'm sorry.  It's the Debtor's

6    Exhibit 9, the big long transcript.

7         THE COURT:  Oh, I see.

8         MR. MASTRO:  If Your Honor just reads the last few

9    pages of the opinion, you'll see that Mr. Myers lost on that

10   issue.  So --

11        THE COURT:  And tell me exactly what was his

12   argument.

13        MR. MASTRO:  I think he was making an argument before

14   that the Chapter 7 trustee was the only party who could bring

15   the alter ego claim in the state court.  And the judge ruled

16   against him.

17        THE COURT:  I see.  Thank you.

18        MR. MYERS:  That is incorrect.

19        MR. MASTRO:  And so --

20        THE COURT:  Mr. Myers, stop interrupting.

21        MR. MYERS:  He's lying.

22        THE COURT:  Stop it.  Stop it.  Stop it.

23        Mr. Mastro, continue.

24        MR. MASTRO:  And the only other thing I would

25   mention, just in terms of the trustee's business judgment, I

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   had alluded to this in my discussion before, and I never

2   really circled back to it, but I think it's appropriate now.

3   When we're talking about not only is the trustee getting the

4   benefit of the 150,000, the trustee is also getting the

5   benefit of the fact that Mr. VerStandig's clients have agreed

6   to cover the cost of any appeals here.

7           THE COURT:  Which would likely be costly.

8           MR. MASTRO:  Likely be very costly.  Mr. Schlossberg

9   testified, I think, Mr. Myers has taken over two dozen appeals

10  in this case alone, not to mention the myriad of other appeals

11  he and his wife have initiated in their I think it's more than

12  a half dozen other bankruptcy cases.  So there's a definite

13  dollar value to that that enures to the benefit of the estate,

14  as Mr. Schlossberg pointed out.  That 150-, that's not going

15  to be reduced by the value of any cost to prosecute the

16  appeal.  So --

17          THE COURT:  Understood.  Let me ask you the same

18  question --

19          MR. MASTRO:  Yeah.

20          THE COURT:  -- I asked Mr. VerStandig.  Are you

21  asking the Court to determine what the estate's interest in

22  Serv Trust and Goldsboro are?  Or are you asking the Court to

23  approve a settlement that includes a transfer of whatever the

24  estate's interest may be?

25          MR. MASTRO:  All of our right, title, and interest in



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    Serv Trust, whatever that may be, is what we are conveying to

2    Mr. VerStandig, as he accurately represented to the Court.

3    That is the substance of the settlement.

4              THE COURT:  Okay.  Anything else?

5              MR. MASTRO:  No, Your Honor.

6              MR. MYERS:  Your Honor, may I have thirty seconds?

7              THE COURT:  Mr. Myers, I'm going to give you thirty

8    seconds.  And it starts now.

9              MR. MYERS:  Okay.  That's --

10             THE COURT:  Only if you promise to sit down after

11   thirty seconds.

12             MR. MYERS:  Yeah.  Okay.  Thank you.  They're asking

13   this Court to sign an order that redeems the entirety of Serv

14   Trust's interest in Goldsboro.  This Court has no jurisdiction

15   over Serv Trust's property.  And you can't sign an order that

16   transfers Serv Trust's property to the King parties.  That

17   case is still in Montgomery County Circuit Court.  And here's

18   the decision in BAP Fourth Circuit --

19             THE COURT:  And your time is up.  Thank you, Mr.

20   Myers.  Take a seat.

21             MR. MYERS:  That's --

22             All right.  All right.  So this is what the Court is

23   going to do.

24             MR. MYERS:  That's unfortunate.

25             THE COURT:  The Court is going to take a little bit



GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    of time to review the exhibits, review the cases that have

2    been cited.  And the Court will give an oral ruling by video.

3            So let's talk about the scheduling of that.  I don't

4    want to mess up anybody's long weekend, but how about first

5    thing on Thursday morning, 10 a.m.?

6            MR. MASTRO:  I can do that.

7            MR. VERSTANDIG:  Your Honor, for clarity, July 3rd?

8            THE COURT:  July 3rd.

9            MR. VERSTANDIG:  That works.

10           MR. SCHLOSSBERG:  I can make that work, Your Honor.

11           MR. MYERS:  I have a hearing in Florida.

12           THE COURT:  What time is your hearing?

13           MR. MYERS:  It's -- I don't have it with me.  I don't

14    keep it, like, in my calendar.  Anytime the next -- when is

15    July 4th?  Monday?

16           THE COURT:  July 4th is Friday.

17           MR. MYERS:  Friday.

18           THE COURT:  July 3rd is Thursday.

19           MR. MYERS:  Can you do the following week?  I'll be

20    back.

21           MR. SCHLOSSBERG:  You don't have to be back.  We're

22    doing it virtually.

23           THE COURT:  We're doing it virtually, and there's

24    nothing for you to do other than sit and listen.  And I don't

25    anticipate it taking more than, I'd say, twenty to thirty

www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1   minutes at the very most.

2          MR. SCHLOSSBERG:  Your Honor, I will tell you that

3   Mr. Mastro and I can both make our calendars available

4   whatever time you choose on Thursday.

5          MR. VERSTANDIG:  Likewise, Your Honor.

6          THE COURT:  All right.  So --

7          MR. MYERS:  I would request after the 4th of July

8   weekend.

9          THE COURT:  Well, what time -- you don't know what

10  time your hearing is on Thursday?

11         MR. MYERS:  I don't.  And I'll be preparing.  And so

12  I would just ask any time after July 4th -- July 5th, 6th,

13  7th.

14         MR. MASTRO:  Your Honor, if he knows what court is

15  hearing is in, he can look it up on the public docket.

16         MR. MYERS:  I'll figure it out, Mr. Mastro.

17         THE COURT:  Yeah, let's do that.  What court is your

18  hearing in?

19         MR. MYERS:  I have a hearing down in Collier County

20  Circuit Court.  I have a hearing that was --

21         THE COURT:  I just need to know the time.

22         MR. MYERS:  I don't know the time, Your Honor.  I

23  don't have it with me.  I don't do it like that.  I don't --

24         THE COURT:  All right.  So Collier County Circuit

25  Court.  Mr. Mastro, are you able to access their docket online

escribers
www.escribers.net | 800-257-0885

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    so that you can determine the time of the hearing?

2            MR. SCHLOSSBERG:  Go out in the hall.

3            MR. MASTRO:  If I go out -- can I go out in the hall

4    and get a better reception?

5            THE COURT:  Yeah.  Let's take a five-minute recess.

6            MR. MYERS:  This is ridiculous.  Just do it on

7    Thursday then.  I don't care.

8            MR. SCHLOSSBERG:  Okay.  All right.  Well, then we'll

9    do it on Thursday.  Let's do it on Thursday.

10           MR. MYERS:  I mean, you guys are unagreeable to

11   everything.  You're trying to just --

12           THE COURT:  No, no, no.  Stop talking to them.  Talk

13   to me.

14           MR. MYERS:  Okay.  Well, I think it's -- I think

15   there's so much here.  We're on, what, Wednesday?

16           THE COURT:  No, today's Tuesday.

17           MR. MYERS:  Tuesday.  So there is so much here.

18   There are so many decisions.  There are so many questions that

19   I think that, for example, that they can dismiss a claim

20   without prejudice and create a final order.

21           THE COURT:  Mr. Myers, I'm ready to give my ruling

22   now.  I just want to be able to organize my thoughts in a way

23   that will make it easier for the appellate courts, that will

24   have to tackle whatever appeal gets filed from this.  So I

25   appreciate your concern for me, but I don't need longer than

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1    that.  I will be ready at 10 a.m.  If it's better for you, we

2    can start at 8 a.m. --

3              MR. MYERS:  No, 10 a.m. is fine.

4              THE COURT:  -- so that we can get it out of the way

5    early before your hearing so that you can focus on your

6    hearing.

7              MR. MYERS:  Okay.  10 a.m. on Thursday.

8              THE COURT:  Okay.  10 a.m. on Thursday, July the 3rd.

9              MR. MYERS:  So it sounds like you've already made a

10   ruling.

11             THE COURT:  Well, I have a pretty good idea where I

12   want to go with this.  And that should come as no surprise,

13   based on the fact that I kept trying to get you to refocus

14   your efforts on the issue before the Court, and instead, you

15   chose to spend two days on things that are either completely

16   irrelevant to the Court or nearly completely irrelevant to the

17   Court.

18             I tried to help you, Mr. Myers, refocus your efforts,

19   and you fought me at every turn.  And that's your decision.

20   And you will live with the consequences of those actions.

21             MR. MYERS:  So will everybody.

22             THE COURT:  All right.  The Court will issue a

23   hearing notice, and the Court will also email the parties with

24   information on how to log in for the virtual hearing.  Thank

25   you all for being here.  And thank you for your patience.

GREGORY B. MYERS; KING, ET AL. v. SCHLOSSBERG

1          MR. SCHLOSSBERG:   Thank you, Your Honor.

2          MR. VERSTANDIG:   Thank you, Your Honor.

3          MR. SCHLOSSBERG:   Thank you, Mr. Whitfield.

4          THE CLERK:   Court is now adjourned.

5      (Whereupon these proceedings were concluded)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Appellees' Appendix 0614

```
 1                         I N D E X

 2                                                          VOIR
       WITNESSES:              DIRECT  CROSS  REDIRECT  RECROSS  DIRE
 3     Debtor:
       Gregory Myers              6
 4

 5     EXHIBITS:     DESCRIPTION                   I.D.     EVID.
       Debtor:
 6     8            Judge Delano order            35
       7            Order                         38
 7     8            Order                         38
       9            Transcript                    59
 8

 9     CLOSING ARGUMENT:                          Pages
       Mr. VerStandig                             87-94
10     Mr. Mastro                                 94-106
       Mr. Myers                                  106-158
11     Mr. VerStandig (Rebuttal)                  158-171
       Mr. Mastro (Rebuttal)                      171-174
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

escribers
www.escribers.net | 800-257-0885

Appellees' Appendix 0615

1

2                                CERTIFICATION

3      I certify that the foregoing is a correct transcript from the

4      electronic sound recording of the proceedings in the above-

5      entitled matter.

6

7      *Sharona Shapiro*                        January 5, 2026

8      _____          _____

9      SHARONA SHAPIRO                          DATE

10     AAERT Certified Electronic Transcriber CET-492

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25